IN THE COURT OF COMMON PLEAS

OF CUYAHOGA COUNTY, OHIO

~~~~~~~~~~~~~~~~~~~~

VICTORIA D. JOHNSON,


Plaintiff,


vs.          Case No.  1:13CV-2012


UNIVERSITY HOSPITALS

PHYSICIAN SERVICES,


Defendant.

~~~~~~~~~~~~~~~~~~~~

Deposition of

VICTORIA DEBRA JOHNSON


March 14, 2014
10:22 a.m.

Taken at:
Giffen & Kaminski LLC
1300 East 9th Street, Suite 1600
Cleveland, OH  44114-1573


Christine M. Krause

1    APPEARANCES:

2

3         On behalf of the Plaintiff:

4              Herron Law Offices, by

5              MARK P. HERRON, ESQ.

6              75 Public Square, Suite 920

7              Cleveland, OH  44113

8              216-280-2828

9              herronlaw@msn.com

10

11        On behalf of the Defendant:

12             Giffen & Kaminski LLC, by

13             KERIN LYN KAMINSKI, ESQ.

14             DONALD C. BULEA, ESQ.

15             1300 East 9th Street, Suite 1600

16             Cleveland, OH  44114-1573

17             216-621-5161

18             kkaminski@thinkgk.com

19             dbulea@thinkgk.com

20                  ~ ~ ~ ~ ~

21

22

23

24

25

1                 TRANSCRIPT INDEX

2

3    APPEARANCES............................    2

4

5    INDEX OF EXHIBITS ...................... 4

6

7    EXAMINATION OF DEPONENT

8    BY MS. KAMINSKI.........................    8

9

10   REPORTER'S CERTIFICATE.................. 270

11

12   EXHIBIT CUSTODY

13   EXHIBITS RETAINED BY COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXHIBITS

2     NUMBER              DESCRIPTION            MARKED

3    Exhibit 1     Medicare Enrollment .......... 54
                   Application
4
     Exhibit 2     Physical Exam dated January .. 91
5                  25, 2012

6    Exhibit 3     Phone Message dated January .. 92
                   26, 2012
7
     Exhibit 4     Adult Sick Visit Form......... 92
8
     Exhibit 5     Phone Message dated February . 96
9                  14, 2012

10   Exhibit 6     Phone Message dated March 2, . 98
                   2012
11
     Exhibit 7     Phone Message dated March 8, . 101
12                 2012

13   Exhibit 8     Phone Message dated March .... 103
                   20, 2012
14
     Exhibit 9     Adult Sick Visit Form dated .. 104
15                 June 11, 2012

16   Exhibit 10    Adult Sick Visit Form dated .. 111
                   June 19, 2012
17
     Exhibit 11    Phone Message dated July 17, . 113
18                 2012

19   Exhibit 12    Phone Message dated July 26, . 114
                   2012
20
     Exhibit 13    FMLA Form dated July 26, ..... 115
21                 2013

22   Exhibit 14    Phone Message date August .... 121
                   10, 2012
23
     Exhibit 15    Geauga Medical Center Report . 124
24                 dated August 17, 2012

25

1   Exhibit 16   Ahuja Medical Center Report .. 125
               dated October 7, 2012
2
    Exhibit 17   E-mail Correspondence from ... 130
3                Bronxvikki

4   Exhibit 18   E-mail Correspondence dated .. 136
               March 19, 2012
5
    Exhibit 19   E-mail Correspondence from ... 139
6                Victoria Johnson

7   Exhibit 20   UH Performance Evaluation .... 146
               dated March 6, 2012
8
    Exhibit 21   E-mail Correspondence from ... 155
9                Sheryl Johnson

10  Exhibit 22   E-mail Correspondence from ... 160
               Victoria Johnson Regarding
11               Medication

12  Exhibit 23   E-mail Correspondence from ... 163
               Victoria Johnson
13
    Exhibit 24   E-mail Correspondence from ... 165
14               Victoria Johnson

15  Exhibit 25   E-mail Correspondence from ... 174
               Christina Morrison
16
    Exhibit 26   E-mail Correspondence from ... 175
17               Sheryl Johnson

18  Exhibit 27   E-mail from Carole Meisler ... 176
               dated July 17, 2012
19
    Exhibit 28   CGS Letter In Re: Joseph ..... 179
20               Stone, dated July 19, 2012

21  Exhibit 29   CGS Letter In Re: Angela ..... 183
               Capp, dated July 19, 2012
22
    Exhibit 30   E-mail correspondence from ... 185
23               Victoria Johnson

24  Exhibit 31   E-mail correspondence from ... 198
               Victoria Johnson
25

1   Exhibit 32    E-mail correspondence from ... 199
                  Carole Meisler dated July
2                 24, 2012

3   Exhibit 33    E-mail correspondence from ... 203
                  Victoria Johnson dated July
4                 24, 2012

5   Exhibit 34    E-mail correspondence from ... 207
                  Victoria Johnson dated July
6                 26, 2012

7   Exhibit 35    E-mail correspondence from ... 212
                  Victoria Johnson dated July
8                 27, 2012

9   Exhibit 36    E-mail correspondence from ... 222
                  Jill Fulton-Royer dated July
10                27, 2012

11  Exhibit 37    E-mail correspondence from ... 224
                  Jill Fulton-Royer dated July
12                27, 2012

13  Exhibit 38    Hand Delivered letter dated .. 227
                  July 23, 2012
14
    Exhibit 39    E-mail Correspondence from ... 232
15                Sheryl Johnson dated July
                  26, 2012
16
    Exhibit 40    E-mail Correspondence from ... 235
17                Christina Morrison dated
                  July 30, 2012
18
    Exhibit 41    Department of Health and ..... 238
19                Human Services Form dated
                  August 4, 2012
20
    Exhibit 42    HIPPA Complaint.............. 240
21
    Exhibit 43    Charge of Discrimination...... 244
22
    Exhibit 44    Excerpt, Integrity Manual..... 255
23
    Exhibit 45    CMS-8551..................... 257
24
    Exhibit 46    Letter From Christina ........ 259
25                Morrison dated July 26, 2012

```
 1   Exhibit 47    Letter From Victoria Johnson . 262
                   dated October 5, 2012
 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                VICTORIA DEBRA JOHNSON, of lawful
 2    age, called for examination, as provided by the
 3    Ohio Rules of Civil Procedure, being by me
 4    first duly sworn, as hereinafter certified,
 5    deposed and said as follows:
 6          EXAMINATION OF VICTORIA DEBRA JOHNSON
 7    BY MS. KAMINSKI:
 8          Q.    Would you state your full name for
 9    the record?
10          A.    Victoria D. Johnson.
11          Q.    What does the D stand for?
12          A.    Debra.
13          Q.    What is your current residential
14    address?
15          A.    3646 Lynnfield Road, Shaker Heights
16    Ohio, 44122.
17          Q.    How long have you lived there?
18          A.    Since 1999.
19          Q.    Do you reside with anybody else?
20          A.    No.
21          Q.    What did you do prior to the time
22    you went to work for University Hospital
23    Physician Services?
24          A.    I had some temp positions and I
25    also worked as a realtor.
```

1          Q.      What type of temp positions did you

2     have?

3          A.      Clerical.

4          Q.      Did you work out of one particular

5     temp agency?

6          A.      There were several.

7          Q.      Several?

8                  And when did you get your realtor's

9     license?

10         A.      In 2001.

11         Q.      And up until the time you went to

12    work for University Hospitals, did you ever

13    make your full living as a realtor?

14         A.      Yes, I did.

15         Q.      When was that?

16         A.      I believe that was in 2001 when I

17    got my license.  I worked for, yes, Realty One.

18         Q.      Other than in 2001 did you ever

19    make your full time living as a realtor?

20         A.      Yes, up until 2000 -- I guess right

21    before I started with UH.

22         Q.      What made you stop working full

23    time as a realtor and start working at UH?

24         A.      The market got pretty bad.

25         Q.      But for the bad market would you

1    have stayed as a full time realtor?

2           A.    Probably.

3           Q.    Did you ever stop selling real

4    estate while you worked at UH?

5           A.    Yes, there were some years.

6           Q.    Which years?

7           A.    I want to say I put my license in

8    escrow, I think, in 2008.

9           Q.    Until?

10          A.    Until, is it 2012?  I think to

11   2012.

12          Q.    So in 2012 you started selling real

13   estate again?

14          A.    Uh-huh.

15          Q.    Yes?  You just have to say yes out

16   lout for the reporter.

17          A.    Yes.

18          Q.    Do you remember what month of 2012

19   you started selling real estate again?

20          A.    No, I didn't.  It wasn't full time.

21   It was a transaction here or there.

22          Q.    And how did you get those

23   transactions to handle?

24          A.    Friends.

25          Q.    And who was the broker that you had

1   your license with?

2         A.     VS Realty.

3         Q.     VS Realty?

4         A.     Uh-huh.

5         Q.     Is that a yes?

6         A.     Yes.

7         Q.     And how many transactions would you

8    say you handled in 2012?

9         A.     Maybe one or two.  I don't quite

10   remember.

11        Q.     You would have handled those while

12   you were working at UH; is that correct?

13        A.     Correct.

14        Q.     In fact, you had some of the

15   information about those transactions sent to

16   you at work at UH; correct?

17        A.     That's possible.

18        Q.     What hours did you work for UH in

19   2012?  What were your work hours?

20        A.     From -- I want to say from six to

21   four and I was on off on Fridays.

22        Q.     So you did your real estate work

23   primarily in the evenings and on Friday,

24   Saturday and Sunday?

25        A.     Correct.

1          Q.    But there was some overlap, some

2     things you had to do during your work day;

3     correct?

4          A.    Right.  Yes.

5          Q.    Do you know how much you made from

6     your real estate business in 2012?

7          A.    No, I don't remember.

8          Q.    Now, besides your selling real

9     estate in 2012, you also own some properties

10    that you lease; is that correct?

11         A.    Correct.

12         Q.    And how many properties do you own?

13         A.    Two.

14         Q.    And how long have you owned them?

15         A.    I don't recall.  Well, the one

16    property is 1999, which is where I live.  And

17    the other one, I don't remember when I

18    purchased it.

19         Q.    After 1999?

20         A.    Yes.

21         Q.    Now, you rent those two properties

22    out; correct?

23         A.    Correct.

24         Q.    And you make money on a monthly

25    basis from those?

Page 13

1          A.     Well, they basically pay for
2     themselves.
3          Q.     You're not making money from them?
4          A.     Very little.
5          Q.     Okay.  When you first went to work
6     for UH, what did you do?
7          A.     I started out as a provider
8     enrollment clerk.
9          Q.     What was your job function?
10         A.     Filing, copying, I handled the out
11    of state Medicaid enrollment.
12         Q.     What did that entail, the out of
13    state Medicaid enrollment?
14         A.     It entailed enrolling the providers
15    in out of state Medicare.
16         Q.     Filling out forms?
17         A.     Medicaid, I'm sorry.  Medicaid.
18         Q.     Filling out forms?
19         A.     Correct.
20         Q.     How did you learn to fill out those
21    forms?
22         A.     With the assistance of some of the
23    co-workers.
24         Q.     Did you have any background in
25    Medicaid or Medicare when you came to UH?

1           A.    No.

2           Q.    Did you have any background in

3     reading regulations or any legal training?

4           A.    No.

5           Q.    When you came to UH?

6           A.    No.

7           Q.    Have you, since you went to UH,

8     have you taken any coursework in Medicare or

9     Medicaid?

10          A.    No.

11          Q.    Any coursework in regulatory

12    issues?

13          A.    No.

14          Q.    So basically on-the-job training?

15          A.    Correct.

16          Q.    At some point in time your job

17    changed at UH; is that correct?

18          A.    Correct.

19          Q.    When was that?

20          A.    I don't recall the exact date.  I

21    know that there was a supervisor who left and I

22    guess everybody got bumped up.  It may have

23    been in October, I'm not sure.  I think, maybe,

24    October.

25          Q.    October of 2011?

1        A.    Yes.

2        Q.    And how did your actual job

3   function change?

4        A.    Well, I started enrolling providers

5   in Medicare, Medicaid, BWC, other than out of

6   state.

7        Q.    And is that what you did as of

8   full-time is enroll Medicare and Medicaid for

9   providers?

10       A.    Yes, that was my primary function.

11       Q.    Did you have any other functions?

12       A.    I believe I still had out of state

13  Medicaid then it transitioned to each of the

14  provider enrollment reps doing their own.  That

15  was basically the bulk of it.

16       Q.    How did you learn the work of

17  enrolling Medicare or Medicaid, was that,

18  again, on-the-job training?

19       A.    Correct.

20       Q.    Now, while you were a clerk did you

21  do any billing work?

22       A.    I probably did.  There was some

23  tasks that were passed onto the clerk.

24       Q.    And what would those tasks have

25  been?

Page 16

1          A.    I don't recall.  I don't know that

2     there were some tasks that were passed onto me.

3          Q.    It wasn't a constant thing?

4          A.    No.

5          Q.    And in October of 2011 or whenever

6     it is that your job changed, thereafter did you

7     do any billing work?

8          A.    Well, the provider enrollment

9     department is responsible for billing.

10         Q.    But did you do any billing?

11         A.    I didn't do any actual billing, no.

12         Q.    So is it correct to say that when

13    your job changed you became what they call a

14    specialist?

15         A.    Correct.

16         Q.    Who in particular helped you learn

17    or gave you the on-the-job training when you

18    became a specialist?

19         A.    The other clerk.  Bianca Barnes.

20    Christine Sohn.  And that was pretty much it.

21    I didn't get much help from the supervisors.

22         Q.    Who was your first supervisor when

23    you became a specialist?

24         A.    Renee Cipriani.  Well, when I

25    became a specialist, I think she was there for

1    a while, it was because she was leaving that --

2          Q.    So a short time?

3          A.    Correct.

4          Q.    Who replaced Renee as your direct

5    supervisor?

6          A.    I would say that was Tori Cardaro.

7          Q.    How do you spell her last name; do

8    you know?

9          A.    C-A-R-D-A-R-O, Cardaro.

10         Q.    And after Cardaro?

11         A.    Tori left then Sheryl Johnson.

12         Q.    Now, did you have any particular

13   issues with Tori?

14         A.    No.

15         Q.    Did you have any personality issues

16   with Sheryl Johnson?

17         A.    No, not really.

18         Q.    Do you know who it is that Tori

19   reported to?

20         A.    Steve Riddle.

21         Q.    And how about Sheryl?

22         A.    Steve Riddle.

23         Q.    Did you have any issues with Steve

24   Riddle?

25         A.    Issues, I mean -- no.  There were

1    some things that I didn't agree with that he

2    didn't agree with, but --

3         Q.    You had some disagreements with

4    him?

5         A.    Right.

6         Q.    But they weren't personal?

7         A.    No.

8         Q.    You agree they weren't personal?  I

9    had a double-negative in there?

10        A.    Excuse me.

11        Q.    I had a double-negative.

12              You will agree with me --

13        A.    That they weren't personal, right.

14              MR. HERRON:  It's Friday, you are

15    allowed the occasional grammatical slipup.  We

16    won't hold it against you.

17              MS. KAMINSKI:  Thank you.

18        Q.    Did you have any difficulty with

19    your co-workers?

20        A.    No, not that I recall.

21        Q.    Now, in October, November and

22    December of 2011, did you have any particular

23    work issues that you recall?

24        A.    Not that I recall.

25        Q.    You were filling out the enrollment

1    forms and not having any issues; is that

2    correct?

3         A.    Correct.

4         Q.    And at the time when you were

5    filling out those enrollment forms were you

6    using your phone number on those enrollment

7    forms?

8         A.    That I don't remember.  I believe I

9    was.

10        Q.    In January of 2012 do you recall

11   having any particular issues at work?

12        A.    No issues.  I mean, not that I

13   recall.

14        Q.    In February of 2012, any issues?

15        A.    With the application?

16        Q.    With anything at work?

17        A.    In February?  Yes.

18        Q.    What was the issue in February?

19        A.    There was an issue in February

20   where I was sitting across from a co-worker and

21   a couple times I caught him fondling himself.

22        Q.    Now, had you sat across -- how long

23   had you sat across from him?

24        A.    Well, we moved I guess when -- I

25   think it was after Tori left they decided to

1    move the provider enrollment department.  I

2    mean, which meant the four of us from where we

3    were sitting over to where Sheryl Johnson was

4    sitting because Tori left and, I guess, Sheryl

5    wanted to keep a better eye on us.

6         Q.    When was that how long, had you sat

7    there?

8         A.    I think it started in January.  I'm

9    not exactly sure of the date.

10        Q.    But you had sat across from this

11    gentlemen for a while before the issues of him

12    fondling himself began?

13        A.    No.  I never sat across from him.

14    When we moved over to the area where Sheryl

15    sat, he asked if he could be next to me, across

16    from me.

17        Q.    Okay.  And how long after he moved

18    across from you did the fondling begin?

19        A.    I can't say exactly when it

20    started.  I know that I did witness him in

21    February.

22        Q.    And was it once, twice, three

23    times?

24        A.    A couple times.

25        Q.    Two times?

Page 21

1          A.    Yes, at least two times.

2          Q.    Would it have been more than two

3     times?

4          A.    Well, I know I caught him twice.

5     It could have possibly been more than two

6     times.

7          Q.    When you say you caught him, what

8     do you mean by you caught him?

9          A.    Well, I noticed him going like

10    (indicating) this with himself.

11         Q.    And he is at his desk?

12         A.    Yes.

13         Q.    Where is his desk in relationship

14    to yours?

15         A.    Directly across from me in a cube.

16    We all sat in cubes.

17         Q.    Now, you said that -- did he expose

18    himself?

19         A.    No.

20         Q.    When you say he was fondling

21    himself, what was he doing?

22         A.    He had his hand motioning down at

23    his private parts.

24         Q.    Did you say anything to him?

25         A.    Yes, I did.

1          Q.    The first time you saw it?

2          A.    I don't believe it was the first

3     time.  I think it was the second time that I

4     saw him.  I told him, I said, you need to stop

5     doing that.

6          Q.    What did he say?

7          A.    He didn't say anything.  He got up

8     and walked away.  I don't know where he went

9     after that.

10         Q.    And then did you report that?

11         A.    Yes, I did.

12         Q.    Who did you report that to?

13         A.    I believe I reported it -- I don't

14    know who I reported it to first.  I know I

15    reported to HR and to my manager.

16         Q.    So to Sheryl?

17         A.    Yes.

18         Q.    And who in HR?

19         A.    Christina Morrison.

20         Q.    And how long after the second time

21    where you told him to stop doing that did you

22    report it?

23         A.    I don't recall the amount of time,

24    but I know there was some time.

25         Q.    Days?

1          A.    Yes, days.

2          Q.    Weeks?

3          A.    I don't think it was more than

4     weeks.  I mean -- I don't think it was weeks.

5          Q.    And what made you decide to report

6     it days later?

7          A.    I almost want to say that I can't

8     remember exactly, but his hand was down -- I

9     can't say he did it again, but his hand was

10    down when I turned my chair.

11         Q.    How long was it between the first

12    time you saw him fondling himself and the

13    second?

14         A.    I don't recall.

15         Q.    And who is this that we are talking

16    about?

17         A.    Paul Williams.  I mean, Paul

18    Simmons.

19         Q.    Had you ever had any conversations

20    with Paul before the fondling incident?

21         A.    Yes.  I mean, it took a while,

22    while he was sitting across from me, but it

23    took a while for me to speak to him, but I

24    eventually started saying good morning.

25         Q.    Did you ever have any conversations

1    with him after you reported the fondling?

2          A.    No, I tried to avoid talking to

3    him.

4          Q.    And he didn't come up and try to

5    talk to you?

6          A.    I almost want to say he did.  I

7    remember coming into work one morning and I

8    don't think it was after I reported him, I

9    think it was after I told him to stop.  He came

10   in and said -- I didn't say anything to him, he

11   said, good morning, Victoria, as if I needed to

12   speak to him and he needed for me to respond to

13   his good morning.

14         Q.    Did you talk to any of your

15   co-workers about this incident?

16         A.    Yes.

17         Q.    Who did you talk to?

18         A.    The other reps in my department.

19         Q.    Who?

20         A.    Bianca Barnes and Christine.

21         Q.    Had they witnessed the same kind of

22   behavior?

23         A.    Well, I don't think they witnessed

24   the same behavior in talking to them.  I do

25   know that Bianca did mention that he did look

1    at her kind of odd.

2         Q.    When did you tell Bianca about this

3    behavior of Paul Simmons?

4         A.    I think it was probably at the

5    time, either when I told him to stop or maybe

6    days after.

7         Q.    At the same time you reported it to

8    Sheryl and Christina?

9         A.    That I'm not sure.

10        Q.    How about, is there anybody else

11   other than Sheryl, Christina and Bianca that

12   you would have talked to about it?

13        A.    I don't remember.  Oh, I did speak

14   to -- I spoke to Sheryl.  I think Sheryl said

15   she would talk to his supervisor.

16        Q.    Did Sheryl take it seriously?

17        A.    I would imagine.  I was hoping that

18   she did.

19        Q.    Pardon me?

20        A.    I was hoping that she did.

21        Q.    Did she say she would investigate

22   it?

23        A.    We had a meeting and I don't recall

24   the date of the meeting.

25        Q.    But did she say --

Page 26

1        A.    She said she would talk to

2   Christina they would contact his supervisor.

3        Q.    Were you asked if you wanted to --

4   would move your seat?

5        A.    Yes, I was.

6        Q.    And what did you say to that?

7        A.    I didn't want to move my seat.

8        Q.    Why was that?

9        A.    Well, for one, you know, we're

10  together as a provider enrollment team.  And I

11  felt that I was the one to not have to need to

12  move my seat.  I felt that he probably should

13  have moved his seat.

14       Q.    Is that ultimately what happened?

15       A.    Correct, yes.

16       Q.    How long after you made the report

17  was his seat moved?

18       A.    Almost, I can't say immediately,

19  but within days.

20       Q.    So they took action fairly quickly?

21       A.    Yes.  I think it was within a

22  couple -- there was some days until they made

23  their decision or until they had a meeting with

24  him, I took some time off.

25       Q.    So you took some time off after you

Page  27

 1   made the report?

 2        A.    I almost want to say yes.

 3        Q.    And then you came back to work once

 4   you knew they moved his seat?

 5        A.    Correct.

 6        Q.    Did you ever ask them to do

 7   anything other than move his seat?

 8        A.    No.  No, I don't recall asking them

 9   anything other than that.  I never asked him

10   to.  They suggested that -- suggested that I

11   move my seat.  I said no, so they suggested

12   that they move his seat.

13        Q.    Was that satisfactory to you that

14   they moved his seat?

15        A.    Not really.

16        Q.    Did you tell them it wasn't

17   satisfactory?

18        A.    I don't recall if I did or if I

19   didn't.  I honestly felt that I didn't want to

20   be in the same building.  I felt uncomfortable

21   being on the same floor.  They moved him to the

22   other side of the building, but then again I

23   know I was uncomfortable I would see him in the

24   hallway, see him in the elevator, see him in

25   the parking lot.

1   Q. Did he ever approach you after you

2 made the report?

3   A. No.

4   Q. Any inappropriate behavior by him

5 after the report?

6   A. No, I didn't witness anything after

7 that.

8   Q. In October, November and December

9 of 2011 were you having work performance

10 problems?

11   A. No, I don't recall any.

12   Q. You're not aware of any?

13   A. I don't recall any.

14   Q. In January did you have any work

15 performance issues?

16   A. I don't recall any.

17   Q. How about in February, any work

18 performance issues?

19   A. I don't recall any.

20   Q. Did anybody other than Christina,

21 any HR personnel, ever talk to you about your

22 report about the fondling?

23   A. You said Chris -- oh, did anyone?

24   Q. Right.

25   A. I can't --

Page 29

1          Q.    Anybody else from HR?

2          A.    I don't recall.  I think -- I don't

3     recall.  I don't recall.

4          Q.    Any other manager talk to you about

5     it?

6          A.    There was another manager and I

7     forgot her name.  She transferred over to, I

8     think, to another building, but I don't recall

9     her name.

10          Q.    Did any of your direct managers

11     indicate they were unhappy with you as a result

12     of that report?

13          A.    No, they didn't.

14          Q.    Okay.  So that's in February you

15     had reported that you had that issue at work.

16                In March did you have any issues at

17     work?

18          A.    I'm not sure if that's the same

19     month that I had a review.  It may have been.

20          Q.    And what was the issue about your

21     review?

22          A.    I had a review, performance review

23     and, you know, you discussed your weaknesses or

24     your successes and during -- right after the

25     review, I was presented with two corrective

1    actions.  Documents.

2              And the one, I can't remember

3    because I asked for a copy but I wasn't given a

4    copy of it.  But one was with regard to a

5    provider, it was Elizabeth Schuld.  And then

6    there was another one with another provider and

7    I forgot the provider's name kind of directed

8    that I was responsible for doing something that

9    I didn't do, which caused them to lose money.

10        Q.    What is it that was claimed that

11   you did?

12        A.    I almost want to say it had

13   something to do with an enrollment application,

14   I didn't process it in a timely manner, the

15   Medicare application.  I didn't process it in a

16   timely manner.

17        Q.    You say that isn't true?

18        A.    No.  I went back in, compared the

19   dates.  They never gave me a copy of the

20   corrective action, so I wrote down everything.

21   And I went back to my desk to verify what they

22   had on the corrective action and it didn't hold

23   any merit.  And I brought it to their

24   attention.

25        Q.    And who is it that had told you

1    about this corrective action?

2         A.    Steve Riddle was in the office and

3    Sheryl Johnson.

4         Q.    So after you went back to your desk

5    and looked at what the facts were did you

6    provide them with the facts that you learned?

7         A.    Yes, I did.  I can't say it was the

8    exact same day, it may have been the day after,

9    but I did provide them with facts.

10        Q.    And what did they say?

11        A.    That I don't remember.  I asked for

12   a copy.  I know at some point I asked for a

13   copy of it and they said they would have to

14   check with HR to see if they could give me a

15   copy.  I refused to sign it, I know that.  But

16   I do recall putting on the bottom that I

17   refused to sign and I needed to investigate

18   the -- I think, yeah.

19        Q.    Did they accept the facts --

20        A.    Yes.

21        Q.    -- once they told you the facts

22   were wrong?

23              They did?

24        A.    Uh-huh.

25        Q.    So they agreed with you that that

```
 1   had not -- that --

 2          A.     Yes.

 3          Q.     -- it was not your fault?

 4          A.     Yes.

 5          Q.     So they didn't hold steadfast that

 6   somehow or other you made a mistake; right?

 7          A.     Can you explain?

 8          Q.     They did not hold steadfast to the

 9   belief that you made a mistake, when presented

10   with the facts they said, yeah, you're right?

11          A.     Right.

12          Q.     All right.  Other than the two

13   issues that were brought to your attention

14   about provider enrollment that you got

15   corrected, did you have any other issues at

16   work in March?

17          A.     Not that I recall.

18          Q.     In April did you have any issues at

19   work, April of 2012?

20          A.     Not that I recall.

21          Q.     May, any issues at work?

22          A.     Not that I recall.

23          Q.     June, any issues at work?

24          A.     Yes.

25          Q.     What were the issues in June?
```

1           A.    In June, I almost want to say that

2      at -- there was a meeting where we discussed

3      the provider enrollment applications and we

4      were sitting there, and I believe this was in

5      June, we're sitting there and they were talking

6      about how we have to address the unbill report.

7      And how some of their applications were

8      returned denied because the provider could not

9      be reached directly.

10               And I almost want to say that this

11     was the meeting where, I think his name is

12     Jordan, were saying something to the effect

13     that -- one of the other reps said something to

14     the effect that we probably shouldn't be

15     completing these applications as we are.  And

16     he mentioned something about, yeah, we are all

17     going to be walking out of here with pink or

18     orange jailhouse jumpsuits.

19          Q.    What did that mean?

20          A.    That we're doing something that we

21     shouldn't be doing.

22          Q.    And what was that?

23          A.    Well, what we were doing, we were

24     putting our personal phone numbers that were at

25     our desks, assigned to us, on the Medicare 855I

Page 34

1    application.

2         Q.    And the whole department was doing

3    that?

4         A.    Correct.

5         Q.    And had you been doing that from

6    October forward?

7         A.    I'm not sure, because I know at

8    some point the 855 application changed.  And I

9    know with Medicare they never called us to

10   verify this information, so to me it became

11   obvious that we were doing this when they

12   started verifying that we were filling out

13   these applications and they needed to be

14   verified.

15        Q.    But were you using the same phone

16   number the entire time that you worked there?

17        A.    Correct.

18        Q.    And before June it hadn't created

19   an issue; is that right?

20        A.    Right, because they never called us

21   and verified.  Well, before June, I want to

22   say, the day that they took over, CGS took over

23   that's when we started to get the phone calls.

24        Q.    Was CGS a new person that was

25   reviewing these applications?

1          A.    Yes.

2          Q.    Before who had reviewed them?

3          A.    There was a company, I forgot the

4    name of the company.  They were out of

5    Columbus, I think they were out of Columbus,

6    Ohio.

7          Q.    So CGS was new, a new relationship?

8          A.    Correct.

9          Q.    And you say they were returning

10   applications because they couldn't verify; is

11   that correct?

12         A.    Correct.

13         Q.    Were there things other than the

14   phone number that were causing the verification

15   issue?

16         A.    Well, the I almost want to say that

17   there was -- pretty much the phone calls.  I

18   know the addresses were incorrect, too.  Pretty

19   much, sometimes it could be an NPI number

20   transposed.  Sometimes they needed additional

21   certifications with some of the providers.

22         Q.    Now, how many applications would

23   you put in in a month's time would you say?

24         A.    It is hard to say, it varies.

25               MR. HERRON:  Are we in June at this

Page 36

1    point?

2              MS. KAMINSKI:  We were in June.

3         Q.   Are you talking about 15, 20, a

4    hundred?

5         A.   It could have been anywhere between

6    one and 20.

7         Q.   Okay.  Were they all being

8    returned?

9         A.   No.  Only the ones where they

10   couldn't be verified or information was

11   missing.

12        Q.   All right.  But you were using the

13   same phone number on all 20, let's say, that

14   you would put in in a month, let's say;

15   correct?

16        A.   Correct.

17        Q.   In June, of your applications, how

18   many of them were returned?

19        A.   That is hard to say.  I know if

20   they weren't verified they were returned.  And

21   it's probably because I walked away from my

22   desk or --

23        Q.   But how many would you say you had

24   an issue with in June?

25        A.   It could have been anywhere between

1    three to five.

2         Q.    And then were you able to fix those

3    three to five and get them verified?

4         A.    Yes.

5         Q.    And how did you do that?

6         A.    Well, the process is, is that when

7    it needs to be redone we would take -- we would

8    -- well, we completed, we prepared the

9    application packets.  We would then ask the

10   provider, when we sent the package, for their

11   signatures.  We would send, maybe, three to

12   five additional signature pages for them to

13   sign.  And we would have to complete a new

14   application and take one of the signature pages

15   that we had them pre-sign to attach to the

16   application to start all over again.

17        Q.    On these three to five that you had

18   returns say in June, you would resubmit the

19   application.  Did you use the same phone

20   number?

21        A.    Correct.

22        Q.    And they were accepted?

23        A.    Yes.

24        Q.    So you were able to fix the

25   verification problem without changing the phone

1    number; correct?

2         A.    Correct.

3         Q.    In June, other than this issue that

4    you had with the return of three to five

5    applications that you then were able to fix,

6    did you have any other issues at work?

7         A.    In June?  There was a time, and I'm

8    not sure, it may have been in June, I had an

9    issue with -- well, I was taking medication.  I

10   called my supervisor, Sheryl Johnson, that

11   morning to let her know that I was going to be

12   late.  I just felt a little bit drowsy and I

13   interpreted to be the medication and told her

14   that I would be in later on that day.

15            When I arrived, she came over to my

16   cube and she said to me, oh, you're here.  And

17   she said that, I understand your medication is

18   causing you this drowsiness.  Probably wouldn't

19   be a bad thing, or I can't say, I don't know

20   her words verbatim, but it probably would be

21   helpful to go to your doctor and have him

22   adjust your medication so it does not interfere

23   with your work.

24            I went to HR immediately after that

25   because she discussed this in public.  Not in

1    her private office setting.  And I spoke to

2    Christine.  Christine said, well, that's

3    something she shouldn't have said in public.

4    And Christine asked me if she wanted her to

5    address it with Sheryl.  And I said, no, you

6    know what, let's just see how the day goes.

7    And, I said, I'll send her an e-mail.

8              So I sent her an e-mail letting her

9    know I wasn't happy with the fact that she

10   discussed my personal business regarding my

11   medication in public.  And she, in turn, sent

12   an e-mail back saying that she didn't know what

13   type of medication I was on, because I don't

14   think I was specific with her, and that she

15   wasn't aware that talking about my medication

16   was something that needed to be discussed in

17   private.  And she, I guess, she apologized if

18   she was out of line.

19        Q.    Did you accept that apology?

20        A.    Yes, I did.  To keep peace within

21   the office, yes, I did.

22        Q.    And did she ever talk about your

23   medications in public again?

24        A.    No, she hadn't.  No.

25        Q.    And she didn't know what type of

1    medication you were taking; right?

2         A.    No.

3         Q.    And what medication were you

4    taking?

5         A.    Zoloft.

6         Q.    And had you taken some

7    non-prescribed medication that morning as well?

8         A.    I don't recall.

9         Q.    How long had you been taking

10   Zoloft?

11        A.    I almost want to say it was

12   prescribed that month.  Probably immediately --

13   well, yes, it was definitely that month because

14   that's when I started to feel the effects of

15   it.

16        Q.    And it made your drowsy?

17        A.    Well, you know, I'm not used to

18   taking any medication.  I may have attributed

19   that, it could have been the stress I was

20   undergoing as a result of having to take them.

21   I can't pinpoint exactly what it is.

22        Q.    Had you had any issues at work

23   prior to June with sleeping?

24        A.    There was an e-mail that I received

25   and I'm not sure if it was in May or June, but

1    I got an e-mail from Sheryl Johnson to say

2    that, if I'm going to sleep at my desk to put

3    up a sign to let everybody know that I'm on my

4    break.

5         Q.    So you had been sleeping at work?

6         A.    Oh, yeah.

7         Q.    Prior?

8         A.    Yes, everyone does.  I can't say

9    everyone, I take that back.  There are people

10   that sleep at their desk, typically people on

11   the second floor, at their desk or in the

12   lobby.

13        Q.    And you had done that prior to

14   June?

15        A.    Yes.

16        Q.    And so did you thereafter, if you

17   were going to sleep at your desk, put up a sign

18   that you were on your break?

19        A.    I think sometimes I did, sometimes

20   I didn't.  I think at the time I told Sheryl

21   that those signs are something that we put

22   together, they aren't corporate signs -- signs.

23        Q.    And so does that mean if they are

24   not corporate signs you shouldn't put one up?

25        A.    Well, it's not corporate policy

1    that you put this up.

2         Q.    Your direct supervisor was telling

3    you to do that, though; right?

4         A.    Yes.

5         Q.    Doesn't that make it kind of

6    corporate policy for your purposes?

7         A.    I mean, she asked me to do it.  I

8    mean, if she had supplied me the sign.  This is

9    something that I created myself.

10        Q.    Even if you created it yourself,

11   you, thereafter, didn't put it up every time,

12   even though she asked you to; is that right?

13        A.    For the most part I did.  There are

14   times when you forget to put it up or you don't

15   know how long you are going to be on break, so

16   putting it up for two seconds.

17        Q.    How often did you, on break, after

18   you were asked to put up the sign, how often

19   would you say you were sleeping on your break?

20        A.    Well, after she -- I can't say how

21   long.  I know it was an important part for me

22   to take my break at my desk only because if I

23   didn't, I would probably miss the phone calls

24   that we would get from CGS to verify that the

25   doctor can be reached there directly.

Page 43

```
1          Q.     But how often were you needing to
2     sleep during your break?
3          A.     Not often.
4          Q.     Once a week?
5          A.     I can't say exactly.
6          Q.     Are you currently taking any
7     medications?
8          A.     No.
9          Q.     When did you stop taking the
10    Zoloft?
11         A.     Probably after I left UH.
12         Q.     Do you know when?
13         A.     No, I don't know the exact time.
14         Q.     Any other issues in June regarding
15    your employment?
16         A.     None that I recall.
17         Q.     How about July?
18         A.     Yes, July.
19         Q.     Any issues?
20         A.     Yeah, there were issues with the
21    Medicare applications.
22         Q.     Tell me about that.
23         A.     I had gotten some denials on the
24    855 applications for, I want to say, for Dr.
25    Stone and Dr. Gupta.
```

Page 44

1           Q.    And what happened?

2           A.    I believe I got an e-mail.  We were

3    advised to put our e-mail address on the

4    applications also.  I believe I got an e-mail

5    saying that the application was denied, they

6    needed verifications that the doctor can be

7    reached there directly.  I think I brought it

8    to Steve's attention.

9           Q.    And what happened?

10          A.    At the time, I don't know who

11   initiated it, but I told him that because of

12   the meeting that we had about the pink

13   jailhouse jumpsuits that I can't continue to

14   process the applications.

15          Q.    Who made the comment about the pink

16   jailhouse?

17          A.    Jordan.

18          Q.    Who is Jordan?

19          A.    He is a provider enrollment, I'm

20   not sure if he is a specialist or if he has a

21   higher position, but he works for UHMP I worked

22   for UHMG.

23          Q.    And was that a joke that he was

24   making?

25          A.    It was a joke, but it was a joke

1    that shouldn't have been taken lightly.

2         Q.    Did you ever do anything to try to

3    determine whether or not, in fact, putting in a

4    different phone number than CGS wanted you to

5    could lead to criminal charges?

6         A.    Can you, please, repeat?

7         Q.    Did you take any steps to determine

8    whether or not putting in a phone number

9    different from what CGS wanted you to put in

10   could lead to criminal charges?

11             MR. HERRON:  I will object to that

12   to the extent that it calls her to divulge

13   communications she had with legal counsel.

14   Other than that she can answer.

15        A.    I can't answer that because of the

16   communication.

17        Q.    I'm not asking you the content of

18   the communication, I'm asking you if you took

19   any steps to determine it was criminal?

20        A.    No, I can't answer that.

21        Q.    You can't answer when whether you

22   took any steps?

23        A.    No.

24        Q.    Why not?

25        A.    Because I can't divulge that

Page 46

1    information.

2        Q.    I'm not asking you to divulge

3    information that --

4              MR. HERRON:  You can tell her

5    whether or not you consulted with an attorney

6    about it.

7        A.    Yes.

8              MR. HERRON:  But not what the

9    substance of the conversation was.

10       A.    Yes.

11       Q.    So in July you consulted with an

12   attorney?

13       A.    Not in July.

14       Q.    When did you first consult with an

15   attorney to determine if it was criminal to

16   fill in the wrong phone number?

17       A.    Wait, was it in July?  No, that

18   would have been the end of July.  Maybe August.

19   I'm not exactly sure.

20       Q.    July or August?

21       A.    I think it was in August.  Maybe

22   July.  I don't want to be held down to a

23   specific date.

24       Q.    And what attorney did you consult

25   with?

1          A.     My attorney.

2          Q.     Mr. Herron?

3          A.     Yes.  I don't remember the dates,

4     the exact date.

5          Q.     Okay.  Were you still employed?

6          A.     Was I still employed at UH, yes.

7          Q.     Did you at some time determine that

8     it was criminal to put the wrong phone number

9     in?

10              MR. HERRON:  Objection.

11              Again, you can answer that, but you

12     don't need to -- you can answer that if you can

13     do so without disclosing confidential

14     information shared with legal counsel.

15          A.     I can't disclose that without

16     consulting with my attorney.

17          Q.     Did you take any steps to report

18     that to any entity, that this was criminal

19     behavior?

20          A.     I wouldn't say criminal behavior,

21     inappropriate behavior.  I guess, eventually it

22     would probably lead to criminal behavior.

23          Q.     Did you ever call an internal

24     compliance --

25          A.     I did.

```
 1          Q.    -- and tell them that you were
 2    concerned that you were being asked to commit a
 3    crime?
 4          A.    Yes, I did.
 5          Q.    And is that how you put it?  Did
 6    you tell them --
 7          A.    I didn't use the word crime.
 8          Q.    When did you make that report?
 9          A.    I called the UH hotline and
10    expressed my concern about completing the
11    applications, putting our phone number, which
12    is the phone number at the central billing
13    office, to Sheryl Wahl.  Well, the hotline.  I
14    didn't know it was specifically going to go to
15    Sheryl Wahl.
16          Q.    And what happened?
17          A.    She told me that it was
18    investigated by Carole Meisler and that we were
19    correct in using the UH -- in using the desk
20    number that I -- was assigned to me.
21          Q.    Now, had you ever had any
22    interactions with Carol Wahl before?
23          A.    Sheryl Wahl.
24          Q.    Sheryl Wahl, I'm sorry.
25          A.    No.
```

1       Q.    No?

2       A.    Well, interaction, not personally.

3  I believe when we were at the other office on

4  Warrensville Center Road, we were made to --

5  there was a meeting that she had with everyone

6  in the building, and we were made to watch a

7  video to tell us that if, you know, we

8  experienced anything that we felt was

9  inappropriate that we were to contact the UH

10  hotline.

11       Q.    Which is what you did?

12       A.    Yes.

13       Q.    Now, were you aware --

14       A.    Yes.

15       Q.    -- that Sheryl Wahl was the

16  chief --

17       A.    Compliance officer, yes.

18       Q.    And you know that her whole job is

19  to try to make sure that everyone is in

20  compliance with all the regulations; right?

21       A.    Correct.

22       Q.    So Sheryl got back to you and told

23  you that they had investigated it and they felt

24  that this was in compliance; correct?

25       A.    Correct.

Page 50

1        Q.    And did you every talk to Ms.

2    Meisler?

3        A.    I communicated with her via e-mail.

4        Q.    Did you know her?

5        A.    I had seen her around the office.

6        Q.    Ever have any involvement with her

7    other than just seeing her around the office?

8        A.    No.

9        Q.    And you also knew that she was in

10   the compliance department; correct?

11       A.    Yes.

12       Q.    Were you aware that she had called

13   CGS herself?

14       A.    Well, she told us she did.

15       Q.    Once the compliance department told

16   you that they felt that putting your phone

17   number on there was appropriate and that they

18   had contacted CGS about it, did you believe

19   them?

20       A.    No.

21       Q.    Why not?

22       A.    Because I had in black and white

23   denial letters.  She told us several scenarios

24   that would probably -- well, I wouldn't say

25   probably, that CGS said would work in us

1    completing the applications.  However, I had it

2    in black and white that what she told us

3    contradicted what I had from CGS myself.

4              And I felt that she wasn't probably

5    explaining to CGS, because she didn't do the

6    actual -- she didn't perform the actual job,

7    maybe she wasn't explaining it to them in

8    detail.

9         Q.    So you felt you knew better?

10        A.    Yes.  Yes.  It was part of my job

11   function that I did daily.

12        Q.    Now, so in July how many

13   applications would you say you had rejected

14   because of the phone number?

15        A.    I don't know specifically, but I

16   know I did have the -- I would say at least

17   three to five, because I know I did have the

18   one from Stone, Gupta and maybe one other.

19        Q.    And how many applications would you

20   have put in in that month?

21        A.    Anywhere from one to 20.

22        Q.    You don't know how many?

23        A.    No.

24        Q.    Well, you know it was more than one

25   if you had three to five that came back?

Page 52

1        A.    Correct.  Correct.

2        Q.    So still some of the applications

3   were being accepted; correct?

4        A.    Yes.  They were able to verify

5   because I was there at my desk to answer the

6   phone when they called.

7        Q.    And when they called if they had a

8   question or whatever, you could answer it;

9   correct?

10           MR. HERRON:  Objection.  Vagueness

11   on that question as to what they would ask.

12        Q.    If CGS and called and had a

13   question about the application you could answer

14   it?

15        A.    No, not all, it just depends on

16   what the question was.

17        Q.    You could answer it or find the

18   answer?

19           MR. HERRON:  Same objection.

20        A.    Not necessarily true.

21        Q.    Tell me the type of question CGS

22   would have when they called.

23        A.    The main question that they ask is

24   if the doctor can be reached there directly.

25   And that was the main question.

1          Q.    And what was your answer to that?

2          A.    Yes.

3          Q.    And then what would you do, would

4     you contact the doctor?

5          A.    No, we didn't have to contact

6     because they already verified that they could

7     reach the doctor directly.

8          Q.    But if the doctor needed to be

9     contacted, if CGS or Medicare needed to contact

10    the doctor and they called you, you would get

11    ahold of the doctor; correct?

12         A.    It wasn't our responsibility to get

13    ahold of the doctor.

14         Q.    If somebody called you and said, we

15    have this application, we need to speak with

16    the physician, what would you do?

17         A.    They asked if they can verify.

18    They never asked if they could get ahold of

19    them.  They only asked if they could verify.

20         Q.    The information that you got about

21    the doctor to fill out the application came

22    from the doctor's office?

23         A.    Which information are you talking

24    about?

25         Q.    When you are filling out the

Page 54

1    application.

2         A.   Well, when we are filling out the

3    application -- can I see a copy of the

4    application, please?

5                   -  -  -  -  -

6              (Thereupon, Defendant's Exhibit 1,

7              Medicare Enrollment Application, was

8              marked for purposes of

9              identification.)

10                  -  -  -  -  -

11        Q.   Let me show you what we have marked

12   as Defendant's Exhibit 1.  What are you looking

13   at?

14        A.   I'm looking at page five.

15        Q.   Okay.

16        A.   Okay.  Now, they would call to

17   verify --

18             MR. HERRON:  Page five, you are

19   referring to 1284 at the bottom?

20             MS. KAMINSKI:  Right.

21        A.   Yes.

22             They would call to verify that the

23   doctor can be reached at this number.  If there

24   was anything that they needed regarding this

25   application would be an automatic denial.

Page 55

1          Q.    But let's just say something was
2     missing and the thing missing, we'll use page
3     five, was date of birth, that you didn't have
4     the date of birth, you had forgotten to put it
5     in there for some reason.  You would be able to
6     get the date of birth and fill in the
7     application; correct?
8          A.    Yes, from either, one, their
9     profile sheet or curriculum vitae.
10         Q.    Because you would have access to
11    that; right?
12         A.    Yes.
13         Q.    Any of this other information that
14    is on this application that is now marked as
15    Defendant's Exhibit 1 that they need about the
16    doctor you would have been able to get that
17    information if it was missing from the
18    application; correct?
19         A.    Correct.
20         Q.    And if it was something that wasn't
21    on their profile or on their curriculum vitae
22    you would be able to call their office to get
23    something to tell them --
24         A.    Yes.
25         Q.    -- what to fill out; correct?

Page 56

1               Yes?

2          A.    Yes.

3          Q.    So you knew how to contact the

4     doctor's office; correct?

5          A.    Yes.  Most of the time, and I would

6     say a good portion of the time.

7               Well, the Social Security we got

8     from the profile sheet.  If we needed the MPI,

9     we would go to the MPI website.  If we needed

10    the DEA number, we would go to the DEA website.

11    The license number, we would go to the license

12    website.

13              So there was very little

14    communication with the provider.

15         Q.    Sure.

16              But, for instance, whether or not

17    that had had any convictions for various

18    misdemeanors you would have to talk to the

19    doctor?

20         A.    I never asked them that.

21         Q.    You didn't?  You just assumed it

22    was no?

23         A.    They were supposed to fill out this

24    application when we sent it to them so that

25    should have already been filled out.

Page 57

1        Q.    So if it wasn't you would send it

2    over to them to get it filled out?

3        A.    Never had I asked them whether

4    they --

5        Q.    I'm saying, if this application --

6        A.    If it was incomplete we would send

7    them the application back.

8        Q.    Right.

9        A.    We wouldn't ask them over the

10   phone.

11       Q.    So if there was some information

12   needed you would send it back to them --

13       A.    Right.

14       Q.    -- for them to fill it in?

15       A.    Correct.

16       Q.    You knew how to get ahold of the

17   doctors in order to work with them to get these

18   things filled out correctly; correct?

19       A.    We would try to get ahold of them.

20   Because they work, we don't know their hours,

21   we don't know the shifts that they work, we

22   don't know the location that they are at, we

23   would --

24       Q.    It might have been an effort?

25       A.    Yes, it was.

1          Q.    Did you ever have an application

2     that you couldn't fill out because you couldn't

3     find all the information?

4          A.    There probably was, yes.

5          Q.    Which one was that?

6          A.    I don't recall.

7          Q.    What year was that in --

8          A.    I don't recall.

9          Q.    -- was that in 2011?

10         A.    I don't recall.

11         Q.    You don't recall?

12         A.    No.

13         Q.    What did you do, then, if you

14    couldn't fill out the whole application, what

15    did you do with that applications?

16         A.    We would return it to the provider.

17         Q.    You would return it back to the

18    doctor; right?

19         A.    Uh-huh.

20         Q.    Is that a yes?

21         A.    Yes.

22         Q.    Now, other than preparing this

23    Medicare enrollment application to send over to

24    the doctor's office to be submitted, you didn't

25    have any other job functions as a specialist;

1    did you?

2              A.    Yes, we did.

3              Q.    What was that?

4              A.    I don't recall.

5              Q.    You don't remember?

6              A.    No.  Inputting ORG numbers in, I do

7    know that.  Inputting the Medicaid application

8    into an electronic website.  Once we got the

9    PINs back from Medicare, after their

10   application was verified, we would input into

11   the system so that we could start billing

12   Medicare.  But for the bulk of it, it was

13   completing the applications.

14             Q.    Okay.

15             A.    Checking to see -- we had reports

16   to check to see which doctors were still

17   lingering with their enrollment applications.

18                   I'm trying to take myself through a

19   daily routine.

20                   Once we got the PINs we would put

21   it into the IDS systems so that the claims

22   could start dropping.

23             Q.    Okay.  So in July were you able to

24   fix the three to five that were not accepted

25   originally?

1          A.    I was able to fix, did I fix it, I

2     brought it to the attention of Sheryl Johnson

3     and Steve Riddle that -- because the reason why

4     it was denied is because I walked away from my

5     desk and when Medicare called I wasn't there to

6     verify that they could be reached at the

7     number.

8               So it went into my -- you know, my

9     voicemail kicked in.  And my voicemail states

10    my name, is says, Victoria Johnson of the

11    provider enrollment department.  So they denied

12    it because they wanted a number where the

13    doctor's personal service would identify their

14    name as opposed to my name.

15         Q.    After you identified this problem

16    were you able to fix those three to five

17    applications?

18         A.    I don't believe I did.  I told them

19    I can't verify.  And I did with an e-mail.  I

20    told them, I can no longer do this.

21         Q.    Now, did you -- were some of these

22    applications that were denied, did you have no

23    phone number listed on the application?

24         A.    No, these applications we put

25    together, we copy them and so it was just easy

1    to just put the phone number there and keep the

2    same phone number.

3         Q.    So all of the applications that you

4    had that were denied in July, it's your belief

5    that you had a phone number on the form?

6         A.    Yes.

7         Q.    So you told Steve and Sheryl that

8    you were no longer going to put that phone

9    number on in July?

10        A.    Correct.

11        Q.    Is that correct?

12        A.    Uh-huh.

13        Q.    What happened next?

14        A.    I know that, that I communicated

15   with some of the people at CGS, Shamekia

16   McLaughlin, and just to make sure that I'm

17   following the procedure of CGS.

18             I asked them to just clarify in

19   their e-mail, again, that what I was doing was,

20   well, what the UHMG was doing was improper.  I

21   forwarded that information to my supervisors.

22   And I know at one point they asked me to --

23   verbally they came over to me and asked me to

24   put Sheryl's number as opposed to my number.

25        Q.    Did you do that?

Page 62

1        A.    I told them, thank you for letting

2    me know that I could do that, but I still felt

3    that it was improper.

4        Q.    And so did you do it?

5        A.    No, I didn't.

6        Q.    What happened next?

7        A.    I know sometime during the

8    communication that this was going on I had

9    asked them, I think I asked, I almost want to

10   say I asked Sheryl, I'm sorry, Carole, if she

11   had a person that she spoke to at CGS.

12       Q.    And?

13       A.    I don't think she ever responded to

14   the e-mail.

15       Q.    What happens next?

16       A.    I know -- I can't say the chain of

17   events exactly.  Sometime in July Steve sent an

18   e-mail saying that it's come, you know, to his

19   attention that people were sleeping at their

20   desk and that we were no longer able to sleep

21   at our desk anymore.

22       Q.    Okay.  And then what happened?

23       A.    The -- I think it was the day of

24   the 25th or the 26th.  It was the day that I

25   was called, I was told by Sheryl Johnson that

1    she wanted to speak to me inside the HR office.

2          Q.    And?

3          A.    So I met her at the HR office.  She

4    was there and Christina Morrison was there and,

5    eventually, Steve Riddle came in.  And they

6    talked about the Medicare applications.

7                They also said that, you know,

8    because I sent them an e-mail letting them know

9    that since I'm no longer able to sleep at my

10   desk that, you know, just to be aware that I

11   did inform them that I was taking medication

12   and that is something that was out of my

13   control.

14               And they said, well, because you

15   are taking the medication and you are falling

16   asleep at your desk, we want you to go see the

17   EAP counselor.

18         Q.    And next?

19         A.    They told me that they made an

20   appointment for me to me that day.  And I told

21   them, I said, you know what, I can't do this

22   anymore.  I discussed going on FMLA with my

23   private doctor, Dr. Headen, and I said I am

24   going to leave the office to have him initiate

25   the paperwork for FMLA.  So I left the office.

1              As I was leaving the office

2      Christina Morison, I called, she was tying to

3      hand me the paperwork for the EAP counselor.

4      As I was going to my desk, here, are you

5      refusing this, get a witness, get a witness.

6      And it was very humiliating.

7          Q.    What happens next?

8          A.    I packed my -- I got my purse.

9      Left the office.  Went to -- I think I went to

10     my doctor's office.  I called him or called him

11     or I'm almost certain that I went to the office

12     that day.  Told him that I want him to, you

13     know, start the FMLA paperwork.  Yeah, I

14     dropped it off.  He filled it out and returned

15     it to me via e-mail.  And that I didn't --

16     well, he returned it to me via e-mail.  I went

17     to my e-mail account at the office and I was

18     shutdown.  It was shutdown.  Called the IT

19     department to find out what was going on and it

20     was shutdown.

21              After that morning I went to my

22     doctor's office to pick up the paperwork.  I

23     got there about 6, 6:30.  And on my way back

24     from the office I got a call from Christine and

25     she said that we overnighted the EAP -- no, she

1    didn't overnight, they sent via messenger the

2    EAP paperwork.  So I told her I didn't get it.

3              I live in a two-family.  I had

4    picked up my mail, I didn't see anything.  I

5    don't know whether it was on the inside of the

6    house or outside of the house.  She said, well,

7    it should be at your house.  When I looked

8    inside the hallway and it was there.  The

9    hallway or -- either the outside door, yeah, it

10   was the outside door.

11             And she said, you are to take that

12   paperwork and go to the EAP office.  It was

13   9:30, I think that the appointment was at 10.

14   It was 9:30, I said, well, can you call them

15   and tell them I am running a little late.

16             I went to the EAP office and met

17   with Kathy Springer.  I gave her the paperwork,

18   which was not completed.  And she said, well,

19   let me contact your supervisor and have her

20   complete the paperwork.  And she said, well,

21   you're here because you are unfit for duty.

22   And they said that it is because you were

23   asleep at your desk.

24             MR. HERRON:  Do you have a point

25   where I could take a quick five-minute break?

Page 66

1              MS. KAMINSKI:  Let her finish the

2     answer, then we can.

3        Q.    Go ahead.

4        A.    That's how I ended up at the EAP.

5        Q.    Unfit for duty because you were

6     sleeping?

7        A.    Yes.

8              Nothing in my personnel file prior

9     to that about unfit for duty or sleeping.

10       Q.    So when you --

11             MR. HERRON:  She finished her

12    answer, can we take that --

13             MS. KAMINSKI:  In just a second.

14             MR. HERRON:  -- five minute, two

15    cups of coffee kicking in break?

16             MS. KAMINSKI:  Just a second.

17       Q.    When you went to see Kathy Springer

18    did you see anybody else besides her that day?

19       A.    Well, Jill was there.

20       Q.    Anybody else, any doctors?

21       A.    No.

22             MS. KAMINSKI:  Okay.

23             ( Short recess had.)

24       Q.    So you went to see Kathy Springer?

25       A.    Uh-huh.

1        Q.      What happens next?

2        A.      She told me I was there because I

3    was referred for falling asleep at my desk.

4    She asked if I take a drug -- well, I explained

5    to her that I felt that I was there because of

6    the Medicare applications.

7               She asked that I complete a drug

8    screening and one for alcohol.  And she also

9    told me that I was going to be -- I got a

10   referral to see Dr. Pallas, the psychiatrist.

11       Q.      Anything else happen with Kathy?

12       A.      She asked that I sign five of the

13   medical release forms, which I did.  I handed

14   her the FMLA paperwork that I received from my

15   doctor and took the test.

16       Q.      What test?

17       A.      The drug screening and the

18   breathalyzer test.

19       Q.      Then what happens?

20       A.      She gave me an appointment, I think

21   it was within two days.  I know that it was

22   originally sent for July 31st, I think I ended

23   up going on August 2nd to see Dr. Pallas.

24       Q.      So between the time you talked to

25   Kathy Springer and you go to see Dr. Pallas,

Page 68

1    did you have any further interaction with

2    anybody from UH?

3          A.    No, I don't believe so.  I know --

4          Q.    Did you go see your private doctor?

5          A.    No.

6          Q.    So then you went to see Dr. Pallas?

7          A.    Yes.

8          Q.    He did some tests?

9          A.    Yes, he gave me, I think it was a

10   two or three hour test.

11         Q.    And, then, did you talk to him as

12   well?

13         A.    Yes.

14         Q.    Anything else?

15         A.    He tested me for some other stuff,

16   a short test.  Asked me to count backwards from

17   a hundred by sevens, you know.

18               I explained to him about the

19   Medicare applications and how I was asked to

20   complete them with my phone number.  I

21   explained to him about the scenario with Paul

22   Simmons.  And that was pretty much it, you

23   know.

24               He -- I don't have -- I mean, he

25   said that he can't -- he said he doesn't doubt

1   that they are filling out the applications

2   incorrectly.  That's all I remember.

3        Q.    And then during June and July were

4   you working as a realtor?

5        A.    I don't believe so.

6        Q.    Is that because you couldn't or

7   because you didn't have any work to do?

8        A.    Probably because I didn't have any

9   work to do.  I don't recall when I took my

10  license back out of escrow.

11       Q.    Because you could have physically

12  been able to do work as a realtor; is that

13  correct?

14       A.    Yes.  Physically, yes.

15       Q.    Emotionally?

16       A.    Yes.

17       Q.    All right.  So then you go to see

18  Dr. Pallas in August, what's the next thing

19  that happens?

20       A.    After that, I believe I got an

21  e-mail or phone call from Kathy Springer, she

22  told me Dr. Pallas recommend that I go see

23  another psychiatrist, which I did.

24       Q.    Who was that?

25       A.    Dr. Dutton.

Page 70

1          Q.     And when did you see Dr. Dutton?

2          A.     I don't recall the exact date, but

3     I know that I went to see him and he gave me

4     some paperwork for me to return to work, I

5     think it was in September, it may have been

6     after the holiday.  After the Labor Day

7     holiday.

8          Q.     So he felt that you were able to

9     return to work; correct?

10         A.     Correct.

11         Q.     Did you agree with him?

12         A.     Yes.

13         Q.     And did you return to work in

14    September?

15         A.     No, I didn't.

16         Q.     Why not?

17         A.     Well, they told me that I needed a

18    return to work form, which I was expecting to

19    get from Kathy Springer.

20         Q.     And what happened?

21         A.     I never got the form.  She told me

22    -- what did she tell me?  She needed to get

23    some more information from the doctors before

24    she would write me a return to work.

25         Q.     And do you know if your doctors

1    provided her that information?

2           A.    I don't think they did.

3           Q.    Do you know why not?

4           A.    Well, I do recall seeing an e-mail

5    from Dr. Dutton to say that I am no longer

6    under his care.  I do recall speaking to Dr.

7    Dutton he said he doesn't want to -- I think I

8    asked him for some information, he said he

9    doesn't want to be involved or something like

10   that.  I can't recall exactly.

11          Q.    Did you go back to your regular

12   physician and ask him for a return to work?

13          A.    No, I didn't.  I was expecting to

14   get that from Kathy Springer after my

15   evaluation.

16          Q.    So Kathy never gives that to you?

17          A.    No.

18          Q.    So you never go back to work?

19          A.    No.

20          Q.    Did you call anybody to try to

21   figure out how to get back to work?

22          A.    I was hoping to hear back from

23   Kathy Springer, since this was initiated with

24   EAP.

25          Q.    Do you finally hear from her?

```
 1          A.    I think -- I believe she sent me an

 2   e-mail saying she can't because she needed to

 3   speak to the doctor.  So I was like in a fix,

 4   when do I go back to work?

 5          Q.    Okay.  So then what happens?

 6          A.    I was -- well, I was placed on

 7   unpaid administrative leave.  And while on

 8   unpaid administrative leave I applied for

 9   unemployment.

10          Q.    When did you apply for

11   unemployment?

12          A.    I almost want to say that it was in

13   August.  I don't know the exact time.

14          Q.    And what happened with your

15   unemployment request?

16          A.    I was granted unemployment

17   benefits.

18          Q.    And when did you get unemployment

19   benefits?

20          A.    I don't recall the exact time.

21          Q.    For how long; do you know?

22          A.    For a short period.

23          Q.    So you were getting unemployment in

24   August, September, what happens next about your

25   going back to work?
```

1          A.    I received -- let me see, I'm

2    trying to figure out the dates.  I received a

3    letter October 1st telling me that I'm supposed

4    to report back to work on October 8th.

5          Q.    Was this good news to you?

6          A.    Yes.

7          Q.    What happens?

8          A.    Prior to my going back to work I

9    sent, I think it's Christine, an e-mail.  I'm

10   not sure if it was an e-mail or letter, telling

11   her that I will report to work on October 8th

12   and that I didn't want to be asked to complete

13   the applications.  I wanted to be treated

14   fairly.  I almost want to say I asked her to

15   give me something regarding Paul Simmons.

16         Q.    Did you draft that letter by

17   yourself?

18         A.    Yes.

19         Q.    Okay.  So you sent her a letter?

20         A.    Yes.

21               I went to work and explained to her

22   -- I went to work that morning and I think it

23   was around, I believe it was at 6, there was no

24   one there, no management.  So I went to my desk

25   and I told her that -- while I was actually

1    doing something, but I don't believe I could

2    back on my computer.  But doing some of the

3    things that I could possibly do, maybe filing,

4    I don't recall exactly what it was, until I had

5    the talk with Christine.

6            Q.    And who did you have a talk with?

7            A.    Christine and Angelique, I don't

8    remember her last name.

9            Q.    Did you know Angelique before that

10   meeting?

11           A.    Well, yes, she was the person who

12   was standing at the door the day that I left to

13   go to my doctor's appointment.

14           Q.    Okay.  And what was your talk with

15   Christine and Angelique?

16           A.    Again, about the Medicare

17   applications.  I told them that I didn't want

18   to complete the application with putting my

19   personal phone number in section 2B.

20                 If the application is completed, if

21   the application is completed by someone who

22   needed to be contacted by CGS, that should have

23   been done in section 13.  Section 13th.  The

24   contact person should be in section 13

25   regarding a person you need to contact

1    regarding this application.

2        Q.    Okay.  And so you told them that

3    you weren't going to fill it out the way they

4    wanted you to; correct?

5        A.    Correct.

6        MR. HERRON:  Objection.

7        Go ahead.

8        Q.    And they made it clear how they

9    wanted you to fill it out; right?

10        A.    Well, yes, they made it clear how

11    they wanted it filled out.  They made it clear

12    that if we were to answer the phone and we

13    identified the phone number for CGS, that we

14    were to answer the phone as though we weren't

15    the billing department.

16        Q.    Okay.  And, well, you didn't answer

17    the phone billing department, you answered it

18    -- well, that you were --

19        A.    Sometimes I said, this is Victoria.

20    Sometimes I said, doctor's office.  Sometimes

21    -- I don't believe I said provider enrollment,

22    that would be a clear indication that we were

23    the provider enrollment department and not the

24    doctor's office.

25        Q.    And so you indicated to them that

Page 76

```
1    you weren't going to do it the way that they
2    wanted you to; correct?
3         A.    Correct.
4         Q.    And what happened?
5         A.    She told me that if I needed 24
6    hours to reconsider to let her know.  And I
7    told her that I did not need 24 hours to
8    reconsider.  And she said, well, if that's the
9    case, then we have to terminate you.  She also
10   gave me a letter to the response that I sent.
11        Q.    Anything else happen?
12        A.    No, I went and packed my stuff at
13   my desk and left.
14        Q.    Did you fill out a new application
15   for unemployment or were you on unemployment
16   already?
17        A.    No, I wasn't on unemployment.
18        Q.    Your unemployment had ended before
19   October 8th?
20        A.    Wait.  My unemployment had ended --
21   well, I didn't claim benefits for the week that
22   I went back to work.
23        Q.    Did you reapply, then, for
24   unemployment?
25        A.    Yes.
```

1          Q.    Did you get unemployment?

2          A.    Yes.

3          Q.    Since that time have you looked for

4     a job?

5          A.    Yes.  Since I was unemployed I have

6     looked for a job.  Right now I'm working as a

7     realtor.

8          Q.    Where --

9          A.    It's rather hard to explain, also,

10    to potential employers the reason why I was

11    released from UH.

12         Q.    And where have you looked for a

13    job?

14         A.    Title companies.

15         Q.    Which ones?

16         A.    Administrative.  I don't remember

17    the title companies.

18         Q.    Do you keep a copy of your

19    applications?

20         A.    Well, most of them were by my

21    calling.  Most of my inquiries of jobs were my

22    calling.  A good portion of it was by phone.

23         Q.    Did you ever fill out an

24    application?

25         A.    I don't recall.  I can't recall.

1      Q.    You can't recall if you filled out

2   an application for a job?

3      A.    I almost want to say that most of

4   the contacts were by phone.

5      Q.    Where have you looked beside title

6   companies?

7      A.    Some businesses in the area that I

8   live.

9      Q.    What businesses?

10     A.    I don't recall.

11     Q.    Do you recall a single -- a single

12  name of anyplace you have looked for work?

13     A.    No.

14     Q.    How about in the last month; do you

15  recall?

16     A.    I have been self-employed as a

17  realtor.

18     Q.    Have you looked for work in the

19  last month?

20     A.    No.

21     Q.    When did you stop looking for work?

22     A.    I can't recall.

23     Q.    Was it sometime in 2013 that you

24  stopped looking for work?

25     A.    I don't recall.

1          Q.     How much money did you make last

2     year as a realtor?

3          A.     I don't recall.  Probably, maybe,

4     40,000.

5          Q.     So the market has picked up?

6          A.     Yes.  No, benefits, but --

7          Q.     And you still have your two rental

8     properties?

9          A.     Correct.

10         Q.     And do you have properties listed

11    now?

12         A.     Yes.

13         Q.     How many properties do you have

14    listed now?

15         A.     I would say probably about six or

16    seven.

17         Q.     And who holds your real estate

18    license?

19         A.     VS Realty.

20         Q.     Pardon?

21         A.     VS Realty.

22         Q.     Is that a family owned business?

23         A.     No.

24         Q.     Or a business you had a

25    relationship with?

```
 1        A.    No.

 2        Q.    And you make all commission?

 3        A.    Yes.

 4        Q.    And so far in 2014 how have you

 5   done?

 6        A.    I've had a couple transactions

 7   close.  Of course, with real estate, you don't

 8   get paid weekly, so only if the property

 9   closes.

10        Q.    So how much have you made this

11   year?

12        A.    I would say probably about 6,000

13   dollars.

14        Q.    And you are going into the busy

15   season of the spring?

16        A.    Well, our busiest season, believe

17   it or not, is between January and March, we

18   have a lot of investors.  I mean, a lot of the

19   houses that I sell, they are bank-owned

20   properties.

21        Q.    Do you anticipate that you are

22   going to be able to do as well this year as you

23   did last year?

24              MR. HERRON:  Objection.

25   Speculative.
```

Page 81

1           Go ahead.

2      A.    I can't say.  My broker always

3   tells me this market, you know it is here one

4   day and tomorrow it could be something

5   completely different.

6      Q.    At least it is robust enough that

7   you are not looking for another job; correct?

8      A.    Right now, no.

9      Q.    In response to some interrogatories

10  that I sent to you and you've responded to I

11  asked you who had knowledge of the facts

12  alleged in your complaint?

13     A.    Uh-huh.

14     Q.    Or the damages?  And one of the

15  people that you listed was Kara Ladaika, who is

16  that?

17     A.    Kara Ladaika is the, I believe, she

18  is the FMLA person for UH.

19     Q.    So she would have knowledge of your

20  FMLA request?

21     A.    Yes, she does.

22     Q.    Anything else that relates to this

23  case?

24     A.    I don't think she is the person

25  from short-term disability, just FMLA.

Page 82

1          Q.    How about Lisa Edgehouse, what does
2     she know?
3          A.    I know that -- I think I saw an
4     e-mail from her, I don't recall.  She is with
5     UH.
6          Q.    Jill Fulton?
7          A.    She was the nurse practitioner at
8     my meeting with Kathy Springer.
9          Q.    Other than that meeting with Ms.
10    Springer, would she have any other knowledge?
11         A.    I think pretty much, that was it.
12         Q.    Chip Fienga, what does he know?
13         A.    Oh, I don't know.  I think he was
14    on an e-mail regarding my FMLA.
15         Q.    Renee Cipriani.  Why did you list
16    her?
17         A.    She was my previous supervisor.
18         Q.    And what does she know about the
19    facts of the complaint?
20         A.    She probably -- shouldn't be much.
21    She was -- she wasn't around.  She wasn't the
22    supervisor at the time.
23         Q.    Teresa Linehan or Linehan, what
24    does she know?
25         A.    Teresa Lineham, I forgot her role.

Page 83

1    Probably on an e-mail.

2         Q.   Cynthia Laterna, why would you list

3    here?

4         A.   E-mail.  That was an e-mail.

5         Q.   Josh Shkolnik?

6         A.   Was on an e-mail.  These are HR

7    people.

8         Q.   Jacqueline Edmonds?

9         A.   Jacqueline Edmonds.  I think that

10   was an e-mail also.

11        Q.   You listed the name out of people

12   that were on various e-mails?

13        A.   Right.

14        Q.   Jacqueline Adamich?

15        A.   She was in an e-mail.  She

16   processed my enrollment application, not my

17   enrollment application, my employment

18   application.

19        Q.   Jane Reese?

20        A.   Jane, she is probably on an e-mail

21   because I think I met her at a meeting.

22        Q.   Do you know what meeting?

23        A.   I think it was at the Federal

24   Building.  I think that was her name.

25        Q.   In the course of this case?

Page 84

1          A.    Yes.

2          Q.    Kathleen Springer, other than the

3    she is the EAP person; right?

4          A.    Correct.

5          Q.    Corporate screening, why did you

6    list them as having --

7          A.    Corporate screening, I believe

8    that's with regard to my employment

9    application.

10         Q.    Un Kim, it's because she worked at

11   CGS?

12         A.    Yes, I had communication with her

13   at CGS.

14         Q.    Andrew Baumann, same thing, you had

15   communications?

16         A.    Yes.

17         Q.    Shamekia?

18         A.    McLaughlin.

19         Q.    Same thing?

20         A.    CGS.

21         Q.    What about Paula Paty?

22         A.    That is Shamekia's supervisor.

23         Q.    Did you ever talk to Paula?

24         A.    Yes.

25         Q.    And then there is some other

Page 85

1    supervisor at CGS you don't remember the name?

2         A.    I spoke to -- I think Paula Paty

3    moved to another department.  I called to speak

4    to a supervisor, I don't recall her name, and

5    then she referred me to the compliance office

6    of the CGS.

7         Q.    When was this?

8         A.    I don't recall.

9         Q.    And do you know the compliance

10   officer's name?

11        A.    I don't recall her name.

12        Q.    Have you had any communications

13   with CGS since you left the employ of UH?

14        A.    Yes.

15        Q.    When was that?

16        A.    I don't recall the date.

17        Q.    In the last month?

18        A.    No, not in the last month.

19        Q.    In the last year?

20        A.    Yes, within the last year.

21        Q.    And who did you communicate with?

22        A.    Both the supervisor and the

23   compliance officer.

24        Q.    When you made those phone calls?

25        A.    Yes.

Page 86

1        Q.    But you don't know their names?

2        A.    I have it written down.  I want to

3    say, I don't know why Miss White rings a bell.

4        Q.    Where do you have it written down

5    at?

6        A.    I can't find it.

7        Q.    Why did you call the supervisor?

8        A.    I called them regarding the

9    application.  I called them regarding the

10   application.

11       Q.    And why while you were not working

12   at UH were you calling them regarding the

13   application?

14       A.    Well, I was hoping, I don't know,

15   maybe to shed some light on what's going on

16   or -- I don't recall.

17       Q.    What were you told?

18       A.    Well, the supervisor told me that

19   she would have the compliance officer call me.

20   I explained to her that I was terminated from

21   UH.  And she said something about her calling

22   me back, she would check some of the

23   applications that were denied and she would

24   call me back, but she never did.

25       Q.    Did you ever talk to the compliance

Page 87

1    officer?

2         A.    Yes, I did.

3         Q.    Is that the one who said she would

4    call you back?

5         A.    Yes.

6         Q.    The supervisor who didn't know

7    anything and got you over to the compliance

8    officer?

9         A.    Well, she -- I believe she looked

10   at that application -- I don't recall what

11   happened, but I know she referred me to the

12   compliance officer.

13        Q.    Then the compliance officer never

14   called you back?

15        A.    No.  She asked me the name of some

16   providers that may have been on the

17   applications that we were completing and she

18   never called me back.

19        Q.    And she what?

20        A.    She never called me back.

21        Q.    Did you give her the name of

22   providers?

23        A.    Yes, I do recall the provider.

24        Q.    What name did you give her?

25        A.    I don't recall the doctor's name.

Page 88

1     I think it was an anesthesia provider, wait a

2     minute, Matthew Kellems.

3          Q.    Why did you choose Matthew Kellems

4     to give to the compliance officer?

5          A.    His name stood out in my mind.

6          Q.    Why was that?

7          A.    It took a while to process his

8     application.

9          Q.    And why was that?

10         A.    He had to provide documentation --

11    he had to provide documentation.  I think he

12    was terminated from UH.  And then he was

13    brought back to UH.

14         Q.    Were you able to confirm that your

15    view that it was CGS' view that UH was using

16    the wrong phone number when you talked to the

17    compliance officer?

18         A.    She never called me back.  The only

19    documentation I have is what I received as far

20    as denial letters.

21         Q.    While you were employed at UH,

22    other than talking to CGS about what their

23    requirements were with respect to the phone

24    number, did you talk to anybody else to find

25    out what was the --

1          A.      Oh, yes, I did.

2          Q.      What else?

3          A.      I.L. Donerson.

4          Q.      Pardon me?

5          A.      I.L. Donerson.

6          Q.      Who is that?

7          A.      A 20-year old plus friend.

8          Q.      He is a friend of yours?

9          A.      Yes.

10         Q.      And why would you have talked to

11    him about it?

12         A.      He worked in Washington, D.C. at

13    the time.  I told him, you know, about the

14    process.  And, well, he told me that he worked

15    at HHS.  And he told me that he would check

16    their integrity manual to see if we should or

17    should not be filling out these applications.

18              He sent me something, I believe he

19    sent me something from the integrity manual to

20    show that the doctor needed to be reached

21    directly and it had to be the personal service.

22    And he advised me to -- that I probably

23    shouldn't continue to do it because there is

24    usually an audit that is done every three years

25    and they should be checking those applications

Page 90

1    to be sure that the doctor's number is on there

2    as opposed to how they did it.

3         Q.    What, is it I.L.?

4         A.    I.L., yeah.  I, period, L, period.

5         Q.    What does the I stand for?

6         A.    That's just his name, I.L.

7         Q.    Donerson, D O N --

8         A.    E-R-S-O-N.

9         Q.    How do you know I.L. Donerson?

10        A.    I have been knowing him for 20

11   years.

12        Q.    Where did you meet him?

13        A.    In New York City.

14        Q.    What is his job at HHS?

15        A.    He was a contractor.

16        Q.    Contractor doing what?

17        A.    I don't know specifically what he

18   was doing.

19        Q.    Is he a builder, contractor,

20   somebody who pounds nails or --

21        A.    No, he processes grants.

22        Q.    So he isn't in the section that

23   works with the manuals; is that correct?

24        A.    Correct.

25              -  -  -  -  -

Page 91

1                (Thereupon, Defendant's Exhibit 2,

2                Physical Exam dated January 25,

3                2012, was marked for purposes of

4                identification.)

5                       -  -  -  -  -

6        Q.    I'm going to show you what I have

7     marked as Exhibit 2.  These are records from

8     your doctor's office.

9                How long had you seen, is it Dr.

10    Headen?

11       A.    Uh-huh.

12       Q.    Yes?

13       A.    Yes.

14       Q.    How long have you been a patient of

15    Dr. Headen's?

16       A.    I don't recall.

17       Q.    Was it before January of 2012?

18       A.    That I don't recall.

19       Q.    I see that you sought, this is a

20    physical exam that Dr. Headen did on January

21    25th, 2012; do you see that?

22       A.    Yes, I see it.

23       Q.    And it says here that the reason

24    you're there is because you have a rash; is

25    that correct?

1          A.    Yes.

2          Q.    And that you are without complaints

3    except for that rash, is that correct, at that

4    time?

5          A.    According to this report.

6          Q.    So in January of 2012 you weren't

7    having issues at work that required you to seek

8    medical attention; is that correct?

9          A.    Correct.

10                    -   -   -   -   -

11               (Thereupon, Defendant's Exhibit 3,

12               Phone Message dated January 26,

13               2012, was marked for purposes of

14               identification.)

15                    -   -   -   -   -

16          Q.    And then I will show you what I

17    have marked as Exhibit 3.

18          A.    Uh-huh.

19          Q.    Do you recall why you would have

20    called Dr. Headen on January 26th?

21          A.    No, I don't.

22                    -   -   -   -   -

23               (Thereupon, Defendant's Exhibit 4,

24               Adult Sick Visit Form, was marked

25               for purposes of identification.)

1                    -  -  -  -  -

2          Q.    Showing you what has been marked as

3     Exhibit 4.

4               Do you recall that you saw Dr.

5     Headen on February 13th, 2012?

6          A.    Yes.

7          Q.    And that you report that you had

8     increased anxiety over a situation at work.

9     Was that correct?

10          A.    Correct.

11          Q.    And it says that you are having

12     decreased sleep and increased anxiety; is that

13     correct?

14          A.    Correct.

15          Q.    Had you ever had an episode of

16     anxiety that caused you to seek medical

17     attention before this time?

18          A.    I don't recall.

19          Q.    You don't recall?

20          A.    No, I don't think I did.  I think

21     this probably happened after the episode with

22     Paul.

23          Q.    Right.

24               Before this time, before February

25     13th, 2012 had you ever sought medical

1    attention for anxiety?

2          A.    No, I don't think so.

3          Q.    You would know if you had; wouldn't

4    you?

5          A.    Yes.

6          Q.    So is the answer no?

7          A.    No.

8          Q.    It says that you feel threatened at

9    work.  Why did you feel threatened at work?

10         A.    I felt threatened at work because

11   of the good morning hello.  Like I told you, I

12   felt like I was almost forced to say hello to

13   him.  He came into my face and said, good

14   morning, Victoria.  And I felt that threatened.

15         Q.    And that had happened by February

16   13th?

17         A.    Yes.

18         Q.    Anything other than him leaning

19   over and saying hello that made you feel

20   threatened?

21         A.    Well, that specifically made me

22   feel threatened.

23         Q.    It says that had you a meeting

24   scheduled at work with HR and does not feel

25   comfortable returning to work until the

1    situation is resolved?

2         A.    Correct.

3         Q.    Had you already reported to HR by

4    this time?

5         A.    Yes.

6         Q.    Now, it says down there that you

7    didn't want any meds and wouldn't take a

8    referral to a counselor.  Is there a reason why

9    you wouldn't go see a counselor if you were

10   having all this anxiety?

11        A.    I was hoping that it would probably

12   pass or I just didn't want to go see a

13   counselor.

14        Q.    So why did you go to the doctor

15   about the anxiety if you weren't going to take

16   medications and wouldn't go see a counselor?

17   What did you think the doctor could do for you?

18        A.    I don't know.  This is the first

19   time I have ever been in this situation.

20        Q.    Then he suggested that you take

21   medication and you decided not to?

22        A.    I don't think he suggested any

23   medication at that time.

24        Q.    What relaxation techniques did he

25   give to you?

Page 96

1       A.    I don't recall.

2       Q.    Did you do them?

3       A.    I don't recall if he gave me any.

4       Q.    What were the symptoms of your

5   anxiety?

6       A.    Just basically feeling overwhelmed

7   about the entire situation.

8       Q.    And how did that manifest itself

9   for you, feeling overwhelmed?

10      A.    By his presence, pretty much.

11      Q.    But what was your reaction, how did

12  you experience the anxiety?

13      A.    Feeling overwhelmed.  Just feeling

14  overwhelmed.

15                  -  -  -  -  -

16            (Thereupon, Defendant's Exhibit 5,

17            Phone Message dated February 14,

18            2012, was marked for purposes of

19            identification.)

20                  -  -  -  -  -

21      Q.    Showing you what I have marked as

22  Exhibit 5.  This is the next day, February

23  14th.  It says, patient walked in and asked for

24  a call from you.

25            Do you recall walking into your

Page 97

1    doctor's office?

2         A.    I think at the time he wasn't able

3    to see me.  I'm not sure.

4         Q.    Do you recall why you were back in

5    his office a day later?

6         A.    Probably because he didn't answer

7    the phone call.

8         Q.    So since he didn't answer the phone

9    you went to his office?

10        A.    Yes.

11        Q.    And what were you needing from him

12   either on the phone or in person?

13        A.    I don't know at the time.  I mean,

14   it could have been just someone to talk to.

15        Q.    If you needed someone to talk to

16   why did you reject his offer of a counselor?

17        A.    I don't know.  I don't have any

18   clue.

19        Q.    You what?

20        A.    I have no clue.

21        Q.    You see down there under plan of

22   action, she will ask for a transfer.

23              What does that mean?

24        A.    I think we probably talked about me

25   going to a different department.

Page 98

1          Q.    You talked about that with your

2    doctor?

3          A.    Possibly, yes, if it's listed here.

4          Q.    And this had nothing to do with, in

5    February, this has nothing to do with what

6    phone number you are putting on the Medicare

7    applications; right?

8          A.    No.

9          Q.    You would agree with me that it

10   doesn't?

11         A.    It doesn't.

12               -  -  -  -  -

13               (Thereupon, Defendant's Exhibit 6,

14               Phone Message dated March 2, 2012,

15               was marked for purposes of

16               identification.)

17               -  -  -  -  -

18         Q.    Showing you what I have marked as

19   Exhibit 6.

20               Between March, excuse me, between

21   February 14th and March 2nd did you seek

22   medical care from anybody other than Dr.

23   Headen?

24         A.    Wait.  What are the dates?

25         Q.    Between what is now marked as

1    Exhibit 5 and Exhibit 6.  Exhibit 5 is 2/14,

2    2012, you made the phone call to him and then

3    walked into his office.  And the next note we

4    have is March 2nd.

5              Did you seek medical attention from

6    anybody within those two dates?

7         A.    I really don't recall.

8         Q.    Do you have any doctor other than

9    Dr. Headen?

10        A.    No.

11        Q.    And on 3/2 it says a fax number

12   there and it says, need form faxed.  She left

13   and her result from testing any problem please

14   call.

15              What form did you need fax?

16        A.    Need form faxed she left and her

17   results from testing.  I don't know, that may

18   have been a physical.  I'm not sure.

19        Q.    Whose fax number is that?

20        A.    On Exhibit?

21        Q.    Six.

22        A.    201 -- I believe that's my fax

23   number.

24        Q.    At home?

25        A.    No, at the office.

Page 100

1          Q.    So you were asking him to fax a

2     form to your office fax; is that right?

3          A.    Yes.  I don't know, maybe I asked

4     for FMLA then, I'm not sure.  I'm trying to

5     figure out which form that is.

6          Q.    Why would you have been asking for

7     FMLA on March 2nd?

8          A.    It may have been because of the

9     anxiety.

10         Q.    So you felt you couldn't do your

11    job?

12         A.    I was upset at the fact that he

13    fondled himself.

14         Q.    I understand.

15               But did you feel that you could do

16    your job?

17         A.    I don't know.  I don't recall.  I

18    know I was visibly, I mean, upset.

19         Q.    And so you don't know what form

20    this is?

21         A.    No, I don't recall.

22         Q.    And you were asking your doctor to

23    fax something to work.

24               Were you the only person who had

25    access to that fax?

Page 101

1        A.    4288, I'm trying to figure out,

2    4288.  I know that we had specific fax numbers

3    that would come to our desk.  I'm not sure if

4    this was one of our faxes that we could just go

5    ahead and print it from our desk.

6        Q.    But you don't know for sure?

7        A.    I don't remember.  Maybe it was

8    e-fax.

9                   -  -  -  -  -

10                (Thereupon, Defendant's Exhibit 7,

11                Phone Message dated March 8, 2012,

12                was marked for purposes of

13                identification.)

14                   -  -  -  -  -

15        Q.    Let me show you what I have marked

16    as Exhibit 7.

17        A.    Oh, the health assessment form.

18        Q.    This is two days or, excuse me, six

19    days later, March 8th?

20        A.    Oh, I remember.

21        Q.    What is this?

22        A.    This probably, hold on a second,

23    this was, I believe, the health assessment

24    form, yes.

25        Q.    What health assessment was that?

Page 102

1      A.   There was a program that UH had

2   where they would give you ten dollars in your

3   paycheck if you completed a health assessment.

4   I guess it was a proactive thing for you to --

5   yes, this is what it was.  It was a health

6   assessment form.

7           In order for us to get the ten

8   dollar credit, we had to get the form from the

9   doctor to show that we went there.

10     Q.   So it was a wellness program?

11     A.   Yes.  Yes.  Now, I remember.

12     Q.   And you believe now that you have

13   seen that on Exhibit 7, that Exhibit 6 would

14   have been referring to the same form; is that

15   correct?

16     A.   I almost think it should have been,

17   yes, because I know that I had to request it a

18   couple of times.

19     Q.   Okay.  And so you were asking that

20   the doctor verify that you were a patient of

21   his --

22     A.   Right.

23     Q.   -- under his care?

24     A.   Get my ten dollars a week or

25   whatever it was.  I think we had to do it by a

Page 103

1    certain time, there was a deadline.

2                    -  -  -  -  -

3                (Thereupon, Defendant's Exhibit 8,

4                Phone Message dated March 20, 2012,

5                was marked for purposes of

6                identification.)

7                    -  -  -  -  -

8         Q.    Okay.  Let me show you what I have

9    marked as Exhibit 8.

10               On March 20th you left a message

11    for him to call you.  It says, plan of action,

12    having anxiety over work situation, schedule an

13    appointment, is what you were told.

14               Do you recall making this phone

15    call?

16        A.    Uh-huh.

17        Q.    Yes?

18        A.    I don't recall making it, but I see

19    here that I did call.

20        Q.    What would be the anxiety that you

21    were having on March 20th; do you know?

22        A.    The only thing that I could

23    probably think of is when I had my review and

24    I'm presenting the two write-ups.  That's the

25    only thing that I could think of.

Page 104

1          Q.    That created anxiety for you?

2          A.    Yeah.  Yeah, someone accuses you of

3    doing something.

4          Q.    Was your anxiety alleviated when

5    you gave them the fax and they acknowledged

6    that you had not made the mistakes?

7          A.    Somewhat.

8                   -  -  -  -  -

9                (Thereupon, Defendant's Exhibit 9,

10               Adult Sick Visit Form dated June 11,

11               2012, was marked for purposes of

12               identification.)

13                  -  -  -  -  -

14         Q.    I'm going to show you what I have

15   marked as exhibit 9.

16               Do you know if you ended up making

17   an appointment between March 20th and June

18   11th?

19         A.    Like I said, the appointment when I

20   was prescribed the Zoloft, I don't recall the

21   date of that.

22         Q.    Exhibit 9 shows that you are

23   getting Zoloft?

24         A.    Okay then.

25         Q.    So in between March 20th when you

1    call and they say to schedule an appointment

2    and June 11th, did you see any health care

3    providers?

4         A.    No, not that I recall.

5         Q.    So you didn't do as they requested

6    and schedule an appointment on March 20th; is

7    that correct?

8         A.    Correct.

9         Q.    So then on June 11th you said you

10   were having increased stress at work and that

11   your nerves were bad.

12             What does that mean?  What were the

13   symptoms of your nerves being bad?

14        A.    Well, it says here, decreased

15   interest, appetite.

16        Q.    Was that true?  Did you have a

17   decreased appetite?

18        A.    Yes.

19        Q.    Had you lost weight?

20        A.    I don't remember.

21        Q.    You were having decreased

22   concentration; is that accurate?

23        A.    Uh-huh.

24        Q.    You have to say yes or no for the

25   court reporter.

Page 106

1          A.    Yes.

2          Q.    And your job requires you to

3     concentrate?

4          A.    Oh, sure, yes.

5          Q.    So a decrease in concentration

6     would make your job performance less than it

7     should be; would you agree?

8               MR. HERRON:  Objection.

9          A.    Excuse me?

10              MS. KAMINSKI:  Want to read it back

11    to her?

12              (Record read.)

13         A.    At peaks, yes.  Peaks and high

14    times and low times.  I was still able to

15    complete my job.

16         Q.    Okay.  And you say that these

17    symptoms were present since 2/12 after the

18    event with your co-worker.

19              So you had been in this where you

20    had decreased concentration and decreased sleep

21    and a depressed mood since 2/12; is that

22    correct?

23         A.    Correct.

24         Q.    And did you go to use the EAP at

25    all at work during that time?

Page 107

1          A.    No.

2          Q.    Did you go back to HR and report

3    that you were still having difficulty with the

4    fact that gentleman was still working on the

5    same floor?

6          A.    No.

7          Q.    You didn't have any dizziness it

8    says; is that correct?

9          A.    No, no dizziness.

10         Q.    Now, at this time you decided to

11   take Zoloft; is that correct?

12         A.    Yes.

13         Q.    And the Zoloft you were given, were

14   you given less than 50 milligrams to begin with

15   then you build up to 50 milligrams or did you

16   start with the 50 milligrams?

17         A.    Zoloft at 50 milligrams.  I think

18   it was decreased to 25.

19         Q.    Did you start lower than 50,

20   though?

21         A.    I don't recall.

22         Q.    Did you decide that you would see a

23   counselor?

24         A.    No, I didn't decide that I would

25   see a counselor.

1       Q.    What changed your mind about taking

2    the Zoloft?

3       A.    Well, my family was concerned.  As

4    I have always been a healthy person, you know.

5    They just felt that the stress was causing me

6    to take the medication and they were concerned

7    about that.

8       Q.    They were concerned that you were

9    taking Zoloft?

10      A.    That how -- yeah, you know, I'm a

11   healthy person, all of the sudden now I'm

12   taking medication, I guess.  I'm not the type

13   of person that would take the medication.

14      Q.    So let me ask you.  My original

15   question was, why did you decide to take the

16   Zoloft and you said it was because your family

17   was concerned, but now it sounds like your

18   family didn't want you to take it?

19      A.    Why I decided to take it?

20      Q.    Yes.

21      A.    I felt I needed to.  Once I

22   expressed to my family that I was taking it,

23   they were concerned about my taking it.

24      Q.    Now, as a result of decreased

25   sleep, were you feeling sleepier at work before

Page 109

1    June 11th of 2012?

2         A.    Was I feeling sleepy at work?  I

3    don't think -- it was at home.

4         Q.    No.  I am saying, because you had

5    decreased sleep, were you feeling more tired at

6    work?

7         A.    I wouldn't say that.

8         Q.    You don't think you were sleeping

9    more often --

10        A.    No.

11        Q.    -- before June 11th?

12        A.    No.

13        Q.    Now, as of June 11th, 2012 you're

14   still saying that your depression and issues

15   are really tied to the fondling event; correct?

16        A.    Yes.  Again, because he's still on

17   the same floor.

18        Q.    Right.

19        A.    You know, I still see him in the

20   elevator.

21        Q.    Okay.

22        A.    We have the issue of the

23   applications being denied.

24        Q.    So by June 11th is that part of

25   what you thought was your problem, was the

1    applications being denied?

2        A.    Probably a combination of

3    everything.

4        Q.    You didn't mention that to your

5    doctor; did you?

6        A.    About the application?

7        Q.    Yes.

8        A.    I could have.  I don't recall, I

9    could have though.

10       Q.    It says here that the symptoms were

11   present since 2/12.  Do you see that?

12       A.    Uh-huh.

13       Q.    That doesn't -- with the event with

14   the co-worker.  It doesn't indicate they

15   increased because of additional problems or

16   anything; does it?

17       A.    No.

18       Q.    Do you remember whether or not you

19   discussed the applications with your doctor or

20   not?

21       A.    I do not.

22       Q.    So the best memory you have is

23   recorded here on Exhibit 9; isn't it?

24       A.    Can you repeat that?

25       Q.    Your memory is no better than what

Page 111

1    is on Exhibit 9; correct?

2         A.    Correct.

3               -  -  -  -  -

4               (Thereupon, Defendant's Exhibit 10,

5               Adult Sick Visit Form dated June 19,

6               2012, was marked for purposes of

7               identification.)

8               -  -  -  -  -

9         Q.    Show you what I have marked as

10   Exhibit 10.  This is eight days later you go

11   back to the doctor; correct?

12        A.    Uh-huh.

13        Q.    Yes?

14        A.    Let me just look at the dates,

15   which are 6/19, uh-huh.

16        Q.    So yes?

17        A.    Yes.

18        Q.    And it says that you have

19   improvement in your anxiety and depression, the

20   Zoloft is working; correct?

21        A.    Correct.

22        Q.    You reported that the Zoloft made

23   you feel tired; correct?

24        A.    Made her feel tired, yes.

25        Q.    And but you also say that you have

1    some sinus congestion and your ear is clogged;

2    correct?

3         A.    Correct.

4         Q.    So it could have been that that was

5    making you feel a little tired; correct?

6         A.    My ear being clogged?

7         Q.    And the sinus, yes.

8         A.    I can't attribute to my sinuses

9    making me feel, but, I don't know maybe was,

10   maybe wasn't.

11        Q.    It says you report HA yesterday,

12   which has resolved, what is HA; do you know?

13        A.    Reported HA yesterday, which has

14   resolved, no.

15        Q.    It says you had blurry vision for a

16   few days.  Do you recall that?

17        A.    Yes.

18        Q.    That would make it difficult to be

19   filling out the forms; yes?

20        A.    I don't think it hindered my

21   ability to fill out my applications.

22        Q.    Okay.

23        A.    My -- I never got anything from HR

24   that I had a problem with filling out the

25   applications, they just said that I resisted

Page 113

1    filling out the applications.

2         Q.    Did you take the Claritin-D that

3    was prescribed?

4         A.    Yes, I did.

5         Q.    Did it cause you to feel drowsy?

6         A.    I don't recall.

7                    -  -  -  -  -

8              (Thereupon, Defendant's Exhibit 11,

9              Phone Message dated July 17, 2012,

10             was marked for purposes of

11             identification.)

12                   -  -  -  -  -

13        Q.    I will show you what I have marked

14   as Exhibit 11.

15             Between 6/19, 2012, which is

16   Exhibit 10 and 7/17, 2012, which is Exhibit 11

17   do you recall going to any physicians?

18        A.    Yeah, I think I went to, what's is

19   name, Dr. Abbass.

20        Q.    Who is Dr. Abbass?

21        A.    He is an ENT doctor.

22        Q.    Why did you go to Dr. Abbass?

23        A.    Because of my ears being clogged.

24        Q.    This would seem to say on the plan

25   of action, she will see an ENT, ears are still

1    clogged.

2              So it looks like maybe you went to

3    see Dr. Abbass after this?

4        A.    Correct.  I'm not sure if you have

5    to get a referral to Dr. Abbass, but I know I

6    went to see Dr. Abbass.

7        Q.    Your ears being clogged doesn't

8    have anything do with your work anxiety;

9    correct?

10       A.    No.

11       Q.    And you didn't call because you

12   were still having anxiety; correct?

13       A.    To Dr. Abbass?

14       Q.    To Dr. Headen.

15             I mean, it doesn't indicate that on

16   this phone message; does it?

17       A.    No.

18       Q.    And was your anxiety better at this

19   time as a result of the Zoloft?

20       A.    I believe it was.

21       Q.    Okay.

22                  -  -  -  -  -

23             (Thereupon, Defendant's Exhibit 12,

24             Phone Message dated July 26, 2012,

25             was marked for purposes of

Page 115

1              identification.)

2                   - - - - -

3         Q.    Showing you what's been marked as

4    Exhibit 12.  This is about nine days later.

5    The message just says, please call.

6              Do you recall why you would have

7    been calling the doctor on 7/26?

8         A.    Which doctor is this?

9         Q.    Headen.

10        A.    No, I don't recall.

11              Oh, this is the day -- the 26th.  I

12   believe this is the day that I was on my way to

13   the appointment when I told him I was going to

14   get my FMLA.

15        Q.    Okay.  Let me show you Exhibit 13

16   and you can look at those together.

17                   - - - - -

18              (Thereupon, Deposition Exhibit 13,

19              FMLA Form dated July 26, 2013, was

20              marked for purposes of

21              identification.)

22                   - - - - -

23        A.    Yes.

24        Q.    This is a form that was filled out

25   by Dr. Headen on 7/26; correct?

Page 116

1          A.    Correct.

2          Q.    And this is a form that says you

3    need to be off work; correct?

4          A.    Yes.  He said it's probably best

5    that you take some time off until August 8th.

6          Q.    Now, when he did that, you didn't

7    have an appointment with him on 7/26; did you?

8          A.    No.

9          Q.    And, as I can tell from the

10   records, the last time that you had talked to

11   him about anxiety or stress was more than a

12   month prior to him filling out that you needed

13   to take off work; is that correct?

14         A.    Yes, if that's what you are saying.

15         Q.    Well, the last record I see him

16   talking about your stress is on June 19th;

17   right?

18         A.    Yes, if that's what you have.

19         Q.    So without seeing you or talking to

20   you further he determined that you should be

21   off work until August 8th; is that correct?

22         A.    Correct.

23         Q.    How did he make that determination;

24   do you know?

25                MR. HERRON:  Objection.

Page 117

1          A.    I don't know.

2          Q.    Did you go pick this form up from

3     his office?

4          A.    The morning of the 27th he e-mailed

5     it to me.

6          Q.    And had you dropped this form off

7     at his office or e-mailed it to him?

8          A.    I want to say I dropped it off at

9     his office.

10         Q.    But you didn't see him?

11         A.    No.

12         Q.    Did you fill out any portion of --

13    did you fill in the date of 8/8?

14         A.    No, he filled that in.

15         Q.    Did you tell him how long you

16    wanted to be off?

17         A.    I don't remember that.  It must

18    have been a two-week period.

19         Q.    And why did you decide you needed

20    to have him fill out this form when you were

21    asked to take a -- you decided to ask him to

22    fill out this form when you were asked to take

23    a fit for employment exam; correct?

24         A.    Wait.  Repeat that.

25         Q.    You went to work that day and they

1    asked you to go to the EAP to get a fit for

2    work exam; correct?

3         A.    Correct.

4         Q.    In response to being asked to go

5    get this fit for work exam you said you were

6    going to go on FMLA?

7         A.    I said I would talk about going on

8    FMLA.

9         Q.    But you talked about that a month

10   earlier; right?

11        A.    I don't know exactly when we talked

12   about it but, yes, we did talk about it.

13        Q.    In between that time you started

14   the Zoloft and you told me that your anxiety

15   was much better on the Zoloft; correct?

16        A.    Yes, I felt it was much better, but

17   there are things during the -- well, the one

18   situation after that happened with Sheryl,

19   telling my information, I -- that was a peak.

20   You know, the conversation with -- the

21   conversation in the office about the pink

22   jailhouse jumpsuit, that was a peak.  You know,

23   it was just up and down.

24        Q.    So why on this day did you decide

25   you needed to have FMLA, you agreed with them

1    you weren't fit to work?

2              MR. HERRON:  Objection.

3         Q.    Is that right?

4         A.    Excuse me?

5         Q.    You agreed that you were not fit to

6    work?

7         A.    I wouldn't say that I wasn't fit to

8    work.  I just felt that I was having anxiety

9    placed on me at that time.

10        Q.    You were having what?

11        A.    Anxiety placed on me at that time.

12        Q.    An anxiety placed on you, is that

13   what you are saying?

14        A.    Not an anxiety, but anxiety placed

15   on me at that time.

16        Q.    Such that you couldn't work;

17   correct?

18        A.    Probably for that day, maybe the

19   day after, but --

20        Q.    But here you are saying that you

21   can't work for two weeks?

22        A.    That's what the doctor said.

23        Q.    But the doctor said that without

24   ever talking to you; correct?

25        A.    Well, I'm pretty sure with my

Page 120

1    appointments he probably felt that, that I

2    needed the time off.

3              MR. HERRON:  Are you getting close

4    to a lunch break?

5              MS. KAMINSKI:  As soon as we get

6    done with the medical records?

7              MR. HERRON:  Is that going to be in

8    the next five minutes or --

9              MS. KAMINSKI:  I don't know,

10   because I never know how long the answers are

11   going to take.  I am never good at guessing

12   those things.

13        Q.   Did you take the full -- you were

14   going to take the full two weeks off; correct?

15        A.   Yes.  According to this paperwork.

16   And this is not FML -- this isn't approved.

17        Q.   Correct.

18        A.   This is just --

19        Q.   This is what you are asking for?

20        A.   Well, what he suggested I have.

21        Q.   But you have to ask for?

22        A.   I have to agree with what he is

23   asking.

24        Q.   And you did?

25        A.   Yes.

```
 1                      -  -  -  -  -

 2                 (Thereupon, Defendant's Exhibit 14,

 3                 Phone Message date August 10, 2012,

 4                 was marked for purposes of

 5                 identification.)

 6                      -  -  -  -  -

 7        Q.    Showing you what I have marked as

 8   Exhibit 14.  This is August 10th?

 9        A.    Uh-huh.

10        Q.    So about 14 days later, FYI she got

11   an extension on her return to work until 9/1?

12        A.    Uh-huh.

13        Q.    Do you see that?

14        A.    Uh-huh.

15        Q.    Yes?

16        A.    Yes.

17        Q.    And who gave you that extension?

18        A.    Doctor, I believe that must have

19   been Dr. Dutton, who was -- I was told to see

20   -- Dr. Pallas told me to see another

21   psychiatrist for an extension of two weeks.

22        Q.    Okay.  And it says, I spoke to the

23   patient and she is seeing a psychiatrist.

24              That is Dr. Dutton; correct?

25        A.    I don't think -- this had to be --
```

Page 122

1    I don't know who this came from because I don't

2    think Dr. Dutton responded to any of these.

3         Q.    I am just saying that Dr. Headen is

4    noting that you are seeing a psychiatrist, and

5    that would refer to Dr. Dutton that you are

6    seeing; correct?

7         A.    Correct.

8         Q.    How many times did you see Dr.

9    Dutton?

10        A.    Once, probably twice.  Maybe once.

11   I can't remember.  It was more than once.

12   Maybe once or twice.

13        Q.    You are not sure whether it's once

14   or twice?

15        A.    I know it is definitely once.

16        Q.    Did he prescribe any change in the

17   Zoloft?

18        A.    No, that was -- no, he didn't

19   prescribe anything.

20        Q.    Did he suggest a change in the

21   Zoloft?

22        A.    No, he didn't.

23        Q.    Did he tell you that he wasn't

24   going to continue to see you?

25        A.    Yes, he did.

1          Q.     When did he tell you that?

2          A.     He told me that he could no longer

3     see me as a patient because he was on the board

4     at UH.

5          Q.     And what difference does that make?

6          A.     I don't know, you would have to ask

7     him.

8          Q.     And when did he tell you that, at

9     the time that you saw him?

10         A.     Yes.

11         Q.     And is he the one that gave you the

12     extension until 9/1?

13         A.     I believe his -- I don't have it in

14     front of me.

15                Do you have the documentation?

16         Q.     I do not.

17         A.     I believe it was until 9/4.

18         Q.     Okay.

19                (Discussion had off the record.)

20                MS. KAMINSKI:  Did you produce the

21     Dr. Dutton records?

22                MR. HERRON:  No.  Because Dr.

23     Dutton is not responding to our subpoena.

24                MS. KAMINSKI:  Okay.

25                MR. HERRON:  Why is he not doing

Page 124

1    that, I don't know.

2                MS. KAMINSKI:  Okay.

3                MR. HERRON:  We want them as much

4    as you do.

5                MS. KAMINSKI:  All right.

6                Maybe we can work on that.

7                      -  -  -  -  -

8                (Thereupon, Defendant's Exhibit 15,

9                Geauga Medical Center Report dated

10               August 17, 2012, was marked for

11               purposes of identification.)

12                     -  -  -  -  -

13        Q.    All right.  Let me show you what I

14   have marked as Exhibit 15.

15               This says August 17th, 2012 you

16   have a tonsillectomy; is that correct?

17        A.    Uh-huh.

18        Q.    Yes?

19        A.    Yes.

20        Q.    So while you were --

21        A.    I think this may have been -- I

22   know that -- I think I got a return to work on

23   9/1, but I'm not sure, from Dr. Abbass.

24        Q.    So it was Dr. Abbass that gave you

25   an extension; is that correct?

Page 125

1          A.    Yes, I believe he did.

2          Q.    Because you were going to have the

3    tonsillectomy?

4          A.    Correct.

5          Q.    So while you were out on FMLA you

6    had the tonsillectomy; correct?

7                MR. HERRON:  Objection.

8          A.    I was --

9                MR. HERRON:  Go ahead.  We are not

10   accepting her assumption in the question that

11   you were out on FMLA.

12         A.    I don't believe I was on FMLA.  It

13   wasn't approved.

14         Q.    Okay.  While you had a request for

15   FMLA pending?

16         A.    Right, pending.

17         Q.    You had the tonsillectomy then;

18   correct?

19         A.    Yes, but the return to work was

20   within the time from 9/1 and Dr. Dutton's was

21   9/4.

22                    -   -   -   -   -

23                (Thereupon, Defendant's Exhibit 16,

24                Ahuja Medical Center Report dated

25                October 7, 2012, was marked for

1        purposes of identification.)

2              - - - - -

3     Q.    Let me show you what I have marked

4   as Exhibit 16.

5     A.    Do you have the return to paperwork

6   from Dr. Abbass?

7     Q.    No.

8         MS. KAMINSKI:  Do you have Dr.

9   Abbass' records?

10        MR. HERRON:  I didn't know about

11  Dr. Abbass until about two minutes ago.

12        MS. KAMINSKI:  Okay.

13    Q.    This is October 7th of 2012 medical

14  record and it appears that you had a sinus

15  test; is that correct?

16    A.    Uh-huh.

17    Q.    Yes?

18    A.    Uh-huh.

19    Q.    You have to say yes or no, you

20  can't uh-huh or uh-huh.

21    A.    Yes.

22        MR. HERRON:  She is supposed to

23  advise you of that at the beginning of the

24  deposition, to give verbal responses and not

25  the uh-huhs and huh-uhs or gestures.

1          A.     Yes.

2                 MR. HERRON:  Please remember to

3     give the verbal responses.

4                 THE WITNESS:  Uh-huh.

5                 MR. HERRON:  Yes?

6                 THE WITNESS:  Yes.

7          Q.     It says here that you were supposed

8     to have an outpatient CAT scan of her sinuses

9     next week and that you feel it is an urgent

10    matter and you wanted it that night.

11                What made it so urgent that you had

12    to have it that night?

13         A.     I want to say it's because of the

14    dizziness.  I believe it was because of the

15    dizziness because I know I went to the ER at

16    Bedford and I was experiencing dizziness.  But

17    I don't believe -- I don't recall.  I think

18    they couldn't do the CAT scan there.  I don't

19    recall.

20                MS. KAMINSKI:  We would like those

21    ER records as well.

22                MR. HERRON:  Send me a follow-up so

23    that I remember to follow-up, otherwise I can

24    guarantee you I will forget.

25         Q.     And the results of the CAT scan

1    were that they didn't find any particular

2    structural issues --

3          A.    Right.

4          Q.    -- with regard to your sinuses;

5    correct?

6          A.    Correct.

7          Q.    So their recommendation was

8    basically just a follow-up with Dr. Abbass;

9    correct?

10         A.    Yes.  I think he gave me -- I think

11   he gave me something, I'm not sure.  That was

12   from Dr. Abbass.  He gave me the Afrin and the

13   Flonase, yes.

14         Q.    You were already taking Keflex and

15   Doxycycline; correct?

16         A.    That was from Bedford, the doctor

17   there gave me that.

18         Q.    Now, did the sinus issues and the

19   dizziness lead you to be somewhat tired?

20         A.    No.

21         Q.    Were you still, as of 10/7, 2012,

22   suffering from the anxiety?

23         A.    Yes, because I was out of -- I

24   believe I was still -- when was this done?

25   When was this done?

Page 129

1      Q.    10/7, 2012.

2      A.    10/7, probably.  I went back to

3 work 10/8.

4      Q.    So were you still suffering from

5 anxiety?

6      A.    Probably minor.

7      Q.    Did you continue to take the Zoloft

8 once you were on leave?

9      A.    I don't think so, because the

10 medications I have -- the medications that I

11 told him that I was taking and I don't see

12 Zoloft here.

13      Q.    Do you know when you quit taking

14 the Zoloft?

15      A.    Not exactly.

16      Q.    But it was sometime when you were

17 on leave?

18      A.    Yes.

19            MS. KAMINSKI:  Okay.  Let's take a

20 lunch break.

21            How long would you like, Counselor?

22            MR. HERRON:  How long do you need?

23            MS. KAMINSKI:  Half hour.

24            MR. HERRON:  That sounds good.

25            (Lunch recess had.)

Page 130

1                    -  -  -  -  -

2                (Thereupon, Defendant's Exhibit 17,

3                e-mail Correspondence from

4                Bronxvikki, was marked for purposes

5                of identification.)

6                    -  -  -  -  -

7       Q.    I will show you what I have marked

8   as Exhibit 17.  It started at page three of

9   that e-mail.  Do you see there is an e-mail

10  from you on February 10th at 8:23 a.m.?  Do you

11  see that?

12      A.    Uh-huh.

13      Q.    Yes?

14      A.    Yes.

15      Q.    And the bronxvikki, that's you;

16  correct?

17      A.    Correct.

18      Q.    And that's your home e-mail?

19      A.    Correct.

20      Q.    On February 10th were you at home?

21      A.    I believe I probably was.  Let me

22  see.  Yes.

23      Q.    And is it the day before that you

24  had reported the issues about Paul's behavior?

25      A.    Possibly.  I don't know the exact

Page 131

1    date.

2            Q.    You see that then on page 2, in the

3    middle there, Christina says that, in the

4    interim is a possible to move Victoria?

5            A.    Uh-huh.

6            Q.    And then she says, Victoria how

7    long have you been sitting next to Paul?

8            A.    Uh-huh.

9            Q.    And then ask you a question about

10   if you're sure it was lingering fondling or

11   more like a lot of adjusting.

12           Do you see that?

13           A.    Yes.

14           Q.    And then you write back on the

15   first page of Exhibit 17 at 9:38 and you say

16   you haven't been feeling well.

17           What were the problems that you

18   were having that you weren't feeling well?

19           A.    I don't remember.  I know that I

20   was upset when I talked to him.  When I talked

21   to him again he stormed -- I told him to stop.

22   He stormed out of the office, but it was quite

23   unusual because Paul, he kept a lot of papers

24   on his desk.  And I want to say this is the day

25   that when I told him to stop and he stormed out

1  of the of the office, he took all of the papers

2  that were on his desk and threw them in the

3  garbage can.  And I think that upset me because

4  I didn't know his state of mind.

5       Q.    But that had happened three or four

6  days before this time; right?

7       A.    Yes.

8       Q.    You see, you are responding on

9  Sunday and the questions were asked on Friday,

10 so this has gone all day Friday, Saturday and

11 Sunday and you are just then responding.

12            Do you see that?

13      A.    Wait.  Which is -- can you?

14      Q.    The Friday one that asks you the

15 questions is February 10th.

16      A.    Yes.

17      Q.    At 9:16 a.m.

18      A.    Uh-huh.

19      Q.    And your response is February 12th

20 at 9:38 p.m.?

21      A.    That's a Sunday, yes.

22      Q.    Okay.  So it's been a couple of

23 days before you're responding to it, that's why

24 you apologize that you are just getting back.

25            Do you see that?

Page 133

1          A.    Yes.

2          Q.    You say you want to stay in your

3    cube.  Do you see that?

4          A.    Yes.

5          Q.    Why did you want to stay in your

6    cube?

7          A.    Because I was part of the provider

8    enrollment team and I felt that I was the

9    victim.  You know, he asked to sit next to me

10   so I -- I believe, in my mind, that he should

11   be the one to move.

12         Q.    And how do you know that he asked

13   to sit?

14         A.    I found out from another -- from

15   Becky.

16         Q.    Becky who?

17         A.    I don't remember Becky's last name.

18         Q.    Where did Becky work?

19         A.    She worked in the same on the same

20   floor.  I believe she worked for the UHMP side.

21         Q.    Same as Paul?

22         A.    Same as Paul, yes.  It was Becky

23   she told me that because I had talked to her.

24   I talked to Bianca and I talked to Christine

25   about his behavior.

1          Q.     And what did Becky tell you?

2          A.     She said, wow, she said, you know,

3     what I think it was at that time she told me,

4     wow, as a matter of fact, he was the one who

5     had requested to sit across from you.

6          Q.     How would she know that?

7          A.     I don't know.

8          Q.     And then you see that on Monday

9     Christina tells you that she knew about some

10    other positions.  Had you indicated to her that

11    you might be interested in other positions?

12         A.     I want to say that she may have

13    suggested that and I said, probably, sure.

14         Q.     Well, remember that you told your

15    doctor that you were thinking about maybe a

16    transfer?

17         A.     Right.

18         Q.     So had you indicated?

19         A.     He may have suggested that also.  I

20    don't know.  I don't remember.

21         Q.     Had you suggested to Christina that

22    you would be interested in a transfer?

23         A.     Yes.

24         Q.     Did you follow-up on these job

25    potentials that Christina is listing here on

1    Exhibit 17?

2         A.    I know I applied for a job

3    position.  I think I applied for two of them.

4    I don't recall the dates of them.

5         Q.    What happened with your

6    applications?

7         A.    They sent me something that they

8    choose another candidate.

9         Q.    Did you have interviews?

10        A.    No.

11        Q.    But you see that Tina is saying

12   that she will help support your application;

13   right?

14        A.    Yes.

15        Q.    There's nothing in Tina's e-mail

16   here to you that looks like she is angry or

17   upset that you made this report; is there?

18             MR. HERRON:  Objection.

19             Answer if you know.

20        A.    It doesn't look like from the

21   e-mail.

22        Q.    And then you respond with, thanks,

23   give Kim my number, which would further

24   indicate that you were interested in pursuing

25   other opportunities inside of UH; correct?

Page 136

1          A.    Yes.

2          Q.    Did you have your cubicle before

3     Paul moved to his?

4          A.    Yes.  I believe when I moved he was

5     still sitting across from Steve Riddle.

6                      -  -  -  -  -

7                 (Thereupon, Deposition Exhibit 18,

8                 e-mail Correspondence dated March

9                 19, 2012, was marked for purposes of

10                identification.)

11                     -  -  -  -  -

12         Q.    Showing you what I have marked as

13    Exhibit 18.

14               Turn to page two of that, you will

15    see that it's an e-mail chain that starts off

16    with the end of the last one where you ask Tina

17    to give Kim your number, page two of it.

18               Do you see your February 13th,

19    11:19 a.m. e-mail?

20         A.    Uh-huh, yes.

21         Q.    That picks up where we left off on

22    the last e-mail.  Do you see that?

23         A.    Yes.

24         Q.    And it appears from this e-mail

25    that you were trying to call Kim; correct?

Page 137

1        A.    Yes.

2        Q.    At some point Christina, at the

3    bottom of page one, suggests to you, because

4    you have been so emotional that you might go to

5    EAP to get some help.  Do you see that?

6        A.    From Christine at 7:12 p.m.?

7        Q.    Right.

8        A.    EAP is a wonderful benefit that we

9    have at UH for UH employees.  During all of

10   this it might be something that you could take

11   advantage of.

12            Correct.

13       Q.    Did you take suggestion and go see

14   anybody in EAP?

15       A.    I didn't.

16       Q.    And then on February 14th you see

17   at 1:02 you write to Christina and one of the

18   things you do is you want to know the details,

19   whatever details you can know about Paul

20   Simmons.

21            Do you see that?

22       A.    Correct.

23       Q.    Christina basically tells you that

24   things were addressed and that he is moving

25   today as you requested.

Page 138

1           Do you see that?

2      A.     Yes.

3      Q.     Is that accurate?

4      A.     That's accurate.  She did not tell

5    me the outcome of the meeting.

6      Q.     And she says she has made changes

7    to help you feel comfortable.

8             They never said to you, don't come

9    back if you are still having trouble; did she?

10     A.     Don't come back where?

11     Q.     Christina, she never said, and I

12   don't want to hear from you about this again or

13   anything like that to you; did she?

14     A.     I don't imagine she would say

15   something like that as an HR person.

16     Q.     But she didn't?

17     A.     No, she didn't.

18     Q.     And you never went back and saw her

19   and told her that you were still upset that he

20   was in the building; did you?

21     A.     No, I didn't.  But that doesn't

22   mean that I didn't feel that way, you know, I'm

23   a big girl.

24     Q.     You didn't ever seek out EAP as

25   suggested to you; correct?

Page 139

1        A.    Correct.

2                    -  -  -  -  -

3              (Thereupon, Defendant's Exhibit 19,

4              e-mail Correspondence from Victoria

5              Johnson, was marked for purposes of

6              identification.)

7                    -  -  -  -  -

8        Q.    Show you what I have marked as

9    Exhibit 19.

10             In an e-mail chain on the second

11   page there you write Steve about your

12   performance review; correct?

13       A.    At 7:12?

14       Q.    Yes.

15       A.    Yes.

16       Q.    And you say that you believe that

17   you were given the performance review you were

18   given because of your complaint about Paul

19   Simmons.

20             Do you see that?

21       A.    Yes, that was a belief of mine.

22       Q.    And what led you to that belief?

23       A.    Because the CAs were inaccurate.

24       Q.    And because they were inaccurate

25   they had to somehow or other be related to

1    Paul?

2         A.    Not related to Paul.  To me it

3    could have been, in my mind, as some form of

4    retaliation or to present the fact that I

5    wasn't a model employee, I don't know.

6         Q.    Why would they want to retaliate

7    against you because you wanted to report that

8    about Paul?

9              MR. HERRON:  Objection.

10             Go ahead.  If you know why.

11             THE WITNESS:  If I know why?

12             MR. HERRON:  If you know why.

13        A.    I don't know why, but I don't know

14   why they would write it.

15        Q.    So you naturally link those two in

16   your head --

17             MR. HERRON:  Objection.

18        Q.    -- without any facts to link them;

19   is that right?

20        A.    Well, it came out of the blue that

21   they wrote these things on me.

22        Q.    And this is more than a year later;

23   right?

24        A.    No, it's the same year.

25        Q.    Oh, same year, excuse me.

1        A.    Matter of fact, that was in

2    February about Paul, my review was in March.

3        Q.    And do you know when your review

4    was actually written?

5        A.    No, I don't remember the exact

6    date.  It should be in there.  If you don't, I

7    mean --

8        Q.    If they actually determine what

9    your review is going to be before the Paul

10   event, you would have to agree that it wouldn't

11   be related to Paul; wouldn't you?

12              MR. HERRON:  Objection.

13              Assuming facts not in evidence.

14       Q.    I will ask you to assume those

15   facts.

16       A.    I won't assume those facts.

17       Q.    I'm not ask you whether you want to

18   or not.  For purposes of my question, assume

19   that your review was actually determined what

20   it was going to be in January before you --

21       A.    That's not true.

22       Q.    If I could finish my question.

23       A.    Go ahead.

24       Q.    I want you to assume that it was

25   determined what your review was going to be in

1    January before you made the report about Paul.

2    If that's true, then it couldn't possibly have

3    to do with Paul.

4              Would you agree with that?

5         A.    I would agree with that.

6         Q.    Okay.

7         A.    However, my review -- my review was

8    after the fact.  And I specifically remember

9    that I was supposed to -- I believe everybody

10   in the department had their review in March.  I

11   believe, well, I know I had mines after

12   there's.  Maybe a week after.  So and I don't

13   think he completed it yet.

14        Q.    Okay.  Yes.  I'm not disagreeing

15   with you.  I know that your review was in

16   March.

17        A.    Right.

18        Q.    But I'm saying if they had

19   determined what your rating was going to be in

20   January, because it was a review of not January

21   and February, but a review of the prior year;

22   correct?

23        A.    Correct.  But listen to this, the

24   corrective actions were from two to three weeks

25   prior, so --

1          Q.     And those corrective actions are

2     not reflective in your review or are they?

3          A.     No, they disposed of them.

4          Q.     And did you ever in writing give

5     them the information with regard to what was

6     wrong with the corrective actions you say they

7     presented you with?

8          A.     Did I give them?

9          Q.     You said you went back to your

10    desk, got the fax?

11         A.     And presented it to them.

12         Q.     You presented it in writing?

13         A.     That I don't remember.  But I

14    presented it to them.  Well, I didn't present

15    the response in writing, but I showed them the

16    paperwork in which they said that I caused them

17    to lose money on Elizabeth Schuld.  And that

18    happened in 2012, it wasn't the year prior.

19         Q.     Did you keep that paperwork?

20         A.     I am trying to figure, do I have a

21    copy of that.  I don't believe -- I'm not sure.

22    I have I'm not sure.

23              But it was because of these claims

24    that were recent and not -- like I said, I was

25    the last one to have my review.  I think he put

1    it off for like a week or two after everyone

2    else had theirs.

3         Q.    You see that on the next page

4    Christina responds to you and says that Steve

5    and Sheryl have documented performance concerns

6    that fell under your responsibility that

7    occurred in 2011.  Do you see that?

8         A.    Uh-huh.

9         Q.    Yes?

10        A.    Yes.

11        Q.    Was that an accurate statement?

12        A.    It's from the day that he -- he

13   prepared the review until a year before.

14        Q.    Right.  But it says that they

15   documented performance concerns that fell on

16   your responsibility and occurred in 2011.

17             Is that accurate that that

18   demonstrated to you some issues in 2011?

19        A.    No, there weren't any in 2011,

20   those corrective actions were in 2012.

21        Q.    You see that a formal corrective

22   action was not issued to you.  The CA is

23   currently Steve and Sheryl's documentation of

24   the events, not a formal CA on your records.

25             Do you see that?

Page 145

```
 1         A.    Yes.  I'm trying to -- in 2011.
 2    Technically, I believe -- when was I promoted
 3    to provider enrollment?  That was in October of
 4    2000 --
 5         Q.    According to your testimony, yes.
 6         A.    2011?
 7         Q.    Right.
 8         A.    So Steve wouldn't have much to go
 9    on.  I was only under his tenure from October
10    to --
11         Q.    December?
12         A.    -- December.
13         Q.    So you dispute that statement, is
14    what I'm asking?
15         A.    Well, my performance was done based
16    on the evaluation of my work, but he wasn't
17    responsible for a good portion of 2011.
18         Q.    You were aware that there was not a
19    formal corrective action; is that correct?
20         A.    I am aware -- yes, they did not
21    give me a copy of it.
22         Q.    And up above you say they have
23    documentation to present to you to support my
24    belief.  Do you see that?
25         A.    Yes.
```

Page 146

1        Q.    So they did meet with you then;

2    right?

3        A.    Yes.  They said they wouldn't give

4    me the corrective action only because it would

5    prevent me from moving to another department,

6    not that I was right.  I mean, I was wrong in

7    what I did.

8        Q.    So they were trying to be helpful

9    to you because you had expressed an interest in

10    moving to another department; is that correct?

11        A.    Right.  If I'm wrong, I'm wrong,

12    that's something you don't do away with.

13        Q.    You would agree that they were

14    trying to be helpful to you?

15        A.    Yeah, they were.

16            (Discussion had off the record.)

17                -  -  -  -  -

18            (Thereupon, Defendant's Exhibit 20,

19            UH Performance Evaluation dated

20            March 6, 2012, was marked for

21            purposes of identification.)

22                -  -  -  -  -

23        Q.    Let me show you what I have marked

24    as Exhibit 20.

25            Do you recognize that as your --

1          A.     Uh-huh, yes.

2          Q.     -- performance evaluation that we

3    were just talking about; correct?

4          A.     Yes.

5          Q.     And it shows that it is a March 6th

6    evaluation; correct?

7          A.     Correct.

8          Q.     The first one says that you

9    frequently meet the expectation; correct?

10         A.     Uh-huh, yes.

11         Q.     And it says that you need to pay a

12   little closer attention to the detail when

13   submitting applications?

14         A.     Correct.

15         Q.     Did you disagree with that?

16         A.     Well, everybody has their

17   interpretations, but this is what they put down

18   here.

19         Q.     The next one says you consistently

20   meet the expectation; correct?

21         A.     Correct.

22         Q.     And the next one on integrity says

23   you frequently meet the expectation; correct?

24         A.     Correct.

25         Q.     Compassion says you frequently meet

Page 148

1    it; correct?

2         A.    Correct.

3         Q.    But it says that you don't

4    consistently present a positive disposition or

5    convey a desire to maintain constructive

6    interpersonal relationships.

7               Did you agree with that?

8         A.    Interpersonal relationships.  Well,

9    they said that because I'm not, you know, they

10   -- what did they say?  Because I'm not, you

11   know, I'm off to myself, right.

12        Q.    And so that's accurate that you

13   were off to yourself?

14        A.    Well, I wouldn't say one hundred

15   percent of the time.

16        Q.    But predominantly?

17        A.    Predominantly yes.

18        Q.    The next one on teamwork says

19   frequently meets expectations.

20               Do you see that?

21        A.    Where is the teamwork?  Yes.

22        Q.    It says at the end there, Victoria

23   needs to have a better understanding of the

24   rejection report and how to work the report.

25               Would you agree with that?

Page 149

1          A.    Yes, I was never properly trained
2     on how to --
3          Q.    Do that?
4          A.    -- do that.
5          Q.    Okay.  And the next category it
6     says frequently meets expectations.  Do you see
7     that?
8          A.    Yes.
9          Q.    It says that you need to transfer
10    information to appropriate departments on a
11    timely basis, referring physicians, new
12    providers that needed loaded into IDX.  All of
13    these processes ultimately impacts claims out
14    the door?
15              Do you see that as an issue with
16    your transferring information to others; did
17    you agree with that?
18         A.    Yes, but it contradicts frequently
19    meeting expectations.
20         Q.    Well, that's as opposed to does not
21    meet expectations; correct?
22         A.    Yeah, well, those are the choices.
23         Q.    Well, there's two above that.
24         A.    Well, it says consistently, right,
25    exceeds and meets.

1          Q.    So there are two categories above

2    frequently meets and one below?

3          A.    That's correct.

4          Q.    And then the next category is

5    frequently meets and it says that you need to

6    engage yourself during required meetings and

7    new knowledge skills such that required to work

8    rejection reports are not always learned and

9    applied effectively?

10         A.    Well, they put that there, I was

11   never formally trained on the rejection

12   reports.

13         Q.    So you were having trouble with the

14   rejection reports?

15         A.    Correct.

16         Q.    And then building trust, frequently

17   meets expectations, it says Victoria's

18   interactions do not consistently elicit

19   confidence and trust from others.

20               Would you agree with that?

21         A.    I see it here.  Do I agree with it?

22               Well, you know, you have Bianca --

23   at this time you had Bianca and Christine, they

24   were considered, you know, a peer.  So, you

25   know, and that probably came from -- I mean, I

Page 151

1    understand what he is saying, I'm not part of a

2    group or whatever.  You know, I felt when I

3    went to go ask them for questions or how to do

4    something that I was just being shunned off.

5         Q.    So far none of these categories

6    have anything to do with the two incidences

7    that you were independently written up for;

8    right?

9              MR. HERRON:  Objection to the form.

10             Go ahead.

11        A.    Can you repeat that?

12        Q.    Sure.

13        A.    Or rephrase it.

14        Q.    So far all of the categories that

15   we looked at and the ratings and the comments,

16   they don't have to look at two specific

17   incidences that you have indicated you have

18   been written up for; correct?

19             MR. HERRON:  Same objection.

20             You can answer.

21        A.    From this evaluation, no.

22        Q.    Right, okay.

23             And the next one is, frequently

24   meets expectation.  And it says that you would

25   benefit from communicating more closely with

Page 152

1    your provider contacts.  There have been times

2    when they have asked for information or updates

3    to be done within IDX and they have not been

4    completed on a timely basis and they have gone

5    to other PE reps for assistance?

6         A.    Uh-huh.

7         Q.    Now, that doesn't have anything to

8    do with the two individual incidences that you

9    were written up for; correct?

10        A.    Correct.  That's why it hard for me

11   to believe that I was written up for them.

12        Q.    So at least this review that we

13   have seen thus far doesn't have to do with

14   those two incidences; correct?

15             MR. HERRON:  Objection.

16             You can answer if you know.

17        A.    Can you repeat that, please?

18        Q.    So far the review that we have seen

19   doesn't have to do with the two incidences that

20   you were independently written up for?

21             MR. HERRON:  Same objection.

22             But you can answer.

23        A.    No.  But I'm curious here.  It says

24   for 2011 there were issues related to the

25   application as well as expectations.

Page 153

1            Are they referring those two to

2    this?

3        Q.    You have to read the whole

4    sentence.

5        A.    All right.

6        Q.    For 2011 there are issues related

7    to the application as well as below expectation

8    efforts to stay current with rejection report,

9    which seems to be --

10       A.    As well as.  Right.

11       Q.    All right.  So.

12            Then if you go to the last page

13   here of the review.

14       A.    Oh, sorry.

15       Q.    You will see in there it kind of

16   repeats the same comments.  Then it says,

17   Victoria can maintain a level of

18   professionalism by not nodding off or appearing

19   disengaged.

20            So by this time you had had some

21   issues with nodding off; correct?

22       A.    At the meetings, yes.

23       Q.    Okay.

24       A.    You know, sometimes you go into a

25   meeting and, you know, because of your being in

1    a room or the temperature or, I mean, it's

2    happened not only in providing rooms, when I go

3    for my continuing education with real estate

4    so.

5         Q.    Okay.  When it says employee

6    comments, it says comments forthcoming.

7              Did you ever present comments?

8         A.    Yes, I did.  And that was with

9    regard to the two write-ups.

10        Q.    Did you do anything in writing?

11        A.    I honestly can't say whether it was

12   in writing.  I know I did address them with it

13   or about it.  I think I requested a meeting in

14   writing.

15        Q.    And then you did sign this form.

16   Do you see that?

17        A.    Yes.

18              I don't believe I signed those two

19   write-ups, but I did sign this.  This right

20   here, it says, overall, Victoria does not

21   portray herself -- maintain a level of

22   professionalism by not nodding off.  It says

23   not.  It doesn't say nodding off.

24                   -  -  -  -  -

25              (Thereupon, Defendant's Exhibit 21,

Page 155

1              e-mail Correspondence from Sheryl

2              Johnson, was marked for purposes of

3              identification.)

4                   -  -  -  -  -

5         Q.    Let me show you what I have marked

6    as Exhibit 21.

7         A.    Maybe they were looking for my

8    approval, but that's okay.

9         Q.    If you look at page two of Exhibit

10   21.

11        A.    Uh-huh.

12        Q.    There is an e-mail from Sheryl to

13   you of April 3rd.  Do you see that?

14        A.    Which page, two?

15        Q.    Yes.

16        A.    Yes.

17        Q.    This is where she asks you, Sheryl,

18   your supervisor, asked you to place a break

19   sign and said that several people had mentioned

20   that you were sleeping and did not see a break

21   sign; correct?

22        A.    Correct.

23        Q.    And your response to Sheryl then, a

24   couple of days later was, I verbally told you

25   before you were sending this e-mail that I was

1    on break, a rest period.  And then you say

2    this, please inform those walking up and down

3    the aisle that I sometimes will stay at my desk

4    during my break, just in case I do not put a

5    break, which something I do, only because I do

6    not wish to be disturbed.

7              Now, that seems like it had to have

8    been some sarcasm or something because you

9    wouldn't really expect that Sheryl was going to

10   go out into the hallways and tell everybody

11   what your behavior would be on break; did you?

12             MR. HERRON:  Objection.

13        A.    Can you rephrase that?

14        Q.    Did you really expect her to inform

15   people walking up and down the aisle that you

16   sometimes stay at your desk during your break?

17   You really thought that your supervisor should

18   go out there and inform people?

19             MR. HERRON:  Objection.

20             If you understand her question you

21   can answer.  Go ahead.

22        A.    I don't expect her to.  But not

23   everybody puts up a break sign when they are on

24   their lunch break.  So I may have felt, you

25   know -- I don't know what I felt, but not

1    everyone does it, you know.  And I spoke to her

2    verbally, but she decided to send an e-mail.

3           Q.    If not everybody does it, does it

4    mean you shouldn't do it?

5                 MR. HERRON:  Objection.

6                 Go ahead.

7                 Relevance.

8                 Go ahead if you understand what she

9    is talking about.

10          A.    Well, if it's a company policy

11   everybody should do it.

12          Q.    If you are asked specifically to do

13   something by your supervisor, do you still have

14   the right to do say, no, I'm not going to do

15   that?

16          A.    Why is she asking me -- as a matter

17   of that fact, yes.  Why is she asking just me

18   to do it and not everyone else?  Is that

19   another form of harassment or retal --

20          Q.    Is she asking you because you were

21   reported sleeping at your desk?

22          A.    Well, I'm on my break and I told

23   her that I was on my break and I felt that that

24   should suffice, because not everybody does it.

25          Q.    Okay.  Then you say, I don't

1    believe these signs are supplied by UH.

2              In order to put a sign up you

3    thought UH should supply you a sign?

4         A.    Yes, if it is company policy I felt

5    that they should provide a sign.  If it is

6    company policy for us to not take a break at

7    our desk and if it's company policy they should

8    supply the sign.

9              But then I also told her that the

10   reason why I take my breaks at my desk is that

11   so I could answer the phone calls from CGS so I

12   can tell them the doctor can be reached there

13   directly.

14        Q.    And so now you say, again, I am

15   made to feel --

16        A.    Although they cannot.

17        Q.    Again I am made to feel that

18   management is creating a hostile work

19   environment?

20        A.    Correct.

21        Q.    Why do you say again?

22        A.    Well, this was after my review.  So

23   then, you know, I felt the corrective action

24   was putting me -- I mean, hostile.  I felt that

25   the break sign was hostile.

Page 159

1          Q.     Anything else?

2          A.     That's it.  Certainly what I see

3     here.

4          Q.     And so you still thought the

5     corrective action was hostile once you were

6     able to show them their facts were wrong and

7     they with withdrew it?

8          A.     No, they --

9          Q.     And it's not okay if they just made

10    a mistake on the facts with you?

11         A.     That's not a serious fact.  That is

12    a serious mistake.

13         Q.     But they didn't process it once you

14    gave them the facts; did they?

15                MR. HERRON:  If you know.

16                Objection.

17         A.     Whether they did away with it or

18    not, I just felt that they shouldn't have

19    created it.  I mean, that's something that you

20    don't take lightly.  That very well can -- if

21    it was put in my folder could keep me from

22    moving to another department.  It could also

23    now -- those were two.  There's a third strike

24    program, the third one, I'm out of there.

25                         -  -  -  -  -

Page 160

1                    (Thereupon, Defendant's Exhibit 22,

2                    e-mail Correspondence from Victoria

3                    Johnson Regarding Medication, was

4                    marked for purposes of

5                    identification.)

6                         -  -  -  -  -

7        Q.    Showing you what I have marked as

8    Exhibit 22.

9             If you go to the third page of the

10   stream of e-mails, this is your e-mail that you

11   referenced before to Sheryl where you let

12   Sheryl know that you were not pleased with her

13   saying anything about your medication; is that

14   correct?

15       A.    Correct.

16       Q.    And you sent that on June 13th at

17   11:06 correct?

18       A.    Correct.

19       Q.    And on June 13th at 11:25 she

20   writes you back and apologizes; correct?

21       A.    Wait, hold on a second, let me just

22   catch up with you.

23             Okay.  So where are you at now?

24       Q.    The response from Sheryl to you.

25       A.    Which is?

Page 161

1          Q.     Right at the top.

2          A.     Victoria, I didn't realize that my

3     asking if you were doing okay or if maybe the

4     doctor could decrease your medication so that

5     you were not having effects that you are having

6     was to be had in a private setting.  That is

7     correct.

8                 She is a nurse.  She is a manager,

9     so she should know.

10         Q.     And then she said she didn't know

11    what you were taking and she said her

12    apologies, she was out of line; correct?

13         A.     She apologized, but that doesn't

14    take away the fact that she did it in public.

15         Q.     And after that is when you wrote

16    Christina Morrison; correct?

17         A.     Correct.

18         Q.     And you tell her that you don't

19    want her to talk to Sheryl until you leave;

20    right?

21         A.     Where does it say that?  Which one

22    is that?

23         Q.     The next one, from you to

24    Christina.

25         A.     At what time?

Page 162

1          Q.     12:51.

2          A.     Right.  Maybe you can talk to

3    Sheryl later on when I leave.  Yes.

4          Q.     You say you can't deal with any

5    additional stress; correct?

6          A.     Yes.

7          Q.     And then Tina says that she is

8    going to talk to her and glad that she

9    apologized?

10         A.     Correct.

11         Q.     And she has a good response to you?

12         A.     Yes.

13         Q.     Caring response?

14         A.     Yes.

15         Q.     Did your other co-workers know that

16   you were taking medication?

17         A.     I don't believe I said anything to

18   them.

19         Q.     You don't know for sure?

20         A.     I don't recall.

21         Q.     Who is it that overheard what

22   Sheryl said?

23         A.     Who would have heard were the two

24   cubes, the one in back of me, the one in front

25   of Sheryl.  The two cubes, the four cubes on

1    the other side.

2         Q.    Who would have heard that?

3         A.    Let's see, I think Paul was sitting

4    behind me at the time or Kristen Johnson.

5         Q.    So you don't recall?

6         A.    No I don't recall because we moved

7    some seats around.

8         Q.    Do you know if anybody heard it?

9         A.    No one had said anything to me, so

10   I don't know if they heard it.  Bottom line, I

11   felt it should have been done inside an office.

12                  -  -  -  -  -

13                  (Thereupon, Defendant's Exhibit 23,

14                  e-mail Correspondence from Victoria

15                  Johnson, was marked for purposes of

16                  identification.)

17                  -  -  -  -  -

18         (Discussion had off the record.)

19         Q.    I'm going to show you what I have

20   marked as Exhibit 23.

21              Exhibit 23, you took the e-mails,

22   the one that you had sent and the one where

23   Sheryl responded that we saw in Exhibit 22 and

24   sent them to your home; correct?

25         A.    Yes.

1          Q.    And you did that, you sent them to

2     your house, over a month later; is that

3     correct?

4          A.    Yes.

5          Q.    Why did you do that?

6          A.    I contacted -- I'm so upset.  I

7     contacted, who was it (crying) I forgot who I

8     contacted.  I think it was and told them that

9     she had discussed my personal information, but

10    they told me that that wasn't an issue that I

11    had to deal with, I would have to take it up

12    with management.

13         Q.    So why did you send it to your

14    house?

15         A.    Because I had an application that I

16    had to fill out.  I forgot the name of the

17    entity.  I think it's the civil rights.

18         Q.    Did you further tell anybody at UH

19    that you were upset about this after your

20    communications with Christina?

21         A.    I don't recall.

22         Q.    So more than a month later you were

23    still upset?

24         A.    Yes.

25         Q.    Do you want to take a break?

Page 165

1          A.    Yeah, to get a tissue.

2          Q.    There's some right there.

3                MR. HERRON:  Why don't we take

4     five?

5                (Short recess had.)

6          Q.    Ready to proceed?

7                MR. HERRON:  Ready to proceed.

8          A.    Yes.

9                     -  -  -  -  -

10               (Thereupon, Defendant's Exhibit 24,

11               e-mail Correspondence from Victoria

12               Johnson, was marked for purposes of

13               identification.)

14                    -  -  -  -  -

15         Q.    Let me show you what I have marked

16    as Exhibit 24.

17               If you could go to page three of

18    three of this e-mail chain.  You wrote an

19    e-mail on June 29th to basically everybody that

20    was in your department; is that correct?

21         A.    June 29th?

22               MR. HERRON:  Are you asking her if

23    she wrote an e-mail on June 29th?

24               MS. KAMINSKI:  That Sheryl did,

25    excuse me.

Page 166

1        A.    At 10:21?

2        Q.    Right.

3        A.    Uh-huh.

4        Q.    Yes?

5        A.    Yes.

6        Q.    And she says that she wanted to

7    remind everybody that CGS is being extremely

8    critical of the applications; correct?

9        A.    Correct.

10       Q.    And it says that Bianca had two

11   applications returned because the imprinted

12   data in a bottom, left-hand corner of several

13   of the pages were cutoff.

14            So they were being critical in many

15   respects, correct, CGS was?

16       A.    Correct.

17       Q.    And then Jordan said that they had

18   denied an app and said that you guys were a

19   billing company; correct?

20       A.    It says, yes, that there was an

21   application that was denied, they called Monica

22   to verify and they denied the application

23   because they said we were a billing office.  I

24   believe, I don't know if they talked to Monica

25   or if it went to the voicemail.

1          Q.    And then Jordan says that we sent

2     her a nice detailed e-mail telling her that we

3     were not and they had not heard anything yet;

4     correct?

5          A.    Correct, that's what it says.

6          Q.    And then Steve Riddle says, let's

7     make sure everyone who answers the phones,

8     specifically for the MP billing services line,

9     that they recognize the area codes.

10         A.    And answer the phone --

11         Q.    I'm going to get there.

12               And the MP billing services, that's

13    not you; right?

14         A.    No, that's not me.

15         Q.    Okay.

16         A.    He addressed it to everyone.

17         Q.    Right.

18         A.    So if we were not a part of the MP

19    we still would be -- we were MG.

20         Q.    Right.

21         A.    So he sent it to everyone but

22    specifically for the billing services because

23    Monica worked for MP.

24         Q.    Right.

25               And he says that he doesn't want it

1    to be determined that you were a billing

2    company because you really weren't a billing

3    company; correct?

4         A.    We were the building, central

5    billing office, the entire office.  The way

6    that it works --

7              MR. HERRON:  You just answer her

8    questions, yes or no, that's what she is asking

9    for.

10        A.    Yes.

11        Q.    You weren't working for a billing,

12   you weren't doing billing services; correct?

13        A.    Not the billing.

14        Q.    Right?

15        A.    Right.

16        Q.    And then you wrote Steve on July

17   16th.  Do you see that?

18        A.    Yes.

19        Q.    And you said that you had

20   reservations about lying since we incorporated

21   this practice.  I will not be participating in

22   this unethical practice any longer for moral

23   reasons.

24              What was the unethical practice?

25        A.    The unethical practice was

1    answering the phone and verifying that the

2    doctor could be reached there directly.  When I

3    did not answer the phone it would go into my

4    voicemail, it would clearly identify the number

5    as my number, not the provider's office.

6        Q.    Now, let's assume that you work for

7    a doctor at UH on the main campus?

8        A.    Uh-huh.

9        Q.    Yes?

10        A.    Yes.

11        Q.    You will assume that for me?

12        A.    Uh-huh.

13        Q.    And he has an office in Bolwell,

14    but -- and he also has an office in, what's the

15    one that's on the other side of the hospital,

16    Humphrey.

17            Are you familiar with the main

18    campus?

19        A.    Yes.

20        Q.    Those offices are a long, long way

21    away; correct?

22        A.    Correct.

23        Q.    And you were to sit in Humphrey and

24    give that phone number, you wouldn't be able to

25    directly give it to the doctor who is in

Page 170

1    Bolwell; would you?  You would have to call him

2    and tell him he had a message and you would

3    still be part of his office; wouldn't you?

4         A.    Yes.  And that's what the

5    application stated.  It could be his location,

6    but we were verifying this when we were at the

7    billing office.

8         Q.    But what I am saying is, under

9    those circumstances, you wouldn't be under the

10   same roof, really, you would be in the same

11   complex?

12        A.    Right.  We were not under the same

13   roof and that is the issue that CGS was having.

14        Q.    And CGS was aware of where you were

15   located and where the doctors were located;

16   correct?

17              MR. HERRON:  Objection.

18              If you know.

19        A.    They did not.

20        Q.    You told them?

21        A.    We told them, yes.  We lied to

22   them.

23        Q.    No.  No.  No.  You told them in an

24   e-mail.  You informed them what the

25   circumstances were; right?

Page 171

1          A.     Which e-mail is that?

2          Q.     I will show it to you here in a

3     little bit.

4          A.     Okay.

5          Q.     Let's keep going by this.

6                 So the unethical practice is

7     answering the phone and saying you can directly

8     get the doctor; right?

9          A.     Correct.  No, not get the doctors,

10    that they can be reached at that number.

11         Q.     Well, reached.  Reached at that

12    number.  Reached is the operative word; right?

13    You could reach the doctors; couldn't you?

14         A.     Not directly at that number, at my

15    number.

16         Q.     Okay.

17         A.     Then when it was denied it said

18    that the number that they were looking for was

19    one of the doctor's personal service when they

20    expect to reach him either at his home or his

21    cell phone or his location.

22         Q.     Now, you go onto to say, this

23    situation has imposed additional stress and in

24    turn affects my performance.

25                Are you saying that your

1    performance was below par at this time?

2              MR. HERRON:  Objection.

3        A.    It wasn't subpar because it did not

4    hinder me from completing the applications the

5    way that they told me to.

6        Q.    Buy you thought you were having a

7    negative impact on your performance; right?

8        A.    It had imposed additional stress.

9        Q.    Which, in turn, affected negatively

10   your performance; right?

11       A.    I just felt --

12       Q.    You weren't indicating a positive

13   performance?

14       A.    I felt bad about doing it.

15       Q.    What you are indicating here is,

16   your performance is worse because of the

17   additional stress, right, not better?

18       A.    I don't feel good about what I'm

19   doing, that would be picking up the phone.

20       Q.    You would agree with me that what

21   you mean here is that your performance is

22   negatively impacted; correct?

23       A.    Yes, because I didn't want to

24   answer the phone.

25       Q.    Okay.  And then you tell Steve --

Page 173

1          A.     Uh-huh.

2          Q.     -- that you have been taking

3     prescribed medication, stress and

4     antidepressants?

5          A.     Yes.

6          Q.     And that your family wants you to

7     stop taking them.

8          A.     Correct.

9          Q.     So you are disclosing to Steve that

10    you are on that medication; correct?

11         A.     Yes, I am.  I am pretty sure that

12    the e-mail that I sent Christine about my

13    taking medication would have somehow gotten to

14    Steve.

15         Q.     But you didn't know that; did you?

16         A.     I felt that if I talked to him and

17    tell him I'm taking medication, I have no

18    problem doing that, I don't want him telling

19    anybody else.

20         Q.     And you didn't just tell him

21    medication, you tell him you are taking stress

22    and antidepressants; correct?

23         A.     Correct.  Which is the Zoloft.

24         Q.     And now you are telling him that

25    you are going to stop taking it?

Page 174

1        A.    Correct.

2        Q.    And is this at or about the time

3    you stopped taking the medication?

4        A.    It probably -- I mean it could have

5    been.

6              MR. HERRON:  I will object to your

7    characterization in that question that she

8    indicated that she was going to stop taking the

9    medication.  That is not what she said in the

10   e-mail.

11                    -  -  -  -  -

12              (Thereupon, Defendant's Exhibit 25,

13              e-mail Correspondence from Christina

14              Morrison, was marked for purposes of

15              identification.)

16                    -  -  -  -  -

17       Q.    Let me show what you what I have

18   marked as Exhibit 25.

19              If you would just look at the first

20   e-mail there from Christina Morrison to Sheryl

21   and Steve and it says, on July 17th, I just

22   went to see Victoria to see if she had a minute

23   to talk and she was sleeping at her desk.  I

24   woke her up and asked her if she was okay.  She

25   said, yes, she was just a little tired.

1          Do you recall that Christina came

2     by and woke you up at your desk?

3          A.    Yes.

4          Q.    Were you on break that time, too?

5          A.    Yes.

6          Q.    Did you have the sign up?

7          A.    I don't recall.

8                - - - - -

9                (Thereupon, Deposition Exhibit 26,

10               e-mail Correspondence from Sheryl

11               Johnson, was marked for purposes of

12               identification.)

13               - - - - -

14         Q.    Let me show you what I have marked

15    as Exhibit 26.

16               If you would turn to the last page

17    of Exhibit 26 there's a statement there by

18    Kristen Johnson.

19               Do you know Kristen Johnson?

20         A.    Yes.

21         Q.    Did you have any problems with

22    Kristen Johnson?

23         A.    No.

24         Q.    If you look at the last page of the

25    document that I have handed you as Exhibit 26?

1          A.     Uh-huh, yes.

2          Q.     You see there is a statement there,

3     if you would read that statement to yourself?

4          A.     Yes, I see that.

5          Q.     Okay.  Do you remember this

6     happening?

7          A.     I briefly do.

8          Q.     And is this an accurate depiction

9     of what happened?

10          A.     Yes, I also believe that I was on

11     my break.

12          Q.     Okay.

13          A.     I mean, for me to put a blanket

14     over, it was just me putting my head down.

15                     -  -  -  -  -

16                (Thereupon, Defendant's Exhibit 27,

17                e-mail from Carole Meisler dated

18                July 17, 2012, was marked for

19                purposes of identification.)

20                     -  -  -  -  -

21          Q.     Let me show you what I have marked

22     as Exhibit 27.

23                Do you remember receiving this from

24     Carole Meisler?

25          A.     Yes.

1      Q.    Did you have any communications

2   with Carole that were not in e-mail?

3      A.    I don't recall.  I don't think I

4   did.

5      Q.    You see that she says that the

6   expectation is that the physician would not be

7   answering the contact telephone number and that

8   the messages would be forwarded to the

9   physicians as needed.

10         Would you have any reason to

11  believe that that is not true?

12     A.    Not true in her saying that?

13     Q.    Do you have any reason to believe

14  that CGS didn't tell her that?

15     A.    Yes.

16     Q.    What is that?

17     A.    Because I had in writing that they

18  wanted to reach the doctor directly and that it

19  had to be their own personal service number,

20  one, either their phone number or their house

21  number or office number.

22     Q.    You had that from somebody at CGS,

23  but you didn't know -- did you know whether

24  they were a policy decider or not at CGS?

25     A.    No, this was on a denial form, a

1   standard.

2          Q.    And, then, it says that the purpose

3   for the contact telephone number is in order to

4   verify information on the application.  That

5   was, in fact, your job, right, to fill out

6   those applications?

7          A.    They put the responsibility on us.

8                When you read the application on

9   section 2B it says, do you, so they are

10  anticipating that the provider is filling out

11  the application.

12         Q.    And, then, CGS recognizes that

13  often support personnel will be able to handle

14  these queries?

15         A.    Correct.

16         Q.    Do you have any reason to believe

17  that is not true?

18         A.    That's true.

19               However, those queries are supposed

20  to be handled by the contact person, which is

21  supposed to be listed in section 13.

22         Q.    Right.  You were the contact person

23  listed in 13; right?

24         A.    In 13 and also in 2B.

25         Q.    Now, just last night or late

Page 179

1    yesterday --

2              (Discussion had off the record.)

3         Q.    -- your lawyer sent us this

4    document.

5                   -  -  -  -  -

6              (Thereupon, Defendant's Exhibit 28,

7              CGS Letter In Re: Joseph Stone,

8              dated July 19, 2012, was marked for

9              purposes of identification.)

10                  -  -  -  -  -

11        Q.    Do you know where this document was

12   kept before yesterday?

13        A.    Where it was kept?

14        Q.    Yes.

15        A.    What do you mean by where it was

16   kept?

17        Q.    Did you have this document in your

18   possession before yesterday?

19        A.    Yes.

20        Q.    And where did you keep it?

21        A.    Along with my other documents.

22        Q.    Do you know why it wasn't produced

23   to me until yesterday?

24        A.    It may have been an accident as to

25   why it wasn't sent over.  It's noted in some of

1    the e-mails that I got from -- Dr. Stone, I

2    would have gotten this from Andrew Baumann.  I

3    think he handled Dr. Stone.

4           Q.    And how did you come to have this

5    document at your house?

6           A.    Well, I worked from home sometimes.

7           Q.    And you printed this out at home?

8           A.    I don't recall whether I printed it

9    out at home or I printed it at the office.  I

10   don't know.

11          Q.    Why did you have it at your house

12   more than a year after you have left the employ

13   of UH?

14          A.    It was documents that I had while I

15   was working at UH.

16          Q.    And you kept it?

17          A.    Yes.

18          Q.    And you had it at your house,

19   something about Dr. Stone?

20          A.    Well, we were going through the

21   process of, you know, the unpaid leave and the

22   paid leave, I made a copy of the documentation.

23          Q.    And when did you do that?

24          A.    I don't remember when.  I don't

25   know whether it was before I left or when I

1    went back to work.  It wasn't when I went back

2    to work because -- I don't think it was when I

3    went back to work.  But, no, this -- I had

4    documentation from some of the e-mails and this

5    is the documentation.

6           Q.    And why did you keep this

7    particular piece of documentation?

8           A.    Why did I keep it?

9           Q.    Yes.

10          A.    Well, to be able to show that I had

11   documentation in black and white that what we

12   were doing wasn't correct.

13          Q.    And why does this show that?

14          A.    Why or where?

15          Q.    What is it that it shows that's

16   what you were doing was incorrect?

17          A.    It says that we were unable to

18   provide -- to verify that the provider could be

19   reached at this phone number you provided in

20   the correspondence, which would have been my

21   number.  And the reason why they must have sent

22   this is because they could not have contacted

23   me physically.  It must have went to my

24   voicemail.  And then once -- my voicemail says,

25   you reached the desk of Victoria Johnson,

1    provider enrollment department, then they would

2    automatically deny the application.

3         Q.    The requested revisions are not

4    only that but there's other things, there is

5    not a new signature page; correct?

6         A.    They didn't say that there isn't a

7    signature page, they are saying that each time

8    you have to make a correction to the

9    application a new signature page has to be

10   added.

11        Q.    And it also says it is missing a

12   photocopy of the current passport or a

13   photocopy of the driver's license; correct?

14        A.    Yes.

15        Q.    What did page two say?

16        A.    It's probably the address and the

17   name of the person who sent it.

18        Q.    And you say you were not handling

19   Dr. Joseph Stone?

20        A.    Yes, I was handling Dr. Stone.

21        Q.    Were you able to fix these

22   problems?

23        A.    No, this, I believe, is when that I

24   told them I wasn't going to do this anymore.

25        Q.    So this is one you said you

Page 183

1    wouldn't handle?

2           A.    That's correct.

3           Q.    And, then, do you remember that you

4    produced documents to me earlier in the case?

5           A.    Documents to you?

6           Q.    I requested a bunch of documents

7    and they were sent over to me earlier in the

8    case.  Do you recall that?

9           A.    Yes.

10          Q.    Do you know why this particular

11   document was not with that production?

12          A.    It may have been overlooked.  I

13   wasn't intentionally trying to hide anything.

14   I would want you to have it.

15                    -   -   -   -   -

16                (Thereupon, Defendant's Exhibit 29,

17                CGS Letter In Re: Angela Capp, dated

18                July 19, 2012, was marked for

19                purposes of identification.)

20                    -   -   -   -   -

21          Q.    Let me show you Exhibit 29.

22                MR. HERRON:  The real question

23   would be, why did they not provide it to us in

24   their documentation?

25          Q.    Did you, when you got

1     correspondence from CGS, did you normally print

2     it out?

3            A.    What do you mean print it out?  I

4     believe this right here --

5            Q.    I'm not asking about Exhibit 29

6     that you have now in front of you.  I'm asking,

7     as a general matter, if CGS sent you a letter,

8     I would assume that most of the correspondence

9     you got from them you got by e-mail; correct?

10           A.    No, we got some stuff regular mail.

11           Q.    This, what is now Exhibit 29, and

12    what was previously 28, would that have come as

13    a regular mail letter or would that have come

14    by e-mail?

15           A.    This probably would have come by

16    mail.

17           Q.    Regular mail?

18           A.    Yes.

19           Q.    And so you then you would have had

20    to take it to the copy machine and copy it to

21    take it home; correct?

22           A.    Possibly, yes.

23           Q.    And, again, to copy this I would

24    assume for the same reason is that you thought

25    it would demonstrate that, in fact, some of the

Page 185

1    applications were denied because of the need

2    for a valid phone number; is that correct?

3            A.    Correct.

4            Q.    Now, I notice that the third bullet

5    point here is different than it was on Exhibit

6    28.  Here it asks for the non-physician

7    practitioner's degree, certificate or

8    transcript do you see that?

9            A.    Yes.

10           Q.    Aside from just the valid phone

11   number, both of these had other issues for

12   which they were rejected; correct?

13           A.    Correct.

14           Q.    Did you also handle the Angela

15   Capp?

16           A.    Yes.

17           Q.    So it was you that hadn't provided

18   this other information; is that correct?

19           A.    Yes.  The driver's license was

20   probably in their file.  I could possibly go to

21   the practitioner's -- to the website to get a

22   copy of her practitioner's degree.

23                      -  -  -  -  -

24                 (Thereupon, Defendant's Exhibit 30,

25                 e-mail correspondence from Victoria

1            Johnson, was marked for purposes of

2            identification.)

3                 -  -  -  -  -

4       Q.    Let me show you what I have marked

5    as Exhibit 30.  Start on page six of these

6    e-mails.

7            Are you there?

8       A.    Yes.  Page six.  Hold on.

9       Q.    Do you see that that starts with a

10   July 19th e-mail --

11      A.    Uh-huh.

12      Q.    -- to you from Shamekia?

13      A.    Yes.

14      Q.    And this is where she says she

15   needs a valid number placed in 2B; correct?

16      A.    Correct.

17            And a new signed and dated section

18   15.

19      Q.    Now, on Dr. Gupta's application, do

20   you recall that you had left the phone number

21   blank?

22      A.    No, I didn't leave it blank,

23   because those were pre-printed.

24      Q.    So you think that your phone number

25   was on that application?

Page 187

1        A.    I'm almost certain that it was.  If

2    I used the same -- I mean, the application

3    packet that I have, I believe that this was

4    denied because I wasn't there to answer my

5    phone at my desk.

6        Q.    And then you wrote back to

7    Shamekia, you see on page five there, on July

8    20th, and you say, can you clarify what CGS

9    expectations are when asking if the provider

10   can be reached at this number?

11       A.    Yes.

12       Q.    And, actually, what the form says

13   is, contact directly, not reached at this

14   number; correct?

15       A.    Contact directly, that's right.

16   Yeah, contact directly.  None of the providers

17   worked at the central billing office.

18       Q.    And then you say at the top there,

19   you see a page five, you're writing to Shamekia

20   of CGS, and you say, with regard to section 2B,

21   and your question if the provider can be

22   reached directly at this location, the

23   providers cannot be reached here as this is the

24   office where we enroll the providers and

25   provide in-house billing services for them.

1    The practice location is 11100 Euclid Avenue.

2    How do we address this issue if the provider

3    cannot be reached here?

4              Do you see that you tell her that?

5    A.    Yes.

6    Q.    Now --

7    A.    Well, she responded, the address

8    listed in section two cannot be that of the

9    billing office.

10   Q.    But the providers cannot be reached

11   here isn't exactly accurate.  You could reach

12   the provider; correct?

13             MR. HERRON:  Objection.

14   A.    Directly.

15   Q.    Right.  But you did it on a regular

16   basis when you were doing the applications;

17   correct?

18   A.    Doing what?

19   Q.    You reached the provider on a

20   regular basis when you were doing the

21   applications.  That is what you told me this

22   morning.

23   A.    I -- rephrase that.

24   Q.    You reached the provider on a

25   regular basis?

Page 189

1          A.     I told you I didn't need to call

2     them.

3          Q.     But we went through this this

4     morning and you told me that when you needed

5     to --

6               MR. HERRON:  Let me make an

7     objection to form --

8          Q.     -- that you could get a hold of

9     them?

10              MR. HERRON:  Objection to form.

11         A.     I told you that --

12              MR. HERRON:  The issue is not

13    whether Victoria can reach the provider

14    directly, it is whether CGS can reach the

15    provider directly.

16         A.     It's CGS.

17         Q.     That isn't my question.

18         A.     I had a way of reaching them.

19         Q.     Okay.  Good.

20         A.     But I did not reach out to them,

21    not unless it was something that I couldn't

22    handle from the office myself.

23         Q.     And so then Shamekia writes back

24    and says, the address listed in section two

25    cannot be of the billing service.  Now, you are

Page 190

 1   not a billing service; right?

 2        A.    I worked in the central billing

 3   office.

 4        Q.    But you didn't do the billing

 5   service?

 6        A.    No, I didn't do the billing

 7   service.  But the central billing office --

 8   their rejection said that it can't be the

 9   central billing office, it cannot be the

10   management service office.

11        Q.    That's not what's said here.  Let's

12   just keep going with what we see here.  We will

13   go through each one of them.

14        A.    Okay.

15        Q.    And then you tell her, this is what

16   I am interpreting.  However, I have been told

17   to continue to use this address and telephone

18   number.  Can you verify with your supervisor

19   and manager?

20              Now, who had told you at that time

21   to continue to use that address and telephone

22   number?

23        A.    Steve Riddle.  Sheryl Johnson.

24        Q.    Okay.  And then she asked you,

25   well, who asked you to use that number.  And

Page 191

1    you tell Shamekia who did; correct?

2         A.    Correct.

3         Q.    And then she said she is willing to

4    forward that information to their support team

5    and wait for a reply; correct?

6         A.    Correct.

7         Q.    Now, Shamekia is wondering about

8    it, I would guess?

9         A.    She's not wondering, she knows what

10   she is doing.

11        Q.    She is going to forward it to

12   somebody else?

13        A.    I don't know.  She felt she needed

14   to take it to a higher being.

15        Q.    You write her back and say, our

16   compliance officer said it's okay for us to

17   answer the phone and verify that the doctor can

18   be reached here and we should pass on a message

19   to the doctor.  Please verify that is correct.

20              So now you have told CGS exactly

21   what is happening; correct?

22        A.    What Carol Meisler has told me.

23        Q.    You have told them directly that

24   what you are doing is, you are going to get a

25   message and pass it onto the doctor; right?

Page 192

1          A.     That is what I was told that I was

2     supposed to do.

3          Q.     I know.  And you told CGS the truth

4     about what is happening; correct?

5          A.     Correct.

6          Q.     And then Shamekia writes you

7     back --

8          A.     Uh-huh.

9          Q.     -- and she says -- and she sent you

10    what's in the program integrity manual;

11    correct?

12         A.     Correct.

13         Q.     And it says down there, if an

14    answering service appears and the contractor

15    can identify it as the applicant's personal

16    service it is not necessary to talk directly to

17    the applicant or an official thereof.

18         A.     Which page are you on?

19         Q.     I'm at the top of page two, reading

20    what she sent you as part of the program

21    integrity manual which, in fact, it wasn't at

22    the time, but what she sent you.

23         A.     Okay.

24         Q.     It says, if an answering service

25    appears and the contractor can identify it as

Page 193

1    the applicant's personal service, it is not

2    necessary to talk directly to the applicant or

3    an official thereof.  The contractor only needs

4    to verify that the applicant can be reached at

5    this number; right?

6         A.    You are talking about 15 point

7    five, point two, point two.

8         Q.    I am.  And that's what it says;

9    correct?

10        A.    The correspondence address.  The

11   correspondence address must be one where the

12   contractor can directly contact the applicant,

13   which is the provider, to resolve any issues

14   once the provider is enrolled in the Medicare

15   program.  It cannot be the address of a billing

16   agency, management services organization, chain

17   home office or the provider's representative,

18   which would probably be us, attorney, financial

19   advisor.  It can, however, be a post office box

20   or, in the case of an individual practitioner,

21   the person's home address.

22             The contractor shall call the

23   telephone number listed in this section to

24   verify that the contractor can directly contact

25   the applicant, which would be the doctor, not

Page 194

1    the provider enrollment department.  If an

2    answering service appears and the contractor

3    can identify it as the applicant's personal

4    service, which would have the doctor's name,

5    Dr. Gupta.  They understand that the doctor is

6    on-call, surgery, whatever.  It is not

7    necessary to talk to the applicant directly or

8    an official thereof.  The contractor only needs

9    to verify that the applicant can be reached at

10   this number.

11        Q.    The contractor only needs to verify

12   that the applicant can be reached at this

13   number; correct?

14        A.    Right.  By identifying as his

15   personal service.

16        Q.    Right.

17              And you told them that the way they

18   can be reached is through you, correct, in the

19   e-mail right before that?

20        A.    That's is I was told to say from

21   Sheryl.

22        Q.    So you forward on internally to

23   Steve, Sheryl, Carole and Sheryl, this e-mail

24   chain; correct?

25        A.    Yes.

Page 195

1          Q.    And --

2          A.    Inclusive of the integrity manual.

3          Q.    Right.

4                And you ask Carole to tell you who

5    she spoke with that suggested you could

6    continue to take calls here; correct?

7          A.    Correct.

8          Q.    And then you tell them about your

9    friend that works at HHS; right?

10         A.    Correct.  And he also sent me --

11   well, I was waiting to hear from him, but when

12   I talked to him he read off the integrity

13   manual.

14         Q.    So now you have told CGS what is

15   happening and you have also told the

16   supervisors at UH; right?

17         A.    Yes.  Because --

18         Q.    And --

19         A.    -- I was told that if I felt there

20   was something that they weren't compliant, to

21   bring it to their attention.

22         Q.    And, then, what happened with Dr.

23   Gupta's application, did it proceed?

24         A.    No, because I wouldn't proceed with

25   it.

Page 196

```
 1        Q.     Do you know what ultimately
 2   happened with it?
 3        A.     Maybe Sheryl or someone else
 4   proceeded with processing it.
 5        Q.     And it got processed even after CGS
 6   was told what number was being used; correct?
 7        A.     I don't know if it was processed, I
 8   can't give you that answer.
 9               Can I get a Kleenex?
10        Q.     Sure.
11               Because now, hereafter, CGS, after
12   Exhibit 30, CGS is on notice that everyone that
13   comes through with that phone number on it,
14   that you are who you are and what you're doing
15   as far as the doctor; correct?
16        A.     Wait.  Can you repeat that?
17        Q.     After you tell Shamekia what is
18   happening here, every application you put in or
19   that comes in with the number that is at your
20   desk, they will know exactly what is happening,
21   they will know that you are not situated with
22   the doctor, but that you can reach the doctor
23   to give them a message; correct?
24        A.     Every app -- I didn't put any
25   applications.  If there were applications that
```

Page 197

1    were processed after that, that was before I

2    told them that I wasn't going -- there was some

3    still in the --

4         Q.    They are aware that that is how UH

5    is doing it?

6         A.    Yes.

7         Q.    It is no secret to them now?

8         A.    No.

9         Q.    And CGS continues to process

10   applications; correct?

11        A.    Well, they will continue process

12   applications if they continue to tell them that

13   they can be reached there directly.

14        Q.    But you told them what the reaching

15   there directly means?

16        A.    Yes, but that's on them.

17        Q.    That is on them.  That's right.

18              Now, CGS never made any threats to

19   you that if you continue to do that that they

20   would find you guilty of fraud; did they?

21        A.    No.

22        Q.    They never said it was criminal if

23   you continued to use that phone number; did

24   they?

25        A.    No.

Page 198

1                         -  -  -  -  -

2                    (Thereupon, Defendant's Exhibit 31,

3                    e-mail correspondence from Victoria

4                    Johnson, was marked for purposes of

5                    identification.)

6                         -  -  -  -  -

7          Q.    Now, on that same day, I will show

8    you what I have marked as Exhibit 31, you sent

9    that full e-mail chain that was Exhibit 30, you

10   sent that to your house; correct?

11         A.    Yes.

12         Q.    You sent that to your home e-mail?

13         A.    Wait.  Which one?

14         Q.    Exhibit 31?

15         A.    It says, yeah, from Victoria

16   Johnson to bronxvikki.

17         Q.    So you sent the information related

18   to Dr. Gupta's application to your personal

19   e-mail; correct?

20         A.    Yes.

21         Q.    And that's while you were working

22   at UH?

23         A.    Yes.

24                    -  -  -  -  -

25                    (Thereupon, Defendant's Exhibit 32,

```
1              e-mail correspondence from Carole

2              Meisler dated July 24, 2012, was

3              marked for purposes of

4              identification.)

5                   -  -  -  -  -

6         Q.    Showing you what I have marked as

7    Exhibit 32.

8              You see that Carole is advising you

9    that she spoke to Shamekia's supervisor;

10   correct?

11        A.    Yes.

12        Q.    So somebody over Shamekia's job

13   responsibilities; correct?

14        A.    Yes.

15        Q.    And per that supervisor of

16   Shamekia's, she said that you should tell

17   Shamekia that the provider will not pick up the

18   telephone, but as part of the job description,

19   you get any message from him or her, that you

20   will contact the provider for CGS as part of

21   your job.

22              Did you see that?

23        A.    Yes, I see that.

24        Q.    Now, that is true, isn't it, that

25   as part of your job if they needed you to
```

1    contact the provider you would do that; right?

2         A.    That's what they told me to do.  I

3    don't know if it was within my job description.

4         Q.    And so did that happen, did

5    Shamekia call?

6         A.    Shamekia called and asked if I --

7    if she was able to contact the provider there

8    directly and I told her no.

9         Q.    Did you give her this answer, that

10   the provider will not pick up the telephone,

11   but as part of your job description, you get

12   any message to him or her and that you will

13   contact the provider for CGS as part of your

14   job, did you do what you were asked to do?

15        A.    There is an e-mail that I sent to

16   -- I told her the doctor could not be reached

17   directly, but I would give him a message.

18        Q.    So you didn't use this exact

19   language that your supervisor asked you to use?

20        A.    Right.

21        Q.    Was there something wrong with this

22   language?

23        A.    Because the doctor could not be

24   reached there directly.

25        Q.    But that's what it says here;

1   right?

2          A.      It says that they can, but they

3   cannot.

4          Q.      It says that the provider will not

5   pick up the telephone, that's correct; right?

6          A.      That's correct.

7          Q.      And as part of your job description

8   you get any message to him or her that you will

9   contact the provider for CGS as part of your

10  job.  That's all -- you could have done all of

11  that; right?

12         A.      Per the supervisor, tell Shamekia

13  that the provider will not pick up the phone,

14  right, correct, because they are not at that

15  location, but as part of your job description

16  she made me -- I guess she incorporated that as

17  part of my job description now, to get them a

18  message.

19         Q.      Did you have an actual job

20  description?

21         A.      I don't believe it's in the packet.

22         Q.      Did you go look to see if it was

23  part of your job description?

24         A.      No, I don't have a copy of my job

25  description.

```
1        Q.    On July 24th?

2        A.    No.

3        Q.    Did you look to see if it was in

4   your job description?

5        A.    No.

6        Q.    Did you have a job description?

7        A.    Yes, I believe you have to have one

8   in order for you to apply for the position.

9        Q.    So you didn't go look at that?

10       A.    No, this was something that was

11  created at this, I guess, this particular

12  scenario, so I don't even know if it would be

13  part of that.

14       Q.    Now, this is what -- this isn't

15  something that Carole came up with, this is

16  something that Shamekia's supervisor said

17  should be done; correct?

18            MR. HERRON:  Objection.

19            THE WITNESS:  Go ahead.

20       A.    Well, this is what Carole said

21  Shamekia's supervisor said to her.

22       Q.    So per her supervisor, so that is

23  coming from CGS; correct?

24            MR. HERRON:  Objection.

25       A.    Correct.  Well, so Carole says.
```

1          Q.     Why would Shamekia be more correct

2     than her supervisor?

3                 MR. HERRON:  Objection.

4          A.     I don't know.

5                      -  -  -  -  -

6                 (Thereupon, Deposition Exhibit 33,

7                 e-mail correspondence from Victoria

8                 Johnson dated July 24, 2012, was

9                 marked for purposes of

10                identification.)

11                     -  -  -  -  -

12         Q.     Handing you what I have marked as

13    Exhibit 33.

14                Now, from page four back, that's

15    all a copy of what we have already looked at.

16    The new starts on page three.

17                And there's an e-mail from you to

18    Shamekia.  And you're telling Shamekia, now,

19    that is how I always interpret that.  I'm not

20    sure where our compliance officer is getting

21    her information from.  However, she asked that

22    we ask to get a supervisor's name if we have

23    trouble enrolling.  I have always had

24    reservations by putting our phone number simply

25    by what section 2B states.  This needs to be by

1    management as all the provider enrollment

2    representatives follow the same procedure.  Is

3    there any way your management can follow-up on

4    this matter?

5              So now you have clearly told

6    Shamekia that everybody does it this way;

7    correct?

8         A.   It says, this is how I have always

9    interpreted it.

10        Q.   You say to her in the second

11   paragraph, as all the provider enrollment

12   representatives follow the same procedure.  You

13   are telling her that everybody here does it the

14   same way; correct?

15        A.   Correct.

16        Q.   So now you have told her, it's not

17   just me that puts down my phone number and what

18   happens is, if you call me and I have to

19   contact the doctor, everybody here does it;

20   correct?

21        A.   Correct.

22        Q.   So there no secret by CGS as to

23   what is happening and how these enrollments are

24   taking place; correct?

25        A.   That's true.

Page 205

1          MR. HERRON:  Objection the term

2    having to speculate what CGS does or doesn't

3    know.

4          Q.    Well, you told them?

5          A.    I told them, yes.

6          Q.    You came right out and told them

7    what was happening?

8          A.    Right.  Right.

9          Q.    So if they decided to process

10   applications after you told them, then they are

11   accepting that as the procedure; correct?

12         A.    I guess they are.

13         MR. HERRON:  Objection.

14         It requires you to speculate as to

15   what they are accepting or not accepting.

16         A.    Okay.

17         Q.    And so then the next one is, the

18   next e-mail there is from Shamekia and she

19   tells you that her supervisor's name is Paula

20   Paty; correct?

21         A.    Correct.

22         Q.    And she tells you that she is going

23   to advise Paula about the whole issue; correct?

24         A.    Yes.

25         Q.    So she is going to probably forward

Page 206

1    her --

2         A.    The issue.

3         Q.    -- the e-mails as you have

4    described what happens; correct?

5         A.    Correct.

6         Q.    So now you know it is not only

7    Shamekia that knows, but a supervisor there;

8    correct?

9         A.    Correct.

10        Q.    And so then you write to Shamekia

11   after that and you say, I could not verify that

12   the provider can be reached at this number or

13   is located at this building.  Please note my

14   return e-mail information below.  The number

15   listed on the application is that of my desk.

16   If you wish to call back, I will not answer and

17   my name will be identified on the voicemail.  I

18   can, however, forward a message to them.

19             That couldn't be clearer as to what

20   is happening; could it?

21        A.    Right.

22        Q.    If they went ahead and processed

23   Gupta's application, then they are doing that

24   knowing what the verification process is at UH;

25   correct?

Page 207

1        A.    Correct.

2        Q.    And then you forwarded that e-mail

3   onto yourself?

4        A.    Yes.

5                    -  -  -  -  -

6              (Thereupon, Defendant's Exhibit 34,

7              e-mail correspondence from Victoria

8              Johnson dated July 26, 2012, was

9              marked for purposes of

10             identification.)

11                   -  -  -  -  -

12       Q.    This is Exhibit 34.

13             Now, I note that Exhibits 32 and

14   33, that the time frame where you're having

15   these conversations is, starts --

16       A.    Before I was sent to EAP.

17       Q.    -- starts on July 19th and then

18   ends on July 24th; right?

19             On Exhibits 32 and 33, the

20   correspondence starts on July 19th and it ends

21   on July 24th; correct?

22       A.    Correct.

23       Q.    So now we are on Exhibit 34 and you

24   will note that that starts on July 19th;

25   correct?

Page 208

```
 1         A.    Wait.  Exhibit 34 that starts on

 2    July 19th at 3:09.

 3         Q.    So at the same time you are writing

 4    Shamekia at CGS about this issue you are

 5    writing Andrew Baumann; correct?

 6         A.    Well, this is the e-mail that I got

 7    for Dr. Stone, the one that you couldn't figure

 8    out when I had, so I also had a copy of the

 9    e-mail.

10         Q.    Right.  You had the letter, we

11    looked at the letter earlier; right?

12         A.    Correct.

13         Q.    So this is where you got the e-mail

14    rejecting the application?

15         A.    Right.

16         Q.    And you respond on July 20th and

17    you say, can you please clarify what CGS

18    expectations are when asking if the provider

19    can be reached directly at this number and what

20    number should be listed in 2B.

21              Same question you asked Shamekia;

22    correct?

23         A.    Correct.  They are two people that

24    are giving me the same answer and the provider

25    is giving me a different answer.
```

Page 209

1        Q.    So you are asking two different

2   people at the same time at CGS; right?

3        A.    Yes.  And this I have in black and

4   white.

5        Q.    You had the other in black and

6   white, as well; right?

7        A.    Nothing from Shamekia's supervisor

8   in black and white.

9        Q.    But from Shamekia you have it?

10       A.    From Shamekia?

11       Q.    Yes.

12       A.    That she was told to -- no, I had

13   in black and white from Carole that Shamekia

14   was going to call me.

15       Q.    Okay.  So, then, Andrew gives you

16   his answer that for section 2B, the phone

17   number should be a number that either a

18   voicemail or person can identify that the

19   number is a valid number or contact the

20   provider, so either a home number that the

21   voicemail identifies the provider or the

22   location where the provider will be working.

23   If you have any other questions feel free to

24   ask; right?

25       A.    Right.

Page 210

1        Q.    That's what Andrew tells you?

2        A.    Yes.

3        Q.    And you forward that on to Steve

4    and Sheryl and Sheryl; correct?

5        A.    Uh-huh, yes.

6        Q.    And ask what number you should use

7    because you no longer want to participate in

8    telling CGS that the provider can be reached at

9    this location, as most of them are located at

10   main campus; correct?

11       A.    Correct.

12             Did I say most or all?

13       Q.    You said most.

14       A.    Where is that?

15       Q.    At the bottom of page two.

16       A.    Oh, when I say most of them are

17   located at the main campus.  There is some at

18   the main campus, there is some at Geauga, there

19   is some at Richmond Hospital, but none at the

20   central billing office.

21       Q.    So would it fix it for you if you

22   were mobile at the time you put in each

23   application you moved from doctor's office to

24   doctor's office to doctor's office?

25       A.    Can you ask me that again?

1        Q.      Would you think that it was more

2    appropriate for you to use your phone number if

3    you moved from doctor's office to doctor's

4    office to doctor's office when you put the

5    applications in?

6        A.      No, they asked for their cell phone

7    number.  They don't expect them to answer, but

8    they ask for their cell phone number or their

9    house number, they don't expect them to answer.

10   They were not given the opportunity to put a

11   number there.  We pre-populated that.

12       Q.      The next e-mail is to Sheryl, you

13   say, thanks for verbally instructing me to use

14   your number on the applications, I will now do

15   it from now on.  But you didn't do that; right?

16       A.      No, because I didn't continue to

17   fill out the application.

18       Q.      Okay.  And then you write, on July

19   23rd, you write that you needed a phone number

20   to populate 2B.  And then you say, I know

21   during our weekly meetings the ongoing joke is

22   that the provider enrollment team will one day

23   be walking out of here in pink and orange

24   jailhouse jumpsuits, which I no longer find

25   amusing.

1              So at one time you did find it

2      amusing?

3           A.    I didn't say I found it amusing.  I

4      would say, I would no longer deal with it, is

5      what I meant to say.

6           Q.    And then you say, I would also like

7      a copy of the two corrective actions that were

8      presented to me after my review that were

9      referencing providers Moonda and Schuld?

10          A.    Right.

11          Q.    I would like to have this in

12     writing; is that correct?

13          A.    Yes.

14          Q.    And then you sent this e-mail chain

15     to your house; correct?

16          A.    Yes.  Am I talking to the person

17     from -- my friend from D.C.  I don't know

18     whether I felt that we would be audited.  I

19     just wanted to provide documentation that we

20     were told to do this.

21          Q.    Let me show you what I will mark as

22     35.

23                     -  -  -  -  -

24                (Thereupon, Defendant's Exhibit 35,

25                e-mail correspondence from Victoria

1          Johnson dated July 27, 2012, was

2          marked for purposes of

3          identification.)

4               - - - - -

5     Q.    This is, again, starts on July

6    19th; correct?

7     A.    From the last page?

8     Q.    Yes.

9          MR. HERRON:  Next to the last page.

10    A.    Yes.

11    Q.    And this is a response you got from

12   Un Kim; correct?

13    A.    Correct.

14    Q.    And you send that on to Carole and

15   say, this confirms my previous e-mail; correct?

16    A.    Correct.

17    Q.    And then Carole tells you on July

18   19th, this is now the third person at CGS that

19   you are asking about this; correct?

20    A.    Yes, because I got another denial.

21    Q.    And Carole says, I understand your

22   confusion, but the current form does not state

23   what you were told.  And she then lists what

24   was in all these other e-mails from the people.

25          And then she tells you that the

1    current CMS 885I states:  Provide contact

2    information for the person shown in section 2A

3    above.  Once enrolled, the information provided

4    below will be used by the fee-for-service

5    contractor if it needs to contact you directly.

6              Per CGS, physician's support staff

7    can answer the phone and give a message to the

8    physician.  Any other questions?

9              So she says, look, these people, Un

10   Kim, the fellow and Shamekia have cited the

11   wrong section to you, it's not even applicable

12   anymore, here's the applicable section, and I

13   have talked to the supervisors and they are

14   accepting of the way we were doing this; right?

15   That's what you are being told?

16        A.    Yes.

17        Q.    Okay.  But despite all of that you

18   determine that you know better; is that right?

19              MR. HERRON:  Objection.

20        A.    Excuse me?

21        Q.    You decide that you know better

22   than Carole knows; correct?

23        A.    I don't feel I know better.  I am

24   going by what I see in writing.

25        Q.    But what you are following is what

1    you are getting from CGS in writing instead of

2    what the people at UH, who are charged with

3    determining what the right way to go is --

4              MR. HERRON:  Objection.

5        Q.    -- are sending you in writing;

6    correct?

7              MR. HERRON:  Objection.

8              Pre-supposes that it is up to UH to

9    decide how to comply with the Medicare,

10   Medicaid regulations.

11       Q.    You can answer.

12             MR. HERRON:  If you know?

13             THE WITNESS:  If I know?

14             MR. HERRON:  If you know.

15       A.    I don't know.

16       Q.    But you said you're going by what

17   you have in writing?

18       A.    Yes, I'm going by what I have in

19   writing.

20       Q.    You have from Carole in writing

21   what the applicable section is and what you

22   should do?

23       A.    What I have in writing from the

24   denial letter versus what Carole is telling me.

25       Q.    Okay.  Do you agree with me that if

Page  216

1   CGS says that this procedure is okay, then it's

2   okay?

3        A.    If they said it and not produced

4   documents, I would probably believe the

5   documents that I see in front of me.

6        Q.    Okay.  So you would determine that

7   your reading of what it means to be reached is

8   preferable and more important than what CGS

9   says?

10            MR. HERRON:  Objection.

11            Mischaracterizing her testimony.

12       A.    I'm not understanding that

13   question.

14       Q.    Okay.  Now, Carole writes you later

15   in the day on July 19 and said, good news, I

16   spoke to Ms. Kim.  Per Ms. Kim there is no

17   problem for UH to use UH's telephone numbers as

18   the contact number in the application.  There

19   is no expectation that the physician will

20   answer directly.  I was very clear with her

21   regarding your concerns and she assured me that

22   UH complies with CGS' expectation.

23            Now, this is the person that sent

24   you the denial letter?

25       A.    Right.  But she also said, per Ms.

1    Kim.  She works with a large hospital that

2    provides a hospital main telephone number and

3    the operator answers the phone.  So now I have

4    three other scenarios.  One, we can give them a

5    message, the next one, we can have the hospital

6    operator answer the phone.  It's --

7         Q.   So when you faced with this

8    confusion isn't it rational to follow what UH's

9    compliance is telling you to do?

10        A.   It is not national because the

11   compliance office is giving me two or three

12   different versions.

13        Q.   Okay.  Then you tell Carole,

14   despite Carole telling you what she has done,

15   that you are going to call them and make sure

16   that you are interpreting CGS's expectations

17   correctly; right?

18        A.   Yes, which I have done, and they

19   continually send me what it says in section 2B.

20        Q.   And then you tell, Carole, and by

21   the way, I'm going to have the providers

22   complete section 2B themselves, I'm not going

23   to populate that anymore; right?

24        A.   Yes.  I'm not going to do it

25   anymore.

1          Q.     And then you have, I guess some

2     more communications with Kim.  And you say that

3     you just received an e-mail from Kim stating

4     that we can populate the application with the

5     main hospital number per CGS.  Please let Steve

6     Riddle know that this is their policy as we can

7     no longer use CBO's phone number.  I am sure

8     the department will be happy to hear this.

9     Thanks for your help.

10               So now, based on your

11    communications with Kim, after Carole has

12    already communicated with them, you are telling

13    everybody that they can use the main hospital

14    number; right?

15         A.    Wait.  I just received an e-mail

16    from Kim saying we can populate the application

17    with the main hospital number per CGS, please

18    let Steve Riddle know that this is their

19    policy.  And I -- I said the department will be

20    happy to use this -- to hear this.

21               We wouldn't have to answer the

22    phone and lie anymore, saying that they could

23    be reached.

24         Q.    Where is this e-mail from Kim?  Did

25    you send them home to yourself?

1          A.    I received an e-mail from Kim

2     stating that we -- that's the one that I got

3     from Carole Meisler.

4          Q.    You say, I just received an e-mail

5     from Kim?

6          A.    I just received an e-mail from Kim?

7          Q.    Do you have that e-mail?

8          A.    No, I would probably be referring

9     to -- let me see, this was July 19th at 4:58,

10    so I went home at -- probably.  And then the

11    next morning I came in and probably read the

12    e-mail.  So, no, I don't have anything at home.

13         Q.    So you didn't keep that e-mail from

14    Kim?

15         A.    That was the one from Carole.

16         Q.    No, it says you just received an

17    e-mail from Kim.

18         A.    Well, I can't say I got it directly

19    from Kim, but it's the one that Carole sent

20    from Kim.

21         Q.    But you're writing to Carole.  Why

22    would you write that to Carole?  Carole is the

23    one that told you that she talked to Kim.

24         A.    Wait.  Stating that we can populate

25    the e-mail -- well, yeah.  Then, I was probably

Page 220

1    saying that I received the e-mail, because

2    Carole sent me the e-mail and the same people

3    are referenced in the e-mail, so I was probably

4    responding back to Carole.  It had the entry

5    number, important, yeah.  I -- I don't have any

6    e-mail from Kim.

7         Q.    All right.  If you look at the page

8    before that, you cut and paste something that

9    doesn't have a date on it or anything from Kim?

10        A.    Which one.

11        Q.    It says per Kim, you may use the

12   hospital operator number as long as they will

13   verify that the provider can be reached at that

14   number.

15             Do you see, it doesn't have any

16   date or anything?

17        A.    Yeah.  Maybe I did get an e-mail

18   from Kim.  I don't know.

19        Q.    And then basically you are

20   telling --

21        A.    Sometimes you can get an e-mail and

22   the transition part, you know.

23        Q.    And, then, basically you are just

24   telling Carole in your July 20th e-mail at 10

25   o'clock, clarify with Steve what number other

1    than central billing office we should be using

2    as the existing number is not in compliance?

3              You've decided, contrary to the

4    compliance department and the head of UH's

5    compliance, with years of experience with

6    regulatory compliance --

7              MR. HERRON:  Objection.

8         Q.   -- you've determined that what you

9    are doing isn't in compliance; is that correct?

10             MR. HERRON:  Objection.

11             We are not going to assume that she

12   is anywhere accurate, anything that she said

13   about the issue of compliance, we are not

14   accepting that as accurate.

15        Q.   Are you going to answer the

16   question?

17        A.   I can't answer the question.

18        Q.   You can't answer that question?

19        A.   Well, I will agree with what my

20   attorney said.

21        Q.   Because of what your attorney said

22   you can't answer?

23        A.   It's not because of what he said,

24   it's the truth of what he said.

25        Q.   You're not going -- you're telling,

1    on July 20th at 10 o'clock, you are saying to

2    compliance, Carole Meisler, and to the head of

3    compliance, Sheryl Wahl, that they have to come

4    up with a number other than central billing

5    office because the existing number is not in

6    compliance; right?

7         A.    Yes.  I believe there was an e-mail

8    from Sheryl Wahl, too, that said that -- I

9    think that there was an e-mail from her that

10   said I had an issue with using the CBO number.

11        Q.    Okay.  And then you basically tell

12   Carole that you are going to wait to hear from

13   Steve and it has to be in writing as to what

14   number you are going to use; right?

15        A.    Yes.

16                   -  -  -  -  -

17              (Thereupon, Defendant's Exhibit 36,

18              e-mail correspondence from Jill

19              Fulton-Royer dated July 27, 2012,

20              was marked for purposes of

21              identification.)

22                   -  -  -  -  -

23        Q.    Showing you what have I marked as

24   Exhibit 36.

25              So, July 20th, at 10 o'clock you

1    say you're not going to -- you're going to wait

2    for a number, this one is not in compliance.

3    At 10:22 you reiterate that you're not going to

4    process anything.  And, then, at 12:23, a

5    couple hours later, you say you are going home,

6    you have a headache and blurred vision; is that

7    correct?

8         A.    Yes.

9         Q.    Did you go to the doctor that day?

10        A.    No, I went home.  I believe I went

11   home.  I may have went gone to the doctor's

12   office.

13        Q.    Do you know what you did?

14        A.    No, I don't recall.

15        Q.    Were you able to drive with your

16   blurred vision?

17        A.    Yes.

18        Q.    Were you able to engage in your

19   real estate business with the blurred vision?

20        A.    I don't recall if I engaged that

21   day in real estate.

22        Q.    But while this is going on with the

23   applications and what have you, you are

24   engaging in your real estate business in part

25   from your desk at UH; correct?

1          A.     I don't recall.  And if I did it

2    was probably on my break.

3          Q.     Did you have set break times?

4          A.     Excuse me?

5          Q.     Did you have set break times?

6          A.     No.

7          Q.     You just took your break whenever

8    you wanted to?

9          A.     Yes, everyone did.

10         Q.     Did you have to sign out for your

11   break?

12         A.     No.  Wait a minute.  Did we have to

13   sign out?  I know the policy changed at some

14   point.  I know, yeah -- I don't remember.

15                   -  -  -  -  -

16                (Thereupon, Defendant's Exhibit 37,

17                e-mail correspondence from Jill

18                Fulton-Royer dated July 27, 2012,

19                was marked for purposes of

20                identification.)

21                   -  -  -  -  -

22         Q.     Showing you what I have marked as

23   Exhibit 37.

24                This is the July 23rd, 2012 e-mail

25   from Steve Riddle to everybody saying that

1    there is no more sleeping at work stations; is

2    that correct?

3         A.    Correct.

4         Q.    And in response to that no more

5    sleeping in the work stations, you say to him,

6    please, note that drowsiness is a side effect

7    that I'm experiencing while taking my

8    prescribed stress medication.  And, then, what

9    is that, a definition of drowsiness or

10   something that you put in there?

11        A.    People who are drowsy may fall

12   asleep in inappropriate situations or at

13   inappropriate times, yes.

14        Q.    Is that something like you went on

15   the Web and Googled the word drowsiness and

16   then cut and pasted it in here or what?

17        A.    Probably.

18        Q.    And why are you telling him that

19   you are drowsy, does that mean that you should

20   be able to sleep at your work station?

21        A.    I don't want him to interpret my

22   sleeping as intentional because he told us not

23   to do it.

24              That's interesting, this came

25   after --

1          MR. HERRON:  Wait until she asks

2     you a question.

3          Q.    What did you want to say?

4          A.    It's interesting that we got this

5     e-mail after the application process.

6          Q.    Is it possible that you got this

7     because you have gotten medication in June and

8     started sleeping more at your desk?

9          A.    Is it possible that I could have

10    gotten --

11         Q.    That you started sleeping more at

12    your desk and it created an issue and that's

13    why it came out now?

14         A.    It came out when?  This day?

15         Q.    Yes.

16              Is it possible that the reason it

17    comes out now has nothing to do with the

18    application, but rather because you were

19    sleeping more often at your desk?

20         MR. HERRON:  Objection.

21              This pre-supposes that she knows

22    what their motives were.

23              She can answer if she knows what

24    their motives were.

25         A.    I don't know what their motives

Page 227

1    were.

2          Q.    So you don't know if it was tied to

3    the applications either; do you?

4          A.    No, I don't.

5          Q.    No you don't, is that what you

6    said?

7          A.    Can you rephrase the question?

8          Q.    If you don't know what their

9    motivations were, you don't know if they were

10   tied to the application process; right?

11         A.    No, I said it was just a

12   coincidence that it came out after.

13         Q.    Right.

14                    -   -   -   -   -

15               (Thereupon, Defendant's Exhibit 38,

16               Hand Delivered letter dated July 23,

17               2012, was marked for purposes of

18               identification.)

19                    -   -   -   -   -

20         Q.    Handing you what I have marked as

21   Exhibit 38.

22               So you got a letter on July 23rd

23   from the vice-president and chief compliance

24   officer of University Hospitals; correct?

25         A.    Correct.

1          Q.    Sheryl Wahl; right?

2          A.    Correct.

3          Q.    And she said that her office and

4     Carol Meisler in particular had confirmed that

5     the use of the telephone number was allowable

6     and correct; correct?

7          A.    Correct.

8          Q.    And they, in fact, had taken your

9     complaint about it very seriously; correct?

10              MR. HERRON:  Objection.

11         A.    That I don't know.

12         Q.    Well, the same day that you said

13    that there were issues, the compliance officers

14    started making phone calls and talking to CGS;

15    didn't they?

16         A.    Yes.

17              MR. HERRON:  Objection.

18         Q.    Your answer?

19              MR. HERRON:  If you have personal

20    knowledge that they contacted CGS you can

21    answer, if you don't have personal knowledge,

22    don't guess or speculate.

23         A.    I don't have personal knowledge.

24         Q.    Well, you were told they did that?

25         A.    Right.  I didn't actually see them

1    make the phone calls.

2         Q.    Right.  Your complaint certainly

3    wasn't ignored; was it?

4         A.    No, it wasn't.

5         Q.    They acted on it and communicated

6    about it; didn't they?

7         A.    Correct.

8         Q.    Do you know what Sheryl Wahl's

9    background or experience is?

10        A.    Yes, she said she's compliance

11   office.

12        Q.    Do you know what her experience is

13   with compliance?

14        A.    No, I don't.

15        Q.    Did you do any investigation to

16   find out whether or not she was a person you

17   could rely on?

18        A.    No, I did not.

19        Q.    Did you do any investigation of

20   anybody at CGS to find out if they were people

21   they could rely on?

22        A.    An investigation, no, I did not.

23        Q.    Did you do anything to try to

24   determine who was more reliable, the people

25   that e-mailed you from CGS or Sheryl Wahl?

Page 230

```
 1          A.    I would have no way of
 2    investigating.  I could only apply the denial
 3    letters.
 4          Q.    Did you know who would have more
 5    knowledge about what was appropriate on an
 6    855I, section 2B?
 7          A.    No.
 8          Q.    Now, you will agree that as of July
 9    25th, 2012 you were having some impaired
10    functioning; correct?
11                MR. HERRON:  Objection.
12          A.    No, I don't agree.
13          Q.    You don't agree?
14          A.    That's what I was told by my
15    supervisor.
16          Q.    Well, on July 26th you called your
17    doctor up and asked him for FMLA leave because
18    of severe depression; right?
19          A.    Anxiety.  If it says depression,
20    yes, I guess it is depression.
21          Q.    You wouldn't have gone out on or
22    asked your doctor to support your going out on
23    leave unless you had impaired functioning;
24    would you?  You wouldn't fake that?
25          A.    It was elevated when they called me
```

1    into the office and started telling me that I

2    was impaired.

3         Q.    So you did have impaired

4    functioning?

5         A.    They told me that.

6         Q.    So on the 25th you weren't

7    impaired, but on the 26th you were?

8         A.    I believe my anxiety attacks

9    elevated or escalated when in certain

10   situations.

11        Q.    And you were feeling a lot of

12   stress at work; correct?

13        A.    Correct.

14        Q.    And your stress was elevated by the

15   issues around the signatures and the phone

16   numbers; correct?

17        A.    Right.

18        Q.    And, in fact, you told the people

19   at UH that you had been thinking about going

20   out on FMLA; correct?

21        A.    I had told them I had talked to my

22   doctor, yes.

23        Q.    Now, you wouldn't have gone out on

24   FMLA leave unless you were impaired in your

25   functioning; would you?

Page  232

1        A.    I wouldn't say I was impaired in my

2    functioning, I was able to process the

3    applications as you can clearly see.  I was

4    able to process other things, but I felt

5    probably at the time, that because, you know,

6    they kept raising the issue of the applications

7    and so forth that I just maybe at that time I

8    just felt I needed a break.

9              MR. HERRON:  Speaking of breaks, I

10   need to take a bathroom break.

11             MS. KAMINSKI:  Okay.

12             MR. HERRON:  So take a few minutes.

13             (Short recess had.  )

14       Q.    What time was the meeting on July

15   26th?

16       A.    I don't recall exactly, somewhere

17   around 10, 10:30.

18                  -  -  -  -  -

19             (Thereupon, Defendant's Exhibit 39,

20             e-mail Correspondence from Sheryl

21             Johnson dated July 26, 2012, was

22             marked for purposes of

23             identification.)

24                  -  -  -  -  -

25       Q.    Showing you what I have marked as

Page 233

1    Exhibit 39.

2              If you look at page two of Exhibit

3    39 from your home e-mail you sent to Sheryl

4    Johnson at 1:32 on July 26th that you weren't

5    feeling well and would not be in the rest of

6    the day nor tomorrow or Friday; correct?

7         A.    Yes.

8         Q.    And so that's after they have asked

9    you to go to EAP to have a fit for work

10   evaluation; correct?

11        A.    Correct.

12        Q.    You say you are not feeling well.

13   How were you feeling?

14        A.    I don't recall.  Probably stressed.

15        Q.    In particular how is it that your

16   stress embodied itself?

17        A.    That I don't recall.  I guess it is

18   probably stress.  I can't say exactly for sure.

19        Q.    When you say you were feeling

20   stress.  How is it that you feel stress?  What

21   happens to your body; anything?

22        A.    I get a headache.

23        Q.    Anything else?

24        A.    That's pretty much it.

25        Q.    So as a result of having a

1    headache, feeling stressed, at 1:30 on Thursday

2    you know you're not going to be in the rest of

3    that day or tomorrow or Friday; is that right?

4         A.    Yes.

5         Q.    And then an hour later you say, my

6    physician and I discussed my need to go on

7    medical leave, but you didn't really talk to

8    your doctor that day; right?

9         A.    On the 26th?

10        Q.    Yes, when we went through your

11   medical records I asked if you had talked to

12   your doctor that day and you said no?

13        A.    On the 26th, I said I don't recall

14   if I talked to him, if I picked up the FMLA

15   paper that day or talked to him, one or the

16   other.  But, then again, I think I said I did

17   see him.  I dropped off the paperwork.

18        Q.    You dropped off the paperwork?

19        A.    I dropped off the paperwork.  I

20   didn't talk to him.  He was with a patient,

21   correct.

22        Q.    This was inaccurate that you

23   discussed it with them?

24        A.    No, I said I didn't discuss it that

25   day.  I discussed it with him earlier.  Not

1    earlier that day, just earlier in general.

2        Q.    So that was more than a month

3    earlier that you talked to him?

4        A.    I don't know exactly when.

5        Q.    We looked at your medical records

6    and that is when you talked to him, one month

7    earlier?

8        A.    One month earlier that was the last

9    time, so that's probably when it was.

10       Q.    And then you say that she can send

11   the paperwork for EAP appointment via certified

12   mail.

13             Why were you mandating that they

14   send something to you certified mail?

15       A.    They said that they were going to

16   send it certified mail, they were going to send

17   it regular mail and messenger, which is

18   indicated on there.

19             -  -  -  -  -

20             (Thereupon, Defendant's Exhibit 40,

21             e-mail Correspondence from Christina

22             Morrison dated July 30, 2012, was

23             marked for purposes of

24             identification.)

25             -  -  -  -  -

1        Q.    Showing you what I have marked as

2   Exhibit 40.

3              So, now, on the 26th your doctor

4   has said that you are suffering from a major

5   depression and can't work for a couple of

6   weeks.

7        A.    Where is it in this?

8        Q.    And this is on the 27th in the

9   evening, you write this e-mail to Christina; is

10  that correct?

11       A.    Wait.  Where does it say that my

12  doctor --

13       Q.    Earlier in the exhibits, you can

14  look back at it, signed on the 26th.

15       A.    Okay.  If you tell me it's in

16  there.

17              What were you asking me?

18       Q.    So on the 26th you ask your doctor

19  if he'll sign the paperwork for you to be off

20  work; correct?

21       A.    Correct.

22       Q.    And then while you were off work

23  with stress, you write Christina and ask for

24  your reviews to be sent to you by e-mail; is

25  that correct?

Page 237

1         A.    Yes.

2         Q.    Isn't that just trying to add some

3    stress to you?

4         A.    I'm stressed, I'm not dead.  I

5    wasn't dead.

6         Q.    So you could still function well

7    enough to want to see those reviews; right?

8         A.    Yes.

9         Q.    And the stress didn't keep you from

10   continuing to confront Christina about

11   something that you wanted and thought was

12   wrong; correct?

13        A.    Correct.  I probably felt more

14   stressed being in their presence as opposed to

15   being home.

16        Q.    Did you ever contact the Ohio

17   Attorney General about anything at UH?

18        A.    Ohio Attorney General?

19        Q.    No?

20        A.    Is that regarding the medication,

21   my medication?

22        Q.    Regarding anything.  Did you

23   contact the Ohio Attorney General?

24        A.    I don't recall.

25        Q.    Why on August 2nd did you decide

Page 238

1    you should have some of your personal

2    belongings picked up?

3           A.    I left my shoes there, which they

4    denied giving to me.  They denied me access to

5    the building.  There were some calendars,

6    personal calendars.  There were two note pads

7    that I asked for that they never gave me.

8           Q.    So you never got these items?

9           A.    The pads, I never got.  The shoes

10   were there when I came back on October 8th and

11   the calendars were there when I came back on

12   October 8th.

13          Q.    What were on these pads?

14          A.    Personal stuff.  Some personal -- I

15   believe I had one personal and one office.

16          Q.    And what kind of stuff?

17          A.    Things I would jot down, you know,

18   in terms of my appointments or if I needed to

19   call someone and some stuff with regard to the

20   doctor's meeting minutes.

21                   -  -  -  -  -

22                (Thereupon, Defendant's Exhibit 41,

23                Department of Health and Human

24                Services Form dated August 4, 2012,

25                was marked for purposes of

1          identification.)

2                    -  -  -  -  -

3          Q.    I'm going to hand you what I have

4    marked as Exhibit 41.

5               Did you fill this out on October

6    4th as indicated there?  August 4th, 2012?

7          A.    August 4th, it has my signature on

8    it.

9          Q.    Did you go to the Department of

10   Health and Human Services to fill this out or

11   how did you do this?

12         A.    Oh, this is -- I think I sent them

13   an e-mail.

14         Q.    And why did you decide to take this

15   action on August 4th?

16         A.    No particular reason.  I know that

17   I was stressed.  And I am until this day about

18   her talking about my medication.

19         Q.    Even though you don't know anybody

20   that heard it and she didn't know what

21   medication?

22         A.    Well, the obvious fact is that she

23   did it.

24         Q.    Do you know what happened with this

25   complaint?

Page 240

```
 1          A.    I believe they told me that they
 2     weren't the ones who handled this type of
 3     complaint, that I would have to make it to
 4     someone else.  I forgot --
 5          Q.    What about August 4th led you to
 6     want to make a complaint about this issue?
 7          A.    I don't recall.
 8          Q.    You were out on leave; correct?
 9          A.    Uh-huh.
10          Q.    Yes?
11          A.    Yes.
12                    -   -   -   -   -
13                (Thereupon, Deposition Exhibit 42,
14                HIPPA Complaint, was marked for
15                purposes of identification.)
16                    -   -   -   -   -
17          Q.    Let me show you what I have marked
18     as Exhibit 42.
19                To whom did you send this?
20          A.    I don't recall.  I think this was
21     attached to this.
22          Q.    You think that Exhibit 42 was
23     attached to Exhibit 41?
24          A.    Yes.
25          Q.    So this was part of your complaint
```

Page 241

1    to the --

2            A.    I don't recall exactly.

3            Q.    Did you make a complaint to anybody

4    other than the Health and Human Services?

5            A.    I don't recall.  I think this has

6    to do with this.

7            Q.    While you were on leave did you go

8    back to see Dr. Headen?

9            A.    I don't remember.  I know I went to

10   -- I got the FMLA paperwork.  I saw Dr. Dutton.

11   I saw Dr. Abbass.  I don't think I did.

12           Q.    When Dr. Dutton told you he

13   wouldn't take you on as a patient did you go

14   back to Dr. Headen?

15           A.    I'm not sure.

16           Q.    Did you just quit the Zoloft on

17   your own?

18           A.    Yes.

19           Q.    Did you do it by tapering off or

20   did you just quit?

21           A.    I don't recall.

22           Q.    Did you do it under a doctor's

23   care?

24           A.    Did I do it under a doctor's care?

25           Q.    Did a doctor give you instructions

1    to go off the Zoloft and --

2          A.    I did it on my own.

3          Q.    I did it on my own?

4          A.    Uh-huh.

5          Q.    Have you gone on any other

6    antidepressants?

7          A.    No.

8          Q.    Have you seen any other doctors for

9    emotional difficulties?

10         A.    Seen a doctor for emotional

11   difficulties, no.

12         Q.    For anxiety?

13         A.    No.

14         Q.    So since you saw Dr. Dutton you

15   have not been treated for anxiety?

16         A.    I don't believe so.

17         Q.    Well, you would know; wouldn't you?

18         A.    Yes.

19         Q.    So is the answer, no, you have not

20   been treated?

21         A.    Let me see, since Dr. Dutton, that

22   would be October.  I don't believe so.

23         Q.    Now in September of 2012 were you

24   planning on going back to work at University

25   Hospitals?

1        A.    In September?

2        Q.    Yes.

3        A.    Yes.

4        Q.    And then on October 1st you got the

5    letter saying come back by October 8th;

6    correct?

7        A.    Yes.  They never gave anything to

8    me, never gave me a return -- Kathy Springer

9    never gave me a return back to work.

10       Q.    But then they wrote you and said

11   come back to work October 8th; correct?

12       A.    Right.

13       Q.    And did you write or try to talk to

14   anybody about your return to work date in

15   September?

16       A.    That I don't recall.  I received a

17   letter stating that my FMLA had ran out on the

18   21st.  I don't recall getting something to say

19   that I was approved on FMLA.  I had applied for

20   unemployment and they just left me in limbo.

21       Q.    Were you writing Kathy saying when

22   can I come back to work?

23       A.    She wrote me saying I couldn't come

24   back without a doctor's note.

25       Q.    Did you go to the doctor and try to

1    get the doctor's note to go back to work?

2        A.    I thought the notice I got from Dr.

3    Dutton was sufficient.

4        Q.    Dr. Dutton's ran out September 4th;

5    right?

6        A.    Yes.

7        Q.    So did you ever see a doctor or

8    anything to say that for the month of September

9    you needed to be out --

10       A.    They were responsible for putting

11   me on unpaid administrative leave, so I was

12   interpreting that they would give me -- well,

13   she said I couldn't return.

14       Q.    Let me show you what I have marked

15   as Exhibit 43.

16                  -  -  -  -  -

17              (Thereupon, Defendant's Exhibit 43,

18              Charge of Discrimination, was marked

19              for purposes of identification.)

20                  -  -  -  -  -

21       Q.    So on October 1st they send a

22   letter to you telling you to come back to work

23   on October 8th; correct?

24       A.    Correct.

25       Q.    And then on October 4th you file

Page 245

1    this Charge of Discrimination; correct?

2         A.    Yes.

3         Q.    What led you to file a Charge of

4    Discrimination on October 4th?

5         A.    Well, I felt it had to do with the

6    Medicare applications.

7         Q.    But why did you decide to go -- you

8    have been out of work and that all happened in

9    July, it's been August, September, and then on

10   October 4th you decide to go file with the

11   EEOC, why is that?

12        A.    I can't explain why that particular

13   day.

14        Q.    Did your lawyer go with you?

15        A.    Go with me where?

16        Q.    To fill out the complaint at the

17   EEOC?

18        A.    No.

19        Q.    Or the OCRC?  No?

20        A.    Did he come with me to fill it out?

21        Q.    Right.

22        A.    No.

23        Q.    But you signed it in front of your

24   lawyer?

25        A.    Yes.

1      Q.    Did you write the paragraph that's

2   on the form?

3      A.    Yes, for the most part.  Some I

4   didn't.

5      Q.    Who wrote the part that you didn't

6   write?

7      A.    My attorney did the part I didn't

8   understand.  Well, I guess I didn't understand.

9      Q.    What is the perceived disability

10  that you believe you were discriminated on?

11             MR. HERRON:  Objection.

12             Calls for her to make a legal

13  conclusion.  Calls for a legal conclusion.

14      Q.    Go ahead.

15             MR. HERRON:  You can answer if you

16  understand the question, obviously.

17      A.    What was the question again?

18      Q.    What disability did you think

19  people thought you had?

20             MR. HERRON:  Same objection.

21      A.    I don't understand the legal

22  ramifications of this.

23      Q.    Well, I understand that you don't

24  understand the legal --

25      A.    I'm not an attorney.

```
 1          Q.    Did you think somebody at work
 2     thought you had a disability?
 3          A.    I can't answer that.
 4          Q.    You don't know if they did?
 5          A.    I can't answer that.
 6                MR. HERRON:  It calls for her to
 7     make a legal conclusion.
 8          Q.    Well, you filed a lawsuit where you
 9     claim that UH perceived that you had a
10     disability.
11          A.    I'm not an attorney.
12          Q.    I understand that.
13                Who is it at UH that thought you
14     were disabled?
15          A.    I can't answer that.
16          Q.    You don't know?
17          A.    No.
18          Q.    You are unaware of anybody at UH
19     that thought you were disabled?
20          A.    I'm not a lawyer.
21                MR. HERRON:  Continuing objection
22     to the term disabled.
23                Calls for legal conclusions.
24          Q.    Did anybody treat you were like you
25     were disabled?
```

1            MR. HERRON:  Same objection.

2            Calls for a legal conclusion, the

3   term disabled.

4       A.    I'm not an attorney.  I can't

5   answer that.

6       Q.    You can answer it, you don't have

7   to be an attorney.

8            MR. HERRON:  She just told you she

9   can't answer, she is not an attorney.  She

10  doesn't understand the legal definition.

11           MS. KAMINSKI:  I'm not asking her

12  that.

13      Q.    What is your definition of

14  disabled?

15           MR. HERRON:  Objection.

16           Her personal definition is

17  irrelevant.

18      Q.    What is your definition of

19  disabled?

20           MR. HERRON:  Objection.  Relevance.

21      A.    I'm not an attorney.  I can't

22  answer it.

23      Q.    I'm asking what your personal --

24  what you think is your definition of disabled?

25           MR. HERRON:  Same objection.

Page 249

1        Q.    You have to answer.

2        A.    I'm not an attorney.  I can't

3    answer that.

4        Q.    You have to answer the question.

5        A.    I don't know how to answer it.

6        Q.    Do you not know the definition of

7    disabled for yourself?

8              MR. HERRON:  Same objection.

9        Q.    Do you know the word disabled?

10       A.    Yes.

11       Q.    You signed a form here that you

12   said, not your attorney, you believed that you

13   were discriminated against on the basis of a

14   perceived disability.  When you signed that

15   form, did you know what you were signing?

16       A.    I'm not an attorney.  I just based

17   it by my attorney.

18       Q.    So you signed a form that you

19   didn't understand the words?

20       A.    Yes.

21       Q.    Have you ever used the word

22   disabled?

23       A.    Yes, I have.

24       Q.    In what context have you used the

25   word disabled?

1        A.    Probably someone that can't do

2    things for themselves.

3        Q.    Okay.  And in any other context

4    that you have used the word disabled?

5        A.    I don't recall.

6        Q.    Let's use that.  I think it's a

7    very good definition.  Somebody that can't do

8    something for themselves?

9        A.    Uh-huh.

10       Q.    Did you think that anybody at UH

11   had a view of you that you couldn't do

12   something for yourself?

13            MR. HERRON:  Objection.

14            Calls for a guess or speculation as

15   to what other people perceived.

16       A.    Right.

17       Q.    Is this what you think, I'm not

18   asking whether you are right or not, do you

19   think there is somebody at UH that thought you

20   couldn't do something?

21       A.    I can't tell what they were

22   thinking.

23       Q.    Okay.  Did they treat you in such a

24   way as that you believed that you thought they

25   thought you couldn't do something for yourself?

1              MR. HERRON:   Same objection.

2         A.    I can't answer that.  Well, other

3    than them saying I can't perform my work

4    because of my -- I was sleeping at my desk.

5         Q.    Other than them saying you can't

6    perform your work because you were sleeping at

7    your desk?

8         A.    Right.  That's not true.

9         Q.    Anything else?

10        A.    No, that's it.

11        Q.    Did anybody ever say you can't

12   perform your work or whether they were

13   concerned you could perform your work?

14        A.    Well, I believe that's the reason

15   why they sent me to EAP.

16        Q.    They sent you to have an evaluation

17   to see if you could do the work; correct?

18        A.    And the evaluation said I could do

19   the work.

20        Q.    And on the day that they sent you

21   for that you went to your doctor to say you

22   couldn't work; right?

23        A.    I was stressed out about the whole

24   situation.

25        Q.    Okay.  And you couldn't work;

1   right?

2         A.    Yes.  I couldn't work.

3         Q.    In your letter of October 5th to

4   Christina Morrison you wrote, I think that UH

5   has tried, tried to portray me as mentally

6   unstable.

7               In what way had they tried to

8   portray you as unstable?

9         A.    I felt that because they sent me to

10  see a psychiatrist.

11        Q.    Because of the evaluation?

12        A.    No, not because of the evalu -- no,

13  because they sent me to see a psychiatrist.

14        Q.    Anything else, other than the fact

15  that they asked you to see a psychiatrist, that

16  led you to say that they were trying to portray

17  you as mentally unstable?

18        A.    No, I didn't see any reason why

19  they should have sent me to see a psychiatrist.

20        Q.    Is there anything else that they

21  did, other than then standing you to see a

22  psychiatrist, that you think was them trying to

23  portray you as mentally unstable?

24        A.    No, that's it.

25        Q.    Is there anything that ties what

1    they said or did that ties directly between the

2    fact that they sent you to see a psychiatrist

3    and because you said you wouldn't lie on the

4    provider applications?

5         A.    Can you repeat that?

6         Q.    It there anything that ties

7    directly their request that you see a

8    psychiatrist to your saying that you wouldn't

9    lie on provider applications?

10              MR. HERRON:  Objection.

11              To the extent that it calls you to

12   guess or speculate as to what their motives

13   were, but you can answer.

14        A.    Well, the fact that I'm looking at

15   it in black and white that the applications

16   need to be -- that the providers needed to be

17   reached directly and them telling me that I

18   need to follow those directions of the

19   compliance officer.

20              I wanted to make sure that I was

21   putting myself -- that I was complying, but not

22   doing something that I wasn't supposed to be

23   doing.

24        Q.    And had anybody ever told you that

25   there was some penalty for putting down the

1    wrong phone number?

2         A.    The person that I spoke to at EC,

3    they said, yes, there can be a penalty, which

4    is also on the back of the application,

5    falsifying.

6         Q.    Yes, falsifying the application.

7         A.    Yes, or misleading.

8         Q.    Did anybody from CGS say they

9    thought the wrong phone number was false and

10   misleading?

11        A.    They denied the application because

12   they couldn't verify the doctor.

13        Q.    Did anyone tell you that the

14   verifying the wrong number would be false and

15   be misleading?

16        A.    With the e-mails I got from

17   Shamekia.

18        Q.    Did she say false and misleading?

19        A.    She never used those exact words.

20        Q.    The psychiatrist that you went to

21   see for your evaluation for fit to work said

22   that you should be off work until September

23   4th; is that correct?

24        A.    He said two weeks.

25        Q.    Okay.

Page 255

```
 1                    -  -  -  -  -
 2              (Thereupon, Defendant's Exhibit 44,
 3              Excerpt, Integrity Manual, was
 4              marked for purposes of
 5              identification.)
 6                    -  -  -  -  -
 7      Q.    Showing you what I have marked as
 8  Exhibit 44.
 9              What is this?
10      A.    This looks like this is part of, I
11  can't -- yeah, part of the integrity manual.
12      Q.    Where did you get it?
13      A.    I don't recall having this.  This
14  is probably -- I don't recall.  This is part of
15  the manual that changed.  It changed in March
16  or May.
17      Q.    Where did you get this document
18  from?
19      A.    I don't recall.
20      Q.    Did you ever have this document in
21  your possession?
22      A.    I don't recall.
23              MS. KAMINSKI:  Can you look to see
24  if this is a document that was produced from
25  her, Counsel?
```

Page 256

1           MR. HERRON:  Excuse me?

2           MS. KAMINSKI:  Can you look to see

3    if this a document that she provided?

4           MR. HERRON:  Yes, we provided it.

5    It has our Bates Stamp on the bottom.

6           MS. KAMINSKI:  Does that mean that

7    she has provided it to you?

8           MR. HERRON:  Well, I'm not going to

9    tell you what she has provided to me or not

10   provided to me, that's privileged information.

11          We provided to you as part of our

12   response to your request for production of

13   documents.

14      Q.    Is this a document you think you

15   had in your possession ever?

16      A.    I don't recall.

17      Q.    Have you kept the original

18   documents at home?

19      A.    For the most part, yes.

20      Q.    Would you look to see, please,

21   whether or not this is a document that you

22   have?

23      A.    I don't have anything with me.

24      Q.    You can look, we are going to get

25   back together, in between you can look to see

Page 257

1    if this is a document that you had in your

2    possession.  Okay?

3         A.    Okay.

4                   -  -  -  -  -

5               (Thereupon, Defendant's Exhibit 45,

6               CMS-8551, was marked for purposes of

7               identification.)

8                   -  -  -  -  -

9         Q.    Showing you what I have marked as

10   Exhibit 45.

11              What is this?

12        A.    This is the CMS application, 855I.

13        Q.    And why did you have this?

14        A.    This is the actual application that

15   we were instructed to fill out.

16        Q.    What does it say under the first

17   line of B, is that your writing?

18        A.    Yes.

19        Q.    What does that say?

20        A.    We are a billing agency for

21   provider.

22        Q.    Is that what yours said that when

23   you filled it out?

24        A.    No, I just put that in there.

25   These are little notes.

Page 258

```
 1        Q.    Those are notes to yourself?

 2        A.    Yes.

 3        Q.    When did you put those on the

 4   document?

 5        A.    I don't recall.

 6        Q.    Before the lawsuit?

 7        A.    I don't recall.

 8        Q.    And what does that other note say?

 9        A.    Were told to complete this portion

10   with my phone number.

11        Q.    And when did you put that note on

12   there?

13        A.    I don't recall.

14        Q.    Before the lawsuit?

15        A.    I don't recall.

16        Q.    So you have no idea when you wrote

17   those notes to yourself?

18        A.    I would say before the lawsuit.

19        Q.    Were those notes to yourself or

20   notes to somebody else?

21        A.    Well, this right here says January

22   11th.  It says January 11th, 2013.

23        Q.    So how is it that you printed this

24   off or had this?

25        A.    I don't recall.
```

Page 259

1        Q.    And were those notes to yourself or

2    notes to somebody else?

3              MR. HERRON:  Asked and answered.

4              She said she doesn't recall.

5        A.    I don't recall.

6              MS. KAMINSKI:  She didn't answer

7    that.  She gave me the date in response to that

8    question.

9        A.    I don't recall.

10                   -  -  -  -  -

11             (Thereupon, Defendant's Exhibit 46,

12             Letter From Christina Morrison dated

13             July 26, 2012, was marked for

14             purposes of identification.)

15                   -  -  -  -  -

16       Q.    Let me show you what I have marked

17    as Exhibit 46.

18             MR. HERRON:  Can you make this the

19    last one for the day?

20             MS. KAMINSKI:  The last exhibit,

21    then I have other questions.

22       A.    Can I see the application?

23       Q.    Here is Exhibit 46.

24             If you would look through those

25    documents and tell me if that is all your

Page 260

1    handwriting on those documents?

2         A.    Yes, it is.

3         Q.    Look at each one.

4         A.    Uh-huh.  Okay.  This is my

5    handwriting.

6         Q.    Do you know when you wrote these

7    notes?

8         A.    No, I don't recall when I wrote

9    them.

10        Q.    Are they notes to yourself or notes

11   to somebody else?

12        A.    Well, notes to myself.

13        Q.    Were they before the lawsuit or

14   after?

15        A.    They were probably before the

16   lawsuit.

17              MS. KAMINSKI:  All right.  We will

18   come back to those next time.  I need just a

19   minute, then we will finish up for the day.

20              (Short recess had.)

21        Q.    Just a couple to wind up today and

22   then we can get back together when we set

23   another date.

24              During September of 2012 were you

25   working at your real estate business?

Page 261

1          A.      September of 2012, I don't recall.

2          Q.      Would you have any records that

3     would help you, any calendars that would show

4     what you were doing during September of 2012?

5          A.      I may have -- well, the calendar

6     that I had at my desk I didn't have access to.

7          Q.      Did you have a calendar that you

8     used at home?

9          A.      No, I kept it at my desk.

10         Q.      Did you have a calendar that you

11    maintained in your phone?

12         A.      No.

13         Q.      Okay.  So when you went back in on

14    October 8th to go to work, you were planning on

15    starting work that day; correct?

16         A.      Yes.

17         Q.      And the only reason that you didn't

18    continue your job is because you were asked to

19    fill out the --

20         A.      Medicare application.

21         Q.      -- Medicare application using your

22    phone number; is that correct?

23         A.      Correct.

24         Q.      And had you agreed to do that you

25    would have been working there as of October

Page 262

1    8th; correct?

2         A.    I assume so.

3         Q.    Because that was the only issue

4    that was brought up in that meeting; correct?

5         A.    In the meeting with?

6         Q.    On October 8th.

7         A.    Can I have a copy of the document?

8         Q.    What document?

9         A.    I mean, the return to work

10   document.

11        Q.    The letter that said, come in on

12   October 8th?

13        A.    No, the one that I responded to

14   coming back to work.

15             MR. HERRON:  The letter of the 5th

16   is what you are talking about?

17             THE WITNESS:  Yeah, the letter of

18   the 5th.

19        Q.    Your letter?

20        A.    Yes.

21             -  -  -  -  -

22             (Thereupon, Defendant's Exhibit 47,

23             Letter From Victoria Johnson dated

24             October 5, 2012, was marked for

25             purposes of identification.)

Page 263

1                      -  -  -  -  -

2          Q.    I will hand you what I have marked

3     as Exhibit 47, which is your letter of October

4     5th.

5          A.    Okay.  So I requested to work in a

6     non-hostile work environment.  I needed a copy

7     of my drug and alcohol screening and the

8     psychiatric report from Dr. Pallas, because I

9     never received it.

10                    Not to be asked to complete

11    Medicare, Medicaid, out of state Medicaid

12    and/or any other provider enrollment

13    applications that are prohibited or in

14    violation of their rules.

15                    Would like to see a company-wide

16    distributed e-mail informing employees that

17    they are no longer permitted to rest at their

18    desks during their breaks.

19                    Would like to have confirmed and/or

20    a report that Paul Simmons has also been placed

21    on unpaid administrative leave subject to a

22    mandatory psychiatric evaluation, as I have

23    reported to HR his offensive sexual behavior.

24                    And then I wanted to not be

25    subjected to retaliatory corrective actions,

1    which I believe I received, be it formal or

2    informal.

3              And yet to see a copy of the

4    corrective actions presented to me during my

5    2011, it should have been '12, no 2011,

6    performance that were clearly retaliatory

7    because of my complaint to HR regarding Paul

8    Simmons' sexual behavior, although he has moved

9    to the other side of the building, I am not

10   totally comfortable with his presence in the

11   building.

12             I was not totally comfortable with

13   his presence.

14        Q.   What did you want to read that

15   letter for?

16        A.   Well, you asked me if the

17   application was the only thing that would

18   prohibit me and these are also things that I

19   was hoping to expecting to return to.

20        Q.   So unless one through six was

21   complied with you weren't going to come back to

22   work?

23        A.   I would have probably -- I mean.

24   Eventually they would have to be complied with.

25   I don't think I was asking for anything

Page 265

1     unreasonable.  I think with the e-mails, I

2     think it's fair to not just, you know, have the

3     provider enrollment department, that is

4     something that I feel should be company wide,

5     but it wouldn't be the end of the world.

6                But the main thing was making sure

7     that people were in compliance with the

8     application.

9          Q.    And the only thing that was

10    discussed that day on October 8th was about the

11    filling out the applications?

12         A.    No, we discussed everything.

13         Q.    You discussed everything?

14         A.    Yeah, there was a letter she --

15         Q.    She responded to your letter, but

16    -- so they told you you would come back to a

17    non-hostile work environment; is that correct?

18         A.    Right.

19         Q.    And she told you she would give you

20    a copy of the drug and alcohol screening and

21    psychiatric report?

22         A.    Can I see that document?

23         Q.    I am saying she told you that;

24    right?

25         A.    I don't recall what she told me,

1    it's in that letter.

2         Q.    We can just go through here, what

3    do you recall?

4              MR. HERRON:  When I told you I

5    needed to be out of here by 4:30 I was pretty

6    serious.  We are running on quarter of.

7              MS. KAMINSKI:  Okay.  Let's finish

8    this.

9              MR. HERRON:  Well, let's get done

10   in a like a minute or so.

11        A.    I said she would or wouldn't do, I

12   don't recall offhand.

13        Q.    You don't remember whether or not

14   they would comply with number two?

15        A.    I need to see the letter.

16        Q.    So without the letter you can't

17   remember?

18        A.    No, I can't remember.

19        Q.    Number 3.  Discussed the complete

20   Medicare and Medicaid form and you basically

21   told them you would not do it the way they

22   wanted you to do it; correct?

23        A.    Correct.  Because it a discrepancy

24   with what CGS was telling me.

25        Q.    And they told you that they needed

1   you to fill out those forms the way they were

2   asking you to do it; correct?

3        A.    Right.

4        Q.    And you told them you couldn't, so

5   there is no sense staying; correct?

6        A.    No, they said if I didn't fill them

7   out that they would terminate me.

8        Q.    And?

9        A.    They terminated me.

10       Q.    And then they told you, why don't

11  you go home and think about it for 24 hours;

12  correct?

13       A.    Yes.

14       Q.    And you said you didn't need to

15  think about it?

16       A.    Right, I wasn't going to complete

17  the application.

18       Q.    You absolutely said there was no

19  way you were going to do it that way; right?

20       A.    Correct.

21       Q.    Rather than doing it that way you

22  understood that you were going to lose your

23  job?

24       A.    Correct.

25       Q.    So these other things, one through

Page 268

1    six, weren't the issues that caused you to lose

2    your job, it was the simply number three --

3         A.    Correct.

4         Q.    -- correct?

5              MR. HERRON:  Okay.  Let's call it a

6    day.  I really do need to get moving.

7              MS. KAMINSKI:  We will agree that

8    we will come up with a --

9              MR. HERRON:  We will.

10             MS. KAMINSKI:  -- time and date to

11   finish the deposition?

12             THE NOTARY:  Would you like to

13   advise on waiver now?

14             MR. HERRON:  We will wait until the

15   end on waiver.  We will review it.  I always

16   review it.

17             (Deposition adjourned at 4:46 p.m.)

18

19

20

21

22

23

24

25

Page 269

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to the

7    applicable Rules of Civil Procedure.

8

9                TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12                Original - Ms. Kaminski

13

14

15

16

17

18

19

20

21

22

23

24

25

Page  270

```
 1              REPORTER'S CERTIFICATE

 2    The State of Ohio,    )

 3                                  SS:

 4    County of Cuyahoga.  )

 5

 6              I, Christine M. Krause, a Notary

 7    Public within and for the State of Ohio, duly

 8    commissioned and qualified, do hereby certify

 9    that the within named witness, VICTORIA DEBRA

10    JOHNSON, was by me first duly sworn to testify

11    the truth, the whole truth and nothing but the

12    truth in the cause aforesaid; that the

13    testimony then given by the above-referenced

14    witness was by me reduced to stenotypy in the

15    presence of said witness; afterwards

16    transcribed, and that the foregoing is a true

17    and correct transcription of the testimony so

18    given by the above-referenced witness.

19              I do further certify that this

20    deposition was taken at the time and place in

21    the foregoing caption specified.

22

23

24

25
```

1    I do further certify that I am not a

2  relative, counsel or attorney for either party,

3  or otherwise interested in the event of this

4  action.

5        IN WITNESS WHEREOF, I have hereunto

6  set my hand and affixed my seal of office at

7  Cleveland, Ohio, on this ___21___ day of

8  ___March___, 20_14_.

9

10

11

12

13    Christine M. Krause

14    Christine M. Krause, Notary Public

15    within and for the State of Ohio

16

17  My commission expires January 14, 2014.

18

19

20

21

22

23

24

25

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
           ASSIGNMENT NO: 1828241
 3         CASE NAME: Johnson, Victoria v. UH Physician Services
           DATE OF DEPOSITION: 3/14/2014
 4         WITNESS' NAME: Victoria Debra Johnson

 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.

 7         I have made no changes to the testimony
      as transcribed by the court reporter.
 8
      _____         _____
 9      Date                     Victoria Debra Johnson

10         Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
           Statement; and
14         Their execution of this Statement is of
           their free act and deed.
15
           I have affixed my name and official seal
16
      this _____ day of_____, 20_____.
17
                    _____
18                  Notary Public

19                  _____
                    Commission Expiration Date
20

21

22

23

24

25
```

```
 1                    DEPOSITION REVIEW
                    CERTIFICATION OF WITNESS
 2
            ASSIGNMENT NO: 1828241
 3          CASE NAME: Johnson, Victoria v. UH Physician Services
            DATE OF DEPOSITION: 3/14/2014
 4          WITNESS' NAME: Victoria Debra Johnson

 5          In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
 6     my testimony or it has been read to me.

 7          I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
 8     well as the reason(s) for the change(s).

 9          I request that these changes be entered
       as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11     as this Certificate, and request and authorize
       that both be appended to the transcript of my
12     testimony and be incorporated therein.

13     _____        _____
          Date                    Victoria Debra Johnson
14
            Sworn to and subscribed before me, a
15     Notary Public in and for the State and County,
       the referenced witness did personally appear
16     and acknowledge that:

17          They have read the transcript;
            They have listed all of their corrections
18          in the appended Errata Sheet;
            They signed the foregoing Sworn
19          Statement; and
            Their execution of this Statement is of
20          their free act and deed.

21          I have affixed my name and official seal

22     this _____ day of_____ , 20_____.

23          _____
            Notary Public
24
            _____
25          Commission Expiration Date
```

1                    ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2              ASSIGNMENT NO: 1828241

3    PAGE/LINE(S) /        CHANGE        /REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19

20   _____      _____
        Date                Victoria Debra Johnson

21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22   DAY OF _____, 20_____ .

23              _____
                Notary Public
24
                _____
25              Commission Expiration Date

**A**

**abbass** 113:19,20,22
114:3,5,6,13 124:23,24
126:6,9,11 128:8,12
241:11
**ability** 112:21
**able** 37:2,24 38:5 52:4
55:5,16,22 59:23 60:1
60:16 62:20 63:9 69:12
70:8 80:22 88:14 97:2
106:14 159:6 169:24
178:13 181:10 182:21
200:7 223:15,18 225:20
232:2,4
**abovereferenced** 270:13
270:18
**absolutely** 267:18
**accept** 31:19 39:19
**accepted** 37:22 52:3
59:24
**accepting** 125:10 205:11
205:15,15 214:14
221:14
**access** 55:10 100:25
238:4 261:6
**accident** 179:24
**account** 64:17
**accurate** 105:22 138:3,4
144:11,17 148:12 176:8
188:11 221:12,14
**accuses** 104:2
**acknowledge** 272:11
273:16
**acknowledged** 104:5
**act** 272:14 273:20
**acted** 229:5
**action** 26:20 30:20,22
31:1 97:22 103:11
113:25 144:22 145:19
146:4 158:23 159:5
239:15 271:4
**actions** 30:1 142:24
143:1,6 144:20 212:7
263:25 264:4
**actual** 15:2 16:11 51:6,6
201:19 257:14
**adamich** 83:14

**add** 237:2
**added** 182:10
**additional** 35:20 37:12
110:15 162:5 171:23
172:8,17
**address** 8:14 33:6 39:5
44:3 154:12 182:16
188:2,7 189:24 190:17
190:21 193:10,11,15,21
**addressed** 137:24 167:16
**addresses** 35:18
**adjourned** 268:17
**adjust** 38:22
**adjusting** 131:11
**administrative** 72:7,8
77:16 244:11 263:21
**adult** 4:7,14,16 92:24
104:10 111:5
**advantage** 137:11
**advise** 126:23 205:23
268:13
**advised** 44:3 89:22
**advising** 199:8
**advisor** 193:19
**affixed** 271:6 272:15
273:21
**aforesaid** 270:12
**afrin** 128:12
**age** 8:2
**agency** 9:5 193:16 257:20
**ago** 126:11
**agree** 18:1,2,8,12 70:11
98:9 106:7 120:22
141:10 142:4,5 146:13
148:7,25 149:17 150:20
150:21 172:20 215:25
221:19 230:8,12,13
268:7
**agreed** 31:25 118:25
119:5 261:24
**ahead** 66:3 75:7 81:1
101:5 125:9 140:10
141:23 151:10 156:21
157:6,8 202:19 206:22
246:14
**ahold** 53:11,13,18 57:16
57:19
**ahuja** 5:1 125:24

**aisle** 156:3,15
**alcohol** 67:8 263:7
265:20
**alleged** 81:12
**alleviated** 104:4
**allowable** 228:5
**allowed** 18:15
**amount** 22:23
**amusing** 211:25 212:2,3
**andrew** 84:14 180:2
208:5 209:15 210:1
**anesthesia** 85:11
**angela** 5:21 183:17
185:14
**angelique** 74:7,9,15
**angry** 135:16
**answer** 45:14,15,20,21
47:11,12 52:5,8,13,17
52:18 53:1 66:2,12
75:12,14,16 94:6 97:6,8
135:19 151:20 152:16
152:22 156:21 158:11
167:10 168:7 169:3
172:24 187:4 191:17
196:8 200:9 206:16
208:24,25 209:16 211:7
211:9 214:7 215:11
216:20 217:6 218:21
221:15,17,18,22 226:23
228:18,21 242:19
246:15 247:3,5,15
248:5,6,9,22 249:1,3,4
249:5 251:2 253:13
259:6
**answered** 75:17 259:3
**answering** 169:1 171:7
177:7 192:14,24 194:2
**answers** 120:10 167:7
217:3
**anticipate** 80:21
**anticipating** 178:10
**antidepressants** 173:4,22
242:6
**anxiety** 93:8,12,16 94:1
95:10,15 96:5,12 100:9
103:12,20 104:1,4
111:19 114:8,12,18
116:11 118:14 119:8,11

119:12,14,14 128:22
129:5 230:19 231:8
242:12,15
**anybody** 8:19 25:10
28:20 29:1 66:18,20
68:2 71:20 88:24 98:22
99:6 137:14 163:8
164:18 173:19 229:20
239:19 241:3 243:14
247:18,24 250:10
251:11 253:24 254:8
**anymore** 62:21 63:22
182:24 214:12 217:23
217:25 218:22
**anyplace** 78:12
**apologies** 161:12
**apologize** 132:24
**apologized** 39:17 161:13
162:9
**apologizes** 160:20
**apology** 39:19
**app** 166:18 196:24
**appear** 272:11 273:15
**appearances** 2:1 3:3
**appearing** 153:18
**appears** 126:14 136:24
192:14,25 194:2
**appended** 273:11,18
**appetite** 105:15,17
**applicable** 214:11,12
215:21 269:7
**applicant** 192:17 193:2,4
193:12,25 194:7,9,12
**applicants** 192:15 193:1
194:3
**application** 4:3 19:15
30:13,15 34:1,8 37:9,14
37:16,19 44:5 52:13
53:15,21 54:1,3,4,7,25
55:7,14,18 56:24 57:5,7
58:1,14,23 59:7,10
60:23 74:18,20,21 75:1
76:14 77:24 78:2 83:16
83:17,18 84:9 86:9,10
86:13 87:10 88:8 110:6
135:12 152:25 153:7
164:15 166:21,22 170:5
178:4,8,11 182:2,9

186:19,25 187:2 195:23
196:18 198:18 206:15
206:23 208:14 210:23
211:17 216:18 218:4,16
226:5,18 227:10 254:4
254:6,11 257:12,14
259:22 261:20,21
264:17 265:8 267:17
**applications** 33:3,7,15
34:13,25 35:10,22
36:17 38:5 43:21,24
44:4,14 48:11 51:1,13
51:19 52:2 58:15 59:13
59:17 60:17,22,24 61:3
63:6 67:6 68:19 69:1
73:13 74:17 77:19
86:23 87:17 89:17,25
98:7 109:23 110:1,19
112:21,25 113:1 135:6
147:13 166:8,11 172:4
178:6 185:1 188:16,21
196:25,25 197:10,12
205:10 211:5,14 223:23
227:3 232:3,6 245:6
253:4,9,15 263:13
265:11
**applied** 72:8 135:2,3
150:9 243:19
**apply** 72:10 202:8 230:2
**appointment** 63:20 65:13
67:20 74:13 103:13
104:17,19 105:1,6
115:13 116:7 235:11
**appointments** 120:1
238:18
**approach** 28:1
**appropriate** 50:17
149:10 211:2 230:5
**approval** 155:8
**approved** 120:16 125:13
243:19
**april** 32:18,19 155:13
**area** 20:14 78:7 167:9
**arent** 41:22
**arrived** 38:15
**aside** 185:10
**asked** 20:15 26:3 27:9
30:3 31:11,12 39:4 42:7

42:12,18 48:2 53:17,18
53:19 56:20 57:3 61:18
61:22,23 62:9,9,10 67:4
67:7,12 68:16,19 71:8
73:12,14 81:11 87:15
96:23 100:3 117:21,22
118:1,4 132:9 133:9,12
152:2 155:18 157:12
174:24 190:24,25 200:6
200:14,19 203:21
208:21 211:6 230:17,22
233:8 234:11 238:7
252:15 259:3 261:18
263:10 264:16
**asking** 27:8 45:17,18
46:2 100:1,6,22 102:19
120:19,23 145:14
157:16,17,20 161:3
165:22 168:8 184:5,6
187:9 208:18 209:1
213:19 236:17 248:11
248:23 250:18 264:25
267:2
**asks** 132:14 155:17 185:6
226:1
**asleep** 63:16 65:23 67:3
225:12
**assessment** 101:17,23,25
102:3,6
**assigned** 33:25 48:20
**assignment** 272:2 273:2
274:2
**assistance** 13:22 152:5
**assume** 141:14,16,18,24
169:6,11 184:8,24
221:11 262:2
**assumed** 56:21
**assuming** 141:13
**assumption** 125:10
**assured** 216:21
**attach** 37:15
**attached** 240:21,23 273:7
**attacks** 231:8
**attention** 30:24 32:13
44:8 60:2 62:19 92:8
93:17 94:1 99:5 147:12
195:21
**attorney** 46:5,12,15,24

47:1,16 193:18 221:20
221:21 237:17,18,23
246:7,25 247:11 248:4
248:7,9,21 249:2,12,16
249:17 271:2
**attribute** 112:8
**attributed** 40:18
**audit** 89:24
**audited** 212:18
**august** 4:22,24 6:19
46:18,20,21 67:23
69:18 72:13,24 116:5
116:21 121:3,8 124:10
124:15 237:25 238:24
239:6,7,15 240:5 245:9
**authorize** 273:11
**automatic** 54:25
**automatically** 182:2
**avenue** 188:1
**avoid** 24:2
**aware** 28:12 39:15 49:13
50:12 63:10 145:18,20
170:14 197:4

---

## B

**back** 27:3 30:18,21 31:4
39:12 41:9 49:22 51:25
57:7,12 58:17 59:9
64:23 69:10 71:11,18
71:21,22 72:4,25 73:4,8
74:2 76:22 86:22,24
87:4,14,18,20 88:13,18
97:4 106:10 107:2
111:11 129:2 131:14
132:24 138:9,10,18
143:9 160:20 162:24
181:1,1,3 187:6 189:23
191:15 192:7 203:14
206:16 220:4 236:14
238:10,11 241:8,14
242:24 243:5,9,11,22
243:24 244:1,22 254:4
256:25 260:18,22
261:13 262:14 264:21
265:16
**background** 13:24 14:2
229:9
**backwards** 68:16

**bad** 9:24,25 38:19 105:11
105:13 172:14
**bankowned** 80:19
**barnes** 16:19 24:20
**based** 145:15 218:10
249:16
**basically** 13:1 14:14
15:15 96:6 128:8
137:23 165:19 220:19
220:23 222:11 266:20
**basis** 12:25 149:11 152:4
188:16,20,25 249:13
**bates** 256:5
**bathroom** 232:10
**baumann** 84:14 180:2
208:5
**becky** 133:15,16,18,22
134:1
**beckys** 133:17
**bedford** 127:16 128:16
**began** 20:12
**beginning** 126:23
**behalf** 2:3,11
**behavior** 24:22,24 25:3
28:4 47:19,20,21,22
130:24 133:25 156:11
263:23 264:8
**belief** 32:9 61:4 139:21
139:22 145:24
**believe** 9:16 15:12 19:8
22:2,13 33:4 44:2,4
49:3 50:18 60:18 68:3
69:5,20 72:1 73:23 74:1
75:21 80:16 81:17 84:7
87:9 89:18 99:22
101:23 102:12 114:20
115:12 121:18 123:13
123:17 125:1,12 127:14
127:17 128:24 130:21
133:10,20 136:4 139:16
142:9,11 143:21 145:2
152:11 154:18 158:1
162:17 166:24 176:10
177:11,13 178:16
182:23 184:4 187:3
201:21 202:7 216:4
222:7 223:10 231:8
238:15 240:1 242:16,22

246:10 251:14 264:1
**believed** 249:12 250:24
**bell** 86:3
**belongings** 238:2
**benefit** 137:8 151:25
**benefits** 72:17,19 76:21
79:6
**best** 110:22 116:4
**better** 20:5 51:9 110:25
114:18 118:15,16
148:23 172:17 214:18
214:21,23
**bianca** 16:19 24:20,25
25:2,11 133:24 150:22
150:23 166:10
**big** 138:23
**billing** 15:21 16:7,9,10,11
48:12 59:11 75:15,17
166:19,23 167:8,12,22
168:1,2,5,11,12,13
170:7 187:17,25 188:9
189:25 190:1,2,4,6,7,9
193:15 210:20 221:1
222:4 257:20
**birth** 55:3,4,6
**bit** 38:12 171:3
**black** 50:22 51:2 181:11
209:3,5,8,13 253:15
**blank** 186:21,22
**blanket** 176:13
**blue** 140:20
**blurred** 223:6,16,19
**blurry** 112:15
**board** 123:3
**body** 233:21
**bolwell** 169:13 170:1
**bottom** 31:16 54:19
137:3 163:10 166:12
210:15 256:5
**box** 193:19
**break** 41:4,18 42:15,17
42:19,22 43:2 65:25
66:15 120:4 129:20
155:18,20 156:1,4,5,11
156:16,23,24 157:22,23
158:6,25 164:25 175:4
176:11 224:2,3,5,7,11
232:8,10

**breaks** 158:10 232:9
263:18
**breathalyzer** 67:18
**briefly** 176:7
**bring** 195:21
**broker** 10:25 81:2
**bronxvikki** 5:3 130:4,15
198:16
**brought** 30:23 32:13 44:7
60:2 88:13 262:4
**build** 107:15
**builder** 90:19
**building** 27:20,22 29:8
49:6 83:24 138:20
150:16 168:4 206:13
238:5 264:9,11
**bulea** 2:14
**bulk** 15:15 59:12
**bullet** 185:4
**bumped** 14:22
**bunch** 183:6
**busiest** 80:16
**business** 12:6 39:10
79:22,24 223:19,24
260:25
**businesses** 78:7,9
**busy** 80:14
**buy** 172:6
**bwc** 15:5

___

**C**

**ca** 144:22,24
**calendar** 261:5,7,10
**calendars** 238:5,6,11
261:3
**call** 16:13 47:23 54:16,22
55:22 64:24 65:14
69:21 71:20 86:7,19,24
87:4 96:24 97:7 99:2,14
103:11,15,19 105:1
114:11 115:5 136:25
170:1 189:1 193:22
200:5 204:18 206:16
209:14 217:15 238:19
268:5
**called** 8:2 34:9,20 38:10
48:9 50:12 52:6,7,12,22
53:10,14 60:5 62:25

64:2,10,10,18 85:3 86:8
86:9 87:14,18,20 88:18
92:20 166:21 200:6
230:16,25
**calling** 77:21,22 86:12,21
115:7
**calls** 34:23 35:17 42:23
45:12 85:24 158:11
195:6 228:14 229:1
246:12,13 247:6,23
248:2 250:14 253:11
**campus** 169:7,18 210:10
210:17,18
**candidate** 135:8
**cant** 20:19 23:7,9 26:18
28:25 30:2 31:7 38:19
40:21 41:8 42:20 43:5
44:13 45:15,20,21,25
47:15 60:19 62:16
63:21 68:25 71:10 72:2
77:25 78:1,22 81:2 86:6
112:8 119:21 122:11
126:20 154:11 162:4
190:8 196:8 219:18
221:17,18,22 233:18
236:5 245:12 247:3,5
247:15 248:4,9,21
249:2 250:1,7,21 251:2
251:3,5,11 255:11
266:16,18
**capp** 5:21 183:17 185:15
**caption** 270:21
**cardaro** 17:6,9,9,10
**care** 71:6 98:22 102:23
105:2 241:23,24
**caring** 162:13
**carol** 48:22 191:22 228:4
**carole** 5:18 6:1 48:18
62:10 176:17,24 177:2
194:23 195:4 199:1,8
202:15,20,25 209:13
213:14,17,21 214:22
215:20,24 216:14
217:13,14,20 218:11
219:3,15,19,21,22,22
220:2,4,24 222:2,12
**cas** 139:23
**case** 1:8 76:9 81:23 83:25

156:4 183:4,8 193:20
272:3 273:3
**cat** 127:8,18,25
**catch** 160:22
**categories** 150:1 151:5
151:14
**category** 149:5 150:4
**caught** 19:21 21:4,7,8
**cause** 113:5 270:12
**caused** 30:9 93:16 143:16
268:1
**causing** 35:14 38:18
108:5
**cbo** 222:10
**cbos** 218:7
**cell** 171:21 211:6,8
**center** 4:23 5:1 49:4
124:9 125:24
**central** 48:12 168:4
187:17 190:2,7,9
210:20 221:1 222:4
**certain** 64:11 103:1
187:1 231:9
**certainly** 159:2 229:2
**certificate** 3:10 185:7
270:1 273:11
**certification** 272:1 273:1
**certifications** 35:21
**certified** 8:4 235:11,14
235:16
**certify** 270:8,19 271:1
**cgs** 5:19,21 34:22,24 35:7
42:24 45:4,9 50:13,18
50:25 51:3,5 52:12,21
53:9 61:15,17 62:11
74:22 75:13 84:11,13
84:20 85:1,6,13 88:15
88:22 158:11 166:7,15
170:13,14 177:14,22,24
178:12 179:7 183:17
184:1,7 187:8,20
189:14,16 191:20 192:3
195:14 196:5,11,12
197:9,18 199:20 200:13
201:9 202:23 204:22
205:2 208:4,17 209:2
210:8 213:18 214:6
215:1 216:1,8,22 218:5

218:17 228:14,20
  229:20,25 254:8 266:24
**cgss** 217:16
**chain** 62:16 136:15
  139:10 165:18 193:16
  194:24 198:9 212:14
**chair** 23:10
**change** 15:3 122:16,20
  273:8 274:3
**changed** 14:17 16:6,13
  34:8 108:1 224:13
  255:15,15
**changes** 138:6 272:7
  273:7,9
**changing** 37:25
**characterization** 174:7
**charge** 6:21 244:18 245:1
  245:3
**charged** 215:2
**charges** 45:5,10
**check** 31:14 59:16 86:22
  89:15
**checking** 59:15 89:25
**chief** 49:16 227:23
**chip** 82:12
**choices** 149:22
**choose** 88:3 135:8
**chris** 28:23
**christina** 5:15 6:17,24
  22:19 25:8,11 26:2
  28:20 63:4 64:2 131:3
  134:9,21,25 137:2,17
  137:23 138:11 144:4
  161:16,24 164:20
  174:13,20 175:1 235:21
  236:9,23 237:10 252:4
  259:12
**christine** 1:22 16:20
  24:20 39:2,2,4 64:24
  73:9 74:5,7,15 133:24
  137:6 150:23 173:12
  270:6 271:14
**cipriani** 16:24 82:15
**circumstances** 170:9,25
**cited** 214:10
**city** 90:13
**civil** 8:3 164:17 269:3,7
  272:5 273:5

**claim** 76:21 247:9
**claimed** 30:10
**claims** 59:21 143:23
  149:13
**clarify** 61:18 187:8
  208:17 220:25
**claritind** 113:2
**clear** 75:8,10,11,22
  216:20
**clearer** 206:19
**clearly** 169:4 204:5 232:3
  264:6
**clerical** 9:3
**clerk** 13:8 15:20,23 16:19
**cleveland** 1:20 2:7,16
  271:7
**clogged** 112:1,6 113:23
  114:1,7
**close** 80:7 120:3
**closely** 151:25
**closer** 147:12
**closes** 80:9
**clue** 97:18,20
**cms** 214:1 257:12
**cms8551** 6:23 257:6
**codes** 167:9
**coffee** 66:15
**coincidence** 227:12
**columbus** 35:5,5
**com** 2:9,18,19
**combination** 110:2
**come** 24:4 62:18 101:3
  138:8,10 180:4 184:12
  184:13,15 222:3 243:5
  243:11,22,23 244:22
  245:20 260:18 262:11
  264:21 265:16 268:8
**comes** 196:13,19 226:17
**comfortable** 94:25 138:7
  264:10,12
**coming** 24:7 202:23
  262:14
**comment** 44:15
**comments** 151:15 153:16
  154:6,6,7
**commission** 80:2 271:17
  272:19 273:25 274:25
**commissioned** 270:8

**commit** 48:2
**common** 1:1
**communicate** 85:21
**communicated** 50:3
  61:14 218:12 229:5
**communicating** 151:25
**communication** 45:16,18
  56:14 62:8 84:12
**communications** 45:13
  84:15 85:12 164:20
  177:1 218:2,11
**companies** 77:14,17 78:6
**company** 35:3,4 157:10
  158:4,6,7 166:19 168:2
  168:3 265:4
**companywide** 263:15
**compared** 30:18
**compassion** 147:25
**complaint** 6:20 81:12
  82:19 139:18 228:9
  229:2 239:25 240:3,6
  240:14,25 241:3 245:16
  264:7
**complaints** 92:2
**complete** 37:13 65:20
  67:7 68:20 73:12 74:18
  106:15 217:22 258:9
  263:10 266:19 267:16
**completed** 37:8 65:18
  74:20,21 102:3 142:13
  152:4
**completely** 81:5
**completing** 33:15 48:10
  51:1 59:13 87:17 172:4
**complex** 170:11
**compliance** 47:24 49:17
  49:20,24 50:10,15 85:5
  85:9,23 86:19,25 87:7
  87:12,13 88:4,17
  191:16 203:20 217:9,11
  221:2,4,5,6,9,13 222:2
  222:3,6 223:2 227:23
  228:13 229:10,13
  253:19 265:7
**compliant** 195:20
**complied** 264:21,24
**complies** 216:22
**comply** 215:9 266:14

**complying** 253:21
**computer** 74:2
**concentrate** 106:3
**concentration** 105:22
  106:5,20
**concern** 48:10
**concerned** 48:2 108:3,6,8
  108:17,23 251:13
**concerns** 144:5,15
  216:21
**conclusion** 246:13,13
  247:7 248:2
**conclusions** 247:23
**confidence** 150:19
**confidential** 47:13
**confirm** 88:14
**confirmed** 228:4 263:19
**confirms** 213:15
**confront** 237:10
**confusion** 213:22 217:8
**congestion** 112:1
**considered** 150:24
**consistently** 147:19
  148:4 149:24 150:18
**constant** 16:3
**constructive** 148:5
**consult** 46:14,24
**consulted** 46:5,11
**consulting** 47:16
**contact** 26:2 49:9 53:4,5
  53:9 56:3 65:19 74:24
  74:25 177:7 178:3,20
  178:22 187:13,15,16
  193:12,24 199:20 200:1
  200:7,13 201:9 204:19
  209:19 214:1,5 216:18
  237:16,23
**contacted** 50:18 53:9
  74:22 164:6,7,8 181:22
  228:20
**contacts** 78:4 152:1
**content** 45:17
**context** 249:24 250:3
**continually** 217:19
**continue** 44:13 89:23
  122:24 129:7 190:17,21
  195:6 197:11,12,19
  211:16 261:18

**continued** 197:23
**continues** 197:9
**continuing** 154:3 237:10
  247:21
**contractor** 90:15,16,19
  192:14,25 193:3,12,22
  193:24 194:2,8,11
  214:5
**contradicted** 51:3
**contradicts** 149:18
**contrary** 221:3
**control** 63:13
**conversation** 46:9 118:20
  118:21
**conversations** 23:19,25
  207:15
**convey** 148:5
**convictions** 56:17
**copy** 30:3,4,19 31:12,13
  31:15 54:3 60:25 77:18
  143:21 145:21 180:22
  184:20,20,23 185:22
  201:24 203:15 208:8
  212:7 262:7 263:6
  264:3 265:20
**copying** 13:10
**corner** 166:12
**corporate** 41:22,24,25
  42:6 84:5,7
**correct** 11:12,13,16,25
  12:3,10,11,22,23 13:19
  14:15,17,18 15:19
  16:12,15 17:3 19:2,3
  26:15 27:5 34:4,17 35:8
  35:11,12 36:15,16
  37:21 38:1,2 48:19
  49:21,24,25 50:10 52:1
  52:1,3,9 53:11 55:7,18
  55:19,25 56:4 57:15,18
  61:10,11 69:13 70:9,10
  75:4,5 76:2,3 79:9 81:7
  84:4 90:23,24 91:25
  92:3,8,9 93:9,10,13,14
  95:2 102:15 105:7,8
  106:22,23 107:8,11
  109:15 111:1,2,11,20
  111:21,23 112:2,3,5
  114:4,9,12 115:25

116:1,3,13,21,22
117:23 118:2,3,15
119:17,24 120:14,17
121:24 122:6,7 124:16
124:25 125:4,6,18
126:15 128:5,6,9,15
130:16,17,19 135:25
136:25 137:12,22
138:25 139:1,12 142:22
142:23 145:19 146:10
147:3,6,7,9,14,20,21,23
147:24 148:1,2 149:21
150:3,15 151:18 152:9
152:10,14 153:21
155:21,22 158:20
160:14,15,17,18,20
161:7,12,16,17 162:5
162:10 163:24 164:3
165:20 166:8,9,15,16
166:19 167:4,5 168:3
168:12 169:21,22
170:16 171:9 172:22
173:8,10,22,23 174:1
178:15 181:12 182:5,13
183:2 184:9,21 185:2,3
185:12,13,18 186:15,16
187:14 188:12,17 191:1
191:2,5,6,19,21 192:4,5
192:11,12 193:9 194:13
194:18,24 195:6,7,10
196:6,15,23 197:10
198:10,19 199:10,13
201:5,6,14 202:17,23
202:25 203:1 204:7,14
204:15,20,21,24 205:11
205:20,21,23 206:4,5,8
206:9,25 207:1,21,22
207:25 208:5,12,22,23
210:4,10,11 212:12,15
213:6,12,13,15,16,19
214:22 215:6 221:9
223:7,25 225:2,3
227:24,25 228:2,6,6,7,9
229:7 230:10 231:12,13
231:16,20 233:6,10,11
234:21 236:10,20,21,25
237:12,13 240:8 243:6
243:11 244:23,24 245:1

251:17 254:23 261:15
261:22,23 262:1,4
265:17 266:22,23 267:2
267:5,12,20,24 268:3,4
270:17
**corrected** 32:15
**correction** 182:8
**corrections** 273:17
**corrective** 29:25 30:20
  30:22 31:1 142:24
  143:1,6 144:20,21
  145:19 146:4 158:23
  159:5 212:7 263:25
  264:4
**correctly** 57:18 217:17
**correspondence** 5:2,4,5,8
  5:10,12,13,15,16,22,24
  6:1,3,5,7,9,11,14,16
  130:3 136:8 139:4
  155:1 160:2 163:14
  165:11 174:13 175:10
  181:20 184:1,8 185:25
  193:10,11 198:3 199:1
  203:7 207:7,20 212:25
  222:18 224:17 232:20
  235:21
**couldnt** 35:10 36:10 58:2
  58:2,14 69:6 100:10
  119:16 127:18 142:2
  171:13 189:21 206:19
  208:7 243:23 244:13
  250:11,20,25 251:22,25
  252:2 254:12 267:4
**counsel** 45:13 47:14
  255:25 269:1,10 271:2
**counselor** 63:17 64:3
  95:8,9,13,16 97:16
  107:23,25 129:21
**count** 68:16
**county** 1:2 270:4 272:10
  273:15
**couple** 19:21 20:24 26:22
  80:6 102:18 132:22
  155:24 223:5 236:5
  260:21
**course** 80:7 83:25
**coursework** 14:8,11
**court** 1:1 3:13 105:25

272:7
**coworker** 19:20 106:18
  110:14
**coworkers** 13:23 18:19
  24:15 162:15
**created** 34:18 42:9,10
  104:1 159:19 202:11
  226:12
**creating** 158:18
**credit** 102:8
**crime** 48:3,7
**criminal** 45:5,10,19
  46:15 47:8,18,20,22
  197:22
**critical** 166:8,14
**crying** 164:7
**cube** 21:15 38:16 133:3,6
**cubes** 21:16 162:24,25,25
**cubicle** 136:2
**cups** 66:15
**curious** 152:23
**current** 8:13 153:8
  182:12 213:22 214:1
**currently** 43:6 144:23
**curriculum** 55:9,21
**custody** 3:12
**cut** 220:8 225:16
**cutoff** 166:13
**cuyahoga** 1:2 270:4
**cynthia** 83:2

---
**D**

**daily** 51:11 59:19
**damages** 81:14
**data** 166:12
**date** 4:22 14:20 20:9
  25:24 46:23 47:4 55:3,4
  55:6 70:2 85:16 104:21
  117:13 121:3 131:1
  141:6 220:9,16 243:14
  259:7 260:23 268:10
  269:11 272:3,9,19
  273:3,13,25 274:20,25
**dated** 4:4,6,8,10,11,13,14
  4:16,17,19,20,24 5:1,4
  5:7,18,20,21 6:1,3,5,7,9
  6:11,13,15,17,19,25 7:1
  91:2 92:12 96:17 98:14

101:11 103:4 104:10
111:5 113:9 114:24
115:19 124:9 125:24
136:8 146:19 176:17
179:8 183:17 186:17
199:2 203:8 207:8
213:1 222:19 224:18
227:16 232:21 235:22
238:24 259:12 262:23
**dates** 30:19 47:3 73:2
98:24 99:6 111:14
135:4
**day** 12:2 31:8,8 34:22
38:14 39:6 62:23,24
63:20 64:12 66:18 70:6
74:12 81:4 96:22 97:5
115:11,12 117:25
118:24 119:18,19
130:23 131:24 132:10
144:12 198:7 211:22
216:15 223:9,21 226:14
228:12 233:6 234:3,8
234:12,15,25 235:1
239:17 245:13 251:20
259:19 260:19 261:15
265:10 268:6 271:7
272:16 273:22 274:22
**days** 22:25 23:1,6 25:6
26:19,22 67:21 101:18
101:19 111:10 112:16
115:4 121:10 132:6,23
155:24
**dbulea** 2:19
**dea** 56:10,10
**dead** 237:4,5
**deadline** 103:1
**deal** 162:4 164:11 212:4
**debra** 1:16 8:1,6,12
270:9 272:4,9 273:4,13
274:20
**december** 18:22 28:8
145:11,12
**decide** 23:5 107:22,24
108:15 117:19 118:24
214:21 215:9 237:25
239:14 245:7,10
**decided** 19:25 95:21
107:10 108:19 117:21

157:2 205:9 221:3
**decider** 177:24
**decision** 26:23
**decrease** 106:5 161:4
**decreased** 93:12 105:14
105:17,21 106:20,20
107:18 108:24 109:5
**deed** 272:14 273:20
**defendant** 1:13 2:11
**defendants** 54:6,12 55:15
91:1 92:11,23 96:16
98:13 101:10 103:3
104:9 111:4 113:8
114:23 121:2 124:8
125:23 130:2 139:3
146:18 154:25 160:1
163:13 165:10 174:12
176:16 179:6 183:16
185:24 198:2,25 207:6
212:24 222:17 224:16
227:15 232:19 235:20
238:22 244:17 255:2
257:5 259:11 262:22
**definitely** 40:13 122:15
**definition** 225:9 248:10
248:13,16,18,24 249:6
250:7
**degree** 185:7,22
**delivered** 6:13 227:16
**delivery** 269:9,11
**demonstrate** 184:25
**demonstrated** 144:18
**denial** 50:23 54:25 88:20
177:25 213:20 215:24
216:24 230:2
**denials** 43:23
**denied** 33:8 44:5 60:4,11
60:22 61:4 86:23
109:23 110:1 166:18,21
166:22 171:17 185:1
187:4 238:4,4 254:11
**deny** 182:2
**department** 6:18 16:9
20:1 24:18 34:2 50:10
50:15 60:11 64:19
75:15,17,23 85:3 97:25
142:10 146:5,10 159:22
165:20 182:1 194:1

218:8,19 221:4 238:23
239:9 265:3
**departments** 149:10
**depends** 52:15
**depiction** 176:8
**deponent** 3:7
**deposed** 8:5
**deposition** 1:15 115:18
126:24 136:7 175:9
203:6 240:13 268:11,17
270:20 272:1,3 273:1,3
**depressed** 106:21
**depression** 109:14
111:19 230:18,19,20
236:5
**described** 206:4
**description** 4:2 199:18
200:3,11 201:7,15,17
201:20,23,25 202:4,6
**desire** 148:5
**desk** 21:11,13 30:21 31:4
36:22 41:2,10,11,17
42:22 48:19 52:5 60:5
62:20,21 63:10,16 64:4
65:23 67:3 73:24 76:1
101:3,5 131:24 132:2
143:10 156:3,16 157:21
158:7,10 174:23 175:2
181:25 187:5 196:20
206:15 223:25 226:8,12
226:19 251:4,7 261:6,9
**desks** 33:25 263:18
**despite** 214:17 217:14
**detail** 51:8 147:12
**detailed** 167:2
**details** 137:18,19
**determination** 116:23
**determine** 45:3,7,19
46:15 47:7 141:8
214:18 216:6 229:24
**determined** 116:20
141:19,25 142:19 168:1
221:8
**determining** 215:3
**didnt** 10:20 16:11,21
18:1,2 22:7 24:4,10
26:7 27:19,19 28:6
29:13 30:9,14,15,22

32:5 39:12,25 41:20
42:11,23 48:7,14 51:5,6
53:5 55:3 56:21 58:24
62:5 64:15 65:1,2,4
69:7,8 70:15 71:13
73:12 74:17 75:16
76:21 87:6 95:7,12 97:6
97:8 105:5 107:7,24
108:18 110:4 114:11
116:6 117:10 122:18,22
126:10 128:1 132:4
137:15 138:16,17,21,22
138:24 143:14 159:13
161:2,10 172:23 173:15
173:20 177:14,23 182:6
186:22 189:1 190:4,6
196:24 200:18 202:9
211:15,16 212:3 219:13
228:15,25 229:6 234:7
234:20,24 237:9 239:20
246:4,5,7,8 249:19
252:18 259:6 261:6,17
267:6,14
**difference** 123:5
**different** 45:4,9 81:5
97:25 185:5 208:25
209:1 217:12
**difficult** 112:18
**difficulties** 242:9,11
**difficulty** 18:18 107:3
**direct** 17:4 29:10 42:2
**directed** 30:7
**directions** 253:18
**directly** 21:15 33:9 42:25
44:7 52:24 53:7 89:21
158:13 169:2,25 171:7
171:14 177:18 187:13
187:15,16,22 188:14
189:14,15 191:23
192:16 193:2,12,24
194:7 197:13,15 200:8
200:17,24 208:19 214:5
216:20 219:18 253:1,7
253:17
**disability** 81:25 246:9,18
247:2,10 249:14
**disabled** 247:14,19,22,25
248:3,14,19,24 249:7,9

249:22,25 250:4
**disagree** 147:15
**disagreeing** 142:14
**disagreements** 18:3
**disclose** 47:15
**disclosing** 47:13 173:9
**discrepancy** 266:23
**discriminated** 246:10
  249:13
**discrimination** 6:21
  244:18 245:1,4
**discuss** 234:24
**discussed** 29:23 33:2
  38:25 39:10,16 63:22
  110:19 164:9 234:6,23
  234:25 265:10,12,13
  266:19
**discussion** 123:19 146:16
  163:18 179:2
**disengaged** 153:19
**disposed** 143:3
**disposition** 148:4
**dispute** 145:13
**distributed** 263:16
**disturbed** 156:6
**divulge** 45:12,25 46:2
**dizziness** 107:7,9 127:14
  127:15,16 128:19
**doctor** 38:21 42:25 44:6
  52:24 53:4,7,8,10,11,13
  53:21 54:23 55:16
  56:19 58:18 63:23
  67:15 68:4 72:3 89:20
  95:14,17 98:2 99:8
  100:22 102:9,20 110:5
  110:19 111:11 113:21
  115:7,8 119:22,23
  121:18 128:16 134:15
  158:12 161:4 169:2,7
  169:25 171:8 177:18
  191:17,19,25 193:25
  194:5 196:15,22,22
  200:16,23 204:19 223:9
  230:17,22 231:22 234:8
  234:12 236:3,12,18
  241:25 242:10 243:25
  244:7 251:21 254:12
**doctors** 53:22 56:4 57:17

58:24 59:16 60:13
64:10,22 66:20 70:23
70:25 74:13 75:20,24
87:25 90:1 91:8 97:1
170:15 171:9,13,19
194:4 210:23,24,24
211:3,3,4 223:11
238:20 241:22,24 242:8
243:24 244:1
**document** 175:25 179:4
  179:11,17 180:5 183:11
  255:17,20,24 256:3,14
  256:21 257:1 258:4
  262:7,8,10 265:22
**documentation** 88:10,11
  88:19 123:15 144:23
  145:23 180:22 181:4,5
  181:7,11 183:24 212:19
**documented** 144:5,15
**documents** 30:1 179:21
  180:14 183:4,5,6 216:4
  216:5 256:13,18 259:25
  260:1
**doesnt** 42:5 68:25 71:7,9
  98:10,11 110:13,14
  114:7,15 135:20 138:21
  152:7,13,19 154:23
  161:13 167:25 205:2
  220:9,15 248:10 259:4
**doing** 15:14 21:21 22:5
  22:21 30:8 33:20,21,23
  34:2,5,11 61:19,20 74:1
  74:2 90:16,18 104:3
  123:25 161:3 168:12
  172:14,19 173:18
  181:12,16 188:16,18,20
  191:10,24 196:14 197:5
  206:23 214:14 221:9
  253:22,23 261:4 267:21
**dollar** 102:8
**dollars** 80:13 102:2,24
**donald** 2:14
**donerson** 89:3,5 90:7,9
**dont** 11:9 12:7,15,17
  14:20 16:1,1 19:8 22:2
  22:8,13,23 23:3,4,14
  24:8,23 25:13,23 27:8
  27:18 28:11,13,16,19

29:2,2,3,8 31:11 38:19
39:13 40:8 42:14 43:13
44:10 46:22 47:3,12
51:15,22 57:20,21,22
58:6,8,10,11 59:4,5
60:18 62:13 65:5 68:3
68:24 69:5,9 70:2 71:2
72:13,20 74:1,4,7 75:21
77:16,25 78:10,25 79:3
80:7 81:24 82:4,13 85:1
85:4,8,11,16 86:1,3,14
86:16 87:10,25 90:17
91:16,18 92:21 93:18
93:19,20 94:2 95:18,22
96:1,3 97:13,17,17 99:7
99:17 100:3,17,17,19
100:21 101:6,7 103:18
104:20 105:20 107:21
109:3,8 110:8 112:9,20
113:6 115:10 117:1,17
118:11 120:9 121:25
122:1,1 123:6,13 124:1
125:12 127:17,17,18
129:9,11 130:25 131:19
133:17 134:7,20,20
135:4 138:8,10,12,14
140:5,13,13 141:5,6
142:12 143:13,21
146:12 148:3 151:16
154:18 156:22,25
157:25 159:20 161:18
162:17,19,20 163:5,6
163:10 164:21 165:3
166:24 172:18 173:18
175:7 177:3,3 180:8,10
180:24,24 181:2 191:13
196:7 200:3 201:21,24
202:12 203:4 211:7,9
212:17 214:23 215:15
219:12 220:5,18 223:14
223:20 224:1,14 225:21
226:25 227:2,4,5,8,9
228:11,21,22,23 229:14
230:12,13 232:16
233:14,17 234:13 235:4
237:24 239:19 240:7,20
241:2,5,9,11,21 242:16
242:22 243:16,18

246:21,23 247:4,16
248:6 249:5 250:5
255:13,14,19,22 256:16
256:23 258:5,7,13,15
258:25 259:5,9 260:8
261:1 264:25 265:25
266:12,13 267:10
**door** 65:9,10 74:12
  149:14
**doublenegative** 18:9,11
**doubt** 68:25
**doxycycline** 128:15
**dr** 43:24,25 63:23 67:10
  67:23,25 68:6 69:18,22
  69:25 70:1 71:5,6 91:9
  91:15,20 92:20 93:4
  98:22 99:9 113:19,20
  113:22 114:3,5,6,13,14
  115:25 121:19,20,24
  122:2,3,5,8 123:21,22
  124:23,24 125:20 126:6
  126:8,11 128:8,12
  180:1,3,19 182:19,20
  186:19 194:5 195:22
  198:18 208:7 241:8,10
  241:11,12,14 242:14,21
  244:2,4 263:8
**draft** 73:16
**drive** 223:15
**drivers** 182:13 185:19
**dropped** 64:14 117:6,8
  234:17,18,19
**dropping** 59:22
**drowsiness** 38:18 225:6,9
  225:15
**drowsy** 38:12 40:16
  113:5 225:11,19
**drug** 67:4,7,17 263:7
  265:20
**duly** 8:4 270:7,10
**dutton** 69:25 70:1 71:5,7
  121:19,24 122:2,5,9
  123:21,23 241:10,12
  242:14,21 244:3
**duttons** 125:20 244:4
**duty** 65:21 66:5,9

—————————— E ——————————

**eap** 63:17 64:3,25 65:2
  65:12,16 66:4 71:24
  84:3 106:24 118:1
  137:5,8,14 138:24
  207:16 233:9 235:11
  251:15
**ear** 112:1,6
**earlier** 118:10 183:4,7
  208:11 234:25 235:1,1
  235:3,7,8 236:13
**ears** 113:23,25 114:7
**east** 1:20 2:15
**easy** 60:25
**ec** 254:2
**edgehouse** 82:1
**edmonds** 83:8,9
**education** 154:3
**eeoc** 245:11,17
**efax** 101:8
**effect** 33:12,14 225:6
**effectively** 150:9
**effects** 40:14 161:5
**effort** 57:24
**efforts** 153:8
**eight** 111:10
**either** 25:5 55:8 65:9
  97:12 171:20 177:20
  209:17,20 227:3 271:2
**electronic** 59:8
**elevated** 230:25 231:9,14
**elevator** 27:24 109:20
**elicit** 150:18
**elizabeth** 30:5 143:17
**email** 5:2,4,5,8,10,12,13
  5:15,16,18,22,24 6:1,3
  6:5,7,9,11,14,16 39:7,8
  39:12 40:24 41:1 44:2,3
  44:4 50:3 60:19 61:19
  62:14,18 63:8 64:15,16
  64:17 69:21 71:4 72:2
  73:9,10 82:4,14 83:1,4
  83:4,6,10,15,20 130:3,9
  130:9,18 135:15,21
  136:8,15,19,22,24
  139:4,10 155:1,12,25
  157:2 160:2,10 163:14
  165:11,18,19,23 167:2
  170:24 171:1 173:12

174:10,13,20 175:10
  176:17 177:2 184:9,14
  185:25 186:10 194:19
  194:23 198:3,9,12,19
  199:1 200:15 203:7,17
  205:18 206:14 207:2,7
  208:6,9,13 211:12
  212:14,25 213:15 218:3
  218:15,24 219:1,4,6,7
  219:12,13,17,25 220:1
  220:2,3,6,17,21,24
  222:7,9,18 224:17,24
  226:5 232:20 233:3
  235:21 236:9,24 239:13
  263:16
**emailed** 117:4,7 229:25
**emails** 83:12 160:10
  163:21 180:1 181:4
  186:6 206:3 213:24
  254:16 265:1
**embodied** 233:16
**emotional** 137:4 242:9,10
**emotionally** 69:15
**employ** 85:13 180:12
**employed** 47:5,6 88:21
**employee** 140:5 154:5
**employees** 137:9 263:16
**employers** 77:10
**employment** 43:15 83:17
  84:8 117:23
**ended** 66:4 67:22 76:18
  76:20 104:16
**ends** 207:18,20
**engage** 150:6 223:18
**engaged** 223:20
**engaging** 223:24
**enroll** 15:8 187:24
**enrolled** 193:14 214:3
**enrolling** 13:14 15:4,17
  203:23
**enrollment** 4:3 13:8,11
  13:13 15:14 16:8 18:25
  19:5,6 20:1 26:10 30:13
  32:14 33:3 44:19 54:7
  58:23 59:17 60:11
  75:21,23 83:16,17
  133:8 145:3 182:1
  194:1 204:1,11 211:22

263:12 265:3
**enrollments** 204:23
**ent** 113:21,25
**entail** 13:12
**entailed** 13:14
**entered** 273:9
**entire** 34:16 96:7 168:5
  272:5 273:5
**entity** 47:18 164:17
**entry** 220:4
**environment** 158:19
  263:6 265:17
**episode** 93:15,21
**er** 127:15,21
**errata** 273:7,10,18 274:1
**erson** 90:8
**escalated** 231:9
**escrow** 10:8 69:10
**esq** 2:5,13,14
**estate** 10:4,13,19 11:22
  12:6,9 79:17 80:7 154:3
  223:19,21,24 260:25
**euclid** 188:1
**evalu** 252:12
**evaluation** 5:7 71:15
  145:16 146:19 147:2,6
  151:21 233:10 251:16
  251:18 252:11 254:21
  263:22
**evening** 236:9
**evenings** 11:23
**event** 106:18 109:15
  110:13 141:10 271:3
**events** 62:17 144:24
**eventually** 23:24 47:21
  63:5 264:24
**everybody** 14:22 41:3
  142:9 147:16 156:10,23
  157:3,11,24 165:19
  166:7 204:6,13,19
  218:13 224:25
**evidence** 141:13
**exact** 14:20 31:8 43:13
  47:4 70:2 72:13,20
  130:25 141:5 200:18
  254:19
**exactly** 20:9,19 23:8
  40:21 43:5 46:19 62:17

71:10 74:4 118:11
  129:15 188:11 191:20
  196:20 232:16 233:18
  235:4 241:2
**exam** 4:4 91:2,20 117:23
  118:2,5
**examination** 3:7 8:2,6
**exceeds** 149:25
**excerpt** 6:22 255:3
**excuse** 18:10 98:20
  101:18 106:9 119:4
  140:25 165:25 214:20
  224:4 256:1
**executed** 273:10
**execution** 272:14 273:19
**exhibit** 3:12 4:3,4,6,7,8
  4:10,11,13,14,16,17,19
  4:20,22,23 5:1,2,4,5,7,8
  5:10,12,13,15,16,18,19
  5:21,22,24 6:1,3,5,7,9
  6:11,13,14,16,18,20,21
  6:22,23,24 7:1 54:6,12
  55:15 91:1,7 92:11,17
  92:23 93:3 96:16,22
  98:13,19 99:1,1,1,20
  101:10,16 102:13,13
  103:3,9 104:9,15,22
  110:23 111:1,4,10
  113:8,14,16,16 114:23
  115:4,15,18 121:2,8
  124:8,14 125:23 126:4
  130:2,8 131:15 135:1
  136:7,13 139:3,9
  146:18,24 154:25 155:6
  155:9 160:1,8 163:13
  163:20,21,23 165:10,16
  174:12,18 175:9,15,17
  175:25 176:16,22 179:6
  183:16,21 184:5,11
  185:5,24 186:5 196:12
  198:2,8,9,14,25 199:7
  203:6,13 207:6,12,23
  208:1 212:24 222:17,24
  224:16,23 227:15,21
  232:19 233:1,2 235:20
  236:2 238:22 239:4
  240:13,18,22,23 244:15
  244:17 255:2,8 257:5

257:10 259:11,17,20,23
262:22 263:3
**exhibits** 3:5,13 4:1
207:13,19 236:13
**existing** 221:2 222:5
**expect** 156:9,14,22
171:20 211:7,9
**expectation** 147:9,20,23
151:24 153:7 177:6
216:19,22
**expectations** 148:19
149:6,19,21 150:17
152:25 187:9 208:18
217:16
**expecting** 70:18 71:13
264:19
**experience** 96:12 221:5
229:9,12
**experienced** 49:8
**experiencing** 127:16
225:7
**expiration** 272:19 273:25
274:25
**expires** 271:17
**explain** 32:7 77:9 245:12
**explained** 67:4 68:18,21
73:21 86:20
**explaining** 51:5,7
**expose** 21:17
**expressed** 48:10 108:22
146:9
**extension** 121:11,17,21
123:12 124:25
**extent** 45:12 253:11
**extremely** 166:7
**eye** 20:5

——————————
F
——————————

**face** 94:13
**faced** 217:7
**fact** 11:14 39:9 45:3
100:12 107:4 134:4
140:4 141:1 142:8
157:17 159:11 161:14
178:5 184:25 192:21
228:8 231:18 239:22
252:14 253:2,14
**facts** 31:5,6,9,19,21 32:10

81:11 82:19 140:18
141:13,15,16 159:6,10
159:14
**fair** 265:2
**fairly** 26:20 73:14
**fake** 230:24
**fall** 225:11
**falling** 63:15 67:3
**false** 254:9,14,18
**falsifying** 254:5,6
**familiar** 169:17
**family** 79:22 108:3,16,18
108:22 173:6
**far** 80:4 88:19 151:5,14
152:13,18 196:15
**fault** 32:3
**fax** 99:11,15,19,22 100:1
100:2,23,25 101:2
104:5 143:10
**faxed** 99:12,16
**faxes** 101:4
**february** 4:8 19:14,17,18
19:19 20:21 28:17
29:14 93:5,24 94:15
96:17,22 98:5,21
130:10,20 132:15,19
136:18 137:16 141:2
142:21
**federal** 83:23
**feeforservice** 214:4
**feel** 40:14 94:8,9,19,22,24
100:15 111:23,24 112:5
112:9 113:5 127:9
138:7,22 158:15,17
172:18 209:23 214:23
233:20 265:4
**feeling** 96:6,9,13,13
108:25 109:2,5 131:16
131:18 231:11 233:5,12
233:13,19 234:1
**fell** 144:6,15
**fellow** 214:10
**felt** 26:11,12 27:19,20
38:12 49:8,23 50:16
51:4,9 62:2 67:5 70:8
94:10,12,14 100:10
108:5,21 118:16 119:8
120:1 133:8 151:2

156:24,25 157:23 158:4
158:23,24 159:18
163:11 172:11,14
173:16 191:13 195:19
212:18 232:4,8 237:13
245:5 252:9
**fienga** 82:12
**figure** 71:21 73:2 100:5
101:1 143:20 208:7
**file** 66:8 185:20 244:25
245:3,10
**filed** 247:8
**filing** 13:10 74:3
**fill** 13:20 46:16 53:21
55:6,25 56:23 57:14
58:2,14 75:3,9 76:14
77:23 112:21 117:12,13
117:20,22 164:16 178:5
211:17 239:5,10 245:16
245:20 257:15 261:19
267:1,6
**filled** 56:25 57:2,18 64:14
75:11 78:1 115:24
117:14 257:23
**filling** 13:16,18 18:25
19:5 34:12 53:25 54:2
69:1 89:17 112:19,24
113:1 116:12 178:10
265:11
**finally** 71:25
**financial** 193:18
**find** 52:17 58:3 64:19
86:6 88:24 128:1
197:20 211:24 212:1
229:16,20
**finish** 66:1 141:22 260:19
266:7 268:11
**finished** 66:11
**first** 8:4 13:5 16:22 22:1
22:2,14 23:11 46:14
95:18 131:15 147:8
174:19 257:16 270:10
**fit** 117:23 118:1,5 119:1,5
119:7 233:9 254:21
**five** 37:1,3,12,17 38:4
51:17,25 54:14,18 55:3
59:24 60:16 66:14
67:12 120:8 165:4

187:7,19 193:7
**fiveminute** 65:25
**fix** 37:2,24 38:5 59:24
60:1,1,16 72:3 182:21
210:21
**flonase** 128:13
**floor** 27:21 41:11 107:5
109:17 133:20
**fml** 120:16
**fmla** 4:20 63:22,25 64:13
67:14 81:18,20,25
82:14 100:4,7 115:14
115:19 118:6,8,25
125:5,11,12,15 230:17
231:20,24 234:14
241:10 243:17,19
**folder** 159:21
**follow** 204:2,12 217:8
253:18
**following** 61:17 214:25
**follows** 8:5
**followup** 127:22,23 128:8
134:24 204:3
**fondled** 100:13
**fondling** 19:21 20:12,18
21:20 23:12,20 24:1
28:22 109:15 131:10
**forced** 94:12
**foregoing** 270:16,21
272:13 273:18
**forget** 42:14 127:24
**forgot** 29:7 30:7 35:3
82:25 164:7,16 240:4
**forgotten** 55:4
**form** 4:7,14,16,20 6:19
61:5 70:18,21 92:24
99:12,15,16 100:2,5,19
101:17,24 102:6,8,14
104:10 111:5 115:19,24
116:2 117:2,6,20,22
140:3 151:9 154:15
157:19 177:25 187:12
189:7,10 213:22 238:24
246:2 249:11,15,18
266:20
**formal** 144:21,24 145:19
264:1
**formally** 150:11

**forms** 13:16,18,21 19:1,5
19:7 67:13 112:19
267:1
**forth** 232:7
**forthcoming** 154:6
**forward** 34:6 191:4,11
194:22 205:25 206:18
210:3
**forwarded** 61:21 177:8
207:2
**found** 133:14 212:3
**four** 11:21 20:2 132:5
162:25 203:14
**frame** 207:14
**fraud** 197:20
**free** 209:23 272:14
273:20
**frequently** 147:9,23,25
148:19 149:6,18 150:2
150:5,16 151:23
**friday** 11:23 18:14 132:9
132:10,14 233:6 234:3
**fridays** 11:21
**friend** 89:7,8 195:9
212:17
**friends** 10:24
**front** 123:14 162:24
184:6 216:5 245:23
**full** 8:8 9:13,19,22 10:1
10:20 120:13,14 198:9
**fulltime** 15:8
**fulton** 82:6
**fultonroyer** 6:9,11
222:19 224:18
**function** 13:9 15:3,10
51:11 237:6
**functioning** 230:10,23
231:4,25 232:2
**functions** 15:11 58:25
**further** 68:1 116:20
135:23 164:18 270:19
271:1
**fyi** 121:10

---
**G**

**garbage** 132:3
**geauga** 4:23 124:9
210:18

**general** 184:7 235:1
237:17,18,23
**gentleman** 107:4
**gentlemen** 20:11
**gestures** 126:25
**getting** 72:23 104:23
120:3 132:24 203:20
215:1 243:18
**giffen** 1:19 2:12
**girl** 138:23
**give** 31:14 73:15 87:21,24
88:4 95:25 102:2
126:24 127:3 135:23
136:17 143:4,8 145:21
146:3 169:24,25 196:8
196:23 200:9,17 214:7
217:4 241:25 244:12
265:19 269:1,10
**given** 30:3 107:13,14
139:17,18 211:10
270:13,18
**gives** 71:16 209:15
**giving** 208:24,25 217:11
238:4
**glad** 162:8
**go** 38:21 48:14 56:9,10
56:11 63:16 65:12 66:3
67:25 68:4 69:17,22
71:11,18 72:4 74:13
75:7 81:1 95:9,12,14,16
101:4 106:24 107:2
111:10 113:22 117:2
118:1,4,6 125:9 137:4
137:13 140:10 141:23
145:8 151:3,10 153:12
153:24 154:2 156:10,18
156:21 157:6,8 160:9
165:17 169:3 171:22
185:20 190:13 201:22
202:9,19 215:3 223:9
233:9 234:6 239:9
241:7,13 242:1 243:25
244:1 245:7,10,14,15
246:14 261:14 266:2
267:11
**goes** 39:6
**going** 21:9 33:17 38:11
41:2,17 42:15 48:14

61:8 62:8 63:22,24 64:4
64:19 67:9,23 72:25
73:8 75:3 76:1 80:14,22
86:15 91:6 95:15 97:25
104:14 113:17 115:13
118:6,7 120:7,11,14
122:24 125:2 141:9,20
141:25 142:19 156:9
157:14 162:8 163:19
167:11 171:5 173:25
174:8 180:20 182:24
190:12 191:11,24 197:2
205:22,25 209:14
214:24 215:16,18
217:15,21,22,24 221:11
221:15,25 222:12,14
223:1,1,3,5,22 230:22
231:19 234:2 235:15,16
239:3 242:24 256:8,24
264:21 267:16,19,22
**good** 23:24 24:11,13 56:6
73:5 77:22 94:11,13
120:11 129:24 145:17
162:11 172:18 189:19
216:15 250:7
**googled** 225:15
**gotten** 43:23 173:13
180:2 226:7,10
**grammatical** 18:15
**granted** 72:16
**grants** 90:21
**group** 151:2
**guarantee** 127:24
**guess** 9:20 14:22 19:24
20:4 39:17 47:21 102:4
108:12 191:8 201:16
202:11 205:12 218:1
228:22 230:20 233:17
246:8 250:14 253:12
**guessing** 120:11
**guilty** 197:20
**gupta** 43:25 51:18 194:5
**guptas** 186:19 195:23
198:18 206:23
**guys** 166:18

---
**H**

**ha** 112:11,12,13

**hadnt** 34:18 39:24
185:17
**half** 129:23
**hallway** 27:24 65:8,9
**hallways** 156:10
**hand** 6:13 21:22 23:8,9
64:3 227:16 239:3
263:2 271:6
**handed** 67:13 175:25
**handing** 203:12 227:20
**handle** 10:23 178:13
183:1 185:14 189:22
**handled** 11:8,11 13:10
178:20 180:3 240:2
**handling** 182:18,20
**handwriting** 260:1,5
**happen** 67:11 76:11
200:4
**happened** 26:14 44:1,9
48:16 61:13 62:6,22
70:20 72:14 76:4 87:11
93:21 94:15 118:18
132:5 135:5 143:18
154:2 176:9 195:22
196:2 239:24 245:8
**happening** 176:6 191:21
192:4 195:15 196:18,20
204:23 205:7 206:20
**happens** 62:15 64:7 67:1
67:19 69:19 72:5,24
73:7 204:18 206:4
233:21
**happy** 39:9 218:8,20
**harassment** 157:19
**hard** 35:24 36:19 77:9
152:10
**havent** 131:16
**head** 140:16 176:14
221:4 222:2
**headache** 223:6 233:22
234:1
**headen** 63:23 91:10,20
92:20 93:5 98:23 99:9
114:14 115:9,25 122:3
241:8,14
**headens** 91:15
**health** 6:18 101:17,23,25
102:3,5 105:2 238:23

**higher** 44:21 191:14
**hinder** 172:4
**hindered** 112:20
**hippa** 6:20 240:14
**hold** 18:16 30:22 32:5,8
  101:22 160:21 186:8
  189:8
**holds** 79:17
**holiday** 70:6,7
**home** 99:24 109:3 130:18
  130:20 163:24 171:20
  180:6,7,9 184:21
  193:17,21 198:12
  209:20 218:25 219:10
  219:12 223:5,10,11
  233:3 237:15 256:18
  261:8 267:11
**honestly** 27:19 154:11
**hoping** 25:17,20 71:22
  86:14 95:11 264:19
**hospital** 8:22 169:15
  210:19 217:1,2,5 218:5
  218:13,17 220:12
**hospitals** 1:10 9:12
  227:24 242:25
**hostile** 158:18,24,25
  159:5
**hotline** 48:9,13 49:10
**hour** 68:10 129:23 234:5
**hours** 11:18,19 57:20
  76:6,7 223:5 267:11
**house** 65:6,6,7 164:2,14
  177:20 180:5,11,18
  198:10 211:9 212:15
**houses** 80:19
**hr** 22:15,18 28:21 29:1
  31:14 38:24 63:1,3 83:6
  94:24 95:3 107:2
  112:23 138:15 263:23
  264:7
**huhuhs** 126:25
**human** 6:19 238:23
  239:10 241:4
**humiliating** 64:6
**humphrey** 169:16,23
**hundred** 36:4 68:17
  148:14

**healthy** 108:4,11
**hear** 71:22,25 138:12
  195:11 218:8,20 222:12
**heard** 162:23 163:2,8,10
  167:3 239:20
**heights** 8:15
**held** 46:22
**hell** 236:19
**hello** 94:11,12,19
**help** 16:21 135:12 137:5
  138:7 218:9 261:3
**helped** 16:16
**helpful** 38:21 146:8,14
**hereinafter** 8:4
**heres** 214:12
**hereunto** 271:5
**herron** 2:4,5 18:14 35:25
  45:11 46:4,8 47:2,10
  52:10,19 54:18 65:24
  66:11,14 75:6 80:24
  106:8 116:25 119:2
  120:3,7 123:22,25
  124:3 125:7,9 126:10
  126:22 127:2,5,22
  129:22,24 135:18 140:9
  140:12,17 141:12 151:9
  151:19 152:15,21
  156:12,19 157:5 159:15
  165:3,7,22 168:7
  170:17 172:2 174:6
  183:22 188:13 189:6,10
  189:12 202:18,24 203:3
  205:1,13 213:9 214:19
  215:4,7,12,14 216:10
  221:7,10 226:1,20
  228:10,17,19 230:11
  232:9,12 246:11,15,20
  247:6,21 248:1,8,15,20
  248:25 249:8 250:13
  251:1 253:10 256:1,4,8
  259:3,18 262:15 266:4
  266:9 268:5,9,14
**herronlaw** 2:9
**hes** 109:16
**hhs** 89:15 90:14 195:9
**hide** 183:13
**high** 106:13

**idea** 258:16
**identification** 54:9 91:4
  92:14,25 96:19 98:16
  101:13 103:6 104:12
  111:7 113:11 115:1,21
  121:5 124:11 126:1
  130:5 136:10 139:6
  146:21 155:3 160:5
  163:16 165:13 174:15
  175:12 176:19 179:9
  183:19 186:2 198:5
  199:4 203:10 207:10
  213:3 222:21 224:20
  227:18 232:23 235:24
  239:1 240:15 244:19
  255:5 257:7 259:14
  262:25
**identified** 60:15 75:13
  206:17
**identifies** 209:21
**identify** 60:13 169:4
  192:15,25 194:3 209:18
**identifying** 194:14
**ids** 59:21
**idx** 149:12 152:3
**ignored** 229:3
**ill** 39:7
**im** 13:17 14:23 20:8 25:9
  29:18 34:7 38:7 40:17
  40:25 41:2,3 44:19
  45:17,18 46:2,19 48:24
  54:14 57:5 59:18 61:16
  62:10 63:9 64:11 73:1,3
  73:9 77:6 91:6 97:3
  99:18 100:4,4 101:1,3
  103:24 104:14 108:10
  108:11,12 114:4 119:25
  124:23 128:11 138:22
  141:17 142:14,18
  143:21,22 145:1,14
  146:11,11 148:9,10,11
  151:1 152:23 157:14,22
  159:24 163:19 164:6
  167:11 172:18 173:17
  184:5,6 187:1 192:19
  203:19 215:18 216:12

**I**

217:21,22,24 225:7
  237:4,4 239:3 241:15
  246:25 247:11,20 248:4
  248:11,21,23 249:2,16
  250:17 253:14 256:8
**imagine** 25:17 138:14
**immediately** 26:18 38:24
  40:12
**impact** 172:7
**impacted** 172:22
**impacts** 149:13
**impaired** 230:9,23 231:2
  231:3,7,24 232:1
**important** 42:21 216:8
  220:5
**imposed** 171:23 172:8
**imprinted** 166:11
**improper** 61:20 62:3
**improvement** 111:19
**inaccurate** 139:23,24
  234:22
**inappropriate** 28:4 47:21
  49:9 225:12,13
**incidences** 151:6,17
  152:8,14,19
**incident** 23:20 24:15
**inclusive** 195:2
**incomplete** 57:6
**incorporated** 168:20
  201:16 273:12
**incorrect** 35:18 181:16
**incorrectly** 69:2
**increased** 93:8,12 105:10
  110:15
**independently** 151:7
  152:20
**index** 3:1,5 4:1
**indicate** 29:11 110:14
  114:15 135:24
**indicated** 75:25 134:10
  134:18 151:17 174:8
  235:18 239:6
**indicating** 21:10 172:12
  172:15
**indication** 75:22
**individual** 152:8 193:20
**inform** 63:11 156:2,14,18
**informal** 264:2

**information** 11:15 34:10
    36:10 46:1,3 47:14
    53:20,23 55:13,17
    57:11 58:3 61:21 70:23
    71:1,8 118:19 143:5
    149:10,16 152:2 164:9
    178:4 185:18 191:4
    198:17 203:21 206:14
    214:2,3 256:10
**informed** 170:24
**informing** 263:16
**inhouse** 187:25
**initiate** 63:24
**initiated** 44:11 71:23
**input** 59:10
**inputting** 59:6,7
**inquiries** 77:21
**inside** 63:1 65:5,8 135:25
    163:11
**instance** 56:16
**instructed** 257:15
**instructing** 211:13
**instruction** 269:2,10
**instructions** 241:25
**integrity** 6:22 89:16,19
    147:22 192:10,21 195:2
    195:12 255:3,11
**intentional** 225:22
**intentionally** 183:13
**interaction** 49:2 68:1
**interactions** 48:22
    150:18
**interest** 105:15 146:9
**interested** 134:11,22
    135:24 271:3
**interesting** 225:24 226:4
**interfere** 38:22
**interim** 131:4
**internal** 47:23
**internally** 194:22
**interpersonal** 148:6,8
**interpret** 203:19 225:21
**interpretations** 147:17
**interpreted** 38:13 204:9
**interpreting** 190:16
    217:16 244:12
**interrogatories** 81:9
**interviews** 135:9

**investigate** 25:21 31:17
**investigated** 48:18 49:23
**investigating** 230:2
**investigation** 229:15,19
    229:22
**investors** 80:18
**involved** 71:9
**involvement** 50:6
**irrelevant** 248:17
**isnt** 30:17 90:22 110:23
    120:16 182:6 188:11
    189:17 199:24 202:14
    217:8 221:9 237:2
**issue** 19:18,19 29:15,20
    34:19 35:15 36:24 38:3
    38:9 109:22 149:15
    164:10 170:13 188:2
    189:12 205:23 206:2
    208:4 221:13 222:10
    226:12 232:6 240:6
    262:3
**issued** 144:22
**issues** 14:12 17:13,15,23
    17:25 18:23 19:1,11,12
    19:14 20:11 28:15,18
    29:16 32:13,15,18,21
    32:23,25 38:6 40:22
    43:14,19,20 92:7
    109:14 128:2,18 130:24
    144:18 152:24 153:6,21
    185:11 193:13 228:13
    231:15 268:1
**items** 238:8
**ive** 80:6

### J

**jacqueline** 83:8,9,14
**jailhouse** 33:18 44:13,16
    118:22 211:24
**jane** 83:19,20
**january** 4:4,6 19:10 20:8
    28:14 80:17 91:2,17,20
    92:6,12,20 141:20
    142:1,20,20 258:21,22
    271:17
**jill** 6:9,11 66:19 82:6
    222:18 224:17
**job** 13:9 14:16 15:2 16:6

16:13 49:18 51:6,10
    58:25 77:4,6,13 78:2
    81:7 90:14 100:11,16
    106:2,6,15 134:24
    135:2 178:5 199:12,18
    199:21,25 200:3,11,14
    201:7,10,15,17,19,23
    201:24 202:4,6 261:18
    267:23 268:2
**jobs** 77:21
**johnson** 1:4,16 5:6,9,10
    5:12,14,17,23,24 6:3,5
    6:7,15 7:1 8:1,6,10
    17:11,16 20:3 31:3
    38:10 41:1 60:2,10
    62:25 139:5 155:2
    160:3 163:4,15 165:12
    175:11,18,19,22 181:25
    186:1 190:23 198:4,16
    203:8 207:8 213:1
    232:21 233:4 262:23
    270:10 272:3,4,9 273:3
    273:4,13 274:20
**joke** 44:23,25,25 211:21
**jordan** 33:12 44:17,18
    166:17 167:1
**joseph** 5:19 179:7 182:19
**josh** 83:5
**jot** 238:17
**july** 4:17,19,20 5:18,20
    5:21 6:1,3,5,7,9,11,13
    6:15,17,25 43:17,18
    46:11,13,17,18,20,22
    51:12 59:23 61:4,9
    62:17 67:22 69:3 113:9
    114:24 115:19 168:16
    174:21 176:18 179:8
    183:18 186:10 187:7
    199:2 202:1 203:8
    207:8,17,18,20,21,24
    208:2,16 211:18 213:1
    213:5,17 216:15 219:9
    220:24 222:1,19,25
    224:18,24 227:16,22
    230:8,16 232:14,21
    233:4 235:22 245:9
    259:13
**jumpsuit** 118:22

**jumpsuits** 33:18 44:13
    211:24
**june** 4:15,16 32:23,25
    33:1,5 34:18,21 35:25
    36:2,17,24 37:18 38:3,7
    38:8 40:23,25 41:14
    43:14 69:3 104:10,17
    105:2,9 109:1,11,13,24
    111:5 116:16 160:16,19
    165:19,21,23 226:7

### K

**kaminski** 1:19 2:12,13
    3:8 8:7 18:17 36:2
    54:20 66:1,13,16,22
    106:10 120:5,9 123:20
    123:24 124:2,5 126:8
    126:12 127:20 129:19
    129:23 165:24 232:11
    248:11 255:23 256:2,6
    259:6,20 260:17 266:7
    268:7,10 269:12
**kara** 81:15,17
**kathleen** 84:2
**kathy** 65:17 66:17,24
    67:11,25 69:21 70:19
    71:14,16,23 82:8 243:8
    243:21
**keep** 20:5 39:20 61:1
    77:18 143:19 159:21
    171:5 179:20 181:6,8
    190:12 219:13 237:9
**keflex** 128:14
**kellems** 88:2,3
**kept** 131:23 179:12,13,16
    180:16 232:6 256:17
    261:9
**kerin** 2:13
**kicked** 60:9
**kicking** 66:15
**kim** 84:10 135:23 136:17
    136:25 213:12 214:10
    216:16,16 217:1 218:2
    218:3,11,16,24 219:1,5
    219:6,14,17,19,20,23
    220:6,9,11,18
**kind** 24:21 25:1 30:7
    42:5 153:15 238:16

**kkaminski** 2:18
**kleenex** 196:9
**knew** 27:4 50:9 51:9 56:3
  57:16 134:9
**know** 12:5 14:21 16:1
  17:8,18 20:20 21:4 22:8
  22:14,14,24 24:25 26:9
  27:23 29:23 31:12,15
  34:7,9 35:18 36:19
  38:11,19 39:6,9,12,25
  40:17 41:3 42:15,21
  43:12,13 44:10 48:14
  49:7,18 50:4 51:15,16
  51:17,22,24 57:20,21
  57:22 59:7 60:8 61:14
  61:22 62:2,7,16,18 63:7
  63:8,10,21 64:13 65:5
  67:21 68:3,17,23 70:3
  70:25 71:3 72:13,21
  74:9 76:6 81:3 82:2,3
  82:12,13,18,24 83:22
  85:9 86:1,3,14 87:6,11
  89:13 90:9,17 94:3
  95:18 97:13,17 99:17
  100:3,17,18,19 101:2,6
  102:17 103:21 104:16
  108:4,10 109:19 112:9
  112:12 114:5 116:24
  117:1 118:11,20,22
  120:9,10 122:1,15
  123:6 124:1,22 126:10
  127:15 129:13 130:25
  131:19 132:4 133:9,12
  134:2,6,7,20 135:2,19
  137:18,19 138:22 140:5
  140:10,11,12,13,13
  141:3 142:11,15 148:9
  148:11 150:22,24,25
  151:2 152:16 153:24,25
  154:12 156:25,25 157:1
  158:23 159:15 160:12
  161:9,10 162:15,19
  163:8,10 166:24 170:18
  173:15 175:19 177:23
  177:23 179:11,22
  180:10,21,25 183:10
  191:13 192:3 196:1,7
  196:20,21 200:3 202:12

203:4 205:3 206:6
  211:20 212:17 214:18
  214:21,23 215:12,13,14
  215:15 218:6,18 220:18
  220:22 223:13 224:13
  224:14 226:25 227:2,8
  227:9 228:11 229:8,12
  230:4 232:5 234:2
  235:4 238:17 239:16,19
  239:20,24 241:9 242:17
  247:4,16 249:5,6,9,15
  260:6 265:2
**knowing** 90:10 206:24
**knowledge** 81:11,19
  82:10 150:7 228:20,21
  228:23 230:5
**knows** 191:9 206:7
  214:22 226:21,23
**krause** 1:22 270:6 271:14
**kristen** 163:4 175:18,19
  175:22

---

**L**

**labor** 70:6
**ladaika** 81:15,17
**language** 200:19,22
**large** 217:1
**late** 38:12 65:15 178:25
**laterna** 83:2
**law** 2:4
**lawful** 8:1
**lawsuit** 247:8 258:6,14
  258:18 260:13,16
**lawyer** 179:3 245:14,24
  247:20
**lead** 45:5,10 47:22
  128:19
**leaning** 94:18
**learn** 13:20 15:16 16:16
**learned** 31:6 150:8
**lease** 12:10
**leave** 63:24 72:7,8 129:8
  129:17 161:19 162:3
  180:21,22 186:22
  230:17,23 231:24 234:7
  240:8 241:7 244:11
  263:21
**leaving** 17:1 64:1

**led** 139:22 240:5 245:3
  252:16
**left** 14:21 17:11 19:25
  20:4 43:11 63:25 64:9
  74:12 76:13 85:13
  99:12,16 103:10 136:21
  180:12,25 186:20 238:3
  243:20
**lefthand** 166:12
**legal** 14:3 45:13 47:14
  246:12,13,21,24 247:7
  247:23 248:2,10 274:1
**letter** 5:19,21 6:13,24 7:1
  73:3,10,16,19 76:10
  179:7 183:17 184:7,13
  208:10,11 215:24
  216:24 227:16,22 243:5
  243:17 244:22 252:3
  259:12 262:11,15,17,19
  262:23 263:3 264:15
  265:14,15 266:1,15,16
**letters** 50:23 88:20 230:3
**letting** 39:8 62:1 63:8
**level** 153:17 154:21
**license** 9:9,17 10:7 11:1
  56:11,11 69:10 79:18
  182:13 185:19
**lie** 218:22 253:3,9
**lied** 170:21
**light** 86:15
**lightly** 45:1 159:20
**limbo** 243:20
**line** 39:18 161:12 163:10
  167:8 257:17 273:7
  274:3
**lineham** 82:25
**linehan** 82:23,23
**lingering** 59:17 131:10
**link** 140:15,18
**lisa** 82:1
**list** 82:15 83:2 84:6
**listed** 60:23 79:10,14
  81:15 83:11 98:3
  178:21,23 188:8 189:24
  193:23 206:15 208:20
  273:7,17
**listen** 142:23
**listing** 134:25 273:7

**lists** 213:23
**little** 13:4 38:12 56:13
  65:15 112:5 147:12
  171:3 174:25 257:25
**live** 12:16 65:3 78:8
**lived** 8:17
**living** 9:13,19
**llc** 1:19 2:12
**loaded** 149:12
**lobby** 41:12
**located** 170:15,15 206:13
  210:9,17
**location** 57:22 170:5
  171:21 187:22 188:1
  201:15 209:22 210:9
**long** 8:17 12:14 19:22
  20:6,17 22:20 23:11
  26:16 40:9 42:15,21
  72:21 91:9,14 117:15
  120:10 129:21,22 131:7
  169:20,20 220:12
**longer** 60:20 61:8 62:20
  63:9 71:5 123:2 168:22
  210:7 211:24 212:4
  218:7 263:17
**look** 24:25 111:14 115:16
  135:20 151:16 155:9
  174:19 175:24 201:22
  202:3,9 214:9 220:7
  233:2 236:14 255:23
  256:2,20,24,25 259:24
  260:3
**looked** 31:5 65:7 77:3,6
  77:12 78:5,12,18 87:9
  151:15 203:15 208:11
  235:5
**looking** 54:12,14 78:21
  78:24 81:7 155:7
  171:18 253:14
**looks** 114:2 135:16
  255:10
**lose** 30:9 143:17 267:22
  268:1
**lost** 105:19
**lot** 27:25 80:18,18 131:11
  131:23 231:11
**lout** 10:16
**low** 106:14

**lower** 107:19
**lunch** 120:4 129:20,25
  156:24
**lying** 168:20
**lyn** 2:13
**lynnfield** 8:15

**M**

**machine** 184:20
**mail** 65:4 184:10,13,16
  184:17 235:12,14,16,17
**main** 52:23,25 169:7,17
  210:10,17,18 217:2
  218:5,13,17 265:6
**maintain** 148:5 153:17
  154:21
**maintained** 261:11
**major** 236:4
**making** 13:3 44:24
  103:14,18 104:16 112:5
  112:9 228:14 265:6
**management** 73:24
  158:18 164:12 190:10
  193:16 204:1,3
**manager** 22:15 29:4,6
  161:8 190:19
**managers** 29:10
**mandating** 235:13
**mandatory** 263:22
**manifest** 96:8
**manner** 30:14,16
**manual** 6:22 89:16,19
  192:10,21 195:2,13
  255:3,11,15
**manuals** 90:23
**march** 1:17 4:10,11,13
  5:4,7 29:16 32:16 80:17
  98:14,20,21 99:4 100:7
  101:11,19 103:4,10,21
  104:17,25 105:6 136:8
  141:2 142:10,16 146:20
  147:5 255:15
**mark** 2:5 212:21
**marked** 4:2 54:8,11
  55:14 91:3,7 92:13,17
  92:24 93:2 96:18,21
  98:15,18,25 101:12,15
  103:5,9 104:11,15

111:6,9 113:10,13
  114:25 115:3,20 121:4
  121:7 124:10,14 125:25
  126:3 130:4,7 136:9,12
  139:5,8 146:20,23
  155:2,5 160:4,7 163:15
  163:20 165:12,15
  174:14,18 175:11,14
  176:18,21 179:8 183:18
  186:1,4 198:4,8 199:3,6
  203:9,12 207:9 213:2
  222:20,23 224:19,22
  227:17,20 232:22,25
  235:23 236:1 238:25
  239:4 240:14,17 244:14
  244:18 255:4,7 257:6,9
  259:13,16 262:24 263:2
**market** 9:24,25 79:5 81:3
**matter** 127:10 134:4
  141:1 157:16 184:7
  204:4
**matthew** 88:2,3
**mclaughlin** 61:16 84:18
**mean** 17:25 19:12 20:2
  21:8 23:4,17,21 33:19
  41:23 42:7,8 68:24
  80:18 97:13,23 100:18
  105:12 114:15 138:22
  141:7 146:6 150:25
  154:1 157:4 158:24
  159:19 172:21 174:4
  176:13 179:15 184:3
  187:2 225:19 256:6
  262:9 264:23
**means** 197:15 216:7
**meant** 20:2 212:5
**medicaid** 13:11,13,17,17
  13:25 14:9 15:5,8,13,17
  59:7 215:10 263:11,11
  266:20
**medical** 4:23 5:1 67:13
  92:8 93:16,25 98:22
  99:5 120:6 124:9
  125:24 126:13 234:7,11
  235:5
**medicare** 4:3 13:15,25
  14:8 15:5,8,17 30:15
  33:25 34:9 43:21 53:9

54:7 58:23 59:9,12 60:5
  63:6 67:6 68:19 74:16
  98:6 193:14 215:9
  245:6 261:20,21 263:11
  266:20
**medication** 5:11 38:9,13
  38:17,22 39:11,13,15
  40:1,3,7,18 63:11,15
  95:21,23 108:6,12,13
  160:3,13 161:4 162:16
  173:3,10,13,17,21
  174:3,9 225:8 226:7
  237:20,21 239:18,21
**medications** 39:23 43:7
  95:16 129:10,10
**meds** 95:7
**meet** 90:12 146:1 147:9
  147:20,23,25 149:21
**meeting** 25:23,24 26:23
  33:2,11 44:12 49:5
  74:10 82:8,9 83:21,22
  94:23 138:5 149:19
  153:25 154:13 232:14
  238:20 262:4,5
**meetings** 150:6 153:22
  211:21
**meets** 148:19 149:6,25
  150:2,5,17 151:24
**meisler** 5:18 6:1 48:18
  50:2 176:17,24 191:22
  199:2 219:3 222:2
  228:4
**memory** 110:22,25
**mentally** 252:5,17,23
**mention** 24:25 110:4
**mentioned** 33:16 155:19
**merit** 30:23
**message** 4:6,8,10,11,13
  4:17,19,22 92:12 96:17
  98:14 101:11 103:4,10
  113:9 114:16,24 115:5
  121:3 170:2 191:18,25
  196:23 199:19 200:12
  200:17 201:8,18 206:18
  214:7 217:5
**messages** 177:8
**messenger** 65:1 235:17
**met** 63:3 65:16 83:21

**mg** 167:19
**middle** 131:3
**midwest** 274:1
**milligrams** 107:14,15,16
  107:17
**mind** 88:5 108:1 132:4
  133:10 140:3
**mine** 139:21
**mines** 142:11
**minor** 129:6
**minute** 66:14 88:2
  174:22 224:12 260:19
  266:10
**minutes** 120:8 126:11
  232:12 238:20
**mischaracterizing**
  216:11
**misdemeanors** 56:18
**misleading** 254:7,10,15
  254:18
**missing** 36:11 55:2,2,17
  182:11
**mistake** 32:6,9 159:10,12
**mistakes** 104:6
**mobile** 210:22
**model** 140:5
**monday** 134:8
**money** 12:24 13:3 30:9
  79:1 143:17
**monica** 166:21,24 167:23
**month** 10:18 29:19 36:14
  40:12,13 51:20 78:14
  78:19 85:17,18 116:12
  118:9 164:2,22 235:2,6
  235:8 244:8
**monthly** 12:24
**months** 35:23
**mood** 106:21
**moonda** 212:9
**moral** 168:22
**morison** 64:2
**morning** 23:24 24:7,11
  24:13 38:11 40:7 64:21
  73:22 94:11,14 117:4
  188:22 189:4 219:11
**morrison** 5:15 6:17,25
  22:19 63:4 161:16
  174:14,20 235:22 252:4

259:12
**motioning** 21:22
**motivations** 227:9
**motives** 226:22,24,25
253:12
**move** 20:1 26:4,7,12 27:7
27:11,12 131:4 133:11
**moved** 19:24 20:14,17
26:13,17 27:4,14,21
85:3 136:3,4 163:6
210:23 211:3 264:8
**moving** 137:24 146:5,10
159:22 268:6
**mp** 167:8,12,18,23
**mpi** 56:8,9
**msn** 2:9

**N**

**nails** 90:20
**name** 8:8 17:7 29:7,9
30:7 33:11 35:4 60:10
60:14,14 74:8 78:12
83:11,24 85:1,4,10,11
87:15,21,24,25 88:5
90:6 113:19 133:17
164:16 182:17 194:4
203:22 205:19 206:17
272:3,4,15 273:3,4,21
**named** 270:9
**names** 86:1
**national** 217:10
**naturally** 140:15
**necessarily** 52:20
**necessary** 192:16 193:2
194:7
**need** 22:4 26:11 47:12
53:15 55:15 74:25 76:7
99:12,15,16 116:3
129:22 147:11 149:9
150:5 185:1 189:1
232:10 234:6 253:16,18
260:18 266:15 267:14
268:6
**needed** 24:11,12 31:17
34:13 35:20 39:16 44:6
53:8,9 54:24 56:8,9
57:12 70:17,22 72:2
74:22 76:5 89:20 97:15

108:21 116:12 117:19
118:25 120:2 149:12
177:9 189:4 191:13
199:25 211:19 232:8
238:18 244:9 253:16
263:6 266:5,25
**needing** 43:1 97:11
**needs** 37:7 148:23 186:15
193:3 194:8,11 203:25
214:5
**negative** 172:7
**negatively** 172:9,22
**nerves** 105:11,13
**never** 20:13 27:9 30:19
34:9,20 53:18 56:20
57:3 70:21 71:16,18
86:24 87:13,18,20
88:18 112:23 120:10,11
138:8,11,18 149:1
150:11 197:18,22 238:7
238:8,9 243:7,8,9
254:19 263:9
**new** 34:24 35:7,7 37:13
76:14 90:13 149:11
150:7 182:5,9 186:17
203:16
**news** 73:5 216:15
**nice** 167:2
**night** 127:10,12 178:25
**nine** 115:4
**nodding** 153:18,21
154:22,23
**nonhostile** 263:6 265:17
**nonphysician** 185:6
**nonprescribed** 40:7
**normally** 184:1
**notary** 268:12 270:6
271:14 272:10,18
273:15,23 274:23
**note** 99:3 206:13 207:13
207:24 225:6 238:6
243:24 244:1 258:8,11
**noted** 179:25
**notes** 257:25 258:1,17,19
258:20 259:1,2 260:7
260:10,10,12
**notice** 185:4 196:12
244:2

**noticed** 21:9
**noting** 122:4
**november** 18:21 28:8
**npi** 35:19
**number** 4:2 19:6 34:16
35:14,19 36:13 37:20
38:1 45:4,8 46:16 47:8
48:11,12,20 50:17
51:14 54:23 56:10,11
60:7,12,23 61:1,2,5,9
61:24,24 68:20 74:19
75:13 88:16,24 90:1
98:6 99:11,19,23
135:23 136:17 169:4,5
169:24 171:10,12,14,15
171:18 177:7,19,20,21
177:21 178:3 181:19,21
185:2,11 186:15,20,24
187:10,14 190:18,22,25
193:5,23 194:10,13
196:6,13,19 197:23
203:24 204:17 206:12
206:14 208:19,20
209:17,17,19,19,20
210:6 211:2,7,8,9,11,14
211:19 216:18 217:2
218:5,7,14,17 220:5,12
220:14,25 221:2 222:4
222:5,10,14 223:2
228:5 254:1,9,14
258:10 261:22 266:14
266:19 268:2
**numbers** 33:24 59:6
101:2 216:17 231:16
273:7
**nurse** 82:7 161:8

**O**

**object** 45:11 174:6
**objection** 47:10 52:10,19
75:6 80:24 106:8
116:25 119:2 125:7
135:18 140:9,17 141:12
151:9,19 152:15,21
156:12,19 157:5 159:16
170:17 172:2 188:13
189:7,10 202:18,24
203:3 205:1,13 214:19

215:4,7 216:10 221:7
221:10 226:20 228:10
228:17 230:11 246:11
246:20 247:21 248:1,15
248:20,25 249:8 250:13
251:1 253:10
**obvious** 34:11 239:22
**obviously** 246:16
**occasional** 18:15
**occurred** 144:7,16
**oclock** 220:25 222:1,25
**ocrc** 245:19
**october** 5:1 7:1 14:23,24
14:25 16:5 18:21 28:8
34:6 73:3,4,11 76:19
125:25 126:13 145:3,9
238:10,12 239:5 242:22
243:4,5,11 244:21,23
244:25 245:4,10 252:3
261:14,25 262:6,12,24
263:3 265:10
**odd** 25:1
**offensive** 263:23
**offer** 97:16
**offhand** 266:12
**office** 31:2 39:1,21 48:13
49:3 50:5,7 53:22 55:22
56:4 58:24 63:1,3,24,25
64:1,9,10,11,17,22,24
65:12,16 75:20,24 85:5
91:8 97:1,5,9 99:3,25
100:2 117:3,7,9 118:21
131:22 132:1 163:11
166:23 168:5,5 169:5
169:13,14 170:3,7
177:21 180:9 187:17,24
188:9 189:22 190:3,7,9
190:10 193:17,19
210:20,23,24,24 211:3
211:4,4 217:11 221:1
222:5 223:12 228:3
229:11 231:1 238:15
271:6
**officer** 49:17 85:23 86:19
87:1,8,12,13 88:4,17
191:16 203:20 227:24
253:19
**officers** 85:10 228:13

**offices** 2:4 169:20
**official** 192:17 193:3
   194:8 272:15 273:21
**oh** 1:20 2:7,16 25:13
   28:23 38:16 41:6 82:13
   89:1 101:17,20 106:4
   115:11 140:25 153:14
   210:16 239:12
**ohio** 1:2 8:3,16 35:6
   237:16,18,23 270:2,7
   271:7,15
**okay** 13:5 20:17 29:14
   36:7 47:5 54:15,16
   59:14,23 62:22 66:22
   72:5 73:19 74:14 75:2
   75:16 102:19 103:8
   104:24 106:16 109:21
   112:22 114:21 115:15
   121:22 123:18,24 124:2
   125:14 126:12 129:19
   132:22 142:6,14 149:5
   151:22 153:23 154:5
   155:8 157:25 159:9
   160:23 161:3 167:15
   171:4,16 172:25 174:24
   176:5,12 189:19 190:14
   190:24 191:16 192:23
   205:16 209:15 211:18
   214:17 215:25 216:1,2
   216:6,14 217:13 222:11
   232:11 236:15 250:3,23
   251:25 254:25 257:2,3
   260:4 261:13 263:5
   266:7 268:5
**old** 89:7
**oncall** 194:6
**once** 20:22 27:3 31:21
   43:4 50:15 59:8,20
   108:21 122:10,10,11,12
   122:13,15 129:8 159:5
   159:13 181:24 193:14
   214:3
**ones** 36:9 77:15 240:2
**ongoing** 211:21
**onthejob** 14:14 15:18
   16:17
**operative** 171:12
**operator** 217:3,6 220:12

**opportunities** 135:25
**opportunity** 211:10
**opposed** 60:14 61:24
   90:2 149:20 237:14
**orange** 33:18 211:23
**order** 57:17 102:7 158:2
   178:3 202:8
**org** 59:6
**organization** 193:16
**original** 108:14 256:17
   269:12
**originally** 59:25 67:22
**outcome** 138:5
**outpatient** 127:8
**outside** 65:6,9,10
**overall** 154:20
**overheard** 162:21
**overlap** 12:1
**overlooked** 183:12
**overnight** 65:1
**overnighted** 64:25
**overwhelmed** 96:6,9,13
   96:14
**owned** 12:14 79:22

---

**P**

**package** 37:10
**packed** 64:8 76:12
**packet** 187:3 201:21
**packets** 37:9
**pads** 238:6,9,13
**page** 54:14,18 55:2 130:8
   131:2,15 136:14,17
   137:3 139:11 144:3
   153:12 155:9,14 160:9
   165:17 175:16,24 182:5
   182:7,9,15 186:5,8
   187:7,19 192:18,19
   203:14,16 210:15 213:7
   213:9 220:7 233:2
   273:7 274:3
**pages** 37:12,14 166:13
**paid** 80:8 180:22
**pallas** 67:10,23,25 68:6
   69:18,22 121:20 263:8
**paper** 234:15
**papers** 131:23 132:1
**paperwork** 63:25 64:3,13

64:22 65:2,12,17,20
   67:14 70:4 120:15
   126:5 143:16,19 234:17
   234:18,19 235:11
   236:19 241:10
**par** 172:1
**paragraph** 204:11 246:1
**pardon** 25:19 79:20 89:4
**parking** 27:25
**part** 42:13,21 51:10
   109:24 133:7 151:1
   167:18 170:3 192:20
   199:18,20,25 200:11,13
   201:7,9,15,17,23
   202:13 220:22 223:24
   240:25 246:3,5,7
   255:10,11,14 256:11,19
   273:9
**participate** 210:7
**participating** 168:21
**particular** 9:4 16:16
   17:12 18:22 19:11
   128:1 181:7 183:10
   202:11 228:4 233:15
   239:16 245:12
**parts** 21:23
**party** 271:3
**pass** 95:12 191:18,25
**passed** 15:23 16:2
**passport** 182:12
**paste** 220:8
**pasted** 225:16
**patient** 91:14 96:23
   102:20 121:23 123:3
   234:20 241:13
**paty** 84:21 85:2 205:20
**paul** 23:17,17,20 25:3
   68:21 73:15 93:22
   131:7,23 133:21,22
   136:3 137:19 139:18
   140:1,2,8 141:2,9,11
   142:1,3 163:3 263:20
   264:7
**paula** 84:21,23 85:2
   205:19,23
**pauls** 130:24
**pay** 13:1 147:11
**paycheck** 102:3

**pe** 152:5
**peace** 39:20
**peak** 118:19,22
**peaks** 106:13,13
**peer** 150:24
**penalty** 253:25 254:3
**pending** 125:15,16
**people** 41:9,10 61:15
   62:19 81:15 83:7,11
   155:19 156:15,18
   208:23 209:2 213:24
   214:9 215:2 220:2
   225:11 229:20,24
   231:18 246:19 250:15
   265:7
**perceived** 246:9 247:9
   249:14 250:15
**percent** 148:15
**perform** 51:6 251:3,6,12
   251:13
**performance** 5:7 28:9,15
   28:18 29:22 106:6
   139:12,17 144:5,15
   145:15 146:19 147:2
   171:24 172:1,7,10,13
   172:16,21 264:6
**period** 72:22 90:4,4
   117:18 156:1
**permitted** 263:17
**person** 34:24 62:11 74:11
   74:24,25 81:18,24 84:3
   97:12 100:24 108:4,11
   108:13 138:15 178:20
   178:22 182:17 209:18
   212:16 213:18 214:2
   216:23 229:16 254:2
**personal** 18:6,8,13 33:24
   39:10 60:13 74:19
   89:21 164:9 171:19
   177:19 192:15 193:1
   194:3,15 198:18 228:19
   228:21,23 238:1,6,14
   238:14,15 248:16,23
**personality** 17:15
**personally** 49:2 272:11
   273:15
**personnel** 28:21 66:8
   178:13

persons 193:21
phone 4:6,8,10,11,13,17
  4:19,22 19:6 33:24
  34:15,23 35:14,17
  36:13 37:19,25 42:23
  45:4,8 46:16 47:8 48:11
  48:12 50:16 51:14 52:6
  57:10 60:23 61:1,2,5,8
  68:20 69:21 74:19
  75:12,13,14,17 77:22
  78:4 85:24 88:16,23
  92:12 96:17 97:7,8,12
  98:6,14 99:2 101:11
  103:4,14 113:9 114:16
  114:24 121:3 158:11
  167:10 169:1,3,24
  171:7,21 172:19,24
  177:20 181:19 185:2,10
  186:20,24 187:5 191:17
  196:13 197:23 201:13
  203:24 204:17 209:16
  211:2,6,8,19 214:7
  217:3,6 218:7,22
  228:14 229:1 231:15
  254:1,9 258:10 261:11
  261:22
phones 167:7
photocopy 182:12,13
physical 4:4 91:2,20
  99:18
physically 69:11,14
  181:23
physician 1:11 8:23
  53:16 71:12 177:6
  214:8 216:19 234:6
  272:3 273:3
physicians 113:17 149:11
  177:9 214:6
pick 64:22 117:2 199:17
  200:10 201:5,13
picked 65:4 79:5 234:14
  238:2
picking 172:19
picks 136:21
piece 181:7
pink 33:17 44:12,15
  118:21 211:23
pinpoint 40:21

pins 59:9,20
place 155:18 204:24
  270:20
placed 72:6 119:9,11,12
  119:14 186:15 263:20
plaintiff 1:6 2:3
plan 97:21 103:11 113:24
planning 242:24 261:14
pleas 1:1
please 45:6 54:4 99:13
  115:5 127:2 152:17
  156:2 191:19 206:13
  208:17 218:5,17 225:6
  256:20
pleased 160:12
plus 89:7
point 14:16 31:12 34:8
  36:1 61:22 65:24 137:2
  185:5 193:6,7,7 224:14
policy 41:25 42:6 157:10
  158:4,6,7 177:24 218:6
  218:19 224:13
populate 211:20 217:23
  218:4,16 219:24
portion 56:6 77:22
  117:12 145:17 258:9
portray 154:21 252:5,8
  252:16,23
position 44:21 135:3
  202:8
positions 8:24 9:1 134:10
  134:11
positive 148:4 172:12
possession 179:18 255:21
  256:15 257:2
possible 11:17 131:4
  226:6,9,16
possibly 21:5 74:3 98:3
  130:25 142:2 184:22
  185:20
post 193:19
potential 77:10
potentials 134:25
pounds 90:20
practice 168:21,22,24,25
  171:6 188:1
practitioner 82:7 193:20
practitioners 185:7,21,22

predominantly 148:16
  148:17
preferable 216:8
prepared 37:8 144:13
preparing 58:22
prepopulated 211:11
preprinted 186:23
prescribe 122:16,19
prescribed 40:12 104:20
  113:3 173:3 225:8
presence 96:10 237:14
  264:10,13 270:15
present 106:17 110:11
  140:4 143:14 145:23
  148:4 154:7
presented 29:25 32:9
  143:7,11,12,14 212:8
  264:4
presenting 103:24
presign 37:15
presupposes 215:8
  226:21
pretty 9:24 16:20 35:17
  35:18 68:22 82:11
  96:10 119:25 173:11
  233:24 266:5
prevent 146:5
previous 82:17 213:15
previously 184:12
primarily 11:23
primary 15:10
print 101:5 184:1,3
printed 180:7,8,9 258:23
prior 8:21 40:23 41:7,13
  66:8 73:8 116:12
  142:21,25 143:18
private 21:23 39:1,17
  63:23 68:4 161:6
privileged 256:10
proactive 102:4
probably 10:2 15:22 25:4
  26:12 33:14 36:21
  38:18,20 40:12 42:23
  43:11 47:22 50:24,25
  51:4 58:4 69:8 79:3,15
  80:12 82:20 83:1,20
  89:22 93:21 95:11 97:6
  97:24 101:22 103:23

110:2 116:4 119:18
  120:1 122:10 129:2,6
  130:21 134:13 150:25
  174:4 182:16 184:15
  185:20 193:18 205:25
  216:4 219:8,10,11,25
  220:3 224:2 225:17
  232:5 233:14,18 235:9
  237:13 250:1 255:14
  260:15 264:23
problem 37:25 60:15
  99:13 109:25 112:24
  173:18 216:17
problems 28:10 110:15
  131:17 175:21 182:22
procedure 8:3 61:17
  204:2,12 205:11 216:1
  269:7 272:5 273:5
proceed 165:6,7 195:23
  195:24
proceeded 196:4
process 30:14,15 37:6
  44:14 88:7 89:14
  159:13 180:21 197:9,11
  205:9 206:24 223:4
  226:5 227:10 232:2,4
processed 83:16 196:5,7
  197:1 206:22
processes 90:21 149:13
processing 196:4
produce 123:20
produced 179:22 183:4
  216:3 255:24
production 183:11
  256:12
professionalism 153:18
  154:22
profile 55:9,21 56:8
program 102:1,10
  159:24 192:10,20
  193:15
prohibit 264:18
prohibited 263:13
promoted 145:2
properly 149:1
properties 12:9,12,21
  79:8,10,13 80:20
property 12:16 80:8

**provide** 31:6,9 88:10,11
  158:5 181:18 183:23
  187:25 212:19 214:1
**provided** 8:2 71:1 181:19
  185:17 214:3 256:3,4,7
  256:9,10,11
**provider** 13:7 15:14 16:8
  20:1 26:10 30:5,6 32:14
  33:3,8 37:10 44:19
  56:14 58:16 60:11
  75:21,23 87:23 88:1
  133:7 145:3 152:1
  178:10 181:18 182:1
  187:9,21 188:2,12,19
  188:24 189:13,15
  193:13,14 194:1 199:17
  199:20 200:1,7,10,13
  201:4,9,13 204:1,11
  206:12 208:18,24
  209:20,21,22 210:8
  211:22 220:13 253:4,9
  257:21 263:12 265:3
**providers** 13:14 15:4,9
  30:7 35:21 87:16,22
  105:3 149:12 169:5
  187:16,23,24 188:10
  193:17 212:9 217:21
  253:16
**provides** 217:2
**providing** 154:2
**psychiatric** 263:8,22
  265:21
**psychiatrist** 67:10 69:23
  121:21,23 122:4 252:10
  252:13,15,19,22 253:2
  253:8 254:20
**public** 2:6 38:25 39:3,11
  39:23 161:14 270:7
  271:14 272:10,18
  273:15,23 274:23
**purchased** 12:18
**purpose** 178:2
**purposes** 42:6 54:8 91:3
  92:13,25 96:18 98:15
  101:12 103:5 104:11
  111:6 113:10 114:25
  115:20 121:4 124:11
  126:1 130:4 136:9

  139:5 141:18 146:21
  155:2 160:4 163:15
  165:12 174:14 175:11
  176:19 179:9 183:19
  186:1 198:4 199:3
  203:9 207:9 213:2
  222:20 224:19 227:17
  232:22 235:23 238:25
  240:15 244:19 255:4
  257:6 259:14 262:25
**purse** 64:8
**pursuant** 269:3,6
**pursuing** 135:24
**put** 10:7 35:23 36:14 41:2
  41:17,21,24 42:1,11,14
  42:18 44:3 45:9 47:8
  48:5 51:20 55:4 59:20
  60:24 61:1,8,24 143:25
  147:17 150:10 156:4
  158:2 159:21 176:13
  178:7 196:18,24 210:22
  211:4,10 225:10 257:24
  258:3,11
**puts** 156:23 204:17
**putting** 31:16 33:24
  42:16 45:3,8 48:11
  50:16 74:18 98:6
  158:24 176:14 203:24
  244:10 253:21,25

---

**Q**

**qualified** 270:8
**quarter** 266:6
**queries** 178:14,19
**question** 52:8,11,13,16
  52:21,23,25 108:15
  125:10 131:9 141:18,22
  156:20 174:7 183:22
  187:21 189:17 208:21
  216:13 221:16,17,18
  226:2 227:7 246:16,17
  249:4 259:8
**questions** 132:9,15 151:3
  168:8 209:23 214:8
  259:21
**quick** 65:25
**quickly** 26:20
**quit** 129:13 241:16,20

**quite** 11:9 131:22

---

**R**

**raising** 232:6
**ramifications** 246:22
**ran** 243:17 244:4
**rash** 91:24 92:3
**rating** 142:19
**ratings** 151:15
**rational** 217:8
**reach** 53:7 171:13,20
  177:18 188:11 189:13
  189:14,20 196:22
**reached** 33:9 42:25 44:7
  52:24 54:23 60:6 89:20
  158:12 169:2 171:10,11
  171:11,12 181:19,25
  187:10,13,22,23 188:3
  188:10,19,24 191:18
  193:4 194:9,12,18
  197:13 200:16,24
  206:12 208:19 210:8
  216:7 218:23 220:13
  253:17
**reaching** 189:18 197:14
**reaction** 96:11
**read** 106:10,12 153:3
  176:3 178:8 195:12
  219:11 264:14 272:5,6
  272:12 273:5,6,17
**reading** 14:3 192:19
  216:7
**ready** 165:6,7
**real** 10:3,12,19 11:22
  12:6,8 79:17 80:7 154:3
  183:22 223:19,21,24
  260:25
**realize** 161:2
**really** 17:17 27:15 99:7
  109:15 156:9,14,17
  168:2 170:10 234:7
  268:6
**realtor** 8:25 9:13,19,23
  10:1 69:4,12 77:7 78:17
  79:2
**realtors** 9:8
**realty** 9:17 11:2,3 79:19
  79:21

**reapply** 76:23
**reason** 55:5 60:3 77:10
  91:23 95:8 158:10
  177:10,13 178:16
  181:21 184:24 226:16
  239:16 251:14 252:18
  261:17 273:8 274:3
**reasons** 168:23
**recall** 12:15 14:20 16:1
  18:20,23,24 19:10,13
  22:23 23:14 25:23 27:8
  27:18 28:11,13,16,19
  29:2,3,3,8 31:16 32:17
  32:20,22 40:8 43:16
  58:6,8,10,11 59:4 69:9
  70:2 71:4,6,10 72:20
  74:4 77:25,25 78:1,10
  78:11,15,22,25 79:3
  82:4 85:4,8,11,16 86:16
  87:10,23,25 91:16,18
  92:19 93:4,18,19 96:1,3
  96:25 97:4 99:7 100:17
  100:21 103:14,18
  104:20 105:4 107:21
  110:8 112:16 113:6,17
  115:6,10 127:17,19
  135:4 162:20 163:5,6
  164:21 175:1,7 177:3
  180:8 183:8 186:20
  223:14,20 224:1 232:16
  233:14,17 234:13
  237:24 240:7,20 241:2
  241:5,21 243:16,18
  250:5 255:13,14,19,22
  256:16 258:5,7,13,15
  258:25 259:4,5,9 260:8
  261:1 265:25 266:3,12
**received** 40:24 67:14
  73:1,2 88:19 218:3,15
  219:1,4,6,16 220:1
  243:16 263:9 264:1
**receiving** 176:23
**recess** 66:23 129:25
  165:5 232:13 260:20
**recognize** 146:25 167:9
**recognizes** 178:12
**recommend** 69:22
**recommendation** 128:7

reconsider 76:6,8
record 8:9 106:12 116:15
   123:19 126:14 146:16
   163:18 179:2 273:9
recorded 110:23
records 91:7 116:10
   120:6 123:21 126:9
   127:21 144:24 234:11
   235:5 261:2
redone 37:7
reduced 270:14
reese 83:19
refer 122:5
referenced 160:11 220:3
   272:11 273:15
referencing 212:9
referral 67:10 95:8 114:5
referred 67:3 85:5 87:11
referring 54:19 102:14
   149:11 153:1 219:8
reflective 143:2
refused 31:15,17
refusing 64:5
regard 30:4 84:8 128:4
   143:5 154:9 187:20
   238:19
regarding 5:10 39:10
   43:14 54:24 73:15
   74:25 75:1 82:14 86:8,9
   86:12 160:3 216:21
   237:20,22 264:7 269:2
   269:11
regular 71:11 184:10,13
   184:17 188:15,20,25
   235:17
regulations 14:3 49:20
   215:10
regulatory 14:11 221:6
reiterate 223:3
reject 97:16
rejected 51:13 185:12
rejecting 208:14
rejection 148:24 150:8
   150:11,14 153:8 190:8
related 139:25 140:2
   141:11 152:24 153:6
   198:17
relates 81:22

relationship 21:13 35:7
   79:25
relationships 148:6,8
relative 271:2
relaxation 95:24
release 67:13
released 77:11
relevance 157:7 248:20
reliable 229:24
rely 229:17,21
remember 10:18 11:10
   12:7,17 19:8 23:8 24:7
   25:13 30:2 31:11 47:3
   59:5 69:2 74:8 77:16
   85:1 101:7,20 102:11
   105:20 110:18 117:17
   122:11 127:2,23 131:19
   133:17 134:14,20 141:5
   142:8 143:13 176:5,23
   180:24 183:3 224:14
   241:9 266:13,17,18
remind 166:7
renee 16:24 17:4 82:15
rent 12:21
rental 79:7
repeat 45:6 110:24
   117:24 151:11 152:17
   196:16 253:5
repeats 153:16
rephrase 151:13 156:13
   188:23 227:7
replaced 17:4
reply 191:5
report 4:23 5:1 22:10,12
   22:22 23:5 26:16 27:1
   28:2,5,22 29:12 33:6
   47:17 48:8 73:4,11 92:5
   93:7 107:2 112:11
   124:9 125:24 135:17
   140:7 142:1 148:24,24
   153:8 263:8,20 265:21
reported 17:19 22:13,14
   22:15 24:1,8 25:7 29:15
   95:3 111:22 112:13
   130:24 157:21 263:23
reporter 3:13 10:16
   105:25 272:7
reporters 3:10 270:1

reports 59:15 150:8,12
   150:14
representative 193:17
representatives 204:2,12
reps 15:14 24:18 33:13
   152:5
request 72:15 81:20
   102:17 125:14 253:7
   256:12 273:9,11
requested 105:5 134:5
   137:25 154:13 182:3
   183:6 263:5 269:1,6,10
required 92:7 150:6,7
requirements 88:23
requires 106:2 205:14
reservations 168:20
   203:24
reside 8:19
residential 8:13
resisted 112:25
resolve 193:13
resolved 95:1 112:12,14
respect 88:23
respects 166:15
respond 24:12 135:22
   208:16
responded 62:13 81:10
   122:2 163:23 188:7
   262:13 265:15
responding 123:23 132:8
   132:11,23 220:4
responds 144:4
response 76:10 81:9
   118:4 132:19 143:15
   155:23 160:24 162:11
   162:13 213:11 225:4
   256:12 259:7
responses 126:24 127:3
responsibilities 199:13
responsibility 53:12
   144:6,16 178:7
responsible 16:9 30:8
   145:17 244:10
rest 156:1 233:5 234:2
   263:17
resubmit 37:18
result 29:11 40:20 99:13
   108:24 114:19 233:25

results 99:17 127:25
retained 3:13
retal 157:19
retaliate 140:6
retaliation 140:4
retaliatory 263:25 264:6
return 38:4 58:16,17
   70:4,9,13,18,24 71:12
   121:11 124:22 125:19
   126:5 206:14 243:8,9
   243:14 244:13 262:9
   264:19
returned 33:8 36:8,18,20
   64:14,16 166:11
returning 35:9 94:25
returns 37:18
review 29:19,21,22,22,25
   103:23 139:12,17 141:2
   141:3,9,19,25 142:7,7
   142:10,15,20,21 143:2
   143:25 144:13 152:12
   152:18 153:13 158:22
   212:8 268:15,16 269:2
   269:6 272:1 273:1
reviewed 35:2
reviewing 34:25
reviews 236:24 237:7
revisions 182:3
richmond 210:19
riddle 17:20,22,24 31:2
   60:3 63:5 136:5 167:6
   190:23 218:6,18 224:25
right 9:20 12:4 18:5,13
   28:24 29:24 32:6,10,11
   32:12 34:19,20 36:12
   40:1 42:3,12 49:20
   54:20 55:11 57:8,13
   58:18 69:17 75:9 77:6
   81:8 83:13 84:3 93:23
   98:7 100:2 102:22
   109:18 116:17 118:10
   119:3 124:5,13 125:16
   128:3 132:6 134:17
   135:13 137:7 140:19,23
   142:17 144:14 145:7
   146:2,6,11 148:11
   149:24 151:8,22 153:5
   153:10,11 154:19

157:14 161:1,20 162:2
165:2 166:2 167:13,17
167:20,24 168:14,15
170:12,25 171:8,12
172:7,10,17 178:5,22
178:23 184:4 187:15
188:15 190:1 191:25
193:5 194:14,16,19
195:3,9,16 197:17
200:1,20 201:1,5,11,14
205:6,8,8 206:21
207:18 208:10,11,15
209:2,6,24,25 211:15
212:10 214:14,18 215:3
216:25 217:17,23
218:14 220:7 222:6,14
227:10,13 228:1,25
229:2 230:18 231:17
234:3,8 237:7 243:12
244:5 245:21 250:16,18
251:8,22 252:1 258:21
260:17 265:18,24 267:3
267:16,19
**rights** 164:17
**rings** 86:3
**road** 8:15 49:4
**robust** 81:6
**role** 82:25
**roof** 170:10,13
**room** 154:1
**rooms** 154:2
**routine** 59:19
**rules** 8:3 263:14 269:3,7
272:5 273:5
**running** 65:15 266:6

**S**

**sarcasm** 156:8
**sat** 19:22,23 20:6,10,13
20:15 21:16
**satisfactory** 27:13,17
**saturday** 11:24 132:10
**saw** 22:1,4 23:12 82:3
93:4 123:9 138:18
163:23 241:10,11
242:14
**saying** 23:24 33:12 39:12
44:5 57:5 62:18 72:2

94:19 109:4,14 116:14
119:13,20 122:3 135:11
142:18 151:1 160:13
170:8 171:7,25 177:12
182:7 218:16,22 220:1
222:1 224:25 243:5,21
243:23 251:3,5 253:8
265:23
**says** 60:10 91:23 93:11
94:8,23 95:6 96:23
99:11,12 103:11 105:14
107:8 110:10 111:18
112:11,15 115:5 116:2
121:22 124:15 127:7
131:3,6 138:6 144:4,14
147:8,11,19,22,25
148:3,18,22 149:6,9,24
150:5,17 151:24 152:23
153:16 154:5,6,20,22
162:7 166:6,10,20
167:1,5,6,25 174:21
177:5 178:2,9 181:17
181:24 182:11 186:14
187:12 189:24 192:9,13
192:24 193:8 198:15
200:25 201:2,4 202:25
204:8 213:21 214:9
216:1,9 217:19 219:16
220:11 230:19 258:21
258:22
**scan** 127:8,18,25
**scenario** 68:21 202:12
**scenarios** 50:23 217:4
**schedule** 103:12 105:1,6
**scheduled** 94:24
**schuld** 30:5 143:17 212:9
**screening** 67:8,17 84:5,7
263:7 265:20
**seal** 271:6 272:15 273:21
**season** 80:15,16
**seat** 26:4,7,12,13,17 27:4
27:7,11,12,14
**seats** 163:7
**second** 22:3,20 23:13
41:11 66:13,16 101:22
139:10 160:21 204:10
**seconds** 42:16
**secret** 197:7 204:22

**section** 74:19,23,23,24
90:22 178:9,21 186:17
187:20 188:8 189:24
193:23 203:25 209:16
214:2,11,12 215:21
217:19,22 230:6
**security** 56:7
**see** 27:23,24,24 31:14
39:6 54:3 59:15,16
63:16 65:4 66:17,18,24
67:10,23,25 68:4,6
69:17,22 70:1,3 73:1
89:16 91:19,21,22 95:9
95:12,16 97:3,21
103:18 105:2 107:22,25
109:19 110:11 113:25
114:3,6 116:15 117:10
121:13,19,20 122:8,24
123:3 129:11 130:9,11
130:22 131:2,12 132:8
132:12,25 133:3 134:8
135:11 136:15,18,22
137:5,13,16,21 138:1
139:20 144:3,7,21,25
145:24 148:20 149:6,15
150:21 153:15 154:16
155:13,20 159:2 163:3
168:17 174:22,22 176:2
176:4 177:5 185:8
186:9 187:7,19 188:4
190:12 199:8,22,23
201:22 202:3 214:24
216:5 219:9 220:15
228:25 232:3 234:17
237:7 241:8 242:21
244:7 251:17 252:10,13
252:15,18,19,21 253:2
253:7 254:21 255:23
256:2,20,25 259:22
263:15 264:3 265:22
266:15
**seeing** 50:7 71:4 116:19
121:23 122:4,6
**seek** 92:7 93:16 98:21
99:5 138:24
**seen** 50:5 91:9 102:13
152:13,18 242:8,10
**selfemployed** 78:16

**sell** 80:19
**selling** 10:3,12,19 12:8
**send** 37:11 39:7 57:1,6,12
58:23 127:22 157:2
164:13 213:14 217:19
218:25 235:10,14,16,16
240:19 244:21
**sending** 155:25 215:5
**sense** 267:5
**sent** 11:15 37:10 39:8,11
56:24 62:17 63:8 65:1
67:22 72:1 73:9,19
76:10 81:10 89:18,19
135:7 160:16 163:22,24
164:1 167:1,21 173:12
179:3,25 181:21 182:17
183:7 184:7 192:9,20
192:22 195:10 198:8,10
198:12,17 200:15
207:16 212:14 216:23
219:19 220:2 233:3
236:24 239:12 251:15
251:16,20 252:9,13,19
253:2
**sentence** 153:4
**september** 70:5,14 72:24
242:23 243:1,15 244:4
244:8 245:9 254:22
260:24 261:1,4
**serious** 159:11,12 266:6
**seriously** 25:16 228:9
**service** 60:13 89:21
171:19 177:19 189:25
190:1,5,7,10 192:14,16
192:24 193:1 194:2,4
194:15
**services** 1:11 6:19 8:23
167:8,12,22 168:12
187:25 193:16 238:24
239:10 241:4 272:3
273:3
**set** 224:3,5 260:22 271:6
**setting** 39:1 161:6
**seven** 79:16
**sevens** 68:17
**severe** 230:18
**sexual** 263:23 264:8
**shaker** 8:15

**shamekia** 61:15 84:17
  186:12 187:7,19 189:23
  191:1,7 192:6 196:17
  199:17 200:5,6 201:12
  203:1,18,18 204:6
  205:18 206:7,10 208:4
  208:21 209:9,10,13
  214:10 254:17
**shamekias** 84:22 199:9
  199:12,16 202:16,21
  209:7
**shared** 47:14
**shed** 86:15
**sheet** 55:9 56:8 273:7,10
  273:18 274:1
**sheryl** 5:9,17 6:15 17:11
  17:16,21 20:3,4,14
  22:16 25:8,11,14,14,16
  31:3 38:10 39:5 41:1,20
  48:13,15,23,24 49:15
  49:22 60:2 61:7 62:10
  62:25 118:18 144:5
  155:1,12,17,23 156:9
  160:11,12,24 161:19
  162:3,22,25 163:23
  165:24 174:20 175:10
  190:23 194:21,23,23
  196:3 210:4,4 211:12
  222:3,8 228:1 229:8,25
  232:20 233:3
**sheryls** 61:24 144:23
**shes** 191:9 229:10
**shifts** 57:21
**shkolnik** 83:5
**shoes** 238:3,9
**short** 17:2 66:23 68:16
  72:22 165:5 232:13
  260:20
**shortterm** 81:25
**shouldnt** 33:14,21 39:3
  41:24 45:1 82:20 89:23
  157:4 159:18
**show** 54:11 89:20 91:6
  92:16 101:15 102:9
  103:8 104:14 111:9
  113:13 115:15 124:13
  126:3 130:7 139:8
  146:23 155:5 159:6

163:19 165:15 171:2
  174:17 175:14 176:21
  181:10,13 183:21 186:4
  198:7 212:21 240:17
  244:14 259:16 261:3
**showed** 143:15
**showing** 93:2 96:21
  98:18 115:3 121:7
  136:12 160:7 199:6
  222:23 224:22 232:25
  236:1 255:7 257:9
**shown** 214:2
**shows** 104:22 147:5
  181:15
**shunned** 151:4
**shutdown** 64:18,18,20
**sick** 4:7,14,16 92:24
  104:10 111:5
**side** 27:22 133:20 163:1
  169:15 225:6 264:9
**sign** 31:15,17 37:13 41:3
  41:17 42:8,18 67:12
  154:15,19 155:19,21
  156:23 158:2,3,5,8,25
  175:6 224:10,13 236:19
**signature** 37:12,14 182:5
  182:7,9 239:7 269:5
**signatures** 37:11 231:15
**signed** 154:18 186:17
  236:14 245:23 249:11
  249:14,18 272:13
  273:18
**signing** 249:15
**signs** 41:21,22,22,24
  158:1
**simmons** 23:18 25:3
  68:22 73:15 137:20
  139:19 263:20 264:8
**simply** 203:24 268:2
**single** 78:11,11
**sinus** 112:1,7 126:14
  128:18
**sinuses** 112:8 127:8
  128:4
**sit** 133:9,13 134:5 169:23
**sitting** 19:20 20:3,4 23:22
  33:4,5 131:7 136:5
  163:3

**situated** 196:21
**situation** 93:8 95:1,19
  96:7 103:12 118:18
  171:23 251:24
**situations** 225:12 231:10
**six** 11:20 79:15 99:21
  101:18 186:5,8 264:20
  268:1
**skills** 150:7
**sleep** 41:2,10,17 43:2
  62:20 63:9 93:12
  106:20 108:25 109:5
  225:20
**sleepier** 108:25
**sleeping** 40:23 41:5 42:19
  62:19 66:6,9 109:8
  155:20 157:21 174:23
  225:1,5,22 226:8,11,19
  251:4,6
**sleepy** 109:2
**slipup** 18:15
**social** 56:7
**sohn** 16:20
**solutions** 274:1
**somebody** 53:14 90:20
  177:22 191:12 199:12
  247:1 250:7,19 258:20
  259:2 260:11
**somewhat** 104:7 128:19
**soon** 120:5
**sorry** 13:17 48:24 62:10
  153:14
**sought** 91:19 93:25
**sounds** 108:17 129:24
**speak** 23:23 24:12 25:13
  53:15 63:1 72:3 85:3
**speaking** 71:6 232:9
**specialist** 16:14,18,23,25
  44:20 58:25
**specific** 39:14 46:23
  101:2 151:16
**specifically** 48:14 51:15
  90:17 94:21 142:8
  157:12 167:8,22
**specified** 270:21
**speculate** 205:2,14
  228:22 253:12
**speculation** 250:14

**speculative** 80:25
**spell** 17:7
**spoke** 25:14 39:1 62:11
  85:2 121:22 157:1
  195:5 199:9 216:16
  254:2
**spring** 80:15
**springer** 65:17 66:17,24
  67:25 69:21 70:19
  71:14,23 82:8,10 84:2
  243:8
**square** 2:6
**ss** 270:3
**staff** 214:6
**stamp** 256:5
**stand** 8:11 90:5
**standard** 178:1
**standing** 74:12 252:21
**start** 9:23 37:16 59:11,22
  64:13 107:16,19 186:5
**started** 9:21 10:12,19
  13:7 15:4 20:8,20 23:24
  34:12,23 40:14 118:13
  130:8 226:8,11 228:14
  231:1
**starting** 261:15
**starts** 136:15 186:9
  203:16 207:15,17,20,24
  208:1 213:5
**state** 8:8 13:11,13,15
  15:6,12 132:4 213:22
  263:11 270:2,7 271:15
  272:10 273:15
**stated** 170:5
**statement** 144:11 145:13
  175:17 176:2,3 272:11
  272:14 273:19,19
**states** 60:9 203:25 214:1
**stating** 218:3 219:2,24
  243:17
**station** 225:20
**stations** 225:1,5
**stay** 133:2,5 153:8 156:3
  156:16
**stayed** 10:1
**staying** 267:5
**steadfast** 32:5,8
**stenotypy** 270:14

**steps** 45:7,19,22 47:17
**steve** 17:20,22,23 31:2
  60:3 61:7 62:17 63:5
  136:5 139:11 144:4,23
  145:8 167:6 168:16
  172:25 173:9,14 174:21
  190:23 194:23 210:3
  218:5,18 220:25 222:13
  224:25
**steves** 44:8
**stone** 5:20 43:25 51:18
  179:7 180:1,3,19
  182:19,20 208:7
**stood** 88:5
**stop** 9:22 10:3 22:4,21
  24:9 25:5 43:9 78:21
  131:21,25 173:7,25
  174:8
**stopped** 78:24 174:3
**stormed** 131:21,22,25
**stream** 160:10
**street** 1:20 2:15
**stress** 40:19 105:10 108:5
  116:11,16 162:5 171:23
  172:8,17 173:3,21
  225:8 231:12,14 233:16
  233:18,20,20 236:23
  237:3,9
**stressed** 233:14 234:1
  237:4,14 239:17 251:23
**strike** 159:23
**structural** 128:2
**stuff** 68:15 76:12 184:10
  238:14,16,19
**subject** 263:21
**subjected** 263:25
**submitted** 58:24
**submitting** 147:13
**subpar** 172:3
**subpoena** 123:23
**subscribed** 272:10
  273:14 274:21
**substance** 46:9
**successes** 29:24
**sudden** 108:11
**suffering** 128:22 129:4
  236:4
**suffice** 157:24

**sufficient** 244:3
**suggest** 122:20
**suggested** 27:10,10,11
  95:20,22 120:20 134:13
  134:19,21 138:25 195:5
**suggestion** 137:13
**suggests** 137:3
**suite** 1:20 2:6,15
**sunday** 11:24 132:9,11
  132:21
**supervisor** 14:21 16:22
  17:5 25:15 26:2 38:10
  42:2 65:19 82:17,22
  84:22 85:1,4,22 86:7,18
  87:6 155:18 156:17
  157:13 190:18 199:9,15
  200:19 201:12 202:16
  202:21,22 203:2 206:7
  209:7 230:15
**supervisors** 16:21 61:21
  195:16 203:22 205:19
  214:13
**supplied** 42:8 158:1
**supply** 158:3,8
**support** 135:12 145:23
  178:13 191:4 214:6
  230:22
**supposed** 56:23 73:3
  126:22 127:7 142:9
  178:19,21 192:2 253:22
**sure** 14:23 20:9 25:9
  29:18 34:7 38:8 40:25
  44:20 46:19 49:19
  56:15 61:16 73:10 90:1
  97:3 99:18 100:4 101:3
  101:6 106:4 114:4
  119:25 122:13 124:23
  128:11 131:10 134:13
  143:21,22 151:12
  162:19 167:7 173:11
  196:10 203:20 217:15
  218:7 233:18 241:15
  253:20 265:6
**surgery** 194:6
**sworn** 8:4 270:10 272:10
  272:13 273:14,18
  274:21
**symptoms** 96:4 105:13

  106:17 110:10
**system** 59:11
**systems** 59:21

**T**

**take** 25:16 37:7,14 40:20
  41:9 42:22 45:7 47:17
  59:18 65:11,25 66:12
  67:4 95:7,15,20 107:11
  108:6,13,15,18,19
  113:2 116:5,13 117:21
  117:22 120:11,13,14
  129:7,19 137:10,13
  158:6,10 159:20 161:14
  164:11,25 165:3 184:20
  184:21 191:14 195:6
  232:10,12 239:14
  241:13
**taken** 1:19 14:8 40:6 45:1
  228:8 270:20
**talk** 24:5,14,17 25:15
  26:1 28:21 29:4 39:22
  50:1 56:18 68:11 74:5,6
  74:14 84:23 86:25
  88:24 97:14,15 118:7
  118:12 161:19 162:2,8
  174:23 192:16 193:2
  194:7 234:7,20 243:13
**talked** 25:12 63:6 67:24
  88:16 89:10 97:24 98:1
  116:10 118:9,11 131:20
  131:20 133:23,24,24
  166:24 173:16 195:12
  214:13 219:23 231:21
  234:11,14,15 235:3,6
**talking** 23:15 24:2,24
  33:5 36:3 39:15 53:23
  88:22 116:16,19 119:24
  147:3 157:9 193:6
  212:16 228:14 239:18
  262:16
**tapering** 241:19
**tasks** 15:23,24 16:2
**team** 26:10 133:8 191:4
  211:22
**teamwork** 148:18,21
**technically** 145:2
**techniques** 95:24

**telephone** 177:7 178:3
  190:17,21 193:23
  199:18 200:10 201:5
  216:17 217:2 228:5
**tell** 25:2 27:16 43:22 46:4
  48:1,6 49:7 52:21 55:23
  65:15 70:22 116:9
  117:15 122:23 123:1,8
  134:1 138:4 156:10
  158:12 161:18 164:18
  170:2 172:25 173:17,20
  173:21 177:14 188:4
  190:15 191:1 195:4,8
  196:17 197:12 199:16
  201:12 217:13,20
  222:11 236:15 250:21
  254:13 256:9 259:25
**telling** 42:2 73:3,10
  118:19 167:2 173:18,24
  203:18 204:13 210:8
  215:24 217:9,14 218:12
  220:20,24 221:25
  225:18 231:1 244:22
  253:17 266:24
**tells** 81:3 134:9 137:23
  205:19,22 210:1 213:17
  213:25
**temp** 8:24 9:1,5
**temperature** 154:1
**ten** 102:2,7,24
**tenure** 145:9
**teresa** 82:23,25
**term** 205:1 247:22 248:3
**terminate** 76:9 267:7
**terminated** 86:20 88:12
  267:9
**terms** 238:18
**test** 67:15,16,18 68:10,16
  126:15
**tested** 68:15
**testify** 270:10
**testimony** 145:5 216:11
  270:13,17 272:6,7
  273:6,9,12
**testing** 99:13,17
**tests** 68:8
**thank** 18:17 62:1
**thanks** 135:22 211:13

218:9
**thats** 11:17 29:14,18
34:23 39:2 40:14 66:4
69:2 76:8 84:8 90:6
99:22 103:24 116:14,18
119:22 130:15,18
132:21,23 138:4 141:21
142:2 146:12 148:12
149:20 150:3 152:10
155:8 159:2,11,19
167:5,12,14 168:8
169:15 170:4 178:18
181:15 183:2 187:15
190:11 193:8 194:20
197:16,17 198:21 200:2
200:25 201:5,6,10
203:14 204:25 210:1
214:15 219:2 225:24
226:12 230:14 233:8,24
235:9 246:1 251:8,10
251:14 252:24 256:10
**theirs** 144:2
**thereof** 192:17 193:3
194:8
**theres** 135:15 142:12
149:23 159:23 165:2
175:17 182:4 203:17
**thing** 16:3 38:19 55:2
69:18 84:14,19 102:4
103:22,25 264:17 265:6
265:9
**things** 12:2 18:1 35:13
57:18 74:3 118:17
120:12 137:18,24
140:21 182:4 232:4
238:17 250:2 264:18
267:25
**think** 10:8,10 14:23
16:25 19:25 20:8 22:3
23:3,4 24:8,9,23 25:4
25:14 26:21 29:2,8
31:18 33:11 35:5 39:14
41:19,20 44:7 46:21
62:9,13,23 64:9 65:13
67:20,22 68:9 70:5 71:2
71:7 72:1 73:9,22 81:24
82:3,11,13 83:9,21,23
83:24 85:2 88:1,11

93:20,20 94:2 95:17,22
97:2,24 102:16,25
103:23,25 107:17 109:3
109:8 112:20 113:18
121:25 122:2 124:21,22
127:17 128:10,10 129:9
132:3 134:3 135:3
142:13 143:25 154:13
163:3 164:8,17 177:3
180:3 181:2 186:24
211:1 222:9 234:16
239:12 240:20,22 241:5
241:11 246:18 247:1
248:24 250:6,10,17,19
252:4,22 256:14 264:25
265:1,2 267:11,15
**thinkgk** 2:18,19
**thinking** 134:15 231:19
250:22
**third** 159:23,24 160:9
185:4 213:18
**thought** 109:25 156:17
158:3 159:4 172:6
184:24 237:11 244:2
246:19 247:2,13,19
250:19,24,25 254:9
**threatened** 94:8,9,10,14
94:20,22
**threats** 197:18
**three** 20:22 37:1,3,11,17
38:4 51:17,25 59:24
60:16 68:10 89:24
130:8 132:5 142:24
165:17,18 203:16 217:4
217:11 268:2
**threw** 132:2
**thursday** 234:1
**tied** 109:15 227:2,10
**ties** 252:25 253:1,6
**time** 8:21 9:11,19,23 10:1
10:20 14:16 17:2 19:4
22:1,3,3,20,23,24 23:12
25:5,7 26:24,25 34:16
35:23 38:7 41:20 42:11
43:13 44:10 47:7 56:5,6
67:24 72:13,20 77:3
82:22 89:13 92:4 93:17
93:24 95:4,19,23 97:2

97:13 103:1 106:25
107:10 114:19 116:5,10
118:13 119:9,11,15
120:2 123:9 125:20
132:6 134:3 148:15
150:23 153:20 161:25
163:4 172:1 174:2
175:4 182:7 190:20
192:22 207:14 208:3
209:2 210:22 212:1
232:5,7,14 235:9
260:18 268:10 270:20
**timely** 30:14,16 149:11
152:4
**times** 19:21 20:23,24,25
21:1,3,6 42:14 102:18
106:14,14 122:8 152:1
224:3,5 225:13
**tina** 135:11 136:16 162:7
**tinas** 135:15
**tired** 109:5 111:23,24
112:5 128:19 174:25
**tissue** 161:1
**title** 77:14,17 78:5
**today** 137:25 260:21
**told** 22:4,21 24:9 25:5
30:25 31:21 38:13
41:20 44:11 48:17
49:22 50:14,15,23 51:2
60:18,20 61:7 62:1,25
63:19,20 64:12 65:2
67:2,9 69:22 70:17,21
73:25 74:17 75:2 76:5,7
86:17,18 89:13,14,15
94:11 103:13 115:13
118:14 121:19,20 123:2
129:11 131:21,25
133:23 134:3,14 138:19
155:24 157:22 158:9
164:8,10 170:20,21,23
172:5 182:24 188:21
189:1,4,11 190:16,20
191:20,22,23 192:1,3
194:17,20 195:14,15,19
196:6 197:2,14 200:2,8
200:16 204:5,16 205:4
205:5,6,10 209:12
212:20 213:23 214:15

219:23 225:22 228:24
230:14 231:5,18,21
240:1 241:12 248:8
253:24 258:9 265:16,19
265:23,25 266:4,21,25
267:4,10
**tomorrow** 81:4 233:6
234:3
**tonsillectomy** 124:16
125:3,6,17
**top** 161:1 187:18 192:19
**tori** 17:6,11,13,18 19:25
20:4
**totally** 264:10,12
**trained** 149:1 150:11
**training** 14:3,14 15:18
16:17
**transaction** 10:21
**transactions** 10:23 11:7
11:15 80:6
**transcribed** 270:16 272:7
**transcript** 3:1 185:8
269:3,6,9,11 272:5,12
273:5,11,17
**transcription** 270:17
**transfer** 97:22 134:16,22
149:9
**transferred** 29:7
**transferring** 149:16
**transition** 220:22
**transitioned** 15:13
**transposed** 35:20
**treat** 247:24 250:23
**treated** 73:13 242:15,20
**tried** 24:2 252:5,5,7
**trouble** 138:9 150:13
203:23
**true** 30:17 52:20 105:16
141:21 142:2 177:11,12
178:17,18 199:24
204:25 251:8 270:16
**trust** 150:16,19
**truth** 192:3 221:24
270:11,11,12
**try** 24:4 45:2 49:19 57:19
71:20 229:23 243:13,25
**trying** 59:18 73:2 100:4
101:1 136:25 143:20

145:1 146:8,14 183:13
237:2 252:16,22
**turn** 39:11 136:14 171:24
172:9 175:16
**turned** 23:10
**twice** 20:22 21:4 122:10
122:12,14
**two** 11:9 12:13,21 20:25
21:1,2,5 29:25 32:12
42:16 66:14 67:21
68:10 79:7 99:6 101:18
103:24 119:21 120:14
121:21 126:11 135:3
136:14,17 140:15
142:24 144:1 149:23
150:1 151:6,16 152:8
152:14,19 153:1 154:9
154:18 155:9,14 159:23
162:23,25 166:10
182:15 188:8 189:24
192:19 193:7,7 208:23
209:1 210:15 212:7
217:11 233:2 238:6
254:24 266:14
**twofamily** 65:3
**twoweek** 117:18
**tying** 64:2
**type** 9:1 39:13,25 52:21
108:12 240:2
**typically** 41:10

**U**

**uh** 5:7 9:21,23 10:4 11:12
11:16,18 13:6,25 14:5,7
14:17 43:11 47:6 48:9
48:19 49:9 68:2 77:11
81:18 82:5 85:13 86:12
86:21 88:12,13,15,21
102:1 123:4 135:25
137:9,9 146:19 158:1,3
164:18 169:7 180:13,15
195:16 197:4 198:22
206:24 215:2,8 216:17
216:22 223:25 231:19
237:17 247:9,13,18
250:10,19 252:4 272:3
273:3
**uhhuh** 10:14 11:4 31:24

58:19 61:12 66:25
81:13 91:11 92:18
103:16 105:23 110:12
111:12,15 121:9,12,14
124:17 126:16,18,20,20
127:4 130:12 131:5,8
132:18 136:20 144:8
147:1,10 152:6 155:11
166:3 169:8,12 173:1
176:1 186:11 192:8
210:5 240:9 242:4
250:9 260:4
**uhhuhs** 126:25
**uhmg** 44:22 61:20
**uhmp** 44:21 133:20
**uhs** 216:17 217:8 221:4
**ultimately** 26:14 149:13
196:1
**un** 84:10 213:12 214:9
**unable** 181:17
**unaware** 247:18
**unbill** 33:6
**uncomfortable** 27:20,23
**undergoing** 40:20
**understand** 38:17 100:14
151:1 156:20 157:8
194:5 213:21 246:8,8
246:16,21,23,24 247:12
248:10 249:19
**understanding** 148:23
216:12
**understood** 267:22
**unemployed** 77:5
**unemployment** 72:9,11
72:15,16,18,23 76:15
76:15,17,18,20,24 77:1
243:20
**unethical** 168:22,24,25
171:6
**unfit** 65:21 66:5,9
**unhappy** 29:11
**university** 1:10 8:22 9:12
227:24 242:24
**unpaid** 72:7,8 180:21
244:11 263:21
**unreasonable** 265:1
**unstable** 252:6,8,17,23
**unusual** 131:23

**updates** 152:2
**upset** 100:12,18 131:20
132:3 135:17 138:19
164:6,19,23
**urgent** 127:9,11
**use** 37:19 48:7 55:2
106:24 190:17,21,25
197:23 200:18,19 210:6
211:2,13 216:17 218:7
218:13,20 220:11
222:14 228:5 250:6
**usually** 89:24

**V**

**vagueness** 52:10
**valid** 185:2,10 186:15
209:19
**varies** 35:24
**various** 56:17 83:12
**verbal** 126:24 127:3
**verbally** 61:23 155:24
157:2 211:13
**verbatim** 38:20
**verification** 35:14 37:25
206:24
**verifications** 44:6
**verified** 34:14,21 36:10
36:20 37:3 53:6 59:10
**verify** 30:21 34:10 35:10
42:24 52:4 53:17,19
54:17,22 60:6,19
102:20 166:22 178:4
181:18 190:18 191:17
191:19 193:4,24 194:9
194:11 206:11 220:13
254:12
**verifying** 34:12 169:1
170:6 254:14
**veritext** 274:1
**versions** 217:12
**versus** 215:24
**vicepresident** 227:23
**victim** 133:9
**victoria** 1:4,16 5:6,10,12
5:14,23,24 6:3,5,7 7:1
8:1,6,10 24:11 60:10
75:19 94:14 131:4,6
139:4 148:22 153:17

154:20 160:2 161:2
163:14 165:11 174:22
181:25 185:25 189:13
198:3,15 203:7 207:7
212:25 262:23 270:9
272:3,4,9 273:3,4,13
274:20
**victorias** 150:17
**video** 49:7
**view** 88:15,15 250:11
**violation** 263:14
**visibly** 100:18
**vision** 112:15 223:6,16,19
**visit** 4:7,14,16 92:24
104:10 111:5
**vitae** 55:9,21
**voicemail** 60:9,9 166:25
169:4 181:24,24 206:17
209:18,21
**vs** 1:8 11:2,3 79:19,21

**W**

**wahl** 48:13,15,22,23,24
49:15 222:3,8 228:1
229:25
**wahls** 229:8
**wait** 46:17 76:20 88:1
98:24 117:24 132:13
160:21 191:5 196:16
198:13 208:1 218:15
219:24 222:12 223:1
224:12 226:1 236:11
268:14
**waiting** 195:11
**waiver** 268:13,15
**walked** 22:8 36:21 60:4
96:23 99:3
**walking** 33:17 96:25
156:2,15 211:23
**want** 10:7 11:20 23:7
24:6 26:7 27:2,19 30:12
33:1,10 34:21 35:16
40:11 43:24 46:22 62:9
63:16 64:12 71:7,9
72:12 73:12,14 74:17
78:3 86:2 95:7,12
106:10 108:18 117:8
124:3 127:13 131:24

133:2,5 134:12 137:18
138:12 140:6 141:17,24
161:19 164:25 167:25
172:23 173:18 183:14
210:7 225:21 226:3
237:7 240:6 264:14
**wanted** 20:5 26:3 39:4
45:4,9 60:12 63:1 73:13
75:4,9,11 76:2 117:16
127:10 140:7 166:6
177:18 212:19 224:8
237:11 253:20 263:24
266:22
**wants** 173:6
**warrensville** 49:4
**washington** 89:12
**wasnt** 10:20 16:3 27:16
30:3 39:9,15 51:4,7
53:12 55:20 57:1 60:5
76:17 82:21,21 97:2
112:10 119:7 122:23
125:13 140:5 143:18
145:16 164:10 172:3
179:22,25 181:1,12
182:24 183:13 187:4
192:21 197:2 229:3,4
237:5 253:22 267:16
**watch** 49:6
**way** 64:23 75:3 76:1
115:12 138:22 168:5
169:20 172:5 189:18
194:17 204:3,6,14
214:14 215:3 217:21
230:1 250:24 252:7
266:21 267:1,19,19,21
**weaknesses** 29:23
**web** 225:15
**website** 56:9,10,12 59:8
185:21
**week** 43:4 76:21 102:24
127:9 142:12 144:1
**weekly** 80:8 211:21
**weeks** 23:2,4,4 119:21
120:14 121:21 142:24
236:6 254:24
**weight** 105:19
**wellness** 102:10
**went** 8:22 9:11 13:5 14:7

22:8 30:18,21 31:4
38:24 60:8 64:9,9,11,16
64:21 65:16 66:17,24
68:6 70:3 73:21,22,24
76:12,22 97:9 102:9
113:18 114:2,6 117:25
127:15 129:2 138:18
143:9 151:3 166:25
174:22 181:1,1,3,23
189:3 206:22 219:10
223:10,10,11 225:14
234:10 241:9 251:21
254:20 261:13
**whats** 69:18 86:15
113:18 115:3 169:14
190:11 192:10
**whereof** 271:5
**white** 50:22 51:2 86:3
181:11 209:4,6,8,13
253:15
**wide** 265:4
**williams** 23:17
**willing** 191:3
**wind** 260:21
**wish** 156:6 206:16
**withdrew** 159:7
**witness** 20:20 28:6 64:5,5
127:4,6 140:11 202:19
215:13 262:17 270:9,14
270:15,18 271:5 272:1
272:4,11 273:1,4,15
**witnessed** 24:21,23
**witnesss** 269:2
**woke** 174:24 175:2
**wonderful** 137:8
**wondering** 191:7,9
**wont** 18:16 141:16
**word** 48:7 171:12 225:15
249:9,21,25 250:4
**words** 38:20 249:19
254:19
**work** 8:22 9:4,12 11:16
11:18,19,22 12:2 13:5
15:16,21 16:7 18:23
19:11,16 24:7 27:3 28:9
28:14,17 29:15,17
32:16,19,21,23 38:6,23
40:22 41:5 50:25 57:17

57:20,21 69:7,9,12 70:4
70:9,13,18,24 71:12,18
71:21 72:4,25 73:4,8,11
73:21,22 76:22 78:12
78:18,21,24 92:7 93:8
94:9,9,10,24,25 100:23
103:12 105:10 106:25
108:25 109:2,6 114:8
116:3,13,21 117:25
118:2,5 119:1,6,8,16,21
121:11 124:6,22 125:19
129:3 133:18 145:16
148:24 150:7 158:18
169:6 181:1,2,3 225:1,5
225:20 231:12 233:9
236:5,20,22 242:24
243:9,11,14,22 244:1
244:22 245:8 247:1
251:3,6,12,13,17,19,22
251:25 252:2 254:21,22
261:14,15 262:9,14
263:5,6 264:22 265:17
**worked** 8:25 9:17 10:4
34:16 44:21 84:10
89:12,14 133:19,20
167:23 180:6 187:17
190:2
**working** 9:22,23 11:12
69:4 77:6 86:11 107:4
111:20 168:11 180:15
198:21 209:22 260:25
261:25
**works** 44:21 90:23 168:6
195:9 217:1
**world** 265:5
**worse** 172:16
**wouldnt** 38:18 47:20
50:24 57:9 94:3 95:7,9
95:16 109:7 119:7
141:10,11 145:8 146:3
148:14 156:9 169:24
170:3,9 183:1 195:24
218:21 230:21,24
231:23 232:1 241:13
242:17 253:3,8 265:5
266:11
**wow** 134:2,4
**write** 70:24 131:14

137:17 139:11 140:14
191:15 206:10 211:18
211:19 219:22 236:9,23
243:13 246:1,6
**writes** 160:20 189:23
192:6 216:14
**writeups** 103:24 154:9,19
**writing** 143:4,12,15
154:10,12,14 177:17
187:19 208:3,5 212:12
214:24 215:1,5,17,19
215:20,23 219:21
222:13 243:21 257:17
**written** 86:2,4 141:4
151:7,18 152:9,11,20
**wrong** 31:22 46:16 47:8
88:16 143:6 146:6,11
146:11 159:6 200:21
214:11 237:12 254:1,9
254:14
**wrote** 30:20 140:21
161:15 165:18,23
168:16 187:6 243:10,23
246:5 252:4 258:16
260:6,8

**X**

**Y**
**yeah** 31:18 32:10 33:16
41:6 43:20 64:13 65:9
90:4 104:2,2 108:10
113:18 146:15 149:22
165:1 187:16 198:15
219:25 220:5,17 224:14
255:11 262:17 265:14
**year** 58:7 79:2 80:11,22
80:23 85:19,20 140:22
140:24,25 142:21
143:18 144:13 180:12
**years** 10:5,6 89:24 90:11
221:5
**yesterday** 112:11,13
179:1,12,18,23
**york** 90:13
**youre** 13:3 28:12 32:10
38:16 65:21 91:24
109:13 131:10 132:23

**Z**

**zoloft** 40:5,10 43:10
104:20,23 107:11,13,17
108:2,9,16 111:20,22
114:19 118:14,15
122:17,21 129:7,12,14
173:23 241:16 242:1

**0**

**000** 79:4 80:12
**02** 137:17
**06** 160:17
**09** 208:2

**1**

**1** 1:8 4:3 54:6,12 55:15
121:11 123:12 124:23
125:20 137:17 233:4
234:1
**10** 1:18 4:16,22 65:13
111:4,10 113:16 121:3
128:21 129:1,2,3 166:1
220:24 222:1,25 223:3
232:17,17
**101** 4:11
**103** 4:13
**104** 4:14
**10th** 121:8 130:10,20
132:15
**11** 4:15,17 104:10 113:8
113:14,16 136:19
160:17,19
**111** 4:16
**11100** 188:1
**113** 4:17
**114** 4:19
**115** 4:20
**11th** 104:18 105:2,9
109:1,11,13,24 258:22
258:22
**12** 4:19 106:17,21 110:11
114:23 115:4 137:6

187:19 196:14 203:18
207:14 215:16 219:21
221:25,25 223:1,1,3
234:2
**youve** 81:10 221:3,8

139:13 162:1 223:4
264:5
**121** 4:22
**124** 4:23
**125** 5:1
**1284** 54:19
**12th** 132:19
**13** 4:20 74:23,24 115:15
115:18 178:21,23,24
**130** 5:2
**1300** 1:20 2:15
**136** 5:4
**139** 5:5
**13cv2012** 1:8
**13th** 74:23 93:5,25 94:16
136:18 160:16,19
**14** 1:17 4:9,22 96:17 99:1
121:2,8,10 272:3 273:3
**146** 5:7
**14th** 96:23 98:21 137:16
**15** 4:23 36:3 124:8,14
186:18 193:6
**155** 5:8
**16** 5:1 125:23 126:4
132:17
**160** 5:10
**1600** 1:20 2:15
**163** 5:12
**165** 5:13
**16th** 168:17
**17** 4:17,24 5:2,18 113:9
113:16 124:10 130:2,8
131:15 135:1 176:18
**174** 5:15
**175** 5:16
**176** 5:18
**179** 5:19
**17th** 124:15 174:21
**18** 5:4 136:7,13
**1828241** 272:2 273:2
274:2
**183** 5:21
**185** 5:22
**19** 4:16 5:4,5,20,21 111:5
111:15 113:15 136:9,19
139:3,9 179:8 183:18
216:15 271:17
**198** 5:24

**199** 6:1
**1999** 8:18 12:16,19
**19th** 116:16 186:10
207:17,20,24 208:2
213:6,18 219:9
**1st** 73:3 243:4 244:21

**2**

**2** 3:3 4:4,10 91:1,7 98:14
99:1,11 106:17,21
110:11 131:2
**20** 4:13 5:7 36:3,6,13
51:21 90:10 103:4
146:18,24 272:16
273:22 274:22
**2000** 9:20 145:4
**2001** 9:10,16,18
**2008** 10:8
**201** 99:22
**2011** 14:25 16:5 18:22
28:9 58:9 144:7,16,18
144:19 145:1,6,17
152:24 153:6 264:5,5
**2012** 4:5,6,9,10,12,13,15
4:16,18,19,22,24 5:1,4
5:7,18,20,21 6:2,4,6,8
6:10,12,13,15,17,19,25
7:1 10:10,11,12,18 11:8
11:19 12:6,9 19:10,14
32:19 91:3,17,21 92:6
92:13 93:5,25 96:18
98:14 99:2 101:11
103:4 104:11 109:1,13
111:6 113:9,15,16
114:24 121:3 124:10,15
125:25 126:13 128:21
129:1 136:9 143:18
144:20 146:20 176:18
179:8 183:18 199:2
203:8 207:8 213:1
222:19 224:18,24
227:17 230:9 232:21
235:22 238:24 239:6
242:23 259:13 260:24
261:1,4 262:24
**2013** 4:21 78:23 115:19
258:22
**2014** 1:17 80:4 271:8

272:3 273:3
**2019** 271:17
**203** 6:3
**207** 6:5
**20th** 103:10,21 104:17,25
105:6 187:8 208:16
220:24 222:1,25
**20year** 89:7
**21** 5:8 154:25 155:6,10
166:1
**212** 6:7
**2162802828** 2:8
**2166215161** 2:17
**21st** 243:18
**22** 1:18 5:10 160:1,8
163:23 223:3
**222** 6:9
**224** 6:11
**227** 6:13
**23** 5:12 6:13 130:10
163:13,20,21 223:4
227:16
**232** 6:14
**235** 6:16
**238** 6:18
**23rd** 211:19 224:24
227:22
**24** 5:13 6:2,4 76:5,7
165:10,16 199:2 203:8
267:11
**240** 6:20
**244** 6:21
**24th** 202:1 207:18,21
**25** 4:5 5:15 91:2 107:18
160:19 174:12,18
**255** 6:22
**257** 6:23
**259** 6:24
**25th** 62:24 91:21 230:9
231:6
**26** 4:6,19,20 5:16 6:6,15
6:25 92:12 114:24
115:7,19,25 116:7
175:9,15,17,25 207:8
232:21 259:13
**262** 7:1
**26th** 62:24 92:20 115:11
230:16 231:7 232:15

233:4 234:9,13 236:3
  236:14,18
**27** 5:18 6:8,10,12 176:16
  176:22 213:1 222:19
  224:18
**270** 3:10
**27th** 117:4 236:8
**28** 5:19 179:6 184:12
  185:6
**29** 5:21 183:16,21 184:5
  184:11
**29th** 165:19,21,23
**2a** 214:2
**2b** 74:19 178:9,24 186:15
  187:20 203:25 208:20
  209:16 211:20 217:19
  217:22 230:6
**2nd** 67:23 98:21 99:4
  100:7 237:25

———————————
**3**

**3** 4:6 92:11,17 99:11
  208:2 266:19 272:3
  273:3
**30** 5:22 6:17 64:23 65:13
  65:14 185:24 186:5
  196:12 198:9 232:17
  234:1 235:22 266:5
**31** 5:24 198:2,8,14
**31st** 67:22
**32** 6:1 198:25 199:7
  207:13,19 233:4
**33** 6:3 203:6,13 207:14
  207:19
**34** 6:5 207:6,12,23 208:1
**35** 6:7 212:22,24
**36** 6:9 222:17,24
**3646** 8:15
**37** 6:11 224:16,23
**38** 6:13 131:15 132:20
  227:15,21
**39** 6:14 232:19 233:1,3
**3rd** 155:13

———————————
**4**

**4** 3:5 4:7 6:19 92:23 93:3
  123:17 125:21 219:9
  238:24 266:5 268:17

**40** 6:16 79:4 235:20
  236:2
**41** 6:18 238:22 239:4
  240:23
**42** 6:20 240:13,18,22
**4288** 101:1,2
**43** 6:21 244:15,17
**44** 6:22 255:2,8
**44113** 2:7
**441141573** 1:20 2:16
**44122** 8:16
**45** 6:23 257:5,10
**46** 6:24 259:11,17,23
  268:17
**47** 7:1 262:22 263:3
**4th** 239:6,6,7,15 240:5
  244:4,25 245:4,10
  254:23

———————————
**5**

**5** 4:8 7:1 96:16,22 99:1,1
  262:24
**50** 107:14,15,16,17,19
**51** 162:1
**54** 4:3
**58** 219:9
**5th** 252:3 262:15,18
  263:4

———————————
**6**

**6** 4:10 5:7 64:23,23 73:23
  80:12 98:13,19 99:1
  102:13 111:15 113:15
  146:20
**6th** 147:5

———————————
**7**

**7** 4:11 5:1 101:10,16
  102:13 113:16 115:7,25
  116:7 125:25 128:21
  129:1,2 137:6 139:13
**75** 2:6
**7th** 126:13

———————————
**8**

**8** 3:8 4:11,13 101:11
  103:3,9 117:13,13
  129:3 130:10

**855** 34:8 43:24
**855i** 33:25 230:6 257:12
**885i** 214:1
**8th** 73:4,11 76:19 101:19
  116:5,21 238:10,12
  243:5,11 244:23 261:14
  262:1,6,12 265:10

———————————
**9**

**9** 4:14 65:13,14 104:9,15
  104:22 110:23 111:1
  121:11 123:12,17
  124:23 125:20,21
  131:15 132:17,20
**91** 4:4
**92** 4:6,7
**920** 2:6
**96** 4:8
**98** 4:10
**9th** 1:20 2:15