1            IN THE COURT OF COMMON PLEAS

2            OF CUYAHOGA COUNTY, OHIO

3          ~~~~~~~~~~~~~~~~~~~~

4   VICTORIA D. JOHNSON,

5

6           Plaintiff,

7

8      vs.         Case No.  1:13CV-2012

9

10  UNIVERSITY HOSPITALS

11  PHYSICIAN SERVICES,

12

13          Defendant.

14       ~~~~~~~~~~~~~~~~~~~~

15          Deposition of

16    VICTORIA DEBRA JOHNSON, VOL. II

17

            May 29, 2014

18          10:00 a.m.

19         Taken at:

        Giffen & Kaminski LLC

20   1300 East 9th Street, Suite 1600

          Cleveland, Ohio

21

22  Christine Zarife Green, CRI, Notary Public

23

24

25

APPEARANCES:

 

    On behalf of the Plaintiff:

        Herron Law Offices, by

        MARK P. HERRON, ESQ.

        75 Public Square, Suite 920

        Cleveland, Ohio 44113

        216-280-2828

        herronlaw@msn.com

 

    On behalf of the Defendant:

        Giffen & Kaminski LLC, by

        KERIN LYN KAMINSKI, ESQ.

        DONALD C. BULEA, ESQ.

        1300 East 9th Street, Suite 1600

        Cleveland, Ohio 44114

        216-621-5161

        kkaminski@thinkgk.com

        dbulea@thinkgk.com

        ~ ~ ~ ~ ~

1                    TRANSCRIPT INDEX
2
3    APPEARANCES................................  276
4
5    INDEX OF EXHIBITS ........................  278
6
7    EXAMINATION OF VICTORIA DEBRA JOHNSON:
8    BY MS. KAMINSKI..........................  279
9
10   REPORTER'S CERTIFICATE...................  343
11
12   EXHIBIT CUSTODY
13   EXHIBITS RETAINED BY COURT REPORTER
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    INDEX OF EXHIBITS

 2

 3    NUMBER              DESCRIPTION            MARKED

 4    Exhibit 48    August 30, 2012 Email......... 299

 5    Exhibit 49    August 2, 2012 Emails......... 301

 6    Exhibit 50    August 3, 2012 Emails......... 302

 7    Exhibit 51    August 2012 Emails........... 303

 8    Exhibit 52    August 2012 Emails........... 307

 9    Exhibit 53    August 30, 2012 Letter........ 309

10    Exhibit 54    October 1, 2012 Letter........ 310

11    Exhibit 55    October 8, 2012 Letter........ 321

12    Exhibit 56    October 8, 2012 Letter........ 322

13    Exhibit 57    CGS Notes.................... 329

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 VICTORIA DEBRA JOHNSON, of lawful
 2    age, called for examination, as provided by the
 3    Ohio Rules of Civil Procedure, being by me
 4    first duly sworn, as hereinafter certified,
 5    deposed and said as follows:
 6                 EXAMINATION OF VICTORIA DEBRA JOHNSON
 7    BY MS. KAMINSKI:
 8         Q.    Ms. Johnson, we're here to finish
 9    your deposition that we started some weeks ago.
10    And I put, in front of you, one of the exhibits
11    that we ended with, Exhibit 46.  And I just
12    wanted to remind you that during the deposition
13    you have to answer audibly, yes or no.  You
14    can't do the uhm-hums or uh-uhs, okay?
15         A.    Yes.
16         Q.    And on the document, 46, that you
17    have in front of you, is that your handwriting?
18         A.    Yes.
19         Q.    And can you help me read those
20    notes?  Start with the left-hand side.  It
21    looks like "PR," is that procedures?
22         A.    Procedures, yes.
23         Q.    "Are unlawful;" is that correct?
24         A.    Yes.
25         Q.    "And I want" -- help me with that.
```

 1          A.     "Nonhostile, unethical, integrity

 2    receipt, duties in a non" -- I was just

 3    scribbling.  "Insisting that I, compromising

 4    position, FMLA."  Phone number, "216-844-6088,

 5    Carol Ladaika, 12:00."

 6          Q.     How about along the side there?

 7    "Need to take leave," is that what that says?

 8          A.     "Need to take leave.  I want to go

 9    back to a stress-free environment."

10          Q.     And when did you take those notes

11    or write that on the document?

12          A.     That, I don't recall.

13          Q.     You wrote this on a letter that was

14    sent to you about rescheduling your fit for

15    duty appointment?

16          A.     Uhm-hum.

17          Q.     Yes?

18          A.     Yes.

19          Q.     Were you talking to somebody about

20    your fit for duty appointment?

21          A.     That, I don't recall.

22          Q.     You see there's a number there

23    that's kind of sideways, 201-4095.  Do you know

24    what that is?

25          A.     201 -- no, I don't remember which

1    number that belongs to.

2         Q.    And were you supposed to see Carol,

3    is that why you wrote that phone number in the

4    noon?

5         A.    That, I don't recall.

6         Q.    Let's turn to the next page.  Is

7    that also your writing --

8         A.    Yes.

9         Q.    -- on VJ208?

10        A.    Yes.

11        Q.    And it says, "Told me I have to see

12   another psychiatrist, although Dr. Pallas said

13   he did not see anything" --

14        A.    "Indicating concern."

15        Q.    And what's that next part?

16        A.    "Just to have my" -- what is it?

17        Q.    Medication, is that what it is?

18        A.    Yes.  "Medication reduced."

19        Q.    Do you remember why or when you

20   wrote that note?

21        A.    No, I don't remember when I wrote

22   it.  I guess it must have been -- I can't say I

23   wrote it the same day, but it must have been

24   because --

25              Yeah, I can't say when I wrote

1    that.

2           Q.    Or why, do you know why you wrote

3    it?

4           A.    No.

5           Q.    Do you know who told you that you

6    have to see another psychiatrist?

7           A.    Well, I think that's what Kathy

8    said.

9           Q.    Because you talked to Kathy on the

10   phone?

11          A.    Yeah, it may have been.  I'm not

12   sure.

13          Q.    And why did you want the results of

14   the consultation with Dr. Pallas?

15          A.    Well, it's my information.  I mean,

16   it's about me, it's not about anyone else.

17          Q.    Now, when you say my doctor has

18   indicated a return to work date of September 4,

19   what doctor was that?

20          A.    I believe that was Dr. Pallas --

21   no, Dr. Dutton.

22          Q.    And that return to work, for

23   September 4, was on the FMLA paperwork you had

24   him fill out?

25          A.    Yes, but it was never approved.

1      Q.     My question isn't whether it was
2  approved or not, but whether or not, when you
3  put the paperwork in from Dr. Dutton, it was
4  for FMLA leave through the 4th; is that right?
5      A.     Correct.
6      Q.     Did you ever read Dr. Pallas'
7  report?
8      A.     I read Dr. Pallas' report after I
9  was discharged.  I believe it was some
10  information I received as part of the packet.
11      Q.     And did you -- did Dr. Pallas tell
12  you that he recommended you see a different
13  psychiatrist?
14      A.     On the report it said that.
15      Q.     And did Dr. Pallas tell you that at
16  the time he saw you?
17      A.     I don't recall.  He may have, but I
18  guess I don't recall.
19      Q.     Did you see another psychiatrist?
20      A.     That's when I went to Dr. Dutton.
21  I believe it was Kathy who told me that
22  Dr. Pallas said that.  But since I had never
23  seen the reports, I --
24      Q.     So Kathy told you that Dr. Pallas
25  had recommended that you see Dr. Dutton?

```
 1          A.    Correct.
 2          Q.    So you went to Dr. Dutton?
 3          A.    Correct.
 4          Q.    And he said you should be off work
 5    until September 4?
 6          A.    Yes.
 7          Q.    And then did you ever go back to
 8    Dr. Dutton?
 9          A.    No.
10          Q.    You just went the one time?
11          A.    Yes.  He refused to see me after
12    that.
13          Q.    And do you know why that is?
14          A.    Well, he said that he was on the
15    board, so it would probably be a conflict for
16    him to treat me.  A board at UH.
17          Q.    The board of what?
18          A.    Of psychiatry with UH.
19          Q.    Did he prescribe you medication?
20          A.    No.
21          Q.    Okay.  So you knew that from
22    Dr. Pallas, who UH had asked you to see, he had
23    sent you to Dr. Dutton, and you knew that
24    Dr. Dutton had --
25          A.    No, he didn't send me to
```

1    Dr. Dutton.

2          Q.    Oh.

3          A.    It was because she said that I

4    needed to go see a psychiatrist.  He didn't

5    specifically say Dr. Dutton.

6          Q.    So you went to see Dr. Dutton,

7    though, as a result of him saying you needed to

8    see a psychiatrist, right?

9          A.    Right.  Per Kathy.

10         Q.    And that psychiatrist said you

11   could return to work on September 4, correct?

12         A.    Correct.

13         Q.    And you knew that?

14         A.    Yes.

15         Q.    And then if you go back, still on

16   Exhibit 46, back to Page VJ215, you see that

17   there's more handwriting there.

18         A.    Yes.

19         Q.    And to me it says "Answer is on.

20   Provider is not at this location."  Is that

21   your handwriting?

22         A.    Yes.  It says "Answer is no.

23   Provider is not at this location."

24         Q.    Okay.  Did you doubt that Carol

25   Meisler had talked to Shamekia's supervisor?

1      A.    No, I wouldn't say -- I can't
2   remember, at the time.  She said -- we were
3   just getting conflicting answers.  I was
4   getting a conflicting answer from Carol and
5   then a conflicting answer from Shamekia.
6      Q.    But you knew that Carol was
7   appointed to try to get to the bottom of what
8   you should do, correct?
9      A.    Yes.
10      Q.    And you believe -- you don't have
11   any reason to believe that Carol is a liar, do
12   you?
13             MR. HERRON:  Objection.  You can
14   answer, if you know.
15      A.    I can't say -- I wouldn't just
16   arbitrarily say she's a liar, but she may not
17   have been giving the supervisor the whole
18   scenario.
19      Q.    Do you have a reason to believe she
20   wasn't giving the supervisor the whole
21   scenario?
22             MR. HERRON:  Objection.  You can
23   answer, if you know.
24      A.    That, I don't know.
25      Q.    So let's assume that she was giving

1    the supervisor the whole scenario, explaining

2    exactly what you were doing correctly, and then

3    Carol comes back and tells you, I've talked to

4    the supervisor, and go ahead and tell them that

5    the provider can be reached at this number,

6    they accept that.  Can you assume that for a

7    minute?

8         A.    I'll try.

9              MR. HERRON:  I'll make an objection

10   to operating on assumptions because that's --

11   facts are not in evidence as to what your

12   assumptions are.

13             MS. KAMINSKI:  Good.

14        Q.    If we assume that, then her

15   direction to you was a proper direction, would

16   you agree?

17             MR. HERRON:  Object to that.  And

18   you can answer, if you know.

19        A.    Again, I'm getting two different

20   answers.  You can call a customer service line

21   and get two different answers, so I don't know

22   what was being told to the supervisor or what.

23             She also came back with three or

24   four different scenarios.  So at that point I'm

25   like, she really -- I don't know where to go

1    with this because she came back with two
2    different scenarios.
3         Q.    Who came back with two different
4    scenarios?
5         A.    Carol.
6         Q.    All right.  And so tell me what
7    that means.  What two different scenarios did
8    Carol come back with?
9         A.    She told us that the supervisor
10   said we can put the number there, and we're
11   supposed to answer the phone as -- which she's
12   stating here.  Then another time she said that
13   we could put the number of the main hospital,
14   and the operator would answer and say the
15   doctor could be reached there directly.
16        Q.    Well, Carol never told you that's
17   how you should fill out the forms, that you
18   should put the main hospital number, did she?
19        A.    No, she didn't.  She said that CGS
20   said it was okay if we did.
21        Q.    But the circumstances under which
22   she said CGS said it was okay, she was kind of
23   telling you, This is even better than just
24   putting a main number down, right?
25        A.    I can't assume that.

1           MR. HERRON:  Objection to the

2    characterization.

3           Q.    You didn't understand that, that

4    when she wrote and said to you that CGS said

5    that even the main hospital number would be

6    acceptable, that that was a step further

7    removed from the doctor than you?

8           A.    I'm not understanding.

9           MR. HERRON:  Objection to the

10   characterization.

11          Q.    You don't understand that?

12          A.    No, I'm not understanding what

13   you're trying to say.

14          Q.    Okay.  Let's go to the next page,

15   VJ227.  Is that your writing?

16          A.    Yes.

17          Q.    And does it say, "She saw me return

18   from McDonald's.  I went on my break to pick up

19   my lunch."  What does that say then?

20          A.    "Twelve minutes to McDonald's and

21   back."

22          Q.    "There a group in billing services

23   that walks on their break" --

24          A.    "Which is longer than 15 minutes."

25          Q.    -- "which is longer than 15

