Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

VICTORIA D. JOHNSON,       )
                              )
          Plaintiff,   )
                              )
vs.                      ) Case No.
                      ) 1:13-cv-2012
                      )
UNIVERSITY HOSPITALS      )
HEALTH SYSTEM, INC. and   )
UNIVERSITY HOSPITALS      )
PHYSICIAN SERVICES,      )
                      )
          Defendants.  )

- - - - -

THE DEPOSITION OF CHRISTINA MORRISON
FRIDAY, APRIL 11, 2014
- - - - -

    The deposition of CHRISTINA MORRISON, called
by the Plaintiff for examination pursuant to the
Federal Rules of Civil Procedure, taken before
me, the undersigned, Gretchen E. Windenburg, a
Court Reporter and Notary Public within and for
the State of Ohio, taken at the offices of Giffen
& Kaminski, LLC, Suite 1600, 1300 East Ninth
Street, Cleveland, Ohio, commencing at
10:43 a.m., the day and date above set forth.

Deposition of Chistina Morrison, taken April 11, 2014

Page 2

```
 1    APPEARANCES:
 2
           On behalf of the Plaintiff:
 3
               Mark P. Herron, Esq.
 4             75 Public Square
               Suite 920
 5             Cleveland, Ohio  44113
               216-280-2828
 6             herronlaw@msn.com
 7         On behalf of the Defendants:
 8             Donald C. Bulea, Esq. (partial
                                 appearance)
 9             Kerin Lyn Kaminski, Esq.
               Giffen & Kaminski, LLC
10             Suite 1600
               1300 East Ninth Street
11             Cleveland, Ohio  44114
               216-621-5161
12             dbulea@thinkgk.com
               kkaminski@thinkgk.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 3

```
 1        CHRISTINA MORRISON DEPOSITION INDEX

 2

 3   EXAMINATION BY:                    PAGE NO.

 4   Mr. Herron                              4

 5

 6   EXHIBIT NO.                        PAGE NO.

 7   Plaintiff's 4                          49

 8   Plaintiff's 5                         104

 9   Plaintiff's 6                         109

10   Plaintiff's 7                         116

11   Plaintiff's 8                         119

12   Plaintiff's 9                         122

13   Plaintiff's 10                        123

14   Plaintiff's 11                        126

15   Plaintiff's 12                        136

16   Plaintiff's 13                        137

17   Plaintiff's 14                        142

18   Plaintiff's 15                        148

19

20

21

22

23

24

25
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 4

1              CHRISTINA MORRISON

2  of lawful age, called by the Plaintiff for

3  examination pursuant to the Federal Rules of

4  Civil Procedure, having been first duly sworn, as

5  hereinafter certified, was examined and testified

6  as follows:

7          EXAMINATION OF CHRISTINA MORRISON

8  BY MR. HERRON:

9  Q   Can I have you state your name, for the

10      record, and spell it, please.

11 A   Full name is Christina, C-H-R-I-S-T-I-N-A,

12     Morrison, M-O-R-R-I-S-O-N.

13 Q   Have you ever given a deposition before?

14 A   No.

15 Q   My name is Mark Herron.  I represent Victoria

16     Johnson in a lawsuit that she has pending

17     against University Hospitals Physician

18     Services, which we will just refer to as

19     University Hospitals.

20 A   Okay.

21 Q   I am going to be asking you some questions

22     regarding your involvement and events that

23     led up to this lawsuit.  A couple of ground

24     rules that you need to follow to make this go

25     relatively smoothly.  The first, most

Deposition of Chistina Morrison, taken April 11, 2014

Page 5

1       important rule is when I'm asking my

2       question, wait for me to finish asking before

3       you start giving your answer.  Okay?

4    A  Okay.

5    Q  We are going to drive Gretchen crazy if we

6       start talking over each other.  And likewise,

7       I will try to let you finish giving your

8       answer before I start attacking you and

9       moving on to something else.  Fair enough?

10   A  Fair enough.

11   Q  So that our court reporter, Gretchen, can

12      take down your testimony today accurately,

13      it's very important that you give verbal

14      responses; nods, gestures, uh-huhs, uh-uhs

15      don't come out accurately in a transcribed

16      record.  I guarantee you will do it at least

17      twice, because everybody else does it, but

18      make sure to give verbal responses so we have

19      an accurate record of what you're saying.

20      Okay?

21   A  Okay.

22   Q  The third rule that you need to follow is, if

23      my question doesn't make sense, something

24      doesn't seem clear to you, and you're not

25      quite sure what it is I'm talking about,

Deposition of Chistina Morrison, taken April 11, 2014

1       please speak up and let me know so that I can

2       either rephrase the question or ask you

3       something differently.  Okay?

4    A  Okay.

5    Q  We are going to assume for the purposes of

6       the record that if you don't speak up and ask

7       for any type of clarification, that you've

8       understood the question in the manner that I

9       have intended it.  Fair enough?

10   A  Yes.

11               MR. BULEA:      I just want to

12      say the way that -- I mean, to the extent

13      that she knows she's misunderstood a

14      question, she'll certainly say that.  I don't

15      think she can agree on the assumption that

16      you're making that if she doesn't know that

17      she's misunderstood a question, then she

18      can't really say that she's misunderstood it.

19               MR. HERRON:     I have

20      absolutely no idea what you're saying, Don,

21      but thank you for making the objection for

22      the record.

23               MR. BULEA:      I'm making an

24      objection and saying -- you can assume

25      whatever you are going to assume.  The way it

Deposition of Chistina Morrison, taken April 11, 2014

Page 7

```
 1       was worded, though, we can't agree that

 2       simply because she doesn't say anything means

 3       that she's fully heard and understood the

 4       question.  Of course, she'll do her best to

 5       the extent she understands.  The fact that

 6       she has misunderstood a question, she'll let

 7       you know.

 8                 MR. HERRON:     I still have

 9       absolutely no idea what you're saying, Don,

10       but I'm not going to belabor the point.

11  Q    If you don't understand something, you'll

12       speak up and let me know?

13  A    I will, yes.

14  Q    I'm not going to presume anything with this

15       next question, but are you under the

16       influence of any medication, drugs, alcohol,

17       or anything else that will impact your

18       ability to testify truthfully today and

19       recollect events that occurred almost two

20       years ago?

21  A    No.

22  Q    What have you done, other than meeting -- I

23       assume -- with the hospital's attorneys, to

24       prepare yourself to testify today?

25  A    I left the hospital for another position back
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 8

1     in December, so nothing.  I have no access to

2     anything.

3  Q  Did you review any documents in preparation

4     for testifying here this morning?

5  A  I don't -- I don't have any documents to

6     review.

7  Q  Well, that doesn't mean somebody didn't give

8     you documents to review.  Did anybody give

9     you documents to review, e-mails, policies

10    and procedures, anything having to do with

11    Victoria Johnson?

12  A  No e-mails, no policies, nothing.

13  Q  Did you review any notes that you took

14    regarding anything having to do with Victoria

15    Johnson to prepare yourself to testify today?

16  A  I mean, again, I left the hospital, so I

17    don't have any of my notes to review.

18  Q  So nobody has given you anything to review in

19    terms of e-mails, documents?  Nobody gave you

20    any type of document to review to prepare

21    yourself to testify this morning?

22  A  Nobody has given me anything, no.

23  Q  When would be the last time then that you

24    would have looked at anything having to do

25    with Victoria Johnson?

Deposition of Chistina Morrison, taken April 11, 2014

1   A   It would have been prior to my -- I left the

2       hospital in the middle of December of 2013,

3       so since then, I wouldn't have had access to

4       anything.

5   Q   Well, before then?

6   A   Well, before then, I would have had access,

7       but I couldn't tell you the exact date I

8       would have looked at them.

9   Q   Did you look at any documents, e-mails,

10      notes, anything pertaining to Victoria

11      Johnson between the time she was terminated

12      and the time you left University Hospitals?

13  A   I mean, I would have gathered the stuff

14      together, yeah.  So there's probably

15      opportunity that I would have looked at it

16      then for sure.

17  Q   Do you recall when that was?

18  A   It would have -- I mean, if I -- so prior to

19      my leaving in December, I'm thinking if I

20      left mid December, it probably would have

21      been early December that I would have, you

22      know, made sure that I had all the

23      information together, if anything came of the

24      situation.

25  Q   You have known that this lawsuit has been

Deposition of Chistina Morrison, taken April 11, 2014

Page 10

1        pending for a while; is that correct?

2    A   I mean, I guess.

3    Q   Well, don't guess.  Either you have known

4        about it or this deposition is the first time

5        you have known about it.

6    A   Yes, I knew that there was something pending.

7                    MR. BULEA:        And I just

8        want to instruct her.  He's not asking you to

9        guess.  He wants you to give truthful

10       testimony, so don't guess.

11                   THE WITNESS:       Yeah.

12   Q   Well, since you've indicated that you left UH

13       back in December of 2013, where are you

14       currently employed?

15   A   I work for Steris Corporation in Mentor.

16   Q   Steris or Stairs?

17   A   Steris, S-T-E-R-I-S.

18   Q   Where in Mentor are they located?

19   A   They're on Heisley Road.

20   Q   On what?

21   A   Heisley Road.  H-E-I-S-L-E-Y.

22   Q   What is your position with Steris Corp.?

23   A   Human resources manager.

24   Q   And you've had that position for, I guess,

25       five months now?

Deposition of Chistina Morrison, taken April 11, 2014

Page 11

1   A   I started there December 31, 2013.

2   Q   Prior to Steris Corporation, you were

3       employed at University Hospitals, correct?

4   A   Yes.

5   Q   You were employed specifically by University

6       Hospitals Physician Services, correct?

7   A   I was.

8   Q   How long were you at University Hospitals

9       Physician Services?

10  A   Let's see.  I started with the Physician

11      Services group in May of -- hang on.  I'm

12      trying to get the exact date.  The exact year

13      would have been, I think, 2012.  Hang on.

14      Let me think.  So I started with University

15      Hospitals -- no, I take that back.  So it

16      would have been May of 2010 that I started

17      with the Physician Services group.

18  Q   And you started with another unit in

19      University Hospitals back in 2008?

20  A   Yes.

21  Q   What unit was that?

22  A   I started with Geauga Hospitals -- Geauga

23      Hospital, which is one of their community

24      hospitals.

25  Q   What was your position with UHPS?

Deposition of Chistina Morrison, taken April 11, 2014

Page 12

1   A   Senior human resources generalist.

2   Q   What was your position at Geauga Hospital?

3   A   Human resources generalist.

4   Q   As a senior human resources generalist at

5       UHPS, to whom did you report?

6   A   Angelique Sunagel.

7   Q   I know her first name.  What's her last name?

8   A   S-U-N-A-G-E-L.

9   Q   What was Ms. Sunagel's title?

10  A   Director of human resources.

11  Q   Was Ms. Sunagel director of human resources

12      for just the UHPS unit?

13  A   Yes.

14  Q   To whom did Ms. Sunagel report, if you know?

15  A   She reports to Jason Elliott, who is the vice

16      president of human resources.

17  Q   Is Mr. Elliott vice president of human

18      resources for just UHPS or --

19  A   He also has the community hospitals, so he

20      has a section of UH.  So he has the Physician

21      Services group and the community hospitals.

22  Q   At UHPS, what were your duties as a senior

23      human resource generalist?

24  A   Employee relations, physician relations.

25      Just the HR liaison for any HR strategies,

Deposition of Chistina Morrison, taken April 11, 2014

Page 13

```
 1        training and development, performance

 2        management.

 3    Q   Do you have any responsibilities for

 4        administering the Family Medical Leave Act

 5        for employees of UHPS?

 6    A   No.

 7    Q   Who did?

 8    A   There is a separate department that

 9        facilitates that.

10    Q   What is that department called?

11    A   There's corporate health.

12    Q   Who is the individual that heads that

13        department -- well, let me back up.

14            Who is the individual that headed that

15        department back in June, July, August of

16        2012?

17    A   Do you mean the person that's like the

18        director over that group?

19    Q   Okay.

20    A   Because we had a representative that handled

21        all of our FMLA.

22    Q   Who was that person.

23    A   That's Kara Ladaika.

24    Q   Kara?

25    A   Kara, with a K, Ladaika, L-A-D-A-I-K-A.  And
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 14

1          then she reports to Ron Todaro, who is the

2          director.  Last name is T-O-D-A-R-O.

3     Q    Other than the duties that you've just

4          listed, did you have any other duties as the

5          senior human resources generalist at UHPS?

6     A    Just a lot of various general HR things.  I

7          mean -- as far as -- like how specific do you

8          want me to get?

9     Q    As specific as you can.

10    A    Just I was the HR liaison for all of the

11         leaders and employees in the Rockwell

12         building, as well as the physician groups

13         spread across Northeast Ohio.  There's

14         physician practice groups in 11 counties, so

15         I was their HR representative.  So any

16         HR-related issue, I was kind of that, you

17         know -- the person they would contact.  So if

18         it was wage stuff, benefits.  You know, I

19         wasn't a benefits person, but I was their

20         first contact to get the information.  If

21         that helps.

22    Q    What, if any, function did you have while

23         senior HR generalist at UHPS with respect to

24         University Hospitals employee assistance

25         program?

Deposition of Chistina Morrison, taken April 11, 2014

Page 15

1    A    So the employee assistance program is -- I

2         mean, I would consider them a business

3         partner.  So it is a program that's there to

4         help assist employees, any employee within

5         the system, from the president down.  If

6         there are any matters that -- it's considered

7         a benefit and it's a counseling, it's -- you

8         know, if employees are having professional

9         issues and personal issues, it's a resource

10        that we have that we partner with to help

11        assist the employees.  So I don't work for

12        them.  They fall under the realm of HR, but

13        they're their own department.  So my

14        relationship with them would have been to

15        partner with them to help, you know, guide

16        employees there if they need assistance.

17   Q    Well, how does somebody go about getting

18        referred to the -- or being referred to the

19        employee assistance program for whatever

20        problem he or she may be having?

21   A    Okay.  It can go many different ways.

22        Employees can contact them directly with no

23        referral.  There is also our referral that's

24        a -- would be considered not mandatory, where

25        maybe the manager is noticing that the

Deposition of Chistina Morrison, taken April 11, 2014

Page 16

1        employee is struggling with personal issues

2        or work issues or in the -- you know, we

3        would help them.  Maybe it wouldn't be

4        mandatory, but we might advise that the

5        employee contact them, because they're there

6        as a help to them.

7              Then there's also what would be

8        considered a mandatory referral, which would

9        be -- there's criteria around that.  And if

10        it were a mandatory referral, the human

11        resource person partners with the manager of

12        employee assistance to make that

13        determination on whether -- just depending on

14        the situation, you know, whatever is going

15        on, to make that determination -- because

16        they're the experts, you know, they're

17        certified counselors -- to determine whether

18        to refer that person or not.

19   Q   You used the term in describing the mandatory

20        referrals of criteria around that.  What did

21        you mean when you said criteria around that?

22        Define that phrase.

23   A   Well, yeah.  So I can't speak to whether it's

24        written criteria, but the manager of the

25        employee assistance, she's the -- she's the

Deposition of Chistina Morrison, taken April 11, 2014

Page 17

```
 1       expert.  I'm not the expert.  So she would
 2       talk with us, talk with the manager,
 3       sometimes talk with the employee to find
 4       out -- see how things are.  And we have kind
 5       of guidelines around -- you know, we're not
 6       going to refer everybody; it's going to be
 7       certain situations where we would mandatory
 8       or voluntarily or suggest that the employee
 9       go see.
10  Q    Well, what are the situations where it would
11       be mandatory?
12  A    It varies.
13  Q    Well, you said there are situations where you
14       would make a mandatory referral.  I'm asking
15       what those situations are.
16  A    There's two tiers.  There's a tier one and a
17       tier two, and that's per policy.
18  Q    Define what tier one is and then define what
19       tier two is, please.
20  A    Well, without having the policy in front of
21       me, I can't read exactly what the policy
22       says.  But tier one would be, if I recall --
23       I hope I'm not flip-flopping them; it's been
24       a while -- you know, if there's decline in
25       performance, situations in the workplace
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 18

1    where the employee is -- suddenly there's a

2    change, whether it be a personality change,

3    observable things where we would have a sense

4    that there might be something going on in the

5    employee's world that might want us to refer

6    them; arguing suddenly, those types of

7    things, distractive or defiant behavior.

8    Those types of things.

9        Then the higher tier would be there's

10   a suspicion that they might be under the

11   influence, threatening to take their life,

12   more serious things.  And, again, without

13   having the policy in front of me, I don't

14   remember the exact verbiage.

15   Q   And tier two is the more serious one, right?

16   A   I believe so.  Again, without having the

17   policy, I don't want to say.  I could be

18   flip-flopping them.

19   Q   Well, we are going to come back to the EAP

20   policies and those things in a minute, and I

21   actually got a little off track.

22       Are there any other duties that you

23   had, as the senior HR generalist at UHPS,

24   that you have not discussed?  Have we covered

25   everything?

Deposition of Chistina Morrison, taken April 11, 2014

Page 19

```
 1   A    You want to read what I said?  Remind me what

 2        I told you, in case I missed something.

 3   Q    You're asking a lot here, for me to read my

 4        own scribble.  Employee relations, physician

 5        relations.  No FMLA responsibilities?

 6   A    I did not.

 7   Q    I mean, you remember your testimony because

 8        you just gave it.  Is there anything else

 9        that you recall being a part of your job that

10        you didn't list?

11   A    Nothing major.

12   Q    Did your job duties ever change between

13        May 2010 when you started at UHPS and when

14        you left in December of 2013, or were they

15        pretty much the same throughout that period?

16   A    Pretty much the same throughout that period.

17   Q    Prior to starting at Geauga Hospital in 2008,

18        where were you employed?

19   A    Lake Hospital System.

20   Q    What was your position there?

21   A    I was the nurse recruiter and I also had done

22        employee relations there as well.

23   Q    How long were you at Lake Hospital System?

24   A    About seven years.

25   Q    Prior to Lake Hospital Systems?
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 20

```
 1   A   I did not work.

 2   Q   What is your education background?

 3   A   Bachelor's of human resources development.

 4       Notre Dame.

 5   Q   The Notre Dame here or the Notre Dame in

 6       South Bend?

 7   A   The Notre Dame in South Euclid, Ohio.

 8   Q   When did you receive your degree?

 9   A   May of 2001.

10   Q   Have you received any other advanced

11       education or training since graduating from

12       Notre Dame in South Euclid?

13   A   Nothing advanced.

14   Q   Where do you reside, since you're no longer

15       at UH?

16   A   You want my home address?

17   Q   Yes.

18   A   3574 Wood Road, and that's in Madison.

19   Q   What's the zip out there?

20   A   44057.

21   Q   How did you first come to know Victoria

22       Johnson?

23   A   My first interactions with her, to the best

24       of my recollection, is she and Sheryl came to

25       me with some concerns about Paul Simmons, a
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 21

1       co-worker.  I really don't recall any, you

2       know, dealings with her prior to that or

3       conversations.  That's the first thing that

4       sticks out in my mind.

5   Q   Had you at least met her prior to the Paul

6       Simmons stuff?

7   A   Probably not formally.  Possibly -- or

8       because we both sat on the same floor, I may

9       have said hello or realized who she was,

10      but...

11  Q   What were these concerns that Ms. Johnson and

12      her supervisor came to you about regarding

13      Mr. Simmons?

14  A   Sheryl had brought to my attention that

15      Victoria had gone to her with concerns that

16      Paul Simmons was fondling himself in his

17      cube.  He sat across from her.  So it was,

18      you know, the normal process, I would then

19      want to jump in and investigate.

20  Q   I don't know what the normal process is.

21      You've got to tell me what the normal process

22      is.

23  A   Okay.  So because -- again, because I was the

24      HR generalist, you know, Sheryl -- oh.

25    (Ms. Kaminski entered the deposition suite.)

Deposition of Chistina Morrison, taken April 11, 2014

Page 22

1          MR. BULEA:        That's all
2     right.  It's just Kerin.
3          THE WITNESS:      Okay.
4   A   It's my responsibility then to take that
5       situation and investigate it.  So that's what
6       I did.  So, of course, I brought Victoria in,
7       talked with her, got her statement, you know,
8       found out the extent of what she saw, asked
9       specific questions about the situation,
10      gathered as much information as I could from
11      her to kind of look into the situation and
12      see what was going on.
13  Q   Had you received any type of training on how
14      to investigate that type of situation?
15  A   Yeah.  I mean, I have been trained.  Just
16      over the years, I had done some training.  I
17      mean, just -- nothing -- if you're saying --
18      asking if I went and took formal classes, no.
19  Q   Well, when I'm asking you what kind of
20      training you received, I'm keeping it pretty
21      open for you to describe to me what the
22      training was.  I don't know how formal or
23      informal it was.
24  A   So I had training at Lake Hospital on, you
25      know, just how to properly do an

Deposition of Chistina Morrison, taken April 11, 2014

Page 23

```
 1        investigation.  I had informal training from
 2        leaders that I had had throughout my career,
 3        you know, on how to do investigations.  I
 4        also -- when I came to UH, the compliance
 5        person that I worked with was Carole Meisler.
 6        She also shared information with me on
 7        investigations as well.  So just kind of
 8        through my career had had different types of
 9        training.  So, you know, did I take an
10        outside class, formal class?  No.  But
11        classes within my career, experts that are in
12        the field.
13   Q    Within the framework of UHPS, and that
14        facility is located out on Euclid Avenue in
15        Euclid, correct?
16   A    Yes.
17   Q    Do all of the UHPS employees work at that
18        location?
19   A    No.  It's what's considered the
20        administrative staff.  So there's -- you
21        know, finance is there, there's a call center
22        there, our compliance officer sat there.
23        Different, you know, administrative-type
24        functions are there, but there were UHPS
25        employees scattered across Northeast Ohio,
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 24

1       different locations.

2  Q    Those would be the physicians, right?

3  A    The physicians, as well as their staff,

4       uh-huh.

5  Q    Well, at least with regards to the department

6       that Victoria Johnson served in, if her

7       supervisor -- or the supervisor of that

8       department -- I guess there were two -- are

9       Mr. Riddle and Sheryl Johnson, right?

10 A    Sheryl reports to Steve.

11 Q    But they would be considered supervisors in

12      the department that Victoria worked in,

13      correct?

14 A    Yes.

15 Q    Now, if either of those supervisors has an

16      issue, any issue with respect to one of their

17      subordinates, are you the contact person for

18      them to come to?

19 A    Yes.

20 Q    Are there any other contact persons for them

21      to come to other than you?

22 A    Yeah.  They could have gone to Angelique.

23      You know, we had an administrative person

24      that sat there; although, she wouldn't have

25      handled some of the things, but she could

Deposition of Chistina Morrison, taken April 11, 2014

Page 25

1       also help them with certain things, too.

2   Q   Who is that administrative person?

3   A   Her name is Joan Presti.  She is the

4       administrative assistant for human resources.

5       P-R-E-S-T-I.

6   Q   And to whom did Ms. Presti report?

7   A   Angelique.

8   Q   So it was a three-person HR staff there at

9       UHPS on Euclid?

10  A   In that building, yes.

11  Q   We'll get into the Paul Simmons a little bit

12      more in a second here.  But prior to when

13      Sheryl Johnson had come to you with

14      Victoria's concerns about Mr. Simmons, had

15      any of Victoria's supervisors come to you

16      regarding any other issues that they were

17      having or concerns that they had regarding

18      Victoria Johnson, or was Paul Simmons the

19      first?

20  A   The first that I recall was Paul Simmons.

21  Q   So you don't recall any of Victoria Johnson's

22      supervisors coming to you with any concerns

23      about her prior to Paul Simmons; is that

24      correct?  Prior to the Paul Simmons matter,

25      right?

Deposition of Chistina Morrison, taken April 11, 2014

Page 26

```
 1   A    I'm trying to remember the order of things in
 2        my head because it has been a couple of
 3        years.  I don't -- I don't recall exactly.
 4   Q    So describe for us what you did in
 5        investigating the complaint about Paul
 6        Simmons.
 7   A    So I spoke to Victoria.  I got her side of
 8        the story, asked her for her concerns, asked
 9        her what resolution she was looking for.
10        Asked her if she wanted to be immediately
11        moved from his area, you know, because they
12        did sit across from each other.  I didn't
13        want her to be uncomfortable during the
14        investigation as we were looking into it.
15        She declined.  I do recall that.  She
16        declined, you know, being moved.  I
17        investigated -- I spoke to Paul, himself, got
18        his statement.  Paul's manager, got her
19        statement.  Paul had been at the hospital
20        system for quite a few years and had worked
21        for that same leader most of that time.
22              There were two people that sat near --
23        in the same area that Victoria had mentioned.
24        I don't recall names.  Again, really didn't
25        know them very well by name.  So just
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 27

1       gathered the facts surrounding, you know,

2       what she was claiming.  Also looked back at,

3       you know, Paul's history, if there were any

4       other complaints historically, any other

5       performance issues, all those types of

6       things.

7               I also -- because when somebody makes

8       a claim such as that, we take that quite

9       seriously and we want to make sure we

10      thoroughly investigate it.  So I also

11      contacted my manager, Angelique, to make sure

12      she was in the loop on it, as well as our

13      legal department, just to make sure that we

14      were covering the investigation thoroughly.

15      So when it is something at a higher level, I

16      always bring in anybody that I feel I need

17      that would be the expert person to help me

18      through it.

19  Q   So as part of your investigation, you

20      interviewed Victoria Johnson, correct?

21  A   Yes.

22  Q   What did she tell you?

23  A   She stated that he -- it appeared that he had

24      fondled himself.  I asked her if, you know --

25      when she's -- to clarify what she meant by

Deposition of Chistina Morrison, taken April 11, 2014

Page 28

1         that.  You know, was it outside of his

2         clothing.  I mean, I needed to know seriously

3         how -- what did she see.  She said that on

4         one or two occasions, it looked like his hand

5         lingered and he was, you know, shuffling

6         around.  She didn't see anything other than

7         outside of the clothing.  She felt that it

8         was an inappropriate gesture on his part.

9         I'm trying to think back.

10   Q    Did she indicate how many times that she saw

11        Mr. Simmons do this?

12   A    She said once, maybe twice.

13   Q    Where was Ms. Johnson's cubicle or

14        workstation in relation to Mr. Simmons's --

15        Victoria Johnson's workstation, rather, in

16        relation to Mr. Simmons's?

17   A    The way it's laid out, there's a couple of

18        rows of cubes with some -- like little hall

19        spaces in between.  At that time, she was

20        sitting in the cube and he was across from

21        her.  There was a hall.

22   Q    So if this conference table is like the

23        hallway, you're sitting here, you would be

24        her, I would be him, we could look directly

25        at each other, right?

Deposition of Chistina Morrison, taken April 11, 2014

Page 29

1   A   Right.  And there's like a whole row of

2       cubes, so there was people on all sides as

3       well.

4   Q   And you interviewed Mr. Simmons, correct?

5   A   Yes.

6   Q   What did he say?

7   A   He said he -- you know, clearly was not doing

8       anything.  He didn't know if he had done

9       something that he -- you know, that might

10      have appeared.  He didn't mean to offend her.

11      He was extremely -- he was extremely taken

12      aback by it.  Could not think of anything

13      that he would have done.  He stated that

14      he -- and I remember this specifically

15      because he does.  He had this big container

16      of pretzels on his table.  And he said, maybe

17      I was wiping crumbs when I was eating

18      pretzels.  He said, I really don't know what

19      I could have done that would have made her

20      think that.

21          But he was very -- you know, making

22      comments such as, if I did anything, I didn't

23      mean to offend her.  I apologize.  I did not

24      do anything inappropriate.  I feel bad if she

25      thought she saw something.  He voluntarily --

Deposition of Chistina Morrison, taken April 11, 2014

Page 30

1          he said, I don't want to make her feel

2          uncomfortable at all.  I'll do whatever I can

3          to help the situation.  His manager stated

4          that, you know, she -- in the many years she

5          had been leading him, he had always worked

6          with many females.  Never had one complaint.

7          There really wasn't anything -- you know, he

8          acknowledged that he -- if he made her feel

9          uncomfortable, he was apologetic, but he did

10          not do anything inappropriate.

11    Q    You said you interviewed others who worked in

12          the same general vicinity, cubicles in that

13          same row?

14    A    There were two other ladies that had made a

15          statement that they had never seen anything

16          inappropriate by him that sat in that same

17          area.

18    Q    So you've essentially got her word against

19          his word, right?

20    A    Yes.

21    Q    How did you resolve the situation?

22    A    We -- she did not want to move.  He was

23          voluntarily -- said he would move, not a

24          problem.  So we moved him out of the

25          situation just so that she was comfortable.

Deposition of Chistina Morrison, taken April 11, 2014

Page 31

1      We couldn't substantiate that anything

2      inappropriate happened.  The gentleman had

3      had no prior issues.  So we moved him.  We

4      offered to move Victoria.  She didn't want to

5      move.  Offered EAP if she felt uncomfortable

6      and wanted to talk to anyone about it.

7   Q  You said you couldn't substantiate that he

8      did anything wrong.  Were you able to

9      substantiate that he didn't do anything

10     inappropriate?

11  A  Can you rephrase that?

12  Q  You said you couldn't substantiate that he

13     did anything inappropriate, right?

14  A  Correct.

15  Q  Were you able to substantiate that he didn't

16     do anything inappropriate?

17  A  There was -- it was just determined that if

18     it wasn't substantiated, we couldn't -- we

19     didn't feel it was appropriate to, you know,

20     punish somebody if we couldn't substantiate

21     that they did something wrong, especially

22     somebody that had a very solid record and a

23     very positive record.  We felt that the best

24     thing we could do would be to do everything

25     we could to help the situation, so that was

Deposition of Chistina Morrison, taken April 11, 2014

```
 1        the resolution we came to.
 2   Q    At any point when you were conducting the
 3        investigation into the allegations against
 4        Mr. Simmons, did you have any concern as to
 5        whether or not Victoria Johnson was making
 6        this allegation up or lying?
 7   A    No.
 8   Q    Did she have any further complaints, at least
 9        that you were aware of, regarding Mr. Simmons
10        after --
11   A    No --
12   Q    -- the investigation?
13   A    -- nothing after.  No.
14   Q    Do you recall when this complaint was
15        initially made?
16   A    I don't recall an exact date.  I'm sorry.
17   Q    Do you recall a month, a year?
18   A    Oh, gosh.  I'd be guessing.
19   Q    Does February of 2012 sound about right?
20   A    Yeah.
21   Q    Do you recall how long it took you to conduct
22        the investigation and take the action that
23        you just described that you took?
24   A    I can't tell you exact dates, but I can tell
25        you it would have been pretty immediate,
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 33

1     especially for that type of a concern.  I

2     would say within a couple of days by the time

3     we started it.  I would have talked to

4     Victoria probably right away.

5  Q  Now, once this incident involving Mr. Simmons

6     was completed, did you have any further

7     issues or contact with Victoria Johnson after

8     that?

9  A  Yes.

10  Q  When?

11  A  She actually came to talk to me several

12     times.  I mean, I can't -- again, I don't

13     have exact dates.  Victoria -- I wanted her

14     to understand that if she ever -- I was the

15     HR -- her HR person and I wanted her to know

16     if she had any concern or any further issues,

17     I wanted her to come talk to me, wanted her

18     to know that I was her advocate.  She did.

19     Oftentimes, she would come in and talk to me.

20     I shouldn't say often, but a few times she

21     came in and talked to me.

22  Q  Let's talk about those.  When was the next

23     time you recall her coming in to talk to you?

24  A  Oh, gosh.  I don't have exact sequence.  I

25     know she talked to me -- there were some

Deposition of Chistina Morrison, taken April 11, 2014

Page 34

1     concerns about some performance issues that

2     she was having that were around that same

3     time.  She came to talk to me about those.

4  Q  What else did she come to talk to you about?

5  A  She once came to me to talk about -- she had

6     a performance review and she wanted to talk

7     to me about that.  If she wanted to, you

8     know, disagree with some of it, you know,

9     what's the process for that.  And, again, I

10    don't have exact sequences of when this all

11    occurred.  It's been a while.  Anything else?

12    Victoria was having some -- she was

13    struggling at work a little bit with her work

14    situation.  She was falling asleep at her

15    desk and so I talked with her several times

16    during that situation.

17 Q  What else do you recall her coming to you

18    about?

19 A  Let me think.  I mean, it all kind of

20    surrounded those types of things.

