IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| VICTORIA JOHNSON, | ) | CASE NO. 1:13-CV-2012 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY HOSPITALS | ) | |
| PHYSICIAN SERVICES, | ) | |
| | ) | |
| Defendant | ) | |

---

## BRIEF IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

Now comes plaintiff Victoria Johnson, by and through counsel, and respectfully requests that this Honorable Court deny the defendant's Motion for Summary Judgment on the basis that there are genuine issues of material fact which must be decided by a jury.


s/*Mark P. Herron*_____
Mark P. Herron (0051998)
75 Public Square, Suite 920
Cleveland, Ohio  44113
(216) 280-2828  FAX (216) 696-0075
email: herronlaw@msn.com

Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 17, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>s/*Mark P. Herron*_____</u>
Mark P. Herron (0051998)
75 Public Square, Suite 920
Cleveland, Ohio 44113
(216) 280-2828 FAX (216) 696-0075
email: herronlaw@msn.com

Attorney for Plaintiff

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. v

STATEMENT OF FACTS ................................................................................................. 1

I.     Introduction .......................................................................................................... 1

II.    Victoria Johnson's Job Duties With UHPS ........................................................ 1

III.   Preparing The 855I Form .................................................................................... 2

IV.   CGS Rejects Numerous 855I Forms ................................................................... 3

V.    UHPS "Investigation" Into Preparing The 855I Form ....................................... 4

VI.   After Refusing To Lie, Victoria Johnson Is Suspended And Ordered To Undergo A Fitness For Duty Evaluation ................................................................................ 10

VII.  Victoria Johnson Files A Charge of Discrimination With The EEOC After She Is Not Reinstated .......................................................................................................... 12

VIII. Victoria Johnson Is Fired .................................................................................... 13

LAW AND ARGUMENT ................................................................................................ 13

I.     Summary Judgment Standards ............................................................................ 13

II.    Genuine Issues Of Material Fact Exist As To Whether UHPS Violated The Americans With Disabilities Act, As Amended, In Ordering Victoria Johnson To Undergo A Fitness For Duty Evaluation And In Subsequently Withholding Her From Her Job Even Though The Fitness For Duty Evaluation Found Nothing Wrong With Her ................. 14

      A.    Plaintiff Victoria Johnson Was Allowed To Nap On Her Break ................................. 16

      B.    Plaintiff Victoria Johnson's Ability To Perform The Essential Functions Of Her Position Was Not Significantly Impaired By Taking A Nap On Her Break ............... 17

      C.    Plaintiff Victoria Johnson Did Not Pose A Direct Threat To Herself Or To Others When She Took A Nap At Her Desk During Her Break ................................. 18

      D.    Because Of The Timing Of The Request That Victoria Johnson Undergo A Fitness For Duty Examination, Genuine Issues Of Material Fact Exist As To Whether It Was Punitive ............................................................................................. 18

III.   GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER UHPS TERMINATED VICTORIA JOHNSON FOR INSUBORDINATION (AS IT CLAIMS) OR IN RETALIATION FOR FILING A CHARGE OF DISCRIMINATION WITH THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ........................................................................................................ 21

A.   Victoria Johnson Has Established A Prima Facie Case Of Retaliation ...................... 23

B.   Genuine Issues Of Material Fact Exist As To Whether UHPS' Proffered Non-Retaliatory Reason For Terminating Victoria Johnson Was Pretextual ..................... 25

CONCLUSION ........................................................................................................................ 27

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                  <u>Page</u>

*A.C. v. Shelby County Board of Education,*
    711 F.3d 687 (6th Cir. 2013) ................................................................. 22-24

*Anderson v. Liberty Lobby,*
    477 U.S. 242 (1986) ............................................................................. 13-14

*Biegas v. Quickaway Carriers, Inc.,*
    573 F.3d 365 (6th Cir. 2009) .................................................................. 13

*Blair v. Henry Filters, Inc.,*
    505 F.3d 517 (6th Cir. 2007) .................................................................. 23

*Cline v. Catholic Diocese of Toledo,*
    206 F.3d 651 (6th Cir. 2000) .............................................................. 22, 24

*Conroy v. New York State Department of Correctional Services,*
    333 F.3d 88 (2nd Cir. 2003) ................................................................... 15

*Denman v. Davey Tree Expert Co.,*
    Case No. 06-2588 (6th Cir. Dec. 27, 2007) ........................................... 16-17

*DiCarlo v. Potter,*
    358 F.3d 408 (6th Cir. 2004) .................................................................. 22

*EEOC v. Ford Motor Company,*
    ___ F.3d ___ (6th Cir. April 22, 2014) ................................................... 22-23

*EEOC v. Prevo's Family Market, Inc.,*
    135 F.3d 1089 (6th Cir. 1998) .................................................................. 15

*Ford v. Securitas Security Services, USA, Inc.,*
    338 F.App'x. 483 (6th Cir. 2009) ............................................................. 25

*Fredenburg v. Contra-Costa County Department of Health Services,*
    172 F.3d 1176 (9th Cir. 1999) ................................................................. 15

*Griffin  v. Finkbeiner,*
    689 F.3d 584 (6th Cir. 2012) .................................................................. 23

*Hamilton v. General Electric Co.,*
    556 F.3d 428 (6th Cir. 2009) .................................................................. 14

*Hoover v. Walsh*,
   682 F.3d 461 (6th Cir. 2012) ........................................................................25

*Hunt v. Crawford*,
   526 U.S. 541 (1999).........................................................................................23

*Johnson v. Kroger Co.*,
   319 F.3d 858 (6th Cir. 2003) ........................................................................14

*Karraker v. Rent-A-Center, Inc.*,
   411 F.3d 831 (7th Cir. 2005) ........................................................................15

*Kroll v. White Lake Ambulance Authority*,
   691 F.3d 809 (6th Cir. 2012) ........................................................................15

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).........................................................................................13

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973).........................................................................................22

*Mickey v. Ziedler Tool & Die Co.*,
   516 F.3d 516 (6th Cir. 2008) ........................................................................24

*Montell v. Diversified Clinical Services, Inc.*,
   ___ F.3d ___ (6th Cir. June 27, 2014)..........................................................24

*Morris v. Oldham County Fiscal Court*,
   201 F.3d 784 (6th Cir. 2000) ........................................................................22

*Nguyen v. City of Cleveland*,
   229 F.3d 559 (6th Cir. 2000) .................................................................. 22-23

*Owhor v. St. John Health-Providence Hospital*,
   503 F.App'x 307 (6th Cir. 2012) ..................................................................25

*Quinn-Hunt v. Bennett Enterprises, Inc.*,
   211 F.App'x 452 (6th Cir. 2006) ..................................................................25

*Reeves v. Sanderson Plumbing Products, Inc.*,
   530 U.S. 133 (2000)..................................................................................14, 22

*Shazor v. Professional Transit Management, LTD*,
   744 F.3d 948 (6th Cir. 2014) .................................................................. 22-25

*Singfield v. Akron Metropolitan Housing Authority*,
   389 F.3d 555 (6th Cir. 2004) ........................................................................22

*Sullivan v. River Valley School District*,
    197 F.3d 804 (6th Cir. 1999) ............................................................................................ 16-17

*Texas Department of Community Affairs v. Burdine*,
    450 U.S. 248 (1981) .................................................................................................................21

*Wexler v. White's Fine Furniture, Inc.*,
    317 F.3d 564 (6th Cir. 2003) (en banc) .............................................................................14

