IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VICTORIA JOHNSON, | ) | CASE NO.  1:13 CV 2012 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| UNIVERSITY HOSPITALS | ) | |
| PHYSICIAN SERVICES, | ) | |
| | ) | |
| Defendant. | ) | MEMORANDUM OPINION |

This matter is before the Court on the Motion for Summary Judgment filed by Defendant, University Hospitals Physician Services ("Physician Services") (Docket #27).   Pursuant to Fed. R. Civ. P. 56, Physician Services seeks summary judgment as to all of the claims asserted by Plaintiff, Victoria Johnson.

I.     **Factual Background**.

Ms. Johnson began her employment with Defendant, Physician Services, on or about September 7, 2008, as a Provider Enrollment Clerk and was later promoted to Provider Enrollment Specialist.  Her immediate supervisor was Provider Service Manager Sheryl Johnson. Sheryl Johnson reported to Steve Riddle, the Director of Billing Services.  As a Provider Enrollment Specialist, Ms. Johnson's job duties consisted primarily of enrolling medical treatment providers for approval by the Center for Medicare and Medicaid Services ("CMS") so

that they could provide treatment to federal Medicare and Medicaid recipients.  (Deposition of Victoria Johnson, "Johnson Depo.", at pp. 14-15).  Enrollment is facilitated through completion of a "CMS 855-I Form" by Physician Services for the medical providers.  Ms. Johnson, and three other Provider Enrollment Specialists, were responsible for completing the Forms, which were then submitted to Cigna Government Services ("CGS"), a government contractor that completes the provider enrollment process for Medicare.  (Affidavit of Sheryl Johnson, "Sheryl Affidavit", at Paragraphs 6-8.)  Ms. Johnson was not responsible for billing.

Specific guidelines for completing the CMS 855-I Form are found within the CMS Program Integrity Manual.  Section 2B of the CMS 855-I Form requests direct contact information for the medical provider.  The guidelines state that the "correspondence address must be one where the contractor can directly contact the applicant" and that it "cannot be the address of a billing agency, management services organization, chain home office, or the provider's representative." (CMS Program Integrity Manual, 15.5.2.2 (A).)  In completing the CMS 855-I Form, it was the practice of the Physician Services Provider Enrollment Specialists to use their individual work phone numbers, rather than the provider's direct phone number, as the contact number.  Ms. Johnson asserts that she was directed by her Physician Services supervisors to place her contact number in Section 2B of the CMS 855-I, which she believed to be contrary to the requirements set forth in the Program Integrity Manual.  Physician Services asserts that it was most efficient for CGS to contact the Provider Enrollment Specialist if there were questions on the application. (Sheryl Affidavit at Paragraph 9.)

### Ms. Johnson's Complaint Regarding Co-Worker

In February 2012, Ms. Johnson reported to Physician Services that one of her co-workers

-2-

was fondling himself. (Johnson Depo. at pp. 20-22.) As a result, Ms. Johnson's supervisor, Sheryl Johnson, and the human resource generalist, Christina Morrison, immediately asked Ms. Johnson if she wanted to move her desk. (Ms. Johnson Depo. at p. 26.) Ms. Johnson declined. (Id.) An investigation was completed within days, resulting in no confirmation that the co-worker fondled himself. (Johnson Depo. at p. 26; Sheryl Johnson Affidavit at Paragraph 3; Christina Morrison Affidavit at Paragraph 3.) Regardless, the co-worker was moved to a different area of the building and Ms. Johnson never asked Physician Services to do anything more regarding the co-worker. (Johnson Depo. at pp. 26-27.) Ms. Johnson stated during deposition that the situation caused her great stress in the following months. (Johnson Depo. at pp. 105-09.)

**Ms. Johnson's 2011 Performance Evaluation; Sleeping.**

In March 2012, Ms. Johnson met with Sheryl Johnson and Mr. Riddle to go over her 2011 Performance Evaluation. The review indicated that Ms. Johnson did not display a positive attitude; needed a better understanding of the rejection reports; needed to improve her communication with provider contacts; and, Ms. Johnson was requested to maintain more professionalism by not nodding off at meetings. (Johnson Depo. at pp. 29; 146-54; Ms. Johnson's 2011 UH Performance Evaluation, March 6, 2012, Exhibit 5 to Defendant's Motion for Summary Judgment.) Ms. Johnson was also presented with two "Corrective Actions" regarding problems with 855-I Forms she had completed. Ms. Johnson disputed the Corrective Actions. Sheryl Johnson and Mr. Riddle admitted they made a mistake in giving Ms. Johnson the Corrective Actions and said Actions were not placed in Ms. Johnson's 2011 review or her personnel file. (Johnson Depo. at pp. 29-32.)