```
 1    minutes."  Now, why did you write this note?
 2         A.    I guess I was trying to explain
 3    myself for what she had written.  It says
 4    "Please note that when requesting that you have
 5    worked through lunch that if you leave the
 6    building to go out and get lunch to bring back
 7    to your desk, that is not considered working
 8    through lunch.  Please do not ask me to approve
 9    'no lunch' if that is the case."
10         Q.    Why did you think that was aimed at
11    you?
12              MR. HERRON:  Objection.  I don't
13    think she testified that she felt that it was
14    aimed at her.
15         Q.    Does your note indicate that you
16    were concerned that this was aimed at you?
17         A.    That, I can't say.
18         Q.    Why did you write this note?
19         A.    I don't know.
20         Q.    You don't know why you wrote the
21    note?
22         A.    No.
23         Q.    You wrote it on this, it's talking
24    about lunch, and it seems like it's saying that
25    what you did is better than what some other
```

1     people did, right?
2              MR. HERRON:   Objection to your
3     characterization.
4         A.    No, that's not true.
5         Q.    It doesn't say that?  "She saw me
6     return from McDonald's."  Who's the she?
7         A.    That, I don't know.
8         Q.    Would it be Sheryl Johnson?
9         A.    It could have been.
10        Q.    But you don't recall?
11        A.    No.
12        Q.    "I went on my break to pick up my
13    lunch.  Twelve minutes to McDonald's and back."
14    Had you turned in that day for a no lunch?
15        A.    No, I don't remember.
16        Q.    "There is a group in billing
17    services that walks on their break which is
18    longer than 15 minutes."  Why were you
19    comparing yourself -- or why do you have that
20    about the billing services there if it's not a
21    comparison to you?
22        A.    I don't know.
23        Q.    You have no idea why you wrote this
24    note or what it means?
25        A.    No.

1          Q.    Is there anything that you would
2     look at or could do to refresh your mind?
3          A.    She never said she caught me.  I
4     don't know why I wrote it.  She never said that
5     I went to McDonald's or returned.
6          Q.    Okay.  When did you write that
7     note?
8          A.    That, I don't remember.
9          Q.    Let's go to VJ240, in that same
10    Exhibit 46.  Again, your writing?
11         A.    246?
12         Q.    Yeah.  240.
13         A.    240.  Yes.
14         Q.    It says, "Christina came to my desk
15    Tuesday, dozed off.  She asked me if I was on
16    my break."  And then what did it say?
17         A.    "If I was on my break.  Yes.  On my
18    break.  Not if I was okay.  She knows I'm on
19    medication."
20         Q.    Who is the Christina that came to
21    your desk?
22         A.    Well, yeah, this is Christina
23    Morrison.
24         Q.    And what led you to write it on the
25    email that is 240?

1          A.     I don't remember.

2          Q.     And why are you noting that she

3   asked if you were on your break and not if you

4   were okay?

5          A.     That, I don't remember either.

6          Q.     Let's go back and look at Exhibit

7   35.  Here, this is Exhibit 35.

8          A.     Yes.

9          Q.     That's the exhibit that we had

10  looked at before where Carol mentions that it

11  was -- that CGS approved calling a general

12  billing number, correct?

13              MR. HERRON:  Objection.

14         A.     Excuse me, what was your question?

15         Q.     That has a reference by Carol

16  Meisler to calling a general billing number,

17  correct?  A general hospital number.

18              MR. HERRON:  Objection.  What are

19  you referring to, a general billing number or a

20  general hospital number?  It's two different

21  things.

22              MS. KAMINSKI:  Hospital number.

23         A.     To use UH's telephone number.  It

24  says UH's telephone number.

25         Q.     Let me see the document here.  She

 1    says, if you look at this email, in the middle,

 2    it says -- this is from Carol Meisler to you,

 3    correct?

 4         A.    Yes.

 5         Q.    It says, "Hello Victoria.  Good

 6    news.  I just spoke to Ms. Kim.  Per Ms. Kim,

 7    there is no problem for UH to use UH's

 8    telephone numbers as a contact number in the

 9    application," right?

10         A.    Correct.

11         Q.    "There is no expectation that a

12    physician will answer the telephone directly,"

13    correct?

14         A.    Correct.

15         Q.    And then she says, "For example,

16    per Ms. Kim, she works with a large hospital

17    system that provides the hospital's main

18    telephone number and the hospital's operator

19    answers the telephone," correct?

20         A.    Yes.

21         Q.    "FYI" -- I can't read that from

22    here.  "FYI, I was very clear with her

23    regarding your concerns, and she assured me

24    that UH complies with CGS's expectations."

25              So are you aware of any other

1   reference, to you, by Carol Meisler that she

2   made to using a general hospital operator

3   number?

4          A.    Well, it says here, according to

5   her conversation with Ms. Kim, Ms. Kim says

6   that it's okay for us to use the main hospital

7   number.

8          Q.    That's how you read that?

9          A.    Yes.

10         Q.    Okay.  And did you think this was a

11  direction to you that you would use the main

12  hospital number?

13         A.    According to her email, that's what

14  it seems like she's telling us to do.

15         Q.    And that's how you read it?

16         A.    Right.

17         Q.    You took this as telling you you

18  should use the main number?

19         A.    Yes.

20         Q.    Why don't you read that one more

21  time and make sure that that's how you read

22  that.  If it is, that's fine.

23         A.    Yes.  And I also responded to that

24  and said that -- I asked her if she was going

25  to tell everybody in the meeting that we can

```
 1    use that main hospital number.  And she came
 2    back and said, No, I did not tell you to use
 3    the main hospital number.
 4         Q.    So was there still any confusion in
 5    your mind after she said --
 6         A.    There is confusion.
 7         Q.    There is?
 8         A.    Yeah.
 9         Q.    Okay.  If you're confused, you're
10    you're confused.  We can't --
11              One of the claims that you've
12    brought, in this lawsuit, is for retaliation,
13    are you aware of that?
14         A.    Yes.
15         Q.    What is it that you believe you
16    were retaliated for?
17              MR. HERRON:  Objection.  Calls for
18    a legal conclusion.
19         Q.    Go ahead.
20              MR. HERRON:  You can answer.
21    Obviously, if you understand her question,
22    obviously, you can answer it, and please do so.
23         A.    Because I was asked to lie on the
24    application, and I didn't.
25         Q.    So that's when you felt that UH was
```

```
 1    taking retaliatory steps against you, is when
 2    you refused to lie?
 3           A.    Yes.
 4                 MR. HERRON:  Objection.  Calls for
 5    legal conclusions, again.
 6           Q.    Is there any other time that you
 7    felt you were retaliated against?
 8                 MR. HERRON:  Same objection.  Calls
 9    for legal conclusions.
10                 MS. KAMINSKI:  Not much of one
11    since she uses the word retaliation throughout
12    her correspondence and letters that she writes.
13           Q.    I'm using retaliation the way you
14    used it.
15           A.    Right.  Again, when I was written
16    up twice, after reporting Paul, and it had no
17    merit, I felt I was retaliated against.
18           Q.    Anything else?
19                 MR. HERRON:  Same objection.
20           A.    Those were the -- yeah, two
21    instances I felt I was retaliated against.
22           Q.    And just to be clear, those two
23    times, when you were written up, those never
24    went into your record?
25           A.    Correct.
```

1        Q.    As to the retaliation on the
2    refusal to lie on the application, who do you
3    believe retaliated against you?
4              MR. HERRON:  Same objection.
5    Again, calls for a legal conclusion.
6         A.    UH.
7         Q.    Who at UH?
8         A.    Who is responsible for dismissing
9    me?
10        Q.    And who do you think is responsible
11   for dismissing you?
12        A.    Steve Riddle.
13        Q.    Anybody else?
14        A.    Well, he gives the directive, so I
15   guess everybody has to follow.  But yeah, he's
16   responsible.
17        Q.    So for you, Steve Riddle is the
18   person that retaliated against you?
19        A.    Yes.
20        Q.    Anybody else?
21             MR. HERRON:  Same objection.
22   Again, calls for legal conclusions.
23        A.    Like I said -- I mean, overall,
24   he's the person responsible for dismissing me.
25   He signed off on my --

1    Q.    Right.  But is there anybody else

2  that you think retaliated against you?

3          MR. HERRON:  Same objection.

4    A.    Probably Sheryl Johnson, she's the

5  one that's responsible for writing me up.

6    Q.    Anybody else?

7          MR. HERRON:  Same objection.

8    A.    That's it.

9    Q.    Okay.

10         -  -  -  -  -

11         (Thereupon, Deposition Exhibit 48,

12         August 30, 2012 Email, was marked

13         for purposes of identification.)

14         -  -  -  -  -

15   Q.    Show you what we'll mark as Exhibit

16  48.  This is an email to Bianca.  And Bianca

17  served in the same role as you did; is that

18  correct?

19   A.    Yes.

20   Q.    And she got an email from CGS.  Are

21  you familiar with Patricia Parham?

22   A.    No.

23   Q.    Saying that she had just left a

24  message.  Patricia says that she just left a

25  message for Bianca, and asked her to call back

1     to verify that Dr. Zhang can be reached at the
2     number that was called.  Did you have occasion
3     where this happened with you, where CGS would
4     leave you a message and ask you to call back?
5          A.    No.  No.  They would call -- if I
6     wasn't at my desk, they would call and --
7     because my phone says Victoria Johnson,
8     provider enrollment.  I almost want to say that
9     most of the time, or -- I mean, there may be a
10    time when she called.  I don't think she sent
11    me an email.  I can't recall.
12         Q.    Let me make sure my question is
13    clear.  I'm not asking you if Patricia, in
14    particular, called or if she sent you an email.
15    I'm asking, did you have occasion where CGS
16    called and left a message for you to call back
17    to confirm the telephone number?
18         A.    I don't recall that.
19               This right here, also, I guess must
20    have been after --
21               MR. HERRON:  She hasn't asked you a
22    question.
23         Q.    What did you say?  What did you
24    want to say?  Go ahead.
25         A.    I was just -- the date on here is

1     August 30, 2012.

2          Q.    Right.

3          A.    I wasn't working then.

4          Q.    I understand that.

5          A.    Okay.

6          Q.    I was asking if you ever had

7     anything like this happen from CGS with you?

8          A.    I don't recall.

9                    -   -   -   -   -

10               (Thereupon, Deposition Exhibit 49,

11               August 2, 2012 Emails, was marked

12               for purposes of identification.)

13                   -   -   -   -   -

14          Q.    I'll show you what I've marked as

15     Exhibit 49.

16               You want to just keep these in a

17     pile in front of you so we keep the originals

18     separate?

19          A.    Okay.

20          Q.    Thank you.  On August 2 you wrote

21     to Sheryl asking to pick up some personal

22     belongings; is that correct?

23          A.    Yes.

24          Q.    And were you able to pick those up?

25          A.    No.

1        Q.     Why not?

2        A.     She never responded -- she said she

3    would have Christine call me.  And I called the

4    person, the receptionist, downstairs in the

5    building and asked if I could come in to pick

6    them up, and she said she was told I wasn't

7    allowed in the building anymore.

8        Q.     And on August 2, did you assume

9    that you were not coming back to work, is that

10   why you were picking up your items?

11       A.     No, I had my calendars and my

12   shoes.

13       Q.     So you still thought you were

14   coming back to work?

15       A.     Yes.

16       Q.     It says, "Please place these items

17   in a sealed envelope and leave them at my front

18   desk."  Did you expect them to place your shoes

19   in an envelope?

20       A.     My calendars, yes.  Not my shoes.

21                    -  -  -  -  -

22               (Thereupon, Deposition Exhibit 50,

23               August 3, 2012 Emails, was marked

24               for purposes of identification.)

25                    -  -  -  -  -

```
1              Q.    I'll show you what I've marked as
2    Exhibit 50.  This is an email chain indicating
3    that you were following up on your request for
4    FMLA; is that correct?
5              A.    Yes.
6              Q.    So you knew who to write at UH in
7    order to find out about that, correct?
8              A.    Yes.
9              Q.    Okay.
10                        -   -   -   -   -
11                   (Thereupon, Deposition Exhibit 51,
12                   August 2012 Emails, was marked for
13                   purposes of identification.)
14                        -   -   -   -   -
15             Q.    I'll show you what I've marked as
16   Exhibit 51.  Bronxvikki@aol.com is you, right?
17   That's your home email account?
18             A.    Yes.
19             Q.    And you're sending to Kathy
20   Springer your return to work as it relates to
21   your fitness for duty, right?
22             A.    Yes.
23             Q.    Did Dr. Dutton say why he didn't
24   want to communicate with anyone?
25             A.    No, he didn't.
```

1          Q.    How did you learn that he didn't
2     want to communicate with anyone?
3          A.    Kathy told me.
4          Q.    So if Kathy told you that, why are
5     you telling that to Kathy again?
6          A.    Okay.  He may have told me, I'm not
7     sure.  It says here, "Does not wish to
8     communicate with anyone."  He may have told me
9     that, I don't recall.
10         Q.    Because Kathy is actually writing
11    you saying, Look, you've told us that your
12    doctor said return to work September 4, but
13    they haven't received that.  And so you're
14    sending it to them.  You actually got the
15    return to work for fitness for duty from
16    Dr. Dutton, and you're sending it to Vikki,
17    right?
18         A.    Sending it to Vikki?
19         Q.    Kathy, I'm sorry.
20               MR. HERRON:  She's Vikki.
21               MS. KAMINSKI:  Yeah, I know.  Thank
22    you.
23         A.    I'm sending her a copy of the FMLA
24    paperwork.  It has to be approved, but this is
25    what he gave to me to have approved.

1      Q.    But if you look at what's attached,
2   what you were sending to Kathy.  This is
3   Dr. Dutton indicating, as you say, that you're
4   fit for --
5      A.    Right, for me to return to FMLA
6   paperwork.
7      Q.    On 8-4-12, correct?
8      A.    Yes.
9      Q.    And you considered this to be about
10  your FMLA and about your fitness for duty,
11  right?
12     A.    My fitness for duty, yes.  Because
13  she asked me to have another psychiatrist --
14  she asked me to go see another psychiatrist.
15     Q.    So as far as you're concerned, as
16  of August 20, you fulfilled the fitness for
17  duty and you have sent them a form, by
18  Dr. Dutton, that shows you're fit for duty as
19  of 8-4-12, correct?  I'm sorry --
20     A.    No, 9-4-12.
21     Q.    9-4-12.  Yeah.
22     A.    He said I can return to work.
23     Q.    Right.
24     A.    Yes.
25     Q.    So he said that you were not fit