21 Q  So the falling asleep at the desk issue that

22    you just referenced, is that something that

23    Victoria came to you to discuss?

24 A  She did not come to me to tell me she was

25    falling asleep at work.  She indicated to me

Deposition of Chistina Morrison, taken April 11, 2014

Page 35

1      a couple of times -- and, again, I can't tell
2      you dates.  It's been too long -- that she
3      was just feeling a lot of stress.  Sheryl
4      came to me a couple of times with concerns of
5      Victoria sleeping at her desk.  She was
6      witnessed by her, as well as by other people.
7      She was getting complaints from other people.
8           So we talked to Victoria about that
9      situation.  We didn't want her to -- you
10     know, I wanted to talk to her about the
11     situation.  I didn't want her to have her job
12     be at risk at all.  Because falling asleep
13     during working hours at your workstation is
14     against policy.  I was concerned.  So, of
15     course, we brought her in to talk to her
16     about it to say, listen, this is the reports
17     that were coming to us, we want to talk to
18     you about it, what's going on.
19  Q  What did Victoria have to say?
20  A  She stated that she -- she did tell me that
21     she was on some medication.  I didn't ask
22     what kind of medication or anything like
23     that, didn't get into those specifics, but
24     she did state that, yes, she was under some
25     stress and was taking some medications.  And

Deposition of Chistina Morrison, taken April 11, 2014

Page 36

1          she did admit that she would fall asleep at

2          her desk occasionally.  She stated that she

3          would, you know, try to do that on her

4          breaks.  But being at her workstation, we

5          suggested it probably wasn't the best place

6          to rest.  If she wanted to rest, we suggested

7          she either go out to her car or go into the

8          break room at least.  Again, when you sit in

9          a cube, people walk by and they don't always

10         know maybe if you're on break.

11    Q    Victoria would get breaks during the course

12         of the day; is that correct?

13    A    Yes.

14    Q    All employees get --

15    A    All employees get -- the policy is everyone

16         gets a break, unless work mandates that you

17         can't take a break.  There are what's

18         considered paid and unpaid breaks.  So lunch

19         period -- if you take your lunch period and

20         go away or clock in and out, that's unpaid.

21         But there were also an allotted -- if your

22         workload supported it, you could take a paid

23         break.  And I think that department generally

24         allows that, either a morning and afternoon,

25         15 minutes.  Or, you know, again based on the

Deposition of Chistina Morrison, taken April 11, 2014

Page 37

1   workload, sometimes you couldn't get those

2   in, but...

3 Q  Was there a policy that people in this

4   department could take a 15-minute break every

5   two hours?

6 A  I don't know if there was a policy in the

7   department.

8 Q  Were there any policy limitations on what

9   employees could do on their breaks?

10 A  The limitations that I'm aware of were, if

11   they were a paid break, they could not leave

12   the premises.

13 Q  What does that mean, not leave the premises?

14 A  Because you're being paid, even if you want

15   to go step away and take a break, if you

16   leave the premises based on liability, you

17   have to clock in and out, which means you're

18   not paid, so it doesn't jibe.  So paid breaks

19   had to be on location.

20 Q  I was going in a little bit different

21   direction than you were in your answer.  What

22   would constitute leaving the premises?

23 A  Leaving UH property.

24 Q  So going out to the parking lot, would that

25   be leaving the premises?

Deposition of Chistina Morrison, taken April 11, 2014

Page 38

```
 1   A   I don't believe so.
 2   Q   There was a parking lot on the property,
 3       right?
 4   A   Yes.
 5   Q   Stepping outside the building would not be
 6       considered leaving the premises, right?
 7   A   Correct.
 8   Q   Getting in the car, driving off to
 9       McDonald's, that would be considered leaving
10       the premises, right?
11   A   Yes.
12   Q   And there was a break room, correct?
13   A   Yes.
14   Q   Vending machines and things like that that
15       people could go to?
16   A   Yes.
17   Q   Was there any policy that you ever saw that
18       said an employee could not take a nap while
19       on their break?
20   A   I don't recall seeing a policy that said --
21       there's no system policy.  The policy is you
22       can't sleep at your station while on the
23       clock or being paid.
24   Q   Was that a written policy?
25   A   It's a corrective action policy, yes.  It's
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 39

1    written.

2  Q  And the document that it's written in, what

3    is that document entitled?

4  A  It's the corrective action policy -- human

5    resources corrective action policy.  I'm

6    going to guess at the number because, again,

7    it's been a little while.  I think it's HR 72

8    possibly.  It references sleeping at work.

9  Q  Does it reference sleeping at work on paid

10    breaks, unpaid breaks, or both?

11  A  I don't know the specific wording.

12  Q  Is that a policy that Victoria Johnson's

13    supervisors should have been aware of?

14  A  It's -- every employee has access to all of

15    the -- yes, definitely.  Every employee has

16    access to those policies.  They're online.

17  Q  Do you recall when it was that Sheryl Johnson

18    came to you regarding concerns about Victoria

19    Johnson sleeping at her desk?

20  A  I don't recall exactly.

21  Q  Do you recall how many times she came to you?

22  A  At least two, three.

23  Q  I think you testified a few moments ago that

24    when you confronted Victoria about this, she

25    said that she was under some stress?

Deposition of Chistina Morrison, taken April 11, 2014

Page 40

 1  A   Yes.

 2  Q   Did you ask her what she was under stress

 3      regarding?

 4  A   Yes.  Well, yeah, during the conversation,

 5      she shared that she was feeling stress from

 6      work, from life.

 7  Q   Did she elaborate on that?

 8  A   Just general statements that I recall.

 9  Q   Well, what do you recall her saying?

10  A   I recall her saying that, you know, she felt

11      her job was stressing her out.

12  Q   Did you ask her what it was about her job

13      that was stressing her out?

14  A   She -- yeah.  I mean, I asked her specifics

15      about, you know, like what's going on, what

16      can we do to help, these kinds of things.  So

17      just so you understand, when she came to me

18      with concerns and sleeping at the desk and

19      she's telling me that she's stressed out, I

20      was trying to do what I could to help her.

21      So in order to help her, I had to ask her

22      questions about, well, what can we do to

23      help.  Again, I offered her EAP several

24      times.

25          The stress she was feeling at work, I

Deposition of Chistina Morrison, taken April 11, 2014

Page 41

1    recall her telling me that she felt stressed

2    by just the pressures of her job.  Again, she

3    was having some performance issues that

4    Sheryl and Steve were both working with her

5    on.  So stress from that.

6  Q  What were the performance issues that

7    Victoria referenced that Steve Riddle and

8    Sheryl Johnson were working with her on?

9  A  Some of it surrounded productivity.  She's a

10   rep for the providers for Medicaid

11   applications, and so calls would come in

12   and -- yeah, I don't -- again, I don't recall

13   exactly, but I think she was having trouble

14   keeping up with -- some of the calls were

15   rolling to other reps because she was

16   unavailable.  That's one thing I recall was

17   an issue.  Not being responsive to some of

18   the providers and the customers that she was

19   supporting.  Those types of things.

20  Q  What else do you recall?

21  A  Part of her job -- main function of her job

22   were these applications -- provider

23   enrollment applications.  She wasn't

24   completing them appropriately.  There was

25   some, you know, conflict there that was

Deposition of Chistina Morrison, taken April 11, 2014

Page 42

1      causing her stress.

2  Q   Who said that she wasn't completing these

3      applications appropriately?

4  A   There's -- her leadership.

5  Q   What did her leadership say regarding how she

6      was not completing these applications

7      appropriately?

8  A   There's a section where you put the contact

9      information for the physician.  The process

10     at UH is to put the enrollment specialist's

11     contact information, because they're the ones

12     that handle the providers' accounts.  And,

13     again, there was meetings where they

14     instructed how to complete these

15     applications.

16          And Victoria had questioned about that

17     phone number.  And they looked into it and

18     said, no, we still want you to put your

19     number there.  So she had concerns that --

20     because it states, you know, we need the

21     provider's number, she felt that it had to be

22     the provider's number, so she was pushing

23     back on that.  She didn't want to put

24     her phone number -- it's not her personal

25     number; her UH number there.  And that's the

Deposition of Chistina Morrison, taken April 11, 2014

Page 43

 1      process that UH follows.

 2           So she continued to not put her number

 3      there.  And her manager, Sheryl, said, if you

 4      don't want to put yours, put mine, but we

 5      can't put the specific provider number there.

 6      So there was stress there because she felt

 7      she shouldn't put her number -- her UH work

 8      number, and they were instructing her to do

 9      so.

10  Q   Well, isn't it true that it was the company

11      that was processing the applications that was

12      telling Victoria that she was putting the

13      wrong number down?

14  A   That is not my recollection.

15  Q   When you spoke with Victoria Johnson about

16      these applications, did she tell you that the

17      company that processed these applications was

18      telling her to do it a different way?

19  A   She told me that she contacted the company,

20      herself, when she started questioning it.

21      She spoke to a rep there -- I don't recall

22      that person's name -- who told her that she's

23      supposed to be putting a number there that

24      can directly contact the physician, the

25      provider.

Deposition of Chistina Morrison, taken April 11, 2014

Page 44

1          So Victoria then continued to push
2     back on her leadership and say, I'm not going
3     to put my number.  So her leaders looked into
4     it, themselves, to confirm that UH was
5     following the process appropriately, and they
6     confirmed that they were.  So Victoria
7     continued to interpret what they told her as
8     I need to put the direct provider number.  So
9     then Victoria called, I believe, if I
10    remember the sequence of events correctly --
11    because there was all this push-back going
12    on.  And I was advising Victoria at the time,
13    you need to follow the directives of your
14    leaders, you know, but we'll work through
15    this process.  But in the meantime, follow
16    the directives of your leaders.  She
17    continued to question and push it and refused
18    to put the number down they were telling her.
19          So then she called the compliance
20    hotline, if I recall, to make a complaint.
21    So then, again, as part of my role, I
22    investigated that with the compliance
23    officer.  The compliance officer, Carole
24    Meisler, called that company -- and I don't
25    remember the name of it, I think it starts

Deposition of Chistina Morrison, taken April 11, 2014

Page 45

1       with a C -- and actually asked Victoria who

2       did you speak to.  So to make sure we were

3       all getting the right information, Carole

4       spoke to that person's supervisor.  So she

5       couldn't get ahold of that person that

6       Victoria said she spoke to, but she spoke to

7       that person's supervisor who confirmed that

8       you don't have to put the provider's exact

9       phone number.  As long as the provider can be

10      contacted through that number, UH is doing

11      the right thing.

12  Q   Were you present when Ms. Meisler had that

13      conversation with the supervisor?

14  A   I actually was.  She did it in my office.

15  Q   Was that a conference call where you could

16      hear what the other supervisor was saying?

17  A   Yes, I absolutely could.

18  Q   Did you take any notes as to what that

19      supervisor said?

20  A   Yes.  Well, actually, the notes were -- I

21      jotted my own little, maybe, informal notes

22      possibly, but I know Carole Meisler is the

23      one -- because she was heading the

24      investigation, she recorded it, documented

25      it, and submitted it.  And I believe she

Deposition of Chistina Morrison, taken April 11, 2014

Page 46

1       shared that with Victoria.  I'm not -- I know

2       she shared the results with Victoria, because

3       that's part of the process.  And I recall

4       that, but I don't -- you know, she would have

5       had the official documentation on that.

6    Q  But you said you did take notes during that

7       meeting, during that conversation?

8    A  I'm thinking I would have.  I don't recall if

9       I exactly did.  But I vividly remember the

10      conversation because she came into my office

11      and made the phone call.

12   Q  Now, isn't it true that the problem that

13      Victoria was having with these applications

14      is that the company that was responsible for

15      processing them was rejecting applications

16      that she was submitting?

17   A  I do not know that.

18   Q  Did Victoria ever tell you that --

19   A  No.

20   Q  -- applications that -- let me finish the

21      question.

22   A  Okay.

23   Q  Did Victoria ever tell you that applications

24      she was submitting to this company, which is

25      called CGS, was rejecting applications that

Deposition of Chistina Morrison, taken April 11, 2014

Page 47

1       she was submitting because of their inability

2       to directly contact the physician at the

3       number that she was providing?  Did Victoria

4       ever tell you that?

5   A   She never told me that.

6   Q   As it pertains to these applications, do you

7       have any understanding as to who it is that

8       sets the rules regarding how these

9       applications are to be completed?

10  A   Can you say that again?  I'm sorry.

11  Q   First of all, do you know what the

12      application is called?

13  A   Not specifically.

14  Q   Have you ever heard of an 855I form?  Do you

15      recall that phrase ever coming up?

16  A   I don't recall that.

17  Q   What are these applications for?

18  A   To my recollection, it's Medicaid or Medicare

19      reimbursement applications.  I do not work in

20      that department.  I do not know.

21  Q   So you don't know --

22  A   I am going off of hearsay from what they told

23      me.

24  Q   So you don't know why these applications have

25      to be submitted; is that correct?

Deposition of Chistina Morrison, taken April 11, 2014

Page 48

1  A  Correct.

2  Q  You don't know who sets the rules for how

3     these applications are to be completed?

4  A  Correct, yes.

5  Q  Have you ever seen the application before?

6  A  I may have briefly seen it once.  I don't

7     really recall.

8  Q  When you sat in on the call that Ms. Meisler

9     had with the supervisor -- you don't recall

10     the name of the supervisor; is that correct?

11  A  I don't.  No, I do not.

12  Q  Do you recall exactly what the supervisor

13     said?

14  A  Yes.  Yes.  I recall that she said that the

15     process that -- if UH -- the process that UH

16     had in place, that the provider enrollment

17     specialist contact number was there, was

18     appropriate as long as that physician or

19     provider could be contacted through that

20     number.  And because our provider enrollment

21     specialists support that provider, that that

22     was appropriate.  That was acceptable.

23         I remember her saying, we understand

24     that physicians cannot be directly contacted

25     sometimes through their direct line because

Deposition of Chistina Morrison, taken April 11, 2014

Page 49

1      they're seeing patients.  Because they

2      understand that, they supported the process.

3      She said the process that UH is following is

4      appropriate.

5   Q   Did the supervisor at CGS state that they did

6      not expect the provider to necessarily

7      directly answer the phone himself or herself

8      when that number was called?

9   A   Yes.

10  Q   Did the supervisor give an example about a

11     large hospital where they would call what's

12     called the main number?  Do you recall that

13     ever coming up during the discussion?

14  A   I don't recall.

15  Q   You don't recall that coming up?

16  A   I don't recall that part of the conversation.

17  Q   You referenced a few moments ago that you

18     might have taken notes about what took place

19     during that conversation, right?

20  A   Yeah.

21  Q   When is the last time you looked at those

22     notes?

23  A   I don't recall.

24                  - - - - -

25     (Plaintiff's Exhibit No. 4  was marked.)

Deposition of Chistina Morrison, taken April 11, 2014

Page 50

```
 1                    - - - - -
 2   Q    I'm going to hand you what's marked as
 3        Plaintiff's Exhibit 4.  Have you seen these
 4        documents prior to today?
 5   A    Yeah.  I wrote them.
 6   Q    They're Bates stamped pages 1420 through
 7        1432, so it's about 12 pages here, right?  13
 8        pages?
 9   A    Yeah.
10   Q    And these are all in your handwriting?
11   A    Yep.  Looks like it.
12   Q    You've just had an opportunity to look
13        through what we've marked as Exhibit 4.  Do
14        you see in there anywhere notes of the
15        conference call that you and Ms. Meisler had
16        with the CGS supervisor whose name you do not
17        recall?
18   A    I mean, I see on 1429 and 1430 that
19        there's -- these are notes surrounding that,
20        but I don't know that that would have been
21        the call.  This, I think, is my conversation
22        with Victoria -- or, you know, notes
23        surrounding that.
24   Q    When you say these are your notes of your
25        conversation with Victoria, let's identify
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 51

1      what page you're referring to and what

2      specific notes you're referring to.

3   A   So 1429, where it's dated 7/16 at the top,

4      this looks like -- where it references, feels

5      will go to jail as a result of this, all a

6      big joke, understands the risk, fraudulent,

7      risk is lying.

8            That would have been what Victoria

9      shared with me about her concerns.  I recall

10     her saying she felt that she could go to jail

11     because she was putting that number down

12     wrong.  That would not have been the phone

13     call to CSG -- or CGS.

14           Again, at the bottom, it looks like

15     more conversation with Victoria about it.

16     Doesn't feel anyone has gone to Steve.  Out

17     of state application, they fill out for

18     provider.  Docs sign -- I don't -- I don't

19     see --

20           I mean, the next page, 7/26, closure

21     CGS, clarified by compliance, will submit.

22     That could have been my notes during the

23     phone call or after we got off the phone with

24     the supervisor.  Again, they just would have

25     been reminder notes to myself, because Carole

Deposition of Chistina Morrison, taken April 11, 2014

Page 52

1        Meisler would have taken the official notes.

2   Q    So all of the notes on page UHPS Johnson 1429

3        are notes that you had of your conversations

4        with Victoria, correct?

5   A    That's what it appears.  Because I've written

6        down what she would have expressed to me as

7        concerns.

8   Q    And the notes on page 1430 may be notes you

9        made after the call to the CGS supervisor?

10  A    I -- it's possible.

11  Q    You're not certain, though, correct?

12  A    Because I don't remember dates of when we

13       actually had that phone call, I can't say for

14       certain.

15  Q    Was anybody else present during this

16       conference call, other than yourself and

17       Ms. Meisler?

18  A    No.

19  Q    Do you recall how long the conference call

20       lasted?

21  A    Not exactly.

22  Q    Generally?

23  A    Maybe 10 to 15 minutes.  10 minutes.

24  Q    Do you recall whether or not during that

25       conversation there was any discussion

Deposition of Chistina Morrison, taken April 11, 2014

Page 53

1       regarding why any applications that Victoria

2       Johnson had been submitting to CGS were being

3       rejected by CGS?

4    A  That did not come up.

5    Q  It's your testimony here today that Victoria

6       Johnson never told you that CGS was rejecting

7       the applications that she was submitting,

8       correct?

9    A  I do not recall her telling me that at all.

10   Q  Do you recall Victoria telling you that

11      people from CGS were telling her that she

12      could not use her direct workstation number

13      on those applications?

14   A  I recall her telling me that she reached out

15      to CGS and that they agreed that -- you know,

16      that -- with her concern about putting that

17      number.  But, again, that's why we called

18      them directly ourselves -- you know,

19      compliance did during the investigation, to

20      confirm.

21   Q  When Victoria came to you and met with you --

22      and it appears to be on the 16th of July; is

23      that correct?

24   A  Yeah, according to these notes.

25   Q  When you met with Victoria on that date, did

Deposition of Chistina Morrison, taken April 11, 2014

Page 54

1      Victoria show you any documents or e-mails

2      that she had received regarding this

3      application process that was at issue?

4  A   I don't recall.

5  Q   When you met with Victoria on July 16, did

6      she indicate to you whether anybody else was

7      concerned that this was fraudulent or illegal

8      or they might go to jail, other than her?

9  A   She -- I asked her -- I remember talking

10     about this to ask her if, you know, was it

11     like a general consensus that people were

12     concerned about this, and she said there were

13     a couple of people that had questions about

14     it, but that they addressed it during a

15     meeting.  But she still had concerns after

16     that meeting.

17 Q   Did she tell you who those individuals were?

18 A   No.

19 Q   Did you ask her who those individuals were?

20 A   I don't recall.  I don't recall.  If I would

21     have, I probably would have written their

22     names down.  I mean, it was more of a

23     general, yeah, there's a little bit of

24     concern, questioning it.  Apparently, it had

25     been brought up a couple of times in

Deposition of Chistina Morrison, taken April 11, 2014

Page 55

```
 1        meetings, which -- this I do recall.  You
 2        know, when they questioned that portion,
 3        that, you know, they addressed it and then
 4        addressed it again in a meeting after -- you
 5        know, Steve and Sheryl to say we have looked
 6        into this a couple of different times, just
 7        put your number there.  We confirmed it's
 8        appropriate.
 9   Q    During the conference call then that you and
10        Ms. Meisler had with the supervisor from CGS,
11        did the issue of what constitutes being able
12        to directly contact a provider come up?
13   A    Carole specifically stated to the supervisor,
14        this is what we ask our provider enrollment
15        specialists to put in, their number, is that
16        appropriate?  And the supervisor said, yes,
17        that's fine, as long as we know if we call
18        with a question or concern that we can reach
19        the physician through that number or through
20        that person.
21   Q    Well, if somebody contacts Victoria Johnson's
22        number, do you know whether or not any
23        particular physician can be reached by
24        calling Victoria at that number?
25   A    I know that Victoria can reach the
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 56

1      physicians.

2  Q   How does she reach the physicians from that

3      number?

4  A   She would then contact them.

5  Q   Could Victoria, if she wanted to, be able to

6      put the CGS representative on hold and

7      connect that representative with that

8      doctor -- with that provider?  They're not

9      all doctors, but...

10 A   I --

11 Q   You look like you don't know.

12 A   I don't know.  I mean, I assume so.  I mean,

13     I don't know how many lines she had on her

14     phone, if she could do that, if she had the

15     ability to do that.  I'm sure she could.

16 Q   Do you know if she had the ability to do

17     that?

18 A   I do not.  Personally, I do not.

19              MR. HERRON:     I need about a

20     five-minute break.

21      (Recess from 11:54 a.m. to 12:09 p.m. )

22 BY MR. HERRON:

23 Q   When you were having these conversations with

24     Victoria Johnson regarding how these

25     applications were to be completed, I notice

Deposition of Chistina Morrison, taken April 11, 2014

Page 57

 1      in your notes that you did make a reference

 2      to 855I.  I guess it's 1427 again.

 3  A   Okay.

 4  Q   Did you ever actually take a look at the

 5      form?

 6  A   I don't recall.

 7  Q   Did you ever review any of the instructions

 8      on how that form was to be prepared?

 9  A   I don't recall.

10  Q   In any of the meetings or the conversations

11      that you had with Ms. Meisler, did you and

12      her review the form or the instructions on

13      how it was to be completed?

14  A   She knew how to fill out the form or how it

15      was to be completed.

16  Q   How did she know how the form was to be

17      completed?

18  A   And when I stated that I don't recall if I

19      reviewed it; I vaguely remember that I may

20      have seen it.  I don't recall how in-depth I

21      reviewed it.  But I do recall that Carole

22      knew intimately about the application.

23  Q   How do you know that she knew intimately

24      about the application?

25  A   She was very familiar -- she verbalized to me

Deposition of Chistina Morrison, taken April 11, 2014

Page 58

1    that she was very familiar with the form and

2    understood it.

3    Q    Did she show you any of the rules regarding

4    how it was to be completed?

5    A    I don't recall seeing rules.  I recall

6    talking about them.

7    Q    Do you recall Victoria Johnson showing you

8    any e-mails that she had received from

9    anybody at CGS that recited the rule that

10    they claimed was not being followed?

11    A    No, I don't recall.

12    Q    Did you, in your conversations with Victoria,

13    ask her if she was receiving any complaints

14    from CGS about how the forms were being

15    completed?

16    A    My recollection, when we were talking about

17    it, that she initiated the questions and

18    concerns.  Now, I don't recall why she did.

19    I didn't specifically ask her, that I

20    remember.  Did you get complaints from CSIQ

21    {sic}.  I remember talking to her about why

22    she had concerns about the phone number and

23    telling me.  You know, well, what is it, why

24    are you concerned about this, if your

25    leadership is telling you to do it, why do

Deposition of Chistina Morrison, taken April 11, 2014

Page 59

 1      you have concerns, so...

 2   Q  What did she say about why she had concerns?

 3   A  She didn't feel comfortable putting her

 4      direct work line there.  She felt it should

 5      be the provider's direct work line, based

 6      on -- she said to me that it was because the

 7      form said -- like, asked for the provider's

 8      number or the -- I don't remember exactly.

 9      You know, the instructions say what's the

10      contact number or the provider's number.  So

11      she felt that putting her number in there was

12      wrong.

13   Q  And you don't recollect her relating to you

14      that she had been told by CGS that the number

15      she was putting down was incorrect?  You

16      don't recall her telling you that; is that

17      correct?

18   A  What I recall is that she reached out to

19      someone at CGS or CSG to ask about the

20      number, to clarify what number she should put

21      in there.  And she told me that she felt that

22      the person that she talked to agreed with her

23      that she should put the provider number, if

24      she could, there.  Now, again, that was her

25      telling me that.  She never showed me

Deposition of Chistina Morrison, taken April 11, 2014

Page 60

1       anything, that I remember, that showed

2       definitive information.  So then my question

3       to her was, well, did you talk to Steve --

4       you know, Steve or Sheryl.  And that's when

5       we had conversation around meetings.  And I

6       said, well, until you have definitive,

7       different -- continue to question it, if you

8       feel, but follow the instructions of your

9       leaders.

10  Q    Let me ask you this then.  Let's just assume

11      for the purposes of this question that

12      Victoria Johnson is being told by CGS that

13      the number that she's being told by her

14      supervisors to use is the improper way of

15      doing it.

16           Would you agree with me that that

17      would be pulling her in two different

18      directions?

19  A    Yes, I would agree.

20  Q    Tell me then why Victoria should follow what

21      her supervisors are saying and not what CGS

22      is saying.

23  A    Her supervisors were instructing her that

24      they also looked into it and that they were

25      confident that they were asking her to do --

Deposition of Chistina Morrison, taken April 11, 2014

Page 61

1          it was their responsibility.  They're the

2          leaders of the department, and if they're

3          instructing her to do so -- I didn't want her

4          to get in trouble for not following the rules

5          or the instructions by her leaders.  They're

6          telling her, we've confirmed it's okay.

7          She's investigating on her end and saying

8          that they're telling me no.  Let's figure it

9          out, but in the meantime, follow the

10         directives of your leader.  I didn't want her

11         to get in trouble.

12    Q    Even if that results in applications that

13         she's responsible for submitting for the

14         physicians or other providers being rejected?

15    A    I would -- I would view that as it would be

16         the responsibility of her leadership, because

17         she's doing what they're telling her.

18    Q    What is your understanding as to what CGS is?

19    A    My understanding would be they're a vender.

20         I don't know honestly.

21    Q    Are you aware that they have a contract with

22         the Department of Health and Human Services

23         to process Medicare and Medicaid provider

24         enrollment applications so that doctors can

25         perform services for patients or clients who

Deposition of Chistina Morrison, taken April 11, 2014

Page 62

1     receive Medicare or Medicaid benefits?

2   A   I understood they were a third party that we

3     worked with.  I knew they had some sort

4     of, you know, like, authority with these

5     applications.  I don't know the full extent

6     of what they do, no.

7   Q   Was it your understanding that CGS had a

8     contract with the United States Department of

9     Health and Human Services to process these

10     applications?  Were you aware of that?

11  A   I was not aware of that.

12  Q   Were you aware that the Center for Medicare &

13     Medicaid Services, which is an agency within

14     the Department of Health and Human Services,

15     sets the rules on how these forms are to be

16     completed?  Were you aware of that?

17  A   No.

18  Q   Did you have any discussion with Ms. Meisler

19     regarding that issue, regarding who sets the

20     rules on how these forms are to be completed?

21  A   Yeah, regarding the importance of the

22     application and what information that's in

23     there, I knew there was an importance.  But

24     they're the experts in that area, so I knew

25     that, you know, if -- you know, our

Deposition of Chistina Morrison, taken April 11, 2014

Page 63

1    compliance department and our leaders of that
2    area were investigating it on their own, too,
3    making sure and confirming that they were
4    doing it appropriately.  I trusted in their
5    knowledge.
6  Q  You used the phrase a moment ago, they're the
7    experts.  You're referring to the compliance
8    department, right?
9  A  I'm -- yes.  I would say -- like, I'm an HR
10    person, so HR to me is where I would, you
11    know, say I have more expertise than somebody
12    that's a physician.  Yes, they, to me, would
13    be the -- that's their line of business, so
14    they should have the knowledge.  Yes.
15  Q  And if the personnel from CGS who have the
16    responsibility to process these applications
17    are saying it's to be a different way, how do
18    you reconcile who's right and who's wrong?
19  A  I think that if there's a question
20    surrounding something like that, then the
21    leadership of those areas work with that
22    group to reconcile it.  And then that
23    information is shared with their employees.
24  Q  Do you know if Ms. Meisler is an attorney as
25    well?

Deposition of Chistina Morrison, taken April 11, 2014

Page 64

1  A    Yes, she is.

2  Q    Do you have any understanding as to what the

3       consequences are or when an 855I application

4       is rejected by CGS or Department of Health

5       and Human Services, Center for Medicare &

6       Medicaid Services?

7  A    No, I do not.

8  Q    You're not aware that if a provider provides

9       services for a patient on Medicare and

10      Medicaid and they haven't been approved as a

11      provider for Medicare and Medicaid, that the

12      hospital does not get reimbursed for those

13      services?  Were you aware of that?

14 A    I would say I have some outside knowledge of

15      that, just living in that world.  I don't

16      know details.

17 Q    Is that something that had come up when you

18      were working out at Geauga or at Lake?

19 A    Not that I recall.

20 Q    Outside of the phone conversation between you

21      and Ms. Meisler and the CGS supervisor, whose

22      name you don't recall -- by the way, we took

23      a break for the while.  Have you had a chance

24      to refresh your recollection as to what the

25      name of that person was?

Deposition of Chistina Morrison, taken April 11, 2014

Page 65

1   A   I wouldn't be able to remember even if I had

2       all day.

3   Q   Was there any follow-up communication between

4       UHPS and that supervisor or CGS confirming

5       the substance of that phone conversation,

6       anything in writing that we can point to?

7       And I'm not asking about any e-mails that you

8       or Ms. Meisler would have written to Victoria

9       Johnson --

10  A   I do not know.

11  Q   -- but anything that came from that

12      supervisor or somebody else at CGS confirming

13      that conversation.

14  A   I don't know.

15  Q   So you don't know if CGS provided any

16      correspondence or e-mail to Ms. Meisler

17      regarding what their expectations were on how

18      the form was to be completed?

19  A   I couldn't say for sure.  I don't recall.

20  Q   Did Ms. Meisler relate to you ever having

21      received anything from CGS confirming that

22      phone conversation?

23  A   I don't recall.

24  Q   Ms. Meisler -- I don't know if assistant is

25      the right term, but is there a Ms. Wahl that

Deposition of Chistina Morrison, taken April 11, 2014

Page 66

1        works with -- Cheryl Wahl?

2   A    Yeah.  Cheryl Wahl is, I believe, the VP.

3        And that is who Carole Meisler reported to.

4   Q    Do you recall seeing anything that CGS would

5        have sent to Cheryl Wahl confirming what

6        CGS's expectations were on how to complete

7        these forms?

8   A    I don't specifically recall seeing anything

9        directly from CGS.

10  Q    Do you recall either Ms. Wahl or Ms. Meisler

11       telling you that they received any type of

12       written confirmation from CGS?

13  A    I do recall that.  And I shouldn't say

14       written.  I do recall them sharing

15       information that they confirmed that they --

16       you know, that they -- they investigated it.

17       Again, I'm not in compliance.  They

18       investigated on their side based off the call

19       that Victoria placed.  And I recall

20       correspondence back to Victoria confirming

21       that they investigated it and supported the

22       process that UH followed.  That's my

23       recollection.

24  Q    And they, are you referring to Meisler and

25       Wahl, or are you referring to CGS?

Deposition of Chistina Morrison, taken April 11, 2014

Page 67

1  A  I am referring to Cheryl and Carole.

2  Q  And you communicated all of this to Victoria?

3  A  Victoria and I talked a lot.  I don't
4     remember exactly how the --

5  Q  Did you communicate what you heard during
6     this phone conversation to Victoria?

7  A  Honestly, I don't recall.  I recall lots of
8     conversations with Victoria around it, but I
9     don't recall exactly -- because that part of
10    it -- although, I was witness to the phone
11    call with Carole, because we always partner
12    on these investigations -- it's a compliance
13    issue.  It's not HR.

14 Q  Going back to the sleeping issue.  Did Steve
15    Riddle ever ask you for any type of guidance
16    on employees sleeping at their workstations
17    during their break?

18 A  Yes.  He -- yes.

19 Q  What did he ask you?

20 A  He and Sheryl had concerns and asked for, you
21    know, guidance on what would be appropriate.
22    He had concerns because it -- you know, for
23    example, Victoria is sleeping in her cube and
24    there's senior VPs that are right there in
25    that same area.  He was concerned about

Deposition of Chistina Morrison, taken April 11, 2014

Page 68

```
 1        professionalism of the department and just

 2        how to address it.