## **STATUTES**

42 U.S.C. §12102 ...............................................................................................................14

42 U.S.C. §12111 ........................................................................................................14, 18

42 U.S.C. §12112 ...............................................................................................................15

42 U.S.C. §12203 ...............................................................................................................21

## **REGULATIONS**

29 C.F.R. §825.300 ...........................................................................................................20

29 C.F.R. §1630.02 ....................................................................................................15, 18

29 C.F.R. §1630.14 ...........................................................................................................15

## **COURT RULES**

Fed. R. Evid. 801(c) .........................................................................................................25

Fed. R. Evid. 802 ..............................................................................................................25

## STATEMENT OF FACTS

### I.  Introduction

Summary judgment should be denied for the following reasons:

- Genuine issues of material fact exist as to whether UHPS had sufficient legal grounds to order Victoria Johnson to undergo a fitness for duty examination in accordance with 42 U.S.C. §12112(d)(4)(A);

- Genuine issues of material fact exist as to whether UHPS unlawfully regarded Victoria Johnson as disabled when it failed to reinstate her after the fitness for duty examination revealed that Victoria Johnson was not suffering from any psychiatric condition that would impair her ability to work;

- Genuine issues of material fact exist as to whether Victoria Johnson was terminated because she was insubordinate (as alleged by UHPS) or because she filed a Charge of Discrimination against UHPS after it failed to reinstate her after the fitness for duty examination revealed that Victoria Johnson was not suffering from any psychiatric condition that would impair her ability to work; and

- UHPS' proffered non-retaliatory claim of insubordination is premised entirely upon inadmissible hearsay evidence, and genuine issues of material fact exist as to whether UHPS even contacted CGS to find out what its expectations were regarding the proper contact information to be entered on the 855I form was.

### II.  Victoria Johnson's Job Duties With UHPS

Victoria Johnson began her employment with University Hospitals Physician Services ("UHPS") on or about September 7, 2008, as a "Provider Enrollment Clerk" and was promoted to "Provider Enrollment Specialist" on or about August 29, 2012.  Her immediate supervisor was Sheryl Johnson (Provider Service Manager), who in turn reported to Steve Riddle (Director of Billing Services).   Riddle oversaw all of the operations of UHPS.  Outside of the issue regarding preparation of the 855I forms, Riddle and Sheryl Johnson have admitted that Victoria Johnson never refused to perform her job duties and was never rude or insubordinate (R. 30, Sheryl Johnson Dep. at 28, Page ID# 1173; R. 31, Riddle Dep. at 96, Page ID# 1313).

UHPS is an arm of the larger University Hospitals ("UH") system.  UH is a large medical care facility that has multiple hospital facilities and physician practices located in numerous counties

throughout Northeast Ohio and all three Northeast Ohio area codes (216, 330 and 440).  Many patients who receive care at the various UH facilities and physician practices receive their care through the federal Medicare and Medicaid programs.  While UHPS has many functions within the UH system, it is undisputed that UHPS is ***the*** entity within UH responsible for billing for services rendered by UH medical personnel (R. 31, Riddle Dep. at 14-16, 34, 64, Page ID# 1231-1233, 1251, 1281).  There are no medical providers located at UHPS.

Medical providers must be approved by the Center for Medicare and Medicaid Services ("CMS") – an agency within the U.S. Department of Health and Human Services – in order to provide treatment to Medicare and Medicaid recipients.  Part of Victoria Johnson's job at UHPS was the preparation and submission of the applications for those individual providers to be approved to provide services to Medicare and Medicaid patients.

### III.    Preparing The 855I Form

The application that physician and non-physician practitioners must complete in order to be able to provide services to Medicare patients is referred to as the "CMS 855I" form.  The form itself is promulgated by CMS.  Once completed, the 855I forms and required accompanying documentation are submitted to a company called "CGS," which is has a government contract with CMS and is responsible for reviewing and approving the 855I forms for medical providers.

In signing the 855I form, the provider must certify that he or she "[has] read the contents of this application, and the information contained herein is true, correct and complete" (MSJ Exhibit 2, Page ID#903).  The provider also certifies by signing the 855I form that they understand the penalties for providing false information in connection with the application (MSJ, Exhibit 2. Page ID#903).  Finally, Section 14 of the 855I form identifies ***seven*** federal criminal statutes that are potentially violated if false information is provided "in this application to gain or maintain enrollment in the Medicare program" (MSJ, Exhibit 2, Page ID#901-902).

At issue in this case is the contact information that is to be included in the 855I form.  Section 13 of the 855I form requires the applicant to designate someone whom CGS can contact "regarding this application."  Specific directions for completing the 855I form are contained within the CMS' "Program Integrity Manual."  The portion of the Program Integrity Manual that was in effect during July, 2012 (Victoria Johnson Declaration at 10), states with respect to Section 13 (emphasis added):

**15.5.2.2 – Correspondence Address**
**(Rev. 414, Issued:  04-06-12,  Effective 05-07-12, Implementation:  05-07-12)**

**A.  Background**

The correspondence address must be one where the contractor can ***directly contact the applicant*** to resolve any issues once the provider is enrolled in the Medicare program.  ***It cannot be the address of a billing agency, management services organization, chain home office, or the provider's representative (e.g., attorney, financial advisor)***.  It can, however, be a P.O. Box or, in the case of an individual practitioner, the person's home address.

The contractor shall call the telephone number listed in this section to verify that the contractor can ***directly contact the applicant***.  If an answering service appears and the contractor can identify it as the applicant's personal service, it is not necessary to talk directly to the applicant or an official thereof.  The contractor only needs to verify that the applicant can be reached at this number.

These directives have the force and effect of law and UH is required to comply with them.  Even though it is undisputed that UHPS was a "billing agency," UHPS nevertheless directed its provider enrollment specialists (including Victoria Johnson) to use the UHPS mailing address and their desk telephone numbers as the contact information on the 855I forms.

**III.**  **CGS Rejects Numerous CMS 855I Forms**

As stated herein, UHPS is a billing center for UH – Steve Riddle admitted as much (R. 31, Riddle Dep. at 14-16, 34, 64, Page ID# 1231-1233, 1251, 1281).  Despite the clear directive of the Program Integrity Manual prohibiting applicants from using a billing center as the contact address and phone number for providers on the 855I form, that is exactly what UHPS directed Victoria Johnson and other Provider Enrollment Specialists to do.

3

This – of course – resulted in numerous 855I forms being rejected by CGS because they could not directly reach the provider at the number that was being provided.  Three applications submitted by Victoria Johnson were rejected because the provider submitting the application could not be directly reached at Victoria Johnson's phone number.  This situation caused considerable consternation within UHPS and among all of the Provider Enrollment Specialists.  Riddle's initial solution to the problem was to instruct the Provider Enrollment Specialists to answer the phones differently when it appeared that CGS was calling.  Riddle admitted at his deposition that it was standard practice for many years – including June through August of 2012 – to answer the phone stating "University Hospitals Physicians Services billing department" and that "once we knew that CGS was regularly calling, I think we probably alerted our staff that they could be getting calls from this particular area code and that would be CGS" (R. 31, Riddle Dep. at 54-55, Page ID# 1272-1273).  On June 29, 2012, Riddle sent an email to the various Provider Enrollment Specialists that a jury can interpret as an instruction to them to ***lie*** to CGS when it called.  In that email, Riddle specifically instructed the Provider Enrollment Specialists to "recognize the area code(s) and answer the phone such that it is not determined that we are a billing service."  Riddle admits sending the email (Riddle Dep. at 94, Exhibit 3, Page ID# 1311, 1343).[1]

## IV.    UHPS "Investigation" Into Preparing The 855I Form

Victoria Johnson was very concerned about whether she was acting lawfully in preparing the 855I forms in the manner that her supervisors were requiring – particularly when it resulted in forms being rejected.  As UHPS outlines in its summary judgment motion, there were numerous emails exchanged back and forth between Victoria Johnson and UHPS personnel regarding this matter.