During her deposition, Ms. Johnson admitted she would nap while at work and that her 2011 performance review accurately indicated that she was "nodding off" during meetings. (Johnson Depo. at pp. 41 and 153.)   On April 3, 2012, Sheryl Johnson advised Ms. Johnson that if she was going to sleep at her desk, she must put up a sign indicating that she was on break. (Johnson Depo. at pp. 41-42 and 155; Email from Sheryl Johnson to Victoria Johnson dated April 3, 2012, Exhibit 6 to Defendant's Motion for Summary Judgment; Affidavit of Sheryl Johnson at  Paragraph 13.) Ms. Johnson stated during deposition that sometimes she used a sign, and other times she did not. (Johnson Depo. at p. 42.) Ms. Johnson also noted that there was no official policy at that time against napping. (Johnson Depo. at pp. 41-42.) In June 2012, Ms. Johnson told Sheryl Johnson that she had to miss work because the medication she had started taking caused her to be drowsy. (Johnson Depo. at p. 38.)

On July 6, 2012, one of Ms. Johnson's co-workers observed her sleeping at her desk, with a blanket, for over 15 minutes. (Johnson Depo. at pp. 175-76; Memorandum from Kristen Johnson to Sheryl Johnson, Exhibit 7 to Defendant's Motion for Summary Judgment.) The co-worker "had to wake her up to ask if she was okay." (Defendant's Motion for Summary Judgment at p. 5, citing Johnson Depo at pp. 174-75; Affidavit of Sheryl Johnson at Paragraph 7.) On July 17, 2012, the Human Resource Generalist, Christina Morrison, found Ms. Johnson sleeping at her desk and had to wake her up. (Johnson Depo. at pp. 174-75; Affidavit of Christina Morrison at Paragraph 7.)

There was no official written policy regarding napping at that time.  However, on July 16, 2012 and July 17, 2012, Ms. Johnson's superiors exchanged emails discussing the matter as follows:

-4-

July 16, 2012 - Steve Riddle emails Christina Morrison, asking what the recourse is if an employee is sleeping during work hours and it is clearly identified by managers or employees. Ms. Morrison responds the matter that they will discuss the next day, but that she was looking for witness statements, manager statement and what was said to the employee. The email does not identify Ms. Johnson by name. Mr. Riddle responds that Sheryl Johnson would provide the details given to her by other employees.

July 17, 2012 – Sheryl Johnson emails Steve Riddle, indicating she asked two employees who witnessed the sleeping for statements and that once the statements were complete Ms. Johnson would be called in for a meeting and an "anecdotal" placed in her file. Later that day, Ms. Morrison sent Sheryl Johnson and Mr. Riddle as response that she went to talk to Ms. Johnson and found her sleeping at her desk and woke her up to ask if she was okay. Ms. Johnson stated yes and that she was on a break. Ms. Morrision asked Sheryl Johnson and Mr. Riddle what the policy was regarding rest/sleeping at desks.

(Deposition of Steve Riddle at Plaintiff's Exhibit 1.)

In July 2012, Physician Services' policies were amended to prohibit employees from napping at their work stations while on break.

**Dispute regarding provider phone number.**

In June 2012, Ms. Johnson voiced concerns about placing her personal work phone number, rather than a direct provider number, in Section 2B of the CMS 855-I Form. Ms. Johnson asserts that she was concerned about whether she was acting lawfully in preparing the 855-I Form as directed, given that the Form specifically includes notice of the criminal statutes that may be violated in the event false information is provided. (Defendant's Motion for Summary Judgment at Exhibit 2.) Ms. Johnson asserts that based on concerns within Physician Services over the provider number, Mr. Riddle then directed the Provider Enrollment Specialists to answer the phone when CGS called so as not to indicate that Physician Services was a billing service. (Deposition of Steve Riddle, "Riddle Depo.", at p. 94, Exhibit 3.)

Ms. Johnson asserts that numerous CMS 855-I Forms were rejected by CGS because they could not directly reach the provider at the number provided. Physician Services states that Ms.

Johnson admitted during deposition that certain 855-I Forms she completed were returned because she refused to answer CGS's calls to verify that the provider could be reached at the phone number in Section 2B.  (Johnson Depo. at pp. 35-37.)  Once Ms. Johnson answered the calls, the Forms were approved.  (Johnson Depo. at pp. 37-38.)

In July 2012, Ms. Johnson refused to verify to CGS that providers could be reached at her phone number.  (Johnson Depo. at pp. 43-44.)  Ms. Johnson believed it to be "unethical" to use her phone number on the 855-I Form.  (Johnson Depo. at pp. 168-69)  Ms. Johnson called University Hospitals' compliance hotline and made a complaint about the requirement that she use her phone number.  (Johnson Depo. at p. 48.)  Carole Meisler, the Physician Services Compliance Officer, was assigned to investigate Ms. Johnson's Complaint.  (Ms. Johnson's Depo. at p. 227-29.)