```
 1    for duty for the time of 8-4-12 until 9-4-12,
 2    correct?
 3         A.    Well, no, he -- okay.  First seen
 4    was 8-4, continuing.  Right.  Yeah, so that
 5    would be a month, yes.
 6         Q.    So UH had asked you to go out and
 7    get a fit for duty evaluation, and the
 8    psychiatrist you saw said that for a month you
 9    weren't fit for duty, correct?
10         A.    Well, that's what he's saying, yes.
11         Q.    And so he agreed with your family
12    physician, that you had seen, that said you
13    needed to be off on FMLA leave because you
14    weren't fit to work, correct?
15         A.    Correct.
16         Q.    So we have two doctors that say you
17    weren't fit to work, at least up until 9-4-12,
18    correct?
19         A.    Correct.
20         Q.    And you didn't have any confusion,
21    in your mind, that a doctor was saying you
22    could return to work on 9-4-12, did you?
23         A.    Correct.
24         Q.    And as of 9-4-12, what did you then
25    do as far as returning to work?
```

1         A.    Well, I sent this to Kathy

2    Springer, and it was her that was supposed to

3    -- it was she that was supposed to tell me to

4    come back to work, which she never did.

5         Q.    All right.  So you think when you

6    send in the paperwork that says you can be out

7    until 9-4-12, then on 9-4-12 UH then has to

8    tell you to come back to work?

9         A.    Yes.

10        Q.    Okay.  So it looks like, to me,

11   when I look at Exhibit 49 and 50, that if you

12   needed something from UH, or you knew UH needed

13   something from you, you knew who to ask or who

14   to correspond with; is that correct?

15        A.    For the most part.

16                    -  -  -  -  -

17             (Thereupon, Deposition Exhibit 52,

18             August 2012 Emails, was marked for

19             purposes of identification.)

20                    -  -  -  -  -

21        Q.    Let me show you what we've marked

22   as Exhibit 52.  This is August 21, 2012 at

23   in the morning, and you're writing Deborah

24   Rogers, do you see that?

25        A.    Yes.

1          Q.     And this is basically saying that
2     you want to get paid for the time that you were
3     in the office, the three plus hours that you
4     worked on the day, correct?
5          A.     Yes.  That was in July.
6          Q.     Right.  And this was the day that
7     you went in and they said they wanted you to do
8     a fit for duty evaluation, and you just left
9     and went to your doctor and had him say that
10     you needed FMLA, correct?
11          A.     During that meeting, yes.
12          Q.     Pardon me?
13          A.     During that meeting.
14          Q.     Right.  So you're looking to get
15     paid for that time, correct?
16          A.     Yes.
17          Q.     And you knew who to write at UH to
18     have that discussion, correct?
19          A.     She contacted me -- Deborah
20     contacted me and asked me if I worked that day,
21     and I was just explaining to her that I was
22     there until 10:30.
23          Q.     Okay.
24                      -  -  -  -  -
25                 (Thereupon, Deposition Exhibit 53,

```
 1                    August 30, 2012 Letter, was marked
 2                    for purposes of identification.)
 3                         -  -  -  -  -
 4         Q.    Let me show you what I've marked as
 5    Exhibit 53.  That's your address, right, 3646
 6    Lynnfield Road, Shaker Heights, Ohio?
 7         A.    Yes.
 8         Q.    And you received this letter?
 9         A.    I guess I did.
10         Q.    And this is telling you that they
11    know you're not working with Dr. Dutton, and
12    that if you don't provide further information,
13    no later than September 7, your FMLA leave will
14    end, right, as of 8-21-12?
15         A.    That's what's in the letter, yes.
16         Q.    And it tells you that you need to
17    get the return to work authorization form
18    filled out and sent in, correct?
19         A.    That's what it says here, yes.
20         Q.    Did you go to see any physician and
21    have them fill out the certificate of physician
22    for any period of time after 8-21-12?
23         A.    No.
24         Q.    Did you submit a certificate of
25    physician for September 7 -- by September 7,
```

310

```
1    2012?
2         A.    No.
3         Q.    Did you have anybody fill out a
4    return to work authorization form?
5         A.    No.
6                    -  -  -  -  -
7               (Thereupon, Deposition Exhibit 54,
8               October 1, 2012 Letter, was marked
9               for purposes of identification.)
10                   -  -  -  -  -
11        Q.    Let me show you what I've marked as
12   Exhibit 54.  So you were told to come back to
13   work, that your FMLA would end as of 8-21-12,
14   and you needed a return to work authorization.
15   And you didn't come back to work at that time,
16   did you?
17        A.    On October 8?
18        Q.    Right.
19        A.    Yes, I did.
20        Q.    No, by September 21.
21        A.    Wait, say that again, please.
22        Q.    You did not return to work by
23   September 21 of 2012; is that correct?
24        A.    September?
25        Q.    August.  I'm sorry.  August 21?
```

```
 1              A.    No.
 2              Q.    And you didn't submit any further
 3    paperwork for additional leave of any type,
 4    correct?
 5              A.    Correct.
 6              Q.    And then on October 1 you were
 7    sent this letter telling you that your leave of
 8    absence ended on August 21, 2012; is that
 9    correct?
10              A.    Correct.
11              Q.    Which you knew from the prior
12    letter, which is Exhibit 53, correct?
13              A.    Yes.
14              Q.    Despite that, you had not come back
15    to work, and so they tell you to come back to
16    work October 8; is that correct?
17              A.    Yes.
18              Q.    It says in the middle there, "We
19    have reached out to you several times and have
20    had no response from you, and our certified
21    letters have been returned unclaimed by you;"
22    is that correct?
23              MR. HERRON:  If you know.
24    Objection.
25              A.    I don't recall any letters being
```

1    returned.

2         Q.    Had you had any communication with

3    Christina Morrison from August 21, 2012 until

4    this letter, dated October 1, 2012?

5         A.    No.

6         Q.    I'll show you what we've marked as

7    Exhibit 55.  Oops, I'm sorry.  Let me show you

8    what was previously marked as Exhibit 47.  This

9    is your letter to Christina Morrison dated

10   October 5, 2012, is it not?

11        A.    Yes.

12        Q.    And you wrote this letter, right?

13        A.    Yes.

14        Q.    Did anybody help you write the

15   letter?

16        A.    No.

17        Q.    You said that you would return to

18   work on October 8, but you say that you were

19   concerned about several things.  And you say,

20   "First, I have contacted Medicare with respect

21   to my supervisor's continued insistence that I

22   use the billing center address and phone

23   number."  Who did you contact at Medicare?

24        A.    I think her name was Mrs. White.

25   Don't quote me on that.  But I contacted the

1    supervisor and the compliance officer.

2         Q.    And what kind of communications did

3    you have with them?

4         A.    I spoke to the supervisor and she

5    said that she believes that the number was

6    correct, but if I had any other questions to

7    talk to the compliance officer, which I did.

8              And the compliance officer asked me

9    the name of a couple providers which I was

10   talking about, and I gave her two or three

11   names.  And she -- I guess she must have

12   investigated it, but she never returned the

13   call after that.  She said she would, but she

14   never returned the call after that.

15        Q.    So when you called Medicare, the

16   first person told you that the number would be

17   acceptable, correct?

18        A.    Yes.

19        Q.    And then the next person you talked

20   to took some names and was going to investigate

21   it, correct?

22        A.    Correct.

23        Q.    So even after Medicare told you

24   that it was acceptable, and you didn't hear

25   back about the investigation, that there was

1    some problem, you still determined that it was

2    improper?

3         A.    Yes.  I don't believe I explained

4    to the supervisor that we were supposed to put

5    the number of -- our number, as far as the

6    person who is helping complete the application

7    versus the provider's number, which is supposed

8    to be the direct contact number.

9         Q.    So when you were calling and

10   talking to the supervisor, you don't think you

11   explained the situation very well?

12        A.    No, I don't think so.

13        Q.    And the day -- was it October 4

14   that you filed your EEOC complaint?

15        A.    Yes.

16        Q.    And do you know who that EEOC

17   complaint was faxed to?

18        A.    It says here my attorney faxed

19   copies.

20        Q.    Do you know who it was faxed to?

21        A.    I have a copy.  I don't recall.

22        Q.    You have a copy of the faxes?

23        A.    No.  I think -- I don't know

24   whether I have a copy of the person who it was

25   sent to.  I have a letter of who received it,

```
 1    because the EEOC sent me something.
 2              MS. KAMINSKI:  Has that been
 3    produced?
 4              MR. BULEA:  Not that I recall.
 5              MR. HERRON:  That has all been
 6    produced.
 7              MS. KAMINSKI:  Okay.  We'll find
 8    it.
 9         Q.    Now, in this writing, at number
10    three, you say that you're not -- that if
11    you're going to return to work you should not
12    be asked to complete the Medicare, Medicaid,
13    out of state Medicaid and/or any other provider
14    enrollment applications that are prohibited or
15    in violation of their rules.  Meaning Medicare
16    rules -- Medicaid rules, right?
17         A.    Medicare rules, yes.
18         Q.    And you said you wanted to see a
19    company-wide distributed email informing
20    employees that they're no longer permitted to
21    rest at their desks during their breaks.  You
22    meant throughout all of UH?
23         A.    I wasn't concerned about UH, just
24    the building that we're working in.  Because it
25    was -- this email came out during this process
```

1    that we weren't supposed to be taking breaks.
2    However, there were people on the second floor
3    who was sleeping in the lobbies during the
4    breaks.
5        Q.    But you used company-wide instead
6    of building-wide?
7        A.    I meant to say building-wide.
8        Q.    So just a miscommunication on your
9    part?
10       A.    Well, it would seem that if it was
11   in their manual -- I mean, I'm just saying,
12   now, it would seem if it was in their manual it
13   would be company-wide, but I was more concerned
14   about the building.
15       Q.    So on your part, you were asking to
16   make it a building-wide and not a company-wide,
17   so this is a miscommunication, correct?
18       A.    Well, like I just said, it seemed
19   like it would be company-wide if it's going to
20   be something that's directed towards --
21       Q.    But moments ago you told me you
22   intended it to be building-wide, that's what
23   you were concerned about?
24       A.    Yes.  But now I'm explaining to you
25   that it should be company-wide, if it's just --

1      Q.    So now you think you intended
2 company-wide?
3      A.    Yes.
4      Q.    Every building at UH?  All 25 or
5 30,000 employees should get a memo?
6      A.    Yeah.  The manual that we have is
7 company-wide.
8      Q.    Okay.  Five, "Would like to have
9 confirmed and/or reports that Paul Simmons has
10 also place on unpaid administrative leave
11 subject to a mandatory psychiatric evaluation,
12 as I have reported to HR his offensive, sexual
13 behavior back in February of 2012."
14      A.    Yes.
15      Q.    And you wanted them to confirm to
16 you whether or not Paul Simmons had had a
17 psychiatric evaluation; is that correct?
18      A.    Yes.
19      Q.    And you wanted him put on unpaid
20 administrative leave, correct?
21      A.    Yes.
22      Q.    And that was one of the conditions
23 for you to return to work; is that correct?
24      A.    Well, it wasn't a condition.  What
25 I would like to have.  It's not conditional.

```
 1          Q.    Okay.  So you say, "Immediately
 2   upon my returning to work I expect the
 3   following."  But that's not a condition.  You
 4   would return even if --
 5          A.    Would like to have confirmed, yes.
 6   It's not a condition.
 7          Q.    So you would return to work even if
 8   number five wasn't true?
 9          A.    Yes.
10          Q.    Six, "I don't want to be subjected
11   to retaliatory correction actions, be it formal
12   or informal.  I have yet to receive a copy of
13   the corrective actions that were presented to
14   me during my 2011 performance evaluation, that
15   were clearly retaliatory because of my
16   complaint to HR regarding Paul Simmons'
17   offensive sexual behavior."
18                Now, you were told that those
19   corrective actions were never formally filed,
20   correct?
21          A.    Yes, I was.
22          Q.    And were you aware that one of the
23   reasons they weren't formally filed is that
24   they were trying to help you be able -- because
25   you had indicated your desire to move
```

319

1    departments?

2         A.    They weren't filed because they had

3    no merit.

4         Q.    Were you told that they weren't

5    filed because you had a desire to move

6    departments and they were trying to help you be

7    able to achieve your goal?

8         A.    Yes, that's what they told me.  So

9    you create something to make yourself look like

10   you're the good person.

11        Q.    They're just all liars?  Were they

12   just lying to you?

13              MR. HERRON:  Objection.

14   Mischaracterization.

15        A.    I have no response to that.

16        Q.    Do you think that when they told

17   you that they were not filing the corrective

18   action forms in order to help you be able to

19   move departments that they were lying to you?

20        A.    They were being retaliatory.

21        Q.    Were they lying, that they were --

22              MR. HERRON:  Objection.

23        A.    They were lying about -- yes, they

24   were lying about the write-ups.

25        Q.    Were they lying that they didn't

1    file the write-ups in your file?

2         A.    No, they told the truth.  They

3    didn't file them.

4         Q.    And that the reason they didn't

5    file them is because they were trying to help

6    you be able to move departments?

7         A.    That's what they said.  I don't

8    know if it's true or not.

9         Q.    And if it is true, that they were

10   trying to help you, that wouldn't be

11   retaliatory, would it?

12              MR. HERRON:  Objection.  Calls for

13   legal conclusions.

14        A.    Retaliatory is that they wrote them

15   up, yes.

16        Q.    But it wouldn't be retaliatory if

17   they were trying to help you move departments,

18   would it?

19        A.    They hold no merit, so them putting

20   it in my folder doesn't make -- it doesn't

21   matter.

22              MS. KAMINSKI:  Would you read back

23   the question?

24              Listen to the question and see if

25   you can answer what I've asked you, okay?