 3   Q    When an employee back in this timeframe would

 4        be taking a break and staying at their

 5        cubicle, were there any limitations on what

 6        they could do while they were taking their

 7        break?  I'll break it down a little bit.

 8        Were there any limitations that you're aware

 9        of?

10   A    Not that I'm aware -- I mean, I guess I'm not

11        really sure what you're asking.  When you say

12        limitations, what do you mean?

13   Q    Well, if an employee is on their break and

14        they're taking their break at their cubicle,

15        can they eat?

16   A    As far as I know.

17   Q    Can they take or make personal phone calls?

18   A    I mean, I -- there wasn't anything that --

19        formally written that said you couldn't make

20        personal phone calls.

21   Q    If they're on their break sitting at their

22        computer -- they have computer terminals,

23        right?

24   A    Yes.

25   Q    Internet?
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 69

1  A  Yes.

2  Q  If they're sitting at their break, can they

3     play Angry Birds or Candy Crush on their

4     break?

5  A  I can tell you what the policy says. I don't

6     know what -- there's many different

7     departments in the hospitals. They might

8     have different rules within each department.

9  Q  We're going to stick with Victoria's

10    department.

11  A  I don't know if there was a strict policy

12    against it within their department. I know

13    that the general policy is that excessive use

14    of these types of things would be forbidden.

15    Yes, they would be against policy. So

16    excessive use of, you know, using personal

17    phone, using the system's phones for

18    personal, excessive use of internet,

19    excessive use -- that is against policy.

20    Now, UH doesn't forbid people from doing

21    that, but if it turns into an issue that's

22    impacting work, then yes.

23  Q  Now, since I'm focusing my questions right

24    now on what they're doing during their break,

25    obviously they're not working during their

Deposition of Chistina Morrison, taken April 11, 2014

Page 70

1       break; that's their time, right?

2    A   Correct, right.

3    Q   If they want to play -- if their break is 15

4        minutes and they want to spend 10 minutes

5        trying to get through a level of Candy Crush,

6        that's not forbidden, right?

7    A   I don't think so.

8    Q   But if some high-level executive were walking

9        through seeing an employee on their break

10       playing Candy Crush, then that might not look

11       too professional, would it?

12   A   Correct.

13   Q   If they're sitting yakking on their phone to

14       their girlfriend or their boyfriend or

15       whatever, that might not look too

16       professional either, right?

17   A   Correct.

18   Q   But it's not prohibited?

19   A   Not that I'm aware.

20   Q   If they wanted to sit and watch Netflix for

21       20 minutes on their 20-minute break, that

22       wouldn't be prohibited; would it be?

23   A   You know, there's a line.  I mean, I'm not

24       going to say no, but...

25   Q   Well, we could say --

Deposition of Chistina Morrison, taken April 11, 2014

Page 71

1    A    There's a professional behavior policy, too,

2         that --

3    Q    So obviously they wouldn't be allowed to like

4         sit and watch pornography at their

5         workstation?

6    A    Correct.

7    Q    I would hope so.  But other than that, there

8         really aren't too many limitations on what

9         somebody can do on their break; that's their

10        15 minutes to clear the cobwebs out of their

11        head, right?

12   A    Yeah, when they're on break, there's some,

13        you know, leeway to what they can do, as long

14        as it lies within the professional behavior

15        policies.

16   Q    When Steve asked you for guidance on what to

17        do with the sleeping-at-the-desk issue, how

18        did you respond to him?

19   A    I understood the concerns.  Even if you're on

20        break, sometimes people don't know you're on

21        break.  And really, people shouldn't be --

22        just as a professional courtesy, shouldn't be

23        sleeping at their desk.  I also advised that

24        to Victoria.  You know, I fully supported her

25        need to -- if she needed to rest or if she

Deposition of Chistina Morrison, taken April 11, 2014

Page 72

1      was feeling stressed, but, you know, go to

2      the break room or that type of thing.

3  Q  When you responded to Mr. Riddle's concerns,

4      did you cite to him the policy that you

5      referenced earlier in your testimony?  And I

6      think you called it HR 72.  Did you reference

7      that to Mr. Riddle in your response to him?

8  A  I don't recall exactly, but there was

9      discussion around what was acceptable per

10     policy as far as sleeping.

11  Q  Was that discussion a verbal conversation or

12     was that in an e-mail exchange?

13  A  That would have been verbal, I'm sure.

14  Q  Now, Mr. Riddle implemented a policy against

15     sleeping at your cubicle on breaks,

16     workstation on breaks, right?

17  A  Right.

18  Q  And he did that on July 23 of 2012; do you

19     recall that?

20  A  Yeah, I recall him sending out an e-mail to

21     everybody.  Because the expectation is when

22     you want to clarify something, you know, it's

23     department-wide.

24  Q  Do you recall there being any issues with

25     Victoria Johnson sleeping at her workstation

Deposition of Chistina Morrison, taken April 11, 2014

Page 73

1    on breaks after Mr. Riddle disseminated that

2    policy on July 23 of 2012?

3  A  Not that I recall.  I don't remember exactly

4    timeline-wise.

5  Q  Do you recall what date it -- well, back that

6    up a second here.

7        After you and Ms. Meisler had the

8    conference call with the CGS representative,

9    I think the testimony has been that both you

10   and her communicated to Victoria Johnson what

11   was the results of that phone conversation,

12   correct?

13  A  I don't remember exactly my conversation with

14    Victoria.  I remember talking about the whole

15    situation several times with her.  I just

16    don't recall exactly what I would have said

17    back to her after that conversation.

18  Q  Do you recall when it was that you got back

19    to her about that?

20  A  Again, it was a compliance hotline, so it was

21    their responsibility to respond back to her.

22  Q  Did you respond back to her?

23  A  I may have talked with her.

24  Q  Do you recall when that was that you talked

25    to her?

Deposition of Chistina Morrison, taken April 11, 2014

Page 74

1   A   No, I do not.

2   Q   When compliance got back to her, do you know

3       when that was?

4   A   No.  I don't remember dates.

5   Q   Do you recall whether compliance got back to

6       Victoria verbally or was that through e-mail?

7   A   It would have been a documented response

8       back.

9   Q   Would you have been copied on that?

10  A   Possibly.  Maybe not.  It just depends on --

11      again, I'm part of it, just because I'm the

12      HR person.  But, again, it was a compliance

13      complaint, so they're the facilitator of it.

14      So they may have copied me.  I don't know.

15  Q   Well, I think the term that you used and the

16      phrase that you used to describe it earlier

17      was you teamed up with them?

18  A   We partner on the investigation, sure, yeah.

19      Because it's the employee that falls under my

20      group that I'm supportive of.

21  Q   So would you expect compliance to keep you in

22      the loop when they communicate directly with

23      the employee who's in your department?

24  A   Yeah.  At least verbally.

25  Q   Now, there came a point in time where

Deposition of Chistina Morrison, taken April 11, 2014

Page 75

1      Victoria was referred to the EAP program.  Do
2      you recall that?
3    A  Yes.
4    Q  When was that?
5    A  I don't remember dates.  It would have
6      been -- probably end of July, early August.
7      End of July.  I'm guessing at dates.
8    Q  Was that a mandatory referral or a voluntary
9      referral?
10   A  It was mandatory at that point.
11   Q  When did the issue of making a mandatory
12      referral for Victoria Johnson to the EAP
13      program, when did that issue first come up?
14   A  Are you asking for a date?
15   Q  Yes, I am.
16   A  I do not remember.
17   Q  Well, how soon before the decision was made
18      to make the mandatory referral did the issue
19      first come up?  Did they all come up the same
20      day, a few weeks before, months before, days
21      before, what?  What's your recollection?
22   A  It would have probably been a few days
23      before.  We don't make decisions like that
24      quickly and we always -- again, as I
25      mentioned before, part of the process would

Deposition of Chistina Morrison, taken April 11, 2014

Page 76

1    be to bring in EAP and talk with them,

2    explain the issues and the concerns, and then

3    a decision is made.  So it wouldn't be a rash

4    decision.

5  Q  I would hope not.  Who first brought up the

6    issue of making a mandatory EAP referral for

7    Victoria Johnson?

8  A  I don't know that it was one person in

9    particular --

10 Q  Well, who?

11 A  -- in my recollection.

12 Q  Who all was it?

13 A  It amounted concerns about her -- her own --

14   you know, she came to me numerous times

15   herself about -- I mean, I -- I woke her up

16   one day sitting at her cube.  Personally.

17   And I asked her, are you okay?  And she came

18   to me later that day and said, I'm really

19   sorry, I know it looked bad, I was sleeping,

20   but I was just really tired.

21 Q  She also told you she was on her break at

22   that time, right?

23 A  I asked her if she was on her break and she

24   said yes.

25 Q  Was she lying to you when she said she was on

Deposition of Chistina Morrison, taken April 11, 2014

Page 77

1      her break, to your knowledge?

2  A   I would think not, no.  So it was a little

3      bit of a culmination of, you know, we have

4      concerns for her.  You know, she's verbally

5      expressed she's stressed and tired.  And

6      falling asleep at your desk is not normal.

7      And, you know, her own admission to me

8      numerous times.  So I think just with the

9      whole situation, I don't recall that one

10     person made that decision.  I think it was a

11     conversation between my boss and EAP.  And

12     her manager was also concerned about what was

13     going on.  It's never normally one person

14     that says -- it's kind of like a conversation

15     that then we -- it's kind of a joint.

16  Q  Did Victoria express to you that she was

17     stressed over the issue regarding how these

18     provider enrollment applications were to be

19     prepared?

20  A  Yes, she did.

21  Q  How many times did she express that that was

22     something that was stressing her out?

23  A  More than once.  I mean, there's a couple of

24     times.  Again, you know, she would come to me

25     and, you know, I wanted to continue to

Deposition of Chistina Morrison, taken April 11, 2014

Page 78

1       support her through that to say, listen, I

2       understand you have questions and concerns.

3       You know, it's a process we're working

4       through.  My advice to her was, again, to

5       follow her directives and not -- you know,

6       she needed to understand that that

7       responsibility wasn't solely on her.

8   Q   Can you understand how somebody would be

9       stressed if they felt they were being asked

10      to do something that they believed was

11      illegal?

12  A   Yes, I understood why she felt stressed over

13      it.

14  Q   Did Victoria indicate anything else regarding

15      her job that caused her to be stressed during

16      these conversations you had with her?

17  A   Not that I recall specifically.  Just kind of

18      in general.  I think she just felt stress

19      with maybe just the whole -- you know, that,

20      I think, was the main thing.

21  Q   That being the provider application issue,

22      right?

23  A   Yeah.  I mean, again, we had numerous

24      conversations.  I kind of sat around the

25      corner from her, so she often would stop in

Deposition of Chistina Morrison, taken April 11, 2014

Page 79

1      or I would -- how are you, that kind of

2      thing.  So I get a sense that she just kind

3      of felt stress in general.

4   Q  Did Victoria Johnson indicate that she was

5      having any stress with any of her other

6      co-workers?  Let me rephrase the question.

7          Did Victoria Johnson indicate that she

8      was having any problems with any of her

9      co-workers that was contributing to or

10     causing her stress?

11  A  I don't remember that.

12  Q  During these conversations that you had with

13     her regarding the source of her stress, did

14     she indicate any continuing issues with

15     respect to Mr. Simmons?

16  A  No, not that I recall.  What I recall is --

17     you know, there weren't any further issues.

18     She may have brought up what happened

19     originally once or twice again after, but

20     nothing new, no new concerns.

21  Q  Any conversations you had with Victoria

22     regarding the source or sources of her

23     stress, did she relate to you any issues

24     going on in her personal life with family or

25     relationships that she was involved in or

Deposition of Chistina Morrison, taken April 11, 2014

Page 80

1    other things that would have been happening

2    to her outside of work?

3  A  I remember her sharing that she had a side

4    job.  Don't recall her mentioning a lot of

5    stress around that.  I recall her mentioning

6    that her family didn't want her taking these

7    medications.  But other than that, no.

8              MS. KAMINSKI:    When you get

9    to a place, the food is here.

10              MR. HERRON:    I'm always at

11    a place when food is here.

12    (Lunch recess from 12:38 p.m. to 12:46 p.m. )

13  BY MR. HERRON:

14  Q  Victoria had indicated to you that she was on

15    some medication, right?

16  A  Yes.

17  Q  Did you ask her what she was on?

18  A  No, I did not.

19  Q  Did you ask her why she was on it?

20  A  I don't -- the conversation was -- she

21    volunteered that information to me.

22  Q  She volunteered to you why she was on

23    medication?

24  A  She volunteered that she was on medication

25    and that she was on it because she was

Deposition of Chistina Morrison, taken April 11, 2014

Page 81

1       stressed.  I did not ask what medication.

2       That's not my business.

3   Q   So going back to the mandatory EAP referral

4       that happened at the end of July.  Relate to

5       me how that issue of that mandatory referral

6       first was raised.

7   A   Well, there had been a couple of instances,

8       other than myself, you know, witnessing her

9       sleeping; her own admission to me that she

10      was under a lot of stress, performance issues

11      at work.  She -- if I recall, there was even

12      some e-mails that she had sent saying,

13      listen, I'm on these medications and I'm

14      going to fall asleep once in a while; all

15      concerns to us that there's something going

16      on and we need to offer some help to this

17      employee.

18  Q   Did anybody express, at least to you, any

19      suspicions, other than the prescribed

20      medications that she was on, that she was

21      using drugs or using alcohol?

22  A   No one expressed that to me.

23  Q   But she was referred for drug and alcohol

24      testing?

25  A   Part of the standard process.

Deposition of Chistina Morrison, taken April 11, 2014

Page 82

1   Q   Well, if there was no concerns about her

2       having -- being under the influence of drugs

3       or alcohol, why refer her for drug or alcohol

4       testing?

5   A   We didn't refer her specifically for that.

6       She was referred for -- you know, her

7       declining performance, her falling asleep at

8       the desk, her own admission to being drowsy

9       during the day, her own admission to the high

10      stress she was under; lots of struggles that

11      she was having at work, which she was

12      verbalizing to her co-workers, her managers,

13      and me.  The drug screen is part of their

14      process.  It's not individualized, if that's

15      what you're asking.  Everybody that is

16      mandated is put through that, in other words.

17  Q   Other than her medications might make her

18      drowsy, did Victoria Johnson ever indicate to

19      you that she felt that she was mentally or

20      physically incapable of performing her job

21      duties?

22  A   Not those specific words.

23  Q   Well, what words did she use?

24  A   I mean, the only thing that I can think of

25      closely is that she, you know, admitted she

Deposition of Chistina Morrison, taken April 11, 2014

Page 83

1      was struggling a little bit, you know,

2      because she was on these medications and

3      under stress and that it might impact her

4      ability to do her job.  But she did not ever

5      state to me that she had any drug or alcohol

6      problems.

7    Q   Did she ever state to you that she had any

8      mental health issues?

9    A   No.

10   Q   Did she ever indicate to you that anything

11      was stressing her, other than the issue

12      regarding how to complete or what number to

13      use on these provider enrollment

14      applications?

15   A   She felt overall stress with her job, not

16      just that.  That was one key thing.  She was

17      being held accountable for her performance

18      and I think was sensing stress with that,

19      too, overall.  So she didn't come to me and

20      say, this is the only thing that's bothering

21      me.  It was a general, I'm feeling stressed.

22   Q   Did you keep any notes of the conversations

23      regarding the EAP referral?

24   A   I don't have any notes personally.  Did I

25      take notes?  Possibly.

Deposition of Chistina Morrison, taken April 11, 2014

Page 84

1  Q   Well, if you took notes about those meetings,
2      where would they have been kept?
3  A   Just depends.  Sometimes I jot notes down.  I
4      don't keep them.  Sometimes I do.  I don't
5      know if I have notes from that.  If I have
6      notes that I would have kept, it would have
7      been in an employee relations file that I
8      would have had and that was all left there.
9  Q   The notes that were marked as Exhibit 4,
10     where did you keep those before you left?
11 A   Probably in my employee relations file.
12     That's a separate file from their employee
13     file.  Let's see if there's anything in here.
14     I don't know.  There's a form -- the EAP
15     form.
16 Q   We'll get to that.
17 A   Okay.
18 Q   When the issue of the mandatory EAP referral
19     came up, was Steve Riddle a part of that
20     conversation?
21 A   Clarify what you mean.  With me --
22 Q   With you.
23 A   -- only?
24 Q   Okay.  With you.
25 A   I honestly don't recall.  I'm sure I would

Deposition of Chistina Morrison, taken April 11, 2014

Page 85

1      have talked to Sheryl for sure about it
2      because she's her direct manager.  I don't
3      recall that I talked to Steve.  I possibly --
4      doesn't always go up that high.
5  Q   Well, relate to me what you recall discussing
6      with Sheryl Johnson then.
7  A   Sheryl was very concerned for Victoria as
8      well.  Just felt that, you know, there was --
9      she had concerns over her, you know,
10     performance, her falling asleep at work, her
11     stress, you know, and through this whole
12     process.  I don't recall talking to Steve,
13     but that doesn't mean I didn't.  Steve
14     doesn't have -- isn't there all the time and
15     doesn't always see what's going on.  So it
16     would have -- you know, Sheryl has more
17     intimate relations with Victoria, so I would
18     have definitely talked to Sheryl.  Don't know
19     about Steve.
20 Q   Did either Sheryl Johnson or Steve Riddle
21     provide you any documentation of any of the
22     performance issues that they claimed that
23     they were having with Victoria?
24 A   I reviewed documentation with them.  I didn't
25     keep any of it that I recall.

Deposition of Chistina Morrison, taken April 11, 2014

Page 86

1  Q  What documentation did you review?

2  A  They had some documentation that we reviewed

3     with -- you know, kind of reviewing, you

4     know, some of the specific where she wasn't

5     meeting expectations, errors, that type of

6     thing.  Maybe complaints.  There was a couple

7     of times that there was a lot of other --

8     statements from other co-workers that had to

9     field her calls because she was not answering

10    phones, that type of thing.  General

11    performance.

12  Q  When was it that you reviewed these

13    documents?

14  A  I mean, it was more than once.  A few times

15    over the -- over the -- kind of the -- over

16    the months that we were having issues with

17    her.

18  Q  Was it in July?

19  A  Honestly, I don't remember.  I can't tell you

20    dates.  I just don't remember.  It was more

21    than once.

22  Q  Who were the co-workers that had made

23    complaints about Victoria regarding having to

24    field her calls or something like that?

25  A  I don't remember names.  People that are in

Deposition of Chistina Morrison, taken April 11, 2014

Page 87

1        her same position.  There's a few of them.

2    Q   Is there a quota issue?

3    A   I do not know.

4    Q   Other than the issue regarding the

5        applications, were any of these performance

6        issues discussed between you and/or Sheryl

7        and/or Steve Riddle in July?

8    A   I remember discussing it with them, but I

9        don't remember the date.

10   Q   And you don't remember the month; is that

11       correct?

12   A   I honestly do not, because it was more than

13       once that we talked about her performance

14       concerns.  So it could have been July, it

15       could have been January, could have been

16       February.  I don't remember.

17   Q   Did you keep any notes of any of those

18       conversations that would help you recollect

19       when they took place?

20   A   It just depends on the situation.  If it

21       comes to a formal -- like a formal write-up,

22       yeah, we would have that documentation.  But

23       if it's just conversation with employees, we

24       don't keep notes.

25   Q   When an employee is sent for an EAP referral

Deposition of Chistina Morrison, taken April 11, 2014

Page 88

```
 1        or referred to EAP, are they also put on a
 2        leave of absence?
 3   A    The EAP process is a five-day -- the first
 4        five days is a paid administrative leave.
 5        That's the EAP.  That's the --
 6   Q    Then what happens after those five days?
 7   A    After the assessment is done, which isn't
 8        always in a five-day time frame -- so if it
 9        goes beyond the paid five days, they're
10        switched to an unpaid administrative leave,
11        which then they have the option of using PTO,
12        if they have it in their bank, or going
13        unpaid while they're out.  And then based on
14        determination, an FMLA could be part of that
15        after or, you know, paralegal, I guess.
16   Q    So the paid leave and then the unpaid leave,
17        those are not FMLA leave; is that what you're
18        saying?
19   A    Correct.
20   Q    Now, my other question was:  After the
21        five-day paid administrative leave runs
22        out -- and that's five calendar days or five
23        business days?
24   A    Five calendar days, I believe, if I remember
25        the policy.
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 89

1  Q  So if the leave begins on a Wednesday or a

2      Thursday, the weekend that follows is

3      considered part of the five days?

4  A  They would -- if I remember, they loop that

5      in, because they sometimes might not hear

6      back from a provider, whoever the assessing

7      physician is, if it happened to go over a

8      weekend.  So it could extend over a weekend.

9      I don't recall exactly the process.  But it's

10     a five paid -- well, and if you think about

11     it, it's a 24/7 operation.  So the five days,

12     depending on what the person is scheduled,

13     could fall on different days.

14  Q  So is the five-day then five scheduled work

15     days for that employee or five consecutive

16     calendar days?

17  A  I don't remember.

18  Q  It's probably the better way to phrase it,

19     right?

20  A  Yeah.

21  Q  So what triggers the transitioning of the

22     paid administrative leave to the unpaid

23     administrative leave?

24  A  Just the five days.  It's just the standard

25     paid five days.  And then after that it goes

Deposition of Chistina Morrison, taken April 11, 2014

Page 90

1      unpaid.  If it hasn't been, you know, either
2      transitioned into an FMLA or -- because that
3      sometimes happens.
4   Q  Is the reason that that sometimes happens
5      because whoever is doing the evaluation of
6      the employee may not get that completed
7      within five days?
8   A  That or -- yes.  I mean, sometimes it can go
9      beyond five days because it's very
10     individualized.  Sometimes then after that,
11     it will transition to an FMLA, just depending
12     on the individual situation, if it's
13     warranted.
14  Q  If whoever is conducting the evaluation comes
15     back and says, well, there's nothing wrong
16     with the employee that prevents him or her
17     from doing their job, are they brought back
18     to work?  Are they put on an unpaid leave?
19     How does that work?
20  A  Once the determination is made -- either
21     they're fit-for-duty or not fit-for-duty --
22     then if they're deemed fit-for-duty, then
23     they're taken off any type of administrative
24     leave based on that process.
25  Q  And brought back to work?

Deposition of Chistina Morrison, taken April 11, 2014

Page 91

1    A    They would come back to work, unless there

2         was like an FMLA initiated or something that

3         would keep them out otherwise.

4    Q    Was Victoria ever on FMLA leave?

5    A    Yeah.

6    Q    When was she on FMLA leave?

7    A    I know for sure she was on -- she initiated

8         FMLA herself the day that we initiated the

9         fit-for-duty.  She verbalized to me that she

10        was going on an FMLA and she contacted her

11        daughter and then reached back and said that

12        she had contacted her doctor about it.  I'm

13        kept in the loop on that process.  I don't

14        facilitate it, but they keep HR, so we know

15        how to help with attendance and that type of

16        thing.

17   Q    Did you ever see any type of evidence stating

18        that Victoria Johnson was on approved FMLA

19        leave at any point in time?

20   A    I don't handle the documentation.

21   Q    I know you don't.  I'm asking if you remember

22        seeing it.

23   A    Kara Ladaika, who is the corporate health

24        FMLA administrator, sends confirmation to us

25        because of the protected information, just

Deposition of Chistina Morrison, taken April 11, 2014

Page 92

```
 1        confirming that the person is out on this
 2        date under FMLA.  I do not handle any or see
 3        any of that paperwork.
 4   Q    And who is the individual?
 5   A    Kara Ladaika, L-A-D-A-I-K-A.
 6   Q    And you claim to have seen documentation from
 7        Kara Ladaika confirming that Victoria was on
 8        FMLA leave?
 9   A    Yeah.
10   Q    Was that an e-mail?
11   A    She always e-mails.  I remember the -- you
12        know, the process.  I remember the -- there
13        was communication around it.
14   Q    Did you retain a copy of that e-mail?
15   A    I doubt that I would have kept a copy.  I may
16        have, but I doubt it.  I didn't normally do
17        that.  I'm copied as an FYI.  She would have
18        all the official records.
19   Q    Do you recall when that e-mail was dated?
20   A    No.
21   Q    Do you recall what month?
22   A    Again, I don't remember exact dates of when
23        she went out on fit-for-duty and then, again,
24        it ended up being the FMLA on her own
25        initiation, so it would have been at that
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 93

1      same time.  I'm guessing end of July, early

2      August.  I don't remember.  I'm not good with

3      dates.  Sorry.

4  Q   In your office, did you retain any type of

5      record or have access to any type of record

6      that indicates the dates that employees are

7      in working or when they're off and why

8      they're off?

9  A   Do you mean like payroll records?

10 Q   Maybe payroll records or any type of record

11     that -- let me back up then here.

12         Victoria, was she a salaried employee

13     or an hourly employee?

14 A   I believe she was hourly.

15 Q   So you have to retain records indicating the

16     dates that she works and doesn't work,

17     correct?

18 A   The payroll system is Kronos and that's

19     where -- that's where they house all the

20     timekeeping.  That is --

21 Q   Would -- go ahead.

22 A   I was just going to say, just to help you

23     understand the process, you know, they will

24     use payroll records sometimes, too, just to

25     rectify FMLA hours.

Deposition of Chistina Morrison, taken April 11, 2014

Page 94

1    Q    Is there a record that would be retained that
2         would indicate when an hourly employee like
3         Victoria, what days she works, what days she
4         doesn't work?  Monday, worked; Tuesday,
5         worked; Wednesday, off.
6    A    Yeah, the payroll system -- most hourly
7         employees -- and I won't say a hundred
8         percent of them -- have to swipe in and out,
9         like a time stamp, on their computer.  But I
10        a hundred percent don't know for sure, but I
11        would guess that she has to swipe in and out.
12        Then when they go out on some sort of leave,
13        their timekeeper puts in those hours for them
14        indicating whether it's FMLA leave,
15        administrative leave, that type of thing.
16   Q    And this is called what, Kronos?
17   A    Kronos, yes.
18   Q    Did you ever see any Kronos records for
19        Victoria Johnson indicating that she was on
20        FMLA leave at any time?
21   A    No.  I would never --
22   Q    Do you have access to the Kronos records?
23   A    I would not have access to her Kronos
24        records, that I'm aware of.  If I have
25        access, I don't know about it.

Deposition of Chistina Morrison, taken April 11, 2014

Page 95

1  Q   Now, when an employee takes FMLA leave, how
2      in the loop are you kept regarding an
3      employee's request for FMLA leave and whether
4      it's granted or denied?  How in the loop were
5      you kept about those matters?
6  A   Yeah.  Kara keeps HR in the loop so that
7      we -- we can help if there's issues with
8      attendance, or just FYI this person that
9      falls under you is out on leave.  The
10     requests don't go through me.  Sometimes
11     people share that they're going out, having a
12     child or something like that, it's obvious,
13     we know they're going out.  An employee can
14     initiate it and I would never know.  Kara's
15     group department facilitates it and then
16     keeps us informed as of the dates.
17          If the documentation is submitted, if
18     there's times when they're not getting a
19     response sometimes, Kara might say, hey,
20     listen, I have been trying to get ahold of
21     this employee, have you or the manager heard
22     from them.  Just to make sure that all the
23     appropriate documentation is submitted, that
24     type of thing.  I work with the manager to
25     help notify the employee if we're trying to

Deposition of Chistina Morrison, taken April 11, 2014

Page 96

1       get ahold of them and, you know, if we

2       haven't heard back from them.  Sometime I'll

3       intervene as the HR person to support that

4       conversation to say, listen, we haven't heard

5       from you, when are you coming back, that type

6       of thing.  That's my role.

7   Q   When an employee applies a request for FMLA

8       leave, there are requirements that must be

9       followed --

10  A   Yes.

11  Q   -- by the employer, right?  And one of those

12      requirements would be for the employer to

13      notify the employee whether or not he or she

14      is eligible for FMLA leave, right?

15  A   That it's been approved.

16  Q   Well, my question is not whether or not it's

17      been approved.  Not all employees are

18      eligible for FMLA leave; you understand that,

19      right?

20  A   Yes.  Based on working hours and have they

21      been there a year and those guidelines, yes.

22  Q   Or have they used up their --

23  A   480 hours.

24  Q   -- 480 hours or 12-week allotment?

25  A   Yes.

Deposition of Chistina Morrison, taken April 11, 2014

Page 97

1   Q   And the employer has to notify an employee,

2       who asks for FMLA leave, whether or not

3       they're eligible, correct?

4   A   That notification -- yes.  And that

5       notification comes from corporate health.

6   Q   Are you copied on that communication?

7   A   I am.

8   Q   Did you ever receive any documentation from

9       Kara or anybody else in her department

10      confirming whether or not Victoria Johnson

11      was eligible for FMLA leave with respect to

12      any requests for it she made?

13  A   I don't remember the exact wording.  I recall

14      that she was out on FMLA.  At a certain

15      point, it changed.  My recollection is that

16      she had a change in physician and then after

17      that, they needed new documentation from that

18      new physician to continue it.  And my

19      recollection is that up until that point, it

20      was covered.  And from that point forward, it

21      was not approved because the documentation

22      was not submitted.

23  Q   Did you see any documentation from Kara

24      Ladaika, or anyone in her department, to

25      Victoria and copied to you stating whether or

Deposition of Chistina Morrison, taken April 11, 2014

Page 98

1        not she was eligible for FMLA leave?

2   A   If she wasn't eligible -- I don't know why

3        she wouldn't have been eligible, I guess, is

4        my response back.  She would have been

5        eligible.  I don't believe there was any

6        reason why she wouldn't have been.

7   Q   My question was:  Did you see any

8        documentation --

9   A   I wouldn't.

10  Q   -- to her stating that she was eligible --

11                  MR. BULEA:      Let him finish

12       the question and then answer.  That will be

13       easier for everyone.

14  A   Sorry.  Go ahead.

15  Q   Were you copied on any documentation to

16       Victoria Johnson which told her that she was

17       eligible or ineligible for FMLA leave?

18  A   I would have been copied if she was not

19       eligible for whatever reason.  My

20       recollection is that she was out on an

21       approved FMLA.  I don't recall the exact

22       document that I would have been copied on.

23  Q   Do you specifically recall being copied on

24       any document to Victoria Johnson stating that

25       she was eligible for FMLA leave?

Deposition of Chistina Morrison, taken April 11, 2014

Page 99

1   A   I don't remember.

2   Q   Do you recall being copied on any document to

3       Victoria Johnson stating that she was

4       approved for FMLA leave?

5   A   I remember being copied on the

6       correspondence.  I remember being copied when

7       she wasn't -- when it was denied with the new

8       physician change.  I don't really remember

9       prior to that because I think she was and

10      then she wasn't.  So my recollection is I

11      must have been, but I just don't remember.  I

12      do remember, though, when she was denied.

13  Q   Do you recall seeing any documentation that

14      stated anything regarding any

15      responsibilities that Victoria Johnson had

16      regarding -- well, strike that for a second.

17          Do you recall seeing any documentation

18      stating when Victoria Johnson was expected to

19      return from FMLA leave?

20  A   Yes.  So when she was -- you know, when her

21      FMLA request was denied, when she changed

22      physicians, she then had been out on an

23      unprotected -- just unprotected time off,

24      because it didn't fall under FMLA, she wasn't

25      on administrative leave.  It was just unpaid

Deposition of Chistina Morrison, taken April 11, 2014

Page 100

1       time off.  I actually would have drafted a

2       letter and sent it to her that said, you

3       know, you are out on -- you are basically out

4       on an unprotected leave, so the expectation

5       is that you'll return to work.  If I recall,

6       it was in August.  I don't remember dates

7       exactly.  So, yeah.

8   Q   Do you recall being copied on any

9       documentation to Victoria Johnson telling her

10      how many hours of leave she had available to

11      her under the FMLA?

12  A   I don't remember.

13  Q   Do you recall being copied on any

14      documentation to Victoria telling her that

15      her leave would be counted against her annual

16      FMLA leave entitlement?

17  A   I don't remember specifically.

18  Q   Did Victoria have any -- at this timeframe,

19      at least -- right for paid leave, to take a

20      paid leave of absence?

21  A   She would have had a right if it would have

22      been a qualifying reason, sure.

23  Q   Is there a paid leave of absence option

24      available to employees who are in

25      Victoria's -- employees like Victoria, in her

Deposition of Chistina Morrison, taken April 11, 2014

Page 101

1      position?