UHPS claims that it commenced an investigation into how to properly prepare the 855I forms in light of the rejections of the forms by CGS and Victoria Johnson's concerns about providing false

---

[1]    Although Sheryl Johnson was copied on this email, she denied at her deposition that any instructions were ever given to the provider enrollment specialists that they were answer the phone differently when a call came in from the area code where CGS was located (R. 30, Sheryl Johnson Dep. at 37-38, Page ID# 1182-1183).  This raises a serious credibility issue with respect to Sheryl Johnson.  Riddle also attempted to deny ever telling the staff to answer the phone differently when CGS called (R. 31, Riddle Dep. at 56, Page ID# 1273) even though the June 29, 2012, email clearly instructs them to do so.

information on the form.  According to UHPS, that investigation consisted of having its "Local Compliance Officer," Carole Meisler, call CGS to find out what its requirements were on the issue of contact information to be entered on the 855I form.  UHPS claims that Meisler called representatives of CGS on multiple occasions and purportedly confirmed with those representatives that it was indeed proper for UHPS to be using Victoria Johnson's direct contact line and the UHPS address as the contact information on the 855I form.

There are genuine issues of material fact as to whether this alleged investigation was even undertaken as UHPS claims.  And if that investigation was in fact undertaken, UHPS' claims as to the results of that investigation are inadmissible hearsay because it consists entirely of out-of-court statements attributed to individuals at CGS which UHPS is offering for the truth of the matters alleged in those statements.  First, Meisler initially denied at her deposition having any knowledge of the whole matter, denied having any knowledge as to what procedures a medical provider must follow to be approved to provide medical services to Medicare patients, denied knowing what the 855I form or the Program Integrity Manual was, and even denied ever having heard of CGS (R. 26-1, Meisler Dep. at 14-16, 39, Page ID#583-585, 608).

While Meisler subsequently claimed to remember the "investigation" after seeing copies of emails that she sent to Wahl and Victoria Johnson (R. 26-1, Meisler Dep. Exhibit 16, Page ID#665-745), there is no documentation corroborating this alleged "investigation" other than Meisler's hearsay testimony as to what non-party CGS purportedly told her.  The record contains no phone records corroborating any of the long-distance phone calls Meisler claims she made to CGS personnel and contains no email communications or other correspondence between Meisler and anyone at CGS which would back up what Meisler claims to have been told.

UHPS did not depose CGS as to either what its requirements were for completing the 855I form or what it told Meisler regarding that matter.  UHPS did not obtain affidavits from anyone at CGS that in any manner corroborates Meisler's testimony.  There is absolutely nothing admissible in

5

the record that in any manner corroborates anything that Meisler claims she was told by CGS regarding how to complete the 855I form.  The only documentation in the record regarding how to properly prepare the 855I forms that is actually from CGS are the various emails to Victoria Johnson stating that it was improper for UHPS to be using her direct line as the contact information for providers seeking to be enrolled in the Medicare program.

Beyond allegedly calling CGS, there is no other evidence in the record of a legitimate thorough investigation into this issue.  Wahl and Meisler admit that they did not review the Program Integrity Manual to ascertain what the CMS requirements regarding contact information were (R. 29, Wahl Dep. at 22-23, 25, page ID# 1007-1008, 1010; R. 26-1, Meisler Dep. at 36-39, Page ID# 605-608).  Riddle did not review the Program Integrity Manual (R. 31, Riddle Dep. at 35-39, Page ID# 1252-1256).  Wahl did not speak with anyone at CGS and did not witness any of the conversations that Meisler claimed to have had with CGS (R. 29, Wahl Dep. at 23-24, 27-28 Page ID# 1008-1009, 1012-1013).  Meisler could not recall whether she conducted any type of research to verify how the 855I form was to be completed (R. 26-1, Meisler Dep. at 64-66, Page ID#633-635).

Wahl admits that she did not conduct any independent investigation into how to properly prepare the 855I forms or seek input from any other source on how to properly prepare the 855I forms and admits that she did not seek any type of legal opinion as to whether it was proper to use Victoria Johnson's direct dial number on the CMS 855I forms (R. 29, Wahl Dep. at 30-32, Page ID# 1015-1017).  Given the potential criminal consequences of providing false or misleading information on the CMS 855I form, the failure to seek a legal opinion on the issue, or at least review the Program Integrity manual to see what it required, is highly suspicious.  Sheryl Johnson – who by her own admission was the immediate supervisor for all of the provider enrollment specializes (including Victoria Johnson) – herself never contacted CGS regarding the proper manner in which to complete the 855I forms (R. 30, Sheryl Johnson Dep. at 44, Page ID# 1189).  Whether an investigation was undertaken as UHPS claims is seriously in question and is for a jury to decide.

6

Even if Meisler called CGS as she claims, the information she claims to have obtained from CGS is inadmissible hearsay. The statements purportedly made by CGS to Meisler are out of court statements. They are offered for the truth of the matters allegedly stated as well – both Wahl and Meisler conceded at deposition that they believed that CGS was being truthful with them and that they would not have told Victoria Johnson that she could use her direct-dial number as the contact number on the 855I forms if they felt that CGS was incorrect (R. 29, Wahl Dep. at 48-49, Page ID#1033-1034; R. 26-1, Meisler Dep. at 30, 43-45, 49-50, 90-91, Page ID#599, 612-614, 618-619, 659-660). Given that there is absolutely no admissible evidence in the record corroborating anything that Meisler claims that CGS told her – much less that CGS ever told it to her in the first place – Meisler's testimony as to what CGS allegedly told her is inadmissible hearsay that cannot be considered for summary judgment purposes.

Putting aside the hearsay issues, and whether an "investigation" was even conducted, the "bottom line" is that everything from CGS that *is* documented and *is* admissible refutes UHPS' position on the issue. This evidence is a series of emails between CGS personnel and Victoria Johnson in the days immediately preceding her removal from service.[2]

Meisler summed up her position on the issue succinctly in an email she sent to Victoria Johnson on July 19, 2012 (R. 26-1, Page ID#709):

> **Per CGS, physician's staff support can answer the phone and give a message to the physician**

*Two* CGS representative (Andrew Baumann and Shamekia McLaughlin) who emailed Victoria Johnson on the issue said that is not true.[3] Baumann stated in an email to Victoria Johnson on July 20,

---

[2]     The emails to Victoria Johnson from CGS personnel are not hearsay. They are not offered for the truth of the matters stated therein, but for the purpose of showing that it was reasonable for Victoria Johnson to believe that she was being instructed by UHPS to prepare the 855I forms incorrectly.