On July 17, 2012, Ms. Meisler called CGS to discuss Ms. Johnson's concerns. (Deposition of Carole Meisler, "Meisler Depo.", at pp. 28-29.)  Ms. Meisler then emailed Ms. Johnson and advised her that she spoke with CGS and they explained there was no expectation that a provider would answer the phone and that the expectation is that support personnel would answer the phone and relay messages to the provider as needed.  (Johnson Depo. at pp. 176-78; Email from Carole Meisler to Victoria Johnson, dated July 17, 2012, Exhibit 8 to Defendant's Motion for Summary Judgment.)

Numerous emails were exchanged between Ms. Johnson and Physicians Services personnel regarding this matter.  The Parties dispute whether an investigation regarding the proper way to complete the 855-I Form was ever really conducted by Physician Services. Physician Services asserts that it conducted an investigation and confirmed that the use of the

Provider Enrollment Specialist number was permitted. Ms. Johnson states that she was informed by two CGS representatives that the phone number provided must be the provider's direct number, not a billing service.

On July 20, 2012, Ms. Johnson advised Sheryl Johnson and Mr. Riddle that she would no longer put her phone number in Section 2B. (Email from Victoria Johnson to Steve Riddle, et al., dated July 20, 2012, Defendant's Motion for Summary Judgment at Exhibit 11; Sheryl Johnson Affidavit at Paragraph 17.) On July 23, 2012, Cheryl Wahl, University Hospital's Chief Compliance Officer, wrote Ms. Johnson a letter to address her on-going concerns regarding using her phone number in Section 2B. (Letter from Cheryl Wahl to Victoria Johnson dated July 23, 2012, Defendant's Motion for Summary Judgment at Exhibit 12.) Ms. Wahl advised Ms. Johnson that Ms. Meisler had contacted CGS and confirmed that Physician Services' current practice of using the Provider Enrollment Specialist's phone number in Section 2B was "both allowable and correct." (Id.)

On July 24, 2012, Ms. Johnson forwarded an email she received from CGS to Mr. Riddle, Sheryl Johnson, Ms. Meisler and Ms. Wahl, and questioned whether Physician Services' practice was acceptable. (Johnson Depo. at pp. 185-86; Email from Victoria Johnson to Steve Riddle, Exhibit 10 to Defendant's Motion for Summary Judgment; Sheryl Johnson Affidavit at Paragraph 16.) Ms. Meisler notified Ms. Johnson that it was acceptable to answer the phone on behalf of the provider. (Johnson Depo. at pp. 198-99; Email from Carole Meisler to Victoria Johnson dated July 24, 2012, Exhibit 13 to Defendant's Motion for Summary Judgment; Sheryl Johnson Affidavit at Paragraph 18.)

**July 26, 2012 Meeting – Fitness for Duty Referral.**

On July 26, 2012, Ms. Johnson met with Sheryl Johnson, Mr. Riddle and Ms. Morrison, at which time she was advised that because she was falling asleep at her desk she was being referred to University Hospital's Employee Assistance Program to undergo a fitness for duty evaluation and alcohol and drug screening. (Johnson Depo. at pp. 62-63.) Physician Services cited Impaired Functioning as the basis for the referral. The referral was made pursuant to University Hospitals, Policy and Procedure HR-85, Section 4.2.1, by which a supervisor may require an evaluation of an employees fitness for duty based on impaired functioning. (Document Bates Stamped UHPS Johnson - 1011.) Ms. Johnson asserts the referral was retaliatory in nature – either for challenging the use of her personal phone number of the 855-I Form or for reporting her co-worker's behavior earlier in the year.

After being notified of the referral, Ms. Johnson called her doctor, Dr. David Headen, and had him prepare FMLA paperwork for leave from July 26, 2012 through August 8, 2012. (Johnson Depo. at pp. 63 and 115-16; Certification of Physician, FMLA Medical Leave of Absence dated July 26, 2012, Defendant's Motion for Summary Judgment at Exhibit 15.) Dr. Headen indicated Ms. Johnson needed to be off work due to anxiety. (Defendant's Motion for Summary Judgment at Exhibit 15.) Ms. Johnson received a letter from Ms. Morrison dated July 26, 2012 that indicated that Ms. Johnson "ha[d] been placed on unpaid Administrative leave until further notice." (Morrison Depo. at Exhibit 7.)

On July 27, 2012, the day after receiving the referral, Ms. Johnson reported to Kathy Springer of the University Hospitals Employee Assistance Program. Ms. Johnson asserts that Ms. Springer indicated that the referral was made due to Ms. Johnson falling asleep at her desk.

-8-

(Johnson Depo. at p. 67.)  Ms. Springer asked that she complete drug and alcohol screening and referred her to Dr. Pallas for the fitness for duty evaluation.  (Johnson Depo. at p. 67.)   Also on July 27, 2012, Ms. Morrison sent Ms. Johnson a letter converting the unpaid "Administrative Suspension" into a paid "Administrative Leave for 5 days."  (Morrison Depo. Exhibit 8.)  The July 27, 2012 letter states that Ms. Morrison would contact Ms. Johnson once her return to work status was determined.  (Id.)