```
 1              (Thereupon, the record was read.)
 2                   MR. HERRON:   Same objection.
 3         A.     Well, not that, but they were
 4    retaliatory for writing them up.
 5         Q.     What was the first thing you said?
 6    Not -- to try to help you move departments is
 7    not a retaliatory act, is it?
 8         A.     That's not a retaliatory act.
 9         Q.     Okay.   That's what I wanted to say.
10         A.     But the fact that they wrote them
11    up is retaliatory.
12         Q.     I got that.   Let's look at Exhibit
13    55 together.
14                   -  -  -  -  -
15                (Thereupon, Deposition Exhibit 55,
16                October 8, 2012 Letter, was
17                marked for purposes of
18                identification.)
19                   -  -  -  -  -
20         Q.     This is a response to the October 5
21    letter that we just looked at as Exhibit 47,
22    correct?
23         A.     Yes.
24         Q.     And in this letter they take, kind
25    of, point by point the six things that you had
```

1   listed in your October 5 letter, correct?

2        A.    Yes.

3        Q.    Is there -- okay.  And did you

4   receive this letter?

5        A.    Yes, the day that I returned to

6   work.

7        Q.    Okay.

8                   -  -  -  -  -

9              (Thereupon, Deposition Exhibit 56,

10             October 8, 2012 Letter, was marked

11             for purposes of identification.)

12                  -  -  -  -  -

13       Q.    Let me show you what I've marked as

14  Exhibit 56.  This is a letter that was written

15  after you had your meeting on October 8,

16  correct?

17       A.    Yes.

18       Q.    I just want to go through it and

19  make sure if there's any corrections that you

20  would make into the accounting of what

21  happened.  Starting at the -- I guess we'll

22  start at the top.  "This letter confirms the

23  result of your meeting with Angelique," the

24  director of human resources, correct?  And you

25  did meet with Angelique and with --

1          A.     Christina.

2          Q.     -- Christina Morrison, correct?

3          A.     Yes.

4          Q.     And you knew that on October 1 they

5     had sent you a letter, formal notification to

6     return to work, correct?

7          A.     Yes.

8          Q.     And they reviewed with you and

9     discussed the concern you raised in your

10    October 5 letter, right?

11         A.     Yes.

12         Q.     And they informed you that you

13    would be expected to perform all your job

14    duties and responsibilities as a provider

15    enrollment specialist, correct?

16         A.     Yes.

17         Q.     And that included appropriately

18    completing the Medicare, Medicaid, and other

19    provider applications, correct?

20         A.     Yes.

21         Q.     And they said it was an essential

22    function of the job.  And you agree with that,

23    don't you?

24         A.     Yes.

25         Q.     And that you informed them that you

1    would not complete the provider applications as

2    instructed, and if instructed to do so you

3    would refuse to do them; is that accurate?

4         A.    Continuing to put my phone number,

5    in which I -- in order for me to verify I have

6    to lie, so yes, that goes hand in hand.

7         Q.    So that's how you were being

8    instructed to do it, is to put your phone

9    number down, correct?

10        A.    Yes.

11        Q.    And you indicated you wouldn't do

12   that, correct?

13        A.    Yes.

14        Q.    And it says, "As you are aware,

15   your concerns previously brought forth relating

16   to this matter were reviewed and investigated.

17   A response was sent to you from Cheryl Wahl,

18   with a statement that the departmental

19   practices are (and were) appropriate."  That

20   was discussed with you, correct?

21        A.    Yes.

22        Q.    And you were told that you were

23   going to be expected to do your job duty as

24   directed, correct?

25        A.    Yes.

1       Q.    And you were asked if you were

2  refusing to perform that essential function of

3  your job, and you said yes; is that accurate?

4       A.    Yes.

5       Q.    And it was explained to you that UH

6  would give you 24 hours to reconsider, and that

7  if you continue to refuse to perform your job

8  duties you would be terminated.  You were told

9  that, correct?

10      A.    Yes.

11      Q.    And then you told them you didn't

12  need 24 hours, that you weren't going to

13  complete the provider applications as

14  instructed, correct?

15      A.    Yes.

16      Q.    And you were, again, told that they

17  would give you 24 hours, but you stated you

18  didn't want the 24 hours, correct?

19      A.    Yes.

20      Q.    And therefore they terminated your

21  employment October 8, for the refusal to

22  perform the job functions as they ask you to do

23  them, correct?

24      A.    Yes, which includes lying.

25      Q.    And then they tell you if you're

1    going to fax confidential information to fax it

2    to a different place, correct?

3            A.    Yes.

4            Q.    And they sent you a copy of your

5    discharge and corrective action, correct?

6            A.    Yes.

7            Q.    As well as a copy of the complaint

8    resolution policy, correct?

9            A.    Yes.

10           Q.    And did you receive, under separate

11   cover, information regarding your benefits?

12           A.    My benefits?  Can you be specific

13   with that?

14           Q.    It says that you're going to

15   receive, under separate cover, information

16   regarding your benefits.  Did you receive

17   anything about your benefits?

18           A.    That, I don't recall.

19           Q.    Okay.  Have you done your 2013 tax

20   return?

21           A.    Yes.

22           Q.    What was your income last year?

23           MR. HERRON:  Objection.  We gave

24   you all that information.

25           MS. KAMINSKI:  You gave us 2012,

```
 1    didn't you?
 2              MR. BULEA:  He gave us 2013.
 3              MS. KAMINSKI:  Oh, we got it?
 4              MR. BULEA:  Yeah.  Last week.
 5              MS. KAMINSKI:  Last week?  I just
 6    haven't seen it.
 7         Q.    How many houses do you currently
 8    have listed?
 9         A.    Two.  Probably two to four.
10         Q.    You don't know how many houses you
11    have listed?
12         A.    Listed?  Yes, I think it's two.  I
13    think it's two.
14         Q.    So how many houses have you sold in
15    the last four months?
16         A.    I don't remember the exact number.
17         Q.    Approximately?
18         A.    Oh, I can say ten.
19         Q.    So you had a good last four months?
20         A.    Well, these are all bank-owned
21    properties.  They don't net much.
22         Q.    But selling ten is pretty good?
23         A.    Yeah, volume-wise.
24         Q.    Are you doing anything other than
25    your real estate work at this point in time?
```

1           A.     No.

2           Q.     Are you looking for any other work?

3           A.     No.

4           Q.     Is your earning level still at or

5    above the earning level that you had when you

6    worked at UH?

7                  MR. HERRON:  Objection to the

8    phrase earning.

9           A.     Aside from real estate?

10          Q.     No, in general.  Are you making as

11   much money --

12          A.     Well, last year I did.

13          Q.     Right.

14          A.     But I had expenses.

15          Q.     How about this year?  Are you on

16   track to make as much money as you did when you

17   were working at UH?

18          A.     No.

19          Q.     Now, your lawyer provided to us

20   some documents that were produced to him by

21   CGS.  Have you looked at any of those

22   documents?

23          A.     I haven't had an opportunity.

24          Q.     Pardon me?

25          A.     I haven't had an opportunity.

```
 1          Q.    So no is the answer?

 2          A.    No.

 3                      -  -  -  -  -

 4                (Thereupon, Deposition Exhibit 57,

 5                CGS Notes, was marked for purposes

 6                of identification.)

 7                      -  -  -  -  -

 8          Q.    This seems to be the kind of notes

 9    that CGS keeps --

10                MR. HERRON:  Objection.

11          Q.    -- that was produced to us by your

12    lawyer.  And you see in the middle of the page

13    there it says, "I called 216-383-6614."  Was

14    that your number?

15          A.    Yes.

16          Q.    "And spoke to Victoria.  She

17    verified that the provider can be reached at

18    this number;" is that correct?

19          A.    Yes.

20          Q.    And that was in --

21          A.    June 21.

22          Q.    June 21 of 2012, correct?

23          A.    Yes.

24          Q.    And this would indicate that she

25    called you -- the contact back and explained
```

1    that per the Ohio license website, the

2    provider's Ohio license is pending.  She stated

3    that she overlooked that information and asked

4    that the application be withdrawn.  She will,

5    again, submit the application once the provider

6    is licensed in Ohio; is that correct?

7            A.    Yes.

8            Q.    So that was -- so at that time the

9    application, that's being discussed in here,

10   the problem was not that they couldn't contact

11   you, the problem was that you had overlooked

12   some information on the application, correct?

13           A.    Yes.

14           Q.    And you were the right person for

15   them to talk to about that application,

16   correct?

17           A.    Yes.

18           Q.    Did you have occasion when you

19   worked at UH, in the provider specialist role,

20   to have CGS ever call and ask to talk to the

21   doctor?

22           A.    They -- I'm trying -- I've never

23   got a phone call where they asked to talk to

24   the doctor.  I've gotten phone calls from

25   patients to ask to talk to the doctor, and I

1    tell them that they couldn't be reached there.
2    But I don't recall CGS, they never called to
3    to speak to the doctor.
4         Q.    You got calls from patients.  Did
5    you give the patients the right number to call
6    since you had the directory right there?
7         A.    We couldn't transfer them, but --
8         Q.    Did you give them the right number,
9    though?
10        A.    Yes.
11        Q.    You did?
12        A.    Uhm-hum.
13        Q.    You didn't just let the patients --
14        A.    Yeah, I wouldn't do that.
15        Q.    Now, but for CGS's purposes, when
16   they called you and needed to know this
17   information about the Ohio license, you were
18   the right person to be called, correct?
19        A.    Yes.
20        Q.    Because you were the one that
21   filled out that application and could be most
22   helpful, correct?
23        A.    Yes.
24        Q.    And had they called the doctor's
25   office, the doctor's office would have had to

1    have given them your number, correct?

2              MR. HERRON:  Objection.

3         Q.    Because you're the one that does

4    the application?

5              MR. HERRON:  Objection.

6    Speculative.

7         A.    The doctor is supposed to provide

8    us with that information to send to CGS.

9         Q.    I understand that.  But if CGS had

10   called the doctor, the doctor's office would

11   have sent them to you because you're the ones

12   responsible for the doctor for doing the

13   applications, correct?

14             MR. HERRON:  Objection.

15   Speculative.  If you know what they would have

16   done, you can --

17        A.    They would have contacted their --

18   at each provider's office there's the -- I

19   forgot the name of the group.  But they're

20   responsible for the doctors obtaining the

21   license.

22        Q.    Yeah, but we're talking about the

23   application and whether the application is

24   missing some information or not.

25        A.    Right.

```
 1        Q.    If CGS calls the doctor's office
 2   about missing information on an application,
 3   they would have said, Well, call the people who
 4   do the application.
 5        A.    Correct.  That's correct.  They
 6   would have called the location itself.  But the
 7   doctor has to give them permission to contact
 8   us, which we put on the application, again.
 9              MR. HERRON:  Can we take five?
10              MS. KAMINSKI:  Sure.
11              (Recess taken.)
12        Q.    What is your commission structure
13   for your real estate business?
14        A.    It varies.  It's a graduated, so it
15   starts at 65, and then at some point it goes to
16   70.
17        Q.    What does 65 and 70 mean?  Explain
18   that to me.
19        A.    I'm sorry.  I get 65 percent and my
20   broker gets 35 percent.  Then it changes to --
21        Q.    And what is the commission that you
22   get on each house?
23        A.    It varies.  Most of them are,
24   like -- bank-owned properties, they're $1,500,
25   and it's split 65 percent minus errors and
```

1    emissions, so it could be about $800?

2         Q.    And nonbank-owned properties?

3         A.    It's usually three percent.

4         Q.    Three percent of the selling price?

5         A.    Yes.

6         Q.    The gross selling price?

7         A.    Yes.  But then that has to be split

8    between my broker and I.

9         Q.    And most of the business that you

10   do are bank-owned properties?

11        A.    Yes.

12        Q.    Do you have listings that are not

13   bank-owned properties?

14        A.    No.  The two or three listings that

15   I have, they are bank-owned.

16        Q.    And how do you get those listings?

17        A.    Well, my broker, he -- I guess I'm

18   assisting him with the bank-owned properties

19   until -- I was anticipating going back to UH.

20        Q.    When were you anticipating going

21   back to UH?

22        A.    On October 8.  And then I can think

23   that's part of my claim for reinstatement of my

24   position.

25        Q.    So you still want to come back to

335