2    A  So there are leave options, several of them.

3       The only time it was paid mandatory was that

4       five days, you know, where the hospital -- or

5       actually, the department paid her, those

6       first five days for the fit-for-duty.  Beyond

7       that, it's not -- we don't -- there is no

8       leave that the hospital pays during that

9       time.  She would pay herself using her PTO

10      bank.  But there are options for approved

11      leaves based on whatever the situation was.

12      There's the personal leave, there's the FMLA,

13      military leave, education leave.  So there

14      are opportunities out there.

15   Q  Is there paid vacation leave?

16   A  PTO is their vacation time.  Paid time off is

17      their --

18   Q  What can you take PTO days for?

19   A  PTO is just your bank.  It encompasses

20      vacation, sick, holiday, personal.  And it

21      all has to be approved through your

22      leadership based on operational needs.

23   Q  How many PTO days per year or per rolling

24      12-month period would Victoria have?

25   A  Yeah, that I don't recall.  It's based on

Deposition of Chistina Morrison, taken April 11, 2014

Page 102

1      your position.  You know, there's certain --

2      positions get a certain amount, you know,

3      exempt people get a little bit more, that

4      kind of thing.  I don't recall exactly how

5      much she would have.

6    Q  But she would have some amount of PTO leave

7      on an annual basis?

8    A  Yeah.  I think she could even bank probably

9      up to a couple hundred hours.

10   Q  Do you recall being copied on any

11     documentation to Victoria Johnson stating

12     that her PTO leave would be applied towards

13     FMLA?

14   A  I don't know what PTO leave is.  PTO leave

15     is --

16   Q  Paid time.

17   A  Her paid time off?

18   Q  Right.

19   A  Yeah, so there's a policy that if you have

20     PTO in your bank, hours in your bank, you

21     have to use them if you're out on a leave.

22   Q  On an FMLA leave?

23   A  Yes.

24   Q  Were you copied on any correspondence or

25     documentation to Victoria Johnson telling her

Deposition of Chistina Morrison, taken April 11, 2014

Page 103

1      that, that any PTO leave that she had

2      available would be applied to her FMLA leave?

3   A  I don't remember.  You know, there's a lot of

4      correspondence that goes out from that group

5      that I'm copied on.  I don't recollect

6      specifically her documents.

7   Q  Did Victoria Johnson have health insurance

8      benefits through UHPS?

9   A  I don't know a hundred percent sure.  You

10     know, she -- I don't know.  She had the

11     option of having them.  I don't know if she

12     chose them.

13  Q  Do you recall being copied on any

14     correspondence or communication to Victoria

15     stating that any requirements -- referencing

16     any requirements she had regarding making any

17     premium payments for her health insurance,

18     assuming she had it, and any consequences of

19     her failing to do so while she was on FMLA

20     leave?

21  A  I don't remember being copied on anything.

22  Q  Are these the types of communications that

23     you would be copied on as part of being kept

24     in the loop regarding FMLA leave for an

25     employee --

Deposition of Chistina Morrison, taken April 11, 2014

Page 104

1   A   They normally don't copy me or HR people on

2       the premium benefit stuff.  I do know that if

3       you're out and you don't have a paycheck for

4       them to collect their portion of it, they do

5       require employees to pay it separately, but I

6       wouldn't be copied on it, more than likely.

7   Q   Well, what typically would you be copied on

8       then?

9   A   The FMLA -- normally, I am copied on the FMLA

10      correspondence to the employee that Kara

11      sends out.

12  Q   You don't recall receiving any correspondence

13      from Kara -- being copied on such

14      correspondence from Kara for Victoria

15      Johnson?

16  A   I'm saying I more than likely was.  And the

17      process is I would have been.  I just can't

18      tell you -- I get copied on all of them.  You

19      know, 4,000 employees.  So I'm sure that I

20      was.  I just don't recall exactly seeing it.

21                  - - - - -

22      (Plaintiff's Exhibit No. 5  was marked.)

23                  - - - - -

24  Q   This is Exhibit 5 for you.  Handing you what

25      we have marked as Exhibit 5, which is a

Deposition of Chistina Morrison, taken April 11, 2014

Page 105

```
 1        two-page document.  Have you seen this
 2        document before today?
 3   A    Oh, yeah.  I would have seen this when I
 4        worked there.
 5   Q    Some of the handwriting on the first page, do
 6        you know whose handwriting that is?
 7   A    Yeah.  That's mine.
 8   Q    Can you describe for us what Exhibit 5 is,
 9        please?
10   A    This actually is a draft that comes from the
11        EAP department.  So Jill Fulton -- you see I
12        have the name, Jill, there.  So this is just
13        their document of their process, the protocol
14        for tier one, which we would have reviewed at
15        the time we were deciding whether or not to
16        refer her.
17   Q    On the first bullet point it says, manager to
18        make contact with HR/EAP to initiate FFD
19        process.
20             You see that, right?
21   A    Right.
22   Q    In Victoria Johnson's case, who would the
23        manager have been?
24   A    It would have been me.
25   Q    So you made contact with the HR/EAP to
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 106

```
 1        initiate the FFD process, right?

 2    A   Correct.

 3    Q   Do you recall what date that was that you

 4        made contact?

 5    A   I do not exactly recall that date.

 6    Q   Would it have been before or after the

 7        conference call that you and Carole Meisler

 8        had with the supervisor from CGS?

 9    A   I don't remember.  Two separate things.  Do

10        not recall.

11    Q   So you don't recall what the sequence was

12        between the two?

13    A   No, I do not.

14    Q   Before that conference call took place, do

15        you recall having any discussions with either

16        Sheryl Johnson or Steve Riddle regarding

17        whether or not Victoria should be referred

18        for a mandatory EAP fitness-for-duty

19        evaluation?

20    A   Clarify that question again.

21    Q   Yes.  Going back again to the conference call

22        that you sat in on between Carole Meisler and

23        the supervisor from CGS who you don't recall.

24    A   Okay.

25    Q   I know you don't recall the date of that
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 107

1      conversation.

2  A   I don't.

3  Q   But do you recall there being any discussions

4      prior to that conversation, prior to that

5      conference call, with Steve Riddle or Sheryl

6      Johnson or anybody else regarding whether

7      Victoria Johnson should be sent for a

8      mandatory EAP fitness-for-duty evaluation?

9  A   I mean, it's possible.  I just don't

10     remember.  I mean, it's two totally separate

11     things, so I don't recall, like, what

12     happened first or if there were conversations

13     before.  Definitely concern about how she was

14     doing, how she was --

15 Q   Now you're referring to this as two separate

16     things.  This was all occurring around the

17     same time, right?

18 A   Sure, all was occurring around the same time.

19     But our concern for her performance and

20     falling asleep is separate than the call to

21     the -- CGS.  So I'm not -- you know what I

22     mean?  I'm not recalling what happened first.

23 Q   But the referral to the EAP all was a result

24     of the stress that Victoria was claiming to

25     be experiencing, right?

Deposition of Chistina Morrison, taken April 11, 2014

Page 108

1   A   Yeah.

2   Q   And one of the major sources of her stress,

3       as she expressed it and as you understood it,

4       was this issue about how to prepare these

5       applications?

6   A   She was stressed about that, yes.

7   Q   So there was a connection between the

8       applications issue and the EAP referral,

9       correct?

10  A   There was -- her reaction to that, yes.

11  Q   She was stressed because --

12  A   She was having a hard time understanding the

13      directives.

14  Q   She was stressed because she felt she was

15      being asked to do something illegal, right?

16  A   Yes.  Even though we assured her numerous

17      times it wasn't.

18  Q   I understand that.  She felt she was being

19      told to do something illegal?

20  A   Yes.  She was very stressed, yes.

21  Q   And that stress was one of the reasons that

22      she was referred to, maybe one of the main

23      reasons she was referred to the EAP?

24  A   Yes.

25  Q   So there was a connection between the two,

Deposition of Chistina Morrison, taken April 11, 2014

Page 109

```
 1      correct?
 2   A  If you -- yeah.  I mean, if that's how you're
 3      going to look at it.
 4                   - - - - -
 5      (Plaintiff's Exhibit No. 6  was marked.)
 6                   - - - - -
 7   Q  We're handing you what we've marked as
 8      Exhibit 6.
 9   A  Okay.
10   Q  Have you seen this document prior to today?
11   A  Yeah.  This is the -- this would be the EAP
12      referral form.
13   Q  And the date is?
14   A  July 25.
15   Q  Of 2012, correct?
16      (Mr. Bulea exited the deposition suite.)
17   A  Yes.
18   Q  Whose handwriting is that at the top?
19   A  That is Sheryl's.  Sheryl Johnson.
20   Q  And the reference is for a tier one mandatory
21      referral, correct?
22   A  Uh-huh.
23   Q  Yes?
24   A  Yes.
25   Q  I told you you would do it once.
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 110

 1    A    Yes.  Thank you.

 2    Q    And the referral is not for suspicion of drug

 3         or alcohol use, correct?

 4    A    Correct.  I mean, we knew she was on

 5         prescribed medications by her own admission.

 6    Q    And the referral is not because Victoria was

 7         engaging in any type of violent, hostile, or

 8         reckless behavior endangering the safety of

 9         others, right?

10    A    Right.

11    Q    It was not a tier two mandatory referral,

12         correct?

13    A    Yeah.  Looks like it was tier one.

14    Q    Right.  And for a tier two, there's no

15         reference to this being because of attendance

16         issues, right?

17    A    Right, she didn't have attendance issues.

18    Q    No indication that this referral was because

19         of what's called a conflictive work

20         relationship, correct?

21    A    Right.

22    Q    And no indication in here that this was

23         because of deteriorating job performance,

24         correct?

25    A    No indication on here, right.

Deposition of Chistina Morrison, taken April 11, 2014

Page 111

```
 1   Q   And referrals can be made for more than one

 2       reason, correct?

 3   A   Yes, definitely.

 4   Q   So if part of the reason for a referral would

 5       be that Victoria Johnson was having a

 6       conflictive work relationship with either of

 7       her superiors, that box could have been

 8       checked off, correct?

 9   A   Yeah.

10   Q   And if there was concerns about Victoria's

11       job performance deteriorating, that box could

12       have been checked off, correct?

13   A   Could have been, yes.

14   Q   And none of those boxes were checked off,

15       correct?

16   A   Yeah.

17   Q   I think we agreed that the date of this is

18       July 25 of 2012, correct?

19   A   Uh-huh.

20   Q   Right?

21   A   Yes.

22   Q   Now, after this form is completed, to whom

23       would it have been submitted?

24   A   It would have been submitted to the EAP

25       manager, which is Jill Fulton.  And then she
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 112

1       assigns one of her -- either her or one of

2       her counselors to it.

3    Q  Now, would you have been provided with a copy

4       of the EAP referral?

5    A  It's possible.

6    Q  Would you have at least been verbally

7       notified of the EAP referral?

8    A  Oh, yeah.  I would have been part of that for

9       sure.

10   Q  Once the EAP referral then is sent on to --

11      and I forget whose name you mentioned.

12   A  Jill.

13   Q  Fulton, right?

14   A  Uh-huh.

15   Q  Yes?

16   A  Yes.  Jill Fulton.

17   Q  What happens at that point once the report is

18      forwarded to Jill Fulton and to her staff?

19   A  They use the form, along with any -- part of

20      their process is they require the manager to

21      submit in writing to them all of the

22      historical reasons why or what's been going

23      on recently that they feel that they need to

24      refer this person, which we would have had a

25      conversation about it, but then the

Deposition of Chistina Morrison, taken April 11, 2014

Page 113

```
 1        requirement is to send it in writing to -- so
 2        that they have all the information they need
 3        as they're assessing this employee.
 4   Q    Then what happens?
 5   A    Then in a mandatory situation, an appointment
 6        would already be predetermined.  So Jill
 7        would look at the calendars, figure out who
 8        has time -- because it's clearly an immediate
 9        need if we're mandating somebody.  It's
10        somebody they want to get on the calendar
11        within a day.  An appointment is determined
12        and then the employee is notified with the
13        manager and then sent to the fit-for-duty.
14        So they have all this information.
15   Q    What role do you play in all of this?  What's
16        your function?
17   A    Just kind of the HR mediator, just kind of
18        helps facilitate, so I -- you know, I work
19        with the manager to bring it to EAP's
20        attention.  So the HR function is -- you
21        know, if we determine that there's concerns
22        for any reason, we loop in the EAP manager,
23        talk with them, get their professional
24        assessment, determine whether it's
25        fit-for-duty, and then meet with the
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 114

1      employee.  Most times I meet with the manager

2      and the employee in these kinds of

3      situations.

4  Q   Together --

5  A   Yeah.

6  Q   -- or separately?

7  A   No, altogether.  Like, we would meet with --

8      so in this case, it was Sheryl, myself,

9      Victoria, and I think Steve was in the

10     room -- I can't remember a hundred percent

11     sure -- when we met with Victoria to talk

12     about this.

13 Q   Well, tell me about that meeting.

14 A   So we, you know, made the assessment, talked

15     with Jill, determined that based on lots of

16     concerns, that we were going to send her out

17     for a mandatory.  We brought her in, talked

18     with her, she immediately got very upset.  It

19     was in my office.  She stormed out of my

20     office.  She wasn't very happy, which, you

21     know, I understand why.  So she wasn't real

22     open to it.

23 Q   Did you tell her what the concerns were --

24 A   Yes.

25 Q   -- that resulted in you taking this action?

Deposition of Chistina Morrison, taken April 11, 2014

Page 115

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What did you tell her? |
| 3 | A | We told her that the reasons were, you know, |
| 4 | | the falling asleep, her admitted -- you know, |
| 5 | | again, I woke her up myself.  Her admitted |
| 6 | | stress, you know, stating that she's on these |
| 7 | | medications.  She had sent e-mails even |
| 8 | | saying that, you know, she was going to be |
| 9 | | falling asleep at inappropriate times.  All |
| 10 | | of these things.  We were explaining why we |
| 11 | | felt the need that we wanted to help her. |
| 12 | | But honestly, you know, she wasn't very open |
| 13 | | to hearing the conversation.  I don't really |
| 14 | | know what she heard.  She didn't stay in my |
| 15 | | office very long. |
| 16 | Q | Did you tell her that she was going to have |
| 17 | | to undergo a drug and alcohol screening? |
| 18 | A | Possibly.  I mean, I -- like I said, the |
| 19 | | conversation was brief.  I don't remember |
| 20 | | what we got to.  I think I would have told |
| 21 | | her that.  If I got -- you know, if it got to |
| 22 | | the point where I was able to share that with |
| 23 | | her.  I mean, I would explain the whole |
| 24 | | process if I needed to.  I tried to talk to |
| 25 | | her. |

Deposition of Chistina Morrison, taken April 11, 2014

                                                    Page 116

1                    - - - - -

2        (Plaintiff's Exhibit No. 7  was marked.)

3                    - - - - -

4    Q   Handing you what we have marked as

5        Plaintiff's Exhibit 7.  Take a moment to flip

6        through those, please.

7    A   Okay.

8    Q   Have you seen these documents prior to today?

9    A   Yeah.  I would have drafted this letter.

10   Q   And you would have sent this letter to

11       Victoria, correct?

12   A   Yep.

13   Q   Did you provide this letter to Victoria at

14       the meeting or was it sent afterwards?

15   A   This would have been sent after, I believe,

16       because she stormed out of the building.  So

17       when I mentioned that she left my office, I

18       went over to her area.  I followed her and I

19       said, talk to me.  If you storm out and don't

20       follow the mandate, you could risk -- this

21       could risk your job.  You know, this is a

22       condition of employment.  And so I tried to

23       talk to her and she left.  Told me she was

24       going out on FMLA leave and she left.

25   Q   Did you have this ready to give to her at the

Deposition of Chistina Morrison, taken April 11, 2014

Page 117

1       meeting, Exhibit 7?

2    A  I don't know.

3    Q  So this was --

4    A  I don't think.  Hang on.  Let me look at it.

5       So I think I probably would have drafted this

6       after, because she left.  So we were giving

7       her 24 hours to consider and come back.  So

8       that's what this letter is from.

9    Q  Well, the meeting that she stormed out of --

10      and certainly not disputing that she stormed

11      out of it -- was she given anything stating

12      the date and time of this fit-for-duty

13      referral?

14   A  This is the second appointment.  We had to

15      change the first one because she wouldn't go

16      to it.

17   Q  Well, when was the first one set for?

18   A  Probably would have been that afternoon.  I

19      don't remember exactly.

20   Q  The 26th?

21   A  So we met with her on -- yeah, I don't

22      remember exactly what time the appointment

23      was, but normally we try to schedule it

24      right -- you know, either right then or

25      whatever.  So, say, maybe it was at 1:00.  I

Deposition of Chistina Morrison, taken April 11, 2014

Page 118

1       don't remember exactly the date.  But that

2       she refused to go to, so we had to schedule a

3       second appointment, and that's what this was.

4    Q  And she went to that appointment?

5    A  She did.

6    Q  She did go to that appointment.  So did you

7       have something to give to her during the

8       meeting at 10:30 in the morning on July 26

9       telling her where to go for whatever had been

10      scheduled for that same day?

11   A  Yes.

12   Q  Was a copy of this map included with the

13      letter that's on the second page of Exhibit

14      7?

15   A  I'm sure.  We always gave a map when we sent

16      someone for EAP, just to make sure that they

17      knew where they were going on the campus.

18   Q  In fact, the letter says kind of in the

19      middle in bold print, see enclosed documents.

20      Which includes the map, right?

21   A  There you go, yeah.

22   Q  What were the other enclosed documents other

23      than the map?

24   A  The employee assistance policy.

25   Q  That's what has the Bates stamp number 1010

Deposition of Chistina Morrison, taken April 11, 2014

Page 119

1        through 1013 at the bottom?

2    A   Yeah.  And then the -- 14 and 15 are the --

3        yeah, so 15 gives all the clarification on

4        the appointment.

5    Q   And 14 is a blank copy of the referral,

6        right?

7    A   It's part of the policy, yeah.

8    Q   The policy that was provided to Victoria with

9        this letter, the parts on like page 1011,

10       1012, were they highlighted --

11   A   Uh-huh.

12   Q   -- as they were sent to her?

13   A   Yeah.

14   Q   What was the result of the fitness-for-duty

15       evaluation?

16   A   My recollection is it was extended beyond the

17       five days, but at the same time she went out

18       on FMLA.  So she was out on a protected leave

19       under FMLA is my recollection.

20                      - - - - -

21       (Plaintiff's Exhibit No. 8  was marked.)

22                      - - - - -

23   Q   Exhibit 8, have you seen this document before

24       today?

25   A   Yeah.  I signed it.

Deposition of Chistina Morrison, taken April 11, 2014

Page 120

1   Q   Can you identify it for us, please?

2   A   Let's see.  Looks like a follow-up.  Thanks

3       for complying.  So then -- so because she

4       complied, then she falls within the

5       five-day -- and it was just a notification

6       that she's under the five-day paid leave then

7       based on the policy, because she went and

8       she's complying.

9   Q   There's no reference to the FMLA in this

10      letter, is there?

11  A   No.  This is just notifying her about the

12      leave -- I'm sorry, about the five -- the

13      paid portion.  Because I had told her before

14      that she was on unpaid and now this flipped

15      to paid because she was complying.

16  Q   Well, what was determined at the

17      fitness-for-duty evaluation?  What

18      determinations were made by those who

19      conducted it?

20  A   They don't share specifics.  They just tell

21      us whether the person is deemed fit-for-duty

22      or not fit-for-duty.  She was never deemed

23      not fit-for-duty that I recall.

24  Q   Was she sent for a psychological or

25      psychiatric evaluation?

Deposition of Chistina Morrison, taken April 11, 2014

Page 121

1   A   I don't know.

2   Q   Do they communicate those types of things to

3       you?

4   A   No, they don't share that specific stuff with

5       us.  Again, they just share that they're

6       going through the process.  I mean, I do know

7       that there's -- that there's things that they

8       do, but that's just basic knowledge from me.

9       That's not what they share with me.  Like,

10      they don't tell me specifically we sent this

11      person out for this and this person out for

12      this.  The only thing that's communicated

13      with us is whether -- you know, are they

14      released, what the dates are, and if they're

15      fit or not.

16  Q   Were you aware or ever made aware that

17      Ms. Johnson was directed to see a gentleman

18      by the name of Dr. Pallas?

19  A   I don't remember that.

20  Q   And you were told that Victoria was referred

21      for the drug and alcohol screening right?

22  A   I know that's part of the process, yes.

23      That's everybody's --

24  Q   Were you ever told the results of that

25      screening?

Deposition of Chistina Morrison, taken April 11, 2014

Page 122

1    A    No.

2    Q    If an employee, who has to go through the

3         drug and alcohol screening as a mandatory

4         part of this process, fails that testing, are

5         you informed of that?

6    A    Well, they would inform us that they weren't

7         fit-for-duty for whatever reason and then

8         that would transition into something else

9         more than likely, like a treatment or

10        something through the FMLA.  But I wouldn't

11        know specifics, no.

12   Q    So if a person was determined to be not fit,

13        they wouldn't tell you why they're not fit?

14   A    Yeah, they don't share the specifics.  It's

15        all very protected.

16                   - - - - -

17        (Plaintiff's Exhibit No. 9  was marked.)

18                   - - - - -

19   Q    Exhibit 9, have you seen this before today?

20   A    Yeah.  So Kathy works for Jill Fulton.  She's

21        one of their certified counselors.

22   Q    And there's a reference to, as soon as I get

23        new information, I will let you know.

24            Do you see that?

25   A    Yep.

Deposition of Chistina Morrison, taken April 11, 2014

Page 123

1   Q   What new information was it, your

2       understanding, that Kathy Springer was

3       referring to?

4   A   They just keep us in the loop to let us know

5       that, yes, the person came to their

6       appointment or not, because we wouldn't know

7       unless somebody told us.  And that they'll

8       follow up with -- once the five days -- you

9       know, where we're at then.  Information --

10      again, when she's saying information, it's

11      dates.  It's the process.  It's got nothing

12      to do with anything specific.

13                      - - - - -

14      (Plaintiff's Exhibit No. 10 was marked.)

15                      - - - - -

16  Q   Handing you what we've marked as Exhibit 10.

17      This is a report from Dr. Pallas.  Have you

18      ever seen this before today?

19  A   Never.

20  Q   Was there at any point -- when all of these

21      issues were being discussed regarding the

22      manner in which these Medicare applications

23      were to be completed, did the issue ever come

24      up regarding whether or not Victoria Johnson

25      should be transferred to another position?

Deposition of Chistina Morrison, taken April 11, 2014

Page 124

```
 1   A   She brought it up.  She a couple of times
 2       brought up to me that she would like to
 3       transfer to a different role, which we were,
 4       you know, supportive if she wanted to
 5       transfer.  I even connected her, I believe if
 6       I recall, with the recruiter, if I remember.
 7       You know, there's always that option.  I
 8       mean, we would certainly not want to hold
 9       someone in a position they don't want to be
10       in.
11   Q   I am going to skip ahead to the meeting in
12       October, which we are going to talk about a
13       little bit more.
14   A   Okay.
15   Q   But was that issue of transferring Victoria
16       to a different position where she didn't have
17       to deal with these Medicare provider
18       enrollment applications, did that issue ever
19       come up during that meeting in October with
20       Victoria?
21   A   Remind me what that meeting was.
22   Q   The one where she ended up being fired right
23       afterwards.
24   A   October?
25   Q   October.  Did you have a meeting with
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 125

1      Victoria Johnson in October where her return

2      to work was discussed?

3  A   I'm sorry.  I'm still thinking in August.

4  Q   I told you I was skipping ahead.  You had a

5      meeting with Victoria in October?

6  A   Yes.  The day she was to come back to work,

7      yes.

8  Q   Was the issue of transferring her to another

9      position where she wouldn't have to deal with

10     these issues regarding these Medicare

11     applications and how they were to be

12     prepared --

13 A   During that meeting?

14 Q   Yes.  During that meeting, was there any

15     discussion regarding transferring her to

16     another position, giving her that option?

17 A   I don't recall if that came up during the

18     meeting.  I don't remember that.

19 Q   Were you ever made aware at any point that

20     Dr. Pallas had suggested that that might be a

21     reasonable way of dealing with the stress

22     that Victoria was experiencing because of the

23     issues about how those applications were

24     provided?

25 A   No, I am not aware of any of that.

Deposition of Chistina Morrison, taken April 11, 2014

Page 126

```
 1                    - - - - -

 2       (Plaintiff's Exhibit No. 11 was marked.)

 3                    - - - - -

 4   Q   Handing you what we have marked as Exhibit

 5       11.  Have you seen this before today?

 6   A   Yeah, this would -- this is again

 7       notification -- just notification per policy

 8       that the five days then transitions to an

 9       unpaid leave.  And then it does mention about

10       the paid time off and the bank, so I did

11       mention that to her.

12   Q   There's no reference to the Family Medical

13       Leave Act or any FMLA leave in this, correct?

14   A   No.  This is just notifying her that her paid

15       leave flipped to administrative -- unpaid.

16       Sorry.  Unpaid administrative.

17   Q   There's a reference in here that you would

18       contact Victoria once her return to work

19       status is determined, correct?

20   A   Yeah, based on whether -- you know.  Whether

21       it's the, you know, leave she's on here or

22       FMLA.  Again, it was all running

23       consecutively.

24   Q   Well, who was going to determine Victoria's

25       return to work status?
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 127

1    A    Based on which leave?

2    Q    Well, there's no reference to FMLA leave in

3         this letter, correct?  The only reference is

4         to unpaid administrative leave, right?

5    A    This is just referencing about the leave

6         switching.

7    Q    And unpaid administrative leave was a

8         decision made by UHPS?

9    A    Because she was still -- so remember, it's

10        running consecutively.  So she's out on

11        fit-for-duty, that switches from a five days

12        paid to an unpaid.  And we had not been

13        notified by the fit-for-duty staff that she

14        was released or fit-for-duty or not

15        fit-for-duty yet.  So I'm just following the

16        process, notifying her that it switches.

17   Q    Is it your claim, as we sit here today, that

18        as of August 14, 2012, nobody over in the EAP

19        program had notified you that Victoria was

20        fit to return to duty as of that date?

21   A    That would -- based on this letter, that

22        would sound accurate.  That as of August 8,

23        she was still technically on both, running

24        consecutively.

25   Q    Now, when an employee is on FMLA leave, the

Deposition of Chistina Morrison, taken April 11, 2014

Page 128

1       return to work date is determined by his or

2       her doctor, and they're expected to return on

3       that date, correct?

4    A  Correct.

5    Q  UH does not determine what the return to work

6       date is going to be, correct?

7    A  It's based on the physician documentation,

8       right.

9    Q  But for the unpaid administrative leave

10      that's referenced in Exhibit 11, UH makes the

11      determination as to when the employee is

12      going to return to work, correct?

13   A  The determination is based off of the

14      evaluation, so I'm not really sure what you

15      mean.

16   Q  But somebody at UH is going to look at that

17      information and determine whether or not that

18      employee should return to work, correct?

19   A  Then they would notify HR to say the

20      evaluation is complete, she's been deemed or

21      he's been deemed fit-for-duty or not

22      fit-for-duty.  And then from there it goes --

23      depending on the situation.

24   Q  If you look back at Dr. Pallas's report -- I

25      know you haven't seen it before today.

Deposition of Chistina Morrison, taken April 11, 2014

Page 129

 1   A   No.

 2   Q   But if you look on the third page in the

 3       section entitled conclusion, Dr. Pallas

 4       states and makes his -- I guess you can call

 5       it a diagnosis, that I do not believe that

 6       Ms. Johnson is suffering from any Axis I

 7       psychiatric condition that would impair her

 8       ability to work in general.

 9           Had anybody informed you that a doctor

10       had said that she was not impaired in her

11       ability to return to work?

12   A   I was never told that she was not

13       fit-for-duty.

14   Q   But you were never told that a doctor had

15       specifically stated that she was not

16       impaired, correct?

17   A   Yes.

18   Q   Was there any medical diagnosis that you were

19       aware of, as of August 14, 2012, stating that

20       Victoria Johnson was not fit to return to

21       work?

22   A   No medical documentation, no.

23   Q   Did you have any other communication

24       either -- I don't care if it was by e-mail,

25       if it was by phone, or correspondence that

Deposition of Chistina Morrison, taken April 11, 2014

Page 130

1      you would have sent.

2            Did you have any other communication

3      with Ms. Johnson between the time when you

4      met with her and she stormed out of your

5      office and August 14 of 2012 when you sent

6      Exhibit 11 to her?

7   A  I don't recall.  I remember speaking with her

8      after she left to confirm that she was

9      planning on going to the second appointment

10     that we made.

11  Q  Where did that conversation take place?

12  A  It would have probably been in my office.  I

13     don't remember.  You know, I don't remember

14     exactly, but I'm sure that I would have

15     spoken with her because I would have had to

16     have told her when the new appointment was.

17     I don't remember specifically.

18  Q  So after she stormed out of your office on

19     that date, she came back?

20  A  No, I would have called her.

21  Q  So it would not have taken place in your

22     office?

23  A  I would have been in my office on the phone

24     is what I meant.

25  Q  So it wasn't a face-to-face conversation?

Deposition of Chistina Morrison, taken April 11, 2014

Page 131

```
 1   A   Oh, no.

 2   Q   You called her or she called you?

 3   A   I would have probably called her to say,

 4       listen, you know, reconsider, new appointment

 5       made.  I just don't remember exactly, but I

 6       would have called her.  I definitely didn't

 7       see her again.

 8   Q   When would have been the next time you would

 9       have communicated or attempted to communicate

10       with Victoria after August 14 of 2012?

11   A   I guess just based on the processes -- I

12       don't know when I would have.  I would be

13       waiting to get notification from Kara Ladaika

14       and/or EAP on whether she was released to

15       come back based on provider information, you

16       know, documentation.  If she's out, she's

17       out.  I don't contact her until I'm told that

18       she's ready to come back and then we just

19       confirm that she knows the date that she's

20       coming back and what her schedule is.  That's

21       the normal process.

22                  MR. HERRON:     We're at a

23       good point for taking a five-minute break.

24         (Recess from 1:54 p.m. to 2:06 p.m. )

25                      - - - - -
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 132

1              (Record read.)

2                   - - - - -

3   BY MR. HERRON:

4   Q   So when was your next contact with her?

5   A   I don't recall honestly.

6   Q   So after October 14, did you receive any or

7       have any communication with Kara or anyone

8       else in her department regarding Ms. Johnson

9       being on FMLA leave?

10  A   I remember that she was out on FMLA and then

11      I remember communication from Kara that

12      indicated she had changed physicians because

13      I think -- I mean, my assumption is that they

14      didn't get -- you know, they were reaching

15      out to the physician she was originally with

16      to find out what the status was.  We found

17      out she wasn't with that physician anymore.

18      So they requested new documentation from her

19      to continue the leave.  I remembered that

20      communication.  Don't remember dates or

21      exactly what it said.  Requesting new

22      certification from her.