[3]     UHPS appears to suggest in its motion that Victoria Johnson intentionally sought out these individuals in an effort to undermine UHPS management (MSJ at 6). Meisler in fact accused Victoria Johnson of "forum shopping" by seeking out a second opinion in an effort "to try to discredit the compliance officer (R. 26-1, Meisler Dep. Exhibit 16, Page ID# 711). This could not be further from the truth. An examination of both email threads shows that Victoria Johnson was responding to emails from these two CGS representatives wherein they were seeking additional and/or corrected

2012, that the phone number "should be either a home number that the voicemail identifies the provider or ***at the location where the provider will be working***" (R. 26-1, Page ID# 712) (emphasis added).

Meisler's position was rejected by McLaughlin in an email string that covered July 19 through July 23, 2012 (R. 26-1, Page ID# 728-737).  The string began when McLaughlin had to reject an 855I application for provider Pankaj Gupta.  McLaughlin emailed Victoria Johnson on July 19, 2012, stating that a valid contact number was necessary.  Victoria Johnson replied to McLaughlin on July 20, 2012, and asked her to "please clarify what CGS expectations are when asking if the provider can be reached at this number and what number should be listed in section 2b."

Victoria Johnson sent an additional email to McLaughlin on July 23, 2012, asking the following:

> "With regard to section 2b, and your question if the provider can be reached directly at this location.  The providers cannot be reached here as this is the office where we enroll the providers and provide in house billing services for them.  The practice location is 11100 Euclid Avenue.  Cleveland, Ohio  44106.  How do we address this issue if the provider cannot be reached here?"

McLaughlin responded as follows:

> "The address listed in section 2 cannot be of the billing service (see that section of the application) we need a valid correspondence address and phone number for the provider in this section and we will have to be able to reach the provider at that number listed."

Victoria Johnson replied:

> "This is what I am interpreting however I have been told to continue to use this address and telephone number, can you verify with your Supervisor and Manager."

McLaughlin replied:

> "May I ask who told you to keep using that number and address?"

Victoria Johnson responded:

> "My Managers Sheryl Johnson, Steve Riddle and our Compliance Officer Carole Meisler."

information regarding 855I applications that had been submitted (R. 26-1, Page ID# 712-714 (Baumann email thread), Page ID#728-737 (McLaughlin email thread)).

8

In response, McLaughlin stated that she would "forward this information to our support team and wait for a reply from support."

A few minutes later, Victoria Johnson sent an additional email to McLaughlin seeking to verify what Meisler had stated in her email of July 19, 2012.  She asked:

> I guess our Compliance Officer said it is okay for us to answer the phone and verify that the doctor can be reached here and we should pass on a message to the doctor.  Please verify that this is correct.

McLaughlin responded stated that what the Meisler had stated was ***incorrect***.  McLaughlin posted a copy of the relevant section of the Program Integrity Manual and stated:

> I have checked with my support team, and I was advised that the provider has to be reached directly at the number.  I have listed what the Program Integrity Manual states below.

That same day, Wahl sent a letter to Victoria Johnson advising her that Meisler had conducted an investigation and had allegedly been told by CGS that it was proper for UHPS to use its address and phone number on the 855I forms.  Outside of the letter and the hearsay statements contained therein as to what Meisler was allegedly told by CGS, Wahl did not provide Victoria Johnson with any documentation from CGS or any other authoritative source confirming that this was indeed proper.

There can be no doubt that Victoria Johnson was being provided with conflicting information regarding how to complete the 855I form.  What the record shows – and what a reasonable jury can easily infer – was that Victoria Johnson was not trying to undermine the UHPS compliance office but was seeking clarity as to how to complete the 855I forms.  Her email exchanges with Baumann and McLaughlin occurred in response to CGS' rejection of 855I forms that had been submitted on behalf of two providers.  Victoria Johnson was not "forum shopping" or trying to discredit the Compliance Officer.  A jury can conclude that she did what any prudent person would do – ask those who were rejecting the 855I forms how to do them correctly.

Instead of receiving clarity, she received irreconcilable conflicting information.  Because the only admissible evidence in the record from CGS was telling her that what Meisler was instructing her

to do was incorrect, it certainly was reasonable for Victoria Johnson to infer that UHPS was telling her to lie.  It is not disputed that she refused to lie.

## VI.  After Refusing To Lie, Victoria Johnson Is Suspended And Ordered To Undergo A Fitness For Duty Evaluation

UHPS' response to Victoria Johnson providing it with information from CGS stating that Meisler's instructions on completing the 855I forms was incorrect was to suspend her from her job on July 26, 2012, and order her to undergo a fitness for duty examination and a drug/alcohol screening. This screening was ordered even though Sheryl Johnson never had any concern as to whether Victoria Johnson was physically or mentally capable of performing her job duties and had never discussed the issue with Riddle (R. 30, Sheryl Johnson Dep. at 32-33, 45-46, Page ID# 1178-1179, 1190-1191).  The letter from Morrison notifying Victoria Johnson of the referral specifically stated that she "ha[d] been placed on an unpaid Administrative leave until further notice" (R. 33-1, Morrison Dep. Exhibit 7, Page ID# 1544).  The referral specifically states that the basis for the referral was "impaired functioning" (R. 33-1, Morrison Dep. Exhibit 6, Page ID# 1543).  The report subsequently prepared by Dr. Pallas confirmed that the purpose of the evaluation "was to assess for the presence of mental illness." (Morrison Dep. Exhibit 10, Page ID# 1554-1557).  On the day following the referral – July 27, 2012, Ms. Morrison sent a letter to Victoria Johnson converting the unpaid "Administrative Suspension" into a paid "Administrative Leave for 5 days" (Morrison Dep. Exhibit 8, Page ID#1552).[4]  The letter further specifically states that "I will contact you once your return to work status is determined."

Victoria Johnson completed the examination on July 31.  In his report prepared August 2, 2012 (Morrison Dep. Exhibit 10, Page ID# 1554-1557), Dr. Pallas stated "I do not believe that Ms. Johnson is suffering from any Axis I psychiatric condition that would impair her ability to work in general" and

---

[4]  UHPS has no explanation for the change in terminology from "Administrative Leave" in the July 26, 2012, letter to "Administrative Suspension" the following day.  A jury can certainly conclude from this change in terminology (along with the other evidence discussed herein) that the "suspension" was punitive in nature and not for the purposes of determining whether Victoria Johnson truly was or was not mentally fit for duty.

"I do not think that she is psychiatrically unable to work."  ___In other words – Dr. Pallas found NOTHING wrong with Victoria Johnson___.

Even though Dr. Pallas found that Victoria Johnson was capable of working, UHPS did not bring her back to work.  Even considering Dr. Pallas' recommendation that Victoria Johnson be given a two-week leave, she should have been allowed to return on August 9, 2012.  She was not.  Instead, on August 14, 2012, UHPS converted the prior "5-day Paid Administrative Leave" to an "unpaid Administrative Leave effective August 10, 2012" (Morrison Dep. Exhibit 11, Page ID#1558).  Yet again, Morrison made it clear that "I will contact you once your return to work status is determined." Notwithstanding Dr. Pallas' findings, there is no evidence on the record of Morrison ever contacting Victoria Johnson regarding her return to work status until October 1, 2012 – a month and a half later (Morrison Dep. Exhibit 13,  Page ID# 1560).  Morrison's affidavit (MSJ Ex. 4, Page ID#913-917) is silent as to any attempts by Morrison to contact Victoria Johnson regarding her return to work status prior to October 1, 2012.