Ms. Johnson then met with Dr. James Pallas for the fitness for duty evaluation.  (Johnson Depo. at p. 69.)  Dr. Pallas's report indicated that the purpose of the evaluation "was to assess for the presence of mental illness" and to determine whether Ms. Johnson "was capable of performing her duties."  Issues of concern noted by Dr. Pallas were "falling asleep at work" and "a difficult relationship with her manager."  (Morrison Depo. at Exhibit 6.)  The examination was completed on July 31, 2012.  (Morrison Depo. at Exhibit 10.)  Dr. Pallas issued his findings on August 2, 2012.  Dr. Pallas stated he did not believe that Ms. Johnson was suffering from a psychiatric condition that would impair her ability to work in general and that he did not think that Ms. Johnson was psychiatrically unable to work, but believed she should see a treating psychiatrist.  (Id.)  Dr. Pallas recommended Ms. Johnson be given a two-week leave and that the treating psychiatrist needed to sign off on her return to work.  (Id.)

Ms. Springer then referred Ms. Johnson to a psychiatrist, Dr. Edward Dutton, who gave Ms. Johnson paperwork indicating she could return to work on September 4, 2012.  (Johnson Depo. at pp. 70, 303-306; FMLA Medical Leave of Absence dated August 4, 2012, Exhibit 16 to Defendant's Motion for Summary Judgment.)   Ms. Johnson agreed with Dr. Dutton's assessment that she could return to work on September 4, 2012.  (Johnson Depo. at p. 70.)

In a letter to Ms. Johnson dated August 14, 2012, University Hospitals notified Ms. Johnson that the prior "5-day Paid Administrative Leave" was converted to an "unpaid Administrative Leave effective August 10, 2012". Ms. Morrison notified Ms. Johnson that she would contact Ms. Johnson once her return to work status was determined. (Morrison Depo. at Exhibit 11.)

Physician Services states that on August 21, 2012, University Hospitals became aware Ms. Johnson was no longer under the care of Dr. Dutton. On August 30, 2012, University Hospitals wrote Ms. Johnson a letter explaining she would need to provide a new Medical Certificate for her FMLA leave[1] to continue and, that if she failed to do so, her FMLA leave would end as of August 21, 2012. (Johnson Depo. at pp. 308-10; Letter from Kara Ladaika to Victoria Johnson dated August 30, 2012, Exhibit 17 to Defendant's Motion for Summary Judgment; Morrison Affidavit at Paragraph 9.) Ms. Johnson did not provide any further documentation expressing a desire for FMLA leave, nor did she return to work in September 2012. (Johnson Depo. at pp. 308-10.) Ms. Johnson stated during deposition that she was waiting for return to work paperwork which she believed would come from Kathy Springer of the University Hospitals' Employee Assistance Program. (Johnson Depo. at p. 70.)

On October 1, 2012, having heard nothing from Ms. Johnson, Ms. Morrison advised Ms. Johnson that her leave ended August 21, 2012 and, that without further documentation, there was no basis for Ms. Johnson to remain off work. The letter stated that if Ms. Johnson did not return

---

[1]     Ms Johnson asserts repeatedly that she was never officially on FMLA leave, but does not raise any FMLA claims in her Amended Complaint. Whether or not the leave was FMLA leave, or something different, is immaterial to the disposition of Ms. Johnson's claims.

-10-

to work on October 8, 2012, her employment would be terminated.  (Johnson Depo. at pp. 310-11; Letter from Christina Morrison to Victoria Johnson dated October 1, 2012, Exhibit 18 to Defendant's Motion for Summary Judgment; Morrison Affidavit at Paragraph 10.)

Ms. Johnson states that on October 4, 2012, prior to receiving the October 1, 2012 letter, she filed a Charge of Discrimination with the EEOC and faxed notice to Physician Services.[2] Ms. Johnson received Ms. Morrison's letter on October 5, 2012.  Ms. Johnson then wrote Ms. Morrison, providing a list of expectations upon her return to work, stating that while she would return to work, she would not follow her supervisors' instructions to place her personal work phone number in Section 2B and asked that she not be required to prepare forms that were "prohibited or in violation of their rules."  (Johnson Depo. at pp. 262-63; Letter from Victoria Johnson to Christina Morrison, Exhibit 19 to Defendant's Motion for Summary Judgment; Morrison Affidavit at Paragraph 11.)  Ms. Johnson states that she also notified Ms. Morrison that she had filed the EEOC charge.

On October 8, 2012, Ms. Johnson reported back to work at Physician Services and met with Ms. Morrison and Angelique Sunagel, Physician Services' Director of Human Resources.  (Johnson Depo. at p. 261; Morrison Affidavit at Paragraph 12; Affidavit of Angelique Sunagel at Paragraph 3, Exhibit 20 to Defendant's Motion for Summary Judgment.)  Ms. Johnson explicitly stated she would not complete the 855-I Forms as instructed by her supervisors and, in response, was told that her concerns about using her phone number in Section 2B were previously

---

[2]
      In the Amended Complaint, Ms. Johnson states the Charge of Discrimination was filed on October 10, 2012.

addressed and she would be expected to perform her job duties as directed.  (Johnson Depo. at pp. 261-62; Morrison Affidavit at Paragraph 12; Sunagel Affidavit at Paragraphs 3-5.)