```
 1    work for UH?
 2         A.    Yes.
 3         Q.    Now, remember the March review that
 4    you got that had the two write-ups, that
 5    weren't put in your file.  You know what I'm
 6    talking about, don't you?
 7         A.    Yes.
 8         Q.    The time period.
 9         A.    Yes.
10         Q.    After that March write-up, March
11    review and the two write-ups, did you incur any
12    pay cut?
13         A.    Any pay cut?
14         Q.    Yes.
15         A.    No, I never got a pay cut.
16         Q.    Did you get a pay raise?
17         A.    No, I didn't get a pay raise.
18         Q.    Did anybody get a pay raise at that
19    time?
20         A.    I don't know.  That's personal
21    information.
22         Q.    Were you given less vacation after
23    that March meeting?
24         A.    After that March meeting, no.  I
25    didn't earn any vacation during my time off
```

1    from July through October.

2         Q.    And after that March meeting, did

3    the place that you sit change at all?

4         A.    No.

5         Q.    Did you have a different supervisor

6    after that March meeting?

7         A.    No.

8         Q.    Were you supposed to have any type

9    of -- were you expecting any promotion in

10   March?

11        A.    No.

12        Q.    Did your day-to-day activities

13   change in any way after March?

14             MR. HERRON:  Objection to form.

15        Q.    Your duties, did your duties

16   change?

17             MR. HERRON:  That's better.

18        A.    Yes, they did.

19        Q.    And how did they change?

20        A.    Well, the person from the IT

21   department, she left.  And I guess instead of

22   them hiring someone to replace her, they made

23   it mandatory that we perform the duties that

24   she had.  And -- well, that was another thing

25   we had to do.  When we got the PINs from

1    Medicare, with regard to the application, you

2    know, for Medicare enrollment, we were told to

3    immediately put them into the system.  So

4    that's what the extra duties were.

5            Q.    Okay.  And did everybody in your

6    department have those extra duties?

7            A.    Yes.

8            Q.    On October 8, when you went into

9    work, were you intending to be employed at UH

10   after that?

11           A.    Yes.

12           Q.    And if you had said that you would

13   put down your phone number on the applications,

14   would you still be employed there?

15           A.    No, because I would have to lie,

16   also.

17                 MR. HERRON:  Objection.

18   Speculative.

19           Q.    Because what?

20           A.    I would have to continue to lie,

21   also.

22           Q.    Yeah, that's not what I'm asking.

23   I'm saying that if you had told them, I'll put

24   down my phone number, and agreed to do that,

25   agreed to put down your phone number, would you

1    have been fired that day?

2              MR. HERRON:  Objection.

3    Speculative.

4         A.    That, I don't know because they

5    both go hand in hand.

6         Q.    Right.  So, for you, the only

7    reason you know of that you were fired is once

8    you said you would not put that phone number

9    down, right?

10             MR. HERRON:  Objection.  You can

11   answer, if you know.

12        A.    That, I don't know.

13        Q.    That's what you were told on that

14   day, right?

15        A.    They expected me to continue to

16   perform my duties as I had in the past.

17        Q.    Right.

18        A.    And that would entail putting the

19   number down, and then also lying to verify.

20        Q.    And?

21        A.    And completing the applications on

22   behalf of the doctors.

23        Q.    And they actually told you, Go

24   think about whether you are willing to do this

25   or not, because we're going to hold your job

```
 1    for 24 hours while you think about that, right?
 2                 MR. HERRON:  Asked and answered.
 3         A.    I'm not going to change my position
 4    on that.
 5         Q.    I understand you're not, but they
 6    said that they would hold your job for 24
 7    hours?
 8         A.    Yes, they did say that.
 9                 MR. HERRON:  Asked and answered.
10         Q.    And was there any other thing that
11    they wanted you to think about for 24 hours,
12    other than whether or not you would put the
13    phone number down that you were being requested
14    to put down?
15         A.    No, that's what they told me it
16    was.
17                 MS. KAMINSKI:  We have nothing
18    further.
19                 Have we got all the documents?  We
20    don't have all the medical records yet, right?
21                 MR. HERRON:  Actually, I think you
22    do because I went through them last night,
23    after I got your email, Don.  The stuff from
24    Dr. Abbass --
25                 MR. BULEA:  Yeah.
```

1          MR. HERRON:  -- whoever, the guy

2     who did the surgery, is actually in the records

3     we gave you earlier.  The surgical records are

4     all there.  And I think you have everything

5     from Dr. Dutton, even though he continues not

6     to respond to my requests.  And I don't know

7     what Bedford ER is.

8          MR. BULEA:  She had testified,

9     during the first deposition, that in mid-August

10    she went to the emergency because of some

11    condition.

12          THE WITNESS:  Sinus.

13          MR. HERRON:  I saw references to

14    sinuses in there, so I think you have all of

15    that anyway.  It's already in -- I believe it

16    was Dr. Headen --

17          MR. BULEA:  I know Dr. Headen took

18    notes on the fact that Victoria was reporting

19    this to her.

20          MR. HERRON:  I think you have

21    everything that exists.

22          MR. BULEA:  Okay.

23          MR. HERRON:  We got some releases

24    that she signed if you guys wanna -- I don't

25    care.

1          MR. BULEA:  Yeah.  If you just send
2    them over.
3          MR. HERRON:  Have at it.  It
4    doesn't make a difference to me.  You're not
5    going to find anything in there that you don't
6    already know or that's going to help you in any
7    way in this case.
8          MS. KAMINSKI:  Okay.  Very good.
9    Thank you.
10       (Deposition concluded at 11:37 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    It was agreed by and between counsel and the

7    parties that the Deponent will read and sign

8    the transcript of said deposition.

9

10                TRANSCRIPT DELIVERY:

11   Counsel was requested to give instruction

12   regarding delivery date of transcript.

13              Original:  Ms. Kaminski

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              REPORTER'S CERTIFICATE
 2    The State of Ohio,   )
 3                                  SS:
 4    County of Cuyahoga.  )
 5
 6              I, Christine Zarife Green, a Notary
 7    Public within and for the State of Ohio, duly
 8    commissioned and qualified, do hereby certify
 9    that the within named witness, VICTORIA DEBRA
10    JOHNSON, was by me first duly sworn to testify
11    the truth, the whole truth and nothing but the
12    truth in the cause aforesaid; that the
13    testimony then given by the above-referenced
14    witness was by me reduced to stenotypy in the
15    presence of said witness; afterwards
16    transcribed, and that the foregoing is a true
17    and correct transcription of the testimony so
18    given by the above-referenced witness.
19              I do further certify that this
20    deposition was taken at the time and place in
21    the foregoing caption specified and was
22    completed without adjournment.
23
24
25
```

1        I do further certify that I am not a

2  relative, counsel or attorney for either party,

3  or otherwise interested in the event of this

4  action.

5        IN WITNESS WHEREOF, I have hereunto

6  set my hand and affixed my seal of office at

7  Cleveland, Ohio, on this ___4Th___ day of

8  ___JUNe___, 20_14_.

9

10

11

12

13      _Christine Z Green_

14      Christine Zarife Green, Notary Public

15      within and for the State of Ohio

16

17  My commission expires October 29, 2017.

18

19

20

21

22

23

24

25

```
1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
2
         ASSIGNMENT NO: 1871104
3        CASE NAME: Johnson, Victoria D. v. University Hospitals
         DATE OF DEPOSITION: 5/29/2014
4        WITNESS' NAME: Victoria Debra Johnson

5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.

7        I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____         _____
9      Date                       Victoria Debra Johnson

10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                  _____
18                Notary Public

19                _____
                  Commission Expiration Date
20

21

22

23

24

25
```

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT NO: 1871104
CASE NAME: Johnson, Victoria D. v. University Hospitals
DATE OF DEPOSITION: 5/29/2014
WITNESS' NAME: Victoria Debra Johnson

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____          _____
   Date                    Victoria Debra Johnson

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

```
                          ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
                   ASSIGNMENT NO: 1871104

     PAGE/LINE(S) /         CHANGE         /REASON

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____


     _____       _____
        Date                   Victoria Debra Johnson

     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

     DAY OF _____, 20_____ .

                      _____
                      Notary Public

                      _____
                      Commission Expiration Date
```

**A**

**abbass** 339:24
**able** 301:24 318:24 319:7 319:18 320:6
**abovereferenced** 343:13 343:18
**absence** 311:8
**accept** 287:6
**acceptable** 289:6 313:17 313:24
**account** 303:17
**accounting** 322:20
**accurate** 324:3 325:3
**achieve** 319:7
**acknowledge** 345:11 346:16
**act** 321:7,8 345:14 346:20
**action** 319:18 326:5 344:4
**actions** 318:11,13,19
**activities** 336:12
**additional** 311:3
**address** 309:5 312:22
**adjournment** 343:22
**administrative** 317:10,20
**affixed** 344:6 345:15 346:21
**aforesaid** 343:12
**age** 279:2
**ago** 279:9 316:21
**agree** 287:16 323:22
**agreed** 306:11 337:24,25 342:6
**ahead** 287:4 296:19 300:24
**aimed** 290:10,14,16
**allowed** 302:7
**angelique** 322:23,25
**answer** 279:13 285:19,22 286:4,5,14,23 287:18 288:11,14 294:12 296:20,22 320:25 329:1 338:11
**answered** 339:2,9
**answers** 286:3 287:20,21 294:19

**anticipating** 334:19,20
**anybody** 298:13,20 299:1 299:6 310:3 312:14 335:18
**anymore** 302:7
**anyway** 340:15
**aol** 303:16
**appear** 345:11 346:15
**appearances** 276:1 277:3
**appended** 346:11,18
**application** 294:9 296:24 298:2 314:6 330:4,5,9 330:12,15 331:21 332:4 332:23,23 333:2,4,8 337:1
**applications** 315:14 323:19 324:1 325:13 332:13 337:13 338:21
**appointed** 286:7
**appointment** 280:15,20
**appropriate** 324:19
**appropriately** 323:17
**approve** 290:8
**approved** 282:25 283:2 293:11 304:24,25
**approximately** 327:17
**arbitrarily** 286:16
**aside** 328:9
**asked** 284:22 292:15 293:3 295:24 296:23 299:25 300:21 302:5 305:13,14 306:6 308:20 313:8 315:12 320:25 325:1 330:3,23 339:2,9
**asking** 300:13,15 301:6 301:21 316:15 337:22
**assignment** 345:2 346:2 347:2
**assisting** 334:18
**assume** 286:25 287:6,14 288:25 302:8
**assumptions** 287:10,12
**assured** 294:23
**attached** 305:1 346:7
**attorney** 314:18 344:2
**audibly** 279:13
**august** 278:4,5,6,7,8,9 299:12 301:1,11,20

302:8,23 303:12 305:16 307:18,22 309:1 310:25 310:25 311:8 312:3
**authorization** 309:17 310:4,14
**authorize** 346:11
**aware** 294:25 296:13 318:22 324:14

**B**

**back** 280:9 284:7 285:15 285:16 287:3,23 288:1 288:3,8 289:21 290:6 291:13 293:6 296:2 299:25 300:4,16 302:9 302:14 307:4,8 310:12 310:15 311:14,15 313:25 317:13 320:22 329:25 334:19,21,25
**bankowned** 327:20 333:24 334:10,13,15,18
**basically** 308:1
**bedford** 307:7
**behalf** 276:3,11 338:22
**behavior** 317:13 318:17
**believe** 282:20 283:9,21 286:10,11,19 296:15 298:3 314:3 340:15
**believes** 313:5
**belongings** 301:22
**belongs** 281:1
**benefits** 326:11,12,16,17
**better** 288:23 290:25 336:17
**bianca** 299:16,16,25
**billing** 289:22 291:16,20 293:12,16,19 312:22
**board** 284:15,16,17
**bottom** 286:7
**break** 289:18,23 291:12 291:17 292:16,17,18 293:3
**breaks** 315:21 316:1,4
**bring** 290:6
**broker** 333:20 334:8,17
**bronxvikki** 303:16
**brought** 296:12 324:15
**building** 290:6 302:5,7

315:24 316:14 317:4
**buildingwide** 316:6,7,16 316:22
**bulea** 276:14 315:4 327:2 327:4 339:25 340:8,17 340:22 341:1
**business** 333:13 334:9

**C**

**calendars** 302:11,20
**call** 287:20 299:25 300:4 300:5,6,16 302:3 313:13,14 330:20,23 331:5 333:3
**called** 279:2 300:2,10,14 300:16 302:3 313:15 329:13,25 331:2,16,18 331:24 332:10 333:6
**calling** 293:11,16 314:9
**calls** 296:17 297:4,8 298:5,22 320:12 330:24 331:4 333:1
**cant** 279:14 281:22,25 286:1,15 288:25 290:17 294:21 296:10 300:11
**caption** 343:21
**care** 340:25
**carol** 280:5 281:2 285:24 286:4,6,11 287:3 288:5 288:8,16 293:10,15 294:2 295:1
**case** 275:8 290:9 341:7 345:3 346:3
**caught** 292:3
**cause** 343:12
**center** 312:22
**certificate** 277:10 309:21 309:24 343:1 346:11
**certification** 345:1 346:1
**certified** 279:4 311:20
**certify** 343:8,19 344:1
**cgs** 278:13 288:19,22 289:4 293:11 299:20 300:3,15 301:7 328:21 329:5,9 330:20 331:2 332:8,9 333:1
**cgss** 294:24 331:15
**chain** 303:2

**change** 336:3,13,16,19
339:3 346:8 347:3
**changes** 333:20 345:7
346:7,9
**characterization** 289:2
289:10 291:3
**cheryl** 324:17
**christina** 292:14,20,22
312:3,9 323:1,2
**christine** 275:22 302:3
343:6 344:14
**circumstances** 288:21
**civil** 279:3 342:3 345:5
346:5
**claim** 334:23
**claims** 296:11
**clear** 294:22 297:22
300:13
**clearly** 318:15
**cleveland** 275:20 276:7
276:16 344:7
**com** 276:9,18,19 303:16
**come** 288:8 302:5 307:4,8
310:12,15 311:14,15
334:25
**comes** 287:3
**coming** 302:9,14
**commission** 333:12,21
344:17 345:19 346:25
347:25
**commissioned** 343:8
**common** 275:1
**communicate** 303:24
304:2,8
**communication** 312:2
**communications** 313:2
**companywide** 315:19
316:5,13,16,19,25
317:2,7
**comparing** 291:19
**comparison** 291:21
**complaint** 314:14,17
318:16 326:7
**complete** 314:6 315:12
324:1 325:13
**completed** 343:22
**completing** 323:18
338:21