23  Q   And did any of that communication come from

24      you -- did any of the communication to

25      Victoria, that is, come from you?

Deposition of Chistina Morrison, taken April 11, 2014

Page 133

```
 1   A   It would have come from Kara, anything
 2       official on her FMLA, yes.
 3   Q   While she was out, was Victoria ever taken
 4       off of the unpaid administrative leave?
 5   A   Not to my recollection.  I don't recall.  I'm
 6       not sure.
 7   Q   So for the entire time that she remained out
 8       until she was terminated, was she considered
 9       to be on unpaid administrative leave?
10   A   She was on two leaves.  She was out
11       originally from the fit-for-duty for the
12       transition to an unpaid.  I don't recall when
13       that ended.  But consecutively, she was on
14       the FMLA.
15   Q   Consecutively or concurrently?
16   A   I'm sorry.  Concurrently.  Sorry.
17   Q   Was she ever taken off of the non-FMLA unpaid
18       administrative leave?
19   A   I don't remember.  Honestly, I don't remember
20       the timeline now.
21   Q   And it is University Hospitals personnel that
22       determine when somebody comes off of the
23       unpaid administrative leave, correct?
24   A   It would have been determined through the
25       fit-for-duty process when she was deemed
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 134

1       either fit-for-duty or not fit-for-duty,

2       which I just don't recall when that would

3       have ended in -- you know, concurrent with

4       the FMLA.  I just mean concurrent with the

5       FMLA, I don't remember when that ended and

6       that continued.

7    Q  So the EAP people make the determination as

8       to when the unpaid administrative leave would

9       end, correct?

10   A  Yes.

11   Q  And they would communicate that to you,

12      correct?

13   A  Yes.

14   Q  Did they ever communicate to you that the

15      unpaid administrative leave ended at any

16      point?

17   A  I don't recall.  And, again, sometimes during

18      these processes, there's -- the FMLA kicks in

19      and it kind of blends, so I don't really

20      remember when that ended and the FMLA

21      continued.

22   Q  Would they notify you if the unpaid

23      administrative leave was ending and was being

24      converted to an FMLA leave?

25   A  In this situation, the FMLA was already in

Deposition of Chistina Morrison, taken April 11, 2014

Page 135

```
 1        place, so it wouldn't have converted because
 2        she applied for the FMLA the same day.
 3    Q   But you never received notification that the
 4        unpaid administrative leave was being
 5        terminated, correct?
 6    A   I don't remember.
 7    Q   If that is something that had happened, that
 8        is something that in the ordinary course of
 9        business would be communicated to you, right?
10    A   Yes.
11    Q   By either e-mail or letter?
12    A   Usually, yeah, I would be part of that
13        communication to say, you know, if
14        fit-for-duty, not fit-for-duty, but a
15        transition -- I shouldn't say transition.
16        She was on an FMLA.  So I just don't recall
17        because of the situation of her being on two.
18        I don't remember exactly.  Yes, normally, I
19        would be looped in on that.
20    Q   If an employee's FMLA ends for whatever
21        reason, can they still be kept on the unpaid
22        administrative leave?
23    A   If -- I don't know.  I mean, I guess.  In
24        certain situations, it could be possible.
25        But that would have had to have been part of
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 136

1      that original -- or if it was a new.

2  Q   Original what or new what?

3  A   So when she went out on fit-for-duty, it

4      switched to an unpaid leave.  Like, what it's

5      considered -- they call it a leave because

6      you're out and you're being put through this

7      evaluation process.  Once that evaluation

8      process is completed, that ends.  She was

9      concurrently out on an FMLA, which then

10     continued.  So once that fit-for-duty is

11     done, that process ends.  So, you know, it

12     would have to be a continuation of that, if

13     it -- if her FMLA ended prior to that.  It

14     doesn't normally happen that way.  It's just

15     two different processes.  I know it seems a

16     little confusing.

17                    - - - - -

18     (Plaintiff's Exhibit No. 12 was marked.)

19                    - - - - -

20  Q   Handing you what's been marked as Exhibit 12.

21     Have you seen this before today?

22  A   I'm copied on it.  It's an e-mail from,

23     again, Kara.

24  Q   It's dated Friday July 27 of 2012, correct?

25  A   Yes.

Deposition of Chistina Morrison, taken April 11, 2014

Page 137

1   Q   This e-mail, at least, doesn't state that

2       Victoria Johnson was on FMLA, but it

3       referenced to whether if it proceeds into an

4       FMLA, correct?

5   A   Yeah.  Probably hadn't been put through the

6       total approval process, because it takes a

7       day or two to get documentation.  So you

8       apply for it and then there's documentation

9       you have to get for it to be finally

10      approved.  So because it was only a day, she

11      probably didn't have it yet.

12  Q   Can we presume from this e-mail that we have

13      marked as Exhibit 12 that as of July 27, 2012

14      at 11:01 a.m., Victoria Johnson was not yet

15      on an FMLA leave?  Can we agree on that?

16  A   Was not on approved FMLA officially yet,

17      correct.

18                  - - - - -

19      (Plaintiff's Exhibit No. 13 was marked.)

20                  - - - - -

21  Q   Handing you what we have marked as Exhibit

22      13.  Have you seen this before today?

23  A   Yep.

24  Q   Can you identify this for us, please?

25  A   So this is a letter that we drafted and sent

Deposition of Chistina Morrison, taken April 11, 2014

Page 138

```
 1        notifying Victoria that, you know -- we
 2        wanted to clarify an expectation for her to
 3        come back to work because she had been out,
 4        the approved FMLA had ended because there was
 5        documentation that wasn't turned in, from my
 6        recollection.
 7    Q   No reference to FMLA paperwork in this
 8        letter, correct?
 9    A   So it says here, to date, we have not heard
10        from you, nor have you provided the
11        additional documents for certification that
12        we requested.
13            That would be certification for FMLA.
14        Now it doesn't say the word FMLA.  But Kara
15        had requested the certification from her, and
16        so based on what we knew, the leave that she
17        was on that was protected ended August 21.
18        There's no -- you know, no more reason for
19        her to be out.  She's just out of work on an
20        unpaid.
21    Q   Was there a letter sent to Victoria Johnson
22        on August 21?
23    A   I don't remember.  That's a specific date,
24        so...
25    Q   You refer to certified letters having been
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 139

1       returned.  Were those certified letters sent

2       by you?

3    A  Yes.

4    Q  Were the certified letters sent by anybody

5       else other than you?

6    A  Kara may have sent some.  I don't know.

7    Q  Do you know if Kara sent any?

8    A  I don't know.  I know I sent some.  I don't

9       know if anyone else did.

10   Q  How many certified letters did you send to

11      Victoria Johnson?

12   A  Several.  I don't remember how many.

13   Q  Were they all returned?

14   A  I believe.  I don't want to say all.  There

15      was a timeframe that they all were, but there

16      were one or two in the beginning that she

17      accepted and maybe one at the end that she

18      accepted.

19   Q  What was the timeframe where she was not

20      accepting them?

21   A  While she was out.  I don't remember the

22      exact dates.

23   Q  So that could be July 27 through October 8,

24      correct?

25   A  Possibly.  I don't know.  But I sent them

Deposition of Chistina Morrison, taken April 11, 2014

Page 140

1       regular mail as well.  Sent them both avenues

2       to try to ensure that she would get one of

3       them.

4    Q  If certified mail that you send is not

5       collected, it comes back to you personally,

6       correct?

7    A  Yes.

8    Q  And you keep a copy of that in the employee

9       file?

10   A  I keep notification that it wasn't accepted

11      or, you know, picked up.

12   Q  When you send certified mail out, do you have

13      the little green receipt tag postmarked to

14      indicate the date that it was sent?

15   A  Yes.

16   Q  I noticed that on some of these letters in

17      here that we have marked, 13 -- well, just

18      look for a moment at Exhibit 13.

19          You say that you sent that by

20      certified mail, but you don't have the return

21      receipt number on there, correct?

22   A  Yeah.  I didn't normally put that in my

23      verbiage of the letter.

24   Q  Exhibit 11, you sent by certified mail on

25      August 14, correct?

Deposition of Chistina Morrison, taken April 11, 2014

Page 141

 1  A   Yeah, I guess.

 2  Q   And there's no reference to this certified

 3      receipt number, correct?

 4  A   Right.  I never put that in the letter.

 5  Q   Why don't you put that in the letter?

 6  A   Just wasn't my practice.

 7  Q   You didn't do that on Exhibit 8, correct?

 8  A   Right, it's not on there.

 9  Q   You didn't do that on Exhibit 7, correct?

10  A   Correct.  But I kept the receipts, so -- but

11      didn't document them in the letter.

12  Q   How do you track the receipts?  When the

13      little green card comes back from the post

14      office --

15  A   Well, the whole thing comes back.

16  Q   -- how do you know what letter that goes to?

17  A   The whole thing comes back if the person

18      doesn't accept it.

19  Q   I understand that.  But when a person does

20      accept it, you get the green card that's

21      affixed to the back back, correct?

22  A   I don't normally send a lot of certified

23      letters, so it's pretty easy to track.

24  Q   But when you get the green card back

25      indicating it's been delivered, you don't

Deposition of Chistina Morrison, taken April 11, 2014

Page 142

1      know what letter that is because you don't

2      have the return receipt number on the letter,

3      correct?

4   A  On this letter?

5   Q  Well, on any of the letters that you send.

6   A  Like I said, I don't send very many and it's

7      to a certain person and that's how I track

8      it.

9                    - - - - -

10     (Plaintiff's Exhibit No. 14 was marked.)

11                   - - - - -

12  Q  Exhibit 14.  Have you seen these documents

13     before today?  We have handed you Exhibit 14,

14     which is five --

15  A  Right.

16  Q  -- pages of documents provided by the

17     hospital's attorneys, Bates stamped 1377

18     through 1381.

19  A  Yes.

20  Q  Is it your handwriting on all of these

21     documents?

22  A  Yes.

23  Q  So the first page would be a certified mail

24     receipt for a document sent to V. Johnson,

25     correct?

Deposition of Chistina Morrison, taken April 11, 2014

Page 143

 1  A  Yes.

 2  Q  You can't tell what date -- that particular

 3     page, 1377, is not postmarked, correct?

 4  A  Right, it's not.

 5  Q  So you don't know what date that letter was

 6     sent?

 7  A  Right.

 8  Q  Because you don't put the return receipt

 9     number on letters, you don't know which

10     letter that corresponds to, right?

11  A  Unless it comes back and I can match it up.

12     By the way, she admitted to me that she

13     wasn't picking up our letters, just so you

14     know.

15  Q  We'll look at the second page.  Again, we

16     have another letter to Victoria, right?

17  A  Right.

18  Q  That's your handwriting, right?

19  A  Yes.

20  Q  When you send these letters out, you keep

21     these receipts, correct?

22  A  Yes.

23  Q  We don't have a postmark date for this

24     letter, right?

25  A  Right.

Deposition of Chistina Morrison, taken April 11, 2014

Page 144

1  Q  So we don't know what date it was sent,

2     correct?

3  A  Right.

4  Q  Because, again, if you don't put the return

5     receipt number on the letter, then you don't

6     know which letter this particular receipt

7     corresponds to, right?

8  A  Right.

9  Q  Same with the receipt on page 1379, correct?

10 A  Right.  Unless it comes back and I can match

11    it up.

12 Q  And the next page, we do have a returned

13    letter, correct?

14 A  Yeah.

15 Q  What's the postmark date on that letter?

16 A  July 27.

17 Q  We have a return receipt green card on the

18    last page, correct?

19 A  Uh-huh.

20 Q  Yes?

21 A  Yes.

22 Q  There's not a date of delivery on that,

23    correct?

24 A  Not that I can see.

25 Q  We do have the article number on the card,

Deposition of Chistina Morrison, taken April 11, 2014

Page 145

1      correct?

2   A   Yes.

3   Q   But because, again, you don't put these

4       numbers on the letters, you don't know which

5       letter this return receipt card corresponds

6       to, correct?

7   A   Right.  Unless I just matched up the dates I

8       sent it.

9   Q   In fact, if we look at the last two pages,

10      the return receipt number ends in 2627,

11      right?

12  A   Yep.

13  Q   So --

14  A   So we know what letter that is.

15  Q   So we know that's a letter sent on July 27?

16  A   Right.

17  Q   That was returned unclaimed?

18  A   Right.

19  Q   We don't know if any of the other letters

20      that you sent certified mail were returned

21      unclaimed, do we?

22  A   Not looking at what I'm seeing here.

23  Q   I'll tell you that these are the only

24      documents regarding certified mail that were

25      provided to me by the University's attorneys.

Deposition of Chistina Morrison, taken April 11, 2014

Page 146

```
 1              When the July 27 letter was returned
 2       by the post office undelivered or
 3       unclaimed -- unclaimed is maybe more
 4       accurate -- where did you keep that?  You put
 5       it in a file, right?
 6    A  Yeah.  I had a file for her, so I would have
 7       kept it in there.
 8    Q  If other letters had been returned unclaimed,
 9       they would have been put into the same file?
10    A  They should have been, yes.
11    Q  When you left in December of this year, what
12       did you do with those files?
13    A  All of my employee relations stuff was just
14       kept in a cabinet.  There's a drawer.  So it
15       would have been left there with all the other
16       stuff.
17    Q  Were you asked by anybody before leaving to
18       gather documents related to Victoria Johnson,
19       to hold them, to save them because of this
20       litigation?
21    A  I wasn't asked to personally hold or save
22       anything.  I -- you know, my manager knew
23       where all my stuff was.  Before I left, I
24       kind of oriented people to where stuff was in
25       my office.
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 147

1  Q  So if there were other letters that were

2     returned by the post office unclaimed or

3     undelivered -- certified mail letters, that

4     is, unclaimed or undelivered to Victoria,

5     they would have been in the same file that

6     the one letter that's the last two pages of

7     Exhibit 14 was kept in?

8  A  Most likely.  I don't remember.

9  Q  You didn't segregate any of those out before

10    you left?

11 A  I don't remember.

12 Q  Tell me about the meeting, what happened at

13    the meeting with Victoria Johnson on

14    October 8, 2012.

15 A  She -- when she came to work that morning --

16    I think it was a Monday morning -- she met

17    with myself and my director and we kind of

18    reviewed, you know, the expectations.

19    Because if she was going to come back to

20    work, we wanted to make sure she understood

21    and we were all on the same page.

22    Expectations of -- you know, she had

23    submitted a letter, if I remember, with some

24    demands or, you know, some -- you know, her

25    expectations of if she were to return, what

Deposition of Chistina Morrison, taken April 11, 2014

Page 148

```
 1        she expected.  So we met with her to kind of

 2        talk about the expectations of her position.

 3   Q    Did you discuss with her what her

 4        expectations were of the hospital?

 5   A    Rephrase that.

 6   Q    Well, you said that Victoria submitted a

 7        letter --

 8   A    Yes.

 9   Q    -- of things that she wanted?

10   A    Yeah.

11   Q    Did you discuss with Victoria the things that

12        she wanted?

13   A    Yeah.  That was part of it.

14                      - - - - -

15        (Plaintiff's Exhibit No. 15 was marked.)

16                      - - - - -

17   Q    Handing you what's marked as Exhibit 15.

18        Have you seen this document prior to today?

19   A    Yeah.

20   Q    What is it?

21   A    This is a letter that Victoria sent in

22        response to our letter stating that she

23        needed to come back to work or we'd consider

24        that voluntary resignation.

25   Q    You considered Exhibit 5 to be a voluntary
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 149

1     resignation?

2  A  No.  I mean, basically saying, you know,

3     you're on an unpaid -- the expectation is

4     you're coming back to work or we'll have to

5     move to termination.

6  Q  So as of October 1, was Victoria still

7     considered to be on the unpaid administrative

8     leave that she had been placed on on the 14th

9     of August?

10  A  She was out just on an unpaid -- I don't know

11     if I would call it leave.  She wasn't on

12     anything structured at that point.  She was

13     just out.

14  Q  Had you advised Victoria at any point between

15     August 14 and October 1 that her unpaid

16     administrative leave status had been

17     terminated, had been ended?

18  A  That communication wouldn't come from me, so

19     I did not.

20  Q  That communication would come from whom?

21  A  Would have -- she -- the fit-for-duty that

22     was transitioned into the unpaid leave is --

23     that situation -- the communication --

24     when -- because that's her and her

25     relationship with that department.  She would

Deposition of Chistina Morrison, taken April 11, 2014

Page 150

```
 1        have been in communication with them.  So
 2        once that evaluation was over, she would have
 3        been notified that her evaluation was
 4        complete.  But I don't send a notification
 5        saying your fit-for-duty is complete.
 6   Q    So when that notification is sent by the
 7        people who handle the EAP, are you copied on
 8        that?
 9   A    I don't -- normally they'll keep me in the
10        loop, but I am not officially notified, no.
11        Like, I'm not copied on it.  I don't know if
12        they verbalize it to her.  I don't really
13        know their process.
14   Q    Well, what do you mean when you say you're
15        kept in the loop?
16   A    Well, they let me know whether somebody is
17        deemed fit-for-duty or not fit-for-duty.
18   Q    Did they ever -- they being the EAP
19        department, right?
20   A    Yeah.
21   Q    Did they ever notify you that Victoria was
22        fit-for-duty?
23   A    She was -- so because they ran concurrently,
24        when that evaluation ended, she was out on
25        FMLA, so she was never -- she was never
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 151

```
 1        deemed not fit-for-duty.  Her evaluation was
 2        completed, but she then switched to FMLA
 3        because she was on FMLA.
 4   Q    Did the EAP department ever tell you that
 5        Victoria was deemed fit-for-duty?
 6   A    I don't recall exactly.  I'm sure they would
 7        have.  I just don't recall how.
 8   Q    If she was deemed fit-for-duty, you're sure
 9        they would have told you; some way, shape, or
10        form, they would have told you?
11   A    Yeah.
12   Q    Do you recall being told in any way, shape,
13        or form --
14   A    I do not recall.
15   Q    -- that she was fit-for-duty?
16   A    I recall that she switched -- she was on
17        FMLA.  I do not recall -- so I recall the
18        evaluation being complete, but I don't recall
19        specifically how I was notified, if it was a
20        call or an e-mail.  I'm sure if it was an
21        e-mail, you would have it.
22   Q    So in response to the letter of October 1,
23        you received the letter from Victoria on
24        October 5, correct?
25   A    Uh-huh.
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 152

1   Q   Yes?

2   A   Yes.

3   Q   And that's the letter we have marked as

4       Exhibit 15, correct?

5   A   Yes.

6   Q   And do you recall how Victoria provided this

7       to you?  Was it mailed to you?  Was it

8       dropped off at your office?

9   A   I don't recall.

10  Q   And Victoria requested in that letter --

11      well, let's go through all of the things that

12      she said that she expected.

13              She expected to work in a non-hostile

14      work environment.

15              Was there any problem with providing

16      her with a non-hostile work environment?

17  A   Absolutely not.

18  Q   She wanted a copy of the drug and alcohol

19      screening and the psychiatric report from

20      Dr. Pallas.  Was she provided with those?

21  A   I don't know.  I don't have access to that.

22      I told her -- if I remember, I told her she

23      had to get that through them, not me.  That I

24      don't know.

25  Q   She asked not to complete the Medicare,

Deposition of Chistina Morrison, taken April 11, 2014

1        Medicaid, out of state Medicaid or any other

2        provider enrollment applications that are

3        prohibited or in violation of their rules.

4                Any problem with that request?

5    A   As long as we are complying with their rules,

6        she was fine.

7    Q   Wanted to see a company-wide distributed

8        e-mail informing employees that they are no

9        longer permitted to rest at their desks

10       during their breaks.

11               Any problem giving her that?

12   A   There's no -- it was not reasonable to ask to

13       do that.

14   Q   I'm sorry?

15   A   We weren't going to send a company-wide

16       e-mail.  That's not reasonable.

17   Q   Well, that had already been done on July 23

18       by Steve Riddle, correct?

19   A   That's not company-wide.  That was his

20       department.  That wasn't even a hospital

21       policy.  That was his department policy.  His

22       department expectation.

23   Q   But from what Victoria is indicating in this

24       particular item, number four, she wanted some

25       clarification on what she could or could not

Deposition of Chistina Morrison, taken April 11, 2014

Page 154

1       do regarding when she wanted to take a rest

2       or take a nap on her break, right?

3   A   Right.  And that's not a problem.

4   Q   And that had been done and communicated by

5       Steve Riddle?

6   A   Yes.

7   Q   On July 23 he said, if you wanted to take a

8       nap during a break, there was a place you

9       could go do that?

10  A   Right.

11  Q   Didn't have any problem with that, correct?

12  A   Yeah.

13  Q   Number five, what did you and Victoria

14      discuss -- well, it wasn't just you and

15      Victoria.  It was you and Angelique and

16      Victoria who met, correct?

17  A   Correct.

18  Q   Did you discuss with her the things that she

19      raised in number five regarding Mr. Simmons?

20  A   We don't share with other employees, just as

21      I wouldn't share what happened with her, the

22      situation with Paul.

23  Q   Is that what you told Victoria?

24  A   Yeah.

25  Q   What did she say?

Deposition of Chistina Morrison, taken April 11, 2014

Page 155

```
 1   A   I don't recall her response.  It just is what

 2       it is.  It's private information.

 3   Q   I understand that.  But my question is:  What

 4       was Victoria's reaction when you told her

 5       that?

 6   A   I don't recall much of her -- I don't recall.

 7   Q   Did she indicate that she wouldn't return to

 8       work if he wasn't given a psychiatric

 9       evaluation and put on --

10   A   No, I don't remember that she said that.

11   Q   -- leave?

12           Did Victoria refuse to return to work?

13   A   She refused -- no.  And we wanted her -- we

14       were providing every opportunity to bring her

15       back to work.  She still refused --

16   Q   She didn't flat-out refuse to work?

17   A   She was refusing to follow the directives of

18       the phone number.  And as I mentioned

19       earlier, Sheryl even offered to let her use

20       her phone number, and she wouldn't even do

21       that.  And Angelique asked her, are you

22       flat-out refusing to follow the directives

23       that we have support that we are doing the

24       right thing, and she said, I'm not going to

25       do it.  We didn't want to terminate her.
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 156

1  Q  Did you provide Victoria with any

2     documentation at this meeting which would

3     show that the way her supervisors wanted her

4     to prepare the forms was not prohibited or

5     was not in violation of Medicare and

6     Medicaid -- I think it was Medicare we were

7     talking about here -- Medicare rules?

8  A  We didn't have that with us, so no, we did

9     not.  But that isn't -- if she wanted

10    something like that, we certainly could have

11    provided that for her.

12 Q  She didn't say she would refuse to prepare

13    the documents; she said she would only refuse

14    to prepare them if it was not in compliance

15    with what the requirements were; is that

16    correct, the Medicare requirements were?

17 A  So we specifically stated that in the phone

18    number section -- which is what she had the

19    focus on -- that the expectation is that she

20    would put her phone number there.  And she

21    refused to do that.

22 Q  And she believed that to be in violation of

23    the Medicare rules, correct?

24 A  She still seemed to believe that that was in

25    violation.

Deposition of Chistina Morrison, taken April 11, 2014

Page 157

1          MR. HERRON:     Okay.  I think

2     I'm at a point where we're going to suspend

3     your deposition.  It appears, from things

4     that you've said, that there are a lot more

5     documents that the hospital has been

6     withholding from me that are going to be

7     looked for.  Right, Kerin?  These supposed

8     FMLA documents.

9          MS. KAMINSKI:     I would not

10    agree that we have been withholding them from

11    you, but I will agree that we are going to

12    look to see if there are other documents, and

13    if there are, we're going to produce them.

14         MR. HERRON:     Okay.  Well,

15    I'm not necessarily saying that you're

16    personally holding them, but if they exist,

17    clearly somebody is.

18         MS. KAMINSKI:     Or we just

19    haven't located them yet.  But this witness

20    wouldn't necessarily testify about the FMLA

21    documents.  She's not in charge of FMLA.

22         MR. HERRON:     Well, she's

23    also testified that she would have been --

24    her phrase on a couple of occasions was kept

25    in the loop --

Deposition of Chistina Morrison, taken April 11, 2014

```
                                                  Page 158

 1                    MS. KAMINSKI:    Yeah, if

 2     there's documents --

 3                    MR. HERRON:      -- and these

 4     things might have been forwarded to her.

 5                    MS. KAMINSKI:    If there's

 6     documents we find that this witness has

 7     testimony to give about, we wouldn't object

 8     to you asking her a couple more questions

 9     about the documents we find.  Not at all.

10                    MR. HERRON:      So we'll keep

11     this open.

12                    MS. KAMINSKI:    Just as to the

13     documents.

14                    MR. HERRON:      And anything

15     that it logically leads to.

16                    MS. KAMINSKI:    Right.

17                    MR. HERRON:      Okay.  So I

18     don't know if you need to advise on signature

19     yet or not.

20                    MS. KAMINSKI:    We won't sign

21     it until it's completed.

22        (Deposition adjourned at 2:43 p.m.)

23

24

25
```

Deposition of Chistina Morrison, taken April 11, 2014

Page 159

1   THE STATE OF OHIO,  )   SS:

    COUNTY OF CUYAHOGA. )

2

3       I, Gretchen E. Windenburg, a Notary Public

4   within and for the State of Ohio, duly

5   commissioned and qualified, do hereby certify

6   that CHRISTINA MORRISON, was first duly sworn to

7   testify the truth, the whole truth and nothing

8   but the truth in the cause aforesaid; that the

9   testimony then given by her was by me reduced to

10  stenotype in the presence of said witness,

11  afterwards transcribed on a computer/printer, and

12  that the foregoing is a true and correct

13  transcript of the testimony so given by her, as

14  aforesaid.

15      I do further certify that this deposition

16  was taken at the time and place in the foregoing

17  caption specified.  I do further certify that I

18  am not a relative, counsel or attorney of either

19  party, or otherwise interested in the event of

20  this action.

21      IN WITNESS WHEREOF, I have hereunto set my

22  hand and affixed my seal of office at Cleveland,

23  Ohio, on this 17th day of July, 2014.

24      _____

        Gretchen E. Windenburg, Notary Public

25      within and for the State of Ohio

        My Commission expires March 15, 2015.

Deposition of Chistina Morrison, taken April 11, 2014

Page 160

1    STATE OF _____)

                         )  SS:

2    COUNTY OF_____)

3

4

5         Before me, a Notary Public in and for said

6    state and county, personally appeared the

7    above-named CHRISTINA MORRISON, who acknowledges

8    that she did sign the foregoing transcript and

9    that the same is a true and correct transcript of

10   the testimony so given.

11        IN TESTIMONY WHEREOF, I have hereunto

12   affixed my name and official seal at

13   _____this _____day of

14   _____, 2014.

15

16

17

18        _____

                CHRISTINA MORRISON

19

20

21        _____

               Notary Public

22

23   My Commission expires:_____

24

25     gew

Deposition of Chistina Morrison, taken April 11, 2014

Page 161

1                DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

     SIGNATURE:_____DATE:_____

24          CHRISTINA MORRISON

25

Deposition of Chistina Morrison, taken April 11, 2014

Page 162

1              DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23

    SIGNATURE:_____DATE:_____

24        CHRISTINA MORRISON

25

## A

aback 29:12
ability 7:18 56:15
  56:16 83:4 129:8
  129:11
able 31:8,15 55:11
  56:5 65:1 115:22
above-named
  160:7
absence 88:2
  100:20,23
absolutely 6:20 7:9
  45:17 152:17
accept 141:18,20
acceptable 48:22
  72:9
accepted 139:17,18
  140:10
accepting 139:20
access 8:1 9:3,6
  39:14,16 93:5
  94:22,23,25
  152:21
accountable 83:17
accounts 42:12
accurate 5:19
  127:22 146:4
accurately 5:12,15
acknowledged 30:8
acknowledges
  160:7
Act 13:4 126:13
action 32:22 38:25
  39:4,5 114:25
  159:20
additional 138:11
address 20:16 68:2
addressed 54:14
  55:3,4
adjourned 158:22
administering 13:4
administrative
  23:20 24:23 25:2
  25:4 88:4,10,21
  89:22,23 90:23

94:15 99:25
  126:15,16 127:4,7
  128:9 133:4,9,18
  133:23 134:8,15
  134:23 135:4,22
  149:7,16
administrative-t...
  23:23
administrator
  91:24
admission 77:7
  81:9 82:8,9 110:5
admit 36:1
admitted 82:25
  115:4,5 143:12
advanced 20:10,13
advice 78:4
advise 16:4 158:18
advised 71:23
  149:14
advising 44:12
advocate 33:18
affixed 141:21
  159:22 160:12
aforesaid 159:8,14
afternoon 36:24
  117:18
age 4:2
agency 62:13
ago 7:20 39:23
  49:17 63:6
agree 6:15 7:1
  60:16,19 137:15
  157:10,11
agreed 53:15 59:22
  111:17
ahead 93:21 98:14
  124:11 125:4
ahold 45:5 95:20
  96:1
alcohol 7:16 81:21
  81:23 82:3,3 83:5
  110:3 115:17
  121:21 122:3
  152:18
allegation 32:6

allegations 32:3
allotment 96:24
allotted 36:21
allowed 71:3
allows 36:24
altogether 114:7
amount 102:2,6
amounted 76:13
and/or 87:6,7
  131:14
Angelique 12:6
  24:22 25:7 27:11
  154:15 155:21
Angry 69:3
annual 100:15
  102:7
answer 5:3,8 37:21
  49:7 98:12
answering 86:9
anybody 8:8 27:16
  52:15 54:6 58:9
  81:18 97:9 107:6
  129:9 139:4
  146:17
anymore 132:17
apologetic 30:9
apologize 29:23
Apparently 54:24
appearance 5:7
APPEARANCES
  2:1
appeared 27:23
  29:10 160:6
appears 52:5 53:22
  157:3
application 47:12
  48:5 51:17 54:3
  57:22,24 62:22
  64:3 78:21
applications 41:11
  41:22,23 42:3,6
  42:15 43:11,16,17
  46:13,15,20,23,25
  47:6,9,17,19,24
  48:3 53:1,7,13
  56:25 61:12,24

62:5,10 63:16
  77:18 83:14 87:5
  108:5,8 123:22
  124:18 125:11,23
  153:2
applied 102:12
  103:2 135:2
applies 96:7
apply 137:8
appointment 113:5
  113:11 117:14,22
  118:3,4,6 119:4
  123:6 130:9,16
  131:4
appropriate 31:19
  48:18,22 49:4
  55:8,16 67:21
  95:23
appropriately
  41:24 42:3,7 44:5
  63:4
approval 137:6
approved 64:10
  91:18 96:15,17
  97:21 98:21 99:4
  101:10,21 137:10
  137:16 138:4
APRIL 1:12
area 26:11,23
  30:17 62:24 63:2
  67:25 116:18
areas 63:21
arguing 18:6
article 144:25
asked 22:8 26:8,8
  26:10 27:24 40:14
  45:1 54:9 59:7
  67:20 71:16 76:17
  76:23 78:9 108:15
  146:17,21 152:25
  155:21
asking 4:21 5:1,2
  10:8 17:14 19:3
  22:18,19 60:25
  65:7 68:11 75:14
  82:15 91:21 158:8

asks 97:2
asleep 34:14,21,25
  35:12 36:1 77:6
  81:14 82:7 85:10
  107:20 115:4,9
assessing 89:6
  113:3
assessment 88:7
  113:24 114:14
assigns 112:1
assist 15:4,11
assistance 14:24
  15:1,16,19 16:12
  16:25 118:24
assistant 25:4
  65:24
assume 6:5,24,25
  7:23 56:12 60:10
assuming 103:18
assumption 6:15
  132:13
assured 108:16
attacking 5:8
attempted 131:9
attendance 91:15
  95:8 110:15,17
attention 21:14
  113:20
attorney 63:24
  159:18
attorneys 7:23
  142:17 145:25
August 13:15 75:6
  93:2 100:6 125:3
  127:18,22 129:19
  130:5 131:10
  138:17,22 140:25
  149:9,15
authority 62:4
available 100:10,24
  103:2
Avenue 23:14
avenues 140:1
aware 32:9 37:10
  39:13 61:21 62:10
  62:11,12,16 64:8

Deposition of Chistina Morrison, taken April 11, 2014

64:13 68:8,10
70:19 94:24
121:16,16 125:19
125:25 129:19
**Axis** 129:6
**a.m** 1:22 56:21
137:14

---

**B**
**Bachelor's** 20:3
**back** 7:25 10:13
11:15,19 13:13,15
18:19 27:2 28:9
42:23 44:2 66:20
67:14 68:3 73:5
73:17,18,21,22
74:2,5,8 81:3 89:6
90:15,17,25 91:1
91:11 93:11 96:2
96:5 98:4 106:21
117:7 125:6
128:24 130:19
131:15,18,20
138:3 140:5
141:13,15,17,21
141:21,24 143:11
144:10 147:19
148:23 149:4
155:15
**background** 20:2
**bad** 29:24 76:19
**bank** 88:12 101:10
101:19 102:8,20
102:20 126:10
**based** 36:25 37:16
59:5 66:18 88:13
90:24 96:20
101:11,22,25
114:15 120:7
126:20 127:1,21
128:7,13 131:11
131:15 138:16
**basic** 121:8
**basically** 100:3
149:2
**basis** 102:7

**Bates** 50:6 118:25
142:17
**beginning** 139:16
**begins** 89:1
**behalf** 2:2,7
**behavior** 18:7 71:1
71:14 110:8
**belabor** 7:10
**believe** 18:16 38:1
44:9 45:25 66:2
88:24 93:14 98:5
116:15 124:5
129:5 139:14
156:24
**believed** 78:10
156:22
**Bend** 20:6
**benefit** 15:7 104:2
**benefits** 14:18,19
62:1 103:8
**best** 7:4 20:23
31:23 36:5
**better** 89:18
**beyond** 88:9 90:9
101:6 119:16
**big** 29:15 51:6
**Birds** 69:3
**bit** 25:11 34:13
37:20 54:23 68:7
77:3 83:1 102:3
124:13
**blank** 119:5
**blends** 134:19
**bold** 118:19
**boss** 77:11
**bothering** 83:20
**bottom** 51:14 119:1
**box** 111:7,11
**boxes** 111:14
**boyfriend** 70:14
**break** 36:8,10,16
36:17,23 37:4,11
37:15 38:12,19
56:20 64:23 67:17
68:4,7,7,13,14,21
69:2,4,24 70:1,3,9