UHPS attempts to get around this issue by suggesting that Victoria Johnson was on FMLA leave (MSJ at 14).  While it is undisputed that she asked for FMLA leave, there is no evidence in the record that any request for FMLA leave was approved.  There is nothing in the record indicating that Victoria Johnson was notified – either verbally or in writing – that she was eligible for FMLA leave or that any request for FMLA leave had been approved.  The three letters from Morrison to Victoria Johnson describe her leave status as "administrative;" there is nothing in the record indicating that her leave status ever was classified as FMLA.[5]

---

[5]  Morrison claimed at deposition that UHPS' "KRONOS" system would indicate whether or not Victoria Johnson was on FMLA leave (R. 33-1, Morrison Dep. at 93-94, Page ID#1438-1439).  Morrison further claimed that an individual named Kara would have copied her on any FMLA correspondence sent to an employee on FMLA leave (R. 33-1, Morrison Dep. at 104, Page ID# 1449).  Riddle also claimed that the ORACLE system would have shown whether Victoria Johnson was on FMLA, and did not recall ever seeing anything in the ORACLE system indicating that (R. 31, Riddle Dep. at 95-96, Page ID#1312-1313).  No such records were produced by defendants during discovery.  Following Morrison's deposition, a letter was sent to defense counsel regarding these documents (Herron declaration at 1).  Still, no such documents (including any ORACLE or KRONOS records) were produced positively confirming that Victoria Johnson

Beyond there being no evidence in the record that any request for FMLA leave was actually approved, there is no evidence in the record that the requests for FMLA leave were even taken into consideration in not returning Victoria Johnson to work.  As indicated in Morrison's three letters to Victoria Johnson, Morrison was to contact her once her return to work status had been determined. Morrison does not allege in her affidavit that she delayed Victoria Johnson's return to work because of the FMLA requests.  There is no evidence in the record from anyone else involved in determining when Victoria Johnson would be allowed to return to work indicating that the delay in her return to work was because of the FMLA requests.  As such, whether Victoria Johnson was actually on FMLA during any of this time, or whether the FMLA request was the reason for delaying her return to work, is at a minimum a jury question.

## VII.  Victoria Johnson Files A Charge of Discrimination With The EEOC After She Is Not Reinstated

As stated, the record indicates that the ***first*** time that Morrison contacted Victoria Johnson regarding returning to work was in a letter sent on October 1, 2012, instructing her to return to work on October 8, 2012.  Because she had not received any prior notification to return to work, Victoria Johnson sent a Charge of Discrimination to the EEOC for filing on October 4, 2012 (Victoria Johnson declaration at 28).  A copy of the Charge of Discrimination was also sent by FAX to Riddle and Sheryl Johnson on October 4, 2012 (Victoria Johnson declaration at 28; Herron declaration at 2).  Victoria Johnson received Morrison's letter on October 5, 2012 – one day later.  Victoria Johnson was not aware of Morrison's October 1, 2012, letter at the time that the EEOC charge was sent to EEOC and FAXed to Riddle and Sheryl Johnson (Victoria Johnson Declaration at 27-28).  UHPS admits having knowledge of the EEOC charge (MSJ at 16).

---

was on FMLA.  No such documents are in the summary judgment record.  It can be inferred from UHPS' inability to produce these that Victoria Johnson never was actually considered by UHPS to be on FMLA leave.

## VIII. Victoria Johnson Is Fired

On October 5, 2012 (immediately upon receipt of Morrison's October 1, 2012, letter and the day after notifying UHPS of her EEOC charge), Victoria Johnson delivered a letter to Morrison confirming that she would return to work on October 8, 2012 (Morrison Dep. Exhibit 15, Page ID# 1566-1567).  In her letter, Victoria Johnson reiterated that she would not lie on the 855I forms and notified Morrison that she had filed the EEOC charge.  She asked to not be required to prepare the 855I forms "that are prohibited or in violation of their rules".

On October 8, 2012, Victoria Johnson met with Morrison and Sunagel.  The manner of preparing the 855I forms was discussed.  Contrary to the implication of the termination letter (MSJ Exhibit 21), Victoria Johnson did not refuse to perform an essential function of her job.  She refused only to prepare the forms improperly and refused to lie.  Morrison and Sunagel reiterated what Meisler had previously told her and directed her to prepare the forms in a manner contrary to what CGS had told her.  Victoria Johnson made it clear that she would return to work as long as she was to prepare the 855I forms in accordance with CGS and CMS requirements.  When she stated that she would not lie – that she would not prepare the forms in a manner contrary to what CGS required – she was fired.

## LAW AND ARGUMENT

## I. SUMMARY JUDGMENT STANDARDS

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This Court's role in deciding summary judgment motions is limited.  "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Biegas v. Quickaway Carriers, Inc.*, 573 F.3d 365, 373 (6th Cir. 2009).  The facts, and any inferences which can be drawn from those facts, must be viewed in the light most favorable to the non-moving party.  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Biegas*, 573 F.3d at 373.

13

Moreover, "although the court should review the record as a whole, ***it must disregard all evidence favorable to the moving party that the jury is not required to believe***.  That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (emphasis added); *Hamilton v. General Electric Co*., 556 F.3d 428, 437-438 (6th Cir. 2009).  Only if the evidence is so one-sided that only defendants could prevail can summary judgment be granted to them.  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (citing *Anderson*, 477 U.S. at 251-252).  Even if it is a "close call," it must be submitted to a jury for resolution.  See, *e.g.*, *Johnson v. Kroger Co.*, 319 F.3d 858, 869 (6th Cir. 2003).

## II. GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER UHPS VIOLATED THE AMERICANS WITH DISABILITIES ACT, AS AMENDED, IN IMPROPERLY ORDERING VICTORIA JOHNSON TO UNDERGO A FITNESS FOR DUTY EVALUATION AND IN SUBSEQUENTLY WITHHOLDING HER FROM HER JOB EVEN THOUGH THE FITNESS FOR DUTY EVALUATION FOUND NOTHING WRONG WITH HER

Under the ADA, "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. §12112(a).  With respect to an individual, the term "disability" includes being regarded as having a physical or mental impairment which substantially one or more major life activities.  42 U.S.C. §12102(1)(C).

An individual is "regarded as" having an impairment if "the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment ***whether or not the impairment limits or is perceived to limit a major life activity***."  42 U.S.C. §12102(3)(A) (emphasis added).  Prohibited actions include but are not limited to refusal to hire, demotion, ***placement on involuntary leave***, termination, exclusion for failure

to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment.  29 C.F.R. §1630.02(l).

Genuine issues of material fact exist as to whether UHPS had sufficient legal grounds to place Victoria Johnson on involuntary leave pending a fitness for duty evaluation, and then to subsequently continue to withhold her from work even after the evaluation found nothing wrong with her.[6]  The ADAAA's prohibition against discrimination against qualified persons with disabilities includes a prohibition against certain medical examinations and inquiries.  42 U.S.C. §12112(d)(1).  An employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, ***unless such examination or inquiry is shown to be job-related and consistent with business necessity***."  42 U.S.C. §12112(d)(4)(A) (emphasis added).  See also 29 C.F.R. §1630.14(c).  Employees can be instructed to undergo medical examinations by employers only "in certain limited circumstances," confined by the "job-relatedness" and "business necessity" requirements.  *Kroll v. White Lake Ambulance Authority*, 691 F.3d 809, 814-815 (6th Cir. 2012); *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998).  All employees are entitled to this protection – they do not have to be a "qualified individual with a disability" for the protection.  See *Conroy v. New York State Department of Correctional Services*, 333 F.3d 88, 94 (2nd Cir. 2003); *Fredenburg v. Contra-Costa County Department of Health Services*, 172 F.3d 1176, 1182 (9th Cir. 1999).