Ms. Johnson refused to comply; was warned by Sunagel that refusal would result in termination; and, Sunagel offered Ms. Johnson 24 hours to reconsider her decision.  (Johnson Depo. at pp. 266-68; Sunagel Affidavit at Paragraphs 3-5; Morrison Affidavit at Paragraph 12.) Ms. Johnson stated she did not need 24 hours to reconsider and that she was not going to complete the Forms as instructed.  (Id.)

Physician Services terminated Ms. Johnson's employment on October 8, 2012 for what it deemed was the refusal to perform an essential function of her job.  (Letter from Christina Morrison to Victoria Johnson dated October 8, 2012, Exhibit 21 to Defendant's Motion for Summary Judgment; Morrison Affidavit at Paragraphs 12-13; Sunagel Affidavit at Paragraphs 3-5.)

## II.    Procedural History.

Ms. Johnson filed her Amended Complaint on September 26, 2013, asserting two claims for relief.  (Docket #9.)  In her First Claim for Relief, Ms. Johnson alleges she was discriminated against by Physician Services on the basis of perceived disability and retaliated against for having filed a Charge of Discrimination against Physician Services, in violation of the Americans With Disabilities Act ("ADA").  In her Second Claim for Relief, Ms. Johnson alleges that Physician Services' removal of her from her employment and subsequent termination constituted unlawful discrimination on the basis of a perceived disability and that she was retaliated against for filing a Charge of Discrimination, in violation of Ohio Rev. Code §§ 4112.02(A) and (I).

Physician Services filed its Motion for Summary Judgment on June 6, 2013.  (Docket

-12-

#27.) Ms. Johnson filed her Brief in Opposition on July 17, 2014. (Docket #35.) Physician

Services filed its Reply Brief on July 28, 2014. (Docket #37.) Ms. Johnson filed a Supplemental

Brief in Opposition to Physician Services's Motion for Summary Judgment on August 14, 2014.

(Docket #44.)

### III.    Summary Judgment Standard.

Summary judgment is appropriate when the court is satisfied "that there is no genuine

dispute as to any material fact and that the moving party is entitled to a judgment as a matter of

law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine dispute"

rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of
> informing the district court of the basis for its motion, and identifying those portions
> of 'the pleadings, depositions, answers to interrogatories, and admissions on file,
> together with affidavits, if any,' which it believes demonstrates the absence of a
> genuine [dispute] of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). As a general matter,

the district judge considering a motion for summary judgment is to examine "[o]nly disputes

over facts that might affect the outcome of the suit under governing law." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution will affect the

outcome of the lawsuit. *Id.* The court will not consider non-material facts, nor will it weigh

material evidence to determine the truth of the matter. *Id.* at 249. Determination of whether a

dispute is "genuine" requires consideration of the applicable evidentiary standards. The court

will view the summary judgment motion in the light most favorable to the party opposing the

motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In sum,

proper summary judgment analysis entails "the threshold inquiry of determining whether there is

the need for a trial--whether, in other words, there are any genuine factual [disputes] that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

## III. Discussion.

The Court has thoroughly and exhaustively reviewed the claims raised by Ms. Johnson in this action; Physician Services' Motion for Summary Judgment and the briefing responsive thereto; and, all supporting documentation, including a detailed analysis of the deposition testimony and evidentiary materials submitted by both Parties.[3]

Reviewing Physician Services' Motion for Summary Judgment in the light most favorable to Ms. Johnson, there are no genuine disputes as to any material facts in this case and

---

[3]

The Court has thoroughly and exhaustively reviewed the Complaint, in conjunction with the Briefs submitted by the Parties and the documentation and depositions filed in support thereof, for purposes of deciding whether summary judgment is appropriate. The Court gives deference to evidence presented by the non-moving party, in this case Ms. Johnson, in the event of any conflict.

-14-

Physician Services is entitled to summary judgment as to all of the claims raised in the Amended

Complaint.  The undisputed evidence establishes that Ms. Johnson was lawfully referred for a

fitness for duty examination based on the fact that she was repeatedly found sleeping at her desk.

Ms. Johnson was later terminated for failing to follow the instructions of her supervisors.  There

is no evidence linking Ms. Johnson's fitness for duty examination to any discriminatory or

retaliatory motive on the part of Physician Services.  Ms. Johnson has wholly failed to

demonstrate that Physician Services discriminated against her on the basis of a disability,

perceived or otherwise, or that she was retaliated against, in violation of either the ADA or Ohio

law.