**compliance** 313:1,7,8
**complies** 294:24
**compromising** 280:3
**concern** 281:14 323:9
**concerned** 290:16 305:15
312:19 315:23 316:13
316:23
**concerns** 294:23 324:15
**concluded** 341:10
**conclusion** 296:18 298:5
**conclusions** 297:5,9
298:22 320:13
**condition** 317:24 318:3,6
340:11
**conditional** 317:25
**conditions** 317:22
**confidential** 326:1
**confirm** 300:17 317:15
**confirmed** 317:9 318:5
**confirms** 322:22
**conflict** 284:15
**conflicting** 286:3,4,5
**confused** 296:9,10
**confusion** 296:4,6 306:20
**considered** 290:7 305:9
**consultation** 282:14
**contact** 294:8 312:23
314:8 329:25 330:10
333:7
**contacted** 308:19,20
312:20,25 332:17
**continue** 325:7 337:20
338:15
**continued** 312:21
**continues** 340:5
**continuing** 306:4 324:4
**conversation** 295:5
**copies** 314:19
**copy** 304:23 314:21,22,24
318:12 326:4,7
**correct** 279:23 283:5
284:1,3 285:11,12
286:8 293:12,17 294:3
294:10,13,14,19 297:25
299:18 301:22 303:4,7
305:7,19 306:2,9,14,15
306:18,19,23 307:14
308:4,10,15,18 309:18

310:23 311:4,5,9,10,12
311:16,22 313:6,17,21
313:22 316:17 317:17
317:20,23 318:20
321:22 322:1,16,24
323:2,6,15,19 324:9,12
324:20,24 325:9,14,18
325:23 326:2,5,8
329:18,22 330:6,12,16
331:18,22 332:1,13
333:5,5 343:17
**correction** 318:11
**corrections** 322:19
346:17
**corrective** 318:13,19
319:17 326:5
**correctly** 287:2
**correspond** 307:14
**correspondence** 297:12
**couldnt** 330:10 331:1,7
**counsel** 342:1,6,11 344:2
**county** 275:2 343:4
345:10 346:15
**couple** 313:9
**court** 275:1 277:13 345:7
**cover** 326:11,15
**create** 319:9
**cri** 275:22
**currently** 327:7
**custody** 277:12
**customer** 287:20
**cut** 335:12,13,15
**cuyahoga** 275:2 343:4

**D**

**date** 282:18 300:25
342:12 345:3,9,19
346:3,13,25 347:20,25
**dated** 312:4,9
**day** 281:23 291:14 308:4
308:6,20 314:13 322:5
338:1,14 344:7 345:16
346:22 347:22
**daytoday** 336:12
**dbulea** 276:19
**deborah** 307:23 308:19
**debra** 275:16 277:7
279:1,6 343:9 345:4,9

346:4,13 347:20
**deed** 345:14 346:20
**defendant** 275:13 276:11
**delivery** 342:10,12
**department** 336:21 337:6
**departmental** 324:18
**departments** 319:1,6,19
320:6,17 321:6
**deponent** 342:7
**deposed** 279:5
**deposition** 275:15 279:9
279:12 299:11 301:10
302:22 303:11 307:17
308:25 310:7 321:15
322:9 329:4 340:9
341:10 342:8 343:20
345:1,3 346:1,3
**description** 278:3
**desire** 318:25 319:5
**desk** 290:7 292:14,21
300:6 302:18
**desks** 315:21
**despite** 311:14
**determined** 314:1
**didnt** 284:25 285:4
288:19 289:3 296:24
303:23,25 304:1 306:20
310:15 311:2 313:24
319:25 320:3,4 325:11
325:18 327:1 331:13
335:17,25
**difference** 341:4
**different** 283:12 287:19
287:21,24 288:2,3,7
293:20 326:2 336:5
**direct** 314:8
**directed** 316:20 324:24
**direction** 287:15,15
295:11
**directive** 298:14
**directly** 288:15 294:12
**director** 322:24
**directory** 331:6
**discharge** 326:5
**discharged** 283:9
**discussed** 323:9 324:20
330:9
**discussion** 308:18

**dismissing** 298:8,11,24
**distributed** 315:19
**doctor** 282:17,19 288:15
 289:7 304:12 306:21
 308:9 330:21,24,25
 331:3 332:7,10,12
 333:7
**doctors** 306:16 331:24,25
 332:10,20 333:1 338:22
**document** 279:16 280:11
 293:25
**documents** 328:20,22
 339:19
**doesnt** 291:5 320:20,20
 341:4
**doing** 287:2 327:24
 332:12
**don** 339:23
**donald** 276:14
**dont** 280:12,21,25 281:5
 281:21 283:17,18
 286:10,24 287:21,25
 289:11 290:12,19,20
 291:7,10,15,22 292:4,8
 293:1,5 295:20 300:10
 300:18 301:8 304:9
 309:12 311:25 312:25
 314:3,10,12,21,23
 318:10 320:7 323:23
 326:18 327:10,16,21
 331:2 335:6,20 338:4
 338:12 339:20 340:6,24
 341:5
**doubt** 285:24
**downstairs** 302:4
**dozed** 292:15
**dr** 281:12 282:14,20,21
 283:3,6,8,11,15,20,22
 283:24,25 284:2,8,22
 284:23,24 285:1,5,6
 300:1 303:23 304:16
 305:3,18 309:11 339:24
 340:5,16,17
**duly** 279:4 343:7,10
**duties** 280:2 323:14
 325:8 336:15,15,23
 337:4,6 338:16
**dutton** 282:21 283:3,20

**duty** 280:15,20 303:21
 304:15 305:10,12,17,18
 306:1,7,9 308:8 324:23

___

**E**

**earlier** 340:3
**earn** 335:25
**earning** 328:4,5,8
**east** 275:20 276:15
**eeoc** 314:14,16 315:1
**either** 293:5 344:2
**email** 278:4 292:25 294:1
 295:13 299:12,16,20
 300:11,14 303:2,17
 315:19,25 339:23
**emails** 278:5,6,7,8 301:11
 302:23 303:12 307:18
**emergency** 340:10
**emissions** 334:1
**employed** 337:9,14
**employees** 315:20 317:5
**employment** 325:21
**ended** 279:11 311:8
**enrollment** 300:8 315:14
 323:15 337:2
**entail** 338:18
**entered** 346:9
**entire** 345:5 346:5
**envelope** 302:17,19
**environment** 280:9
**er** 340:7
**errata** 346:7,10,18 347:1
**errors** 333:25
**esq** 276:5,13,14
**essential** 323:21 325:2
**estate** 327:25 328:9
 333:13
**evaluation** 306:7 308:8
 317:11,17 318:14
**event** 344:3
**everybody** 295:25 298:15
 337:5
**evidence** 287:11
**exact** 327:16

**exactly** 287:2
**examination** 277:7 279:2
 279:6
**example** 294:15
**excuse** 293:14
**executed** 346:10
**execution** 345:14 346:19
**exhibit** 277:12 278:4,5,6
 278:7,8,9,10,11,12,13
 279:11 285:16 292:10
 293:6,7,9 299:11,15
 301:10,15 302:22 303:2
 303:11,16 307:11,17,22
 308:25 309:5 310:7,12
 311:12 312:7,8 321:12
 321:15,21 322:9,14
 329:4
**exhibits** 277:5,13 278:1
 279:10
**exists** 340:21
**expect** 302:18 318:2
**expectation** 294:11
**expectations** 294:24
**expected** 323:13 324:23
 338:15
**expecting** 336:9
**expenses** 328:14
**expiration** 345:19 346:25
 347:25
**expires** 344:17
**explain** 290:2 333:17
**explained** 314:3,11 325:5
 329:25
**explaining** 287:1 308:21
 316:24
**extra** 337:4,6

___

**F**

**fact** 321:10 340:18
**facts** 287:11
**familiar** 299:21
**family** 306:11
**far** 305:15 306:25 314:5
**fax** 326:1,1
**faxed** 314:17,18,20
**faxes** 314:22
**february** 317:13
**felt** 290:13 296:25 297:7

 297:17,21
**file** 320:1,1,3,5 335:5
**filed** 314:14 318:19,23
 319:2,5
**filing** 319:17
**fill** 282:24 288:17 309:21
 310:3
**filled** 309:18 331:21
**find** 303:7 315:7 341:5
**fine** 295:22
**finish** 279:8
**fired** 338:1,7
**first** 279:4 306:3 312:20
 313:16 321:5 340:9
 343:10
**fit** 280:14,20 305:4,18,25
 306:7,9,14,17 308:8
**fitness** 303:21 304:15
 305:10,12,16
**five** 317:8 318:8 333:9
**floor** 316:2
**fmla** 280:4 282:23 283:4
 303:4 304:23 305:5,10
 306:13 308:10 309:13
 310:13
**folder** 320:20
**follow** 298:15
**following** 303:3 318:3
**follows** 279:5
**foregoing** 343:16,21
 345:13 346:18
**forgot** 332:19
**form** 305:17 309:17
 310:4 336:14
**formal** 318:11 323:5
**formally** 318:19,23
**forms** 288:17 319:18
**forth** 324:15
**four** 287:24 327:9,15,19
**free** 345:14 346:20
**front** 279:10,17 301:17
 302:17
**fulfilled** 305:16
**function** 323:22 325:2
**functions** 325:22
**further** 289:6 309:12
 311:2 339:18 343:19
 344:1

**fyi** 294:21,22

**G**

**general** 293:11,16,17,19
  293:20 295:2 328:10
**getting** 286:3,4 287:19
**giffen** 275:19 276:12
**give** 325:6,17 331:5,8
  333:7 342:1,11
**given** 332:1 335:22
  343:13,18
**gives** 298:14
**giving** 286:17,20,25
**go** 280:8 284:7 285:4,15
  287:4,25 289:14 290:6
  292:9 293:6 296:19
  300:24 305:14 306:6
  309:20 322:18 338:5,23
**goal** 319:7
**goes** 324:6 333:15
**going** 295:24 313:20
  315:11 316:19 324:23
  325:12 326:1,14 334:19
  334:20 338:25 339:3
  341:5,6
**good** 287:13 294:5
  319:10 327:19,22 341:8
**gotten** 330:24
**graduated** 333:14
**green** 275:22 343:6
  344:14
**gross** 334:6
**group** 289:22 291:16
  332:19
**guess** 281:22 283:18
  290:2 298:15 300:19
  309:9 313:11 322:21
  334:17 336:21
**guy** 340:1
**guys** 340:24

**H**

**hand** 324:6,6 338:5,5
  344:6
**handwriting** 279:17
  285:17,21
**happen** 301:7
**happened** 300:3 322:21

**hasnt** 300:21
**havent** 304:13 327:6
  328:23,25
**headen** 340:16,17
**hear** 313:24
**heights** 309:6
**hello** 294:5
**help** 279:19,25 312:14
  318:24 319:6,18 320:5
  320:10,17 321:6 341:6
**helpful** 331:22
**helping** 314:6
**hereinafter** 279:4
**hereunto** 344:5
**herron** 276:4,5 286:13,22
  287:9,17 289:1,9
  290:12 291:2 293:13,18
  296:17,20 297:4,8,19
  298:4,21 299:3,7
  300:21 304:20 311:23
  315:5 319:13,22 320:12
  321:2 326:23 328:7
  329:10 332:2,5,14
  333:9 336:14,17 337:17
  338:2,10 339:2,9,21
  340:1,13,20,23 341:3
**herronlaw** 276:9
**hes** 298:15,24 306:10
**hiring** 336:22
**hold** 320:19 338:25 339:6
**home** 303:17
**hospital** 288:13,18 289:5
  293:17,20,22 294:16
  295:2,6,12 296:1,3
**hospitals** 275:10 294:17
  294:18 345:3 346:3
**hours** 308:3 325:6,12,17
  325:18 339:1,7,11
**house** 333:22
**houses** 327:7,10,14
**hr** 317:12 318:16
**human** 322:24

**I**

**idea** 291:23
**identification** 299:13
  301:12 302:24 303:13
  307:19 309:2 310:9

  321:18 322:11 329:6
**ii** 275:16
**ill** 287:8,9 301:14 303:1
  303:15 312:6 337:23
**im** 282:11 287:19,24
  289:8,12 292:18 297:13
  300:13,15 304:6,19,23
  305:19 310:25 312:7
  316:11,24 330:22
  333:19 334:17 335:5
  337:22,23 339:3
**immediately** 318:1 337:3
**improper** 314:2
**included** 323:17
**includes** 325:24
**income** 326:22
**incorporated** 346:12
**incur** 335:11
**index** 277:1,5 278:1
**indicate** 290:15 329:24
**indicated** 282:18 318:25
  324:11
**indicating** 281:14 303:2
  305:3
**informal** 318:12
**information** 282:15
  283:10 309:12 326:1,11
  326:15,24 330:3,12
  331:17 332:8,24 333:2
  335:21
**informed** 323:12,25
**informing** 315:19
**insistence** 312:21
**insisting** 280:3
**instances** 297:21
**instructed** 324:2,2,8
  325:14
**instruction** 342:2,11
**integrity** 280:1
**intended** 316:22 317:1
**intending** 337:9
**interested** 344:3
**investigate** 313:20
**investigated** 313:12
  324:16
**investigation** 313:25
**isnt** 283:1
**items** 302:10,16

**ive** 287:3 301:14 303:1,15
  309:4 310:11 320:25
  322:13 330:22,24

**J**

**job** 323:13,22 324:23
  325:3,7,22 338:25
  339:6
**johnson** 275:4,16 277:7
  279:1,6,8 291:8 299:4
  300:7 343:10 345:3,4,9
  346:3,4,13 347:20
**july** 308:5 336:1
**june** 329:21,22