70:21 71:9,12,20
71:21 72:2 76:21
76:23 77:1 131:23
154:2,8
**breaks** 36:4,11,18
37:9,18 39:10,10
72:15,16 73:1
153:10
**brief** 115:19
**briefly** 48:6
**bring** 27:16 76:1
113:19 155:14
**brought** 21:14 22:6
35:15 54:25 76:5
79:18 90:17,25
114:17 124:1,2
**building** 14:12
25:10 38:5 116:16
**Bulea** 2:8 6:11,23
10:7 22:1 98:11
109:16
**bullet** 105:17
**business** 15:2 63:13
81:2 88:23 135:9

---

**C**
**C** 2:8 45:1
**cabinet** 146:14
**calendar** 88:22,24
89:16 113:10
**calendars** 113:7
**call** 23:21 45:15
46:11 48:8 49:11
50:15,21 51:13,23
52:9,13,16,19
55:9,17 66:18
67:11 73:8 106:7
106:14,21 107:5
107:20 129:4
136:5 149:11
151:20
**called** 1:14 4:2
13:10 44:9,19,24
46:25 47:12 49:8
49:12 53:17 72:6
94:16 110:19

130:20 131:2,2,3
131:6
**calling** 55:24
**calls** 41:11,14
68:17,20 86:9,24
**campus** 118:17
**Candy** 69:3 70:5,10
**caption** 159:17
**car** 36:7 38:8
**card** 141:13,20,24
144:17,25 145:5
**care** 129:24
**career** 23:2,8,11
**Carole** 23:5 44:23
45:3,22 51:25
55:13 57:21 66:3
67:1,11 106:7,22
**case** 1:6 19:2
105:22 114:8
**cause** 159:8
**caused** 78:15
**causing** 42:1 79:10
**center** 23:21 62:12
64:5
**certain** 17:7 25:1
52:11,14 97:14
102:1,2 135:24
142:7
**certainly** 6:14
117:10 124:8
156:10
**certification**
132:22 138:11,13
138:15
**certified** 4:5 16:17
122:21 138:25
139:1,4,10 140:4
140:12,20,24
141:2,22 142:23
145:20,24 147:3
**certify** 159:5,15,17
**CGS** 46:25 49:5
50:16 51:13,21
52:9 53:2,3,6,11
53:15 55:10 56:6
58:9,14 59:14,19

60:12,21 61:18
62:7 63:15 64:4
64:21 65:4,12,15
65:21 66:4,9,12
66:25 73:8 106:8
106:23 107:21
**CGS's** 66:6
**chance** 64:23
**change** 18:2,2
19:12 97:16 99:8
117:15 161:2,4,5
161:7,8,11,13
161:14,16,17,19
161:20,22 162:2,4
162:5,7,8,10,11
162:13,14,16,17
162:19,20,22
**changed** 97:15
99:21 132:12
**charge** 157:21
**checked** 111:8,12
111:14
**Cheryl** 66:1,2,5
67:1
**child** 95:12
**chose** 103:12
**Christina** 1:12,14
3:1 4:1,7,11 159:6
160:7,18 161:24
162:24
**cite** 72:4
**Civil** 1:16 4:4
**claim** 27:8 92:6
127:17
**claimed** 58:10
85:22
**claiming** 27:2
107:24
**clarification** 6:7
119:3 153:25
**clarified** 51:21
**clarify** 27:25 59:20
72:22 84:21
106:20 138:2
**class** 23:10,10
**classes** 22:18 23:11

Deposition of Chistina Morrison, taken April 11, 2014

**clear** 5:24 71:10
**clearly** 29:7 113:8
157:17
**Cleveland** 1:21 2:5
2:11 159:22
**clients** 61:25
**clock** 36:20 37:17
38:23
**closely** 82:25
**closure** 51:20
**clothing** 28:2,7
**cobwebs** 71:10
**collect** 104:4
**collected** 140:5
**come** 5:15 18:19
20:21 24:18,21
25:13,15 33:17,19
34:4,24 41:11
53:4 55:12 64:17
75:13,19,19 77:24
83:19 91:1 117:7
123:23 124:19
125:6 131:15,18
132:23,25 133:1
138:3 147:19
148:23 149:18,20
**comes** 87:21 90:14
97:5 105:10
133:22 140:5
141:13,15,17
143:11 144:10
**comfortable** 30:25
59:3
**coming** 25:22
33:23 34:17 35:17
47:15 49:13,15
96:5 131:20 149:4
**commencing** 1:21
**comments** 29:22
**Commission**
159:25 160:23
**commissioned**
159:5
**communicate** 67:5
74:22 121:2 131:9
134:11,14

**communicated**
67:2 73:10 121:12
131:9 135:9 154:4
**communication**
65:3 92:13 97:6
103:14 129:23
130:2 132:7,11,20
132:23,24 135:13
149:18,20,23
150:1
**communications**
103:22
**community** 11:23
12:19,21
**company** 43:10,17
43:19 44:24 46:14
46:24
**company-wide**
153:7,15,19
**complaint** 26:5
30:6 32:14 44:20
74:13
**complaints** 27:4
32:8 35:7 58:13
58:20 86:6,23
**complete** 42:14
66:6 83:12 128:20
150:4,5 151:18
152:25
**completed** 33:6
47:9 48:3 56:25
57:13,15,17 58:4
58:15 62:16,20
65:18 90:6 111:22
123:23 136:8
151:2 158:21
**completing** 41:24
42:2,6
**compliance** 23:4,22
44:19,22,23 51:21
53:19 63:1,7
66:17 67:12 73:20
74:2,5,12,21
156:14
**complied** 120:4
**complying** 120:3,8

120:15 153:5
**computer** 68:22,22
94:9
**computer/printer**
159:11
**concern** 32:4 33:1
33:16 53:16 54:24
55:18 107:13,19
**concerned** 35:14
54:7,12 58:24
67:25 77:12 85:7
**concerns** 20:25
21:11,15 25:14,17
25:22 26:8 34:1
35:4 39:18 40:18
42:19 51:9 52:7
54:15 58:18,22
59:1,2 67:20,22
71:19 72:3 76:2
76:13 77:4 78:2
79:20 81:15 82:1
85:9 87:14 111:10
113:21 114:16,23
**conclusion** 129:3
**concurrent** 134:3,4
**concurrently**
133:15,16 136:9
150:23
**condition** 116:22
129:7
**conduct** 32:21
**conducted** 120:19
**conducting** 32:2
90:14
**conference** 28:22
45:15 50:15 52:16
52:19 55:9 73:8
106:7,14,21 107:5
**confident** 60:25
**confirm** 44:4 53:20
130:8 131:19
**confirmation** 66:12
91:24
**confirmed** 44:6
45:7 55:7 61:6
66:15

**confirming** 63:3
65:4,12,21 66:5
66:20 92:1,7
97:10
**conflict** 41:25
**conflictive** 110:19
111:6
**confronted** 39:24
**confusing** 136:16
**connect** 56:7
**connected** 124:5
**connection** 108:7
108:25
**consecutive** 89:15
**consecutively**
126:23 127:10,24
133:13,15
**consensus** 54:11
**consequences** 64:3
103:18
**consider** 15:2
117:7 148:23
**considered** 15:6,24
16:8 23:19 24:11
36:18 38:6,9 89:3
133:8 136:5
148:25 149:7
**constitute** 37:22
**constitutes** 55:11
**contact** 14:17,20
15:22 16:5 24:17
24:20 33:7 42:8
42:11 43:24 47:2
48:17 55:12 56:4
59:10 105:18,25
106:4 126:18
131:17 132:4
**contacted** 27:11
43:19 45:10 48:19
48:24 91:10,12
**contacts** 55:21
**container** 29:15
**continuation**
136:12
**continue** 60:7
77:25 97:18

132:19
**continued** 43:2
44:1,7,17 134:6
134:21 136:10
**continuing** 79:14
**contract** 61:21 62:8
**contributing** 79:9
**conversation** 40:4
45:13 46:7,10
49:16,19 50:21,25
51:15 52:25 60:5
64:20 65:5,13,22
67:6 72:11 73:11
73:13,17 77:11,14
80:20 84:20 87:23
96:4 107:1,4
112:25 115:13,19
130:11,25
**conversations** 21:3
52:3 56:23 57:10
58:12 67:8 78:16
78:24 79:12,21
83:22 87:18
107:12
**converted** 134:24
135:1
**copied** 74:9,14
92:17 97:6,25
98:15,18,22,23
99:2,5,6 100:8,13
102:10,24 103:5
103:13,21,23
104:6,7,9,13,18
136:22 150:7,11
**copy** 92:14,15
104:1 112:3
118:12 119:5
140:8 152:18
**corner** 78:25
**Corp** 10:22
**corporate** 13:11
91:23 97:5
**Corporation** 10:15
11:2
**correct** 10:1 11:3,6
23:15 24:13 25:24

Deposition of Chistina Morrison, taken April 11, 2014

27:20 29:4 31:14
36:12 38:7,12
47:25 48:1,4,10
52:4,11 53:8,23
59:17 70:2,12,17
71:6 73:12 87:11
88:19 93:17 97:3
106:2 108:9 109:1
109:15,21 110:3,4
110:12,20,24
111:2,8,12,15,18
116:11 126:13,19
127:3 128:3,4,6
128:12,18 129:16
133:23 134:9,12
135:5 136:24
137:4,17 138:8
139:24 140:6,21
140:25 141:3,7,9
141:10,21 142:3
142:25 143:3,21
144:2,9,13,18,23
145:1,6 151:24
152:4 153:18
154:11,16,17
156:16,23 159:12
160:9
**corrective** 38:25
39:4,5
**correctly** 44:10
**correspondence**
65:16 66:20 99:6
102:24 103:4,14
104:10,12,14
129:25
**corresponds**
143:10 144:7
145:5
**counsel** 159:18
**counseling** 15:7
**counselors** 16:17
112:2 122:21
**counted** 100:15
**counties** 14:14
**county** 159:1 160:2
160:6

**couple** 4:23 26:2
28:17 33:2 35:1,4
54:13,25 55:6
77:23 81:7 86:6
102:9 124:1
157:24 158:8
**course** 7:4 22:6
35:15 36:11 135:8
**court** 1:1,18 5:11
**courtesy** 71:22
**covered** 18:24
97:20
**covering** 27:14
**co-worker** 21:1
**co-workers** 79:6,9
82:12 86:8,22
**crazy** 5:5
**criteria** 16:9,20,21
16:24
**crumbs** 29:17
**Crush** 69:3 70:5,10
**CSG** 51:13 59:19
**CSIQ** 58:20
**cube** 21:17 28:20
36:9 67:23 76:16
**cubes** 28:18 29:2
**cubicle** 28:13 68:5
68:14 72:15
**cubicles** 30:12
**culmination** 77:3
**currently** 10:14
**customers** 41:18
**CUYAHOGA**
159:1
**C-H-R-I-S-T-I-N...**
4:11

——————————
**D**
——————————
**D** 1:4
**Dame** 20:4,5,5,7,12
**date** 1:22 9:7 11:12
32:16 53:25 73:5
75:14 87:9 92:2
106:3,5,25 109:13
111:17 117:12
118:1 127:20

128:1,3,6 130:19
131:19 138:9,23
140:14 143:2,5,23
144:1,15,22
161:23 162:23
**dated** 51:3 92:19
136:24
**dates** 32:24 33:13
35:2 52:12 74:4
75:5,7 86:20
92:22 93:3,6,16
95:16 100:6
121:14 123:11
132:20 139:22
145:7
**daughter** 91:11
**day** 1:22 36:12 65:2
75:20 76:16,18
82:9 91:8 113:11
118:10 125:6
135:2 137:7,10
159:23 160:13
**days** 33:2 75:20,22
88:4,6,9,22,23,24
89:3,11,13,15,16
89:24,25 90:7,9
94:3,3 101:4,6,18
101:23 119:17
123:8 126:8
127:11
**dbulea@thinkgk...**
2:12
**deal** 124:17 125:9
**dealing** 125:21
**dealings** 21:2
**December** 8:1 9:2
9:19,20,21 10:13
11:1 19:14 146:11
**deciding** 105:15
**decision** 75:17 76:3
76:4 77:10 127:8
**decisions** 75:23
**decline** 17:24
**declined** 26:15,16
**declining** 82:7
**deemed** 90:22

120:21,22 128:20
128:21 133:25
150:17 151:1,5,8
**Defendants** 1:10
2:7
**defiant** 18:7
**define** 16:22 17:18
17:18
**definitely** 39:15
85:18 107:13
111:3 131:6
**definitive** 60:2,6
**degree** 20:8
**delivered** 141:25
**delivery** 144:22
**demands** 147:24
**denied** 95:4 99:7,12
99:21
**department** 13:8
13:10,13,15 15:13
24:5,8,12 27:13
36:23 37:4,7
47:20 61:2,22
62:8,14 63:1,8
64:4 68:1 69:8,10
69:12 74:23 95:15
97:9,24 101:5
105:11 132:8
149:25 150:19
151:4 153:20,21
153:22
**departments** 69:7
**department-wide**
72:23
**depending** 16:13
89:12 90:11
128:23
**depends** 74:10 84:3
87:20
**deposition** 1:12,14
3:1 4:13 10:4
21:25 109:16
157:3 158:22
159:15 161:1
162:1
**describe** 22:21 26:4

74:16 105:8
**described** 32:23
**describing** 16:19
**desk** 34:15,21 35:5
36:2 39:19 40:18
71:23 77:6 82:8
**desks** 153:9
**details** 64:16
**deteriorating**
110:23 111:11
**determination**
16:13,15 88:14
90:20 128:11,13
134:7
**determinations**
120:18
**determine** 16:17
113:21,24 126:24
128:5,17 133:22
**determined** 31:17
113:11 114:15
120:16 122:12
126:19 128:1
133:24
**development** 13:1
20:3
**diagnosis** 129:5,18
**different** 15:21
23:8,23 24:1
37:20 43:18 55:6
60:7,17 63:17
69:6,8 89:13
124:3,16 136:15
**differently** 6:3
**direct** 44:8 48:25
53:12 59:4,5 85:2
**directed** 121:17
**direction** 37:21
**directions** 60:18
**directives** 44:13,16
61:10 78:5 108:13
155:17,22
**directly** 15:22
28:24 43:24 47:2
48:24 49:7 53:18
55:12 66:9 74:22

Deposition of Chistina Morrison, taken April 11, 2014

**director** 12:10,11 13:18 14:2 147:17
**disagree** 34:8
**discuss** 34:23 148:3 148:11 154:14,18
**discussed** 18:24 87:6 123:21 125:2
**discussing** 85:5 87:8
**discussion** 49:13 52:25 62:18 72:9 72:11 125:15
**discussions** 106:15 107:3
**disputing** 117:10
**disseminated** 73:1
**distractive** 18:7
**distributed** 153:7
**DISTRICT** 1:1,1
**DIVISION** 1:2
**Docs** 51:18
**doctor** 56:8 91:12 128:2 129:9,14
**doctors** 56:9 61:24
**document** 8:20 39:2,3 98:22,24 99:2 105:1,2,13 109:10 119:23 141:11 142:24 148:18
**documentation** 46:5 85:21,24 86:1,2 87:22 91:20 92:6 95:17 95:23 97:8,17,21 97:23 98:8,15 99:13,17 100:9,14 102:11,25 128:7 129:22 131:16 132:18 137:7,8 138:5 156:2
**documented** 45:24 74:7
**documents** 8:3,5,8 8:9,19 9:9 50:4 54:1 86:13 103:6

116:8 118:19,22 138:11 142:12,16 142:21 145:24 146:18 156:13 157:5,8,12,21 158:2,6,9,13
**doing** 29:7 45:10 60:15 61:17 63:4 69:20,24 90:5,17 107:14 155:23
**Don** 6:20 7:9
**Donald** 2:8
**doubt** 92:15,16
**Dr** 121:18 123:17 125:20 128:24 129:3 152:20
**draft** 105:10
**drafted** 100:1 116:9 117:5 137:25
**drawer** 146:14
**drive** 5:5
**driving** 38:8
**dropped** 152:8
**drowsy** 82:8,18
**drug** 81:23 82:3,13 83:5 110:2 115:17 121:21 122:3 152:18
**drugs** 7:16 81:21 82:2
**duly** 4:4 159:4,6
**duties** 12:22 14:3,4 18:22 19:12 82:21
**duty** 127:20

**E**
**E** 1:17 159:3,24
**EAP** 18:19 31:5 40:23 75:1,12 76:1,6 77:11 81:3 83:23 84:14,18 87:25 88:1,3,5 105:11 106:18 107:8,23 108:8,23 109:11 111:24

112:4,7,10 113:22 118:16 127:18 131:14 134:7 150:7,18 151:4
**EAP's** 113:19
**earlier** 72:5 74:16 155:19
**early** 9:21 75:6 93:1
**easier** 98:13
**East** 1:20 2:10
**EASTERN** 1:2
**easy** 141:23
**eat** 68:15
**eating** 29:17
**education** 20:2,11 101:13
**either** 6:2 10:3 24:15 36:7,24 66:10 70:16 85:20 90:1,20 106:15 111:6 112:1 117:24 129:24 134:1 135:11 159:18
**elaborate** 40:7
**eligible** 96:14,18 97:3,11 98:1,2,3,5 98:10,17,19,25
**Elliott** 12:15,17
**employed** 10:14 11:3,5 19:18
**employee** 12:24 14:24 15:1,4,19 16:1,5,12,25 17:3 17:8 18:1 19:4,22 38:18 39:14,15 68:3,13 70:9 74:19,23 81:17 84:7,11,12 87:25 89:15 90:6,16 93:12,13 94:2 95:1,13,21,25 96:7,13 97:1 103:25 104:10 113:3,12 114:1,2

118:24 122:2 127:25 128:11,18 140:8 146:13
**employees** 13:5 14:11 15:4,8,11 15:16,22 23:17,25 36:14,15 37:9 63:23 67:16 87:23 93:6 94:7 96:17 100:24,25 104:5 104:19 153:8 154:20
**employee's** 18:5 95:3 135:20
**employer** 96:11,12 97:1
**employment** 116:22
**enclosed** 118:19,22
**encompasses** 101:19
**endangering** 110:8
**ended** 92:24 124:22 133:13 134:3,5,15 134:20 136:13 138:4,17 149:17 150:24
**ends** 135:20 136:8 136:11 145:10
**engaging** 110:7
**enrollment** 41:23 42:10 48:16,20 55:14 61:24 77:18 83:13 124:18 153:2
**ensure** 140:2
**entered** 21:25
**entire** 133:7
**entitled** 39:3 129:3
**entitlement** 100:16
**environment** 152:14,16
**ERRATA** 161:1 162:1
**errors** 86:5
**especially** 31:21

33:1
**Esq** 2:3,8,9
**essentially** 30:18
**Euclid** 20:7,12 23:14,15 25:9
**evaluation** 90:5,14 106:19 107:8 119:15 120:17,25 128:14,20 136:7,7 150:2,3,24 151:1 151:18 155:9
**event** 159:19
**events** 4:22 7:19 44:10
**everybody** 5:17 17:6 72:21 82:15
**everybody's** 121:23
**evidence** 91:17
**exact** 9:7 11:12,12 18:14 32:16,24 33:13,24 34:10 45:8 92:22 97:13 98:21 139:22
**exactly** 17:21 26:3 39:20 41:13 46:9 48:12 52:21 59:8 67:4,9 72:8 73:3 73:13,16 89:9 100:7 102:4 104:20 106:5 117:19,22 118:1 130:14 131:5 132:21 135:18 151:6
**examination** 1:15 3:3 4:3,7
**examined** 4:5
**example** 49:10 67:23
**excessive** 69:13,16 69:18,19
**exchange** 72:12
**executive** 70:8
**exempt** 102:3
**Exhibit** 3:6 49:25 50:3,13 84:9

Deposition of Chistina Morrison, taken April 11, 2014

104:22,24,25
105:8 109:5,8
116:2,5 117:1
118:13 119:21,23
122:17,19 123:14
123:16 126:2,4
128:10 130:6
136:18,20 137:13
137:19,21 140:18
140:24 141:7,9
142:10,12,13
147:7 148:15,17
148:25 152:4
**exist** 157:16
**exited** 109:16
**expect** 49:6 74:21
**expectation** 72:21
100:4 138:2 149:3
153:22 156:19
**expectations** 65:17
66:6 86:5 147:18
147:22,25 148:2,4
**expected** 99:18
128:2 148:1
152:12,13
**experiencing**
107:25 125:22
**expert** 17:1,1 27:17
**expertise** 63:11
**experts** 16:16
23:11 62:24 63:7
**expires** 159:25
160:23
**explain** 76:2
115:23
**explaining** 115:10
**express** 77:16,21
81:18
**expressed** 52:6
77:5 81:22 108:3
**extend** 89:8
**extended** 119:16
**extent** 6:12 7:5
22:8 62:5
**extremely** 29:11,11
**e-mail** 65:16 72:12

72:20 74:6 92:10
92:14,19 129:24
135:11 136:22
137:1,12 151:20
151:21 153:8,16
**e-mails** 8:9,12,19
9:9 54:1 58:8
65:7 81:12 92:11
115:7

---

## F

**face-to-face** 130:25
**facilitate** 91:14
113:18
**facilitates** 13:9
95:15
**facilitator** 74:13
**facility** 23:14
**fact** 7:5 118:18
145:9
**facts** 27:1
**failing** 103:19
**fails** 122:4
**Fair** 5:9,10 6:9
**fall** 15:12 36:1
81:14 89:13 99:24
**falling** 34:14,21,25
35:12 77:6 82:7
85:10 107:20
115:4,9
**falls** 74:19 95:9
120:4
**familiar** 57:25 58:1
**family** 13:4 79:24
80:6 126:12
**far** 14:7 68:16
72:10
**February** 32:19
87:16
**Federal** 1:16 4:3
**feel** 27:16 29:24
30:1,8 31:19
51:16 59:3 60:8
112:23
**feeling** 35:3 40:5,25
72:1 83:21

**feels** 51:4
**felt** 28:7 31:5,23
40:10 41:1 42:21
43:6 51:10 59:4
59:11,21 78:9,12
78:18 79:3 82:19
83:15 85:8 108:14
108:18 115:11
**females** 30:6
**FFD** 105:18 106:1
**field** 23:12 86:9,24
**figure** 61:8 113:7
**file** 84:7,11,12,13
140:9 146:5,6,9
147:5
**files** 146:12
**fill** 51:17 57:14
**finally** 137:9
**finance** 23:21
**find** 17:3 132:16
158:6,9
**fine** 55:17 153:6
**finish** 5:2,7 46:20
98:11
**fired** 124:22
**first** 4:4,25 10:4
12:7 14:20 20:21
20:23 21:3 25:19
25:20 47:11 75:13
75:19 76:5 81:6
88:3 101:6 105:5
105:17 107:12,22
117:15,17 142:23
159:6
**fit** 121:15 122:12
122:13 127:20
129:20
**fitness-for-duty**
106:18 107:8
119:14 120:17
**fit-for-duty** 90:21
90:21,22 91:9
92:23 101:6
113:13,25 117:12
120:21,22,23
122:7 127:11,13

127:14,15 128:21
128:22 129:13
133:11,25 134:1,1
135:14,14 136:3
136:10 149:21
150:5,17,17,22
151:1,5,8,15
**five** 10:25 88:4,6,9
88:22,22,24 89:3
89:10,11,14,15,24
89:25 90:7,9
101:4,6 119:17
120:12 123:8
126:8 127:11
142:14 154:13,19
**five-day** 88:3,8,21
89:14 120:5,6
**five-minute** 56:20
131:23
**flat-out** 155:16,22
**flip** 116:5
**flipped** 120:14
126:15
**flip-flopping** 17:23
18:18
**floor** 21:8
**FMLA** 13:21 19:5
88:14,17 90:2,11
91:2,4,6,8,10,18
91:24 92:2,8,24
93:25 94:14,20
95:1,3 96:7,14,18
97:2,11,14 98:1
98:17,21,25 99:4
99:19,21,24
100:11,16 101:12
102:13,22 103:2
103:19,24 104:9,9
116:24 119:18,19
120:9 122:10
126:13,22 127:2
127:25 132:9,10
133:2,14 134:4,5
134:18,20,24,25
135:2,16,20 136:9
136:13 137:2,4,15

137:16 138:4,7,13
138:14 150:25
151:2,3,17 157:8
157:20,21
**focus** 156:19
**focusing** 69:23
**follow** 4:24 5:22
44:13,15 60:8,20
61:9 78:5 116:20
123:8 155:17,22
**followed** 58:10
66:22 96:9 116:18
**following** 44:5 49:3
61:4 127:15
**follows** 4:6 43:1
89:2
**follow-up** 65:3
120:2
**fondled** 27:24
**fondling** 21:16
**food** 80:9,11
**forbid** 69:20
**forbidden** 69:14
70:6
**foregoing** 159:12
159:16 160:8
**forget** 112:11
**form** 47:14 57:5,8
57:12,14,16 58:1
59:7 65:18 84:14
84:15 109:12
111:22 112:19
151:10,13
**formal** 22:18,22
23:10 87:21,21
**formally** 21:7
68:19
**forms** 58:14 62:15
62:20 66:7 156:4
**forth** 1:22
**forward** 97:20
**forwarded** 112:18
158:4
**found** 22:8 132:16
**four** 153:24
**frame** 88:8

framework 23:13
fraudulent 51:6
  54:7
Friday 1:12 136:24
front 17:20 18:13
full 4:11 62:5
fully 7:3 71:24
Fulton 105:11
  111:25 112:13,16
  112:18 122:20
function 14:22
  41:21 113:16,20
functions 23:24
further 32:8 33:6
  33:16 79:17
  159:15,17
FYI 92:17 95:8

**G**

gather 146:18
gathered 9:13
  22:10 27:1
Geauga 11:22,22
  12:2 19:17 64:18
general 14:6 30:12
  40:8 54:11,23
  69:13 78:18 79:3
  83:21 86:10 129:8
generalist 12:1,3,4
  12:23 14:5,23
  18:23 21:24
generally 36:23
  52:22
gentleman 31:2
  121:17
gesture 28:8
gestures 5:14
getting 15:17 35:7
  38:8 45:3 95:18
gew 160:25
Giffen 1:19 2:9
girlfriend 70:14
give 5:13,18 8:7,8
  10:9 49:10 116:25
  118:7 158:7
given 4:13 8:18,22

117:11 155:8
  159:9,13 160:10
gives 119:3
giving 5:3,7 117:6
  125:16 153:11
go 4:24 15:17,21
  17:9 36:7,7,20
  37:15 38:15 51:5
  51:10 54:8 72:1
  85:4 89:7 90:8
  93:21 94:12 95:10
  98:14 117:15
  118:2,6,9,21
  122:2 152:11
  154:9
goes 88:9 89:25
  103:4 128:22
  141:16
going 4:21 5:5 6:5
  6:25 7:10,14
  16:14 17:6,6 18:4
  18:19 22:12 35:18
  37:20,24 39:6
  40:15 44:2,11
  47:22 50:2 67:14
  69:9 70:24 77:13
  79:24 81:3,14,15
  85:15 88:12 91:10
  93:22 95:11,13
  106:21 109:3
  112:22 114:16
  115:8,16 116:24
  118:17 121:6
  124:11,12 126:24
  128:6,12,16 130:9
  147:19 153:15
  155:24 157:2,6,11
  157:13
good 93:2 131:23
gosh 32:18 33:24
graduating 20:11
granted 95:4
green 140:13
  141:13,20,24
  144:17
Gretchen 1:17 5:5

5:11 159:3,24
ground 4:23
group 11:11,17
  12:21 13:18 63:22
  74:20 95:15 103:4
groups 14:12,14
guarantee 5:16
guess 10:2,3,9,10
  10:24 24:8 39:6
  57:2 68:10 88:15
  94:11 98:3 129:4
  131:11 135:23
  141:1
guessing 32:18
  75:7 93:1
guidance 67:15,21
  71:16
guide 15:15
guidelines 17:5
  96:21

**H**

hall 28:18,21
hallway 28:23
hand 28:4 50:2
  159:22
handed 142:13
handing 104:24
  109:7 116:4
  123:16 126:4
  136:20 137:21
  148:17
handle 42:12 91:20
  92:2 150:7
handled 13:20
  24:25
handwriting 50:10
  105:5,6 109:18
  142:20 143:18
hang 11:11,13
  117:4
happen 136:14
happened 31:2
  79:18 81:4 89:7
  107:12,22 135:7
  147:12 154:21

happening 80:1
happens 88:6 90:3
  90:4 112:17 113:4
happy 114:20
hard 108:12
head 26:2 71:11
headed 13:14
heading 45:23
heads 13:12
health 1:8 13:11
  61:22 62:9,14
  64:4 83:8 91:23
  97:5 103:7,17
hear 45:16 89:5
heard 7:3 47:14
  67:5 95:21 96:2,4
  115:14 138:9
hearing 115:13
hearsay 47:22
Heisley 10:19,21
held 83:17
hello 21:9
help 15:4,10,15
  16:3,6 25:1 27:17
  30:3 31:25 40:16
  40:20,21,23 81:16
  87:18 91:15 93:22
  95:7,25 115:11
helps 14:21 113:18
hereinafter 4:5
hereunto 159:21
  160:11
Herron 2:3 3:4 4:8
  4:15 6:19 7:8
  56:19,22 80:10,13
  131:22 132:3
  157:1,14,22 158:3
  158:10,14,17
herronlaw@msn...
  2:6
hey 95:19
high 82:9 85:4
higher 18:9 27:15
highlighted 119:10
high-level 70:8
historical 112:22

historically 27:4
history 27:3
hold 56:6 124:8
  146:19,21
holding 157:16
holiday 101:20
home 20:16
honestly 61:20 67:7
  84:25 86:19 87:12
  115:12 132:5
  133:19
hope 17:23 71:7
  76:5
hospital 7:25 8:16
  9:2 11:23 12:2
  19:17,19,23,25
  22:24 26:19 49:11
  64:12 101:4,8
  148:4 153:20
  157:5
hospitals 1:7,8 4:17
  4:19 9:12 11:3,6,8
  11:15,19,22,24
  12:19,21 14:24
  69:7 133:21
hospital's 7:23
  142:17
hostile 110:7
hotline 44:20 73:20
hourly 93:13,14
  94:2,6
hours 35:13 37:5
  93:25 94:13 96:20
  96:23,24 100:10
  102:9,20 117:7
house 93:19
HR 12:25,25 14:6
  14:10,15,23 15:12
  18:23 21:24 25:8
  33:15,15 39:7
  63:9,10 67:13
  72:6 74:12 91:14
  95:6 96:3 104:1
  113:17,20 128:19
HR-related 14:16
HR/EAP 105:18,25

**human** 10:23 12:1
12:3,4,10,11,16
12:17,23 14:5
16:10 20:3 25:4
39:4 61:22 62:9
62:14 64:5
**hundred** 94:7,10
102:9 103:9
114:10
**H-E-I-S-L-E-Y**
10:21

**I**

**idea** 6:20 7:9
**identify** 50:25
120:1 137:24
**illegal** 54:7 78:11
108:15,19
**immediate** 32:25
113:8
**immediately** 26:10
114:18
**impact** 7:17 83:3
**impacting** 69:22
**impair** 129:7
**impaired** 129:10
129:16
**implemented** 72:14
**importance** 62:21
62:23
**important** 5:1,13
**improper** 60:14
**inability** 47:1
**inappropriate** 28:8
29:24 30:10,16
31:2,10,13,16
115:9
**incapable** 82:20
**incident** 33:5
**included** 118:12
**includes** 118:20
**incorrect** 59:15
**INDEX** 3:1
**indicate** 28:10 54:6
78:14 79:4,7,14
82:18 83:10 94:2