An employer's request for a medical examination is job-related and consistent with business necessity when: (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to herself or

---

[6]  There is no doubt that the fitness for duty evaluation, which included administration of the MMPI examination to Victoria Johnson, constituted a "medical examination" under the ADAAA.  See, e.g., *Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831, 837 (7th Cir. 2005) (holding that an evaluation administered to employees seeking a promotion which included the MMPI constituted a "medical examination" under the ADA because the MMPA "is designed, at least in part, to reveal mental illness and has the effect of hurting the employment prospects of one with a mental disability") (cited with approval in *Kroll*, 691 F.3d at 817-818).  Moreover, Dr. Pallas admitted in his report that the purpose of his evaluation "was to assess for the presence of mental illness."

others.  See *Denman v. Davey Tree Expert Co.*, Case No. 06-2588 (6th Cir. Dec. 27, 2007), slip op. at 4-5.  Since Victoria Johnson never requested an accommodation, the inquiry in this case properly is focused only on the issue of whether UHPS felt that her ability to perform the essential functions of her job was impaired, or whether UHPS felt that she posed a direct threat to herself or to others.

The Sixth Circuit has imposed a high burden of proof upon employers seeking medical examinations to determine whether or not the employee can perform the essential functions of his or her job.  "[F]or an employer's request for an exam to be upheld, there must be ***significant evidence*** that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job."  *Denman*, supra, slip op. at 6; *Sullivan v. River Valley School District*, 197 F.3d 804, 811 (6th Cir. 1990) (emphasis added).  UHPS does not even come close to meeting this burden.

## A.     Plaintiff Victoria Johnson Was Allowed To Nap On Her Break

UHPS bases the referral for the fitness for duty examination on the basis of Victoria Johnson taking naps at her desk during her break time.  However, the evidence is indisputable that UHPS employees were allowed to nap at their desks during their break if the wanted to.  Riddle admitted that there were no written policies that prohibited provider enrollment specialists from taking a nap while on their break (R. 31, Riddle Dep. at 84-85, 92-93, Page ID# 1301-1302, 1309-1310).  Sheryl Johnson admitted that there were no restrictions on what employees could do on their breaks – they could go to the break room, they could go to their car for a smoke, they could run up to McDonalds.  Sheryl Johnson also admitted that they could take a nap at their workstation if they wanted (R. 30, Sheryl Johnson Dep. at 48-50, Page ID# 1193-1195).  Riddle even admitted at his deposition that the occasional quick nap could be an effective way of taking a "mental break" for some people (R. 31, Riddle Dep. at 79, Page ID# 1296).  It was not until July 23, 2012, that the policy was amended to prohibit employees from taking their break naps at their workstation (R. 30, Sheryl Johnson Dep. at 50-51, Page ID# 1195-1196; R. 31, Riddle Dep. at 88, Page ID# 1305).  Even after that July 23, 2012, directive, UHPS employees still could nap during their breaks (just not at their work station).

16

**B.**  **Plaintiff Victoria Johnson' Ability To Perform The Essential Functions Of Her Position Was Not Significantly Impaired By Taking A Nap On Her Break**

Mere speculation that something might be wrong with an employee is not enough to justify ordering a medical examination.  An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions.  *Denman*, supra, slip op. at 6; *Sullivan*, 197 F.3d at 811 (6th Cir. 1999).  There is no evidence in the record supporting any contention that Victoria Johnson's ability to perform the essential functions of her job was impaired by virtue of the occasional napping at her desk while on break.  The only time that the issue was formally raised in any type of performance evaluation was in a 2011 performance review (MSJ at 4) – well before the events underlying this case took place.

As for the more recent events, there simply is no evidence in the record that Victoria Johnson's occasional naps during her break impaired her ability to perform her essential job functions.  Sheryl Johnson' affidavit (MSJ Exhibit 3, page ID#907-912) devotes only two paragraphs to the napping issue and at no point in her affidavit does she allege that the occasional break naps interfered with Victoria Johnson's ability to perform her duties.  Morrison only devotes one sentence in her affidavit to the napping issue (MSJ Exhibit 4, page ID# 913-917) and does not indicate that the single nap she purportedly observed on July 17, 2012, was interfering with Victoria Johnson's ability to perform her job duties.  No evidence has been presented from anyone alleging that Victoria Johnson's occasional permissible break-time naps were interfering with her ability to perform her job duties.  Accordingly, it is respectfully submitted that UHPS cannot meet its burden of showing that a medical examination was necessary to ascertain whether or not Victoria Johnson was capable of performing her job duties because she took an occasional permitted nap during her break.

**C.**     **Plaintiff Victoria Johnson Did Not Pose A Direct Threat To Herself Or To Others When She Took a Nap At Her Desk While On Her Break**

A "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  42 U.S.C. §12111(3).  There is no evidence in the record even remotely suggesting that Victoria Johnson posed any threat to anyone – herself included – when she on occasion took a permitted nap at her desk.  As with the issue of whether the naps interfered with Victoria Johnson's ability to perform her job duties, the affidavits proffered from Sheryl Johnson, Morrison and Sunagel are completely silent on the issue.  No evidence from Riddle or anyone else is proffered to show that Victoria Johnson' napping while on break posed a direct threat to herself or to others.

In addressing the "direct threat" issue, the nature of Victoria Johnson's job duties must be considered.  29 C.F.R. §1630.02(r) ("The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job").  While this type of behavior could be argued to pose a "significant risk" if Victoria Johnson's job entailed driving, intense physical labor or the operation of heavy machinery, her job essentially required her to sit at a desk, use a computer and talk on a telephone.  There is absolutely no evidence in the record that the alleged drowsiness posed a direct threat to Victoria Johnson or to anyone else.

**D.**     **Because Of The Timing Of The Request That Victoria Johnson Undergo A Fitness For Duty Examination, Genuine Issues Of Material Fact Exist As To Whether It Was Punitive**

Separate and apart from whether the fitness for duty examination was justified under the governing regulations, the timing of the fitness for duty examination is questionable.  UHPS claims that the drowsiness issue was serious enough to mention in a performance appraisal conducted in 2011 (MSJ at 4) – yet there is no evidence in the record that a fitness for duty evaluation was ordered at that time or **_why_** one was not ordered.  UHPS claims that the drowsiness issue was serious enough in April,

2012, that Victoria Johnson was told to put up a sign indicating that she was "on break" when she would take a nap at her desk (MSJ at 4).  Again – there is no evidence in the record that a fitness for duty evaluation was ordered at that time; nor is there any evidence in the record as to _**why**_ an evaluation was not ordered at that time.  And it is undisputed that no fitness for duty evaluation was ordered in June, 2012, after Victoria Johnson told Sheryl Johnson that she needed to take time off of work because her medication was making her drowsy.  None of the individuals who have provided affidavits on UHPS' behalf (Sheryl Johnson, Morrison and Sunagel) provide any explanation as to why a fitness for duty evaluation was not ordered earlier.