> A.  **Discrimination Based On Disability - ADA and Ohio Law.**

In her First Claim for Relief, Ms. Johnson alleges, in part, that she was discriminated

against by Physician Services on the basis of perceived disability in violation of the ADA.  42

U.S.C. § 12112(a).  In her Second Claim for Relief, Ms. Johnson alleges, in part, that Physician

Services' removal of her from her employment and subsequent termination constituted unlawful

discrimination on the basis of a perceived disability in violation of R.C. 4112.02(A) and (I).

The ADA prohibits discrimination "against a qualified individual with a disability

because of the disability of such individual in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions or privileges of employment."  42 U.S.C. § 12112(a).  Likewise, Ohio Rev. Code §

4112.02(A) provides:

> "It shall be an unlawful discriminatory practice "[f]or any employer, because of
> the ... [disability] ... of any person, to discharge without just cause, to refuse to
> hire, or otherwise to discriminate against that person with respect to hire, tenure,
> terms, conditions, or privileges of employment, or any matter directly or indirectly

-15-

related to employment."

The essential elements of a claim brought under the ADA and the Ohio handicap discrimination statute are the same. Therefore, case law regarding claims brought under the ADA applies equally to claims brought under the Ohio statute." *Hoffman v. Fidelity Brokerage Servs., Inc.*, 959 F. Supp. 452, 457 n.1 (S.D. Ohio 1997) (citation omitted); see also *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 697 N.E.2d 204, 206-07 (Ohio 1998) ("The federal [ADA] is similar to the Ohio handicap discrimination law. . . . We can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law.").

In order to establish a claim under the ADA or Ohio law, the plaintiff must show that (a) he was disabled, (b) was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation, and (c) he suffered an adverse employment action because of a disability. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir.1996), abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2011) (en banc). The alleged discrimination must have been a "but-for" cause of the employer's adverse decision. *Lewis*, 681 F.3d at 321.

An individual is considered "disabled" under the ADA if she (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such impairment, or (3) is regarded by her employer as having such an impairment. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999); see also, 42 U.S.C. § 12102(2)(A)-(C). An individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially

-16-

limit, a major life activity.  29 C.F.R. § 1630.2(l)(1) (emphasis added). "Whether an individual's impairment 'substantially limits' a major life activity is not relevant to coverage under paragraph (g)(1)(iii) (the 'regarded as' prong) of this section." § 1630.2(j)(2).

If the plaintiff presents evidence of a prima facie case, then the defendant may produce evidence of a legitimate non-discriminatory reason for its actions.  The plaintiff must then introduce evidence to show that the defendant's reason was a mere pretext for illegal discrimination.  At all times, the plaintiff bears the ultimate burden of persuasion.  *See Monette*, 90 F.3d at 1186.

"An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998). "In order to prove pretext, therefore, the plaintiff must introduce admissible evidence to show that the proffered reason was not the true reason for the employment decision and that discriminatory animus was the true motivation driving the employer's determination." *Grace v. USCAR*, 521 F.3d 655, 677-78 (6th Cir. 2008). "An employer may make employment decisions "'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Brown v. Renter's Choice, Inc.*, 55 F. Supp. 2d 788, 795 (N.D. Ohio 1999) (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984)).

## 1.    Fitness for Duty Examination.

The ADA's prohibition against discrimination includes the prohibition of certain medical examinations and inquiries, stating, "A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a

disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

Employers are permitted to conduct voluntary medical examinations and make inquiries into the ability of an employee to perform job-related functions. *Kroll v. White Lake Ambulance Authority*, 691 F.3d 809, 815, n.7 (6th Cir. 2012). Medical examinations by employers are permitted "in limited circumstances," confined by "job-relatedness" and "business necessity" requirements. *Id.* (citing *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998) ("[T]he statute was intended to prevent against 'medical tests and inquiries that do not serve a legitimate business purpose'") (citation omitted). The EEOC has explained that this restriction reflects Congress's intent to protect the rights of applicants and employees to be assessed on merit alone, while protecting the rights of employers to ensure that individuals in the workplace can efficiently perform the essential functions of their jobs. *Kroll*, 691 F.3d at 815 (citation omitted).

"[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan v. River Valley Sch.* Dist., 197 F.3d 804, 811 (6th Cir. 1999). Moreover, "any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Id.* at 812. "A job function is essential if its removal would fundamentally alter the position." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001) (quotations marks and citations omitted). Health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination, even if the examination might disclose whether the employee is disabled or the extent of any disability. *Sullivan*, 197 F.3d at 812 (citation omitted). The same is

true for ordering a mental examination when aberrant behavior similarly affects an employee's job performance. *Id.*

Fitness for duty examinations do not establish a perception of disability and such examinations are not adverse employment actions in the context of civil rights statutes. See *Harrison v. City of Akron,* 43 F. App'x 903, 905 (6th Cir. 2002) ("Psychological examinations and internal investigations are not adverse actions.") (citation omitted); *Bennett v. Roadway Express, Inc.*, No. 20317, 2001 Ohio App. LEXIS 3394, 2001 WL 866261, at *8 (Ohio Ct. App. Aug. 1, 2001) ("an employer's requirement that an employee submit to a psychiatric evaluation to determine whether the employee could continue to fulfill the essential functions of the position is not tantamount to a perception by the employer that the employee is disabled") (citing *Sullivan,* 197 F.3d at 810-11).