**K**

**kaminski** 275:19 276:12
  276:13 277:8 279:7
  287:13 293:22 297:10
  304:21 315:2,7 320:22
  326:25 327:3,5 333:10
  339:17 341:8 342:13
**kathy** 282:7,9 283:21,24
  285:9 303:19 304:3,4,5
  304:10,19 305:2 307:1
**keep** 301:16,17
**keeps** 329:9
**kerin** 276:13
**kim** 294:6,6,16 295:5,5
**kind** 280:23 288:22 313:2
  321:24 329:8
**kkaminski** 276:18
**knew** 284:21,23 285:13
  286:6 303:6 307:12,13
  308:17 311:11 323:4
**know** 280:23 282:2,5
  284:13 286:14,23,24
  287:18,21,25 290:19,20
  291:7,22 292:4 304:21
  309:11 311:23 314:16
  314:20,23 320:8 327:10
  331:16 332:15 335:5,20
  337:2 338:4,7,11,12
  340:6,17 341:6
**knows** 292:18

**L**

**ladaika** 280:5

**large** 294:16
**law** 276:4
**lawful** 279:1
**lawsuit** 296:12
**lawyer** 328:19 329:12
**learn** 304:1
**leave** 280:7,8 283:4 290:5
  300:4 302:17 306:13
  309:13 311:3,7 317:10
  317:20
**led** 292:24
**left** 299:23,24 300:16
  308:8 336:21
**lefthand** 279:20
**legal** 296:18 297:5,9
  298:5,22 320:13 347:1
**letter** 278:9,10,11,12
  280:13 309:1,8,15
  310:8 311:7,12 312:4,9
  312:12,15 314:25
  321:16,21,24 322:1,4
  322:10,14,22 323:5,10
**letters** 297:12 311:21,25
**level** 328:4,5
**liar** 286:11,16
**liars** 319:11
**license** 330:1,2 331:17
  332:21
**licensed** 330:6
**lie** 296:23 297:2 298:2
  324:6 337:15,20
**line** 287:20 346:7 347:3
**listed** 322:1 327:8,11,12
  346:7,17
**listen** 320:24
**listing** 346:7
**listings** 334:12,14,16
**llc** 275:19 276:12
**lobbies** 316:3
**location** 285:20,23 333:6
**longer** 289:24,25 291:18
  315:20
**look** 292:2 293:6 294:1
  304:11 305:1 307:11
  319:9 321:12
**looked** 293:10 321:21
  328:21
**looking** 308:14 328:2

**looks** 279:21 307:10
**lunch** 289:19 290:5,6,8,9
  290:24 291:13,14
**lying** 319:12,19,21,23,24
  319:25 325:24 338:19
**lyn** 276:13
**lynnfield** 309:6

---

**M**

**main** 288:13,18,24 289:5
  294:17 295:6,11,18
  296:1,3
**making** 328:10
**mandatory** 317:11
  336:23
**manual** 316:11,12 317:6
**march** 335:3,10,10,23,24
  336:2,6,10,13
**mark** 276:5 299:15
**marked** 278:3 299:12
  301:11,14 302:23 303:1
  303:12,15 307:18,21
  309:1,4 310:8,11 312:6
  312:8 321:17 322:10,13
  329:5
**matter** 320:21 324:16
**mcdonalds** 289:18,20
  291:6,13 292:5
**mean** 282:15 298:23
  300:9 316:11 333:17
**meaning** 315:15
**means** 288:7 291:24
**meant** 315:22 316:7
**medicaid** 315:12,13,16
  323:18
**medical** 339:20
**medicare** 312:20,23
  313:15,23 315:12,15,17
  323:18 337:1,2
**medication** 281:17,18
  284:19 292:19
**meet** 322:25
**meeting** 295:25 308:11
  308:13 322:15,23
  335:23,24 336:2,6
**meisler** 285:25 293:16
  294:2 295:1
**memo** 317:5

**mentions** 293:10
**merit** 297:17 319:3
  320:19
**message** 299:24,25 300:4
  300:16
**midaugust** 340:9
**middle** 294:1 311:18
  329:12
**midwest** 347:1
**mind** 292:2 296:5 306:21
**minus** 333:25
**minute** 287:7
**minutes** 289:20,24 290:1
  291:13,18
**mischaracterization**
  319:14
**miscommunication**
  316:8,17
**missing** 332:24 333:2
**moments** 316:21
**money** 328:11,16
**month** 306:5,8
**months** 327:15,19
**morning** 307:23
**morrison** 292:23 312:3,9
  323:2
**move** 318:25 319:5,19
  320:6,17 321:6
**msn** 276:9

---

**N**

**name** 312:24 313:9
  332:19 345:3,4,15
  346:3,4,21
**named** 343:9
**names** 313:11,20
**need** 280:7,8 309:16
  325:12
**needed** 285:4,7 306:13
  307:12,12 308:10
  310:14 331:16
**net** 327:21
**never** 282:25 283:22
  288:16 292:3,4 297:23
  302:2 307:4 313:12,14
  318:19 330:22 331:2
  335:15
**news** 294:6

**night** 339:22
**non** 280:2
**nonbankowned** 334:2
**nonhostile** 280:1
**noon** 281:4
**notary** 275:22 343:6
  344:14 345:10,18
  346:15,23 347:23
**note** 281:20 290:1,4,15
  290:18,21 291:24 292:7
**notes** 278:13 279:20
  280:10 329:5,8 340:18
**notification** 323:5
**noting** 293:2
**number** 278:3 280:4,22
  281:1,3 287:5 288:10
  288:13,18,24 289:5
  293:12,16,17,19,20,22
  293:23,24 294:8,18
  295:3,7,12,18 296:1,3
  300:2,17 312:23 313:5
  313:16 314:5,5,7,8
  315:9 318:8 324:4,9
  327:16 329:14,18 331:5
  331:8 332:1 337:13,24
  337:25 338:8,19 339:13
**numbers** 294:8 346:7

---

**O**

**object** 287:17
**objection** 286:13,22
  287:9 289:1,9 290:12
  291:2 293:13,18 296:17
  297:4,8,19 298:4,21
  299:3,7 311:24 319:13
  319:22 320:12 321:2
  326:23 328:7 329:10
  332:2,5,14 336:14
  337:17 338:2,10
**obtaining** 332:20
**obviously** 296:21,22
**occasion** 300:2,15 330:18
**october** 278:10,11,12
  310:8,17 311:6,16
  312:4,10,18 314:13
  321:16,20 322:1,10,15
  323:4,10 325:21 334:22
  336:1 337:8 344:17

**offensive** 317:12 318:17
**office** 308:3 331:25,25 332:10,18 333:1 344:6
**officer** 313:1,7,8
**offices** 276:4
**official** 345:15 346:21
**oh** 285:2 327:3,18
**ohio** 275:2,20 276:7,16 279:3 309:6 330:1,2,6 331:17 343:2,7 344:7 344:15
**okay** 279:14 284:21 285:24 288:20,22 289:14 292:6,18 293:4 295:6,10 296:9 299:9 301:5,19 303:9 304:6 306:3 307:10 308:23 315:7 317:8 318:1 320:25 321:9 322:3,7 326:19 337:5 340:22 341:8
**once** 330:5 338:7
**ones** 332:11
**oops** 312:7
**operating** 287:10
**operator** 288:14 294:18 295:2
**opportunity** 328:23,25
**order** 303:7 319:18 324:5
**original** 342:13
**originals** 301:17
**overall** 298:23
**overlooked** 330:3,11

**P**

**packet** 283:10
**page** 281:6 285:16 289:14 329:12 346:7 347:3
**paid** 308:2,15
**pallas** 281:12 282:14,20 283:6,8,11,15,22,24 284:22
**paperwork** 282:23 283:3 304:24 305:6 307:6 311:3
**pardon** 308:12 328:24
**parham** 299:21

**part** 281:15 283:10 307:15 316:9,15 334:23 346:9
**particular** 300:14
**parties** 342:7
**party** 344:3
**patients** 330:25 331:4,5 331:13
**patricia** 299:21,24 300:13
**paul** 297:16 317:9,16 318:16
**pay** 335:12,13,15,16,17 335:18
**pending** 330:2
**people** 291:1 316:2 333:3
**percent** 333:19,20,25 334:3,4
**perform** 323:13 325:2,7 325:22 336:23 338:16
**performance** 318:14
**period** 309:22 335:8
**permission** 333:7
**permitted** 315:20
**person** 298:18,24 302:4 313:16,19 314:6,24 319:10 330:14 331:18 336:20
**personal** 301:21 335:20
**personally** 345:11 346:15
**phone** 280:4 281:3 282:10 288:11 300:7 312:22 324:4,8 330:23 330:24 337:13,24,25 338:8 339:13
**phrase** 328:8
**physician** 275:11 294:12 306:12 309:20,21,25
**pick** 289:18 291:12 301:21,24 302:5
**picking** 302:10
**pile** 301:17
**pins** 336:25
**place** 302:16,18 317:10 326:2 336:3 343:20
**plaintiff** 275:6 276:3
**pleas** 275:1
**please** 290:4,8 296:22

302:16 310:21
**plus** 308:3
**point** 287:24 321:25,25 327:25 333:15
**policy** 326:8
**position** 280:4 334:24 339:3
**pr** 279:21
**practices** 324:19
**prescribe** 284:19
**presence** 343:15
**presented** 318:13
**pretty** 327:22
**previously** 312:8 324:15
**price** 334:4,6
**prior** 311:11
**probably** 284:15 299:4 327:9
**problem** 294:7 314:1 330:10,11
**procedure** 279:3 345:5 346:5
**procedures** 279:21,22
**process** 315:25
**produced** 315:3,6 328:20 329:11
**prohibited** 315:14
**promotion** 336:9
**proper** 287:15
**properties** 327:21 333:24 334:2,10,13,18
**provide** 309:12 332:7
**provided** 279:2 328:19
**provider** 285:20,23 287:5 300:8 315:13 323:14,19 324:1 325:13 329:17 330:5,19
**providers** 313:9 314:7 330:2 332:18
**provides** 294:17
**psychiatric** 317:11,17
**psychiatrist** 281:12 282:6 283:13,19 285:4 285:8,10 305:13,14 306:8
**psychiatry** 284:18
**public** 275:22 276:6 343:7 344:14 345:10,18

346:15,23 347:23
**purposes** 299:13 301:12 302:24 303:13 307:19 309:2 310:9 321:17 322:11 329:5 331:15
**pursuant** 342:3
**put** 279:10 283:3 288:10 288:13,18 314:4 317:19 324:4,8 333:8 335:5 337:3,13,23,25 338:8 339:12,14
**putting** 288:24 320:19 338:18

**Q**

**qualified** 343:8
**question** 283:1 293:14 296:21 300:12,22 320:23,24
**questions** 313:6
**quote** 312:25

**R**

**raise** 335:16,17,18
**raised** 323:9
**reached** 287:5 288:15 300:1 311:19 329:17 331:1
**read** 279:19 283:6,8 294:21 295:8,15,20,21 320:22 321:1 342:7 345:5,6,12 346:5,6,17
**real** 327:25 328:9 333:13
**really** 287:25
**reason** 286:11,19 320:4 338:7 346:8 347:3
**reasons** 318:23
**recall** 280:12,21 281:5 283:17,18 291:10 300:11,18 301:8 304:9 311:25 314:21 315:4 326:18 331:2
**receipt** 280:2
**receive** 318:12 322:4 326:10,15,16
**received** 283:10 304:13 309:8 314:25
**receptionist** 302:4

**recess** 333:11
**recommended** 283:12,25
**reconsider** 325:6
**record** 297:24 321:1
  346:9
**records** 339:20 340:2,3
**reduced** 281:18 343:14
**reference** 293:15 295:1
**referenced** 345:11
  346:15
**references** 340:13
**referring** 293:19
**refresh** 292:2
**refusal** 298:2 325:21
**refuse** 324:3 325:7
**refused** 284:11 297:2
**refusing** 325:2
**regard** 337:1
**regarding** 294:23 318:16
  326:11,16 342:2,12
**reinstatement** 334:23
**relates** 303:20
**relating** 324:15
**relative** 344:2
**releases** 340:23
**remember** 280:25 281:19
  281:21 286:2 291:15
  292:8 293:1,5 327:16
  335:3
**remind** 279:12
**removed** 289:7
**replace** 336:22
**report** 283:7,8,14
**reported** 317:12
**reporter** 277:13 345:7
**reporters** 277:10 343:1
**reporting** 297:16 340:18
**reports** 283:23 317:9
**request** 303:3 346:9,11
**requested** 339:13 342:1
  342:11
**requesting** 290:4
**requests** 340:6
**rescheduling** 280:14
**resolution** 326:8
**resources** 322:24
**respect** 312:20
**respond** 340:6

**responded** 295:23 302:2
**response** 311:20 319:15
  321:20 324:17
**responsibilities** 323:14
**responsible** 298:8,10,16
  298:24 299:5 332:12,20
**rest** 315:21
**result** 285:7 322:23
**results** 282:13
**retained** 277:13
**retaliated** 296:16 297:7
  297:17,21 298:3,18
  299:2
**retaliation** 296:12 297:11
  297:13 298:1
**retaliatory** 297:1 318:11
  318:15 319:20 320:11
  320:14,16 321:4,7,8,11
**return** 282:18,22 285:11
  289:17 291:6 303:20
  304:12,15 305:5,22
  306:22 309:17 310:4,14
  310:22 312:17 315:11
  317:23 318:4,7 323:6
  326:20
**returned** 292:5 311:21
  312:1 313:12,14 322:5
**returning** 306:25 318:2
**review** 335:3,11 342:2
  345:1 346:1
**reviewed** 323:8 324:16
**riddle** 298:12,17
**right** 283:4 285:8,9 288:6
  288:24 291:1 294:9
  295:16 297:15 299:1
  300:19 301:2 303:16,21
  304:17 305:5,11,23
  306:4 307:5 308:6,14
  309:5,14 310:18 312:12
  315:16 323:10 328:13
  330:14 331:5,6,8,18
  332:25 338:6,9,14,17
  339:1,20
**road** 309:6
**rogers** 307:24
**role** 299:17 330:19
**rules** 279:3 315:15,16,16
  315:17 342:3 345:5