140:14 155:7
**indicated** 10:12
34:25 80:14
132:12
**indicates** 93:6
**indicating** 93:15
94:14,19 141:25
153:23
**indication** 110:18
110:22,25
**individual** 13:12,14
90:12 92:4
**individualized**
82:14 90:10
**individuals** 54:17
54:19
**ineligible** 98:17
**influence** 7:16
18:11 82:2
**inform** 122:6
**informal** 22:23
23:1 45:21
**information** 9:23
14:20 22:10 23:6
42:9,11 45:3 60:2
62:22 63:23 66:15
80:21 91:25 113:2
113:14 122:23
123:1,9,10 128:17
131:15 155:2
**informed** 95:16
122:5 129:9
**informing** 153:8
**initially** 32:15
**initiate** 95:14
105:18 106:1
**initiated** 58:17 91:2
91:7,8
**initiation** 92:25
**instances** 81:7
**instruct** 10:8
**instructed** 42:14
**instructing** 43:8
60:23 61:3
**instructions** 57:7
57:12 59:9 60:8

61:5
**insurance** 103:7,17
**intended** 6:9
**interactions** 20:23
**interested** 159:19
**internet** 68:25
69:18
**interpret** 44:7
**intervene** 96:3
**interviewed** 27:20
29:4 30:11
**intimate** 85:17
**intimately** 57:22,23
**investigate** 21:19
22:5,14 27:10
**investigated** 26:17
44:22 66:16,18,21
**investigating** 26:5
61:7 63:2
**investigation** 23:1
26:14 27:14,19
32:3,12,22 45:24
53:19 74:18
**investigations** 23:3
23:7 67:12
**involved** 79:25
**involvement** 4:22
**involving** 33:5
**in-depth** 57:20
**issue** 14:16 24:16
24:16 34:21 41:17
54:3 55:11 62:19
67:13,14 69:21
71:17 75:11,13,18
76:6 77:17 78:21
81:5 83:11 84:18
87:2,4 108:4,8
123:23 124:15,18
125:8
**issues** 15:9,9 16:1,2
25:16 27:5 31:3
33:7,16 34:1 41:3
41:6 72:24 76:2
79:14,17,23 81:10
83:8 85:22 86:16
87:6 95:7 110:16

110:17 123:21
125:10,23
**item** 153:24

**J**

**jail** 51:5,10 54:8
**January** 87:15
**Jason** 12:15
**jibe** 37:18
**Jill** 105:11,12
111:25 112:12,16
112:18 113:6
114:15 122:20
**Joan** 25:3
**job** 19:9,12 35:11
40:11,12 41:2,21
41:21 78:15 80:4
82:20 83:4,15
90:17 110:23
111:11 116:21
**Johnson** 1:4 4:16
8:11,15,25 9:11
20:22 21:11 24:6
24:9 25:13,18
27:20 32:5 33:7
39:17,19 41:8
43:15 52:2 53:2,6
56:24 58:7 60:12
65:9 72:25 73:10
75:12 76:7 79:4,7
82:18 85:6,20
91:18 94:19 97:10
98:16,24 99:3,15
99:18 100:9
102:11,25 103:7
104:15 106:16
107:6,7 109:19
111:5 121:17
123:24 125:1
129:6,20 130:3
132:8 137:2,14
138:21 139:11
142:24 146:18
147:13
**Johnson's** 25:21
28:13,15 39:12

55:21 105:22
**joint** 77:15
**joke** 51:6
**jot** 84:3
**jotted** 45:21
**July** 13:15 53:22
54:5 72:18 73:2
75:6,7 81:4 86:18
87:7,14 93:1
109:14 111:18
118:8 136:24
137:13 139:23
144:16 145:15
146:1 153:17
154:7 159:23
**jump** 21:19
**June** 13:15

**K**

**K** 13:25
**Kaminski** 1:20 2:9
2:9 21:25 80:8
157:9,18 158:1,5
158:12,16,20
**Kara** 13:23,24,25
91:23 92:5,7 95:6
95:19 97:9,23
104:10,13,14
131:13 132:7,11
133:1 136:23
138:14 139:6,7
**Kara's** 95:14
**Kathy** 122:20
123:2
**keep** 74:21 83:22
84:4,10 85:25
87:17,24 91:3,14
123:4 140:8,10
143:20 146:4
150:9 158:10
**keeping** 22:20
41:14
**keeps** 95:6,16
**kept** 84:2,6 91:13
92:15 95:2,5
103:23 135:21

Deposition of Chistina Morrison, taken April 11, 2014

141:10 146:7,14
147:7 150:15
157:24
**Kerin** 2:9 22:2
157:7
**key** 83:16
**kicks** 134:18
**kind** 14:16 17:4
22:11,19 23:7
34:19 35:22 77:14
77:15 78:17,24
79:1,2 86:3,15
102:4 113:17,17
118:18 134:19
146:24 147:17
148:1
**kinds** 40:16 114:2
**kkaminski@thin...**
2:12
**knew** 10:6 57:14,22
57:23 62:3,23,24
110:4 118:17
138:16 146:22
**know** 6:1,16 7:7,12
9:22 12:7,14
14:17,18 15:8,15
16:2,14,16 17:5
17:24 20:21 21:2
21:18,20,24 22:7
22:22,25 23:3,9
23:21,23 24:23
26:11,16,25 27:1
27:3,24 28:1,2,5
29:7,8,9,18,21
30:4,7 31:19
33:15,18,25 34:8
34:8 35:10 36:3
36:10,25 37:6
39:11 40:10,15
41:25 42:20 44:14
45:22 46:1,4,17
47:11,20,21,24
48:2 50:20,22
53:15,18 54:10
55:2,3,5,17,22,25
56:11,12,13,16

57:16,23 58:23
59:9 60:4 61:20
62:4,5,25,25
63:11,24 64:16
65:10,14,15,24
66:16 67:21,22
68:16 69:6,11,12
69:16 70:23 71:13
71:20,24 72:1,22
74:2,14 76:8,14
76:19 77:3,4,7,24
77:25 78:3,5,19
79:17 81:8 82:6
82:25 83:1 84:5
84:14 85:8,9,11
85:16,18 86:3,4
87:3 88:15 90:1
91:7,14,21 92:12
93:23 94:10,25
95:13,14 96:1
98:2 99:20 100:3
101:4 102:1,2,14
103:3,9,10,10,11
104:2,19 105:6
106:25 107:21
113:18,21 114:14
114:21 115:3,4,6
115:8,12,14,21
116:21 117:2,24
121:1,6,13,22
122:11,23 123:4,6
123:9 124:4,7
126:20,21 128:25
130:13 131:4,12
131:16 132:14
134:3 135:13,23
136:11,15 138:1
138:18 139:6,7,8
139:8,9,25 140:11
141:16 142:1
143:5,9,14 144:1
144:6 145:4,14,15
145:19 146:22
147:18,22,24,24
149:2,10 150:11
150:13,16 152:21

152:24 158:18
**knowledge** 63:5,14
64:14 77:1 121:8
**known** 9:25 10:3,5
**knows** 6:13 131:19
**Kronos** 93:18
94:16,17,18,22,23

---

**L**

**Ladaika** 13:23,25
91:23 92:5,7
97:24 131:13
**ladies** 30:14
**laid** 28:17
**Lake** 19:19,23,25
22:24 64:18
**large** 49:11
**lasted** 52:20
**lawful** 4:2
**lawsuit** 4:16,23
9:25
**leader** 26:21 61:10
**leaders** 14:11 23:2
44:3,14,16 60:9
61:2,5 63:1
**leadership** 42:4,5
44:2 58:25 61:16
63:21 101:22
**leading** 30:5
**leads** 158:15
**leave** 13:4 37:11,13
37:16 88:2,4,10
88:16,16,17,21
89:1,22,23 90:18
90:24 91:4,6,19
92:8 94:12,14,15
94:20 95:1,3,9
96:8,14,18 97:2
97:11 98:1,17,25
99:4,19,25 100:4
100:10,15,16,19
100:20,23 101:2,8
101:12,13,13,15
102:6,12,14,14,21
102:22 103:1,2,20
103:24 116:24

119:18 120:6,12
126:9,13,13,15,21
127:1,2,4,5,7,25
128:9 132:9,19
133:4,9,18,23
134:8,15,23,24
135:4,22 136:4,5
137:15 138:16
149:8,11,16,22
155:11
**leaves** 101:11
133:10
**leaving** 9:19 37:22
37:23,25 38:6,9
146:17
**led** 4:23
**leeway** 71:13
**left** 7:25 8:16 9:1
9:12,20 10:12
19:14 84:8,10
116:17,23,24
117:6 130:8
146:11,15,23
147:10
**legal** 27:13
**letter** 100:2 116:9
116:10,13 117:8
118:13,18 119:9
120:10 127:3,21
135:11 137:25
138:8,21 140:23
141:4,5,11,16
142:1,2,4 143:5
143:10,16,24
144:5,6,13,15
145:5,14,15 146:1
147:6,23 148:7,21
148:22 151:22,23
152:3,10
**letters** 138:25
139:1,4,10 140:16
141:23 142:5
143:9,13,20 145:4
145:19 146:8
147:1,3
**let's** 11:10 33:22

50:25 60:10 61:8
84:13 120:2
152:11
**level** 27:15 70:5
**liability** 37:16
**liaison** 12:25 14:10
**lies** 71:14
**life** 18:11 40:6
79:24
**likewise** 5:6
**limitations** 37:8,10
68:5,8,12 71:8
**line** 48:25 59:4,5
63:13 70:23 161:2
161:5,8,11,14,17
161:20 162:2,5,8
162:11,14,17,20
**lines** 56:13
**lingered** 28:5
**list** 19:10
**listed** 14:4
**listen** 35:16 78:1
81:13 95:20 96:4
131:4
**litigation** 146:20
**little** 18:21 25:11
28:18 34:13 37:20
39:7 45:21 54:23
68:7 77:2 83:1
102:3 124:13
136:16 140:13
141:13
**living** 64:15
**LLC** 1:20 2:9
**located** 10:18 23:14
157:19
**location** 23:18
37:19
**locations** 24:1
**logically** 158:15
**long** 11:8 19:23
32:21 35:2 45:9
48:18 52:19 55:17
71:13 115:15
153:5
**longer** 20:14 153:9

Deposition of Chistina Morrison, taken April 11, 2014

**look** 9:9 22:11 28:24 50:12 56:11 57:4 70:10,15 109:3 113:7 117:4 128:16,24 129:2 140:18 143:15 145:9 157:12
**looked** 8:24 9:8,15 27:2 28:4 42:17 44:3 49:21 55:5 60:24 76:19 157:7
**looking** 26:9,14 145:22
**looks** 50:11 51:4,14 110:13 120:2
**loop** 27:12 74:22 89:4 91:13 95:2,4 95:6 103:24 113:22 123:4 150:10,15 157:25
**looped** 135:19
**lot** 14:6 19:3 35:3 37:24 38:2 67:3 80:4 81:10 86:7 103:3 141:22 157:4
**lots** 67:7 82:10 114:15
**lunch** 36:18,19 80:12
**lying** 32:6 51:7 76:25
**Lyn** 2:9
**L-A-D-A-I-K-A** 13:25 92:5

**M**

**machines** 38:14
**Madison** 20:18
**mail** 140:1,4,12,20 140:24 142:23 145:20,24 147:3
**mailed** 152:7
**main** 41:21 49:12 78:20 108:22
**major** 19:11 108:2

**making** 6:16,21,23 29:21 32:5 63:3 75:11 76:6 103:16
**management** 13:2
**manager** 10:23 15:25 16:11,24 17:2 26:18 27:11 30:3 43:3 77:12 85:2 95:21,24 105:17,23 111:25 112:20 113:13,19 113:22 114:1 146:22
**managers** 82:12
**mandate** 116:20
**mandated** 82:16
**mandates** 36:16
**mandating** 113:9
**mandatory** 15:24 16:4,8,10,19 17:7 17:11,14 75:8,10 75:11,18 76:6 81:3,5 84:18 101:3 106:18 107:8 109:20 110:11 113:5 114:17 122:3
**manner** 6:8 123:22
**map** 118:12,15,20 118:23
**March** 159:25
**Mark** 2:3 4:15
**marked** 49:25 50:2 50:13 84:9 104:22 104:25 109:5,7 116:2,4 119:21 122:17 123:14,16 126:2,4 136:18,20 137:13,19,21 140:17 142:10 148:15,17 152:3
**match** 143:11 144:10
**matched** 145:7
**matter** 25:24
**matters** 15:6 95:5

**McDonald's** 38:9
**mean** 6:12 8:7,16 9:13,18 10:2 13:17 14:7 15:2 16:21 19:7 22:15 22:17 28:2 29:10 29:23 33:12 34:19 37:13 40:14 50:18 51:20 54:22 56:12 56:12 68:10,12,18 70:23 76:15 77:23 78:23 82:24 84:21 85:13 86:14 90:8 93:9 107:9,10,22 109:2 110:4 115:18,23 121:6 124:8 128:15 132:13 134:4 135:23 149:2 152:14
**means** 7:2 37:17
**meant** 27:25 130:24
**mediator** 113:17
**Medicaid** 41:10 47:18 61:23 62:1 62:13 64:6,10,11 153:1,1 156:6
**medical** 13:4 126:12 129:18,22
**Medicare** 47:18 61:23 62:1,12 64:5,9,11 123:22 124:17 125:10 152:25 156:5,6,7 156:16,23
**medication** 7:16 35:21,22 80:15,23 80:24 81:1
**medications** 35:25 80:7 81:13,20 82:17 83:2 110:5 115:7
**meet** 113:25 114:1 114:7
**meeting** 7:22 46:7

54:15,16 55:4 86:5 114:13 116:14 117:1,9 118:8 124:11,19 124:21,25 125:5 125:13,14,18 147:12,13 156:2
**meetings** 42:13 55:1 57:10 60:5 84:1
**Meisler** 23:5 44:24 45:12,22 48:8 50:15 52:1,17 55:10 57:11 62:18 63:24 64:21 65:8 65:16,20,24 66:3 66:10,24 73:7 106:7,22
**mental** 83:8
**mentally** 82:19
**mention** 126:9,11
**mentioned** 26:23 75:25 112:11 116:17 155:18
**mentioning** 80:4,5
**Mentor** 10:15,18
**met** 21:5 53:21,25 54:5 114:11 117:21 130:4 147:16 148:1 154:16
**mid** 9:20
**middle** 9:2 118:19
**military** 101:13
**mind** 21:4
**mine** 43:4 105:7
**minute** 18:20
**minutes** 36:25 52:23,23 70:4,4 70:21 71:10
**missed** 19:2
**misunderstood** 6:13,17,18 7:6
**moment** 63:6 116:5 140:18
**moments** 39:23

49:17
**Monday** 94:4 147:16
**month** 32:17 87:10 92:21
**months** 10:25 75:20 86:16
**morning** 8:4,21 36:24 118:8 147:15,16
**Morrison** 1:12,14 3:1 4:1,7,12 159:6 160:7,18 161:24 162:24
**move** 30:22,23 31:4 31:5 149:5
**moved** 26:11,16 30:24 31:3
**moving** 5:9
**M-O-R-R-I-S-O-N** 4:12

**N**

**name** 4:9,11,15 12:7,7 14:2 25:3 26:25 43:22 44:25 48:10 50:16 64:22 64:25 105:12 112:11 121:18 160:12
**names** 26:24 54:22 86:25
**nap** 38:18 154:2,8
**near** 26:22
**necessarily** 49:6 157:15,20
**need** 4:24 5:22 15:16 27:16 42:20 44:8,13 56:19 71:25 81:16 112:23 113:2,9 115:11 158:18
**needed** 28:2 71:25 78:6 97:17 115:24 148:23
**needs** 101:22

Netflix 70:20
never 30:6,15 47:5
    53:6 59:25 77:13
    94:21 95:14
    120:22 123:19
    129:12,14 135:3
    141:4 150:25,25
new 79:20,20 97:17
    97:18 99:7 122:23
    123:1 130:16
    131:4 132:18,21
    136:1,2
Ninth 1:20 2:10
nods 5:14
non-FMLA 133:17
non-hostile 152:13
    152:16
normal 21:18,20,21
    77:6 131:21
normally 77:13
    92:16 104:1,9
    117:23 135:18
    136:14 140:22
    141:22 150:9
Northeast 14:13
    23:25
NORTHERN 1:1
Notary 1:18 159:3
    159:24 160:5,21
notes 8:13,17 9:10
    45:18,20,21 46:6
    49:18,22 50:14,19
    50:22,24 51:2,22
    51:25 52:1,2,3,8,8
    53:24 57:1 83:22
    83:24,25 84:1,3,5
    84:6,9 87:17,24
notice 56:25
noticed 140:16
noticing 15:25
notification 97:4,5
    120:5 126:7,7
    131:13 135:3
    140:10 150:4,6
notified 112:7
    113:12 127:13,19

150:3,10 151:19
notify 95:25 96:13
    97:1 128:19
    134:22 150:21
notifying 120:11
    126:14 127:16
    138:1
Notre 20:4,5,5,7,12
number 39:6 42:17
    42:19,21,22,24,25
    42:25 43:2,5,7,8
    43:13,23 44:3,8
    44:18 45:9,10
    47:3 48:17,20
    49:8,12 51:11
    53:12,17 55:7,15
    55:19,22,24 56:3
    58:22 59:8,10,10
    59:11,14,20,20,23
    60:13 83:12
    118:25 140:21
    141:3 142:2 143:9
    144:5,25 145:10
    153:24 154:13,19
    155:18,20 156:18
    156:20
numbers 145:4
numerous 76:14
    77:8 78:23 108:16
nurse 19:21

O
object 158:7
objection 6:21,24
observable 18:3
obvious 95:12
obviously 69:25
    71:3
occasionally 36:2
occasions 28:4
    157:24
occurred 7:19
    34:11
occurring 107:16
    107:18
October 124:12,19

124:24,25 125:1,5
    132:6 139:23
    147:14 149:6,15
    151:22,24
offend 29:10,23
offer 81:16
offered 31:4,5
    40:23 155:19
office 45:14 46:10
    93:4 114:19,20
    115:15 116:17
    130:5,12,18,22,23
    141:14 146:2,25
    147:2 152:8
    159:22
officer 23:22 44:23
    44:23
offices 1:19
official 46:5 52:1
    92:18 133:2
    160:12
officially 137:16
    150:10
Oftentimes 33:19
oh 21:24 32:18
    33:24 105:3 112:8
    131:1
Ohio 1:1,19,21 2:5
    2:11 14:13 20:7
    23:25 159:1,4,23
    159:25
okay 4:20 5:3,4,20
    5:21 6:3,4 13:19
    15:21 21:23 22:3
    46:22 57:3 61:6
    76:17 84:17,24
    106:24 109:9
    116:7 124:14
    157:1,14 158:17
once 28:12 33:5
    34:5 48:6 77:23
    79:19 81:14 86:14
    86:21 87:13 90:20
    109:25 112:10,17
    123:8 126:18
    136:7,10 150:2

ones 42:11
online 39:16
open 22:21 114:22
    115:12 158:11
operation 89:11
operational 101:22
opportunities
    101:14
opportunity 9:15
    50:12 155:14
option 88:11
    100:23 103:11
    124:7 125:16
options 101:2,10
order 26:1 40:21
ordinary 135:8
oriented 146:24
original 136:1,2
originally 79:19
    132:15 133:11
outside 23:10 28:1
    28:7 38:5 64:14
    64:20 80:2
overall 83:15,19

P
P 2:3
page 3:3,6 51:1,20
    52:2,8 105:5
    118:13 119:9
    129:2 142:23
    143:3,15 144:9,12
    144:18 147:21
    161:2,5,8,11,14
    161:17,20 162:2,5
    162:8,11,14,17,20
pages 50:6,7,8
    142:16 145:9
    147:6
paid 36:18,22
    37:11,14,18,18
    38:23 39:9 88:4,9
    88:16,21 89:10,22
    89:25 100:19,20
    100:23 101:3,5,15
    101:16 102:16,17

120:6,13,15
    126:10,14 127:12
Pallas 121:18
    123:17 125:20
    129:3 152:20
Pallas's 128:24
paperwork 92:3
    138:7
paralegal 88:15
parking 37:24 38:2
part 19:9 27:19
    28:8 41:21 44:21
    46:3 49:16 67:9
    74:11 75:25 81:25
    82:13 84:19 88:14
    89:3 103:23 111:4
    112:8,19 119:7
    121:22 122:4
    135:12,25 148:13
partial 2:8
particular 55:23
    76:9 143:2 144:6
    153:24
partner 15:3,10,15
    67:11 74:18
partners 16:11
parts 119:9
party 62:2 159:19
patient 64:9
patients 49:1 61:25
Paul 20:25 21:5,16
    25:11,18,20,23,24
    26:5,17,19 154:22
Paul's 26:18 27:3
pay 101:9 104:5
paycheck 104:3
payments 103:17
payroll 93:9,10,18
    93:24 94:6
pays 101:8
pending 4:16 10:1
    10:6
people 26:22 29:2
    35:6,7 36:9 37:3
    38:15 53:11 54:11
    54:13 69:20 71:20

Deposition of Chistina Morrison, taken April 11, 2014

71:21 86:25 95:11
102:3 104:1 134:7
146:24 150:7
**percent** 94:8,10
103:9 114:10
**perform** 61:25
**performance** 13:1
17:25 27:5 34:11
41:3,6 81:10 82:7
83:17 85:10,22
86:11 87:5,13
107:19 110:23
111:11
**performing** 82:20
**period** 19:15,16
36:19,19 101:24
**permitted** 153:9
**person** 13:17,22
14:17,19 16:11,18
23:5 24:17,23
25:2 27:17 33:15
45:5 55:20 59:22
63:10 64:25 74:12
76:8 77:10,13
89:12 92:1 95:8
96:3 112:24
120:21 121:11,11
122:12 123:5
141:17,19 142:7
**personal** 15:9 16:1
42:24 68:17,20
69:16,18 79:24
101:12,20
**personality** 18:2
**personally** 56:18
76:16 83:24 140:5
146:21 157:16
160:6
**personnel** 63:15
133:21
**persons** 24:20
**person's** 43:22 45:4
45:7
**pertaining** 9:10
**pertains** 47:6
**phone** 42:17,24

45:9 46:11 49:7
51:12,23,23 52:13
56:14 58:22 64:20
65:5,22 67:6,10
68:17,20 69:17
70:13 73:11
129:25 130:23
155:18,20 156:17
156:20
**phones** 69:17 86:10
**phrase** 16:22 47:15
63:6 74:16 89:18
157:24
**physically** 82:20
**physician** 1:9 4:17
11:6,9,10,17
12:20,24 14:12,14
19:4 42:9 43:24
47:2 48:18 55:19
55:23 63:12 89:7
97:16,18 99:8
128:7 132:15,17
**physicians** 24:2,3
48:24 56:1,2
61:14 99:22
132:12
**picked** 140:11
**picking** 143:13
**place** 36:5 48:16
49:18 80:9,11
87:19 106:14
130:11,21 135:1
154:8 159:16
**placed** 66:19 149:8
**Plaintiff** 1:5,15 2:2
4:2
**Plaintiff's** 3:7,8,9
3:10,11,12,13,14
3:15,16,17,18
49:25 50:3 104:22
109:5 116:2,5
119:21 122:17
123:14 126:2
136:18 137:19
142:10 148:15
**planning** 130:9

**play** 69:3 70:3
113:15
**playing** 70:10
**please** 4:10 6:1
17:19 105:9 116:6
120:1 137:24
**point** 7:10 32:2
65:6 74:25 75:10
91:19 97:15,19,20
105:17 112:17
115:22 123:20
125:19 131:23
134:16 149:12,14
157:2
**policies** 8:9,12
18:20 39:16 71:15
**policy** 17:17,20,21
18:13,17 35:14
36:15 37:3,6,8
38:17,20,21,21,24
38:25 39:4,5,12
69:5,11,13,15,19
71:1 72:4,10,14
73:2 88:25 102:19
118:24 119:7,8
120:7 126:7
153:21,21
**pornography** 71:4
**portion** 55:2 104:4
120:13
**position** 7:25 10:22
10:24 11:25 12:2
19:20 87:1 101:1
102:1 123:25
124:9,16 125:9,16
148:2
**positions** 102:2
**positive** 31:23
**possible** 52:10
107:9 112:5
135:24
**possibly** 21:7 39:8
45:22 74:10 83:25
85:3 115:18
139:25
**post** 141:13 146:2

147:2
**postmark** 143:23
144:15
**postmarked** 140:13
143:3
**practice** 14:14
141:6
**predetermined**
113:6
**premises** 37:12,13
37:16,22,25 38:6
38:10
**premium** 103:17
104:2
**preparation** 8:3
**prepare** 7:24 8:15
8:20 108:4 156:4
156:12,14
**prepared** 57:8
77:19 125:12
**prescribed** 81:19
110:5
**presence** 159:10
**present** 45:12
52:15
**president** 12:16,17
15:5
**pressures** 41:2
**Presti** 25:3,6
**presume** 7:14
137:12
**pretty** 19:15,16
22:20 32:25
141:23
**pretzels** 29:16,18
**prevents** 90:16
**print** 118:19
**prior** 9:1,18 11:2
19:17,25 21:2,5
25:12,23,24 31:3
50:4 99:9 107:4,4
109:10 116:8
136:13 148:18
**private** 155:2
**probably** 9:14,20
21:7 33:4 36:5

54:21 75:6,22
84:11 89:18 102:8
117:5,18 130:12
131:3 137:5,11
**problem** 15:20
30:24 46:12
152:15 153:4,11
154:3,11
**problems** 79:8 83:6
**Procedure** 1:16 4:4
**procedures** 8:10
**proceeds** 137:3
**process** 21:18,20
21:21 34:9 42:9
43:1 44:5,15 46:3
48:15,15 49:2,3
54:3 61:23 62:9
63:16 66:22 75:25
78:3 81:25 82:14
85:12 88:3 89:9
90:24 91:13 92:12
93:23 104:17
105:13,19 106:1
112:20 115:24
121:6,22 122:4
123:11 127:16
131:21 133:25
136:7,8,11 137:6
150:13
**processed** 43:17
**processes** 131:11
134:18 136:15
**processing** 43:11
46:15
**produce** 157:13
**productivity** 41:9
**professional** 15:8
70:11,16 71:1,14
71:22 113:23
**professionalism**
68:1
**program** 14:25
15:1,3,19 75:1,13
127:19
**prohibited** 70:18
70:22 153:3 156:4

Deposition of Chistina Morrison, taken April 11, 2014

**properly** 22:25
**property** 37:23
  38:2
**protected** 91:25
  119:18 122:15
  138:17
**protocol** 105:13
**provide** 85:21
  116:13 156:1
**provided** 65:15
  112:3 119:8
  125:24 138:10
  142:16 145:25
  152:6,20 156:11
**provider** 41:22
  43:5,25 44:8 45:9
  48:16,19,20,21
  49:6 51:18 55:12
  55:14 56:8 59:23
  61:23 64:8,11
  77:18 78:21 83:13
  89:6 124:17
  131:15 153:2
**providers** 41:10,18
  42:12 61:14
**provider's** 42:21
  42:22 45:8 59:5,7
  59:10
**provides** 64:8
**providing** 47:3
  152:15 155:14
**psychiatric** 120:25
  129:7 152:19
  155:8
**psychological**
  120:24
**PTO** 88:11 101:9
  101:16,18,19,23
  102:6,12,14,14,20
  103:1
**Public** 1:18 2:4
  159:3,24 160:5,21
**pulling** 60:17
**punish** 31:20
**purposes** 6:5 60:11
**pursuant** 1:15 4:3

**push** 44:1,17
**pushing** 42:22
**push-back** 44:11
**put** 42:8,10,18,23
  43:2,4,4,5,7 44:3
  44:8,18 45:8 55:7
  55:15 56:6 59:20
  59:23 82:16 88:1
  90:18 136:6 137:5
  140:22 141:4,5
  143:8 144:4 145:3
  146:4,9 155:9
  156:20
**puts** 94:13
**putting** 43:12,23
  51:11 53:16 59:3
  59:11,15
**P-R-E-S-T-I** 25:5
**p.m** 56:21 80:12,12
  131:24,24 158:22

_____

**Q**

**qualified** 159:5
**qualifying** 100:22
**question** 5:2,23 6:2
  6:8,14,17 7:4,6,15
  44:17 46:21 55:18
  60:2,7,11 63:19
  79:6 88:20 96:16
  98:7,12 106:20
  155:3
**questioned** 42:16
  55:2
**questioning** 43:20
  54:24
**questions** 4:21 22:9
  40:22 54:13 58:17
  69:23 78:2 158:8
**quickly** 75:24
**quite** 5:25 26:20
  27:8
**quota** 87:2

_____

**R**

**raised** 81:6 154:19
**ran** 150:23

**rash** 76:3
**reach** 55:18,25
  56:2
**reached** 53:14
  55:23 59:18 91:11
**reaching** 132:14
**reaction** 108:10
  155:4
**read** 17:21 19:1,3
  132:1
**ready** 116:25
  131:18
**real** 114:21
**realized** 21:9
**really** 6:18 21:1
  26:24 29:18 30:7
  48:7 68:11 71:8
  71:21 76:18,20
  99:8 115:13
  128:14 134:19
  150:12
**realm** 15:12
**reason** 90:4 98:6,19
  100:22 111:2,4
  113:22 122:7
  135:21 138:18
  161:4,7,10,13,16
  161:19,22 162:4,7
  162:10,13,16,19
  162:22
**reasonable** 125:21
  153:12,16
**reasons** 108:21,23
  112:22 115:3
**recall** 9:17 17:22
  19:9 21:1 25:20
  25:21 26:3,15,24
  32:14,16,17,21
  33:23 34:17 38:20
  39:17,20,21 40:8
  40:9,10 41:1,12
  41:16,20 43:21
  44:20 46:3,8
  47:15,16 48:7,9
  48:12,14 49:12,14
  49:15,16,23 50:17

51:9 52:19,24
53:9,10,14 54:4
54:20,20 55:1
57:6,9,18,20,21
58:5,5,7,11,18
59:16,18 64:19,22
65:19,23 66:4,8
66:10,13,14,19
67:7,7,9 72:8,19
72:20,24 73:3,5
73:16,18,24 74:5
75:2 77:9 78:17
79:16,16 80:4,5
81:11 84:25 85:3
85:5,12,25 89:9
92:19,21 97:13
98:21,23 99:2,13
99:17 100:5,8,13
101:25 102:4,10
103:13 104:12,20
106:3,5,10,11,15
106:23,25 107:3
107:11 120:23
124:6 125:17
130:7 132:5 133:5
133:12 134:2,17
135:16 151:6,7,12
151:14,16,17,17
151:18 152:6,9
155:1,6,6
**recalling** 107:22
**receipt** 140:13,21
  141:3 142:2,24
  143:8 144:5,6,9
  144:17 145:5,10
**receipts** 141:10,12
  143:21
**receive** 20:8 62:1
  97:8 132:6
**received** 20:10
  22:13,20 54:2
  58:8 65:21 66:11
  135:3 151:23
**receiving** 58:13
  104:12
**recess** 56:21 80:12

131:24
**recited** 58:9
**reckless** 110:8
**recollect** 7:19
  59:13 87:18 103:5
**recollection** 20:24
  43:14 47:18 58:16
  64:24 66:23 75:21
  76:11 97:15,19
  98:20 99:10
  119:16,19 133:5
  138:6
**reconcile** 63:18,22
**reconsider** 131:4
**record** 4:10 5:16,19
  6:6,22 31:22,23
  93:5,5,10 94:1
  132:1
**recorded** 45:24
**records** 92:18 93:9
  93:10,15,24 94:18
  94:22,24
**recruiter** 19:21
  124:6
**rectify** 93:25
**reduced** 159:9
**refer** 4:18 16:18
  17:6 18:5 82:3,5
  105:16 112:24
  138:25
**reference** 39:9 57:1
  72:6 109:20
  110:15 120:9
  122:22 126:12,17
  127:2,3 138:7
  141:2
**referenced** 34:22
  41:7 49:17 72:5
  128:10 137:3
**references** 39:8
  51:4
**referencing** 103:15
  127:5
**referral** 15:23,23
  16:8,10 17:14
  75:8,9,12,18 76:6