What _is_ undisputed from the record is that UHPS did not order the fitness for duty evaluation until July 26, 2014 - immediately _**after**_ Victoria Johnson had forwarded emails from CGS confirming that the instructions she had been given by Meisler were incorrect and Meisler accused Victoria Johnson of trying to undermine the Compliance Office.  Because it is chronologically undisputed that the issues regarding the completion of the 855I forms occurred _**between**_ the alleged sleeping incidents and the issuance of the fitness for duty directive, a reasonable finder of fact can determine that fitness for duty evaluation was a punitive measure triggered by Victoria Johnson's refusal to lie in connection with the 855I forms and not by the alleged sleeping incidents.

Even if the fitness for duty evaluation was justified, UHPS refusal to reinstate Victoria Johnson after Dr. Pallas concluded on August 2, 2012, that she was not psychiatrically unable to work was entirely unjustified.  Even allowing for the two-week leave that Dr. Pallas recommended, UHPS has no justification for not bringing Victoria Johnson back to work on August 9, 2012 (two weeks following the commencement of the leave).

UHPS attempts to get around this by claiming that Victoria Johnson was on FMLA leave during this time.  The evidence does not support this.  While it is undisputed that Victoria Johnson _**requested**_ FMLA leave, there is no evidence in the record that her request for FMLA leave was _**approved**_ or that the FMLA was the basis for her being held off of work through October 1, 2012.

19

First, all three letters sent to Victoria Johnson by Morrison ***specifically*** stated that she (Morrison) would contact Victoria Johnson once her return to work status has been established.  Yet the record does not contain any evidence that Morrison contacted Victoria Johnson until October 1, 2012.  None of the letters from Morrison state that Victoria Johnson was on FMLA leave – they all state that the leave was "administrative."

Second, there is no evidence in the record that UHPS gave Victoria Johnson any of the notifications that FMLA regulations implemented by the Department of Labor require.  When an employee requests FMLA leave, the employer must notify the employee within five business days as to whether or not the employee is eligible for FMLA leave and, if not, why.  29 C.F.R. §825.300(b)(1), (2).  There is no evidence of any such notification in the record.  The employer is also required to provide written notice to the employee "detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet those expectations.  29 C.F.R. §825.300(c)(1).  There is no evidence of any such notification in the record.  Finally, the employer is required to provide the employee with notification of matters such as the employee's right to substitute paid leave, whether the employer requires the substitution of paid leave, any requirement that the employee make premium payments to maintain health benefits, the consequences of failing to make any required premium payments, the employee's right to maintenance of health care benefits during FMLA leave, and the employee's potential liability for payment of health insurance premiums if the employee fails to return to work after the leave.  29 C.F.R. §825.300(c)(1)(i) – (vii).  Again – there is no evidence of any such notifications in the record.  The absence of evidence of any of these notifications also permits a jury to conclude that Victoria Johnson was not on FMLA leave when she was being withheld from service.  Since there is no evidence in the record that anyone specifically relied upon those requests in failing to return Victoria Johnson to work or that she actually was on FMLA leave, a jury can conclude that she never was on FMLA leave

UHPS' contention that Victoria Johnson cannot establish that she was improperly regarded as disabled because she purportedly "can not identify what impairment she thinks Physicians Services perceived her as having" (MSJ, at 13) is meritless.  Dr. Pallas' report clearly indicates that the basis for the referral was "to assess for the presence of mental illness."  UHPS' purpose in ordering the fitness for duty evaluation is clear and not disputed.

UHPS mischaracterizes Dr. Pallas' report when the claim that reinstatement was improper because Dr. Pallas "determined that Plaintiff should see a psychiatrist" (MSJ at 8).  The fact that Dr. Pallas recommended follow-up care with a psychiatrist does not translate into a conclusion by Dr. Pallas that Victoria Johnson was incapable of performing her job.  In more general terms, a medical professional's recommendation of follow-up care for any type of condition is not a *de facto* finding of incapacity or inability to work.  UHPS' mischaracterization of Dr. Pallas' report is directly contrary to his explicit findings that "I do not believe that Ms. Johnson is suffering from any Axis I psychiatric condition that would impair her ability to work in general" and "I do not think that she is psychiatrically unable to work."  Had Dr. Pallas felt that Victoria Johnson needed to remain off of work pending further psychiatric counselling, he would have said so.  He did not.  There simply is no evidence in the record that supports UHPS' failure to reinstate Victoria Johnson after Dr. Pallas cleared her.

III.  **GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER UHPS TERMINATED VICTORIA JOHNSON FOR INSUBORDINATION (AS IT CLAIMS) OR IN RETALIATION FOR FILING A CHARGE OF DISCRIMINATION WITH THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

The ADAAA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]."  42 U.S.C. §12203(a).  ADAAA retaliation cases are governed by the familiar burden-shifting established in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248

(1981) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). See *EEOC v. Ford Motor Company*, ___ F.3d ___, ___ (6th Cir. April 22, 2014).

"[T]he burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). To establish a *prima facie* case of retaliation, a plaintiff must prove that (1) he or she engaged in activity protected by the ADAAA and/or R.C. 4112.02(I); (2) this exercise of protected rights was known to defendant; (3) defendant therefore took an adverse action against the plaintiff, or the plaintiff was subjected to severe or retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). At the summary judgment stage, a party need ***not*** prove his or her prima facie case of retaliation by a preponderance of the evidence. *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004). When addressing the *prima facie* case, a Court should be looking at the evidence independent of the nondiscriminatory reason proffered by the defense as its reason for the adverse action. *A.C. v. Shelby County Board of Education*, 711 F.3d 687, 699 (6th Cir. 2013); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000).

Once a *prima facie* case has been made, the burden of production of evidence shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *Morris*, 201 F.3d at 793. If the employer carries its burden of production, the burden shifts back to the employer to show that the proffered reason was not the true reason for the adverse employee action but instead is pretext. *Morris*, 201 F.3d at 793. However, the plaintiff is ***not*** required to produce additional independent evidence of retaliation to overcome summary judgment. The plaintiff need only produce sufficient evidence to rebut – not disprove – the defendant's proffered rationale to overcome summary judgment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149 (2000); *Shazor v. Professional*

*Transit Management, LTD,* 744 F.3d 948, 957 (6th Cir. 2014); *Griffin v. Finkbeiner,* 689 F.3d 584, 593 (6th Cir. 2012); *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007).

The *sine qua non* of any retaliation case is intent. Intent is inherently a question of fact. The Sixth Circuit has held that caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence and that once a prima facie case is established either by the introduction of direct evidence or reliance on the McDonnell Douglas presumption, summary judgment for the defendant ordinarily will not be appropriate on any ground pertaining to the merits because the crux of a retaliation dispute is the elusive factual question of intentional discrimination. *EEOC v. Ford Motor Company*, ___ F.3d ___, ___ (6th Cir. 2014); *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 (6th Cir. 2004) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 8 (1981)). Even where all the other basic facts are undisputed, if the question of motivation itself is the sole issue in dispute, summary judgment may not be granted. *Hunt v. Crawford*, 526 U.S. 541, 549 (1999). When these principles are properly applied to this case, summary judgment is improper.

### A.  Victoria Johnson Has Established A Prima Facie Case Of Retaliation

UHPS does not dispute that Victoria Johnson engaged in protective activity when she filed her Charge of Discrimination with the EEOC and does not dispute that UHPS was aware that she had engaged in protected activity at the time that it fired her. UHPS does not dispute that Victoria Johnson sustained an adverse employment action when she was terminated.