Physician Services' referral of Ms. Johnson for a fitness for duty examination, and drug and alcohol screening was justified based on the uncontroverted evidence that Ms. Johnson was repeatedly sleeping at her desk. Physician Services formally raised the issue of Ms. Johnson sleeping at her desk in her 2011 Performance Evaluation, but Ms. Johnson was still napping at her desk in 2012, up until the time she was referred for examination. The issue was addressed with Ms. Johnson on multiple occasions. Regardless of the reason Ms. Johnson was napping at her desk, and regardless of whether Ms. Johnson was able to adequately complete her work when awake, the napping was affecting job conditions enough that other employees had to wake her up and had raised concerns to their supervisors. Further, Ms. Johnson indicated during deposition that in a meeting with Steve Riddle, Sheryl Johnson and Tina Morrision, she stated that falling asleep at her desk "was out of her control." (Johnson Depo. at p. 63.)

Clearly, the ability to stay awake at work is an essential function of most any job. Ms.

Johnson argues there was no policy prohibiting Provider Enrollment Specialists from taking a nap on their break at that time and that it did not impact her ability to complete her work. (Brief in Opposition at p. 16.) However, repeatedly finding an employee asleep at her desk, for whatever reason, whether on break and whether or not there is an official policy banning such behavior,[4] is a legitimate business concern and it was reasonable for Physician Services to contemplate whether Ms. Johnson could continue to fulfill her job requirements. Accordingly, this Court concludes that Physician Services did not violate the ADA by requiring Ms. Johnson to undergo a fitness for duty examination and drug and alcohol testing.

### 2.  Return to Work.

Ms. Johnson argues that even if the fitness for duty examination was justified, Physician Services' failure to reinstate her after Dr. Pallas concluded on August 2, 2012 that she was not psychiatrically unable to work was unjustified. Ms. Johnson's argument seems to be that the failure to reinstate her sooner is proof that Physician Services regarded her as disabled and that the failure to reinstate her sooner is an adverse employment action under the ADA.

As stated above, Physician Services had a lawful basis, under the facts and circumstances of this case, for referring Ms. Johnson for a fitness for duty examination and a fitness for duty examination does not establish a perception of disability. Further, there is no evidence to establish that Ms. Johnson's leave, or the duration of her leave, was the result of Physician Services regarding her as disabled. However, even had Ms. Johnson presented evidence that Physician Services regarded her as disabled, and satisfied the elements of a prima facie case of

---

[4]     Physician Services' policies were amended in July 2012 to prohibit employees from taking naps at their work stations during breaks.

disability discrimination, which this Court does not find, she has failed to offer evidence that the reasons given by Physician Services for failing to return her to work were a pretext for discrimination.

Physician Services asserts, and the evidence demonstrates, The fact that Ms. Johnson was not invited to return to work sooner was based on the fact that Physician Services had not received documentation releasing her to work. Ms. Johnson has failed to prove this was a pretext for disability discrimination. The certifications provided by various doctors indicated the need for Ms. Johnson's leave to extend through September 4, 2012. The record demonstrates Physician Services worked to honor the recommendations of the Ms. Johnson's doctors and, that when the requested leave period expired, Physician Services offered Ms. Johnson the opportunity to document the need for more leave or return to work. The record reflects continuous correspondence by letter from University Hospitals and/or Physician Services to Ms. Johnson, as well as email communication between Ms. Johnson and various University Hospitals and/or Physician Services Employees, throughout Ms. Johnson's leave.

On August 30, 2012, Ms. Johnson was notified that in order to remain on leave, she would need to provide additional documentation no later than September 7, 2012. Ms. Johnson did not respond to that request for additional documentation and states that she was waiting for return to work information from Ms. Springer. Even if there was a miscommunication as to who was to provide the return to work information, this does not in any way suggest that Physician Services was discriminating against Ms. Johnson. The evidence, at best, reflects a miscommunication, not the failure to reinstate based on a perception of disability.

On October 1, 2012, a month later, Ms. Morrison of Physician Services sent a letter to Ms. Johnson, indicating that they had not heard from her; had not received the requested

-21-

documentation; and, that Ms. Johnson was expected to return to work on October 8, 2012.  Ms. Johnson returned to work on October 8, 2012.  Ms. Johnson's belief that she could have returned to work sooner is not evidence that Physician Services discriminated against her.