346:5

---

**S**

**saw** 283:16 289:17 291:5
  306:8 340:13
**saying** 285:7 290:24
  299:23 304:11 306:10
  306:21 308:1 316:11
  337:23
**says** 280:7 281:11 285:19
  285:22 290:3 292:14
  293:24 294:1,2,5,15
  295:4,5 299:24 300:7
  302:16 304:7 307:6
  309:19 311:18 314:18
  324:14 326:14 329:13
**scenario** 286:18,21 287:1
**scenarios** 287:24 288:2,4
  288:7
**scribbling** 280:3
**seal** 344:6 345:15 346:21
**sealed** 302:17
**second** 316:2
**see** 280:22 281:2,11,13
  282:6 283:12,19,25
  284:11,22 285:4,6,8,16
  293:25 305:14 307:24
  309:20 315:18 320:24
  329:12
**seen** 283:23 306:3,12
  327:6
**selling** 327:22 334:4,6
**send** 284:25 307:6 332:8
  341:1
**sending** 303:19 304:14
  304:16,18,23 305:2
**sent** 280:14 284:23
  300:10,14 305:17 307:1
  309:18 311:7 314:25
  315:1 323:5 324:17
  326:4 332:11
**separate** 301:18 326:10
  326:15
**september** 282:18,23
  284:5 285:11 304:12
  309:13,25,25 310:20,23
  310:24
**served** 299:17

**service** 287:20
**services** 275:11 289:22
  291:17,20
**set** 344:6
**sexual** 317:12 318:17
**shaker** 309:6
**shamekia** 286:5
**shamekias** 285:25
**sheet** 346:7,10,18 347:1
**sheryl** 291:8 299:4
  301:21
**shes** 286:16 288:11
  295:14 299:4 304:20
**shoes** 302:12,18,20
**show** 299:15 301:14
  303:1,15 307:21 309:4
  310:11 312:6,7 322:13
**shows** 305:18
**side** 279:20 280:6
**sideways** 280:23
**sign** 342:7
**signature** 342:5
**signed** 298:25 340:24
  345:13 346:18
**simmons** 317:9,16
  318:16
**sinus** 340:12
**sinuses** 340:14
**sit** 336:3
**situation** 314:11
**six** 318:10 321:25
**sleeping** 316:3
**sold** 327:14
**solutions** 347:1
**somebody** 280:19
**sorry** 304:19 305:19
  310:25 312:7 333:19
**speak** 331:3
**specialist** 323:15 330:19
**specific** 326:12
**specifically** 285:5
**specified** 343:21
**speculative** 332:6,15
  337:18 338:3
**split** 333:25 334:7
**spoke** 294:6 313:4 329:16
**springer** 303:20 307:2
**square** 276:6

**ss** 343:3
**start** 279:20 322:22
**started** 279:9
**starting** 322:21
**starts** 333:15
**state** 315:13 343:2,7
  344:15 345:10 346:15
**stated** 325:17 330:2
**statement** 324:18 345:13
  345:14 346:19,19
**stating** 288:12
**stenotypy** 343:14
**step** 289:6
**steps** 297:1
**steve** 298:12,17
**street** 275:20 276:15
**stressfree** 280:9
**structure** 333:12
**stuff** 339:23
**subject** 317:11
**subjected** 318:10
**submit** 309:24 311:2
  330:5
**subscribed** 345:10
  346:14 347:21
**suite** 275:20 276:6,15
**supervisor** 285:25 286:17
  286:20 287:1,4,22
  288:9 313:1,4 314:4,10
  336:5
**supervisors** 312:21
**supposed** 281:2 288:11
  307:2,3 314:4,7 316:1
  332:7 336:8
**sure** 282:12 295:21
  300:12 304:7 322:19
  333:10
**surgery** 340:2
**surgical** 340:3
**sworn** 279:4 343:10
  345:10,13 346:14,18
  347:21
**system** 294:17 337:3

### T

**take** 280:7,8,10 321:24
  333:9
**taken** 275:19 333:11

343:20
**talk** 313:7 330:15,20,23
  330:25
**talked** 282:9 285:25
  287:3 313:19
**talking** 280:19 290:23
  313:10 314:10 332:22
  335:6
**tax** 326:19
**telephone** 293:23,24
  294:8,12,18,19 300:17
**tell** 283:11,15 287:4
  288:6 295:25 296:2
  307:3,8 311:15 325:25
  331:1
**telling** 288:23 295:14,17
  304:5 309:10 311:7
**tells** 287:3 309:16
**ten** 327:18,22
**terminated** 325:8,20
**testified** 290:13 340:8
**testify** 343:10
**testimony** 343:13,17
  345:6,7 346:6,9,12
**thank** 301:20 304:21
  341:9
**thats** 280:23 282:7
  283:20 287:10 288:16
  291:4 293:9 295:8,13
  295:15,21,22 296:25
  299:5,8 303:17 306:10
  309:5,15,19 316:20,22
  318:3 319:8 320:7
  321:8,9 324:7 330:9
  333:5 334:23 335:20
  336:17 337:4,22 338:13
  339:15 341:6
**theres** 280:22 285:17
  322:19 332:18
**theyre** 315:20 319:11
  332:19 333:24
**thing** 321:5 336:24
  339:10
**things** 293:21 312:19
  321:25
**think** 282:7 290:10,13
  295:10 298:10 299:2
  300:10 307:5 312:24

314:10,12,23 317:1
  319:16 327:12,13
  334:22 338:24 339:1,11
  339:21 340:4,14,20
**thinkgk** 276:18,19
**thought** 302:13
**three** 287:23 308:3
  313:10 315:10 334:3,4
  334:14
**time** 283:16 284:10 286:2
  288:12 295:21 297:6
  300:9,10 306:1 308:2
  308:15 309:22 310:15
  327:25 330:8 335:8,19
  335:25 343:20
**times** 297:23 311:19
**told** 281:11 282:5 283:21
  283:24 287:22 288:9,16
  302:6 304:3,4,6,8,11
  310:12 313:16,23
  316:21 318:18 319:4,8
  319:16 320:2 324:22
  325:8,11,16 337:2,23
  338:13,23 339:15
**top** 322:22
**track** 328:16
**transcribed** 343:16 345:7
**transcript** 277:1 342:3,8
  342:10,12 345:5,12
  346:5,11,17
**transcription** 343:17
**transfer** 331:7
**treat** 284:16
**true** 291:4 318:8 320:8,9
  343:16
**truth** 320:2 343:11,11,12
**try** 286:7 287:8 321:6
**trying** 289:13 290:2
  318:24 319:6 320:5,10
  320:17 330:22
**tuesday** 292:15
**turn** 281:6
**turned** 291:14
**twelve** 289:20 291:13
**twice** 297:16
**two** 287:19,21 288:1,3,7
  293:20 297:20,22
  306:16 313:10 327:9,9

327:12,13 334:14 335:4
  335:11
**type** 311:3 336:8

### U

**uh** 284:16,18,22 294:7,24
  296:25 298:6,7 303:6
  306:6 307:7,12,12
  308:17 315:22,23 317:4
  325:5 328:6,17 330:19
  334:19,21 335:1 337:9
**uhmhum** 280:16 331:12
**uhmhums** 279:14
**uhs** 293:23,24 294:7
**uhuhs** 279:14
**unclaimed** 311:21
**understand** 289:3,11
  296:21 301:4 332:9
  339:5
**understanding** 289:8,12
**unethical** 280:1
**university** 275:10 345:3
  346:3
**unlawful** 279:23
**unpaid** 317:10,19
**use** 293:23 294:7 295:6
  295:11,18 296:1,2
  312:22
**uses** 297:11
**usually** 334:3

### V

**vacation** 335:22,25
**varies** 333:14,23
**verified** 329:17
**verify** 300:1 324:5
  338:19
**veritext** 347:1
**versus** 314:7
**victoria** 275:4,16 277:7
  279:1,6 294:5 300:7
  329:16 340:18 343:9
  345:3,4,9 346:3,4,13
  347:20
**vikki** 304:16,18,20
**violation** 315:15
**vj208** 281:9
**vj215** 285:16

vj227 289:15
vj240 292:9
vol 275:16
volumewise 327:23
vs 275:8

**W**

wahl 324:17
wait 310:21
walks 289:23 291:17
wanna 340:24
want 279:25 280:8
282:13 300:8,24 301:16
303:24 304:2 308:2
318:10 322:18 325:18
334:25
wanted 279:12 308:7
315:18 317:15,19 321:9
339:11
wasnt 286:20 300:6
301:3 302:6 315:23
317:24 318:8
way 297:13 336:13 341:7
website 330:1
week 327:4,5
weeks 279:9
went 283:20 284:2,10
285:6 289:18 291:12
292:5 297:24 308:7,9
337:8 339:22 340:10
weve 307:21 312:6
whats 281:15 305:1
309:15
whereof 344:5
white 312:24
whos 291:6
willing 338:24
wish 304:7
withdrawn 330:4
witness 340:12 343:9,14
343:15,18 344:5 345:1
345:4,11 346:1,4,15
witnesss 342:2
word 297:11
work 282:18,22 284:4
285:11 302:9,14 303:20
304:12,15 305:22
306:14,17,22,25 307:4

307:8 309:17 310:4,13
310:14,15,22 311:15,16
312:18 315:11 317:23
318:2,7 322:6 323:6
327:25 328:2 335:1
337:9
worked 290:5 308:4,20
328:6 330:19
working 290:7 301:3
309:11 315:24 328:17
works 294:16
wouldnt 286:1,15 320:10
320:16 324:11 331:14
write 280:11 290:1,18
292:6,24 303:6 308:17
312:14
writes 297:12
writeup 335:10
writeups 319:24 320:1
335:4,11
writing 281:7 289:15
292:10 299:5 304:10
307:23 315:9 321:4
written 290:3 297:15,23
322:14
wrote 280:13 281:3,20,21
281:23,25 282:2 289:4
290:20,23 291:23 292:4
301:20 312:12 320:14
321:10

**X**

**Y**

yeah 281:25 282:11
292:12,22 296:8 297:20
298:15 304:21 305:21
306:4 317:6 327:4,23
331:14 332:22 337:22
339:25 341:1
year 326:22 328:12,15
youre 289:13 296:9,9,10
303:19 304:13,16 305:3
305:15,18 307:23
308:14 309:11 315:10
315:11 319:10 325:25
326:14 332:3,11 339:5
341:4

youve 296:11 304:11

**Z**

zarife 275:22 343:6
344:14
zhang 300:1

**0**

00 275:18 280:5
000 317:5

**1**

1 275:8 278:10 310:8
311:6 312:4 323:4
333:24
10 275:18 308:22
11 341:10
12 280:5
1300 275:20 276:15
13cv2012 275:8
15 289:24,25 291:18
1600 275:20 276:15
1871104 345:2 346:2
347:2

**2**

2 278:5 301:11,20 302:8
20 305:16 345:16 346:22
347:22
201 280:25
2011 318:14
2012 278:4,5,6,7,8,9,10
278:11,12 299:12 301:1
301:11 302:23 303:12
307:18,22 309:1 310:1
310:8,23 311:8 312:3,4
312:10 317:13 321:16
322:10 326:25 329:22
2013 326:19 327:2
2014 275:17 344:8 345:3
346:3
2014095 280:23
2017 344:17
21 307:22 310:20,23,25
311:8 312:3 329:21,22
2162802828 276:8
2163836614 329:13
2166215161 276:17

2168446088 280:4
24 325:6,12,17,18 339:1,6
339:11
240 292:12,13,25
246 292:11
25 317:4
276 277:3
278 277:5
279 277:8
29 275:17 344:17 345:3
346:3
299 278:4

**3**

3 278:6 302:23
30 278:4,9 299:12 301:1
308:22 309:1 317:5
301 278:5
302 278:6
303 278:7
307 278:8
309 278:9
310 278:10
321 278:11
322 278:12
329 278:13
343 277:10
35 293:7,7 333:20
3646 309:5
37 341:10

**4**

4 282:18,23 284:5 285:11
304:12 314:13
44113 276:7
44114 276:16
46 279:11,16 285:16
292:10
47 312:8 321:21
48 278:4 299:11,16
49 278:5 301:10,15
307:11
4th 283:4

**5**

5 312:10 321:20 322:1
323:10 345:3 346:3
50 278:6 302:22 303:2

307:11
**500** 333:24
**51** 278:7 303:11,16
**52** 278:8 307:17,22
**53** 278:9 308:25 309:5
311:12
**54** 278:10 310:7,12
**55** 278:11 312:7 321:13
321:15
**56** 278:12 322:9,14
**57** 278:13 329:4

---

**6**

**65** 333:15,17,19,25

---

**7**

**7** 309:13,25,25
**70** 333:16,17
**75** 276:6

---

**8**

**8** 278:11,12 310:17
311:16 312:18 321:16
322:10,15 325:21
334:22 337:8
**800** 334:1
**82112** 309:14,22 310:13
**84** 306:4
**8412** 305:7,19 306:1

---

**9**

**920** 276:6
**9412** 305:20,21 306:1,17
306:22,24 307:7,7
**9th** 275:20 276:15