Deposition of Chistina Morrison, taken April 11, 2014

81:3,5 83:23
84:18 87:25
107:23 108:8
109:12,21 110:2,6
110:11,18 111:4
112:4,7,10 117:13
119:5
**referrals** 16:20
111:1
**referred** 15:18,18
75:1 81:23 82:6
88:1 106:17
108:22,23 121:20
**referring** 51:1,2
63:7 66:24,25
67:1 107:15 123:3
**refresh** 64:24
**refuse** 155:12,16
156:12,13
**refused** 44:17
118:2 155:13,15
156:21
**refusing** 155:17,22
**regarding** 4:22
8:14 21:12 25:16
25:17 32:9 39:18
40:3 42:5 47:8
53:1 54:2 56:24
58:3 62:19,19,21
65:17 77:17 78:14
79:13,22 83:12,23
86:23 87:4 95:2
99:14,16 103:16
103:24 106:16
107:6 123:21,24
125:10,15 132:8
145:24 154:1,19
**regards** 24:5
**regular** 140:1
**reimbursed** 64:12
**reimbursement**
47:19
**rejected** 53:3 61:14
64:4
**rejecting** 46:15,25
53:6

**relate** 65:20 79:23
81:4 85:5
**related** 146:18
**relating** 59:13
**relation** 28:14,16
**relations** 12:24,24
19:4,5,22 84:7,11
85:17 146:13
**relationship** 15:14
110:20 111:6
149:25
**relationships** 79:25
**relative** 159:18
**relatively** 4:25
**released** 121:14
127:14 131:14
**remained** 133:7
**remember** 18:14
19:7 26:1 29:14
44:10,25 46:9
48:23 52:12 54:9
57:19 58:20,21
59:8 60:1 65:1
67:4 73:3,13,14
74:4 75:5,16
79:11 80:3 86:19
86:20,25 87:8,9
87:10,16 88:24
89:4,17 91:21
92:11,12,22 93:2
97:13 99:1,5,6,8
99:11,12 100:6,12
100:17 103:3,21
106:9 107:10
114:10 115:19
117:19,22 118:1
121:19 124:6
125:18 127:9
130:7,13,13,17
131:5 132:10,11
132:20 133:19,19
134:5,20 135:6,18
138:23 139:12,21
147:8,11,23
152:22 155:10
**remembered**

132:19
**Remind** 19:1
124:21
**reminder** 51:25
**rep** 41:10 43:21
**rephrase** 6:2 31:11
79:6 148:5
**report** 12:5,14 25:6
112:17 123:17
128:24 152:19
**reported** 66:3
**reporter** 1:18 5:11
**reports** 12:15 14:1
24:10 35:16
**represent** 4:15
**representative**
13:20 14:15 56:6
56:7 73:8
**reps** 41:15
**request** 95:3 96:7
99:21 153:4
**requested** 132:18
138:12,15 152:10
**Requesting** 132:21
**requests** 95:10
97:12
**require** 104:5
112:20
**requirement** 113:1
**requirements** 96:8
96:12 103:15,16
156:15,16
**reside** 20:14
**resignation** 148:24
149:1
**resolution** 26:9
32:1
**resolve** 30:21
**resource** 12:23
15:9 16:11
**resources** 10:23
12:1,3,4,10,11,16
12:18 14:5 20:3
25:4 39:5
**respect** 14:23 24:16
79:15 97:11

**respond** 71:18
73:21,22
**responded** 72:3
**response** 72:7 74:7
95:19 98:4 148:22
151:22 155:1
**responses** 5:14,18
**responsibilities**
13:3 19:5 99:15
**responsibility** 22:4
61:1,16 63:16
73:21 78:7
**responsible** 46:14
61:13
**responsive** 41:17
**rest** 36:6,6 71:25
153:9 154:1
**result** 51:5 107:23
119:14
**resulted** 114:25
**results** 46:2 61:12
73:11 121:24
**retain** 92:14 93:4
93:15
**retained** 94:1
**return** 99:19 100:5
125:1 126:18,25
127:20 128:1,2,5
128:12,18 129:11
129:20 140:20
142:2 143:8 144:4
144:17 145:5,10
147:25 155:7,12
**returned** 139:1,13
144:12 145:17,20
146:1,8 147:2
**review** 8:3,6,8,9,13
8:17,18,20 34:6
57:7,12 86:1
**reviewed** 57:19,21
85:24 86:2,12
105:14 147:18
**reviewing** 86:3
**Riddle** 24:9 41:7
67:15 72:7,14
73:1 84:19 85:20

87:7 106:16 107:5
153:18 154:5
**Riddle's** 72:3
**right** 18:15 22:2
24:2,9 25:25
28:25 29:1 30:19
31:13 32:19 33:4
38:3,6,10 45:3,11
49:19 50:7 63:8
63:18 65:25 67:24
68:23 69:23 70:1
70:2,6,16 71:11
72:16,17 76:22
78:22 80:15 89:19
96:11,14,19
100:19,21 102:18
105:20,21 106:1
107:17,25 108:15
110:9,10,14,16,17
110:21,25 111:20
112:13 117:24,24
118:20 119:6
121:21 124:22
127:4 128:8 135:9
141:4,8 142:15
143:4,7,10,16,17
143:18,24,25
144:3,7,8,10
145:7,11,16,18
146:5 150:19
154:2,3,10 155:24
157:7 158:16
**risk** 35:12 51:6,7
116:20,21
**Road** 10:19,21
20:18
**Rockwell** 14:11
**role** 44:21 96:6
113:15 124:3
**rolling** 41:15
101:23
**Ron** 14:1
**room** 36:8 38:12
72:2 114:10
**row** 29:1 30:13
**rows** 28:18

Deposition of Chistina Morrison, taken April 11, 2014

Page 15

**rule** 5:1,22 58:9
**rules** 1:16 4:3,24
  47:8 48:2 58:3,5
  61:4 62:15,20
  69:8 153:3,5
  156:7,23
**running** 126:22
  127:10,23
**runs** 88:21

**S**

**safety** 110:8
**salaried** 93:12
**sat** 21:8,17 23:22
  24:24 26:22 30:16
  48:8 78:24 106:22
**save** 146:19,21
**saw** 22:8 28:10
  29:25 38:17
**saying** 5:19 6:20,24
  7:9 22:17 40:9,10
  45:16 48:23 51:10
  60:21,22 61:7
  63:17 81:12 88:18
  104:16 115:8
  123:10 149:2
  150:5 157:15
**says** 17:22 69:5
  77:14 90:15
  105:17 118:18
  138:9
**scattered** 23:25
**schedule** 117:23
  118:2 131:20
**scheduled** 89:12,14
  118:10
**screen** 82:13
**screening** 115:17
  121:21,25 122:3
  152:19
**scribble** 19:4
**seal** 159:22 160:12
**second** 25:12 73:6
  99:16 117:14
  118:3,13 130:9
  143:15

**section** 12:20 42:8
  129:3 156:18
**see** 11:10 17:4,9
  22:12 28:3,6
  50:14,18 51:19
  84:13 85:15 91:17
  92:2 94:18 97:23
  98:7 105:11,20
  118:19 120:2
  121:17 122:24
  131:7 144:24
  153:7 157:12
**seeing** 38:20 49:1
  58:5 66:4,8 70:9
  91:22 99:13,17
  104:20 145:22
**seen** 30:15 48:5,6
  50:3 57:20 92:6
  105:1,3 109:10
  116:8 119:23
  122:19 123:18
  126:5 128:25
  136:21 137:22
  142:14 148:18
**segregate** 147:9
**send** 113:1 114:16
  139:10 140:4,12
  141:22 142:5,6
  143:20 150:4
  153:15
**sending** 72:20
**sends** 91:24 104:11
**senior** 12:1,4,22
  14:5,23 18:23
  67:24
**sense** 5:23 18:3
  79:2
**sensing** 83:18
**sent** 66:5 81:12
  87:25 100:2 107:7
  112:10 113:13
  115:7 116:10,14
  116:15 118:15
  119:12 120:24
  121:10 130:1,5
  137:25 138:21

139:1,4,6,7,8,25
  140:1,14,19,24
  142:24 143:6
  144:1 145:8,15,20
  148:21 150:6
**separate** 13:8
  84:12 106:9
  107:10,15,20
**separately** 104:5
  114:6
**sequence** 33:24
  44:10 106:11
**sequences** 34:10
**serious** 18:12,15
**seriously** 27:9 28:2
**served** 24:6
**services** 1:9 4:18
  11:6,9,11,17
  12:21 61:22,25
  62:9,13,14 64:5,6
  64:9,13
**set** 1:22 117:17
  159:21
**sets** 47:8 48:2 62:15
  62:19
**seven** 19:24
**shape** 151:9,12
**share** 95:11 115:22
  120:20 121:4,5,9
  122:14 154:20,21
**shared** 23:6 40:5
  46:1,2 51:9 63:23
**sharing** 66:14 80:3
**SHEET** 161:1
  162:1
**Sheryl** 20:24 21:14
  21:24 24:9,10
  25:13 35:3 39:17
  41:4,8 43:3 55:5
  60:4 67:20 85:1,6
  85:7,16,18,20
  87:6 106:16 107:5
  109:19 114:8
  155:19
**Sheryl's** 109:19
**she'll** 6:14 7:4,6

**show** 54:1 58:3
  156:3
**showed** 59:25 60:1
**showing** 58:7
**shuffling** 28:5
**sic** 58:21
**sick** 101:20
**side** 26:7 66:18
  80:3
**sides** 29:2
**sign** 51:18 158:20
  160:8
**signature** 158:18
  161:23 162:23
**signed** 119:25
**Simmons** 20:25
  21:6,13,16 25:11
  25:14,18,20,23,24
  26:6 28:11 29:4
  32:4,9 33:5 79:15
  154:19
**Simmons's** 28:14
  28:16
**simply** 7:2
**sit** 26:12 36:8 70:20
  71:4 127:17
**sitting** 28:20,23
  68:21 69:2 70:13
  76:16
**situation** 9:24
  16:14 22:5,9,11
  22:14 30:3,21,25
  31:25 34:14,16
  35:9,11 73:15
  77:9 87:20 90:12
  101:11 113:5
  128:23 134:25
  135:17 149:23
  154:22
**situations** 17:7,10
  17:13,15,25 114:3
  135:24
**skip** 124:11
**skipping** 125:4
**sleep** 38:22
**sleeping** 35:5 39:8

39:9,19 40:18
  67:14,16,23 71:23
  72:10,15,25 76:19
  81:9
**sleeping-at-the-d...**
  71:17
**smoothly** 4:25
**solely** 78:7
**solid** 31:22
**somebody** 8:7
  15:17 27:7 31:20
  31:22 55:21 63:11
  65:12 71:9 78:8
  113:9,10 123:7
  128:16 133:22
  150:16 157:17
**soon** 75:17 122:22
**sorry** 32:16 47:10
  76:19 93:3 98:14
  120:12 125:3
  126:16 133:16,16
  153:14
**sort** 62:3 94:12
**sound** 32:19 127:22
**source** 79:13,22
**sources** 79:22
  108:2
**South** 20:6,7,12
**spaces** 28:19
**speak** 6:1,6 7:12
  16:23 45:2
**speaking** 130:7
**specialist** 48:17
**specialists** 48:21
  55:15
**specialist's** 42:10
**specific** 14:7,9 22:9
  39:11 43:5 51:2
  82:22 86:4 121:4
  123:12 138:23
**specifically** 11:5
  29:14 47:13 55:13
  58:19 66:8 78:17
  82:5 98:23 100:17
  103:6 121:10
  129:15 130:17

Deposition of Chistina Morrison, taken April 11, 2014

specifics 35:23
40:14 120:20
122:11,14
specified 159:17
spell 4:10
spend 70:4
spoke 26:7,17
43:15,21 45:4,6,6
spoken 130:15
spread 14:13
Springer 123:2
Square 2:4
SS 159:1 160:1
staff 23:20 24:3
25:8 112:18
127:13
Stairs 10:16
stamp 94:9 118:25
stamped 50:6
142:17
standard 81:25
89:24
start 5:3,6,8
started 11:1,10,14
11:16,18,22 19:13
33:3 43:20
starting 19:17
starts 44:25
state 1:19 4:9 35:24
49:5 51:17 83:5,7
137:1 153:1 159:1
159:4,25 160:1,6
stated 27:23 29:13
30:3 35:20 36:2
55:13 57:18 99:14
129:15 156:17
statement 22:7
26:18,19 30:15
statements 40:8
86:8
states 1:1 42:20
62:8 129:4
stating 91:17 97:25
98:10,24 99:3,18
102:11 103:15

151:19 156:17

115:6 117:11
129:19 148:22
station 38:22
status 126:19,25
132:16 149:16
stay 115:14
staying 68:4
stenotype 159:10
step 37:15
Stepping 38:5
Steris 10:15,16,17
10:22 11:2
Steve 24:10 41:4,7
51:16 55:5 60:3,4
67:14 71:16 84:19
85:3,12,13,19,20
87:7 106:16 107:5
114:9 153:18
154:5
stick 69:9
sticks 21:4
stop 78:25
storm 116:19
stormed 114:19
116:16 117:9,10
130:4,18
story 26:8
strategies 12:25
Street 1:21 2:10
stress 35:3,25
39:25 40:2,5,25
41:5 42:1 43:6
78:18 79:3,5,10
79:13,23 80:5
81:10 82:10 83:3
83:15,18 85:11
107:24 108:2,21
115:6 125:21
stressed 40:19 41:1
72:1 77:5,17 78:9
78:12,15 81:1
83:21 108:6,11,14
108:20
stressing 40:11,13
77:22 83:11
strict 69:11

strike 99:16
structured 149:12
struggles 82:10
struggling 16:1
34:13 83:1
stuff 9:13 14:18
21:6 104:2 121:4
146:13,16,23,24
submit 51:21
112:21
submitted 45:25
47:25 95:17,23
97:22 111:23,24
147:23 148:6
submitting 46:16
46:24 47:1 53:2,7
61:13
subordinates 24:17
substance 65:5
substantiate 31:1,7
31:9,12,15,20
substantiated
31:18
suddenly 18:1,6
suffering 129:6
suggest 17:8
suggested 36:5,6
125:20
suite 1:20 2:4,10
21:25 109:16
Sunagel 12:6,11,14
Sunagel's 12:9
superiors 111:7
supervisor 21:12
24:7,7 45:4,7,13
45:16,19 48:9,10
48:12 49:5,10
50:16 51:24 52:9
55:10,13,16 64:21
65:4,12 106:8,23
supervisors 24:11
24:15 25:15,22
39:13 60:14,21,23
156:3
support 48:21 78:1
96:3 155:23

supported 36:22
49:2 66:21 71:24
supporting 41:19
supportive 74:20
124:4
supposed 43:23
157:7
sure 5:18,25 9:16
9:22 27:9,11,13
45:2 56:15 63:3
65:19 68:11 72:13
74:18 84:25 85:1
91:7 94:10 95:22
100:22 103:9
104:19 107:18
112:9 114:11
118:15,16 128:14
130:14 133:6
147:20 151:6,8,20
surrounded 34:20
41:9
surrounding 27:1
50:19,23 63:20
suspend 157:2
suspicion 18:10
110:2
suspicions 81:19
swipe 94:8,11
switched 88:10
136:4 151:2,16
switches 127:11,16
switching 127:6
sworn 4:4 159:6
system 1:8 15:5
19:19,23 26:20
38:21 93:18 94:6
Systems 19:25
system's 69:17
S-T-E-R-I-S 10:17
S-U-N-A-G-E-L
12:8

_____

T
table 28:22 29:16
tag 140:13
take 5:12 11:15

18:11 22:4 23:9
27:8 32:22 36:17
36:19,22 37:4,15
38:18 45:18 46:6
57:4 68:17 83:25
100:19 101:18
116:5 130:11
154:1,2,7
taken 1:16,19
29:11 49:18 52:1
90:23 130:21
133:3,17 159:16
takes 95:1 137:6
talk 17:2,2,3 31:6
33:11,17,19,22,23
34:3,4,5,6 35:10
35:15,17 60:3
76:1 113:23
114:11 115:24
116:19,23 124:12
148:2
talked 22:7 33:3,21
33:25 34:15 35:8
59:22 67:3 73:23
73:24 85:1,3,18
87:13 114:14,17
talking 5:6,25 54:9
58:6,16,21 73:14
85:12 156:7
teamed 74:17
technically 127:23
tell 9:7 21:21 27:22
32:24,24 34:24
35:1,20 43:16
46:18,23 47:4
54:17 60:20 69:5
86:19 104:18
114:13,23 115:2
115:16 120:20
121:10 122:13
143:2 145:23
147:12 151:4
telling 40:19 41:1
43:12,18 44:18
53:9,10,11,14
58:23,25 59:16,25

Deposition of Chistina Morrison, taken April 11, 2014

61:6,8,17 66:11
100:9,14 102:25
118:9
**term** 16:19 65:25
74:15
**terminals** 68:22
**terminate** 155:25
**terminated** 9:11
133:8 135:5
149:17
**termination** 149:5
**terms** 8:19
**testified** 4:5 39:23
157:23
**testify** 7:18,24 8:15
8:21 157:20 159:7
**testifying** 8:4
**testimony** 5:12
10:10 19:7 53:5
72:5 73:9 158:7
159:9,13 160:10
160:11
**testing** 81:24 82:4
122:4
**thank** 6:21 110:1
**Thanks** 120:2
**thing** 21:3 31:24
41:16 45:11 72:2
78:20 79:2 82:24
83:16,20 86:6,10
91:16 94:15 95:24
96:6 102:4 121:12
141:15,17 155:24
**things** 14:6 17:4
18:3,7,8,12,20
24:25 25:1 26:1
27:6 34:20 38:14
40:16 41:19 69:14
80:1 106:9 107:11
107:16 115:10
121:2,7 148:9,11
152:11 154:18
157:3 158:4
**think** 6:15 11:13,14
28:9 29:12,20
34:19 36:23 39:7

39:23 41:13 44:25
50:21 63:19 70:7
72:6 73:9 74:15
77:2,8,10 78:18
78:20 82:24 83:18
89:10 99:9 102:8
111:17 114:9
115:20 117:4,5
132:13 147:16
156:6 157:1
**thinking** 9:19 46:8
125:3
**third** 5:22 62:2
129:2
**thoroughly** 27:10
27:14
**thought** 29:25
**threatening** 18:11
**three** 39:22
**three-person** 25:8
**Thursday** 89:2
**tier** 17:16,17,18,19
17:22 18:9,15
105:14 109:20
110:11,13,14
**tiers** 17:16
**time** 8:23 9:11,12
10:4 26:21 28:19
33:2,23 34:3
44:12 49:21 70:1
74:25 76:22 85:14
88:8 91:19 93:1
94:9,20 99:23
100:1 101:3,9,16
101:16 102:16,17
105:15 107:17,18
108:12 113:8
117:12,22 119:17
126:10 130:3
131:8 133:7
159:16
**timeframe** 68:3
100:18 139:15,19
**timekeeper** 94:13
**timekeeping** 93:20
**timeline** 133:20

**timeline-wise** 73:4
**times** 28:10 33:12
33:20 34:15 35:1
35:4 39:21 40:24
54:25 55:6 73:15
76:14 77:8,21,24
86:7,14 95:18
108:17 114:1
115:9 124:1
**tired** 76:20 77:5
**title** 12:9
**Todaro** 14:1
**today** 5:12 7:18,24
8:15 50:4 53:5
105:2 109:10
116:8 119:24
122:19 123:18
126:5 127:17
128:25 136:21
137:22 142:13
148:18
**told** 19:2 43:19,22
44:7 47:5,22 53:6
59:14,21 60:12,13
76:21 98:16
108:19 109:25
115:3,20 116:23
120:13 121:20,24
123:7 125:4
129:12,14 130:16
131:17 151:9,10
151:12 152:22,22
154:23 155:4
**top** 51:3 109:18
**total** 137:6
**totally** 107:10
**track** 18:21 141:12
141:23 142:7
**trained** 22:15
**training** 13:1 20:11
22:13,16,20,22,24
23:1,9
**transcribed** 5:15
159:11
**transcript** 159:13
160:8,9

**transfer** 124:3,5
**transferred** 123:25
**transferring**
124:15 125:8,15
**transition** 90:11
122:8 133:12
135:15,15
**transitioned** 90:2
149:22
**transitioning** 89:21
**transitions** 126:8
**treatment** 122:9
**tried** 115:24 116:22
**triggers** 89:21
**trouble** 41:13 61:4
61:11
**true** 43:10 46:12
159:12 160:9
**trusted** 63:4
**truth** 159:7,7,8
**truthful** 10:9
**truthfully** 7:18
**try** 5:7 36:3 117:23
140:2
**trying** 11:12 26:1
28:9 40:20 70:5
95:20,25
**Tuesday** 94:4
**turned** 138:5
**turns** 69:21
**twice** 5:17 28:12
79:19
**two** 7:19 17:16,17
17:19 18:15 24:8
26:22 28:4 30:14
37:5 39:22 60:17
106:9,12 107:10
107:15 108:25
110:11,14 133:10
135:17 136:15
137:7 139:16
145:9 147:6
**two-page** 105:1
**type** 6:7 8:20 22:13
22:14 33:1 66:11
67:15 72:2 86:5

86:10 90:23 91:15
91:17 93:4,5,10
94:15 95:24 96:5
110:7
**types** 18:6,8 23:8
27:5 34:20 41:19
69:14 103:22
121:2
**typically** 104:7
**T-O-D-A-R-O** 14:2

_____
**U**

**UH** 10:12 12:20
20:15 23:4 37:23
42:10,25 43:1,7
44:4 45:10 48:15
48:15 49:3 66:22
69:20 128:5,10,16
**UHPS** 11:25 12:5
12:12,18,22 13:5
14:5,23 18:23
19:13 23:13,17,24
25:9 52:2 65:4
103:8 127:8
**uh-huh** 24:4
109:22 111:19
112:14 119:11
144:19 151:25
**uh-huhs** 5:14
**uh-uhs** 5:14
**unavailable** 41:16
**unclaimed** 145:17
145:21 146:3,3,8
147:2,4
**uncomfortable**
26:13 30:2,9 31:5
**undelivered** 146:2
147:3,4
**undergo** 115:17
**undersigned** 1:17
**understand** 7:11
33:14 40:17 48:23
49:2 78:2,6,8
93:23 96:18
108:18 114:21
141:19 155:3

Deposition of Chistina Morrison, taken April 11, 2014

understanding
  47:7 61:18,19
  62:7 64:2 108:12
  123:2
understands 7:5
  51:6
understood 6:8 7:3
  58:2 62:2 71:19
  78:12 108:3
  147:20
unit 11:18,21 12:12
United 1:1 62:8
University 1:7,8
  4:17,19 9:12 11:3
  11:5,8,14,19
  14:24 133:21
University's 145:25
unpaid 36:18,20
  39:10 88:10,13,16
  89:22 90:1,18
  99:25 120:14
  126:9,15,16 127:4
  127:7,12 128:9
  133:4,9,12,17,23
  134:8,15,22 135:4
  135:21 136:4
  138:20 149:3,7,10
  149:15,22
unprotected 99:23
  99:23 100:4
upset 114:18
use 53:12 60:14
  69:13,16,18,19
  82:23 83:13 93:24
  102:21 110:3
  112:19 155:19
Usually 135:12

          V

V 142:24
vacation 101:15,16
  101:20
vaguely 57:19
varies 17:12
various 14:6
vender 61:19

Vending 38:14
verbal 5:13,18
  72:11,13
verbalize 150:12
verbalized 57:25
  91:9
verbalizing 82:12
verbally 74:6,24
  77:4 112:6
verbiage 18:14
  140:23
vice 12:15,17
vicinity 30:12
Victoria 1:4 4:15
  8:11,14,25 9:10
  20:21 21:15 22:6
  24:6,12 25:18,21
  26:7,23 27:20
  28:15 31:4 32:5
  33:4,7,13 34:12
  34:23 35:5,8,19
  36:11 39:12,18,24
  41:7 42:16 43:12
  43:15 44:1,6,9,12
  45:1,6 46:1,2,13
  46:18,23 47:3
  50:22,25 51:8,15
  52:4 53:1,5,10,21
  53:25 54:1,5
  55:21,24,25 56:5
  56:24 58:7,12
  60:12,20 65:8
  66:19,20 67:2,3,6
  67:8,23 71:24
  72:25 73:10,14
  74:6 75:1,12 76:7
  77:16 78:14 79:4
  79:7,21 80:14
  82:18 85:7,17,23
  86:23 91:4,18
  92:7 93:12 94:3
  94:19 97:10,25
  98:16,24 99:3,15
  99:18 100:9,14,18
  100:25 101:24
  102:11,25 103:7

103:14 104:14
105:22 106:17
107:7,24 110:6
111:5 114:9,11
116:11,13 119:8
121:20 123:24
124:15,20 125:1,5
125:22 126:18
127:19 129:20
131:10 132:25
133:3 137:2,14
138:1,21 139:11
143:16 146:18
147:4,13 148:6,11
148:21 149:6,14
150:21 151:5,23
152:6,10 153:23
154:13,15,16,23
155:12 156:1
Victoria's 25:14,15
  69:9 100:25
  111:10 126:24
  155:4
view 61:15
violation 153:3
  156:5,22,25
violent 110:7
vividly 46:9
voluntarily 17:8
  29:25 30:23
voluntary 75:8
  148:24,25
volunteered 80:21
  80:22,24
VP 66:2
VPs 67:24
vs 1:6

          W

wage 14:18
Wahl 65:25 66:1,2
  66:5,10,25
wait 5:2
waiting 131:13
walk 36:9
walking 70:8

want 6:11 10:8
  14:8 18:5,17 19:1
  20:16 21:19 26:13
  27:9 30:1,22 31:4
  35:9,11,17 37:14
  42:18,23 43:4
  61:3,10 70:3,4
  72:22 80:6 113:10
  124:8,9 139:14
  155:25
wanted 26:10 31:6
  33:13,15,17,17
  34:6,7 35:10 36:6
  56:5 70:20 77:25
  115:11 124:4
  138:2 147:20
  148:9,12 152:18
  153:7,24 154:1,7
  155:13 156:3,9
wants 10:9
warranted 90:13
wasn't 14:19 30:7
  31:18 36:5 41:23
  42:2 68:18 78:7
  86:4 98:2 99:7,10
  99:24 108:17
  114:20,21 115:12
  130:25 132:17
  138:5 140:10
  141:6 143:13
  146:21 149:11
  153:20 154:14
  155:8
watch 70:20 71:4
way 6:12,25 28:17
  43:18 60:14 63:17
  64:22 89:18
  125:21 136:14
  143:12 151:9,12
  156:3
ways 15:21
Wednesday 89:1
  94:5
weekend 89:2,8,8
weeks 75:20
went 22:18 92:23

116:18 118:4
119:17 120:7
136:3
weren't 79:17
  122:6 153:15
we'll 25:11 44:14
  84:16 143:15
  149:4 158:10
we're 17:5 69:9
  78:3 95:25 109:7
  113:9 123:9
  131:22 157:2,13
we've 50:13 61:6
  109:7 123:16
WHEREOF
  159:21 160:11
Windenburg 1:17
  159:3,24
wiping 29:17
withholding 157:6
  157:10
witness 10:11 22:3
  67:10 157:19
  158:6 159:10,21
witnessed 35:6
witnessing 81:8
woke 76:15 115:5
Wood 20:18
word 30:18,19
  138:14
worded 7:1
wording 39:11
  97:13
words 82:16,22,23
work 10:15 15:11
  16:2 20:1 23:17
  34:13,13,25 36:16
  39:8,9 40:6,25
  43:7 44:14 47:19
  59:4,5 63:21
  69:22 80:2 81:11
  82:11 85:10 89:14
  90:18,19,25 91:1
  93:16 94:4 95:24
  100:5 110:19
  111:6 113:18

Deposition of Chistina Morrison, taken April 11, 2014

125:2,6 126:18,25
128:1,5,12,18
129:8,11,21 138:3
138:19 147:15,20
148:23 149:4
152:13,14,16
155:8,12,15,16
**worked** 23:5 24:12
26:20 30:5,11
62:3 94:4,5 105:4
**working** 35:13 41:4
41:8 64:18 69:25
78:3 93:7 96:20
**workload** 36:22
37:1
**workplace** 17:25
**works** 66:1 93:16
94:3 122:20
**workstation** 28:14
28:15 35:13 36:4
53:12 71:5 72:16
72:25
**workstations** 67:16
**world** 18:5 64:15
**wouldn't** 9:3 16:3
24:24 65:1 70:22
71:3 76:3 98:3,6,9
104:6 117:15
122:10,13 123:6
125:9 135:1
149:18 154:21
155:7,20 157:20
158:7
**write-up** 87:21
**writing** 65:6
112:21 113:1
**written** 16:24
38:24 39:1,2 52:5
54:21 65:8 66:12
66:14 68:19
**wrong** 31:8,21
43:13 51:12 59:12
63:18 90:15
**wrote** 50:5

**Y**

**yakking** 70:13
**yeah** 9:14 10:11
16:23 22:15 24:22
32:20 40:4,14
41:12 49:20 50:5
50:9 53:24 54:23
62:21 66:2 71:12
72:20 74:18,24
78:23 87:22 89:20
91:5 92:9 94:6
95:6 100:7 101:25
102:8,19 105:3,7
108:1 109:2,11
110:13 111:9,16
112:8 114:5 116:9
117:21 118:21
119:2,3,7,13,25
122:14,20 126:6
126:20 135:12
137:5 140:22
141:1 144:14
146:6 148:10,13
148:19 150:20
151:11 154:12,24
158:1
**year** 11:12 32:17
96:21 101:23
146:11
**years** 7:20 19:24
22:16 26:3,20
30:4
**Yep** 50:11 116:12
122:25 137:23
145:12

**Z**

**zip** 20:19

**1**

**1** 149:6,15 151:22
**1:00** 117:25
**1:13-cv-2012** 1:6
**1:54** 131:24
**10** 3:13 52:23,23
70:4 123:14,16
**10:30** 118:8

**10:43** 1:22
**1010** 118:25
**1011** 119:9
**1012** 119:10
**1013** 119:1
**104** 3:8
**109** 3:9
**11** 1:12 3:14 14:14
126:2,5 128:10
130:6 140:24
**11:01** 137:14
**11:54** 56:21
**116** 3:10
**119** 3:11
**12** 3:15 50:7 136:18
136:20 137:3
**12-month** 101:24
**12-week** 96:24
**12:09** 56:21
**12:38** 80:12
**12:46** 80:12
**122** 3:12
**123** 3:13
**126** 3:14
**13** 3:16 50:7 137:19
137:22 140:17,18
**1300** 1:20 2:10
**136** 3:15
**137** 3:16
**1377** 142:17 143:3
**1379** 144:9
**1381** 142:18
**14** 3:17 119:2,5
127:18 129:19
130:5 131:10
132:6 140:25
142:10,12,13
147:7 149:15
**14th** 149:8
**142** 3:17
**1420** 50:6
**1427** 57:2
**1429** 50:18 51:3
52:2
**1430** 50:18 52:8
**1432** 50:7

**148** 3:18
**15** 3:18 36:25 52:23
70:3 71:10 119:2
119:3 148:15,17
152:4 159:25
**15-minute** 37:4
**16** 54:5
**16th** 53:22
**1600** 1:20 2:10
**17th** 159:23

**2**

**2:06** 131:24
**2:43** 158:22
**20** 70:21
**20-minute** 70:21
**2001** 20:9
**2008** 11:19 19:17
**2010** 11:16 19:13
**2012** 11:13 13:16
32:19 72:18 73:2
109:15 111:18
127:18 129:19
130:5 131:10
136:24 137:13
147:14
**2013** 9:2 10:13 11:1
19:14
**2014** 1:12 159:23
160:14
**2015** 159:25
**21** 138:17,22
**216-280-2828** 2:5
**216-621-5161** 2:11
**23** 72:18 73:2
153:17 154:7
**24** 117:7
**24/7** 89:11
**25** 109:14 111:18
**26** 118:8
**26th** 117:20
**2627** 145:10
**27** 136:24 137:13
139:23 144:16
145:15 146:1

**3**

**31** 11:1
**3574** 20:18

**4**

**4** 3:4,7 49:25 50:3
50:13 84:9
**4,000** 104:19
**44057** 20:20
**44113** 2:5
**44114** 2:11
**480** 96:23,24
**49** 3:7

**5**

**5** 3:8 104:22,24,25
105:8 148:25
151:24

**6**

**6** 3:9 109:5,8

**7**

**7** 3:10 116:2,5
117:1 118:14
141:9
**7/16** 51:3
**7/26** 51:20
**72** 39:7 72:6
**75** 2:4

**8**

**8** 3:11 119:21,23
127:22 139:23
141:7 147:14
**855I** 47:14 57:2
64:3

**9**

**9** 3:12 122:17,19
**920** 2:4