UHPS focuses its attack on the causation element of the prima facie case. At the prima facie stage, the plaintiff's burden to show causation is minimal and requires merely that the plaintiff put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity. *A.C.*, 711 F.3d at 699; *Nguyen*, 229 F.3d at 566. This evidence simply must allow for an inference *** that the adverse action would not have been taken had the plaintiff not engaged in protected activity. *A.C.*, 711 F.3d at 699; *Nguyen*, 229 F.3d at 563.

23

In attacking the causation element of the prima case, UHPS focuses primarily on Victoria Johnson's alleged insubordination (MSJ at 16).  This is error.  Sixth Circuit precedent is very clear that when addressing the *prima facie* case, a Court should be looking at the evidence independent of the nondiscriminatory reason proffered by the defense as its reason for the adverse action.  *A.C.*, 711 F.3d at 699; *Cline,* 206 F.3d at 660.  Since insubordination is UHPS proffered non-retaliatory reason for terminating Victoria Johnson, the issue of whether or not insubordination occurred should not be considered for purposes of determining whether or not a prima facie case has been established.

Contrary to UHPS' contention (MSJ at 16), causation in this case is not premised simply upon "conjecture" and "personal belief."  Causation in this case can be demonstrated by the close temporal proximity between the time when Victoria Johnson notified UHPS that she had filed her Charge of Discrimination with the EEOC (October 4, 2012) and her termination on October 8, 2012 – a mere four days.  Precedent from the Sixth Circuit is very clear that close temporal proximity can be sufficient to show causation.  See, e.g., *Montell v. Diversified Clinical Services, Inc.*, ___ F.3d ___, ___ (6th Cir. June 27, 2014) (where only one day passed between protected activity and ultimatum form supervisor to quit or be fired, plaintiff presented sufficient evidence  which "were the jury to believe her story, they could make the reasonable inference that the adverse employment action is so close in time after an employer learns of a protected activity that the action was caused by that activity"); *A.C.* 711 F.3d at 699 ("temporal proximity can often help meet this causal burden . . . and when the adverse action comes 'very close in time' after the exercise of protected activity, 'such temporal proximity . . . is significant enough' to meet the burden alone."); *Mickey v. Ziedler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  For purposes of the prima facie case, causation has been established and the real focus is appropriately on the issue of pretext..

**B.**    **Genuine Issues Of Material Fact Exist As To Whether UHPS' Proffered Non-Retaliatory Reason For Terminating Victoria Johnson Was Pretextual**

As UHPS concedes, summary judgment can be overcome if there are genuine issues of material fact as to whether the proffered reason has a basis in fact (MSJ at 18).  The **_sole_** non-retaliatory reason proffered by UHPS is its contention that Victoria Johnson "refus[ed] to perform a primary function of her job as instructed by her supervisors" (MSJ at 17).  It is quite clear from UHPS' motion that it relies **_entirely_** upon the investigation allegedly conducted by Wahl and Meisler to support its contention that the manner in which Victoria Johnson's supervisors were instructing her to complete the 855I forms was acceptable to CGS and that Victoria Johnson was being insubordinate in refusing to do what UHPS claims CGS said she could do.

UHPS' argument is premised **_entirely_** upon inadmissible hearsay evidence.  UHPS relies solely upon Meisler's description of unsworn statements allegedly made to her during phone conversations she claims to have had with management personnel at CGS regarding the proper direct contact number to be used.  Meisler's testimony as to these alleged conversations is classic hearsay.  Hearsay is an out-of-court statement offered for the truth of the matter asserted therein.  Fed. R. Evid. 801(c).  Hearsay is inadmissible – Meisler would not be able to testify as to what she allegedly was told by CGS personnel at the trial of this case.  Fed. R. Evid. 802.  A court cannot rely upon inadmissible hearsay when ruling upon a summary judgment motion.  See, e.g., *Shazer*, 744 F.3d at 960-961; *Hoover v. Walsh*, 682 F.3d 461, 491 n. 34 (6th Cir. 2012); *Owhor v. St. John Health-Providence Hospital*, 503 F.App'x 307, 313 (6th Cir. 2012); *Ford v. Securitas Security Services, USA, Inc.*, 338 F.App'x. 483, 487-488 (6th Cir. 2009); *Quinn-Hunt v. Bennett Enterprises, Inc.*, 211 F.App'x 452, 458 (6th Cir. 2006).

The statements attributed to CGS personnel by Meisler are unsworn and were made out of court.  They have been offered for the truth of the matters claimed therein – both Meisler and Wahl admitted as much and further denied that they would have instructed Victoria Johnson to do use her own number as a direct contact number for the providers if they felt that what CGS allegedly told them

was wrong.  There are no applicable exceptions to the hearsay rule that would allow these alleged conversations to be admitted into evidence.

Beyond Meisler's hearsay testimony, there simply is no evidence in the record that corroborates the alleged investigation or what Meisler claims to have been told.  There are no affidavits or deposition testimony from any of the CGS personnel whom Meisler allegedly spoke with that in any manner corroborates what Meisler claims she was told.  There are no emails from anyone at CGS confirming what Meisler alleges was stated.  There is absolutely no admissible evidence in the record confirming that anyone from CGS told Meisler what she claimed she was told – much less that these conversations even occurred.  The burden is on UHPS to show that the alleged investigation upon which it bases its defense of insubordination actually took place, and a jury is not required to conclude that the investigation actually took place based upon the state of the record that UHPS has presented.

Because UHPS has not presented any admissible evidence showing that it was proper for it to be instructing Victoria Johnson to use her direct-dial number and the UHPS address as the contact information on the 855I form, a jury is not required to conclude that Victoria Johnson was being insubordinate in refusing to complete the 855I forms in the manner that her supervisors instructed her to.  Because the **_only_** admissible evidence in the record as to how to properly complete the 855I forms that actually comes from CGS are the various emails to Victoria Johnson contradicting Meisler and specifically instructing her that it was impermissible to be using her direct dial number and UHPS' address in the contact information section of the 855I forms, a reasonable jury can conclude that Victoria Johnson refused to lie – not that she refused to perform an essential function of her job.

Looking at the overall state of the record in this case, a reasonable jury can conclude that UHPS punished Victoria Johnson for refusing to lie by ordering her to undergo an improper fitness for duty exam to determine whether she suffered from mental illness, and that they continued the punishment by refusing to return her to duty when Dr. Pallas found no evidence of mental illness.  If true – this would constitute a violation of the ADA (and UHPS does not specifically deny that).  A jury is not

26

required to believe that Victoria Johnson was actually on FMLA as UHPS claims.  A jury can conclude that Victoria Johnson was justified in filing a Charge of Discrimination with the EEOC and notifying UHPS of that after she had not been returned to work.

Finally, a reasonable jury can conclude from the overall state of the record that Victoria Johnson was not terminated for "refusing to perform and essential job function" but in retaliation for filing a Charge of Discrimination against UHPS after it failed to reinstate her after the fitness for duty examination revealed that Victoria Johnson was not suffering from any psychiatric condition that would impair her ability to work.  On the record in this case, summary judgment is not warranted.

## CONCLUSION

For the foregoing reasons, defendant's summary judgment motion should be denied.

Respectfully Submitted,


*s/Mark P. Herron*
Mark P. Herron (0051998)
75 Public Square, Suite 920
Cleveland, Ohio  44113
(216) 280-2828  FAX (216) 696-0075
email: herronlaw@msn.com

Attorney for Plaintiff