Ms. Johnson also argues that the timing of the request that Ms. Johnson undergo a fitness for duty examination creates an inference that the request was punitive – a direct result of her disagreement with her superiors regarding the proper way to fill out the 855-I Form.  Ms. Johnson argues because the disagreement occurred "between the alleged sleeping incidents and the issuance of the fitness for duty directive, a reasonable finder of fact can determine that fitness for duty evaluation was a punitive measure."  Brief in Opposition at p. 19.  Ms. Johnson, therefore, is arguing that she was retaliated against for disagreeing with her supervisors over the 855-I Form, not discriminated against based on a perceived disability.  Such a claim is not actionable under the ADA.

For all of the foregoing reasons, Ms. Johnson's ADA discrimination claim fails as a matter of law.

**B.      Retaliation under the ADA and Ohio Rev. Chapter 4112.**

Under the ADA, an employer may not "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. ' 12203(a).  Similarly, Ohio's anti-retaliation provision, at Ohio Rev. Code § 4112.02(I), provides that it shall be an unlawful discriminatory practice:

> For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

A prima facie case of retaliation requires a plaintiff to demonstrate that (1) he engaged in activity

protected by the ADA; (2) the defendant knew of the exercise of his protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and, (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009).   In order to establish causation, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not" engaged in protected activity. *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000).

Temporal proximity is insufficient in and of itself to establish causation. *See Nguyen v. City of Cleveland,* 229 F.3d 559, 567 (6th Cir. 2000) (refusing to find that temporal proximity was sufficient in itself to establish a causal connection, and declining to decide "how much evidence in addition to temporal proximity would be required"); *McNett v. Harden Comm. Fed. Credit Union,* 118 F. App'x 960, 965 (6th Cir. 2004) (unpublished) ("[T]he employer's knowledge of the protected activity coupled with an adverse action occurring close in time can create an inference of causation *where the particular circumstances strengthen the inference of causation."*) (emphasis added) (citing *Nguyen,* 229 F.3d at 566).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant "to produce evidence of a legitimate, nondiscriminatory reason for its actions." *Niswander v. Cincinnati Ins. Co.,* 529 F.3d 714, 720 (6th Cir. 2008). The plaintiff must then demonstrate that the legitimate reason is pretextual. *Id.* Ms. Johnson has not satisfied her burden.

Ms. Johnson presents no evidence, aside from temporal proximity, from which one could infer that she was terminated in retaliation for filing a Charge of Discrimination with the EEOC. As stated above, temporal proximity, standing alone, is insufficient to establish causation. Ms. Johnson was notified by letter dated October 1, 2012, that she was required to return to work no

later than October 8, 2012, because there was no basis for her continued leave. Ms. Johnson asserts that on October 4, 2012, prior to receiving said letter, she filed her charge of discrimination with the EEOC and faxed notice to Physician Services. On October 5, 2012, Ms. Johnson responded to the October 1, 2012 letter, indicating that she would return on October 8, 2012, but only under certain conditions and indicated that she would not use her personal work phone number in Section 2B of the 855-I form, as previously instructed by her supervisors.

Ms. Johnson returned to work on October 8, 2012 and was terminated **after** she expressed refusal to follow the instructions of her supervisors. Ms. Johnson was even offered 24 hours to reconsider her refusal. The undisputed evidence demonstrates that Physician Services invited Ms. Johnson to return to work on October 8, 2012, on the condition that she followed the directions of her supervisors. She refused. She was terminated. There is no evidence to suggest that had Ms. Johnson agreed to follow the directions that she would have been terminated or that she would not have resumed working for Physician Services that day. There is no evidence of record that Ms. Johnson's EEOC charge had any bearing on the decision to terminate her employment. Accordingly, Ms. Johnson's retaliation claims under the ADA and Ohio law fail as a matter of law.

Ms. Johnson also states she was forced to undergo the fitness for duty exam as a punishment for refusing to fill out the 855-I Form as directed and also makes mention that she may have been being retaliated against for making a complaint about a co-worker several months earlier. As stated above, there is no evidence to support Ms. Johnson's claim that the request she undergo a fitness for duty examination, or the duration of her leave, was in any way punitive or the result of discrimination. More importantly, the retaliation provisions of the ADA and Ohio Revised Code Chapter 4112 prohibit retaliation against an employee who opposes discrimination

-24-

prohibited under those provisions.  Refusing to complete the 855-I form as directed by her supervisors has nothing to do with opposing unlawful discriminatory practices under the ADA or Ohio law.  Likewise, there is no evidence in the record to establish Ms. Johnson was retaliated against for complaining about her co-worker's behavior and such a complaint would not be actionable as a claim for retaliation under the ADA or Ohio Revised Code § 4112.02. Accordingly, to the extent that Ms. Johnson claims she was retaliated against for failing to fill out the 855-I Form as requested, or for previous complaints regarding a co-worker, her claim fails as a matter of law.

**IV.    Conclusion.**

The Motion for Summary Judgment Filed by Defendant, University Hospitals Physician Services, (Docket #27) is hereby GRANTED.  This case is hereby TERMINATED.  All other pending motions are terminated.

IT IS SO ORDERED.

DONALD C. NUGENT
United States District Judge

DATED: September 15, 2014

-25-